Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 1 of 65

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 2 8 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE ESCUDERO, JR. | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. B-00-193 |
| BAUER CORPORATION D/B/A | § | |
| BAUER LADDER CORPORATION | § | |

## DEFENDANT BAUER CORPORATION'S RULE 702 MOTION OBJECTING TO AND/OR TO EXCLUDE THE OPINIONS AND CONCLUSIONS OF DESIGNATED EXPERT DR. JAMES PUGH

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant BAUER CORPORATION D/B/A BAUER LADDER CORPORATION brings this Motion pursuant to Federal Rule of Evidence 702, Testimony by Experts, objecting to, and seeking the exclusion of, opinions rendered by Plaintiff's designated engineer expert, Dr. James Pugh. Federal Rule of Evidence 702 requires a witness to be qualified as an expert by knowledge, skill, experience, training or education. If qualified, he may testify if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Defendant contends Dr. James Pugh is not qualified to give the opinions he has rendered in this case. In the alternative, if qualified, Defendant contends his testimony is not based upon sufficient facts or data, is not the product of reliable principles and methods, and he has not applied the principles and methods reliably to the facts of the case. Defendant requests a hearing and ruling consistent with its request herein.

CHPDF - www.fasio.com

## NATURE OF THE CASE

1.      This is a products liability case with allegations of defective stepladder based upon (1) manufacturing defect and (2) design defect. Plaintiff was injured in an accident which occurred on May 10, 1999 when he was on a six foot stepladder manufactured by Defendant in 1988-1990. Plaintiff has sued BAUER CORPORATION D/B/A BAUER LADDER CORPORATION for personal injury based on product defect theory. It is undisputed that the ladder had never before been seen by Plaintiff when he got on it and he was unfamiliar with it with the exception of conducting something less than a "meticulous inspection." It is further undisputed that the ladder had in it numerous pre-existing cracks and splits which, according to OSHA, mandated that the ladder should have been taken out of service and not used. In addition, the ladder had been stolen or turned up missing from its original owner, the Santa Rosa Independent School District Maintenance Department in Santa Rosa, Texas, near Brownsville. It is undisputed there is no history of the ladder's treatment, use, wear and tear, or possible abuse from the time it left the hands of the Santa Rosa Independent School District and was used by Plaintiff. The ladder was purchased new by the Santa Rosa Independent School District and was in excellent condition without any evidence of defects such as cracking or splitting. When last seen by the maintenance supervisor for the school district it remained in good condition without any evidence of defects. Thus, the inference is that the ladder became cracked and split in its legs or rails, particularly along the edges or corners of the U-shaped rails. These pre-existing splits enlarged when Plaintiff was on the ladder which, in turn, resulted in the ladder becoming unstable so that Plaintiff fell to the floor causing an injury. It is undisputed that Plaintiff knew as a construction company employer that cracked and split ladders should be removed from service and it would be dangerous to use one.

-2-

Dr. Pugh gave a discovery deposition the morning of August 16, 2001, followed by his trial deposition in the "afternoon session." The trial deposition consisted of direct examination by Mr. Benton, followed by cross-examination by Mr. Gendry.

## OPINIONS AND TESTIMONY OF DR. JAMES PUGH--TRIAL DEPOSITION

### A.    DIRECT EXAMINATION BY MR. BENTON

1.    Cracks already in the ladder "zipped up the back legs" destroying the mechanical integrity of the back leg allowing the ladder to fall over and throw Plaintiff to the floor. The <u>design</u> of the stepladder caused the accident to happen by allowing the cracks to propagate quite a distance rendering the rail incapable of supporting the load.[1]

2.    A different design would have prevented this failure phenomenon. The different design would be to encapsulate the foot of the rail (also called a leg) to keep splitting, if it does occur, from allowing the split to separate further.[2]

3.    Or, cross braces already riveted to the rear part of the rail, could be additionally riveted to the front edge of the leg rail.[3]

4.    The <u>quality</u> of the fiberglass effected the integrity of the rails causing the material to be brittle and subject to failure; therefore there was need in the design [of the ladder] by "enhancement of properties" by adding a encapsulating boot to accommodate for the weakness in the leg. More cross

---

[1]    *Dr. James Pugh deposition, p. 22, L. 2-L. 17: p. 23, l. 250p. 24, L. 4; p. 25, L. 6-L. 25.*

[2]    *Dr. Pugh deposition, p. 26, L. 5-L. 18; p. 41, l. 3-L. 14.*

[3]    *Dr. Pugh deposition, p. 27 l. 23-p. 27, L. 6.*

-3-

CMPDF - www.fenrir.com

fibers of fiberglass going across instead of just long-wise, would have strengthened the vital area (the corners of the U-shaped rails) where the crack occurred.[4]

5.  Dr. Pugh's admission that testing of the material of what failed in the ladder is necessary to evaluate the factors relating to the failure of the ladder."[5]

6.  An example of a ladder with a "rather aggressive design to hold the bottom of the legs together" is found on the Werner ladder. It shows an additional part that ties in all parts of the rail into the bottom cross-brace on the back and into the bottom step.[6]

## B. CROSS-EXAMINATION BY MR. GENDRY

1.  The only fiberglass ladder cases Dr. Pugh has worked on have been Bauer ladder cases.[7]

2.  Dr. Pugh has not analyzed the failure of the Werner ladder, which he implies offers a safer alternative design.[8]

3.  Dr. Pugh has a background in analyzing and testing fiberglass ladders, other than analyzing two other Bauer ladder cases. And, he has done no failure analysis or testing of any fiberglass ladders with the exception of

---

[4] *Dr. Pugh deposition, p. 46-p. 48, l. 2.*

[5] *Dr. Pugh deposition, p. 51, l. 23-p. 52, L. 7.*

[6] *Dr. Pugh deposition, p 32, l. 6-p. 33, L. 19.*

[7] *Dr. Pugh deposition, p. 57, l. 6-9; p. 60, L. 16-25.*

[8] *Dr. Pugh deposition, p. 57, l. 22-p. 58, L. 7.*

"microscopic analysis."[9]

4.    There is no literature Dr. Pugh knows of specific to ladders that microscopic examination is sufficient to show an insufficient or imperfect weaving of the fiberglass structure of the fiberglass composite[10]

5.    There are specific tests such as the peel test, the Torsion tests, the crush, the microhardness and the quantitative microscopy, which could have been utilized to determine the strength of the corner of a ladder [where the pre-existing splits were, and which expanded when Plaintiff was on the ladder]. Dr. Pugh has done none of these tests.[11]

6.    Dr. Pugh agrees he cannot say within a reasonable degree of engineering probability that the fiberglass mat or weaving was insufficient.  He has a suspicion, though.[12]

7.    Dr. Pugh's microscopic observation of the split surface could be reproduced by a photograph from a camera attached to the camera, but this would not be demonstrable by photography to a jury as it "takes a trained eye to make the determination."  It is "analysis and observation" (presumably under the microscope) that make it probable that there was lack of inadequate crossing

---

[9]    *Dr. Pugh deposition, p. 60, L. 16-p. 61, L. 7; p. 61, L. 22-p. 62, l. 10.*

[10]    *Dr. Pugh deposition, p. 61, L. 15-L. 21.*

[11]    *Dr. Pugh deposition, p. 62, L. 5-L. 17; p. 73, L. 16-p. 74, L. 2.*

[12]    *Dr. Pugh deposition. p. 62, L. 18-L. 24.*

over of fibers around the corner.[13]/[14] [To avoid confusion, it is undisputed that Dr. Pugh took no photos during microscopic observation.]

8.    Dr. Pugh has not published papers on ladder failure.[15]

9.    The ladder bore pre-existing cracking and splitting on a ladder of which nobody knows the history.[16]

10.   All ladders can become broken, worn out damaged and abused so that they have to be taken out of service. This ladder may have been taken out of service before Plaintiff used it. Ladders can suffer cracks from pressure placed against the ladder or if a ladder falls to the floor, or if misused by throwing or banging them around.[17]

11.   Dr. Pugh knows of no scientific or testing evidence the ladder was defectively made in the manufacturing process, or when the ladder left the hands of the manufacturer in 1988-1990.[18]

12.   A ladder with a boot on it would last longer than one that doesn't have a boot on it; a boot would have eliminated the hazard.[19]

---

[13]   *Dr. Pugh deposition, p. 64, L. 17-p. 65, l. 21.*

[14]   *NOTE: Dr. Pugh previously said he could not say within engineering probability that the fiberglass mat was insufficient. Thus, microscopic analysis is moot. See Footnote 6. See also Footnote 5-Dr. Pugh said testing is necessary "to evaluate the factors relating to the failure of the ladder.*

[15]   *Dr. Pugh deposition, p. 75, L. 15-L. 18.*

[16]   *Dr. Pugh deposition, p. 82, L. 9-L. 15.*

[17]   *Dr. Pugh deposition, p. 82, L. 16-p. 84, L. 21.*

[18]   *Dr. Pugh deposition, p. 85, L. 14-p. 87, L. 5.*

[19]   *Dr. Pugh deposition, p. 88, L. 20-L. 24; p. 92, L. 6-L. 14.*

13.     Dr. Pugh has done no statistical analysis or failure testing of any ladders with boots to see if it eliminates the hazard and makes the ladder last longer, or how much use it takes to cause a ladder with a boot to fail.[20]

14.     Dr. Johnson [Defendant's expert] conducted tests [on the rails], and the tests showed ANSI-ATSM standards were met.  On, the other hand, Dr. Pugh has done no testing regarding the strength of the ladder corners.[21]

**C.     DR. PUGH'S CORE OPINIONS**

15.     Dr. Pugh opines that the fiberglass material or fibers were of insufficient quality, quantity, and/or improperly or insufficiently woven in the area where splits occurred, causing weakness to those areas.  Manufacturing defect.

16.     Since the split areas were inherently weak, the hazard could have been designed out by encapsulating the bottom of the rails with a boot, and/or by reinforcing the U-shaped rails with more cross-bracing tying in the entire rail (front and rear flanges of the U-shaped rails) to the bottom pre-existing cross-brace.  Design defect.

**D.     DEFENDANT'S CONTENTIONS**

17.     Dr. Pugh's opinions are objected to and they should be excluded because it has not been demonstrated he has the requisite knowledge, skill, experience, or training to form opinions on this particular subject matter.  Fed. R. Civ. P. 702.

---

[20]     *Dr. Pugh deposition, p. 92, L. 15-p. 93, L. 5; p. 95, L. 9-L. 15.*

[21]     *Dr. Pugh deposition, p. 96, L. 16-p. 97, L. 3.*

18.     It has not been shown Dr. Pugh has sufficient facts or data to form his opinions.

19.     It has not been shown Dr. Pugh's opinions are the product of reliable principles and methods.

20.     It has not been shown that Dr. Pugh has applied the principles and methods reliably to the facts of the case.

**E.      DISCUSSION AND ARGUMENT**

21.     The modified Rule 702 incorporates the principles regarding expert testimony enunciated in ***Daubert v. Merrell Dow Pharmaceuticals, Inc***.  Those principles include (1) whether the expert's technique or theory can be tested, --that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence of and maintenance and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.  Plaintiff has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.[22]

22.     It is to be considered whether an expert testifies out of research they have conducted independent of the litigation, or whether they have developed

---

[22]      *See §1 and §2, Advisory Notes to Rule 702.*

opinions expressly for purposes of testifying. In this regard there may be too great an analytical gap between the data and the opinions offered. In addition, has the expert accounted for obvious alternative explanations.[23]

23.   Dr. Pugh's core opinion that the fiberglass material or fibers were of insufficient quality, quantity, and/or improperly or insufficiently woven, is objected to and must be excluded. First, Dr. Pugh admitted he cannot say within a reasonable degree of engineering probability that the fiberglass fibers (the mat or weaving) was insufficient, although he stated he had a suspicion. *See* Footnote 12. He admitted that testing of the material which failed in the ladder is necessary to "evaluate the factors relating to the failure of the ladder." *See* Footnote 5. Dr. Pugh admitted that he did no testing to determine the strength of the fiberglass material. Since testing is required of the material by his own admission, and, since he has done none, his "suspicion" of weakness in the fiberglass is an opinion without supporting data from testing or otherwise. Suspicion of a defect is legally insufficient for admissibility. Even though Dr. Pugh did a so-called "microscopic analysis", microscopic analysis does not provide any reliability to his "suspicion"- - considering his statements that testing was necessary, that he did none, and that he cannot give an opinion within a reasonable degree of engineering probability. With regard to microscopic examination, Dr. Pugh admitted there is no literature specific to ladders to show insufficient or

---

[23]   *See §4, Advisory Notes to Rule 702.*

-9-

imperfect weaving of the fiberglass structure of the fiberglass composite. *See* Footnote 10. Dr. Pugh listed a number of tests which he thought could have been utilized to determine the strength of the corner of a ladder- -where the pre-existing splits were and which expanded- -but he conducted none of these confirming tests. (Defendant does not concede these tests would have been adequate in any event; and, Plaintiff has the burden to show the admissibility of the opinion.) In addition, Dr. Pugh's microscopic observation could have been reproduced by a photograph made by use of a camera attached to the microscope. However, he stated he could not demonstrate to a jury an explanation of a photograph if one were produced because "it takes a trained eye to make the determination." Here, he was talking about his observation ("suspicion") that the fiberglass fibers were insufficient. In short, Dr. Pugh expects the trier of fact to rely upon his opinion just because he says it is so. One cannot bridge gaps in reasoning simply because he says so, but must demonstrate and explain to the judge how and why he reached his conclusion. *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999).

24.   Dr. Pugh's second core opinion was that the hazard of the weak structure could have been designed out by encapsulating the bottom of the rails with a boot, and/or by reinforcing the U-shaped rails with more cross-bracing tying in the entire rail to the already pre-existing cross-brace. He gives as an example of a safer alternative design a ladder produced by the Werner Ladder

-10-

Company. Again, this opinion is unsupportable for the reasons described in the preceding paragraph because the opinion of design defect is dependent upon proof, first of all, that the structure was defective because of a manufacturing defect. Assuming that Dr. Pugh has no reliable data, testing or information to support the premise of an inherently weak structure, the conclusion that a hazard had to be designed out is faulty. The Advisory Committee Notes to Rule 702 state a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[24] Additionally, Dr. Pugh's testimony shows he has not ruled out the most plausible explanation for the failure of the ladder rails. It is undisputed the ladder rails were split and cracked before Plaintiff mounted the ladder. Dr. Pugh agreed that all ladders eventually will wear out or need to be taken out of service because of wear/tear, abuse or misuse. This ladder was unknown to Plaintiff and there is no history of the ladder with the exception that it was in good condition without cracking and splitting when it was stolen or turned up missing from the Santa Rosa Independent School District. (*See* Defendant's motion for summary judgment- -Affidavit of Hector Salinas.) Possibly, Dr. Pugh could have ruled out this most plausible explanation for the ladder failure, but this would have had to be done with objectively verifiable data. He admits he did no failure analysis of either the

---

[24]   *Rule 702, Fed. R. Civ. P., 2000 Notes of Advisory Committee, §4, quoting from General Elec. Co. v. Joiner, 522 U.S. 136, 1 (1997).*

-11-

Bauer ladder or the Werner ladder that has additional support around the bottom of the rails. *See* Footnote 8. In fact, Dr. Pugh has no background in analyzing and testing fiberglass ladders, other than (as he says) analyzing two other Bauer ladder cases. It is noteworthy that Dr. Pugh did not demonstrate the details of what he did to analyze other Bauer ladders. *See* Footnote 9. Since there is no objectively verifiable data supporting Dr. Pugh's opinion that the hazard (if one exists) could be designed out, his opinion must be rejected. The most that Dr. Pugh can say about the addition of an encapsulating boot, is that it would have made the ladder last longer. However, he has done no statistical analysis or failure testing to demonstrate a boot would make the ladder last longer. (In this case, we are talking about a ladder that was ten or eleven years old at the time of the accident and with an unknown history.) Dr. Pugh acknowledges Defendant's designated expert, Dr. John Johnson, conducted ANSI-ATSM tests which showed the ladder met standards.

25.   Attached to this motion is a copy of Dr. Pugh's deposition, which is incorporated as a part of this motion. Defendant requests the motion be heard by oral argument if deemed appropriate by the court, and the motion be ruled on before this case is presented for trial.

**D.   DR. PUGH NOT QUALIFIED**

26.   Defendant contends Dr. Pugh is not qualified to give opinions in a ladder case. He has worked only on litigation cases involving Bauer ladders; has

-12-

published no papers on ladder failure; has reviewed no literature regarding ladder failure; and his theories have not been subjected to peer review. His opinions regarding ladders are for litigation and do not arise out of independent research.

WHEREFORE, PREMISES CONSIDERED, Defendant **Bauer Corporation d/b/a Bauer Ladder Corporation** prays that its objection to Dr. Pugh's opinions be granted, that Dr. Pugh's opinions be stricken, and that he not be allowed to give his opinions until the court has ruled on this motion, and for such other and further relief as deemed appropriate by the court in law and equity.

Respectfully submitted,

GENDRY & SPRAGUE, P.C.
645 Lockhill Selma
San Antonio, Texas 78216-5707
Telephone: (210) 349-0511
Facsimile: (210) 349-2760

By: _____
RON A. SPRAGUE
State Bar No. 18962100
Federal I.D. No. 151
THOMAS W. GENDRY
State Bar No. 07727000
Federal I.D. No. 27525

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading was mailed, certified mail, return receipt requested, to Mr. Barry Benton, 284 Ebony Avenue, Brownsville, Texas 78520, on this ___28th___ day of September, 2001.

_____
RON A. SPRAGUE
THOMAS W. GENDRY

r:\ras\escudero\702Motion

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE ESCUDERO, JR. | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. B-00-193 |
| BAUER CORPORATION D/B/A | § | |
| BAUER LADDER CORPORATION | § | |

## ORDER GRANTING DEFENDANT'S 702 MOTION
## OBJECTING TO AND/OR TO EXCLUDE THE OPINIONS
## AND CONCLUSIONS OF DESIGNATED EXPERT DR. JAMES PUGH

On this the _____ day of _____, 2001, came on to be considered Defendant's 702

Motion Objecting to and/or Exclude the Opinions and Conclusions of Designated Expert Dr. James

Pugh. After reviewing the Motion and the arguments of counsel, the Court is of the opinion that

Defendant's Motion should be granted.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED, that Defendant's Motion

is, in all things, GRANTED. The Court hereby orders:

SIGNED AND ENTERED this _____ day of _____, 2001.

_____
JUDGE PRESIDING

r:\ras\escudero\702Motion

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 16 of 65

1

2              IN THE UNITED STATES DISTRICT COURT

3              FOR THE SOUTHERN DISTRICT OF TEXAS

4                    BROWNSVILLE DIVISION

5

6    JOSE ESCUDERO, JR.,

7

8                 Plaintiff,

9

10              vs.                    No. B-00-193

11

12   BAUER CORPORATION D/B/A

13   BAUER LADDER CORPORATION,

14

15              Defendant.

16   --------------------------------x

17

18         VIDEOTAPED DEPOSITION OF DR. JAMES PUGH

19                  Mineola, New York

20              Thursday August 16, 2001

21

22

23   Reported by:

     LINDA SALZMAN

24   Job No 124356b

25

DR. JAMES PUGH - AFTERNOON SESSION                    AUGUST 16, 2001

2 (Pages 2 to 5)

Page 2

```
 6                  August 16, 2001
 7                  2:50 p.m.
 8
 9          Videotaped Deposition of DR. JAMES
10   PUGH, held at the offices of Inter-City
11   Testing & Consulting Corp., 167 Willis
12   Avenue, Mineola, New York, pursuant to
13   Notice, before Linda Salzman, a Notary
14   Public of the State of New York.
```

Page 3

```
 2   APPEARANCES:
 3
 4      BARRY R. BENTON, ESQ.
 5      Attorney for Plaintiff
 6          284 Ebony Avenue
 7          Brownsville, Texas 78520-8014
 8      BY:  BARRY R. BENTON, ESQ.
 9
10      GENDRY & SPRAGUE, P.C.
11      Attorneys for Defendant
12          645 Lockhill Selma
13          San Antonio, Texas 78216-5057
14      BY:  THOMAS W. GENDRY, ESQ.
15
16   ALSO PRESENT:
17      SILVIO FACCHIN, Videographer
```

Page 4

```
 2          THE VIDEOGRAPHER:  This is the tape
 3   labeled No. 1 of the videotape deposition of
 4   Dr. James Pugh.  We're now going on the
 5   record.  The time is 2:55 p.m.
 6          Counsel will state their appearances
 7   for the record.
 8          MR. BENTON:  Barry Benton for the
 9   plaintiff, Jose Escudero.
10          MR. GENDRY:  Tom Gendry representing
11   Bauer Ladder Corporation.
12          THE VIDEOGRAPHER:  Will the court
13   reporter please swear in the witness.
14   J A M E S   P U G H,  called as a witness,
15      having been duly sworn by a Notary Public,
16      was examined and testified as follows:
17   EXAMINATION BY
18   MR. BENTON:
19      Q.   Please state your name.
20      A.   My name is James Pugh.  That's spelled
21   P-U-G-H.
22      Q.   And do people refer to you as
23   Dr. Pugh?
24      A.   That's correct, sir.
25      Q.   Can you give the jury a history of
```

Page 5

```
 1          Pugh
 2   your education.
 3      A.   Yes, sir.
 4          I attended college at the
 5   Massachusetts Institute of Technology in
 6   Cambridge, Massachusetts, that's MIT, during the
 7   years 1964 through 1972.
 8          I received two degrees from MIT, a
 9   Bachelor of Science and Engineering specified in
10   materials science and engineering in 1968, nd a
11   Doctor of Philosophy or a Ph.D. specified i
12   biomedical engineering in 1972.
13          That really was the end of my formal
14   college education.  However, I spent a
15   three-month post-doctoral fellowship at MIT from
16   June of 1972 through September of 1972 in
17   bioengineering, during which time I wrote
18   parts of my doctoral thesis for publication i
19   various journals.
20          I took a course in review of basic
21   principles of engineering in preparation for
22   licensing examination as a professional engeer,
23   and I was licensed as a professional engineer
24   the State of New York as a result of a two-d
25   examination, I believe it was in 1984.
```

Page 6

1          Pugh
2          I have attended, I should add I have
3   attended numerous continuing education courses,
4   both biomechanical and engineering in nature,
5   over the years since my graduation, but that's
6   the nature of my formal education.
7          Q.  What have you been doing as a
8   livelihood since you got your Ph.D.?
9          A.  Well, I spent a number of years
10  working in hospitals full time doing
11  bioengineering and biomechanics.
12         I was involved with injuries, injury
13  analysis and the prevention thereof, safety
14  aspects of various work situations, and I
15  designed implants, artificial joints.  I worked
16  with plastics and composites and I have been
17  consulting during that time.
18         I started consulting and doing
19  engineering consulting projects as early as 1966
20  at MIT, so I have been consulting continuously
21  since 1966.
22         And part of my standard practice is to
23  do failure analysis of not only human body parts,
24  but also engineered parts, such as ladders.
25         I should add I have began an

Page 7

1          Pugh
2   affiliation as an independent contractor with the
3   company called Inter-City Testing and Consulting
4   Corporation which is a broad-based consulting
5   engineering firm where we are here today in
6   Mineola, New York.
7          I began that relationship in 1978, and
8   I have been continuously involved as an
9   independent contractor with Inter-City Testing
10  since 1978.
11         I am now a partner of Inter-City
12  Testing and a co-owner, and I still continue to
13  serve as an independent contractor to Inter-City
14  Testing.
15         Q.  Have you ever had professor
16  responsibilities?
17         A.  Yes, I have, sir.
18         Q.  Could you describe those?
19         A.  In 1973 I was appointed assistant
20  professor of orthopedics at the Mount Sinai
21  School of Medicine, and I taught courses at Mount
22  Sinai in biomechanics and injury analysis.
23         I was promoted to associate professor
24  of orthopedics in 1979 at the Mount Sinai School
25  of Medicine.

Page 8

1          Pugh
2          The Mount Sinai School of Medicine is
3   the medical school of the City University of New
4   York.
5          I was appointed associate professor at
6   NYU, that's New York University, in the
7   Department of Occupational Health and Safety in
8   1980, and I taught courses for about a four-year
9   period in ergonomics, which is the science of man
10  and machine interactions to produce useful work
11  without injury to bystanders or operators.  I
12  also taught courses there in biomechanics.
13         I taught at the associate professor
14  level at the City College of the City University
15  of New York in the early '80s for a number of
16  years.  I taught in the Department of Engineering
17  technology courses in applied mechanics, strength
18  of materials and materials science and
19  engineering.  That was all pure engineering
20  courses.
21         I also taught at the associate
22  professor level at the Cooper Union School of
23  Engineering in New York City for about four years
24  in the early '80s.  I taught courses there in
25  biomechanics, biomaterials and materials science

Page 9

1          Pugh
2   and engineering.
3          I was promoted to full professor at
4   the State University of New York at Stony Brook
5   in 1984, and I also assumed a full professorship
6   in the Department of Materials Science and
7   Engineering at Stony Brook at that time.
8          And I continued to serve as professor
9   in the medical school in 1986 when I began my
10  full-time practice of consulting engineering here
11  at Inter-City Testing and Consulting Corporation,
12  and I maintained my professorship at Stony Brook
13  in the Department of Materials Science and
14  Engineering up until about 1988 or thereabouts.
15         I currently offer a course at the full
16  professor level at the Cooper Union School of
17  Engineering in New York City which is taken by
18  upper level graduate students.  It's a catalogue
19  course called EID 124, bioengineering in accident
20  reconstruction, injury prevention and safety.
21         Q.  Have you published anything
22  professionally?
23         A.  My curriculum vitae lists I believe 73
24  publications in engineering and bioengineering.
25         MR. BENTON:  I will have marked as

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 19 of 65

Page 10

Pugh
1
2    Exhibit 1 to your deposition this document
3    here 1 am going to have shown to you.
4        (Plaintiff's Exhibit 1, curriculum
5    vitae, marked for identification, as of this
6    date.)
7    Q.   Can you identify Exhibit No. 1?
8    A.   That's my curriculum vitae with the
9    list of scholarly activities.
10   Q.   Is that basically a professional
11   resume?
12   A.   Yes, sir.
13   Q.   Now, you said that you have been doing
14   forensic engineering testing since the '60s, but
15   how long have you done.it full time?
16   A.   Since 1986.
17   Q.   What exactly -- can you describe the
18   kind of work that involves?
19   A.   Well, it involves -- my practice
20   really has to do with bodily injury, human
21   injury, and the engineering circumstances
22   surrounding it.
23        And my practice consequently involves
24   a large number of different types of accidents,
25   among them accidents occurring on ladders,

Page 11

Pugh
1
2    ladders that have failed as we are going to be
3    talking about today.
4        And my assignments typically involve
5    analyzing the injuries and the engineering
6    circumstances surrounding those injuries, which
7    in the case that we are going to be talking today
8    about includes what we call the failure analysis
9    of the ladder.
10   Q.   Who would be your clients in these
11   kind of cases?
12   A.   I do work for a large variety of
13   interested parties.
14        I do work for attorneys who represent
15   injured parties in court actions. I do work for
16   -- a lot of work for insurance companies who
17   represent insurers' interests in various
18   accidents.
19        I do work for companies who are
20   defendants in various lawsuits, and I do a
21   reasonable amount of criminal work.
22        I work for not only prosecutors but
23   also for district attorneys, and I should add 1
24   do a reasonable amount of work for district
25   attorneys in the New York City metropolitan area,

Page 12

Pugh
1
2    including the major boroughs and Westchester
3    County.
4        I should add a large fraction of what
5    1 do for them is done as a professional courtesy
6    and as a public service for which I do not bill
7    and do not get paid.
8    Q.   Do you belong to any affiliations as
9    far as your engineering profession?
10   A.   Yes, sir.
11   Q.   Can you tell us about those?
12   A.   Well, the engineering affiliations
13   include the American Society for Testing and
14   Materials, or the ASTM, which is a standard
15   setting organization, the ASME or American
16   Society for Mechanical Engineers, the SPE or
17   Society of Plastics Engineers.
18        The National Association for
19   Professional Accident Reconstruction
20   Specialists.
21        I belong to the Orthopedic Research
22   Society, Society for Biomaterials. That's an
23   overview.
24        New York State Society for
25   Professional Engineers, National Society for

Page 13

Pugh
1
2    Professional Engineers.
3    Q.   You charge for your services including
4    testifying; is that correct?
5    A.   I charge for my time, yes, sir.
6    Q.   And Mr. Escudero is paying you for
7    your time today; is that right?
8    A.   Well, I don't know who is paying me,
9    but 1 am being paid for my time today, yes.
10   Q.   How do you charge for your time?
11   A.   My time is billed at a rate of $250 an
12   hour.
13   Q.   The first time we met was when?
14   A.   This morning.
15   Q.   Prior to that our association has been
16   how?
17   A.   Telephonically.
18   Q.   We're here today because of an
19   accident in which Mr. Jose Escudero was injured
20   when he fell off a Bauer ladder, you understand
21   that, right?
22   A.   Yes, sir.
23   Q.   Prior to being apprised of the facts
24   surrounding Mr. Escudero's accident, had you had
25   occasion to be involved in Bauer ladders on a

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 20 of 65

Page 14

```
 1          Pugh
 2  professional basis?
 3      A.  Yes, sir.
 4      Q.  Can you tell us about those?
 5      A.  Well, I had done analyses of two prior
 6  accidents.
 7          MR. GENDRY:  Let me make an objection
 8  to the form.
 9      A.  I had done and had been retained to
10  analyze two prior accidents that resulted in
11  injury to people using Bauer ladders, very
12  similar Bauer ladders under very similar
13  circumstances.
14          The captions were Smith versus Bauer
15  and Scott versus Bauer.
16      Q.  Which one was first?
17      A.  I believe the Scott case preceded the
18  Smith case.
19      Q.  And do you remember the date of injury
20  in that case?
21      A.  I don't have that committed to memory,
22  no.
23      Q.  Do you remember roughly what the case
24  was about?
25      A.  Well, I remember what both cases were
```

Page 15

```
 1          Pugh
 2  about.
 3      Q.  I thought we would start with one
 4  first and then the next.
 5          MR. GENDRY:  Objection to the form.
 6      A.  They were both very similar by my
 7  recollection.
 8          They both involved situations where
 9  the gentlemen were using a Bauer ladder,
10  fiberglass ladder much as we have here today,
11  climbing up on the ladder, performing ordinary
12  routine activity when the ladder precipitously
13  collapsed on them, throwing them to the
14  horizontal surface and resulting in significant
15  injury.
16          And both of those ladders exhibited
17  the same failure mechanism, I should add, as was
18  exhibited in the Escudero ladder.
19      Q.  Namely what?
20      A.  Maybe it would be best to have the
21  ladder in front of us, or a photograph, but
22  basically it was -- can you focus in on this?
23          Basically what happened was there was
24  a splitting of the rear legs that caused the rear
25  legs, if you will, to turn to rubber, as it was
```

Page 16

```
 1          Pugh
 2  described, and caused the ladder to collapse.
 3          The rear legs split in an upward
 4  manner which caused them to lose their structural
 5  integrity and failed to support the weight of the
 6  person on the ladder.
 7      Q.  How were the ladders similar in the
 8  two previous cases to the Escudero case?
 9      A.  Well, all three of these ladders were
10  Bauer manufactured fiberglass ladders and they
11  all had very similar, if you will, foot
12  treatments.
13          That is, the bottom of the legs were
14  very similar in each of the three types of --
15  they were virtually identical ladders in all
16  three cases.
17      Q.  When I contacted you about your
18  services, what was your assignment?
19      A.  Well, you asked me to examine the
20  ladder that Mr. Escudero was using at the time of
21  his accident, to advise you about the way the
22  failure occurred that caused him to sustain
23  severe injury to his foot and ankle area, and to
24  let you know what could have been done to prevent
25  this occurrence.
```

Page 17

```
 1          Pugh
 2      Q.  And what did you do to form a
 3  considered opinion in this matter?
 4      A.  Well, initially you shipped to me the
 5  ladder that he was using at the time of the
 6  accident, and you were kind enough to send me
 7  some medical information relating to the
 8  injuries.
 9          You sent me his deposition transcript,
10  his testimony wherein which he described the
11  background and the accident and the condition of
12  the ladder when he was using it.
13          You sent me x-rays showing the damage
14  to the left foot.
15          I had a taped statement of
16  Mr. Escudero answering questions relative to the
17  accident, and subsequently I was forwarded
18  materials consisting of a deposition of a
19  Mr. John Vasichko, V-A-S-I-C-H-K-O, who is an
20  employee of Bauer who is in on some of the design
21  work on the Bauer ladders, and a Mr. Richard
22  Poremba, P-O-R-E-M-B-A, who had written a prior
23  report authored by Naismith, N-A-I-S-M-I-T-H,
24  Engineering on the subject ladder that he had
25  examined.
```

6 (Pages 18 to 21)

Page 18

Pugh

1
2     I received from Dr. Johnson, or that
3   is from you, that Dr. Johnson wrote on behalf of
4   defendant Bauer, a report dated August the 3rd of
5   2001, and I just today received an additional
6   report authored by Dr. Johnson dated August the
7   10th of 2001 which contained the results of some
8   testing that he did on the samples that were
9   removed from the subject ladder.
10        In discovery I received certain
11  documents, including information on ladders,
12  technical specifications, not only on Bauer
13  ladders but other types of ladders, Louisville,
14  Green Bull, Werner.
15        There were some blueprints. I
16  received standards which I already had, ANSI
17  standards.
18        I received an OSHA document,
19  Occupational Safety and Health, and that was
20  really about it.
21        I proceeded to digest all this
22  material, the written materials, I proceeded to
23  take the ladder itself. I carefully documented,
24  and of course I had the report of Naismith
25  Engineering in hand which reported their

Page 19

Pugh

1
2   examination of the ladder, while I was examining
3   it.
4         I examined where the legs had failed.
5   There were -- as you look at the ladder there
6   were splits that were shown on the ladder in
7   certain positions on the ladder; this being the
8   back rails, this being the front rails, if you
9   can see that.
10    Q.  Can we stop right there.
11        Let's identify the parts of the ladder
12  so that we can talk about them freely with the
13  jury understanding what part we're talking
14  about.
15        The average laymen I think would call
16  them legs, but that's really not what they say in
17  the industry, is it?
18    A.  Well, we use the word legs or rails
19  interchangeably pretty much.
20    Q.  Can you just with the use of your
21  drawing show us where the steps are, where the
22  what they call the web is and some of the areas
23  we're going to be talking about today?
24    A.  Well, probably would be best from the
25  diagram from the ANSI standard here. These are

Page 20

Pugh

1
2   the rails, the support rails, these are the back
3   rails, these are the front rails, these are the
4   steps, these are the rear cross-braces, this is
5   the spreader, and the web mechanism is at the
6   top.
7         It's a pretty standard stepladder
8   we're talking about.
9     Q.  What was your understanding of how the
10  accident happened generally?
11    A.  My understanding was that Mr. Escudero
12  was -- had taken the ladder to where he was going
13  to be using it. He examined the ladder to see
14  that it was in usable condition.
15        He proceeded to climb up the ladder
16  to, I believe it was the fourth or fifth step,
17  and he was performing an overhead operation when
18  all of a sudden the ladder just collapsed on him
19  or collapsed with him on it, and his left foot
20  hit the horizontal surface sustaining a severe
21  fracture.
22    Q.  You have had a chance to study the,
23  what we're going to call the subject ladder, the
24  one that was involved in this accident?
25    A.  Yes, sir, in quite a bit of detail.

Page 21

Pugh

1
2     Q.  Based on what you understood from
3   Mr. Escudero, as well as haven't you read some
4   other depositions of witnesses that were at the
5   scene?
6     A.  I only had the depositions of Mr. --
7   well, yes, I did. I'm sorry. You're absolutely
8   correct.
9         I did read and summarize the
10  depositions of Carmen Escudero, Jose Escudero,
11  Sr., Jessie Ramirez, Ramundo Medina.
12        Thanks so much for reminding me of
13  that.
14    Q.  Based on what you learned from the
15  testimony of the other witnesses and from your
16  study of the subject ladder, did you come to any
17  conclusions about how this accident happened?
18    A.  Yes, I did, sir.
19    Q.  Can you tell us about that?
20        MR. GENDRY: Object to form.
21    A.  Well, what happened in this particular
22  accident was the, and this is my drawing of the
23  subject ladder, these are the -- this I have
24  labeled legs 1 and 2 which are the ones you would
25  climb up.

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 22 of 65

Page 22

Pugh

1
2      Legs 1 and 2 are these legs over here,
3  are rails that were the ones that you would climb
4  up, have the steps on them. The back legs are
5  labeled 3 and 4.
6      And basically what happened was there
7  were cracks, small cracks in these legs that when
8  Mr. Escudero was on the ladder zipped up the back
9  legs destroying the mechanical integrity of the
10 back leg and allowing the ladder to fall over and
11 throw him to the floor.
12     Q.   From studying the ladder did it appear
13 that some of the cracks preexisted Mr. Escudero's
14 fall?
15     A.   Yes. There were preexisting cracks in
16 the ladder at the time he mounted the ladder just
17 before the fall.
18     Q.   And did the fall itself in your
19 opinion or not expand or propagate the cracks?
20     A.   You mean the actual event of the
21 ladder hitting the horizontal surface?
22     There may have been some propagation.
23 I can't conclude the amount of that, but there
24 may have been some. Not significant though.
25     Q.   Was there any cracking in the

Page 23

Pugh

1
2  mechanics of the back rails contorting?
3      A.   Oh, yes, that's what in fact
4  happened.
5      The cracks in the back rails started
6  propagating up because there was a load placed on
7  those rails, and they shot up the back rail and
8  essentially reduced the cross-section of the rail
9  to pieces of spaghetti.
10     Q.   Was that while Mr. Escudero was on the
11 ladder?
12     A.   That's correct.
13     Q.   And did you have any information as to
14 how long he was on the ladder before that all
15 happened?
16     A.   My recollection was it was just a
17 short length of time, just a few minutes.
18     Well, there was testimony he was on
19 the ladder ten, fifteen minutes before the fall.
20 That's from Mr. Medina.
21     Mr. Escudero says he was on the ladder
22 three to ten minutes, so a number of minutes.
23     Q.   You've had a chance to look at the
24 ladder.
25     Did the subject ladder, did its

Page 24

Pugh

1
2  particular design promote or cause this accident
3  to happen?
4      A.   Yes, it did, sir.
5      Q.   How?
6      A.   Perhaps it might be useful to have the
7  ladder in front of us here somehow if we can
8  focus on it.
9      Q.   What I would like to do, I will come
10 over here and see if we can get this shot here.
11 I am going to turn this ladder upside down.
12     First of all, as we show the jury this
13 ladder, that is not the way this ladder looked --
14 I am leading you, and let me rephrase that
15 question -- is this the way the ladder looked
16 when you first received it from my office?
17     A.   No, sir. It did not. You may want to
18 open it up just so we -- thank you.
19     Q.   How is it different here now than when
20 you first saw it?
21     A.   Well, it's different in that -- can we
22 focus on the ladder now?
23     It's different in that the legs 3 and
24 4, the rear legs have been -- the top has been
25 cut out for testing by Dr. Johnson on behalf of

Page 25

Pugh

1
2  the defendant Bauer.
3      When I received the ladder these rails
4  were the same fiberglass rails as you see in the
5  front.
6      Q.   How did the design, if it did,
7  precipitate this accident?
8      A.   The design precipitated the accident.
9  If you let us look at the back rails here in
10 particular, and let's just hold these up to the
11 camera if we could, they have been taped
12 together, and if I could just remove the tape
13 here.
14     The cracks propagated quite a
15 distance, perhaps as much as from here up to
16 here, while Mr. Escudero was on the ladder. And
17 of course it rendered this rail incapable of
18 supporting the load on the ladder, basically
19 reduced it to spaghetti. You see how bendable it
20 is.
21     Of course the other one failed also.
22     The cracks shot up the leg, destroyed the
23 mechanical integrity of the back rails and
24 rendered the ladder unable to support the weight
25 that was on it.

Case 1:00-cv-00193  Document 18  Filed in TXSD on 09/28/2001  Page 23 of 65

Page 26

```
1              Pugh
2         And I should add that Mr. Escudero was
3    not particularly heavy.  He gives his height as
4    6,1 to 6,2, and his weight 190 to 200 pounds.
5         Q.   How could this ladder have been
6    designed differently to prevent or make this kind
7    of problem less likely?
8         MR. GENDRY:  Object to the form.
9         A.   Well, it's a very simple matter to
10   take the foot and encapsulate the foot in what we
11   call a boot that keeps any splitting, even if it
12   does occur, it keeps the splitting from allowing
13   the leg or the rails to separate so that they
14   maintain their mechanical integrity.
15        Another way to do it, and we have a
16   ladder outside, is to put, simply put an
17   additional fiberglass sheath around the bottom of
18   the leg to make it stiffer.
19        Did you want to pull that in and put
20   that on the camera?
21        Q.   We will do that in a little bit if
22   it's okay.
23        A.   Other things that should be done and I
24   recommend is that the cross-braces as they are
25   shown to be riveted onto this part of the leg,
```

Page 27

```
1              Pugh
2    they should also be riveted to the front edge of
3    the rail so that it will not separate so it ties
4    the leg together, much as is done with the steps
5    on the front of the ladder which are riveted to
6    both sides of the major, of the large front rail.
7         Q.   And there's going to be some talk in
8    this trial regarding these different parts.
9         What do they call this part right
10   here?
11        A.   Well, I call that a flange.
12        Q.   Okay.  I think that's how it's going
13   to be identified.
14        And this part, do some call this part,
15   this wider part, the web?
16        A.   That could be called the web also.
17   With -- a lot of these words are used
18   interchangeably.
19        With regard to beam technology, this
20   would be called the web of the beam.
21        There is also a web that exists up in
22   the top part here that sustains the top step.
23        Q.   Is it significant with the --
24        A.   With regard to the beam, these would
25   be the flanges, this would be the web.
```

Page 28

```
1              Pugh
2         Q.   Is there any significance that the
3    cracking or splitting occurred between the flange
4    and the web on the rail?
5         A.   Yes, there is.
6         Q.   What would that be?
7         A.   The structure here, that edge is
8    called a geometric discontinuity.  It's a bend or
9    change in shape of the material at that point,
10   and that means that any loads that are placed on
11   this structure are going to be amplified at that
12   corner, so it's a high stress location.
13        And materials in general fail in
14   regions of the high stresses, so this is the
15   region that's most at risk for failure in this
16   particular structure.  It's the edge of the beam.
17        Q.   Is that something in reasonable
18   engineering probability that could be anticipated
19   by a designer or a manufacturer of a ladder?
20        MR. GENDRY:  Objection to the form.
21        A.   Absolutely.  An engineered structure,
22   a manufactured structure must always be designed
23   and built to accommodate stress concentrators
24   resulting from the geometry of the structure,
25   which is what we're talking about here.
```

Page 29

```
1              Pugh
2         Q.   The questions that I am asking you,
3    that I have asked you so far, have they been
4    based on reasonable engineering probability?
5         A.   Yes, sir.
6         Q.   The questions that I am going to ask
7    you in the future, would you also base those
8    answers on reasonable engineering probability?
9         A.   Yes, sir.
10        Q.   And it's your testimony that there are
11   four basic rails to a ladder such as this?
12        A.   Yes, sir.
13        Q.   Would it be a known hazard to a
14   manufacturer, designer of ladders such as this,
15   that they could have cracking or splitting of
16   rails?
17        MR. GENDRY:  Object to form.
18        A.   Yes, sir.
19        Q.   Is that something that they should
20   reasonably anticipate?
21        A.   Yes, sir.
22        Q.   What sort of duty is on a manufacturer
23   in regard to designing a safe product?
24        MR. GENDRY:  Object to form.
25        A.   It really lies in what we call the
```

Case 1:00-cv-00193  Document 18  Filed in TXSD on 09/28/2001  Page 24 of 65

Page 30

Pugh
1
2  principles of hazard management. And the basic
3  principles of hazard management in any situation,
4  but particularly for a designed and manufactured
5  product, is that if there is a hazard in the
6  product, if it can economically and feasibly be
7  designed out the manufacturer must design that
8  hazard out, must eliminate that hazard.
9      Further down the line if it's
10  determined that the hazard, it's not economical
11  or feasible to engineer that or design out that
12  hazard, then it's appropriate to guard against
13  that hazard.
14      And one of the examples of guarding
15  would be the use of a saw, let's say a table saw
16  where you have to have the blade, the hazard to
17  cut the wood. That's the purpose of it. But you
18  can minimize the hazard by putting a guard around
19  the blade that prevents the hand from going into
20  the blade.
21      Now, if it's determined that it's not
22  economical or feasible to either design out the
23  hazard or guard against it, then what's permitted
24  as a last resort is to warn and instruct the user
25  that's the nature of the hazard so they may

Page 31

Pugh
1
2  provide appropriate countermeasures to it.
3      Q. Now, your understanding is that
4  Mr. Escudero was on what step when he fell?
5      A. He was on the fourth or fifth step by
6  his testimony. I do believe that.
7      Q. If would you assume that there is
8  going to be some testimony that the user of these
9  ladders are instructed not to go above the fourth
10  step --
11      A. Yes, sir.
12      Q. -- is there a method that the Bauer or
13  a similar ladder manufacturer could take to
14  eliminate that risk that someone is going to go
15  up higher than four steps?
16      A. Yes, sir.
17      Q. How can they do that?
18      A. An insert can very simply be put in
19  those steps to prevent someone climbing on those
20  steps.
21      Q. When you say "an insert," you mean
22  some sort of physical thing that doesn't allow
23  you use it as a step?
24      A. That's correct, just a flat sheet of
25  plastic in fact, or fiberglass just screwed onto

Page 32

Pugh
1
2  the ladder or adhesed onto the ladder.
3      Q. Under the basic principles of hazard
4  management would that be preferable to warning
5  someone don't get up on the fifth or top step?
6      A. Yes, sir.
7      MR. GENDRY: Objection, leading.
8      Q. Have you looked at other similar
9  stepladders to see if they have designed their
10  rails differently to anticipate and deal with
11  this problem of the rail splitting?
12      MR. GENDRY: Object to form.
13      A. Yes, sir.
14      Q. What other manufacturers have you --
15  models have you looked at?
16      MR. GENDRY: Object to form.
17      A. In particular I have observed the
18  Werner, W-E-R-N-E-R, ladders, and the Werner
19  ladders -- and I believe there's a photograph or
20  a brochure showing that have a rather aggressive
21  design to hold the bottom of the legs together to
22  prevent the splitting that you see on the
23  Escudero ladder.
24      I believe you have photographs there,
25  or maybe the brochure might even be better to

Page 33

Pugh
1
2  show a photograph of.
3      MR. BENTON: Let me have you mark this
4  as Exhibit No. 2.
5      (Plaintiff's Exhibit 2, photograph of
6  Werner ladder, marked for identification, as
7  of this date.)
8      Q. Can you identify Exhibit No. 2 for me,
9  please.
10      A. Yes, sir, this is a Werner ladder.
11      Q. Does that ladder in its design treat.
12      The problem of splitting or cracking
13  of the rails.
14      MR. GENDRY: Object to form.
15      A. That shows an additional part at the
16  base of each leg that ties the leg in, or all
17  parts of the leg into the, or the rail into the
18  bottom cross-brace on the back and into the
19  bottom step on the front.
20      Q. You can take off that little green tab
21  if you would.
22      I will have this marked as Exhibit 3 I
23  believe.
24      (Plaintiff's Exhibit 3, photograph,
25  marked for identification, as of this date.)

Page 34

1          Pugh
2     MR. BENTON: While we're at it, let's
3 mark this one as No. 4.
4     (Plaintiff's Exhibit 4, photograph,
5 marked for identification, as of this date.)
6     Q.   Dr. Pugh, I am handing you these
7 Exhibits 2, 3, and 4.
8     I don't know how good a shot we can
9 get from the camera, but I would love the
10 cameraman to try to zoom in as much as he can.
11     Can you talk about how or why you
12 believe that's a superior design for dealing with
13 the problem of cracking rails?
14     MR. GENDRY: Object to form.
15     A.   This is Exhibit 2 that I showed
16 before, but there are closer ups in Exhibit 3 and
17 Exhibit 4 and they show basically the use of an
18 insert at the bottom of the legs that ties and
19 holds the leg parts, the rails and the flanges
20 and the web together to keep them from flying
21 apart as happened with the Escudero ladder.
22     Q.   The technology involved in these shoes
23 or caps that they're putting on these rails, is
24 that technology something that was available when
25 this subject ladder was manufactured?

Page 35

1          Pugh
2     A.   Yes, sir.
3     Q.   I want you to assume that Bauer is
4 representing that this subject ladder was
5 manufactured sometime around 1990, maybe a little
6 before, 1988 to 1990.
7     A.   Yes, sir.
8     Q.   How far back does at least the concept
9 of reinforcing the bottom of the rails on any
10 kind of ladder go back, to your knowledge?
11     A.   There is a patent dating back to the
12 1930s involving the use of a metal cap or metal
13 in support for wooden ladder legs, to stabilize
14 those legs and prevent deterioration and collapse
15 of those legs.
16     So it goes back at least to the '30s,
17 1930s.
18     Q.   Is that the same general principles
19 we're talking about with the Werner shoes?
20     A.   It's the identical principle, yes.
21     Q.   Do you have any knowledge from reading
22 perhaps Mr. Vasichko's deposition, whether it's
23 affordable in the manufacturing process to put on
24 these type of shoes or caps or enclosures around
25 the ends of the rails?

Page 36

1          Pugh
2     A.   Yes. He testified that it was
3 affordable, and I believe he even intimated that
4 it was in fact less expensive to put these boots
5 that Bauer has begun to use on the bottom of the
6 ladder legs on rather than having the fixtures
7 that were on the ladders that were prone to
8 failure.
9     MR. GENDRY: Object as nonresponsive.
10     Q.   Were you able to review Mr. Vasichko's
11 testimony as a representative of Bauer
12 Corporation --
13     A.   Yes, sir.
14     Q.   -- regarding the effectiveness of
15 enclosing the shoe with some sort of vinyl boot
16 in preventing this fracture that occurred on
17 Mr. Escudero?
18     A.   Yes, I do.
19     MR. GENDRY: Object to form.
20     Q.   What did you learn from reading
21 Mr. Vasichko's deposition?
22     MR. GENDRY: Object to form.
23     A.   That this boot was quite effective in
24 preventing the failures that we see in the
25 Escudero and also the Smith and the Scott

Page 37

1          Pugh
2 ladders.
3     MR. GENDRY: Object as not
4 responsive.
5     MR. BENTON: I will have this marked
6 as Exhibit No. 5, please.
7     (Plaintiff's Exhibit 5, photograph,
8 marked for identification, as of this date.)
9     Q.   I am going to show you a photograph
10 that I am going to represent to you is a group of
11 Bauer ladders.
12     MR. GENDRY: I object to form.
13     Is that your question? Object to
14 form.
15     MR. BENTON: I am going to go ahead
16 and have this marked as Exhibit No. 6.
17     (Plaintiff's Exhibit 6, photograph,
18 marked for identification, as of this date.)
19     Q.   I am going to represent to you that 6
20 is a higher shot of these Bauer ladders and that
21 5 is the lower part of the ladders.
22     A.   Yes, I see that.
23     MR. GENDRY: Object to form.
24     Q.   Are those stepladders similar to the
25 one that is the subject ladder here today?

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 26 of 65

Page 38

Pugh
2    A.   Yes.
3         MR. GENDRY:  Object to form.
4    A.   Yes, sir.
5    Q.   Is there a meaningful difference in
6    regard to protecting against fracturing or
7    splitting or cracking of the rails at the bottom
8    on those ladders?
9         MR. GENDRY:  Object to form.
10   A.   Yes, sir.
11   Q.   How are those designed differently
12   than the subject ladder here?
13        MR. GENDRY:  Object to form.
14   A.   Should I hold the photograph up?
15   Q.   Sure, please.  Always.
16   A.   These photos show the in treatment or
17   the leg treatment of the newer Bauer ladders
18   consisting of a vinyl boot that is encompassing
19   of the bottom of the front and back legs, and as
20   I said, would tie together the rails, the flanges
21   with the web so that this splitting would not be
22   a problem.
23        MR. GENDRY:  Object to responsiveness.
24   Q.   If there was cracking in the rail,
25   would that type of a boot, both on the Bauer as

Page 39

Pugh
2    well as the shoe on the Werner, would they reduce
3    the likelihood that a catastrophic injury would
4    occur from that cracking?
5         MR. GENDRY:  Object to form.
6    A.   Very much so, sir. ·
7    Q.   I may be a bit redundant, but can you
8    explain again how that would prevent again a bad
9    accident happening?
10        MR. GENDRY:  Object to form.
11   A.   They would positively tie in the leg
12   and it would keep the flanges from separating
13   from the rail, and it would ensure that the
14   mechanical integrity of the leg would exist on
15   the ladder for almost an indefinite period of
16   time.
17   Q.   Does the Bauer treatment of the rail
18   shoe and the Werner treatment of the rail shoe
19   show different methods of dealing with the same
20   problem?
21        MR. GENDRY:  Object to form.
22   A.   Yes, sir.
23   Q.   But on the other hand, do they have
24   similarities?
25   A.   Yes, sir.

Page 40

Pugh
2    Q.   You prepared a report of your studies
3    on the subject ladder and comparable ladders; is
4    that true?
5    A.   Yes, sir.
6         MR. BENTON:  I am going to have this
7    marked as Exhibit 7.
8         (Plaintiff's Exhibit 7, a four-page
9    report, marked for identification, as of
10   this date.)
11   Q.   Looking at Exhibit 7, Doctor, can you
12   identify that for us, please.
13   A.   That's my report dated May 22nd of
14   this year, 2001.  It's a four-page report.
15   Q.   Does that report basically summarize
16   your findings and conclusions in this case?
17        MR. GENDRY:  Object to form.
18   A.   Yes, sir.
19   Q.   Let me rephrase that.
20        What does your report do, Doctor?
21   A.   It states in quite a bit of detail the
22   results of my inspection and analysis of the
23   submitted materials, including the ladder, and my
24   opinions and conclusions about how the accident
25   could have been prevented and should have been

Page 41

Pugh
2    prevented.
3         MR. GENDRY:  Object to responsiveness.
4    Q.   And what is your opinion as to the
5    cause of this fall?
6    A.   The failure of manufacturer Bauer to
7    eliminate the hazard of the splitting of the legs
8    between the flanges and the web, particularly the
9    rear legs, which is what causes the accident with
10   these ladders.
11        Their failure to eliminate that hazard
12   by encapsulating or tying together the bottom of
13   those legs with some appropriate means which we
14   know to be economical and feasible to do.
15   Q.   In your opinion if they had treated
16   the protection of rails with shoes or caps
17   similar to the present Bauer design, or Werner,
18   do you have an opinion whether this accident that
19   Mr. Escudero was involved in would have happened
20   or not?
21        MR. GENDRY:  Object to form.
22   A.   Yes, I do, sir.
23   Q.   And what is that opinion?
24        MR. GENDRY:  Object to form.
25   A.   My opinion is that had there been an

Page 42

```
 1              Pugh
 2   appropriate treatment of either the subsequent
 3   Bauer type or the Werner type or other types that
 4   we know of now, that this accident would have
 5   never occurred.
 6       Q.   Now, there is expected to be testimony
 7   that alleges or contends that Mr. Escudero caused
 8   his own accident because he failed to observe the
 9   cracks that were in the rails at the time he went
10   to use this ladder.
11          Is there -- are these kind of cracks
12   that are present in the subject ladder, and I'm
13   not talking post-accident, I'm talking
14   preaccident, the extent of the cracks, are they
15   something that the average layman or even the
16   average construction worker would be looking for
17   when they took a ladder?
18       MR. GENDRY: Object to form.
19       A.   No, they are not.
20          And let me just demonstrate by using
21   the front rails here. I will turn the ladder
22   around.
23          The front rails here in fact are also
24   cracked, but these really are stable cracks, at
25   least they didn't propagate in this accident.
```

Page 43

```
 1              Pugh
 2          And the cracks that existed in the
 3   back rails in my opinion were not dissimilar from
 4   what existed in the front rails. In fact, they
 5   were similar to this what we see here prior to
 6   the subject accident.
 7          And this would be interpreted by a
 8   worker as being an acceptable structure. In
 9   fact, they wouldn't be inclined to even identify
10   this as a major problem because the ladder with
11   this crack when you put it down is relatively
12   stable. You can move it and it's stable.
13          The problem is when you get on the
14   ladder, at least with the rear cracks, and put a
15   load or twist it a little bit, which is normal
16   action, the crack will shoot way up the leg
17   immediately and collapse the ladder.
18          It's called an incipiently unstable
19   crack.
20       MR. GENDRY: Object to responsiveness.
21       Q.   In your studies have you found that
22   when a worker goes to look at the ladder before
23   he uses it, that he understates the importance of
24   inspecting the back rails, the skinnier rails?
25       MR. GENDRY: Object to form.
```

Page 44

```
 1              Pugh
 2       A.   Yes, sir, very much so.
 3       Q.   Why do you think that's so?
 4       MR. GENDRY: Object to form.
 5       A.   The workers don't regard the back
 6   rails as a major load-carrying structure of the
 7   ladder as far as importance with regard to keeping the ladder up.
 8   Their weight is mainly on the front, more massive
 9   rails.
10          In fact, the rear rail legs are
11   smaller in cross-section and they're inherently
12   weaker, and the inspection is generally done of
13   the area where you're going to put your weight,
14   and the attention is paid more closely to that
15   typically.
16          Of course there is nothing on the
17   ladder, there is no warning or instruction to
18   indicate that attention should be paid to the
19   rear legs, particularly because those are the
20   ones that are going to throw you.
21       Q.   I anticipate there is going to be some
22   testimony about the ANSI standards.
23          First, what does ANSI stand for?
24       A.   ANSI is an acronym for American
25   National Standard Institute, which is a standard
```

Page 45

```
 1              Pugh
 2   setting organization.
 3       Q.   Does that institute set standards for
 4   things such as stepladders?
 5       A.   There is an ANSI standard, yes.
 6       Q.   In your opinion can a product, such as
 7   a stepladder in this case, comply with those
 8   standards and still not be the optimum design?
 9       MR. GENDRY: Object to form.
10       A.   Absolutely.
11       Q.   Do you believe this to be the case?
12       MR. GENDRY: Object to form.
13       A.   I believe that -- well, my analysis of
14   this and my analysis of the standards as well as
15   the OSHA requirements, is that they are, as
16   always, intended to provide a minimal or minimum
17   level of safety.
18          And that it is incumbent upon the
19   manufacturer to exceed the requirements of the
20   ANSI standards and the OSHA standards, and
21   requirements to produce a product that is
22   reliably safe and it has hazards that are
23   reasonably eliminated.
24       MR. GENDRY: Object to
25   responsiveness.
```

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 28 of 65

Page 46

Pugh

1
2  Q.  In your study did you have certain
3  opinions about the integrity or the quality of
4  the fiberglass involved with the subject ladder?
5      MR. GENDRY:  Object to form.
6  A.  Yes, sir.
7  Q.  And what were your conclusions about
8  the -- let me ask you, how did you study the
9  quality of the fiberglass itself where it's
10  relevant on this ladder?
11      MR. GENDRY:  Object to form.
12  A.  I examined the failed -- if you can
13  pick that up for me -- thank you.
14      I examined the fracture surfaces, the
15  key fracture surfaces that resulted in the
16  collapse of the ladder under the microscope, and
17  I determined that in fact the failure of these,
18  the joint or the edge or surface between the
19  flanges and the web, was what we call a brittle
20  failure.  That is, you can fit the pieces back
21  pretty much together.  It's a very low energy
22  absorptive failure.
23      And in examination I noticed that the
24  fiberglass fibers, the actual cloth, the way it
25  failed along here was predominantly between

Page 47

Pugh

1
2  fibers running this way rather than across fibers
3  running this way.
4      And of course the nature of the
5  failure being brittle is unacceptable in an
6  engineering sense, and would demand there be an
7  enhancement of properties by the use of a boot or
8  some stabilizing device to accommodate this.
9      MR. GENDRY:  Object to responsiveness.
10  Q.  In a little more simpler terms for
11  someone like myself, did you believe that the
12  quality of the fiberglass was not sufficient?
13      MR. GENDRY:  Object to form.
14  A.  I felt that the fiberglass was not of
15  sufficient quality given the absence of an
16  encapsulating boot or encapsulating type of
17  assembling at the bottom of the leg.
18      That in conjunction with the lack of
19  the boot, the weakness at that edge here was
20  promotive of the failures that we see here.
21  Q.  If there were more cross-fibers of
22  fiberglass going across instead of just
23  long-wise, would that have strengthened this
24  vital area where the crack occurred?
25      MR. GENDRY:  Object to form.

Page 48

Pugh

1
2  A.  Yes, it would have.
3  Q.  Now, I anticipate that there is going
4  to be some testimony that Mr. Escudero or someone
5  was using this ladder at a time when the cracks
6  or fractures were quite extensive like they are
7  today.
8      And some of the evidence there in
9  their attempt to show that is with either paint
10  or spackling in the cracks.
11      Did you take a look at those cracks to
12  see if you saw things like spackling or paint in
13  them?
14  A.  Yes, I did.
15  Q.  What did you find?
16  A.  I did not find any evidence of spackle
17  or paint on the specific fracture surfaces
18  involved with the splitting of the rail or flange
19  to web joint in the back rails.
20  Q.  You testified earlier that you had an
21  opportunity to read the two reports of Dr.
22  Johnson, the Bauer Corporation's expert; is that
23  right?
24  A.  Yes, sir.
25  Q.  Starting with the first report, did

Page 49

Pugh

1
2  you notice one of his conclusions was that there
3  was no evidence of a bad design to the subject
4  ladder?
5  A.  Yes, sir.
6  Q.  Did you see any analysis of
7  alternative designs in his report?
8  A.  No, sir.
9  Q.  How would you characterize his
10  analysis in coming to that conclusion based on
11  his report?
12      MR. GENDRY:  Object to form.
13  A.  I disagree with his findings and we
14  have specific examples of ladders, the Werner
15  ladders with the encapsulating feet that were
16  produced around the same time that this ladder
17  was manufactured, mainly 1988 to 1990, which were
18  much more stable and much more resistant to this
19  type of failure.
20      MR. GENDRY:  Object to responsiveness.
21  Q.  Did you find he even addressed the
22  alternative designs in his first report?
23      MR. GENDRY:  Object to form.
24  A.  I don't recall that he did address
25  that.  I am not finding my copy of that report.

Page 50

Pugh

2  Q.  Then I will just give you this one
3  anyway. There it is right there, if you would
4  like to use mine.
5  A.  Thank you so much.
6  Q.  In looking at the second report, I
7  believe it's August the 10th; is that right?
8  A.  Yes, sir.
9  Q.  What basically was that report
10  purporting to try to show?
11  A.  Well, this August 10th report was the
12  result of testing that was done on the sections
13  that were removed from the accident ladder.
14  And basically what was done was test
15  samples were cut out of these pieces and the test
16  samples looked -- is there a marker here we could
17  use?
18  I could get one. Does that have a
19  felt tip? I could find one if you would like to
20  take a break for a second to do that.
21  THE VIDEOGRAPHER: Off the record.
22  The time is 3:51 p.m.
23  (Recess.)
24  THE VIDEOGRAPHER: We're now going on
25  the record.

Page 51

Pugh

2  The time is 3:52 p.m.
3  BY MR. BENTON:
4  A.  Test samples were cut out of the
5  fiberglass and they were subsequently tested by a
6  tensile tester and other means.
7  Let me make sure I have the
8  configuration properly.
9  Basically samples were cut out that
10  looked like this. That's called -- what we call
11  that is a dog bone specimen, if you will, or a
12  tensile bar with a reduced cross-section. And in
13  some cases a rectangular piece was cut out.
14  So the material that was tested was
15  the material in the middle of the flange or the
16  middle of the rail or the middle of the web.
17  And no testing was done at all of the
18  material along the angle, along the edge that
19  actually failed in the subject ladder.
20  Q.  Is that relevant?
21  A.  Well, it most certainly is.
22  Q.  Why?
23  A.  In order to evaluate the factors
24  relating to the failure of this ladder, if you
25  want to do testing you need to do testing of the

Page 52

Pugh

2  material representative of what failed in the
3  accident. That was never tested.
4  These flanges, the flat flanges
5  never failed. They're still intact. It's the
6  corner that failed. And those were not tested by
7  Dr. Johnson.
8  Q.  In your report you discussed the issue
9  of proper warnings; is that correct?
10  A.  Yes, sir.
11  Q.  Do you have any criticisms of the
12  warning labeling on the subject ladder?
13  A.  Yes, I do.
14  Q.  What are those?
15  A.  Given the configuration of the ladder
16  and the tendency for the ladder to split,
17  particularly in the back legs, the warnings are
18  vague and ambiguous and they don't really
19  indicate exactly what conditions the ladder
20  should be taken out of service, what size crack
21  or where the cracks should be looked for, or
22  anything that would enable the user to adequately
23  identify, look for and identify a structure that
24  is, or failure or an incipient crack that is
25  going to lead to catastrophic failure.

Page 53

Pugh

2  And it's also not the way to manage
3  the hazard. The hazard should be eliminated, not
4  warned against.
5  MR. GENDRY: Object to responsiveness.
6  MR. BENTON: I will pass the witness.
7  MR. GENDRY: Let's take a short
8  break.
9  THE VIDEOGRAPHER: We're now going off
10  the record.
11  The time is 3:54 p.m.
12  (Recess.)
13  THE VIDEOGRAPHER: We're now going on
14  the record.
15  The time is 4:08 p.m.
16  EXAMINATION BY
17  MR. GENDRY:
18  Q.  Dr. Pugh, my name is Tom Gendry.
19  We have met this day for the first
20  time; is that correct, sir?
21  A.  Yes, sir.
22  Q.  Previous to this what we call a trial
23  deposition, you gave a discovery deposition
24  wherein I asked you a series of questions and you
25  responded; is that right?

Page 54

```
1              Pugh
2       A.  Yes, sir.
3       Q.  I am going to follow up on some of the
4  questioning presented to you by Mr. Benton in
5  this case.
6           When is it that you first got involved
7  in this case?
8       A.  I recall it was sometime last summer.
9       Q.  And that was on a call from
10  Mr. Benton; is that correct?
11      A.  That's correct.
12      Q.  Mr. Benton in fact retained you and
13  has paid you money with regard to providing
14  review of this case and testifying in this case?
15      A.  That's correct, sir.
16      Q.  And in fact he has sent you some sums
17  of money as the process has gone on?
18      A.  He's paid me for my time that I spent
19  on the case, yes, sir.
20      Q.  And previously we asked that your time
21  log and your fees in this case be attached to the
22  previous deposition and you have agreed to do
23  that; is that correct?
24      A.  I believe that was done, yes, sir.
25      Q.  Partly that was done by what was
```

Page 56

```
1              Pugh
2       A.  We discussed the case, yes, sir.
3       Q.  If you come to Texas to trial, again I
4  assume that you charge $3,000 per day; is that
5  correct?
6       A.  Plus applicable travel expenses, yes,
7  sir.
8       Q.  If you come to trial down in Texas do
9  you charge for your travel time at $3,000 a day,
10  or how does that work?
11      A.  Well, depending on the scheduling, I
12  mean I can only give you an example.
13          If I can be given the time distance I
14  can often travel down in the morning, appear in
15  court and come back in the evening.
16          If it's doable in one day, even if it
17  takes 18 hours of my time, I only bill 12 hours
18  for that.  It's limited to a 12-hour day.
19          If I have to arrive the prior day I do
20  bill the amount of time that it takes to arrive
21  the prior day.
22      Q.  At what rate the prior day?
23      A.  That's billed at $250 an hour, but
24  what I do, I take documents and I read documents
25  on the plane while I'm in transit, so basically
```

Page 55

```
1              Pugh
2  produced by Mr. Benton.
3           But as to your bills, if there are any
4  more, you're going to attach them; is that
5  correct, sir?
6       A.  I believe that was complete, but yes,
7  if there are any additional I will be happy to
8  attach those.
9       Q.  For the purpose of the jury you
10  charged Mr. Benton, I think you said it was $250
11  per hour as you have spent time working up the
12  case?
13      A.  That's correct.
14      Q.  And up to today you thought you maybe
15  had 15 hours in the case?
16      A.  As a guesstimate, yes, sir.
17      Q.  As a guesstimate.
18          For today's testimony as I understand
19  it, this takes up most of your day, this is a
20  cost to Mr. Benton of $3,000?
21      A.  I am committing a 12-hour day to this
22  particular depo today, yes, sir.
23      Q.  You previously met with Mr. Benton
24  this morning to discuss your expected testimony
25  in the case?
```

Page 57

```
1              Pugh
2  I'm working on the case during the time I'm
3  traveling.
4       Q.  Let me ask you a bit about your
5  background.
6           As I understand it, the fiberglass
7  ladder cases that you have worked on have been
8  Bauer cases only?
9       A.  That's correct.
10      Q.  In other words, Bauer Ladder
11  Corporation fiberglass stepladders is what you
12  have been involved with?
13      A.  To the best of my recollection, yes,
14  sir.
15      Q.  And with respect to other brands and
16  models, in particular you mentioned the Werner
17  brand, you have not been involved in any kind of
18  analysis of the Werner product, would that be
19  correct?
20      A.  I do not believe I have been exposed
21  to any failures of Werner products, yes.
22      Q.  I object to the responsiveness.
23          You have not been involved in any kind
24  of analysis of the Werner product, would that be
25  correct?
```

Case 1:00-cv-00193    Document 18    Filed in TXSD on 09/28/2001    Page 31 of 65

Page 58

```
1              Pugh
2       A.  Well, I have analyzed the Werner
3   products in conjunction with the Bauer cases I've
4   worked on, but I have not -- again in my prior
5   answer if you would be so kind -- I have not been
6   involved in analyzing failure of any Werner
7   ladders.
8          Thank you so much.
9          THE VIDEOGRAPHER:  We're now going off
10  the record.
11         The time is 4:12 p.m.
12         (Recess.)
13         THE VIDEOGRAPHER:  We're now going on
14  the record.
15         The time is 4:14 p.m.
16  BY MR. GENDRY:
17      Q.  You have not done an industrywide
18  comparison of ladders that are similar to or like
19  the footing on the particular Bauer ladder
20  involved in this litigation; is that correct?
21      A.  I'm not sure I understand the
22  question.
23      Q.  Have you done any study of any other
24  ladder besides the Werner ladder?
25      A.  I surely have examined brochures of
```

Page 59

```
1              Pugh
2   the other ladders, Louisville, and I believe it
3   was Green Bull.
4       Q.  This is publications issued by
5   Louisville and Green Bull?
6       A.  Yes, sir.
7       Q.  Have any of those ladders demonstrated
8   footings similar to the Bauer ladder that is
9   involved in this case?
10      A.  I believe so.  It doesn't appear to be
11  depicted in the brochure for Green Bull, but
12  there was testimony from the corporate designee
13  for Bauer that Green Bull produces a similar foot
14  treatment.
15         Louisville, the brochure that I have
16  in front of me here, doesn't appear to show that
17  encapsulation either.
18      Q.  So far as you know, there is at least
19  one other model that you know of that you have
20  seen, or at least a publication of, showing a
21  similar footing to the Bauer ladder?
22      A.  Well, there is a full metal foot for
23  the Louisville depicted here in these brochures
24  similar to the vinyl boot of the Bauer, yes.
25      Q.  I am not talking about the boot.  I am
```

Page 60

```
1              Pugh
2   talking about the shoe similar to the particular
3   ladder involved in this lawsuit.
4       A.  Could you repeat the question,
5   please?
6       Q.  Yes.  Have you examined any other
7   ladders besides the Bauer ladder showing a shoe
8   similar to the shoe on the ladder involved in
9   this lawsuit?
10      A.  I don't recall.
11      Q.  Other than the cases that you have
12  been involved with in the Bauer case, the
13  fiberglass ladders, have you been involved in any
14  other cases involving fiberglass ladders?
15      A.  I do not recall any.
16      Q.  What has been your background
17  concerning the analysis and testing of fiberglass
18  ladders before you ever became involved in this
19  particular case?
20      A.  Fiberglass ladders per se.
21         The only -- well, I'm not sure --
22  well, before this particular case I analyzed the
23  other two Bauer ladder cases, but before that I
24  don't recall any analysis of any fiberglass
25  ladders.
```

Page 61

```
1              Pugh
2       Q.  You have never up to today's date done
3   any sort of failure analysis or testing of any
4   fiberglass ladders, would that be a correct
5   statement?
6       A.  With the exception of microscopic
7   analysis.
8       Q.  Microscopic, you mean some sort of I
9   think you called it a stereo microscopic --
10      A.  Yes.
11      Q.  -- viewing of this particular ladder
12  that we have here today?
13      A.  And the other ladders I have analyzed,
14  yes.
15      Q.  And as I understand it, there is no
16  literature specific to ladders that microscopic
17  examination is sufficient to show that there is
18  an insufficient or imperfect weaving of the
19  fiberglass structure of the fiberglass composite?
20      A.  Specifically for ladders, I do not
21  know that.
22      Q.  And before today's deposition you have
23  done no testing on any fiberglass ladders to make
24  the determination that any of the fiberglass mat,
25  meaning the weaving, the longitudinal or
```

Page 62

1          Pugh
2    transverse weaving is insufficient?
3        A.  Aside from the microscopic analysis,
4    correct.
5        Q.  And previously in the discovery
6    deposition you mentioned that there are a number
7    of tests which could have been utilized to
8    determine the strength of the corner of a ladder
9    as you have put it; is that correct?
10       A.  Yes, sir.
11       Q.  And you mentioned specific tests such
12   as the peel test, the crush test, the torsion
13   test and the microhardness test and the
14   quantitative microscopy; is that correct, sir?
15       A.  Yes, sir.
16       Q.  And you have done none of those tests?
17       A.  That's correct, sir.
18       Q.  In essence you are not able to say
19   within a reasonable degree of engineering
20   probability that the fiberglass mat or the
21   weaving of this ladder was insufficient?
22       A.  I cannot say that to a reasonable
23   probability, that's correct.  I strongly suspect
24   it though.
25       Q.  I object to the responsiveness of the

Page 63

1          Pugh
2    last part of the answer.
3            As I understand it, you're telling the
4    ladies and gentlemen of this jury that you did
5    some sort of microscopic examination here in this
6    facility that we're in here today?
7        A.  Yes, sir.
8        Q.  Is that machine still available for us
9    to look at?
10       A.  If you care to, yes.
11       Q.  In previous testimony you indicated
12   that you can attach a camera to that stereo
13   microscope which you used to look at this
14   particular ladder.
15       A.  Yes, sir.
16       Q.  And with that camera you could take
17   photographs showing what you're saying is
18   insufficient weaving of the fiberglass?
19       A.  Yes, sir.
20       Q.  Is that a costly thing for you to do?
21       A.  It's timely, it's not costly.
22       Q.  What sort of time does it take to do
23   that?
24       A.  Well, this ladder is quite bulky and
25   has to be positioned.  The time consumption is

Page 64

1          Pugh
2    the position, adequate positioning and the fixing
3    of the camera in the location to take an adequate
4    photograph.
5        Q.  And as I understand it, the micron --
6    strike that.
7            The stereo microscopy would what,
8    illustrate to the jury what you're trying to say,
9    that there is insufficient fibers going
10   transversely?
11       A.  Well, in part, but it also doesn't
12   show anything that -- I'm not demonstrating right
13   here -- that is, that the splitting is straight
14   up the edge of the ladder without any splitting
15   going into the flat pieces of the material.
16           That's basically what that's saying.
17       Q.  I object as nonresponsive.
18           My question to you, Doctor, is would
19   the microscope enlarge the area such that the
20   jury could see it to determine whether or not
21   there is in fact some sort of insufficient
22   weaving in this case?
23       A.  On their part I wouldn't be able to
24   demonstrate them.
25       Q.  You would not be able to demonstrate

Page 65

1          Pugh
2    that with a microscope?
3        A.  Not to the jury, no.
4        Q.  In other words, the only way to make a
5    clear determination within a reasonable degree of
6    engineering probability is to have done one of
7    these other tests which I've mentioned, the peel
8    test, the crush test and so forth, to make
9    certain that the corner, as you say, had
10   insufficient weaving?
11       A.  No, it's determinable from microscopy
12   but it takes a trained eye to make the
13   determination.
14           And the point of taking a photograph
15   and not being able to demonstrate it is -- taking
16   a photograph is not convincing.
17           It's the analysis and the observation
18   of the fracture surface and the way the
19   striations run that make it probable that there
20   was lack of adequate crossing over of fibers
21   around the corner.
22       Q.  Do you have any, other than this
23   ladder, any demonstrable evidence to prove that
24   the weaving of the fiber transversely as opposed
25   to longitudinally was insufficient?

Page 66

Pugh
1
2    A.    Yes, I do.
3    Q.    What?
4    A.    The test results of Dr. Johnson.
5    Q.    And how do the test results of
6  Dr. Johnson show that the fiber was weaved
7  inadequately transversely?
8    A.    Well, it shows the failure mode of
9  samples tested along the flat surface of the
10  flange, and it shows a very different fracture
11  than what is exhibited on the edge.
12        And properly molded -- to complete the
13  answer, and properly molded fiberglass at the
14  edge should show the same fracture
15  characteristics or more closely the fracture
16  characteristics demonstrated by Dr. Johnson in
17  his test samples.
18    Q.    In the discovery deposition you
19  admitted to me that the testing done by
20  Dr. Johnson met the ANSI standards; is that
21  correct?
22    A.    Correct.
23    Q.    In other words, there is an
24  industrywide standard that manufacturers of
25  ladders must meet in order to put the product on

Page 67

Pugh
1
2  the market.
3        Dr. Johnson has tested for that and
4  the ladder met and exceeded those standards?
5    A.    I don't know that there is a
6  requirement that the ladders meet the ASTM
7  standards or ANSI standards.
8        It's a good idea for the manufacturers
9  to comply with them, but I don't know of any
10  statutory requirement.
11    Q.    I stand corrected on that with respect
12  to there being a statute.
13        I said industrywide standard. There
14  is an industrywide standard on the part of ladder
15  manufacturers to meet the ANSI or ASTM standards?
16    A.    I believe it's what we call a
17  consensus standard; that is, a manufacturer can
18  decide to comply with ANSI or not.
19        If it complies and it's tested to
20  comply they're entitled to put an ANSI sticker on
21  the ladder; otherwise they can't just put an ANSI
22  sticker on.
23    Q.    And you know that Bauer Company did
24  that?
25    A.    I believe they did, yes.

Page 68

Pugh
1
2    Q.    And Dr. Johnson to confirm that did
3  some testing of this portions of the ladder other
4  than the corner, as you say, and found it to meet
5  the ANSI-ATSM standards?
6    A.    That's correct. He did testing to
7  show something that we already knew, that the
8  ladder is in compliance with the ANSI
9  requirements, with the strict nature of the ANSI
10  requirements.
11    Q.    Dr. Johnson in no fashion stated that
12  the weaving of the ladder transversely was
13  insufficient?
14    A.    He never --
15        MR. BENTON:  Objection to form.
16    A.    That's correct, he never tested for
17  that.
18    Q.    Well, you're saying you can tell from
19  his photographs, the results of his testing that
20  the weaving was inadequate transversely; is that
21  what you're saying?
22    A.    No.  I'm saying that the results of
23  his testing, the photographs of his test samples
24  here that he failed, that he pulled apart and
25  broke, showed a fracture pattern very, very

Page 69

Pugh
1
2  different than what this is here, the splitting
3  of the corner piece.
4        What I am saying is that the corner
5  piece should have shown at least the failure
6  characteristics of these pieces that he tested on
7  the flat surfaces, and they don't.
8        That points to a deficiency in the
9  corner of the ladder.
10    Q.    Object to responsiveness.
11        You previously stated that the weakest
12  point of a structure would be the corner; is that
13  correct?
14    A.    Correct.
15    Q.    That not only applies to fiberglass,
16  it applies to many structures?
17    A.    Correct.
18    Q.    We asked you, Doctor, to produce at
19  your depositions today any professional articles
20  you have reviewed to serve as a basis for your
21  opinions in this case.
22        And as I understand from your
23  discovery deposition, you have no professional
24  articles to support your theories; is that
25  correct?

Page 70

```
1              Pugh
2      A.  I have not relied on any, no.  It's
3  not that I don't have any, I have not relied on
4  any.
5      Q.   And you have not produced in response
6  to our request for production in the depositions
7  in this case, you have not produced any
8  scientific studies to support your opinions in
9  this case?
10     A.   I have not relied on any scientific
11 studies.
12          I relied on the sum total of
13 scientific knowledge in general on the failure
14 characteristics of composites, plastics and
15 materials.
16     Q.   Do you have, Dr. Pugh, any peer review
17 articles supporting your theories of failure in
18 this case?
19          MR. BENTON:  I object to the form.
20 What kind of failure?
21     A.   I'm not sure I understand the question
22 also.
23     Q.   Have your theories that you expressed,
24 your opinions in this case, have they been
25 subjected to peer review by your contemporary
```

Page 71

```
1              Pugh
2  engineers?
3          MR. BENTON:  Objection to form.
4      A.   No.  It would be akin to subject
5  Newton's laws to physics to peer review.
6          These principles have been time-tested
7  and proven, and they are part of the general core
8  curriculum taught to engineering students in
9  materials science.
10          They are common concepts and tenets,
11 T-E-N-E-T-S, of materials science, materials
12 science and engineering.
13     Q.   I object to the responsiveness.
14          Yes or no, have you seen any articles
15 by your contemporaries supporting the theories of
16 failure which you have outlined in this case?
17          MR. BENTON:  Objection to form.
18     A.   Everything I see is consistent and
19 supportive of that.
20     Q.   Any specific journal articles?
21     A.   I would only recall an article that
22 would tend to sway me from the commonly accepted
23 principles.  I have never seen such an article.
24          If you have any in mind I would be
25 happy to take a look at it and advise you to the
```

Page 72

```
1              Pugh
2  validity of it.
3      Q.   Apparently there are certain tests
4  which you mentioned which if your theory was true
5  about what happened here, which would support
6  your theories, that being the peel test, the
7  crush test and the torsion test and the
8  microhardness test and the quantitative
9  microscopy test.
10     A.   Is that a question?
11     Q.   Yes.
12          MR. BENTON:  Objection to the form.
13     A.   I didn't get the question.
14          It sounded like a statement to me, but
15 I will be happy to answer it if you care to
16 phrase it in a natural form.
17     Q.   You have already stated that there are
18 tests which may give support to your theory of
19 how the failure took place.
20     A.   I don't think I testified to that.
21          You had asked me were there tests that
22 could be done on the edge of this particular, you
23 know, that would, though, show the difference in
24 mechanical properties.
25          And I said yes, there are tests that
```

Page 73

```
1              Pugh
2  can be done.
3          I said I don't think it's necessary to
4  do them because the demonstration of the brittle
5  nature of this failure and the way it zips right
6  up this edge without any propagation indicates
7  the weakness in that particular corner.
8          The way you want these things to fail,
9  if a crack starts you want to promote the bulk of
10 failure to the remainder of the material here, to
11 the bulk of the leg.  You don't want to be
12 concentrated all the way up and collapse the
13 ladder.
14          That's a basic concept of design,
15 mechanical science and engineering.
16     Q.   I object to the responsiveness.
17          In your discovery deposition did you
18 not say that a person could test the strength of
19 the corner of the ladder by these various tests
20 which you have outlined, the peel, the crush, the
21 torsion, the electron microscopy -- strike that
22 -- the microhardness and the quantitative
23 microscopy?
24     A.   Yes, sir.
25     Q.   You have done none of those?
```

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 35 of 65

Page 74

Pugh

2     A.   That's correct, I have not done them.
3     Q.   Most of your work has been involved in
4  biomechanics and ergo economics did you say?
5     A.   Ergonomics.
6     Q.   Ergonomics.
7     A.   I have done considerable work in
8  biomechanics and ergonomics, yes.
9     Q.   Can you explain to the jury what
10  subspecialty that is or what that involves?
11     A.   Ergonomics is that science that has to
12  do with, for example, man-machine interactions
13  such that operators of machinery or equipment can
14  produce useful work without injuring themselves
15  and without injuring bystanders.
16        This particular ladder situation would
17  fall in the area of ergonomics. Having a worker
18  on a ladder producing a task in a manner that
19  would not be injurious to himself or bystanders
20  and the ergonomics features of this ladder were
21  part of the analysis that I did on this
22  particular case.
23     Q.   And what is the field of biomechanics?
24     A.   Biomechanics is that branch of
25  bioengineering that applies the laws of physics,

Page 75

Pugh

2  mechanical engineering and material science to
3  the human body to, for example, to explain how
4  certain injuries are produced in certain
5  circumstances, and how they can be prevented.
6     Q.   And your curriculum vitae contains
7  articles that you have published concerning
8  bioergo -- how do you say that?
9     A.   Ergonomics.
10     Q.   Bioergonomics --
11     A.   It's just ergonomics and biomechanics.
12     Q.   And you have published in that area;
13  is that correct?
14     A.   Yes, sir.
15     Q.   You have not published in the area of
16  ladder failure; is that correct?
17     A.   I have not published a paper on ladder
18  failure, that's correct.
19     Q.   In the discovery deposition I think we
20  learned from you that you agree that this ladder
21  bore cracking and splitting before Mr. Escudero
22  ever got on the ladder.
23     A.   That's correct, sir.
24     Q.   And you understand the history of
25  Mr. Escudero and his family, that they were in

Page 76

Pugh

2  the construction business?
3     A.   Yes, sir.
4     Q.   They were required to abide by the
5  OSHA standards concerning inspection of ladders?
6     A.   In principle, yes.
7     Q.   And you understand that Mr. Escudero,
8  Jr., the person who was injured, that he was the
9  manager and at least a part owner of the
10  construction business?
11     A.   I believe that's correct, yes, sir.
12     Q.   You learned from his deposition that
13  he had been involved in many jobs concerning
14  construction?
15     A.   Yes, sir.
16     Q.   And it's your understanding, is it
17  not, that OSHA required him to inspect daily a
18  ladder to see whether or not it had any cracking
19  or splitting or damage to the parts such that it
20  should have been removed from service?
21     A.   That's correct, sir.
22     Q.   If this ladder had been looked at it
23  was obvious, was it not, that the cracks were
24  visible?
25     A.   If one looks for the cracks one could

Page 77

Pugh

2  find them, yes.
3     Q.   In other words, some of these cracks,
4  especially on the back rails that we're talking
5  about, were even widened and worn so extensively
6  that there were gapes or gaps, would that be
7  correct?
8     A.   There were small gaps a fraction of an
9  inch. A small gap that if one looked for that
10  gap one could find it, but it wasn't something
11  that could jump out to the casual observer.
12     Q.   Objection as to the responsiveness to
13  the last part of the answer.
14        In other words, if one were to look at
15  those cracks they would be seen as through and
16  through, you could see daylight?
17     A.   No, I would answer in the affirmative
18  to the question if someone were looking for these
19  cracks they could find them.
20     Q.   So if a person or contractor who is
21  required to abide by OSHA to inspect for cracks,
22  if he had looked at the ladder to look for cracks
23  they would have been visible?
24     A.   Yes.
25     Q.   And it's a failure to exercise

Page 78

Pugh
1
2 ordinary care on the part of an individual or
3 employer required to inspect for cracks not to
4 have done so?
5     A.   The cracks were inspected for by
6 Mr. Escudero and he did not see them by his
7 testimony and by my understanding of his
8 testimony.
9     Q.   Object to the responsiveness.
10     Assuming the ordinary contractor,
11 employer in a construction business, they have
12 the duty to inspect for cracks daily on ladders;
13 is that correct?
14     A.   That's what OSHA says, yes.
15     Q.   And some of these cracks show daylight
16 through them, do they not?
17     A.   Well, they do if you happen to be in a
18 position for the leg to shine daylight through
19 it.
20     Remember these cracks were at the
21 bottom of the legs. When the ladder is inspected
22 prior to use it's more than likely to be
23 inspected in a stood up, erect position on the
24 floor, and it would be highly unlikely that
25 someone would bend down and lie on the floor to

Page 79

Pugh
1
2 examine in detail the legs.
3     In fact, that's too much to ask for a
4 daily inspection. The daily inspection would
5 more than likely be a cursory examination of the
6 ladder close enough to pick out any gross failure
7 of the legs.
8     I don't regard this cracking as gross
9 failure, the cracking that existed at the time
10 Mr. Escudero mounted the ladder.
11     In fact, it's too much to ask, I
12 believe, for a construction person or manager to
13 pick the ladder up and place it on a table and do
14 a detailed examination of each and every part of
15 the ladder for cracks.
16     Q.   Object to the responsiveness of the
17 last part of the answer.
18     You have read some of the testimony in
19 this case by Richard Poremba, engineer?
20     A.   Yes, sir.
21     Q.   Did you read his testimony that
22 preexisting cracks extended as much as 20 or 22
23 inches up one of the rails?
24     A.   I'm not sure I agree with that, but I
25 did read his testimony about that.

Page 80

Pugh
1
2     Q.   That's a fairly significant length of
3 crack, is it not, preexisting?
4     A.   Well, that's correct.
5     And we have a crack on this edge here
6 which is not separated, it's almost that long,
7 which is not obvious from the outside of the rail
8 because it doesn't penetrate all the way through
9 the rail.
10     Q.   So you agree then with Mr. Poremba
11 that there may have been a preexisting crack as
12 much as 20 or 22 inches in length?
13     A.   Not a through crack, I disagree with
14 that.
15     Q.   Even some of these cracks had paint or
16 debris which had -- which were inside the area
17 that had been abraded away over time, would you
18 agree with that?
19     A.   I could find no evidence of anything
20 inside any of the cracks in the fracture surfaces
21 themselves that it separated.
22     There was debris that was adjacent to
23 the fracture surfaces and close to, and there was
24 debris that was on abraded areas outside the
25 fracture surface but not right actually in the

Page 81

Pugh
1
2 pieces that come apart.
3     Q.   In other words, you're telling the
4 jury that there had been such an abraded area,
5 that sometime before where the area was abraded
6 away next to the crack there was a spot of paint?
7     A.   I would agree with that, yes. And of
8 course that occurred on one of the legs down
9 rather low, down around the area of the rivet for
10 the angle reinforcement of the bottom
11 cross-brace.
12     THE VIDEOGRAPHER: We're now going off
13 the record.
14     The time is 4:38 p.m.
15     (Recess.)
16     THE VIDEOGRAPHER: We're now going on
17 the record.
18     The time is 4:40 p.m.
19     Q.   In reviewing the depositions in this
20 case, particularly of Mr. Escudero and some of
21 his employees, it became obvious that this ladder
22 originally came from the Santa Rosa Independent
23 School District near Brownsville, Texas?
24     A.   I wouldn't disagree with that.
25     Q.   In fact, there has been stenciling

Page 86

Pugh
2  any testing data demonstrating to the jury proof
3  that the materials were defective in any fashion
4  when they left -- when it left the hands of Bauer
5  manufacturing?
6      A.  You're talking about absolute proof
7  now?
8      Q.  Yes, sir.
9      A.  Rarely is anything like this rendered
10 to absolute proof.
11     Q.  Is the answer no, you have not?
12     A.  Not to absolute proof, no.
13     Q.  You have been provided with no
14 materials and you have none demonstrating by any
15 scientific means that the materials in this
16 ladder were defective when it left the hands of
17 the manufacturer?
18     A.  You're talking about the materials
19 now, not the design?
20     Q.  The materials, integrity of the
21 materials.
22     A.  Again, I didn't receive in discovery
23 the results of any testing, nor do I know of any
24 testing that Bauer did to verify the safety of
25 the ladder.

Page 87

Pugh
2      Q.  If a ladder has a boot on it, that
3  does not mean necessarily that the rail which is
4  inside the boot will not fracture at some time?
5      A.  That's correct.
6      Q.  In other words, if we took this
7  particular ladder here and we had a boot on it up
8  to here, that doesn't mean that, depending upon
9  how the ladder was used or what happens to the
10 ladder, some ten years later it might have a
11 crack somewhere up the rail?
12     A.  That could happen.
13     Q.  And if so, the ladder again should be
14 taken out of service whether or not it has a boot
15 on it?
16     A.  That's correct.
17     Q.  Are you aware of ladders produced
18 today that are almost identical with respect to
19 the shoe and the cross-bracing and the angle
20 bracing as on this particular ladder?
21     A.  Only through the brochures.
22     Q.  There are some, are there not?
23     A.  Apparently.
24     Q.  Do you know that there is a Werner
25 ladder which is almost identical to this sold on

Page 88

Pugh
2  the market today with the same type of shoe, with
3  the same single brace to the rear flange rail
4  attached to the cross bar?
5      A.  I believe that, but I do not see any
6  of those in service.
7      Q.  Let me just represent to you to assume
8  that one will be produced at trial bought from
9  Home Depot just a week ago, would you say that
10 that ladder is defective?
11     A.  Absolutely.
12     Q.  Why?
13     A.  Well, I would have to see it, but if
14 it doesn't encapsulate the bottom of the leg and
15 the fiberglass is not sheathed up or beefed up
16 it's going to split and cause a problem.
17         But I would have to see the specific
18 Werner ladder. It's not in front of me, so I
19 can't really pass judgment on it adequately.
20     Q.  I think what you are saying, is it
21 not, Doctor, that a ladder with a sheath or a
22 boot on it may last longer than one that doesn't
23 have a boot on it?
24     A.  It will surely last longer, yes.
25     Q.  Just because one product will outlast

Page 89

Pugh
2  another doesn't make the product with the least
3  life on it defective, does it, in design?
4      A.  Well, if that increase in longevity
5  also has a commensurate reduction in hazard, then
6  there is a benefit to be accrued from that
7  longevity, a safety benefit to be accrued from
8  that longevity.
9      Q.  If you have a BMW with a strong shock
10 in it versus a Ford with a weaker shock, that
11 doesn't make the Ford vehicle defective, does it?
12     A.  Depends if the shock fails at a
13 thousand miles in the weaker one and causes an
14 accident and kills somebody, then that's been
15 demonstrated to be a hazard that causes
16 significant problems.
17     Q.  Generally speaking, Doctor, in just
18 about every line of products you're going to find
19 differently designed models?
20     A.  I would agree with that.
21         MR. BENTON: Objection to form.
22     Q.  And to take my analogy, and it may not
23 be the greatest analogy, for example, in the
24 automotive industry, it's well-known that some
25 shocks are better than others, it will last

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 38 of 65

Page 82

Pugh
1
2    shown on the side of the front rail or the ladder
3    to that effect?
4        A.  I am aware of that, yes.
5        Q.  You don't know and nobody has
6    testified as to when this ladder left the hands
7    of the Santa Rosa Independent School District?
8        A.  I would agree with that.
9        Q.  In effect, nobody knows the history of
10   this ladder from the time that it left the Santa
11   Rosa Independent School District, whatever time
12   that may have been, up to the time that
13   Mr. Escudero used it?
14       A.  I would basically agree with that,
15   yes.
16       Q.  All ladders eventually can become
17   broken, worn out, damaged, abused and have to be
18   taken out of service; is that, generalized, a
19   correct statement?
20       A.  All of that falls within the realm of
21   possibility, yes.
22       Q.  You read the testimony of Mr. Escudero
23   that his business had the job of cleaning up job
24   sites at various construction sites?
25       A.  I believe that was one of his

Page 84

Pugh
1
2        Q.  It's a possibility?
3        A.  It's a possibility.
4        Q.  You cannot say that this ladder was
5    not damaged because of abuse?
6        MR. BENTON:  Objection to form.
7        A.  I do not believe this ladder was
8    abused.
9        Q.  Ladders can suffer, such as these
10   fiberglass ladders can suffer cracks if enough
11   pressure is placed against the ladder that it
12   starts cracking?
13       A.  Absolutely.
14       Q.  Or as you mentioned, if the ladder
15   hits the floor, that could make a ladder crack
16   further than what it had already cracked?
17       A.  That's correct.
18       Q.  If a ladder is misused, by that I mean
19   banged around, thrown around, things placed on
20   top of it, eventually it can suffer cracking?
21       A.  Absolutely.
22       Q.  And OSHA speaks to that requiring that
23   the ladder be removed from service if that is
24   noticed in the ladder?
25       A.  That's correct.

Page 83

Pugh
1
2    activities, yes.
3        Q.  For all you know or we know, this
4    ladder may have been disposed of as that it
5    should have been taken out of service at some job
6    site, somebody left it there and somebody picked
7    it up and provided it to Mr. Escudero's company?
8        A.  That may have happened, but then that
9    would have been a disposal contrary to OSHA
10   requirements.
11       Q.  I understand if you are going to take
12   one of these out of service you tie it up and you
13   mark it that it should be taken out of service
14   and then you take some means to cut it up and
15   destroy it?
16       A.  You break it.
17       Q.  Right.  And that was not done in this
18   particular case, was it?
19       A.  That's correct.
20       Q.  It is within the realm of possibility
21   that someone had concluded before Mr. Escudero
22   got on this ladder that it was broken and it
23   should not be used?
24       MR. BENTON:  Objection to form.
25       A.  Is a conjecture, yes.

Page 85

Pugh
1
2        Q.  At the time that this ladder left the
3    manufacturer sometime in 1988 to 1990, I think
4    that's when we believe that the testimony has
5    been when this ladder was manufactured; is that
6    correct?
7        A.  That's correct, sir.
8        Q.  You know of no scientific evidence
9    demonstrating that at that time the ladder was
10   defective in manufacture?
11       A.  Could you please read that question
12   back to me.
13       (Record read.)
14       Q.  Let me repeat the question, rephrase
15   the question.
16       At the time that this ladder left the
17   manufacturer's hands when it was manufactured in
18   1988 to 1990, you know of no scientific evidence
19   demonstrating that this ladder was defective in
20   the manufacturing process?
21       A.  I have not seen produced in discovery
22   anything by Bauer that they did any testing to
23   reveal the inherent flaws in this ladder,
24   correct.
25       Q.  And you have not been provided with

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOSE ESCUDERO, JR.                        §
                                          §
VS.                                       §
                                          §          CIVIL ACTION NO. B-00-193
                                          §
BAUER CORPORATION D/B/A                   §
BAUER LADDER CORPORATION                  §

## COPY OF DR. JAMES PUGH'S DEPOSITION FOR ATTACHMENT TO DEFENDANT BAUER CORPORATION D/B/A BAUER LADDER CORPORATION  RULE 702 MOTION OBJECTING TO AND/OR TO EXCLUDE THE OPINIONS AND CONCLUSIONS OF DESIGNATED EXPERT DR. JAMES PUGH

**DR. JAMES PUGH - AFTERNOON SESSION**                     **AUGUST 16, 2001**

Page 1

1

2                IN THE UNITED STATES DISTRICT COURT

3                FOR THE SOUTHERN DISTRICT OF TEXAS

4                       BROWNSVILLE DIVISION

5

6        JOSE ESCUDERO, JR.,

7

8                       Plaintiff,

9

10               vs.                        No. B-00-193

11

12       BAUER CORPORATION D/B/A

13       BAUER LADDER CORPORATION,

14

15                       Defendant.

16       --------------------------------x

17

18            VIDEOTAPED DEPOSITION OF DR. JAMES PUGH

19                      Mineola, New York

20                   Thursday August 16, 2001

21

22

23       Reported by:

         LINDA SALZMAN

24       Job No 124356b

25

Page 2

1
2
3
4
5
6          August 16, 2001
7             2:50 p.m.
8
9      Videotaped Deposition of DR. JAMES
10  PUGH, held at the offices of Inter-City
11  Testing & Consulting Corp., 167 Willis
12  Avenue, Mineola, New York, pursuant to
13  Notice, before Linda Salzman, a Notary
14  Public of the State of New York.
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2  A P P E A R A N C E S:
3
4     BARRY R. BENTON, ESQ.
5     Attorney for Plaintiff
6        284 Ebony Avenue
7        Brownsville, Texas 78520-8014
8     BY:  BARRY R. BENTON, ESQ.
9
10    GENDRY & SPRAGUE, P.C.
11    Attorneys for Defendant
12       645 Lockhill Selma
13       San Antonio, Texas 78216-5057
14    BY:  THOMAS W. GENDRY, ESQ.
15
16  ALSO PRESENT:
17    SILVIO FACCHIN, Videographer
18
19
20
21
22
23
24
25

Page 4

1
2           THE VIDEOGRAPHER:  This is the tape
3    labeled No. 1 of the videotape deposition of
4    Dr. James Pugh.  We're now going on the
5    record.  The time is 2:55 p.m.
6           Counsel will state their appearances
7    for the record.
8           MR. BENTON:  Barry Benton for the
9    plaintiff, Jose Escudero.
10          MR. GENDRY:  Tom Gendry representing
11   Bauer Ladder Corporation.
12          THE VIDEOGRAPHER:  Will the court
13   reporter please swear in the witness.
14   J A M E S   P U G H,  called as a witness,
15      having been duly sworn by a Notary Public,
16      was examined and testified as follows:
17   EXAMINATION BY
18   MR. BENTON:
19      Q.   Please state your name.
20      A.   My name is James Pugh.  That's spelled
21   P-U-G-H.
22      Q.   And do people refer to you as
23   Dr. Pugh?
24      A.   That's correct, sir.
25      Q.   Can you give the jury a history of

Page 5

1           Pugh
2   your education.
3      A.   Yes, sir.
4           I attended college at the
5   Massachusetts Institute of Technology in
6   Cambridge, Massachusetts, that's MIT, during the
7   years 1964 through 1972.
8           I received two degrees from MIT, a
9   Bachelor of Science and Engineering specied in
10  materials science and engineering in 1968, nd a
11  Doctor of Philosophy or a Ph.D. specified ii
12  biomedical engineering in 1972.
13          That really was the end of my formal
14  college education.  However, I spent a
15  three-month post-doctoral Fellowship at M from
16  June of 1972 through September of 1972 ii
17  bioengineering, during which time I wrote
18  parts of my doctoral thesis for publication i
19  various journals.
20          I took a course in review of basic
21  principles of engineering in preparation for y
22  licensing examination as a professional enger,
23  and I was licensed as a professional enginen
24  the State of New York as a result of a two-d
25  examination, I believe it was in 1984.

Case 1:00-cv-00193  Document 18  Filed in TXSD on 09/28/2001  Page 42 of 65

**Page 6**

1          Pugh
2          I have attended, I should add I have
3   attended numerous continuing education courses,
4   both biomechanical and engineering in nature,
5   over the years since my graduation, but that's
6   the nature of my formal education.
7      Q.   What have you been doing as a
8   livelihood since you got your Ph.D.?
9      A.   Well, I spent a number of years
10  working in hospitals full time doing
11  bioengineering and biomechanics.
12          I was involved with injuries, injury
13  analysis and the prevention thereof, safety
14  aspects of various work situations, and I
15  designed implants, artificial joints. I worked
16  with plastics and composites and I have been
17  consulting during that time.
18          I started consulting and doing
19  engineering consulting projects as early as 1966
20  at MIT, so I have been consulting continuously
21  since 1966.
22          And part of my standard practice is to
23  do failure analysis of not only human body parts,
24  but also engineered parts, such as ladders.
25          I should add I have began an

**Page 7**

1          Pugh
2   affiliation as an independent contractor with the
3   company called Inter-City Testing and Consulting
4   Corporation which is a broad-based consulting
5   engineering firm where we are here today in
6   Mineola, New York.
7          I began that relationship in 1978, and
8   I have been continuously involved as an
9   independent contractor with Inter-City Testing
10  since 1978.
11          I am now a partner of Inter-City
12  Testing and a co-owner, and I still continue to
13  serve as an independent contractor to Inter-City
14  Testing.
15     Q.   Have you ever had professor
16  responsibilities?
17     A.   Yes, I have, sir.
18     Q.   Could you describe those?
19     A.   In 1973 I was appointed assistant
20  professor of orthopedics at the Mount Sinai
21  School of Medicine, and I taught courses at Mount
22  Sinai in biomechanics and injury analysis.
23          I was promoted to associate professor
24  of orthopedics in 1979 at the Mount Sinai School
25  of Medicine.

**Page 8**

1          Pugh
2          The Mount Sinai School of Medicine is
3   the medical school of the City University of New
4   York.
5          I was appointed associate professor at
6   NYU, that's New York University, in the
7   Department of Occupational Health and Safety in
8   1980, and I taught courses for about a four-year
9   period in ergonomics, which is the science of man
10  and machine interactions to produce useful work
11  without injury to bystanders or operators. I
12  also taught courses there in biomechanics.
13          I taught at the associate professor
14  level at the City College of the City University
15  of New York in the early '80s for a number of
16  years. I taught in the Department of Engineering
17  technology courses in applied mechanics, strength
18  of materials and materials science and
19  engineering. That was all pure engineering
20  courses.
21          I also taught at the associate
22  professor level at the Cooper Union School of
23  Engineering in New York City for about four years
24  in the early '80s. I taught courses there in
25  biomechanics, biomaterials and materials science

**Page 9**

1          Pugh
2   and engineering.
3          I was promoted to full professor at
4   the State University of New York at Stony Brook
5   in 1984, and I also assumed a full professorship
6   in the Department of Materials Science and
7   Engineering at Stony Brook at that time.
8          And I continued to serve as professor
9   in the medical school in 1986 when I began my
10  full-time practice of consulting engineering here
11  at Inter-City Testing and Consulting Corporation,
12  and I maintained my professorship at Stony Brook
13  in the Department of Materials Science and
14  Engineering up until about 1988 or thereabouts.
15          I currently offer a course at the full
16  professor level at the Cooper Union School of
17  Engineering in New York City which is taken by
18  upper level graduate students. It's a catalogue
19  course called EID 124, bioengineering in accident
20  reconstruction, injury prevention and safety.
21     Q.   Have you published anything
22  professionally?
23     A.   My curriculum vitae lists I believe 73
24  publications in engineering and bioengineering.
25          MR. BENTON:  I will have marked as

**DR. JAMES PUGH - AFTERNOON SESSION**                    **AUGUST 16, 2001**

4 (Pages 10 to 13)

Page 10

```
1              Pugh
2      Exhibit 1 to your deposition this document
3      here I am going to have shown to you.
4          (Plaintiff's Exhibit 1, curriculum
5      vitae, marked for identification, as of this
6      date.)
7      Q.   Can you identify Exhibit No. 1?
8      A.   That's my curriculum vitae with the
9  list of scholarly activities.
10     Q.   Is that basically a professional
11 resume?
12     A.   Yes, sir.
13     Q.   Now, you said that you have been doing
14 forensic engineering testing since the '60s, but
15 how long have you done it full time?
16     A.   Since 1986.
17     Q.   What exactly -- can you describe the
18 kind of work that involves?
19     A.   Well, it involves -- my practice
20 really has to do with bodily injury, human
21 injury, and the engineering circumstances
22 surrounding it.
23         And my practice consequently involves
24 a large number of different types of accidents,
25 among them accidents occurring on ladders,
```

Page 12

```
1              Pugh
2  including the major boroughs and Westchester
3  County.
4          I should add a large fraction of what
5  I do for them is done as a professional courtesy
6  and as a public service for which I do not bill
7  and do not get paid.
8      Q.   Do you belong to any affiliations as
9  far as your engineering profession?
10     A.   Yes, sir.
11     Q.   Can you tell us about those?
12     A.   Well, the engineering affiliations
13 include the American Society for Testing and
14 Materials, or the ASTM, which is a standard
15 setting organization, the ASME or American
16 Society for Mechanical Engineers, the SPE or
17 Society of Plastics Engineers.
18         The National Association for
19 Professional Accident Reconstruction
20 Specialists.
21         I belong to the Orthopedic Research
22 Society, Society for Biomaterials.  That's an
23 overview.
24         New York State Society for
25 Professional Engineers, National Society for
```

Page 11

```
1              Pugh
2  ladders that have failed as we are going to be
3  talking about today.
4          And my assignments typically involve
5  analyzing the injuries and the engineering
6  circumstances surrounding those injuries, which
7  in the case that we are going to be talking today
8  about includes what we call the failure analysis
9  of the ladder.
10     Q.   Who would be your clients in these
11 kind of cases?
12     A.   I do work for a large variety of
13 interested parties.
14         I do work for attorneys who represent
15 injured parties in court actions.  I do work for
16 -- a lot of work for insurance companies who
17 represent insurers' interests in various
18 accidents.
19         I do work for companies who are
20 defendants in various lawsuits, and I do a
21 reasonable amount of criminal work.
22         I work for not only prosecutors but
23 also for district attorneys, and I should add I
24 do a reasonable amount of work for district
25 attorneys in the New York City metropolitan area,
```

Page 13

```
1              Pugh
2  Professional Engineers.
3      Q.   You charge for your services including
4  testifying; is that correct?
5      A.   I charge for my time, yes, sir.
6      Q.   And Mr. Escudero is paying you for
7  your time today; is that right?
8      A.   Well, I don't know who is paying me,
9  but I am being paid for my time today, yes.
10     Q.   How do you charge for your time?
11     A.   My time is billed at a rate of $250 an
12 hour.
13     Q.   The first time we met was when?
14     A.   This morning.
15     Q.   Prior to that our association has been
16 how?
17     A.   Telephonically.
18     Q.   We're here today because of an
19 accident in which Mr. Jose Escudero was injured
20 when he fell off a Bauer ladder, you understand
21 that, right?
22     A.   Yes, sir.
23     Q.   Prior to being apprised of the facts
24 surrounding Mr. Escudero's accident, had you had
25 occasion to be involved in Bauer ladders on a
```

Page 14

1              Pugh
2  professional basis?
3      A.   Yes, sir.
4      Q.   Can you tell us about those?
5      A.   Well, I had done analyses of two prior
6  accidents.
7          MR. GENDRY:  Let me make an objection
8  to the form.
9      A.   I had done and had been retained to
10 analyze two prior accidents that resulted in
11 injury to people using Bauer ladders, very
12 similar Bauer ladders under very similar
13 circumstances.
14         The captions were Smith versus Bauer
15 and Scott versus Bauer.
16     Q.   Which one was first?
17     A.   I believe the Scott case preceded the
18 Smith case.
19     Q.   And do you remember the date of injury
20 in that case?
21     A.   I don't have that committed to memory,
22 no.
23     Q.   Do you remember roughly what the case
24 was about?
25     A.   Well, I remember what both cases were

Page 15

1              Pugh
2  about.
3      Q.   I thought we would start with one
4  first and then the next.
5          MR. GENDRY:  Objection to the form.
6      A.   They were both very similar by my
7  recollection.
8          They both involved situations where
9  the gentlemen were using a Bauer ladder,
10 fiberglass ladder much as we have here today,
11 climbing up on the ladder, performing ordinary
12 routine activity when the ladder precipitously
13 collapsed on them, throwing them to the
14 horizontal surface and resulting in significant
15 injury.
16         And both of those ladders exhibited
17 the same failure mechanism, I should add, as was
18 exhibited in the Escudero ladder.
19     Q.   Namely what?
20     A.   Maybe it would be best to have the
21 ladder in front of us, or a photograph, but
22 basically it was -- can you focus in on this?
23         Basically what happened was there was
24 a splitting of the rear legs that caused the rear
25 legs, if you will, to turn to rubber, as it was

Page 16

1              Pugh
2  described, and caused the ladder to collapse.
3          The rear legs split in an upward
4  manner which caused them to lose their structural
5  integrity and failed to support the weight of the
6  person on the ladder.
7      Q.   How were the ladders similar in the
8  two previous cases to the Escudero case?
9      A.   Well, all three of these ladders were
10 Bauer manufactured fiberglass ladders and they
11 all had very similar, if you will, foot
12 treatments.
13         That is, the bottom of the legs were
14 very similar in each of the three types of --
15 they were virtually identical ladders in all
16 three cases.
17     Q.   When I contacted you about your
18 services, what was your assignment?
19     A.   Well, you asked me to examine the
20 ladder that Mr. Escudero was using at the time of
21 his accident, to advise you about the way the
22 failure occurred that caused him to sustain
23 severe injury to his foot and ankle area, and to
24 let you know what could have been done to prevent
25 this occurrence.

Page 17

1              Pugh
2      Q.   And what did you do to form a
3  considered opinion in this matter?
4      A.   Well, initially you shipped to me the
5  ladder that he was using at the time of the
6  accident, and you were kind enough to send me
7  some medical information relating to the
8  injuries.
9          You sent me his deposition transcript,
10 his testimony wherein which he described the
11 background and the accident and the condition of
12 the ladder when he was using it.
13         You sent me x-rays showing the damage
14 to the left foot.
15         I had a taped statement of
16 Mr. Escudero answering questions relative to the
17 accident, and subsequently I was forwarded
18 materials consisting of a deposition of a
19 Mr. John Vasichko, V-A-S-I-C-H-K-O, who is an
20 employee of Bauer who is in on some of the design
21 work on the Bauer ladders, and a Mr. Richard
22 Poremba, P-O-R-E-M-B-A, who had written a prior
23 report authored by Naismith, N-A-I-S-M-I-T-H,
24 Engineering on the subject ladder that he had
25 examined.

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 45 of 65

Page 18

```
1           Pugh
2       I received from Dr. Johnson, or that
3   is from you, that Dr. Johnson wrote on behalf of
4   defendant Bauer, a report dated August the 3rd of
5   2001, and I just today received an additional
6   report authored by Dr. Johnson dated August the
7   10th of 2001 which contained the results of some
8   testing that he did on the samples that were
9   removed from the subject ladder.
10      In discovery I received certain
11  documents, including information on ladders,
12  technical specifications, not only on Bauer
13  ladders but other types of ladders, Louisville,
14  Green Bull, Werner.
15      There were some blueprints. I
16  received standards which I already had, ANSI
17  standards.
18      I received an OSHA document,
19  Occupational Safety and Health, and that was
20  really about it.
21      I proceeded to digest all this
22  material, the written materials, I proceeded to
23  take the ladder itself. I carefully documented,
24  and of course I had the report of Naismith
25  Engineering in hand which reported their
```

Page 20

```
1   the rails, the support rails, these are the back
2   rails, these are the front rails, these are the
3   steps, these are the rear cross-braces, this is
4   the spreader, and the web mechanism is at the
5   top.
6       It's a pretty standard stepladder
7   we're talking about.
8       Q.   What was your understanding of how the
9   accident happened generally?
10      A.   My understanding was that Mr. Escudero
11  was -- had taken the ladder to where he was going
12  to be using it.  He examined the ladder to see
13  that it was in usable condition.
14      He proceeded to climb up the ladder
15  to, I believe it was the fourth or fifth step,
16  and he was performing an overhead operation when
17  all of a sudden the ladder just collapsed on him
18  or collapsed with him on it, and his left foot
19  hit the horizontal surface sustaining a severe
20  fracture.
21      Q.   You have had a chance to study the,
22  what we're going to call the subject ladder, the
23  one that was involved in this accident?
24      A.   Yes, sir, in quite a bit of detail.
```

Page 19

```
1           Pugh
2   examination of the ladder, while I was examining
3   it.
4       I examined where the legs had failed.
5   There were -- as you look at the ladder there
6   were splits that were shown on the ladder in
7   certain positions on the ladder; this being the
8   back rails, this being the front rails, if you
9   can see that.
10      Q.   Can we stop right there.
11      Let's identify the parts of the ladder
12  so that we can talk about them freely with the
13  jury understanding what part we're talking
14  about.
15      The average laymen I think would call
16  them legs, but that's really not what they say in
17  the industry, is it?
18      A.   Well, we use the word legs or rails
19  interchangeably pretty much.
20      Q.   Can you just with the use of your
21  drawing show us where the steps are, where the
22  what they call the web is and some of the areas
23  we're going to be talking about today?
24      A.   Well, probably would be best from the
25  diagram from the ANSI standard here.  These are
```

Page 21

```
1           Pugh
2       Q.   Based on what you understood from
3   Mr. Escudero, as well as haven't you read some
4   other depositions of witnesses that were at the
5   scene?
6       A.   I only had the depositions of Mr. --
7   well, yes, I did.  I'm sorry.  You're absolutely
8   correct.
9       I did read and summarize the
10  depositions of Carmen Escudero, Jose Escudero,
11  Sr., Jessie Ramirez, Ramundo Medina.
12      Thanks so much for reminding me of
13  that.
14      Q.   Based on what you learned from the
15  testimony of the other witnesses and from your
16  study of the subject ladder, did you come to any
17  conclusions about how this accident happened?
18      A.   Yes, I did, sir.
19      Q.   Can you tell us about that?
20      MR. GENDRY:  Object to form.
21      A.   Well, what happened in this particular
22  accident was the, and this is my drawing of the
23  subject ladder, these are the -- this I have
24  labeled legs 1 and 2 which are the ones you would
25  climb up.
```

7 (Pages 22 to 25)

Page 22

Pugh
1
2        Legs 1 and 2 are these legs over here,
3   are rails that were the ones that you would climb
4   up, have the steps on them.  The back legs are
5   labeled 3 and 4.
6        And basically what happened was there
7   were cracks, small cracks in these legs that when
8   Mr. Escudero was on the ladder zipped up the back
9   legs destroying the mechanical integrity of the
10  back leg and allowing the ladder to fall over and
11  throw him to the floor.
12       Q.  From studying the ladder did it appear
13  that some of the cracks preexisted Mr. Escudero's
14  fall?
15       A.  Yes.  There were preexisting cracks in
16  the ladder at the time he mounted the ladder just
17  before the fall.
18       Q.  And did the fall itself in your
19  opinion or not expand or propagate the cracks?
20       A.  You mean the actual event of the
21  ladder hitting the horizontal surface?
22       There may have been some propagation.
23  I can't conclude the amount of that, but there
24  may have been some.  Not significant though.
25       Q.  Was there any cracking in the

Page 23

Pugh
1
2   mechanics of the back rails contorting?
3       A.  Oh, yes, that's what in fact
4   happened.
5       The cracks in the back rails started
6   propagating up because there was a load placed on
7   those rails, and they shot up the back rail and
8   essentially reduced the cross-section of the rail
9   to pieces of spaghetti.
10      Q.  Was that while Mr. Escudero was on the
11  ladder?
12      A.  That's correct.
13      Q.  And did you have any information as to
14  how long he was on the ladder before that all
15  happened?
16      A.  My recollection was it was just a
17  short length of time, just a few minutes.
18      Well, there was testimony he was on
19  the ladder ten, fifteen minutes before the fall.
20  That's from Mr. Medina.
21      Mr. Escudero says he was on the ladder
22  three to ten minutes, so a number of minutes.
23      Q.  You've had a chance to look at the
24  ladder.
25      Did the subject ladder, did its

Page 24

Pugh
1
2   particular design promote or cause this accident
3   to happen?
4       A.  Yes, it did, sir.
5       Q.  How?
6       A.  Perhaps it might be useful to have the
7   ladder in front of us here somehow if we can
8   focus on it.
9       Q.  What I would like to do, I will come
10  over here and see if we can get this shot here.
11  I am going to turn this ladder upside down.
12      First of all, as we show the jury this
13  ladder, that is not the way this ladder looked --
14  I am leading you, and let me rephrase that
15  question -- is this the way the ladder looked
16  when you first received it from my office?
17      A.  No, sir.  It did not.  You may want to
18  open it up just so we -- thank you.
19      Q.  How is it different here now than when
20  you first saw it?
21      A.  Well, it's different in that -- can we
22  focus on the ladder now?
23      It's different in that the legs 3 and
24  4, the rear legs have been -- the top has been
25  cut out for testing by Dr. Johnson on behalf of

Page 25

Pugh
1
2   the defendant Bauer.
3       When I received the ladder these rails
4   were the same fiberglass rails as you see in the
5   front.
6       Q.  How did the design, if it did,
7   precipitate this accident?
8       A.  The design precipitated the accident.
9   If you let us look at the back rails here in
10  particular, and let's just hold these up to the
11  camera if we could, they have been taped
12  together, and if I could just remove the tape
13  here.
14      The cracks propagated quite a
15  distance, perhaps as much as from here up to
16  here, while Mr. Escudero was on the ladder.  And
17  of course it rendered this rail incapable of
18  supporting the load on the ladder, basically
19  reduced it to spaghetti.  You see how bendable it
20  is.
21      Of course the other one failed also.
22  The cracks shot up the leg, destroyed the
23  mechanical integrity of the back rails and
24  rendered the ladder unable to support the weight
25  that was on it.

**DR. JAMES PUGH - AFTERNOON SESSION**                    **AUGUST 16, 2001**

8 (Pages 26 to 29)

Page 26

1              Pugh
2     And I should add that Mr. Escudero was
3  not particularly heavy. He gives his height as
4  6,1 to 6,2, and his weight 190 to 200 pounds.
5     Q.   How could this ladder have been
6  designed differently to prevent or make this kind
7  of problem less likely?
8     MR. GENDRY: Object to the form.
9     A.   Well, it's a very simple matter to
10 take the foot and encapsulate the foot in what we
11 call a boot that keeps any splitting, even if it
12 does occur, it keeps the splitting from allowing
13 the leg or the rails to separate so that they
14 maintain their mechanical integrity.
15    Another way to do it, and we have a
16 ladder outside, is to put, simply put an
17 additional fiberglass sheath around the bottom of
18 the leg to make it stiffer.
19    Did you want to pull that in and put
20 that on the camera?
21    Q.   We will do that in a little bit if
22 it's okay.
23    A.   Other things that should be done and 1
24 recommend is that the cross-braces as they are
25 shown to be riveted onto this part of the leg,

Page 27

1              Pugh
2  they should also be riveted to the front edge of
3  the rail so that it will not separate so it ties
4  the leg together, much as is done with the steps
5  on the front of the ladder which are riveted to
6  both sides of the major, of the large front rail.
7     Q.   And there's going to be some talk in
8  this trial regarding these different parts.
9     What do they call this part right
10 here?
11    A.   Well, I call that a flange.
12    Q.   Okay. I think that's how it's going
13 to be identified.
14    And this part, do some call this part,
15 this wider part, the web?
16    A.   That could be called the web also.
17 With -- a lot of these words are used
18 interchangeably.
19    With regard to beam technology, this
20 would be called the web of the beam.
21    There is also a web that exists up in
22 the top part here that sustains the top step.
23    Q.   Is it significant with the --
24    A.   With regard to the beam, these would
25 be the flanges, this would be the web.

Page 28

1              Pugh
2     Q.   Is there any significance that the
3  cracking or splitting occurred between the flange
4  and the web on the rail?
5     A.   Yes, there is.
6     Q.   What would that be?
7     A.   The structure here, that edge is
8  called a geometric discontinuity. It's a bend or
9  change in shape of the material at that point,
10 and that means that any loads that are placed on
11 this structure are going to be amplified at that
12 corner, so it's a high stress location.
13    And materials in general fail in
14 regions of the high stresses, so this is the
15 region that's most at risk for failure in this
16 particular structure. It's the edge of the beam.
17    Q.   Is that something in reasonable
18 engineering probability that could be anticipated
19 by a designer or a manufacturer of a ladder?
20    MR. GENDRY: Objection to the form.
21    A.   Absolutely. An engineered structure,
22 a manufactured structure must always be designed
23 and built to accommodate stress concentrators
24 resulting from the geometry of the structure,
25 which is what we're talking about here.

Page 29

1              Pugh
2     Q.   The questions that I am asking you,
3  that I have asked you so far, have they been
4  based on reasonable engineering probability?
5     A.   Yes, sir.
6     Q.   The questions that I am going to ask
7  you in the future, would you also base those
8  answers on reasonable engineering probability?
9     A.   Yes, sir.
10    Q.   And it's your testimony that there are
11 four basic rails to a ladder such as this?
12    A.   Yes, sir.
13    Q.   Would it be a known hazard to a
14 manufacturer, designer of ladders such as this,
15 that they could have cracking or splitting of
16 rails?
17    MR. GENDRY: Object to form.
18    A.   Yes, sir.
19    Q.   Is that something that they should
20 reasonably anticipate?
21    A.   Yes, sir.
22    Q.   What sort of duty is on a manufacturer
23 in regard to designing a safe product?
24    MR. GENDRY: Object to form.
25    A.   It really lies in what we call the

9 (Pages 30 to 33)

Page 30

Pugh
1
2   principles of hazard management. And the basic
3   principles of hazard management in any situation,
4   but particularly for a designed and manufactured
5   product, is that if there is a hazard in the
6   product, if it can economically and feasibly be
7   designed out the manufacturer must design that
8   hazard out, must eliminate that hazard.
9        Further down the line if it's
10  determined that the hazard, it's not economical
11  or feasible to engineer that or design out that
12  hazard, then it's appropriate to guard against
13  that hazard.
14       And one of the examples of guarding
15  would be the use of a saw, let's say a table saw
16  where you have to have the blade, the hazard to
17  cut the wood. That's the purpose of it. But you
18  can minimize the hazard by putting a guard around
19  the blade that prevents the hand from going into
20  the blade.
21       Now, if it's determined that it's not
22  economical or feasible to either design out the
23  hazard or guard against it, then what's permitted
24  as a last resort is to warn and instruct the user
25  that's the nature of the hazard so they may

Page 31

Pugh
1
2   provide appropriate countermeasures to it.
3        Q.   Now, your understanding is that
4   Mr. Escudero was on what step when he fell?
5        A.   He was on the fourth or fifth step by
6   his testimony. I do believe that.
7        Q.   If would you assume that there is
8   going to be some testimony that the user of these
9   ladders are instructed not to go above the fourth
10  step --
11       A.   Yes, sir.
12       Q.   -- is there a method that the Bauer or
13  a similar ladder manufacturer could take to
14  eliminate that risk that someone is going to go
15  up higher than four steps?
16       A.   Yes, sir.
17       Q.   How can they do that?
18       A.   An insert can very simply be put in
19  those steps to prevent someone climbing on those
20  steps.
21       Q.   When you say "an insert," you mean
22  some sort of physical thing that doesn't allow
23  you use it as a step?
24       A.   That's correct, just a flat sheet of
25  plastic in fact, or fiberglass just screwed onto

Page 32

Pugh
1
2   the ladder or adhesed onto the ladder.
3        Q.   Under the basic principles of hazard
4   management would that be preferable to warning
5   someone don't get up on the fifth or top step?
6        A.   Yes, sir.
7             MR. GENDRY:  Objection, leading.
8        Q.   Have you looked at other similar
9   stepladders to see if they have designed their
10  rails differently to anticipate and deal with
11  this problem of the rail splitting?
12            MR. GENDRY:  Object to form.
13       A.   Yes, sir.
14       Q.   What other manufacturers have you --
15  models have you looked at?
16            MR. GENDRY:  Object to form.
17       A.   In particular I have observed the
18  Werner, W-E-R-N-E-R, ladders, and the Werner
19  ladders -- and I believe there's a photograph or
20  a brochure showing that have a rather aggressive
21  design to hold the bottom of the legs together to
22  prevent the splitting that you see on the
23  Escudero ladder.
24       I believe you have photographs there,
25  or maybe the brochure might even be better to

Page 33

Pugh
1
2   show a photograph of.
3            MR. BENTON:  Let me have you mark this
4   as Exhibit No. 2.
5            (Plaintiff's Exhibit 2, photograph of
6   Werner ladder, marked for identification, as
7   of this date.)
8        Q.   Can you identify Exhibit No. 2 for me,
9   please.
10       A.   Yes, sir, this is a Werner ladder.
11       Q.   Does that ladder in its design treat.
12       The problem of splitting or cracking
13  of the rails.
14            MR. GENDRY:  Object to form.
15       A.   That shows an additional part at the
16  base of each leg that ties the leg in, or all
17  parts of the leg into the, or the rail into the
18  bottom cross-brace on the back and into the
19  bottom step on the front.
20       Q.   You can take off that little green tab
21  if you would.
22       I will have this marked as Exhibit 3 I
23  believe.
24            (Plaintiff's Exhibit 3, photograph,
25  marked for identification, as of this date.)

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 49 of 65

Page 34

                    Pugh
1
2        MR. BENTON: While we're at it, let's
3    mark this one as No. 4.
4        (Plaintiff's Exhibit 4, photograph,
5    marked for identification, as of this date.)
6        Q.   Dr. Pugh, I am handing you these
7    Exhibits 2, 3, and 4.
8        I don't know how good a shot we can
9    get from the camera, but I would love the
10   cameraman to try to zoom in as much as he can.
11       Can you talk about how or why you
12   believe that's a superior design for dealing with
13   the problem of cracking rails?
14       MR. GENDRY: Object to form.
15       A.   This is Exhibit 2 that I showed
16   before, but there are closer ups in Exhibit 3 and
17   Exhibit 4 and they show basically the use of an
18   insert at the bottom of the legs that ties and
19   holds the leg parts, the rails and the flanges
20   and the web together to keep them from flying
21   apart as happened with the Escudero ladder.
22       Q.   The technology involved in these shoes
23   or caps that they're putting on these rails, is
24   that technology something that was available when
25   this subject ladder was manufactured?

Page 35

                    Pugh
1
2        A.   Yes, sir.
3        Q.   I want you to assume that Bauer is
4    representing that this subject ladder was
5    manufactured sometime around 1990, maybe a little
6    before, 1988 to 1990.
7        A.   Yes, sir.
8        Q.   How far back does at least the concept
9    of reinforcing the bottom of the rails on any
10   kind of ladder go back, to your knowledge?
11       A.   There is a patent dating back to the
12   1930s involving the use of a metal cap or metal
13   in support for wooden ladder legs, to stabilize
14   those legs and prevent deterioration and collapse
15   of those legs.
16       So it goes back at least to the '30s,
17   1930s.
18       Q.   Is that the same general principles
19   we're talking about with the Werner shoes?
20       A.   It's the identical principle, yes.
21       Q.   Do you have any knowledge from reading
22   perhaps Mr. Vasichko's deposition, whether it's
23   affordable in the manufacturing process to put on
24   these type of shoes or caps or enclosures around
25   the ends of the rails?

Page 36

                    Pugh
1
2        A.   Yes.  He testified that it was
3    affordable, and I believe he even intimated that
4    it was in fact less expensive to put these boots
5    that Bauer has begun to use on the bottom of the
6    ladder legs on rather than having the fixtures
7    that were on the ladders that were prone to
8    failure.
9        MR. GENDRY: Object as nonresponsive.
10       Q.   Were you able to review Mr. Vasichko's
11   testimony as a representative of Bauer
12   Corporation --
13       A.   Yes, sir.
14       Q.   -- regarding the effectiveness of
15   enclosing the shoe with some sort of vinyl boot
16   in preventing this fracture that occurred on
17   Mr. Escudero?
18       A.   Yes, I do.
19       MR. GENDRY: Object to form.
20       Q.   What did you learn from reading
21   Mr. Vasichko's deposition?
22       MR. GENDRY: Object to form.
23       A.   That this boot was quite effective in
24   preventing the failures that we see in the
25   Escudero and also the Smith and the Scott

Page 37

                    Pugh
1
2    ladders.
3        MR. GENDRY: Object as not
4    responsive.
5        MR. BENTON: I will have this marked
6    as Exhibit No. 5, please.
7        (Plaintiff's Exhibit 5, photograph,
8    marked for identification, as of this date.)
9        Q.   I am going to show you a photograph
10   that I am going to represent to you is a group of
11   Bauer ladders.
12       MR. GENDRY: I object to form.
13       Is that your question?  Object to
14   form.
15       MR. BENTON: I am going to go ahead
16   and have this marked as Exhibit No. 6.
17       (Plaintiff's Exhibit 6, photograph,
18   marked for identification, as of this date.)
19       Q.   I am going to represent to you that 6
20   is a higher shot of these Bauer ladders and that
21   5 is the lower part of the ladders.
22       A.   Yes, I see that.
23       MR. GENDRY: Object to form.
24       Q.   Are those stepladders similar to the
25   one that is the subject ladder here today?

Page 38

Pugh
1
2      A.   Yes.
3          MR. GENDRY: Object to form.
4      A.   Yes, sir.
5      Q.   Is there a meaningful difference in
6   regard to protecting against fracturing or
7   splitting or cracking of the rails at the bottom
8   on those ladders?
9          MR. GENDRY: Object to form.
10     A.   Yes, sir.
11     Q.   How are those designed differently
12  than the subject ladder here?
13         MR. GENDRY: Object to form.
14     A.   Should I hold the photograph up?
15     Q.   Sure, please. Always.
16     A.   These photos show the in treatment or
17  the leg treatment of the newer Bauer ladders
18  consisting of a vinyl boot that is encompassing
19  of the bottom of the front and back legs, and as
20  I said, would tie together the rails, the flanges
21  with the web so that this splitting would not be
22  a problem.
23         MR. GENDRY: Object to responsiveness.
24     Q.   If there was cracking in the rail,
25  would that type of a boot, both on the Bauer as

Page 39

Pugh
1
2   well as the shoe on the Werner, would they reduce
3   the likelihood that a catastrophic injury would
4   occur from that cracking?
5          MR. GENDRY: Object to form.
6      A.   Very much so, sir.
7      Q.   I may be a bit redundant, but can you
8   explain again how that would prevent again a bad
9   accident happening?
10         MR. GENDRY: Object to form.
11     A.   They would positively tie in the leg
12  and it would keep the flanges from separating
13  from the rail, and it would ensure that the
14  mechanical integrity of the leg would exist on
15  the ladder for almost an indefinite period of
16  time.
17     Q.   Does the Bauer treatment of the rail
18  shoe and the Werner treatment of the rail shoe
19  show different methods of dealing with the same
20  problem?
21         MR. GENDRY: Object to form.
22     A.   Yes, sir.
23     Q.   But on the other hand, do they have
24  similarities?
25     A.   Yes, sir.

Page 40

Pugh
1
2      Q.   You prepared a report of your studies
3   on the subject ladder and comparable ladders; is
4   that true?
5      A.   Yes, sir.
6          MR. BENTON: I am going to have this
7   marked as Exhibit 7.
8          (Plaintiff's Exhibit 7, a four-page
9          report, marked for identification, as of
10         this date.)
11     Q.   Looking at Exhibit 7, Doctor, can you
12  identify that for us, please.
13     A.   That's my report dated May 22nd of
14  this year, 2001. It's a four-page report.
15     Q.   Does that report basically summarize
16  your findings and conclusions in this case?
17         MR. GENDRY: Object to form.
18     A.   Yes, sir.
19     Q.   Let me rephrase that.
20     What does your report do, Doctor?
21     A.   It states in quite a bit of detail the
22  results of my inspection and analysis of the
23  submitted materials, including the ladder, and my
24  opinions and conclusions about how the accident
25  could have been prevented and should have been

Page 41

Pugh
1
2   prevented.
3          MR. GENDRY: Object to responsiveness.
4      Q.   And what is your opinion as to the
5   cause of this fall?
6      A.   The failure of manufacturer Bauer to
7   eliminate the hazard of the splitting of the legs
8   between the flanges and the web, particularly the
9   rear legs, which is what causes the accident with
10  these ladders.
11         Their failure to eliminate that hazard
12  by encapsulating or tying together the bottom of
13  those legs with some appropriate means which we
14  know to be economical and feasible to do.
15     Q.   In your opinion if they had treated
16  the protection of rails with shoes or caps
17  similar to the present Bauer design, or Werner,
18  do you have an opinion whether this accident that
19  Mr. Escudero was involved in would have happened
20  or not?
21         MR. GENDRY: Object to form.
22     A.   Yes, I do, sir.
23     Q.   And what is that opinion?
24         MR. GENDRY: Object to form.
25     A.   My opinion is that had there been an

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 51 of 65

Page 42

Pugh

2 appropriate treatment of either the subsequent
3 Bauer type or the Werner type or other types that
4 we know of now, that this accident would have
5 never occurred.
6     Q.   Now, there is expected to be testimony
7 that alleges or contends that Mr. Escudero caused
8 his own accident because he failed to observe the
9 cracks that were in the rails at the time he went
10 to use this ladder.
11         Is there -- are these kind of cracks
12 that are present in the subject ladder, and I'm
13 not talking post-accident, I'm talking
14 preaccident, the extent of the cracks, are they
15 something that the average layman or even the
16 average construction worker would be looking for
17 when they took a ladder?
18     MR. GENDRY: Object to form.
19     A.   No, they are not.
20         And let me just demonstrate by using
21 the front rails here. I will turn the ladder
22 around.
23         The front rails here in fact are also
24 cracked, but these really are stable cracks, at
25 least they didn't propagate in this accident.

Page 43

Pugh

2         And the cracks that existed in the
3 back rails in my opinion were not dissimilar from
4 what existed in the front rails. In fact, they
5 were similar to this what we see here prior to
6 the subject accident.
7         And this would be interpreted by a
8 worker as being an acceptable structure. In
9 fact, they wouldn't be inclined to even identify
10 this as a major problem because the ladder with
11 this crack when you put it down in relatively
12 stable. You can move it and it's stable.
13         The problem is when you get on the
14 ladder, at least with the rear cracks, and put a
15 load or twist it a little bit, which is normal
16 action, the crack will shoot way up the leg
17 immediately and collapse the ladder.
18         It's called an incipiently unstable
19 crack.
20     MR. GENDRY: Object to responsiveness.
21     Q.   In your studies have you found that
22 when a worker goes to look at the ladder before
23 he uses it, that he understates the importance of
24 inspecting the back rails, the skinnier rails?
25     MR. GENDRY: Object to form.

Page 44

Pugh

2     A.   Yes, sir, very much so.
3     Q.   Why do you think that's so?
4     MR. GENDRY: Object to form.
5     A.   The workers don't regard the back
6 rails as a major load-carrying structure of that
7 importance with regard to keeping the ladder up.
8 Their weight is mainly on the front, more massive
9 rails.
10         In fact, the rear rail legs are
11 smaller in cross-section and they're inherently
12 weaker, and the inspection is generally done of
13 the area where you're going to put your weight,
14 and the attention is paid more closely to that
15 typically.
16         Of course there is nothing on the
17 ladder, there is no warning or instruction to
18 indicate that attention should be paid to the
19 rear legs, particularly because those are the
20 ones that are going to throw you.
21     Q.   I anticipate there is going to be some
22 testimony about the ANSI standards.
23         First, what does ANSI stand for?
24     A.   ANSI is an acronym for American
25 National Standard Institute, which is a standard

Page 45

Pugh

2 setting organization.
3     Q.   Does that institute set standards for
4 things such as stepladders?
5     A.   There is an ANSI standard, yes.
6     Q.   In your opinion can a product, such as
7 a stepladder in this case, comply with those
8 standards and still not be the optimum design?
9     MR. GENDRY: Object to form.
10     A.   Absolutely.
11     Q.   Do you believe this to be the case?
12     MR. GENDRY: Object to form.
13     A.   I believe that -- well, my analysis of
14 this and my analysis of the standards as well as
15 the OSHA requirements, is that they are, as
16 always, intended to provide a minimal or minimum
17 level of safety.
18         And that it is incumbent upon the
19 manufacturer to exceed the requirements of the
20 ANSI standards and the OSHA standards, and
21 requirements to produce a product that is
22 reliably safe and it has hazards that are
23 reasonably eliminated.
24     MR. GENDRY: Object to
25 responsiveness.

Case 1:00-cv-00193  Document 18  Filed in TXSD on 09/28/2001  Page 52 of 65

Page 46

1       Pugh
2       Q.   In your study did you have certain
3   opinions about the integrity or the quality of
4   the fiberglass involved with the subject ladder?
5       MR. GENDRY: Object to form.
6       A.   Yes, sir.
7       Q.   And what were your conclusions about
8   the -- let me ask you, how did you study the
9   quality of the fiberglass itself where it's
10  relevant on this ladder?
11      MR. GENDRY: Object to form.
12      A.   I examined the failed -- if you can
13  pick that up for me -- thank you.
14      I examined the fracture surfaces, the
15  key fracture surfaces that resulted in the
16  collapse of the ladder under the microscope, and
17  I determined that in fact the fracture surfaces,
18  the joint or the edge or surface between the
19  flanges and the web, was what we call a brittle
20  failure.  That is, you can fit the pieces back
21  pretty much together.  It's a very low energy
22  absorptive failure.
23      And in examination I noticed that the
24  fiberglass fibers, the actual cloth, the way it
25  failed along here was predominantly between

Page 47

1       Pugh
2   fibers running this way rather than across fibers
3   running this way.
4       And of course the nature of the
5   failure being brittle is unacceptable in an
6   engineering sense, and would demand there be an
7   enhancement of properties by the use of a boot or
8   some stabilizing device to accommodate this.
9       MR. GENDRY: Object to responsiveness.
10      Q.   In a little more simpler terms for
11  someone like myself, did you believe that the
12  quality of the fiberglass was not sufficient?
13      MR. GENDRY: Object to form.
14      A.   I felt that the fiberglass was not of
15  sufficient quality given the absence of an
16  encapsulating boot or encapsulating type of
17  assembling at the bottom of the leg.
18      That in conjunction with the lack of
19  the boot, the weakness at that edge there was
20  promotive of the failures that we see here.
21      Q.   If there were more cross-fibers of
22  fiberglass going across instead of just
23  long-wise, would that have strengthened this
24  vital area where the crack occurred?
25      MR. GENDRY: Object to form.

Page 48

1       Pugh
2       A.   Yes, it would have.
3       Q.   Now, I anticipate that there is going
4   to be some testimony that Mr. Escudero or someone
5   was using this ladder at a time when the cracks
6   or fractures were quite extensive like they are
7   today.
8       And some of the evidence there in
9   their attempt to show that is with either paint
10  or spackling in the cracks.
11      Did you take a look at those cracks to
12  see if you saw things like spackling or paint in
13  them?
14      A.   Yes, I did.
15      Q.   What did you find?
16      A.   I did not find any evidence of spackle
17  or paint on the specific fracture surfaces
18  involved with the splitting of the rail or flange
19  to web joint in the back rails.
20      Q.   You testified earlier that you had an
21  opportunity to read the two reports of Dr.
22  Johnson, the Bauer Corporation's expert; is that
23  right?
24      A.   Yes, sir.
25      Q.   Starting with the first report, did

Page 49

1       Pugh
2   you notice one of his conclusions was that there
3   was no evidence of a bad design to the subject
4   ladder?
5       A.   Yes, sir.
6       Q.   Did you see any analysis of
7   alternative designs in his report?
8       A.   No, sir.
9       Q.   How would you characterize his
10  analysis in coming to that conclusion based on
11  his report?
12      MR. GENDRY: Object to form.
13      A.   I disagree with his findings and we
14  have specific examples of ladders, the Werner
15  ladders with the encapsulating feet that were
16  produced around the same time that this ladder
17  was manufactured, mainly 1988 to 1990, which were
18  much more stable and much more resistant to this
19  type of failure.
20      MR. GENDRY: Object to responsiveness.
21      Q.   Did you find he even addressed the
22  alternative designs in his first report?
23      MR. GENDRY: Object to form.
24      A.   I don't recall that he did address
25  that.  I am not finding my copy of that report.

Page 50

1            Pugh
2     Q.   Then I will just give you this one
3   anyway.  There it is right there, if you would
4   like to use mine.
5     A.   Thank you so much.
6     Q.   In looking at the second report, I
7   believe it's August the 10th; is that right?
8     A.   Yes, sir.
9     Q.   What basically was that report
10  purporting to try to show?
11    A.   Well, this August 10th report was the
12  result of testing that was done on the sections
13  that were removed from the accident ladder.
14         And basically what was done was test
15  samples were cut out of these pieces and the test
16  samples looked -- is there a marker here we could
17  use?
18         I could get one.  Does that have a
19  felt tip?  I could find one if you would like to
20  take a break for a second to do that.
21         THE VIDEOGRAPHER:  Off the record.
22         The time is 3:51 p.m.
23         (Recess.)
24         THE VIDEOGRAPHER:  We're now going on
25  the record.

Page 51

1            Pugh
2         The time is 3:52 p.m.
3   BY MR. BENTON:
4     A.   Test samples were cut out of the
5   fiberglass and they were subsequently tested by a
6   tensile tester and other means.
7         Let me make sure I have the
8   configuration properly.
9         Basically samples were cut out that
10  looked like this.  That's called -- what we call
11  that is a dog bone specimen, if you will, or a
12  tensile bar with a reduced cross-section.  And in
13  some cases a rectangular piece was cut out.
14         So the material that was tested was
15  the material in the middle of the flange or the
16  middle of the rail or the middle of the web.
17         And no testing was done at all of the
18  material along the angle, along the edge that
19  actually failed in the subject ladder.
20    Q.   Is that relevant?
21    A.   Well, it most certainly is.
22    Q.   Why?
23    A.   In order to evaluate the factors
24  relating to the failure of this ladder, if you
25  want to do testing you need to do testing of the

Page 52

1            Pugh
2   material representative of what failed in the
3   accident.  That was never tested.
4         These flanges, the flat flanges
5   never failed.  They're still intact.  It's the
6   corner that failed.  And those were not tested by
7   Dr. Johnson.
8     Q.   In your report you discussed the issue
9   of proper warnings; is that correct?
10    A.   Yes, sir.
11    Q.   Do you have any criticisms of the
12  warning labeling on the subject ladder?
13    A.   Yes, I do.
14    Q.   What are those?
15    A.   Given the configuration of the ladder
16  and the tendency for the ladder to split,
17  particularly in the back legs, the warnings are
18  vague and ambiguous and they don't really
19  indicate exactly what conditions the ladder
20  should be taken out of service, what size crack
21  or where the cracks should be looked for, or
22  anything that would enable the user to adequately
23  identify, look for and identify a structure that
24  is, or failure or an incipient crack that is
25  going to lead to catastrophic failure.

Page 53

1            Pugh
2         And it's also not the way to manage
3   the hazard.  The hazard should be eliminated, not
4   warned against.
5         MR. GENDRY:  Object to responsiveness.
6         MR. BENTON:  I will pass the witness.
7         MR. GENDRY:  Let's take a short
8   break.
9         THE VIDEOGRAPHER:  We're now going off
10  the record.
11         The time is 3:54 p.m.
12         (Recess.)
13         THE VIDEOGRAPHER:  We're now going on
14  the record.
15         The time is 4:08 p.m.
16  EXAMINATION BY
17  MR. GENDRY:
18    Q.   Dr. Pugh, my name is Tom Gendry.
19         We have met this day for the first
20  time; is that correct, sir?
21    A.   Yes, sir.
22    Q.   Previous to this what we call a trial
23  deposition, you gave a discovery deposition
24  wherein I asked you a series of questions and you
25  responded; is that right?

Page 54

Pugh

1
2    A.   Yes, sir.
3    Q.   I am going to follow up on some of the
4 questioning presented to you by Mr. Benton in
5 this case.
6         When is it that you first got involved
7 in this case?
8    A.   I recall it was sometime last summer.
9    Q.   And that was on a call from
10 Mr. Benton; is that correct?
11   A.   That's correct.
12   Q.   Mr. Benton in fact retained you and
13 has paid you money with regard to providing
14 review of this case and testifying in this case?
15   A.   That's correct, sir.
16   Q.   And in fact he has sent you some sums
17 of money as the process has gone on?
18   A.   He's paid me for my time that I spent
19 on the case, yes, sir.
20   Q.   And previously we asked that your time
21 log and your fees in this case be attached to the
22 previous deposition and you have agreed to do
23 that; is that correct?
24   A.   I believe that was done, yes, sir.
25   Q.   Partly that was done, by what was

Page 55

Pugh

1
2 produced by Mr. Benton.
3         But as to your bills, if there are any
4 more, you're going to attach them; is that
5 correct, sir?
6    A.   I believe that was complete, but yes,
7 if there are any additional I will be happy to
8 attach those.
9    Q.   For the purpose of the jury you
10 charged Mr. Benton, I think you said it was $250
11 per hour as you have spent time working up the
12 case?
13   A.   That's correct.
14   Q.   And up to today you thought you maybe
15 had 15 hours in the case?
16   A.   As a guesstimate, yes, sir.
17   Q.   As a guesstimate.
18         For today's testimony as I understand
19 it, this takes up most of your day, this is a
20 cost to Mr. Benton of $3,000?
21   A.   I am committing a 12-hour day to this
22 particular depo today, yes, sir.
23   Q.   You previously met with Mr. Benton
24 this morning to discuss your expected testimony
25 in the case?

Page 56

Pugh

1
2    A.   We discussed the case, yes, sir.
3    Q.   If you come to Texas to trial, again I
4 assume that you charge $3,000 per day; is that
5 correct?
6    A.   Plus applicable travel expenses, yes,
7 sir.
8    Q.   If you come to trial down in Texas do
9 you charge for your travel time at $3,000 a day,
10 or how does that work?
11   A.   Well, depending on the scheduling, I
12 mean I can only give you an example.
13        If I can be given the time distance I
14 can often travel down in the morning, appear in
15 court and come back in the evening.
16        If it's doable in one day, even if it
17 takes 18 hours of my time, I only bill 12 hours
18 for that. It's limited to a 12-hour day.
19        If I have to arrive the prior day I do
20 bill the amount of time that it takes to arrive
21 the prior day.
22   Q.   At what rate the prior day?
23   A.   That's billed at $250 an hour, but
24 what I do, I take documents and I read documents
25 on the plane while I'm in transit, so basically

Page 57

Pugh

1
2 I'm working on the case during the time I'm
3 traveling.
4    Q.   Let me ask you a bit about your
5 background.
6         As I understand it, the fiberglass
7 ladder cases that you have worked on have been
8 Bauer cases only?
9    A.   That's correct.
10   Q.   In other words, Bauer Ladder
11 Corporation fiberglass stepladders is what you
12 have been involved with?
13   A.   To the best of my recollection, yes,
14 sir.
15   Q.   And with respect to other brands and
16 models, in particular you mentioned the Werner
17 brand, you have not been involved in any kind of
18 analysis of the Werner product, would that be
19 correct?
20   A.   I do not believe I have been exposed
21 to any failures of Werner products, yes.
22   Q.   I object to the responsiveness.
23        You have not been involved in any kind
24 of analysis of the Werner product, would that be
25 correct?

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 55 of 65

Page 58

1           Pugh
2     A.   Well, I have analyzed the Werner
3  products in conjunction with the Bauer cases I've
4  worked on, but I have not -- again in my prior
5  answer if you would be so kind -- I have not been
6  involved in analyzing failure of any Werner
7  ladders.
8           Thank you so much.
9           THE VIDEOGRAPHER: We're now going off
10  the record.
11          The time is 4:12 p.m.
12          (Recess.)
13          THE VIDEOGRAPHER: We're now going on
14  the record.
15          The time is 4:14 p.m.
16  BY MR. GENDRY:
17     Q.   You have not done an industrywide
18  comparison of ladders that are similar or like
19  the footing on the particular Bauer ladder
20  involved in this litigation; is that correct?
21     A.   I'm not sure I understand the
22  question.
23     Q.   Have you done any study of any other
24  ladder besides the Werner ladder?
25     A.   I surely have examined brochures of

Page 59

1           Pugh
2  the other ladders, Louisville, and I believe it
3  was Green Bull.
4     Q.   This is publications issued by
5  Louisville and Green Bull?
6     A.   Yes, sir.
7     Q.   Have any of those ladders demonstrated
8  footings similar to the Bauer ladder that is
9  involved in this case?
10     A.   I believe so.  It doesn't appear to be
11  depicted in the brochure for Green Bull, but
12  there was testimony from the corporate designee
13  for Bauer that Green Bull produces a similar foot
14  treatment.
15          Louisville, the brochure that I have
16  in front of me here, doesn't appear to show that
17  encapsulation either.
18     Q.   So far as you know, there is at least
19  one other model that you know of that you have
20  seen, or at least a publication of, showing a
21  similar footing to the Bauer ladder?
22     A.   Well, there is a full metal foot for
23  the Louisville depicted here in these brochures
24  similar to the vinyl boot of the Bauer, yes.
25     Q.   I am not talking about the boot.  I am

Page 60

1           Pugh
2  talking about the shoe similar to the particular
3  ladder involved in this lawsuit.
4     A.   Could you repeat the question,
5  please?
6     Q.   Yes.  Have you examined any other
7  ladders besides the Bauer ladder showing a shoe
8  similar to the shoe on the ladder involved in
9  this lawsuit?
10     A.   I don't recall.
11     Q.   Other than the cases that you have
12  been involved with in the Bauer case, the
13  fiberglass ladders, have you been involved in any
14  other cases involving fiberglass ladders?
15     A.   I do not recall any.
16     Q.   What has been your background
17  concerning the analysis and testing of fiberglass
18  ladders before you ever became involved in this
19  particular case?
20     A.   Fiberglass ladders per se.
21          The only -- well, I'm not sure --
22  well, before this particular case I analyzed the
23  other two Bauer ladder cases, but before that I
24  don't recall any analysis of any fiberglass
25  ladders.

Page 61

1           Pugh
2     Q.   You have never up to today's date done
3  any sort of failure analysis or testing of any
4  fiberglass ladders, would that be a correct
5  statement?
6     A.   With the exception of microscopic
7  analysis.
8     Q.   Microscopic, you mean some sort of I
9  think you called it a stereo microscopic --
10     A.   Yes.
11     Q.   -- viewing of this particular ladder
12  that we have here today?
13     A.   And the other ladders I have analyzed,
14  yes.
15     Q.   And as I understand it, there is no
16  literature specific to ladders that microscopic
17  examination is sufficient to show that there is
18  an insufficient or imperfect weaving of the
19  fiberglass structure of the fiberglass composite?
20     A.   Specifically for ladders, I do not
21  know that.
22     Q.   And before today's deposition you have
23  done no testing on any fiberglass ladders to make
24  the determination that any of the fiberglass mat,
25  meaning the weaving, the longitudinal or

**DR. JAMES PUGH - AFTERNOON SESSION**                    **AUGUST 16, 2001**

17 (Pages 62 to 65)

Page 62

Pugh
1         Pugh
2    transverse weaving is insufficient?
3       A.   Aside from the microscopic analysis,
4    correct.
5       Q.   And previously in the discovery
6    deposition you mentioned that there are a number
7    of tests which could have been utilized to
8    determine the strength of the corner of a ladder
9    as you have put it; is that correct?
10      A.   Yes, sir.
11      Q.   And you mentioned specific tests such
12   as the peel test, the crush test, the torsion
13   test and the microhardness test and the
14   quantitative microscopy; is that correct, sir?
15      A.   Yes, sir.
16      Q.   And you have done none of those tests?
17      A.   That's correct, sir.
18      Q.   In essence you are not able to say
19   within a reasonable degree of engineering
20   probability that the fiberglass mat or the
21   weaving of this ladder was insufficient?
22      A.   I cannot say that to a reasonable
23   probability, that's correct.  I strongly suspect
24   it though.
25      Q.   I object to the responsiveness of the

Page 63

Pugh
1         Pugh
2    last part of the answer.
3         As I understand it, you're telling the
4    ladies and gentlemen of this jury that you did
5    some sort of microscopic examination here in this
6    facility that we're in here today?
7       A.   Yes, sir.
8       Q.   Is that machine still available for us
9    to look at?
10      A.   If you care to, yes.
11      Q.   In previous testimony you indicated
12   that you can attach a camera to that stereo
13   microscope which you used to look at this
14   particular ladder.
15      A.   Yes, sir.
16      Q.   And with that camera you could take
17   photographs showing what you're saying is
18   insufficient weaving of the fiberglass?
19      A.   Yes, sir.
20      Q.   Is that a costly thing for you to do?
21      A.   It's timely, it's not costly.
22      Q.   What sort of time does it take to do
23   that?
24      A.   Well, this ladder is quite bulky and
25   has to be positioned.  The time consumption is

Page 64

Pugh
1         Pugh
2    the position, adequate positioning and the fixing
3    of the camera in the location to take an adequate
4    photograph.
5       Q.   And as I understand it, the micron --
6    strike that.
7         The stereo microscopy would what,
8    illustrate to the jury what you're trying to say,
9    that there is insufficient fibers going
10   transversely?
11      A.   Well, in part, but it also doesn't
12   show anything that -- I'm not demonstrating right
13   here -- that is, that the splitting is straight
14   up the edge of the ladder without any splitting
15   going into the flat pieces of the material.
16        That's basically what that's saying.
17      Q.   I object as nonresponsive.
18        My question to you, Doctor, is would
19   the microscope enlarge the area such that the
20   jury could see it to determine whether or not
21   there is in fact some sort of insufficient
22   weaving in this case?
23      A.   On their part I wouldn't be able to
24   demonstrate them.
25      Q.   You would not be able to demonstrate

Page 65

Pugh
1         Pugh
2    that with a microscope?
3       A.   Not to the jury, no.
4       Q.   In other words, the only way to make a
5    clear determination within a reasonable degree of
6    engineering probability is to have done one of
7    these other tests which I've mentioned, the peel
8    test, the crush test and so forth, to make
9    certain that the corner, as you say, had
10   insufficient weaving?
11      A.   No, it's determinable from microscopy
12   but it takes a trained eye to make the
13   determination.
14        And the point of taking a photograph
15   and not being able to demonstrate it is -- taking
16   a photograph is not convincing.
17        It's the analysis and the observation
18   of the fracture surface and the way the
19   striations run that make it probable that there
20   was lack of adequate crossing over of fibers
21   around the corner.
22      Q.   Do you have any, other than this
23   ladder, any demonstrable evidence to prove that
24   the weaving of the fiber transversely as opposed
25   to longitudinally was insufficient?

Page 66

```
1             Pugh
2    A.   Yes, I do.
3    Q.   What?
4    A.   The test results of Dr. Johnson.
5    Q.   And how do the test results of
6  Dr. Johnson show that the fiber was weaved
7  inadequately transversely?
8    A.   Well, it shows the failure mode of
9  samples tested along the flat surface of the
10 flange, and it shows a very different fracture
11 than what is exhibited on the edge.
12       And properly molded -- to complete the
13 answer, and properly molded fiberglass at the
14 edge should show the same fracture
15 characteristics or more closely the fracture
16 characteristics demonstrated by Dr. Johnson in
17 his test samples.
18   Q.   In the discovery deposition you
19 admitted to me that the testing done by
20 Dr. Johnson met the ANSI standards; is that
21 correct?
22   A.   Correct.
23   Q.   In other words, there is an
24 industrywide standard that manufacturers of
25 ladders must meet in order to put the product on
```

Page 67

```
1             Pugh
2  the market.
3        Dr. Johnson has tested for that and
4  the ladder met and exceeded those standards?
5    A.   I don't know that there is a
6  requirement that the ladders meet the ASTM
7  standards or ANSI standards.
8        It's a good idea for the manufacturers
9  to comply with them, but I don't know of any
10 statutory requirement.
11   Q.   I stand corrected on that with respect
12 to there being a statute.
13       I said industrywide standard. There
14 is an industrywide standard on the part of ladder
15 manufacturers to meet the ANSI or ASTM standards?
16   A.   I believe it's what we call a
17 consensus standard; that is, a manufacturer can
18 decide to comply with ANSI or not.
19       If it complies and it's tested to
20 comply they're entitled to put an ANSI sticker on
21 the ladder; otherwise they can't just put an ANSI
22 sticker on.
23   Q.   And you know that Bauer Company did
24 that?
25   A.   I believe they did, yes.
```

Page 68

```
1             Pugh
2    Q.   And Dr. Johnson to confirm that did
3  some testing of this portions of the ladder other
4  than the corner, as you say, and found it to meet
5  the ANSI-ATSM standards?
6    A.   That's correct. He did testing to
7  show something that we already knew, that the
8  ladder is in compliance with the ANSI
9  requirements, with the strict nature of the ANSI
10 requirements.
11   Q.   Dr. Johnson in no fashion stated that
12 the weaving of the ladder transversely was
13 insufficient?
14   A.   He never --
15       MR. BENTON:  Objection to form.
16   A.   That's correct, he never tested for
17 that.
18   Q.   Well, you're saying you can tell from
19 his photographs, the results of his testing that
20 the weaving was inadequate transversely; is that
21 what you're saying?
22   A.   No.  I'm saying that the results of
23 his testing, the photographs of his test samples
24 here that he failed, that he pulled apart and
25 broke, showed a fracture pattern very, very
```

Page 69

```
1             Pugh
2  different than what this is here, the splitting
3  of the corner piece.
4        What I am saying is that the corner
5  piece should have shown at least the fracture
6  characteristics of these pieces that he tested on
7  the flat surfaces, and they don't.
8        That points to a deficiency in the
9  corner of the ladder.
10   Q.   Object to responsiveness.
11       You previously stated that the weakest
12 point of a structure would be the corner; is that
13 correct?
14   A.   Correct.
15   Q.   That not only applies to fiberglass,
16 it applies to many structures?
17   A.   Correct.
18   Q.   We asked you, Doctor, to produce at
19 your depositions today any professional articles
20 you have reviewed to serve as a basis for your
21 opinions in this case.
22       And as I understand from your
23 discovery deposition, you have no professional
24 articles to support your theories; is that
25 correct?
```

**DR. JAMES PUGH - AFTERNOON SESSION**                    AUGUST 16, 2001

19 (Pages 70 to 73)

Page 70

```
1                 Pugh
2      A.   I have not relied on any, no. It's
3  not that I don't have any, I have not relied on
4  any.
5      Q.   And you have not produced in response
6  to our request for production in the depositions
7  in this case, you have not produced any
8  scientific studies to support your opinions in
9  this case?
10     A.   I have not relied on any scientific
11 studies.
12          I relied on the sum total of
13 scientific knowledge in general on the failure
14 characteristics of composites, plastics and
15 materials.
16     Q.   Do you have, Dr. Pugh, any peer review
17 articles supporting your theories of failure in
18 this case?
19          MR. BENTON:  I object to the form.
20 What kind of failure?
21     A.   I'm not sure I understand the question
22 also.
23     Q.   Have your theories that you expressed,
24 your opinions in this case, have they been
25 subjected to peer review by your contemporary
```

Page 71

```
1                 Pugh
2  engineers?
3          MR. BENTON:  Objection to form.
4      A.   No. It would be akin to subject
5  Newton's laws to physics to peer review.
6          These principles have been time-tested
7  and proven, and they are part of the general core
8  curriculum taught to engineering students in
9  materials science.
10         They are common concepts and tenets,
11 T-E-N-E-T-S, of materials science, materials
12 science and engineering.
13     Q.   I object to the responsiveness.
14          Yes or no, have you seen any articles
15 by your contemporaries supporting the theories of
16 failure which you have outlined in this case?
17          MR. BENTON:  Objection to form.
18     A.   Everything I see is consistent and
19 supportive of that.
20     Q.   Any specific journal articles?
21     A.   I would only recall an article that
22 would tend to sway me from the commonly accepted
23 principles.  I have never seen such an article.
24          If you have any in mind I would be
25 happy to take a look at it and advise you to the
```

Page 72

```
1                 Pugh
2  validity of it.
3      Q.   Apparently there are certain tests
4  which you mentioned which if your theory was true
5  about what happened here, which would support
6  your theories, that being the peel test, the
7  crush test and the torsion test and the
8  microhardness test and the quantitative
9  microscopy test.
10     A.   Is that a question?
11     Q.   Yes.
12          MR. BENTON:  Objection to the form.
13     A.   I didn't get the question.
14          It sounded like a statement to me, but
15 I will be happy to answer it if you care to
16 phrase it in a natural form.
17     Q.   You have already stated that there are
18 tests which may give support to your theory of
19 how the failure took place.
20     A.   I don't think I testified to that.
21          You had asked me were there tests that
22 could be done on the edge of this particular, you
23 know, that would, though, show the difference in
24 mechanical properties.
25          And I said yes, there are tests that
```

Page 73

```
1                 Pugh
2  can be done.
3          I said I don't think it's necessary to
4  do them because the demonstration of the brittle
5  nature of this failure and the way it zips right
6  up this edge without any propagation indicates
7  the weakness in that particular corner.
8          The way you want these things to fail,
9  if a crack starts you want to promote the bulk of
10 failure to the remainder of the material here, to
11 the bulk of the leg.  You don't want to be
12 concentrated all the way up and collapse the
13 ladder.
14          That's a basic concept of design,
15 mechanical science and engineering.
16     Q.   I object to the responsiveness.
17          In your discovery deposition did you
18 not say that a person could test the strength of
19 the corner of the ladder by these various tests
20 which you have outlined, the peel, the crush, the
21 torsion, the electron microscopy -- strike that
22 -- the microhardness and the quantitative
23 microscopy?
24     A.   Yes, sir.
25     Q.   You have done none of those?
```

Page 74

Pugh

2    A.   That's correct, I have not done them.
3    Q.   Most of your work has been involved in
4 biomechanics and ergo economics did you say?
5    A.   Ergonomics.
6    Q.   Ergonomics.
7    A.   I have done considerable work in
8 biomechanics and ergonomics, yes.
9    Q.   Can you explain to the jury what
10 subspecialty that is or what that involves?
11    A.   Ergonomics is that science that has to
12 do with, for example, man-machine interactions
13 such that operators of machinery or equipment can
14 produce useful work without injuring themselves
15 and without injuring bystanders.
16        This particular ladder situation would
17 fall in the area of ergonomics.  Having a worker
18 on a ladder producing a task in a manner that
19 would not be injurious to himself or bystanders
20 and the ergonomics features of this ladder were
21 part of the analysis that I did on this
22 particular case.
23    Q.   And what is the field of biomechanics?
24    A.   Biomechanics is that branch of
25 bioengineering that applies the laws of physics,

Page 75

Pugh

2 mechanical engineering and material science to
3 the human body to, for example, to explain how
4 certain injuries are produced in certain
5 circumstances, and how they can be prevented.
6    Q.   And your curriculum vitae contains
7 articles that you have published concerning
8 bioergo -- how do you say that?
9    A.   Ergonomics.
10    Q.   Bioergonomics --
11    A.   It's just ergonomics and biomechanics.
12    Q.   And you have published in that area;
13 is that correct?
14    A.   Yes, sir.
15    Q.   You have not published in the area of
16 ladder failure; is that correct?
17    A.   I have not published a paper on ladder
18 failure, that's correct.
19    Q.   In the discovery deposition I think we
20 learned from you that you agree that this ladder
21 bore cracking and splitting before Mr. Escudero
22 ever got on the ladder.
23    A.   That's correct, sir.
24    Q.   And you understand the history of
25 Mr. Escudero and his family, that they were in

Page 76

Pugh

2 the construction business?
3    A.   Yes, sir.
4    Q.   They were required to abide by the
5 OSHA standards concerning inspection of ladders?
6    A.   In principle, yes.
7    Q.   And you understand that Mr. Escudero,
8 Jr., the person who was injured, that he was the
9 manager and at least a part owner of the
10 construction business?
11    A.   I believe that's correct, yes, sir.
12    Q.   You learned from his deposition that
13 he had been involved in many jobs concerning
14 construction?
15    A.   Yes, sir.
16    Q.   And it's your understanding, is it
17 not, that OSHA required him to inspect daily a
18 ladder to see whether or not it had any cracking
19 or splitting or damage to the parts such that it
20 should have been removed from service?
21    A.   That's correct, sir.
22    Q.   If this ladder had been looked at it
23 was obvious, was it not, that the cracks were
24 visible?
25    A.   If one looks for the cracks one could

Page 77

Pugh

2 find them, yes.
3    Q.   In other words, some of these cracks,
4 especially on the back rails that we're talking
5 about, were even widened and worn so extensively
6 that there were gapes or gaps, would that be
7 correct?
8    A.   There were small gaps a fraction of an
9 inch.  A small gap that if one looked for that
10 gap one could find it, but it wasn't something
11 that could jump out to the casual observer.
12    Q.   Objection as to the responsiveness to
13 the last part of the answer.
14        In other words, if one were to look at
15 those cracks they would be seen as through and
16 through, you could see daylight?
17    A.   No, I would answer in the affirmative
18 to the question if someone were looking for these
19 cracks they could find them.
20    Q.   So if a person or contractor who is
21 required to abide by OSHA to inspect for cracks,
22 if he had looked at the ladder to look for cracks
23 they would have been visible?
24    A.   Yes.
25    Q.   And it's a failure to exercise

**DR. JAMES PUGH - AFTERNOON SESSION**                    **AUGUST 16, 2001**

21 (Pages 78 to 81)

Page 78

```
 1              Pugh
 2  ordinary care on the part of an individual or
 3  employer required to inspect for cracks not to
 4  have done so?
 5      A.   The cracks were inspected for by
 6  Mr. Escudero and he did not see them by his
 7  testimony and by my understanding of his
 8  testimony.
 9      Q.   Object to the responsiveness.
10           Assuming the ordinary contractor,
11  employer in a construction business, they have
12  the duty to inspect for cracks daily on ladders;
13  is that correct?
14      A.   That's what OSHA says, yes.
15      Q.   And some of these cracks show daylight
16  through them, do they not?
17      A.   Well, they do if you happen to be in a
18  position for the leg to shine daylight through
19  it.
20           Remember these cracks were at the
21  bottom of the legs.  When the ladder is inspected
22  prior to use it's more than likely to be
23  inspected in a stood up, erect position on the
24  floor, and it would be highly unlikely that
25  someone would bend down and lie on the floor to
```

Page 79

```
 1              Pugh
 2  examine in detail the legs.
 3           In fact, that's too much to ask for a
 4  daily inspection.  The daily inspection would
 5  more than likely be a cursory examination of the
 6  ladder close enough to pick out any gross failure
 7  of the legs.
 8           I don't regard this cracking as gross
 9  failure, the cracking that existed at the time
10  Mr. Escudero mounted the ladder.
11           In fact, it's too much to ask, I
12  believe, for a construction person or manager to
13  pick the ladder up and place it on a table and do
14  a detailed examination of each and every part of
15  the ladder for cracks.
16      Q.   Object to the responsiveness of the
17  last part of the answer.
18           You have read some of the testimony in
19  this case by Richard Poremba, engineer?
20      A.   Yes, sir.
21      Q.   Did you read his testimony that
22  preexisting cracks extended as much as 20 or 22
23  inches up one of the rails?
24      A.   I'm not sure I agree with that, but I
25  did read his testimony about that.
```

Page 80

```
 1              Pugh
 2      Q.   That's a fairly significant length of
 3  crack, is it not, preexisting?
 4      A.   Well, that's correct.
 5           And we have a crack on this edge here
 6  which is not separated, it's almost that long,
 7  which is not obvious from the outside of the rail
 8  because it doesn't penetrate all the way through
 9  the rail.
10      Q.   So you agree then with Mr. Poremba
11  that there may have been a preexisting crack as
12  much as 20 or 22 inches in length?
13      A.   Not a through crack, I disagree with
14  that.
15      Q.   Even some of these cracks had paint or
16  debris which had -- which were inside the area
17  that had been abraded away over time, would you
18  agree with that?
19      A.   I could find no evidence of anything
20  inside any of the cracks in the fracture surfaces
21  themselves that it separated.
22           There was debris that was adjacent to
23  the fracture surfaces and close to, and there was
24  debris that was on abraded areas outside the
25  fracture surface but not right actually in the
```

Page 81

```
 1              Pugh
 2  pieces that come apart.
 3      Q.   In other words, you're telling the
 4  jury that there had been such an abraded area,
 5  that sometime before where the area was abraded
 6  away next to the crack there was a spot of paint?
 7      A.   I would agree with that, yes.  And of
 8  course that occurred on one of the legs down
 9  rather low, down around the area of the rivet for
10  the angle reinforcement of the bottom
11  cross-brace.
12           THE VIDEOGRAPHER:  We're now going off
13  the record.
14           The time is 4:38 p.m.
15           (Recess.)
16           THE VIDEOGRAPHER:  We're now going on
17  the record.
18           The time is 4:40 p.m.
19      Q.   In reviewing the depositions in this
20  case, particularly of Mr. Escudero and some of
21  his employees, it became obvious that this ladder
22  originally came from the Santa Rosa Independent
23  School District near Brownsville, Texas?
24      A.   I wouldn't disagree with that.
25      Q.   In fact, there has been stenciling
```

**DR. JAMES PUGH - AFTERNOON SESSION**          **AUGUST 16, 2001**

22 (Pages 82 to 85)

Page 82

Pugh
1
2  shown on the side of the front rail or the ladder
3  to that effect?
4      A.  I am aware of that, yes.
5      Q.  You don't know and nobody has
6  testified as to when this ladder left the hands
7  of the Santa Rosa Independent School District?
8      A.  I would agree with that.
9      Q.  In effect, nobody knows the history of
10  this ladder from the time that it left the Santa
11  Rosa Independent School District, whatever time
12  that may have been, up to the time that
13  Mr. Escudero used it?
14      A.  I would basically agree with that,
15  yes.
16      Q.  All ladders eventually can become
17  broken, worn out, damaged, abused and have to be
18  taken out of service; is that, generalized, a
19  correct statement?
20      A.  All of that falls within the realm of
21  possibility, yes.
22      Q.  You read the testimony of Mr. Escudero
23  that his business had the job of cleaning up job
24  sites at various construction sites?
25      A.  I believe that was one of his

Page 83

Pugh
1
2  activities, yes.
3      Q.  For all you know or we know, this
4  ladder may have been disposed of as that it
5  should have been taken out of service at some job
6  site, somebody left it there and somebody picked
7  it up and provided it to Mr. Escudero's company?
8      A.  That may have happened, but then that
9  would have been a disposal contrary to OSHA
10  requirements.
11      Q.  I understand if you are going to take
12  one of these out of service you tie it up and you
13  mark it that it should be taken out of service
14  and then you take some means to cut it up and
15  destroy it?
16      A.  You break it.
17      Q.  Right.  And that was not done in this
18  particular case, was it?
19      A.  That's correct.
20      Q.  It is within the realm of possibility
21  that someone had concluded before Mr. Escudero
22  got on this ladder that it was broken and it
23  should not be used?
24      MR. BENTON:  Objection to form.
25      A.  Is a conjecture, yes.

Page 84

Pugh
1
2      Q.  It's a possibility?
3      A.  It's a possibility.
4      Q.  You cannot say that this ladder was
5  not damaged because of abuse?
6      MR. BENTON:  Objection to form.
7      A.  I do not believe this ladder was
8  abused.
9      Q.  Ladders can suffer, such as these
10  fiberglass ladders can suffer cracks if enough
11  pressure is placed against the ladder that it
12  starts cracking?
13      A.  Absolutely.
14      Q.  Or as you mentioned, if the ladder
15  hits the floor, that could make a ladder crack
16  further than what it had already cracked?
17      A.  That's correct.
18      Q.  If a ladder is misused, by that I mean
19  banged around, thrown around, things placed on
20  top of it, eventually it can suffer cracking?
21      A.  Absolutely.
22      Q.  And OSHA speaks to that requiring that
23  the ladder be removed from service if that is
24  noticed in the ladder?
25      A.  That's correct.

Page 85

Pugh
1
2      Q.  At the time that this ladder left the
3  manufacturer sometime in 1988 to 1990, I think
4  that's when we believe that the testimony has
5  been when this ladder was manufactured; is that
6  correct?
7      A.  That's correct, sir.
8      Q.  You know of no scientific evidence
9  demonstrating that at that time the ladder was
10  defective in manufacture?
11      A.  Could you please read that question
12  back to me.
13      (Record read.)
14      Q.  Let me repeat the question, rephrase
15  the question.
16      At the time that this ladder left the
17  manufacturer's hands when it was manufactured in
18  1988 to 1990, you know of no scientific evidence
19  demonstrating that this ladder was defective in
20  the manufacturing process?
21      A.  I have not seen produced in discovery
22  anything by Bauer that they did any testing to
23  reveal the inherent flaws in this ladder,
24  correct.
25      Q.  And you have not been provided with

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 62 of 65

Page 86

Pugh
1
2  any testing data demonstrating to the jury proof
3  that the materials were defective in any fashion
4  when they left -- when it left the hands of Bauer
5  manufacturing?
6      A.   You're talking about absolute proof
7  now?
8      Q.   Yes, sir.
9      A.   Rarely is anything like this rendered
10 to absolute proof.
11     Q.   Is the answer no, you have not?
12     A.   Not to absolute proof, no.
13     Q.   You have been provided with no
14 materials and you have none demonstrating by any
15 scientific means that the materials in this
16 ladder were defective when it left the hands of
17 the manufacturer?
18     A.   You're talking about the materials
19 now, not the design?
20     Q.   The materials, integrity of the
21 materials.
22     A.   Again, I didn't receive in discovery
23 the results of any testing, nor do I know of any
24 testing that Bauer did to verify the safety of
25 the ladder.

Page 87

Pugh
1
2      Q.   If a ladder has a boot on it, that
3  does not mean necessarily that the rail which is
4  inside the boot will not fracture at some time?
5      A.   That's correct.
6      Q.   In other words, if we took this
7  particular ladder here and we had a boot on it up
8  to here, that doesn't mean that, depending upon
9  how the ladder was used or what happens to the
10 ladder, some ten years later it might have a
11 crack somewhere up the rail?
12     A.   That could happen.
13     Q.   And if so, the ladder again should be
14 taken out of service whether or not it has a boot
15 on it?
16     A.   That's correct.
17     Q.   Are you aware of ladders produced
18 today that are almost identical with respect to
19 the shoe and the cross-bracing and the angle
20 bracing as on this particular ladder?
21     A.   Only through the brochures.
22     Q.   There are some, are there not?
23     A.   Apparently.
24     Q.   Do you know that there is a Werner
25 ladder which is almost identical to this sold on

Page 88

Pugh
1
2  the market today with the same type of shoe, with
3  the same single brace to the rear flange rail
4  attached to the cross bar?
5      A.   I believe that, but I do not see any
6  of those in service.
7      Q.   Let me just represent to you to assume
8  that one will be produced at trial bought from
9  Home Depot just a week ago, would you say that
10 that ladder is defective?
11     A.   Absolutely.
12     Q.   Why?
13     A.   Well, I would have to see it, but if
14 it doesn't encapsulate the bottom of the leg and
15 the fiberglass is not sheathed up or beefed up
16 it's going to split and cause a problem.
17          But I would have to see the specific
18 Werner ladder. It's not in front of me, so I
19 can't really pass judgment on it adequately.
20     Q.   I think what you are saying, is it
21 not, Doctor, that a ladder with a sheath or a
22 boot on it may last longer than one that doesn't
23 have a boot on it?
24     A.   It will surely last longer, yes.
25     Q.   Just because one product will outlast

Page 89

Pugh
1
2  another doesn't make the product with the least
3  life on it defective, does it, in design?
4      A.   Well, if that increase in longevity
5  also has a commensurate reduction in hazard, then
6  there is a benefit to be accrued from that
7  longevity, a safety benefit to be accrued from
8  that longevity.
9      Q.   If you have a BMW with a strong shock
10 in it versus a Ford with a weaker shock, that
11 doesn't make the Ford vehicle defective, does it?
12     A.   Depends if the shock fails at a
13 thousand miles in the weaker one and causes an
14 accident and kills somebody, then that's been
15 demonstrated to be a hazard that causes
16 significant problems.
17     Q.   Generally speaking, Doctor, in just
18 about every line of products you're going to find
19 differently designed models?
20     A.   I would agree with that.
21          MR. BENTON: Objection to form.
22     Q.   And to take my analogy, and it may not
23 be the greatest analogy, for example, in the
24 automotive industry, it's well-known that some
25 shocks are better than others, it will last

Page 90

Pugh

1  Pugh
2  longer; is that right?
3      A.   I would generally agree with that.
4      Q.   Some engines are built better than
5  other engines, they will last longer?
6      A.   Absolutely.
7      Q.   So simply to say that this ladder when
8  manufactured in 1988 because it did not have a
9  boot on it, that in and of itself does not make
10  it a defective design, would you agree?
11     A.   Not, I don't agree with that.
12     Q.   You're telling the ladies and
13  gentlemen of the jury that just because this
14  ladder did not have a boot on it, given its other
15  characteristics, that it was defectively
16  designed?
17     A.   Yes.
18     Q.   And by "other characteristics," it's
19  your belief, or what you're telling the jury is
20  that the cross-bracing, you could have had more
21  cross-bracing, is that one of the features?
22     A.   Well, what I'm saying specifically is
23  this ladder as produced, if anyone, an ergonomist
24  for example, such as me, had come into the
25  company to evaluate this prior to production, I

Page 92

Pugh

1  Pugh
2      A.   Examination of the failure modes of a
3  product would have revealed the weaknesses and
4  indicated the propriety of putting a boot and/or
5  reinforcing the flanges.
6      Q.   Doctor, I think it's -- we just went
7  through a long discussion, but I think what
8  you're saying is that a boot would have made this
9  ladder last longer and not be subject to
10  splitting; is that what you're saying?
11          MR. BENTON: Objection to form.
12     A.   No.  What I'm saying, a boot would
13  have eliminated the hazard and made this ladder
14  last longer.
15     Q.   Have you done any sort of statistical
16  analysis or failure testing of any ladders with
17  boots indicating that that's the case?
18     A.   No.  That was done in the subsequent
19  studies, reports of statistical claims after the
20  modifications were made.
21     Q.   Have you yourself done any statistical
22  study or testing to determine what it takes, how
23  much use it takes to cause a ladder with a boot
24  to fail?
25     A.   Not quantitatively, no.  But I will

Page 91

Pugh

1  Pugh
2  surely would have been able to tell them just by
3  proofing this without failure testing it even,
4  that there was structural inadequacies that was
5  going to lead to failure, make this prone to
6  failure, and that would lead me to do some
7  additional testing to duplicate this and to
8  describe to them the countermeasures.
9          I would have them tie these
10  cross-braces to both flanges and also put a boot
11  or encapsulation on the bottom of the leg,
12  knowing what I know about the materials science
13  of fiberglass.
14          Now this was not designed by someone
15  that was a specialist in fiberglass by my
16  understanding.
17     Q.   I object to the responsiveness.
18     A.   That's all in the deposition
19  testimony.
20     Q.   I object to the responsiveness.
21     A.   A manufacturer has a responsibility to
22  produce a safe product, and part of producing a
23  safe product is examining the failure modes of
24  that product.
25     Q.   Object to the responsiveness.

Page 93

Pugh

1  Pugh
2  add that in my practice I see a cross-section of
3  failures of products occurring across the
4  country, and it's surprising to me I have not
5  seen a Werner ladder failure.
6      Q.   Objection.
7      A.   And I have seen at least five Bauer
8  ladders fail in this matter.
9      Q.   Objection to the responsiveness of the
10  last part of the answer.
11          You mentioned that Mr. Escudero was
12  possibly on the fifth step of this ladder; is
13  that correct?
14     A.   I think he said fourth or fifth in his
15  dep testimony.
16     Q.   And the fifth step says "Don't step on
17  it," or something to that effect?
18     A.   I believe that's correct.  Not a step.
19     Q.   If Mr. Escudero was on the fifth step
20  of this ladder having been warned not to step on
21  it, that was a breach of the standard of ordinary
22  care on his part?
23     A.   Well, it was a function permissible by
24  the ladder.  It was not in accordance with the
25  recommendations on the ladder.

Case 1:00-cv-00193   Document 18   Filed in TXSD on 09/28/2001   Page 64 of 65

Page 94

Pugh

2  Q.   Are you telling the ladies and
3  gentlemen of the jury that Mr. Escudero, it was
4  okay for him to stand on the fifth step if he
5  did, even though it was marked "Do not step"?
6  A.   I don't recommend stepping on the
7  fifth step, but I don't believe that bore any
8  role in the failure of this ladder.
9  Q.   I object to the responsiveness.
10  If Mr. Escudero stepped on a step
11  which was marked "Do not step," or words to that
12  effect, did he fail to exercise ordinary care?
13  A.   That sounds like a legal term to me.
14  Q.   Was he negligent?
15  A.   It was in violation of the
16  recommendations of the ladder.
17  He was assuming a certain amount of
18  risk if he was aware of that.
19  Q.   Have you looked at the label on the
20  front of the step?
21  A.   Yes.
22  Q.   What does it say?
23  A.   I didn't memorize it. Let me just --
24  it says "Danger, do not stand on or above this
25  step. You can lose your balance."

Page 95

Pugh

2  It doesn't say that the ladder can
3  fail and throw you to the floor.
4  Q.   Object to the responsiveness to the
5  last part of the last answer.
6  A.   The implication of that warning is if
7  you can keep your balance it's not a problem.
8  Q.   Object to the responsiveness.
9  On direct examination you mentioned
10  that if a boot had been on the ladder it may have
11  lasted for an indefinite period of time.
12  A.   Yes.
13  Q.   Have you made any analysis of how long
14  the ladder would have lasted with the boot on it?
15  A.   No, I haven't.
16  THE VIDEOGRAPHER: We're going off the
17  record.
18  The time is 4:58 p.m.
19  (Recess.)
20  THE VIDEOGRAPHER: We're now going on
21  the record.
22  The time is 4:59 p.m.
23  MR. GENDRY: I want to ask you to mark
24  the Notice of Deposition as a defense
25  exhibit, Defendant's 1.

Page 96

Pugh

2  (Defendant's Exhibit 1, Notice of
3  Deposition, marked for identification, as of
4  this date.)
5  Q.   Dr. Pugh, let me hand you Defendant's
6  Exhibit 1, and that is the Notice that I prepared
7  and sent out for your deposition.
8  Have you seen that before today's
9  deposition?
10  A.   No, sir.
11  Q.   You're accustomed to seeing documents
12  requesting you to produce items at your
13  deposition, are you not?
14  A.   Yes, sir. I believe I produced
15  everything responsive to this.
16  Q.   Okay. As I understand your deposition
17  testimony, the test that Dr. Johnson conducted,
18  they did show that the parts that he tested met
19  the ANSI-ATSM standards; is that correct?
20  A.   Yes, sir.
21  Q.   And you have done no testing with
22  regard to the strength of the ladder at the
23  corners?
24  A.   Correct.
25  Q.   And there are tests which we have

Page 97

Pugh

2  already listed which could be done?
3  A.   Yes, sir.
4  MR. GENDRY: I pass the witness.
5  Thank you, sir.
6  FURTHER EXAMINATION
7  BY MR. BENTON:
8  Q.   Just one, maybe two questions,
9  Dr. Pugh.
10  While Mr. Escudero does not admit or
11  necessarily believe that he was on the fifth
12  step, if he was on the fifth step, would that
13  have prevented this accident from happening?
14  A.   You mean if he weren't --
15  Q.   Let me rephrase it. I'm sorry. It's
16  been a long day.
17  If he was on the fifth step, did that
18  cause the accident to happen?
19  A.   No, it didn't.
20  Q.   And why?
21  A.   Because a properly designed and built
22  ladder would have been resistant to failure even
23  if he were on the fifth step.
24  Q.   I want you in answering these
25  questions to follow these definitions that I am

**DR. JAMES PUGH - AFTERNOON SESSION**                                        **AUGUST 16, 2001**

26 (Pages 98 to 101)

Page 98

| | |
|---|---|
| 1 | Pugh |
| 2 | going to give you as I believe they are, or are |
| 3 | very similar as to what the court is going to |
| 4 | instruct the jury. |
| 5 | A design defect is a condition of the |
| 6 | product that renders it unreasonably dangerous as |
| 7 | designed, taking into consideration the utility |
| 8 | of the product and the risk involved in its use. |
| 9 | For a design defect to exist there must have been |
| 10 | a safer alternative design. |
| 11 | And then the definition of safer |
| 12 | alternative design means a product designed other |
| 13 | than the one actually used that in reasonable |
| 14 | probability, one, would have prevented or |
| 15 | significantly reduced the risk of the occurrence |
| 16 | or injury in question without substantially |
| 17 | impairing the product's utility and was |
| 18 | economically and technologically feasible at the |
| 19 | time the product left the control of Bauer |
| 20 | Corporation by the application of existing or |
| 21 | reasonably achievable scientific knowledge. |
| 22 | If you will use those definitions of |
| 23 | design defect and safe alternative design, let me |
| 24 | ask you this question. |
| 25 | A.  Yes. |

Page 99

| | |
|---|---|
| 1 | Pugh |
| 2 | Q.  Was there a design defect in the |
| 3 | subject ladder at the time it left the possession |
| 4 | of Bauer Corporation that was the producing cause |
| 5 | of the occurrence or injury in question; yes or |
| 6 | no? |
| 7 | MR. GENDRY:  Object to the form. |
| 8 | A.  Yes, sir. |
| 9 | Q.  And do you come to that conclusion |
| 10 | based on the testimony you have given at your |
| 11 | deposition today? |
| 12 | A.  Yes, sir. |
| 13 | MR. BENTON:  I'll pass the witness. |
| 14 | MR. GENDRY:  Nothing further. |
| 15 | (Continued to include jurat on the |
| 16 | next page.) |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 100

| | |
|---|---|
| 1 | Pugh |
| 2 | THE VIDEOGRAPHER:  We're now going off |
| 3 | the record. |
| 4 | The time is 5:04 p.m. |
| 5 | This is the end of the tape labeled |
| 6 | No. 1, concluding the videotape deposition |
| 7 | of Dr. James Pugh. |
| 8 | We're off the record. |
| 9 | (Time noted: 5:04 p.m.) |
| 10 | |
| 11 | _____ |
| 12 | JAMES PUGH |
| 13 | |
| 14 | Subscribed and sworn to before me |
| 15 | this ___ day of _____, 2001. |
| 16 | |
| 17 | _____ |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 101

| | |
|---|---|
| 1 | |
| 2 | C E R T I F I C A T E |
| 3 | STATE OF NEW YORK    ) |
| 4 | ) ss.: |
| 5 | COUNTY OF NEW YORK    ) |
| 6 | |
| 7 | I, LINDA SALZMAN, a Notary Public |
| 8 | within and for the State of New York, do |
| 9 | hereby certify: |
| 10 | That JAMES PUGH, the witness whose |
| 11 | deposition is hereinbefore set forth, was |
| 12 | duly sworn by me and that such deposition is |
| 13 | a true record of the testimony given by such |
| 14 | witness. |
| 15 | I further certify that I am not |
| 16 | related to any of the parties to this action |
| 17 | by blood or marriage; and that I am in no |
| 18 | way interested in the outcome of this |
| 19 | matter. |
| 20 | IN WITNESS WHEREOF, I have hereunto |
| 21 | set my hand this 21st day of August, 2001. |
| 22 | |
| 23 | ------------------------- |
| 24 | LINDA SALZMAN |
| 25 | |