United States District Court
Southern District of Texas
FILED

SEP 2 8 2001

Michael N. Milby
Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| JOSE ESCUDERO, JR. | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. **B-00-193** |
| BAUER CORPORATION D/B/A | § | |
| BAUER LADDER CORPORATION | § | |

---

**DEFENDANT, BAUER CORPORATION'S MOTION FOR
SUMMARY JUDGMENT ON LIABILITY**

---

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Defendant, **Bauer Corporation d/b/a Bauer Ladder Corporation,** hereinafter referred to as "Bauer" or "Movant", files its Motion for Summary Judgment on Liability pursuant to Rule 56 of the Federal Rules of Civil Procedure and respectfully states:

### I. PRELIMINARY STATEMENT

1.      This is a personal injury cause of action based on Plaintiff's fall from a ladder from Bauer which occurred on May 10, 1999. Plaintiff filed suit in state court on December 6, 2000, which case was subsequently removed to federal court based on diversity jurisdiction and amount in controversy.  The Court required the parties to file dispositive motions on or before September 28, 2001.

2.      Plaintiff alleges that his injuries resulted from a fall caused by alleged defects in the ladder. Specifically, Plaintiff, Jose Escudero ("Plaintiff"or"Escudero"), alleges that Bauer designed, manufactured, tested and sold the fiberglass ladder involved in the incident made the basis of this lawsuit; that the ladder was placed into the stream of commerce by Defendant prior to the date of the

incident and was not changed or altered since its manufacture, distribution or sale. Plaintiff additionally alleges that the Defendant was negligent in the design, testing and manufacture of the ladder resulting in unsteadiness which was the proximate cause of Plaintiff's injuries. Additionally, Plaintiff alleges breaches of implied warranties of fitness.[1] As a result of the incident, Plaintiff alleges, among other things that his injuries are permanent and affect his capacity to earn a living and enjoy life.[2]

3.      Bauer files its motion for summary judgment as to liability by asserting there is undisputedly no evidence to support Plaintiff's claim on the essential element of causation. Alternatively, there is no evidence, or the evidence is insufficient that the ladder had a (1) manufacturing defect or (2) a designed defect. Accordingly, Bauer is entitled to summary judgment, as a matter of law, as to liability. In support of its Motion, Bauer relies on the depositions, affidavits and discovery on file in this cause, all of which are incorporated by reference for all purposes. Throughout this motion Defendant refers the Court to excerpts from depositions in support of its motion, affidavits and reports, all incorporated and made a part of this motion.

## ARGUMENT AND AUTHORITIES

### A. Summary Judgment Standard

4.      Rule 56(c) of the Federal Rules of Civil Procedure mandates that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

---

[1]      *See Plaintiff's Original Petition, page 2, paragraphs 5-9, attached as Exhibit "1" and incorporated by reference.*

[2]      *Id., at page 3, paragraphs 10.*

Page 2 of 20

5.      While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it need not negate the elements of the nonmovant's case.[3]  If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.[4]  This burden is not satisfied by creating "some metaphysical doubt as to the material facts,[5] by submitting conclusory allegations,[6] or unsubstantiated assertions,[7] or by only a "scintilla" of evidence.[8]

6.      All factual controversies are resolved in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted competent evidence of contradictory facts. *"[The court] do[es] not however, in the absence of proof, assume that the nonmoving party could or would prove the necessary facts."[9]* "Moreover, the nonmoving party's burden is not affected by the type of case summary judgment is appropriate in any case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'"[10]

**FACTS**

---

[3]      *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2553 (1986).

[4]      *Id.* at 2553-54.

[5]      *Matsushita Elec. Indus. Co. V. Zenith Radio Corp.*, 106 S.C.t 1348, 1356 (1986).

[6]      *Lujan v. National Wildlife Fed.*, 110 S.Ct. 3177, 3180 (1990).

[7]      *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

[8]      *Id.*

[9]      *Id.* (emphasis in original).

[10]     *Id.* (citations omitted).

7.    Experts have been designated regarding manufacturing and design of the Bauer ladder and their depositions taken.  Plaintiff has designated Ph.D. James Pugh ("Dr. Pugh"), an engineer, while Defendant Bauer has designated Ph.D. John Johnson ("Dr. Johnson"), also an engineer. Plaintiff Jose Escudero, Jr. has been deposed.  Hector Salinas, supervisor of the Santa Rosa Maintenance Department, Santa Rosa, Texas, has given his affidavit.[11].  Richard Poremba, also an engineer, has given his deposition.  Although the experts may disagree on whether the ladder was defectively manufactured or designed, they do agree that the ladder was broken and damaged before Plaintiff got on the ladder, and that the breakage consisted of pre-existing cracks and splits in the legs (also known as rails) which, when Plaintiff was on the stepladder, further cracked and split causing the ladder to fail in its support of Plaintiff.  Plaintiff came down in a fall, struck his heel on the floor, and suffered a broken heel bone.  As well, all the experts agree that there is no evidence of how the pre-existing cracks and splits got into the legs of the ladder because the history of the ladder's use and condition is virtually unknown from the time it left the hands of its original owner, the Santa Rosa Independent School District Maintenance Department (SR ISD MAINT. DEPT.), until it came into the hands of Plaintiff who used the ladder for the first time when he fell.  The evidence shows the ladder originally was purchased new, in excellent condition and without any evidence of defects such as cracking or splitting of its rails by SR ISD MAINT. DEPT.  The ladder was purchased by SR ISD MAINT. DEPT. ten or more years ago and maintained in its possession until it was either stolen or not returned to the school district by a unknown user.  While the ladder was in the school district's possession, it remained in good condition without evidence of any cracks or splitting of its legs or rails.  It worked properly as a stepladder should.[12]

---

[11]    *Affidavit of Hector Salinas is attached and incorporated for all purposes herein. Exhibit 2.*

[12]    *Id.*

8.    Bottom line, all anyone knows about this ladder is that it was significantly split and cracked after it left the possession of SR ISD MAINT. DEPT. and the damage could have been caused by excessive wear, tear, and abuse before Plaintiff ever got on the ladder. **Causation** is the issue Defendant asks the Court to look at: whether Plaintiff has established as a matter of law that the pre-existing damage to the ladder was not caused by excessive wear, tear, abuse and/or generally not taking care of the ladder. Defendant asks the Court to rule in its favor on the crucial issue of causation and thereby grant it's motion for summary judgment on liability.

## REFERENCES TO FACTS

9.    The fiberglass ladder was manufactured by Bauer Corporation between 1988 and 1990.[13] It is undisputed that John Vasichko is an employee of Bauer and has knowledge of the date of manufacture of this ladder.

10.    The ladder was purchased new by SR ISD MAINT. DEPT. and, while in its possession, was always in excellent or good condition without evidence of any cracks or splitting of its legs or rails.[14]

11.    Deposition of Jose Escudero, Jr., Plaintiff. Plaintiff at the time of the accident was in the construction business as a shareholder with E&E Builders, Inc., and served as a general contractor. His company has never done work for the Santa Rosa Independent School District. He agrees the lettering on the side of the ladder shows it pertains to the Santa Rosa Independent School District. He does not recall seeing this particular ladder before the accident and does not know anyone in connection with the maintenance department of the Santa Rosa Independent School District. He went to his mother's property to do some work, including work on a light fixture. One

---

[13]    *Deposition of John Vasichko, pages 5, 14 and 15. Exhibit 3.*

[14]    *Affidavit of Hector Salinas.*

of his workers named Reymundo brought to Plaintiff the ladder, although Plaintiff does not know where Reymundo got the ladder. Plaintiff's company, E&E Builders, Inc., cleans up job sites and there is a possibility that the ladder may have come from a cleanup site and had been placed in a warehouse located next to his mother's property and used by E&E for storage. Plaintiff normally inspects ladders to see if they are in good operating order, although on this ladder he did not go into a "meticulous" inspection of the ladder. Plaintiff cannot specifically recall anything special about this ladder. He stated "normally, you know, we look at it, and if it's working- -I mean, it looks- -it's in good condition, we use it." The ladder appeared to Plaintiff to be in "good condition." Mr. Escudero's company purchased ladders with the label OSHA and ANSI on the ladder. It is Mr. Escudero's understanding from looking at pictures of the ladder that the legs split open causing him to fall. Plaintiff admits it would be dangerous to use a ladder with breaks in the legs.[15]

12.     Post-accident ladder inspection by Richard Poremba. After the accident happened on Plaintiff's mother's property, Plaintiff made a claim under his mother's homeowner's insurance policy. State Farm, the insurance company, hired Naismith Investigative Engineering Services to examine the ladder, which ladder was received and examined by Naismith's forensic engineer, Richard Poremba. Mr. Poremba got the ladder on June 9, 1999, or approximately one month after the accident.[16] Mr. Poremba's examination of the ladder showed it to be badly worn with lettering on it stating "S.R. ISD MAINT. DEPT." Poremba was asked to identify any defect and/or damage on the ladder and concluded the damage to the ladder was the result of excessive usage, wear and tear and/or misuse. Mr. Poremba in his initial examination of the ladder found it to have various

---

[15]     *Deposition of Jose Escudero, Jr., pp. 3, 12, 13, 25, 33, 34, 41, 42, 46-49, 53, 74, 76, 77. Exhibit 4.*

[16]     *Deposition of Richard Poremba, pp. 4, 5, 12 and 13.*

cracks and splits in all four rails.[17]   Poremba conducted a second examination of the ladder to determine if it had damage on it before the accident, and found evident signs that the rails were split before the accident.  Rail two showed uneven wear across the bottom of the ladder; leg three showed old brown paint inside a crack; leg three showed previous cracking because the separated pieces could not be adjoined.  Leg three also showed white paint or sheetrock joint compound visible inside a crack at the top of the leg.  Leg four was also examined, again showing brown paint inside a crack nine inches and sixteen inches from the bottom of the leg.  The back piece of leg four showed signs of wear and tear that could occur only if the back and side pieces were displaced for sometime.  Exhibit 10 to the deposition, a photograph, depicted the phenomenon of a worn area associated with a gap in the split fourth leg.  For twenty inches up the back of the fourth leg the split pieces did not match up.  The pieces could be pinched together to distinguish a recent split from the old crack.  The twenty inch crack would have been observable to Plaintiff and he should not have used the ladder.  The Occupational Safety and Health Administration Regulations (OSHA) required an employer such as Plaintiff to inspect ladders on a daily basis and to remove from service as unuseable ladders with broken or split rails or legs.[18]  The considerable wear and tear on the ladder resulted in the fall and was observable to the naked eye, as were the splits and cracks.[19]

    13.    Plaintiff's designated engineer/expert, Dr. James Pugh.  Dr. Pugh gave his discovery deposition in a "morning session" on August 16, 2001.  He gave his trial deposition in an "afternoon session" on the same date.  Dr. Pugh stated a ladder can wear out over a period of time including splitting at the corner of the rails.  He stated in this ladder there was pre-existing cracking and

---

[17]    *Deposition of Richard Poremba, pp. 22-28.*

[18]    *Deposition of Richard Poremba, pp. 33-46.*

[19]    *Deposition of Richard Poremba, pp. 29-33.*

splitting before Mr. Escudero got on it including pre-existing gaps in the rails where they split.[20]
OSHA required employers like Mr. Escudero to inspect ladders for split or cracked rails and upon
their presence discard the ladder.[21] It's obvious from looking at the ladder that the split predated the
accident.[22] Given sufficient use, abuse, damage, all ladders eventually can wear out.[23] Upon review
of the variety of testimony in this case, Mr. Pugh states there is not any information regarding how
the ladder was treated. It is possible someone disposed of the ladder and it was picked up at a job
site by Mr. Escudero or someone who worked for him.[24] The failure mechanism in this accident was
a splitting of the rear legs upward so that they lost their structural integrity and failed to support
Plaintiff's weight.[25] Not only were the rear rails split pre-existing the accident, but so were the front
rails.[26] On cross-examination beginning at page 58 of the afternoon session, Dr. Pugh agreed that
the ladder bore cracking and splitting before Mr. Escudero got on the ladder. Plaintiff and his family
were in the construction business and were required to abide by OSHA standards concerning
inspection of ladders on a daily basis. Inspection was to see whether or not the ladder had any
cracking or splitting or damage and, if so, should have been removed from service. One looking for
cracks could find them. Some cracking even produced gaps and were observable.[27] This ladder
apparently came from the Santa Rosa Independent School District and nobody knows the history of

---

[20]   *Ph.D. James Pugh deposition, p. 53, L. 19-p. 59, L. 9. (morning session). Exhibit 6.*

[21]   *Id., p. 58-59.*

[22]   *Id., p. 66, L. 15-L. 15-p. 67, L. 15.*

[23]   *Id., p. 79, L. 7-L. 11.*

[24]   *Id., p. 80, L. 11-p. 81, L. 11.*

[25]   *Ph.D. James Pugh deposition, p. 15, L. 19-p. 16, L. 6. (afternoon session). Exhibit 7.*

[26]   *Id., p. 42, L. 6-p. 43, L. 19.*

[27]   *Id., p. 75, L. 19-p. 77, L. 24.*

the ladder from the time it left the possession of the school district.   All ladders eventually can become broken, worn out, damaged, abused and have to be taken out of service.  Fiberglass ladders can suffer cracks if enough pressure is placed against the ladder that it starts cracking or if it is misused, banged around, thrown around and things placed on top of it.[28]  In his written report Dr. Pugh again admits the "longitudinal cracking of the legs, particularly the back legs, was due to the propagation of pre-existing cracks at the time of the accident on May 10, 1999." (Emphasis added)[29]

14.     Dr. John Johnson deposition testimony.   Dr. Johnson has been designated as Defendant's expert concerning the ladder.  His identification and qualifications generally show a long, extensive history teaching engineering with special emphasis upon materials, including fiberglass products.  He has tested all sorts of ladders and participated in the still largest research program regarding ladders for the Consumer Product Safety Commission.  He has been the chairman of the ANSI 14.5 Committee (America National Standards Institute), regarding fiberglass ladders.[30] His curriculum vitae illustrates his qualifications and expertise.  Dr. Johnson prepared a report dated August 3, 2001 which contains his basic opinions regarding pre-existing damage to the ladder and graphic pictures proving pre-existing cracking and splitting associated with excessive wear and tear and/or abuse or misuse of the ladder.[31]  Dr. Johnson's curriculum vitae illustrates his qualifications to serve as an expert in this case.[32]  Dr. Johnson explains in his testimony that the ladder had pre-existing cracking and splitting.  This includes pre-existing splitting on one rail at eight to ten inches

---

[28]     *Id., p. 81, L. 19-p. 84, L. 25.*

[29]     *Page 2 of Dr. Pugh's written report, first full paragraph.  Exhibit 8.*

[30]     *Dr. John Johnson deposition, pp. 1, 4, and 89-93. Exhibit 9.*

[31]     *Dr. John Johnson report dated August 3, 2001 (Exhibit 6 to his deposition).  Exhibit 10*

[32]     *Dr. John Johnson curriculum vitae (Exhibit 5 to his deposition).  Exhibit 11.*

and up to twenty inches if the testimony of Mr. Poremba is to be believed.  Dr. Johnson's testimony illustrates wear and rubbing marks which are indicative of pre-existing splits or cracks over years time, but certainly more than six months.[33]  An employer is required to inspect ladders for broken or split rails and removed them from service if damaged, according to OSHA Standard 1917.119.[34]  The cracks and splits were evident if a person had inspected the ladder and, comparatively speaking, this was the worse pre-existing damage to a stepladder Dr. Johnson has ever seen over a thirty year period.[35]  The ladder contained a label which warned the user to inspect for worn, damaged or missing parts; to never use a ladder with damaged, missing, worn or loose parts; and to remove worn or damaged or defective ladders from service.  The label is a ANSI promulgated label.[36]

## APPLICABLE LAW

15.    The summary judgment standard, strict liability claim and negligence claim have been set forth in detail in *Hayles v. General Motors Corp.*[37]  Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, citing Fed. R. Civ. P. 56.  The inquiry at the summary judgment stage is whether the evidence presents a sufficient disagreement to require submission to the fact finder or whether it is so one-sided that the moving party must prevail as a matter of law.  Under Fed. R. Civ. P. 56(c), the moving party bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue

---

[33]    *Dr. John Johnson deposition, pp. 105, L. 4-p. 111, L. 2. Exhibit 9.*

[34]    *Id., p. 111. L. 3-p. 112, L. 4.*

[35]    *Id., p. 113. L. 3-L. 19.*

[36]    *Id., p. 115. L.21-p. 117, L. 7.*

[37]    *Hayles v. General Motors Corp., 82. F. Supp. 2nd 650 (S.D. Tex., June 21, 1999).*

of material fact. If the Defendant for moving summary judgment and is not the party with the burden of proof at trial, then the Defendant must affirmatively offer evidence that undermines one or more of the essential elements of the Plaintiff's case, or must demonstrate that the evidence in the summary judgment record falls short of establishing an essential element of the Plaintiff's case. If the Defendant does so, then the Plaintiff, as the non-moving party, must point to evidence in the summary judgment record sufficient for a reasonable fact finder to decide in his favor. A scintilla of evidence, conclusory allegations, speculation, and unsubstantiated assertions will not carry this burden. If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response. When the moving party has met its Rule 56(c) burden, the non-movant cannot survive a motion for summary judgment by resting on the mere allegations of a pleading. The non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. In deciding a summary judgment motion, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Rule 56 <u>mandates</u> the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.[38]

16.     Texas has adopted the strict products liability standard set forth in Section 402A of the Restatement (Second) of Torts. Section 402A says, assuming other requirements had been met, "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer... ."[39] The test is two-pronged: Plaintiff has the burden of showing that the product was

---

[38] *Id.*, 653-654. The language of <u>Hayles</u> is virtually quoted, but without citations. Emphasis is from <u>Hayles</u>.

[39] *Id.*, p. 654.

defective and unreasonably dangerous and that the dangerous condition was a producing cause of Plaintiff's injury. Evidence of a defect may relate to the product's manufacture, design, or marketing.[40] A defectively designed product is one that is unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. In a manufacturing defect case, the Plaintiff must show a manufacturing flaw which renders the product unreasonably dangerous; that the defect existing at the time the product left the seller, and that the defect was the producing cause of the Plaintiff's injuries. A Plaintiff has a manufacturing defect claim when a finished product deviates, in terms of its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous.[41]

## ARGUMENT AND CONCLUSION

17. The evidence shows the ladder Plaintiff mounted had numerous pre-existing cracks and splits which were observable and required Plaintiff not to use the ladder under those conditions. Further, the evidence shows the cracks and splits pre-existed the accident and very well could have, and probably did, result from excessive wear and tear, abuse or misuse. The history of the ladder from the time that it left SR ISD MAINT. DEPT. to when Plaintiff used the ladder for the first time is devoid of how the ladder was used and what had happened to it. The pre-existing damage on the ladder was consistent with excessive wear and tear, abuse or misuse, and Plaintiff has not presented any evidence to rule that out. During the time the school district had possession of the ladder it was in good shape without cracks and splits. There was no sign of any defect from which one can conclude that its ultimate condition at the time of the accident existed at the time of manufacture.

---

[40]     *Id.*, 654-655

[41]     *Id., p. 655, again, virtually quoting from Hayles, but omitting cited authority.*

18.    Negligence requires showing of proximate cause, while producing cause is the test in strict liability.  Proximate cause consists of both cause in fact and foreseeability.  "Cause in fact" means that Defendant's act or omission was a substantial factor in bringing about injury that would not otherwise have occurred.  Causation in fact is common to both proximate and producing cause, including the requirement that Defendant's conduct or product be a substantial factor in bringing about Plaintiff's injuries.[42]  Proof of causation requires more than conjecture or guess, and the existence of a causal link between a Defendant's conduct must be demonstrated by the introduction of probative evidence.[43]  Applying this principle to our case, it is a mere guess that the ladder was not damaged by anything more than wear and tear, abuse and/or misuse.  There is no argument amongst the various witnesses testimony that nobody knows how the ladder became damaged, and the pre-existing damage was consistent with wear and tear, abuse and/or misuse.  Common sense tells me that pre-existing cracks and splits can enlarge when weight is put on a ladder.  Because Plaintiff cannot show what in fact caused the pre-existing damage, there is no material issue for the fact finder at trial regarding causation.  Therefore, Defendant's motion for summary judgment should be granted.

19.    Legal cause is not established if the Defendant's conduct or product does no more than furnish the condition that makes the Plaintiff's injury possible.  This principle applies with equal force to proximate cause and producing cause.  The connection between a Plaintiff's injuries and the Defendant's conduct simply may be too attenuated to constitute legal cause.[44]  In our case legal cause is absent in the absence of competent evidence ruling out wear and tear, abuse and/or

---

[42]    *Union Pump Company v. Allbritton, 898 S.W.2d 773 (Tex.1995).*

[43]    *Mosley v. Excel Corp., 109 F.3d 1006 (5th Circuit, 1997) (en banc hearing denied).*

[44]    *Allbritton, at 776.*

misuse as the cause of the ladder's condition.

## ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT

20.     In the event the court should rule against Defendant regarding the above motion for summary judgment based on the issue of causation, Defendant alternatively asks the court to grant partial summary judgment on the issue of manufacturing defect raised in Plaintiff's pleading. Plaintiff's expert, Dr. James Pugh postulated that there was a failure in the integrity or the quality of the fiberglass, which was not of sufficient quality and caused weakness in the legs of the ladder. He felt the quality of the fiberglass was insufficient.[45]   On cross-examination Dr. Pugh admitted he did not conduct any testing regarding the strength of the corner of a ladder [where the splits occurred] which would allow him to say within a reasonable degree of engineering probability that the fiberglass mat or the weaving was insufficient.  While he had a suspicion, he had no proof in the form of sufficient facts or data or based upon reliable principles and scientific or technical methods. The only thing that Dr. Pugh did to confirm his suspicion was to use a microscope to examine the cracked or split surfaces, but he was not able to demonstrate by photographic evidence from the microscopic examination his theory of insufficient weaving of fiberglass creating insufficient strength in the ladder legs.  He admitted he would not be able to demonstrate his observation and that the jury simply would have to rely upon his "trained eye to make the determination."[46]   He admitted he could not say the fiberglass mat or weaving was insufficient.  Dr. Pugh stated that he could have run a number of tests which would support his theory of the ladder rails or legs being unacceptably weak.  However he ran none of the tests that he stated would support his theory because he did not

---

[45]     *Dr. James Pugh deposition , p . 46, L. 2-p. 48, L. 2, (afternoon session).*

[46]     *Id., p. 60, L. 16-p. 65, L. 21.*

Page 14 of 20

think it was necessary since the crack itself indicates "the weakness in that particular corner."[47] Further, Dr. Pugh acknowledged there is an industry-wide standard- -the ANSI standard and ASTM standard- -which Bauer met upon testing of the ladder by Bauer's designated expert, Dr. John Johnson.[48]  Dr. Pugh did not produce any scientific studies, peer review articles, journal articles which would support his theories in the case.[49]  Dr. Pugh has seen no discovery evidence in the form of testing or scientific evidence demonstrating that the materials or integrity of the materials in the ladder were defective at the time the ladder left the manufacturer sometime in 1988 to 1990.[50]   In summary, there is no evidence that the ladder was defective in manufacture, manufacture process, materials or material arrangement at the time the ladder was manufactured in 1988-1990.

21.     Further, Dr. Pugh, Plaintiff's designated engineer expert, postulates that encapsulating the feet of the ladder with a boot was a safer, alternative design which would have presented this accident from happening, i.e, the splitting of the rails from the bottom.  However, Dr. Pugh bases his premise on the idea that the rails were inherently weak (of which there is no proof) and qualifies his postulation by saying that the encapsulating boot merely would have made the ladder last longer. He has not done any statistical analysis or failure testing of how much use it takes to cause a ladder with a encapsulating boot to fail.[51]

22.     The testing done by Defendant's designated expert, Dr. John Johnson show the parts he tested met the ANSI-ASTM standards, while Dr. Pugh has done no testing with regard to the

---

[47]     *Id.*, *p. 62, L. 5-p. 65, L. 21; p. 72, L. 3-p. 74, L. 2.*

[48]     *Id.*, *p. 66, L. 18-p. 68.*

[49]     *Id.*, *p. 69, L. 18-p. 72, L. 2.*

[50]     *Id.*, *p. 69, L. 18-p. 72, L. 2.*

[51]     *Id.*, *p. 88, L. 20-p. 93, L. 5.*

strength of the ladder at the corners. Dr. John Johnson for the defense conducted testing and rendered a written report which was attached to his deposition as Exhibit 7 to his deposition. The testing done by Dr. Johnson was to address the unfounded and unsupported opinion of Dr. Pugh that there was insufficient materials or integrity of the ladder rails. Various testing prescribed by ANSI A14.5, America National Standard for Ladders-Reinforced Plastic, Safety Requirements was done in accordance with the applicable ASTM standard (America Society for Testing and Materials). Dr. Johnson's testing resulted in Dr. Johnson's opinions that the ladder rails met and exceeded standards indicating the materials were not defectively manufactured or designed. The introduction to his report states the testing is done to insure a structurally sound rail. The test confirmed the rails were structurally sound.[52]   Dr. Johnson's method of testing, appropriateness of testing and results are uncontradicted by any other discovery in this case.

23.   As above-mentioned, Plaintiff's expert relied solely upon observation under a microscope to give the opinion that the rails were insufficient in strength because of insufficient fiberglass fibers or their arrangement. Dr. Pugh could not demonstrate what he was talking about. Defendant's expert, Dr. John Johnson, addressed stereomicroscopy to illustrate that observation of the surface of a fracture is not testing by which one can determine the sufficiency of fibers in the rails.[53]

## CONCLUSION

24.   Defendant asks for summary judgment in whole or part with regard to Plaintiff's allegations of (1) manufacturing defect and (2) design defect. There is no evidence, or the evidence

---

[52]   *Dr. Johnson's report of August 10, 2001 is attached showing purpose of testing and his opinions. Not included are photos and graphs depicting test parameters. If the court needs or request them, them, they will be provided. Exhibit 12.*

[53]   *Dr. Johnson's deposition, pp. 97-98.*

is insufficient and no more than a scintilla of evidence, that there was a defect in manufacture or design. There is no evidence that the ladder deviated, in terms of its construction or quality, from the specifications or planned output in a manner that rendered it unreasonably dangerous. _Hayles_, 655. Plaintiff has the burden of proof to show a manufacturing flaw which rendered the product unreasonably dangerous and that the defect was the producing cause of Plaintiff's injuries. Further, there is no evidence of negligence in the manufacture of the ladder. Thus, as a matter of law there is no controversy to submit for trial regarding a manufacturing defect. With regard to manufacturing defect, even Plaintiff's designated expert has testified he has seen no discovery reflecting deviation in the product's construction or quality, and further acknowledges that Defendant's expert conducted testing showing the structural quality of the rails met industry-wide standards. Plaintiff's expert stated he could not say within a reasonable degree of probability that the fiber arrangement was insufficient to create weakness. Speculation or conjecture are not enough to sustain Plaintiff's burden of proof.

25.     With regard to design defect, Plaintiff's theory is that the structural weakness in the rails (which is unproven), along with the absence of an encapsulating boot, rendered the product unreasonably dangerous. The best Plaintiff's expert could say is that the "encapsulating boot" would extend the structural longevity of the rails to prevent cracking and splitting. Even if the unproven premise of weak materials is cast aside, this postulation must fail because it is merely an argument that one design would outlast the other in terms of time. If this proposition were to be taken as true, than one could argue that the shocks on a Ford are defectively designed because they do not last as long or bear the punishment of the shocks on a heavier built Cadillac. The design defect case carries with it the requirement of producing cause which carries with it "cause in fact." Plaintiff's proof, if any, does not rise to that level. To recover under strict liability, a party must show more than the

Page 17 of 20

mere fact that an accident occurred. *Hayles*, 657-658.

WHEREFORE, PREMISES CONSIDERED, Defendant, Bauer Corporation d/b/a Bauer Ladder Corporation, prays that its Motion for Summary Judgment in whole be granted, or, in the alternative, that it be granted in part, that court costs be taxed to Plaintiff, and for other and further relief as deemed appropriate in law or equity.

Respectfully submitted,

GENDRY & SPRAGUE, P.C.
645 Lockhill Selma
San Antonio, Texas 78216-5057
Telephone:  (512) 349-0511
Facsimile:  (512) 349-2760

By: _____
RON A. SPRAGUE
State Bar No.  18962100
Federal I.D. No. 151
THOMAS W. GENDRY
State Bar No. 07797000
Federal I.D. No. 27525

ATTORNEYS FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been mailed, via certified mail, return receipt requested on this 27th day of September, 2001 to the following:

Mr. Barry R. Benton
284 Ebony Avenue
Brownsville, Texas 78520

_____
THOMAS W. GENDRY

T:\RAS\ESCUDERO\SUMJMT2

Page 18 of  20

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **JOSE ESCUDERO, JR.** | § | |
| | § | |
| **VS.** | § | |
| | § | **CIVIL ACTION NO. B-00-193** |
| **BAUER CORPORATION D/B/A** | § | |
| **BAUER LADDER CORPORATION** | § | |

---

**ORDER GRANTING DEFENDANT, BAUER CORPORATION'S
MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

---

On the ___ day of _____, 2001, came on for consideration Defendant, Bauer

Corporation's Motion for Summary Judgment on Liability. The Court after considering the Motion,

the evidence submitted and pleadings and discovery on file, and all responses and replies thereto,

is of the opinion that the Motion is well taken and should be in all things granted. It is therefore,

ORDERED that Defendant, Bauer Corporation's Motion for Summary Judgment on Liability

is granted its entirety.

SIGNED AND ENTERED this ___ day of _____, 2001.


_____
JUDGE PRESIDING

# INDEX

**EXHIBITS:**  1.      Plaintiff's Original Petition

2.      Hector Salinas Affidavit.

3.      Deposition of John Vasichko.

4.      Deposition of Plaintiff Jose Escudero, Jr.

5.      Deposition of Richard Poremba.

6.      Ph.D. James Pugh deposition (morning session).

7.      Ph.D. James Pugh deposition (afternoon session).

8.      Dr. Pugh's written report, page 2, first full paragraph.

9.      Dr. John Johnson deposition.

10.     Dr. John Johnson report dated August 3, 2001.

11.     Dr. John Johnson curriculum vitae.

12.     Dr. Johnson report dated August 10, 2001.

# INDEX

# EXHIBIT - 1

CVisPDF – www.fastio.com

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 22 of 231



FILED 4:55 O'CLOCK P  M
AURORA DE LA GARZA DIST. CLERK
DEC 0 6 2000
DISTRICT COURT OF CAMERON COUNTY, TEXAS
BY AURORA AHUMADA
DEPUTY

## CAUSE NO. 2000-12-4989-D

| | | |
|---|---|---|
| JOSE ESCUDERO, JR. | * | IN THE DISTRICT COURT |
| | * | |
| VS. | * | CAMERON COUNTY, TEXAS |
| | * | |
| BAUER CORPORATION D/B/A | * | |
| BAUER LADDER CORPORATION | * | 103RD JUDICIAL DISTRICT |

### PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, JOSE ESCUDERO, JR., Plaintiff, in the above-entitled and numbered cause complaining of BAUER CORPORATION D/B/A BAUER LADDER CORPORATION, Defendant and for cause of action would respectfully show as follows:

1.

Plaintiff intends to conduct discovery under level two of Rule 190.1 of the Texas Rules of Civil Procedure.

2.

Plaintiff is a resident of Cameron County, Texas.

3.

Defendant is a foreign corporation doing business as Bauer Ladder Corporation in Cameron County, Texas and may be served with process by serving its registered agent C. T. Corporate System at its registered

address, 350 N. St. Paul, Dallas, Texas 75201.

4.

Plaintiff alleges that on about May 10, 1999, he was repairing a light fixture located in La Feria, Texas. During the course of this work Plaintiff utilized a certain stepladder known as a Type 1-A, Extra Heavy Duty Industrial, six-foot stepladder which was designed, manufactured and sold by Defendant. While on the stepladder and in the process of repairing the light fixture the ladder was caused to twist as a result of a split in the legs of the ladder, resulting in Plaintiff falling to the floor below and sustaining severe injuries.

5.

Plaintiff alleges that Defendant did design, manufacture, test and sell the aforementioned fiberglass ladder, and that said ladder was placed into the stream of commerce by Defendant prior to the date of this accident and was not changed or altered since its manufacture, distribution or sale.

6.

Plaintiff alleges that the Defendant was negligent in the design, testing, and manufacture of said ladder in that said ladder was designed and manufactured in such a way that in the normal use of said ladder the

PLAINTIFF'S ORIGINAL PETITION - PAGE 2

CitePDF - www.faxna.com

fiberglass in the legs would split, resulting in an unsteadiness which was the proximate cause of Plaintiff's injuries and damages.

7.

Plaintiff alleges that the ladder, in its design and configuration as manufactured by the Defendant, was defective and unreasonably dangerous, in violation of the RESTATEMENT (Third Edition) of Torts: PRODUCTS LIABILITY, Sec. 2(b) (1998).

8.

Plaintiff alleges the Defendant breached its warranties of fitness and purpose in that the ladder did not perform as it was intended to perform, and failed in the ordinary use to which it was put.

9.

Plaintiff alleges that the Defendant breached its implied warranties, in violation of the Tex. Bus. & Com. Code, sections 2.314 and 2.315.

10.

Plaintiff alleges that, as a result of the wrongs aforementioned, Plaintiff sustained severe injuries to his left foot and ankle which renders him seriously and permanently disabled; that he has incurred medical and related expenses; and alleges that his injuries are permanent in their effect upon his capacity to earn a living and enjoy life.

11.

WHEREFORE, Plaintiff demands judgment against the Defendant in the sum of SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000.00), pre and post judgment interest, costs of court, and such other and further relief to which he may show himself justly entitled.

Respectfully submitted,

Barry R. Benton
284 Ebony Avenue
Brownsville, Texas  78520
(956) 546-9900 Telephone
(956) 546-9997 Facsimile
State Bar No. 02176500
Cameron County I.D. No. 3101
ATTORNEY IN CHARGE FOR
PLAINTIFF

PLAINTIFF'S ORIGINAL PETITION - PAGE 4

# EXHIBIT - 2

CVisPDF – www.fastio.com

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 27 of 231

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE ESCUDERO, JR | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. B-00-193 |
| BAUER CORPORATION D/B/A | § | |
| BAUER LADDER CORPORATION | § | |

## AFFIDAVIT

My name is HECTOR SALINAS. I am over 21 years of age and am of sound and competent mind to make this my Affidavit of facts under oath. The facts stated herein are based upon my personal knowledge.

I am currently the supervisor in charge of the maintenance department for the Santa Rosa Independent School District located in Santa Rosa, Texas. I have been employed with the maintenance department for over the past eleven years. I am familiar with a fiberglass stepladder which is identified with the words "SR ISD MAINT DEPT." that is the subject matter of this lawsuit brought by Jose Escudero, Jr. This ladder, a Bauer ladder, was purchased new by the Santa Rosa Independent School District some ten or more years ago and was used by the maintenance department for school uses. At some later date the ladder was found to be missing from the maintenance department inventory and was thought to have been stolen or not returned to the school district by a user. At the time of purchase the ladder was in new, excellent condition without evidence of any defects. There was no evidence of cracking or splitting of its rails. It worked properly as a stepladder should. During the time the ladder was in the school district's possession, it remained in good condition without evidence of any cracks or splitting of its legs or rails.

Further, affiant sayeth not.

HECTOR SALINAS

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 28 of 231

**SUBSCRIBED** and sworn to before me the undersigned authority, to certify which witness by hand and seal, on this 25ᵗʰ day of Sept , 2001.



ANTONIO CORDOVA
MY COMMISSION EXPIRES
May 24, 2004

_____
Notary Public State of Texas

ANTONIO CORDOVA
_____
Typed or Printed Name

TRANSCUDERGROUP-SALINAS

# EXHIBIT - 3

CVisPDF – www.fenrio.com

1               JOHN VASICHKO,

2    having been first duly sworn, testified as follows:

3                 E X A M I N A T I O N

4    BY MR. BENTON:

10:04  5        Q.   Please state your name for the record.

6        A.    John D. Vasichko.

7        Q.    Mr. Vasichko, I'm Barry Benton, and I

8    represent Jose Escudero in this case against Bauer

9    Ladder Company.  Am I saying the name of the company

10:04 10   right?

11       A.    I think it's Bauer Corporation.

12       Q.    Okay.  Thank you.

13       A.    So you'd be more correct.

14       Q.    Okay.  And I want to be correct.

10:04 15             You understand that Mr. Escudero has

16   filed a personal injury suit in this case alleging

17   defects in a ladder he was using at the time of an

18   accident, correct?

19       A.    Yes.

10:04 20       Q.    Okay.  You've had your deposition taken

21   before, right?

22       A.    A few times, yes.

23       Q.    So all I ask is a couple things.  If you

24   don't understand my question, you tell me so I can be

10:05 25   clear.

14

10:14 1       Q.  And you're here representing Bauer

2   Corporation because that's who I've noticed, actually

3   the corporation.  And I set out in my notice various

4   questions I was going to ask.  And they produced you

10:14 5  as sort of the appropriate person that could

6   answer, --

7       A.  Yes, sir.

8       Q.  -- at least most of the questions.

9            Whatever nature the agents may be;

10:1410  attorneys, investigators or whatever, have y'all

11  looked at the subject ladder to try to read the

12  manufacture date on it?

13      A.  Well, since I have not seen the ladder, I

14  haven't.  I've not been able to determine anything

10:1515  from the photographs.  And I can't speak directly as

16  to what others may have seen or not seen in their

17  investigation of the product.

18      Q.  Okay.  Well, are you the one that put the

19  age on it between 1988 and '90?

10:1520     A.  Yes.

21      Q.  And how did you arrive at that?

22      A.  I arrived at that in two ways, by knowing

23  the nature of the top that's on the ladder and by

24  knowing the nature of the bracing that's underneath

10:1525  the steps.

10:15 1      Q.   Okay.  So implied in that answer is there

2      were some changes made and that's what dates, in your

3      mind, the range of age?

4      A.   Yes, sir.

10:15 5      Q.   Okay.  What were the changes that were

6      that makes you think that it was '88 to '90?

7      A.   This ladder has a top design that was

8      discontinued about that time.  And it also has

9      aluminum bracing which was discontinued and replaced

10:16 10     with steel braces about that time.  So we know that

11     it was made at least prior to 1990.  I can't tell you

12     the exact date.

13     Q.   And why did you put a -- a number of '88 on

14     it?  Is there some features that were brought in

10:16 15     about 1988 --

16     A.   Because we --

17     Q.   -- that were on that ladder?

18     A.   Yes, we introduced this model about that

19     time, late 1987 early 1988.  So it would have been

10:16 20     produced in that two-year time period.

21     Q.   Okay.  And I've got some photos of the

22     subject ladder if you ever need to refresh your

23     memory about what it looks like and so on.

24              Just briefly describe the product

10:16 25     lineup, I don't know the word I want to use, but

# EXHIBIT - 4

CVisPDF – www.fwsio.com

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

JOSE ESCUDERO, JR.           ) (
          Plaintiff          ) (
                             ) (
VS.                          ) (   CIVIL ACTION NO.
                             ) (      B-00-193
BAUER CORPORATION D/B/A      ) (
BAUER LADDER CORPORATION     ) (
          Defendant          ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF
JOSE ESCUDERO, JR.
MAY 3, 2001

---

ORAL AND VIDEOTAPED DEPOSITION OF JOSE

ESCUDERO, JR., produced as a witness at the instance of

the DEFENDANT, taken in the above styled and numbered

cause on MAY 3, 2001, reported by LINDA LOCKLEAR,

Certified Court Reporter No. 6326, in and for the State

of Texas, at the offices of Barry Benton, 284 Ebony

Avenue, Brownsville, Texas, pursuant to the Texas Rules

of Civil Procedure.



COPY

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

```
 1              (proceedings began at 1:09 p.m.)
 2                   VIDEOGRAPHER:  We're on the record
 3                   JOSE ESCUDERO, JR.,
 4     having been duly sworn, testified as follows:
 5                        EXAMINATION
 6     BY MR. GENDRY:
 7          Q.  Please state your name for the record.
 8          A.  Jose R. Escudero.
 9          Q.  And, Mr. Escudero, have you ever gone by any
10     other names?
11          A.  No, sir.
12          Q.  Okay.
13          A.  Well, they call me Pepe.
14          Q.  Pepe?
15          A.  Yeah.
16          Q.  All right.  Let me explain that I am Tom
17     Gendry, and I represent Bauer Ladder Corporation in
18     this particular case.  And you understand that you're
19     giving your deposition today, of course; is that right?
20          A.  Yes, sir.
21          Q.  And I assume that you've had a chance to talk
22     over with Mr. Benton about what a deposition is?
23          A.  Yes.
24          Q.  All right.  You have to make sure that you make
25     an oral response so the court reporter can take it
```

1    Q.  Okay, thanks.  And your social security number?

2    A.  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.

3    Q.  And how about your current employment?  Where

4    do you work currently?

5    A.  I'm in the construction business.  I am

6    self-employed.

7    Q.  In your self-employment, do you have a business

8    entity such as a corporation or a sole proprietorship?

9    A.  It's E & E Builders, Incorporated.

10   Q.  E & E?

11   A.  E & E.

12   Q.  E & D?

13   A.  No, E & E.

14   Q.  E & E, all right.  E & E --

15   A.  Builders, Incorporated.

16   Q.  And is that a corporation established here in

17   Texas, the State of Texas?

18   A.  Yes, sir.

19   Q.  A Texas corporation?

20   A.  Yes, it is.

21   Q.  And who are the shareholders in E & E Builders,

22   Inc.?

23   A.  Jose Escudero, Sr., and me, myself.

24   Q.  You and your father; is that right?

25   A.  Yes, sir, me and my father.

Q.  Are you 50/50 shareholders?

A.  Yes, sir.

Q.  How long has E & E Builders, Inc., been in business?

A.  Okay, we started off as a partnership.  It was Paisano Construction.  It was in 1998.

Q.  And it was started as -- what was the name of that?

A.  Paisano, P-a-i -- P-a-i-s-a-n-o.

Q.  Paisano Construction?  And where was that out of?

A.  It's a Texas --

Q.  Okay.

A.  -- partnership.  And then in '90 -- right after that -- I'm sorry.  Paisano started in 1997.  I apologize for that.  And in '98 it was incorporated into E & E it was made a corporation.

Q.  So then it became E & E Builders in 1998; is that correct?

A.  Yes, that's correct.

Q.  Are you involved in any other businesses besides E & E currently?

A.  No.  Well, not really.  I help -- I help a friend in an auction -- auction services, and, you know, I get commission out of it and some kind of

1    general contractor?

2        A.  I am the general contractor.

3        Q.  You're the general contractor?  Is that

4    generally the nature of the duties of E & E to be the

5    general contractor on these commercial projects?

6        A.  We combine both.  Sometimes we sub out, and

7    sometimes we do the whole job ourselves.

8        Q.  So as general contractor you might be in charge

9    of the site?  You may hire in subs or you may have --

10   on the other hand, you may have job sites where you

11   have your own employees, and you do all the work?  Is

12   that what you're saying?

13       A.  When I'm a general contractor, yes, I hire all

14   the subs.  We manage the -- the work, the monies,

15   everything.  And when we sub out, we -- we have some

16   employees at certain jobs.  We do a lot of masonry

17   work.

18       Q.  Okay.  And how many employees does E & E have?

19       A.  We do everything as contract labor, sir.

20       Q.  You don't have any employees?

21       A.  Well, three guys.

22       Q.  Three guys?

23       A.  Yeah.

24       Q.  Okay.

25       A.  And --

1    A.  No, sir.

2    Q.  Any other jobs that you're currently interested

3  in?

4    A.  No, not -- not for right now.

5    Q.  Have you ever done any work for the Santa Rosa

6  Independent School District?

7    A.  No, sir.

8    Q.  The lettering on the side of the ladder, which

9  is the subject of this litigation, do you take that to

10  the -- coming from the Santa Rosa Independent School

11  District?

12    A.  Excuse me?

13    Q.  Yes, sir, let me repeat my question.

14       The lettering on the side of the ladder

15  involved in this litigation -- I think it says SRISD --

16    A.  Uh-huh.

17    Q.  -- do you take that to be from the Santa Rosa

18  Independent School District?

19    A.  We've discussed it, and we think -- we think it

20  is, yeah.

21    Q.  Okay.  Have any of your -- strike that.

22       Any of your employees at the time of this

23  accident work for the Santa Rosa Independent School

24  District?

25    A.  No, sir.

1    Q.  To your knowledge, any former employees that
2    you have had ever work at the Santa Rosa Independent
3    School District?

4    A.  Not to my knowledge.

5    Q.  Do you know anyone in connection with the
6    maintenance department of the Santa Rosa Independent
7    School District?

8    A.  No.

9    Q.  The ladder involved in this particular
10   accident, had you ever seen that ladder before the
11   accident?

12   A.  I don't recall seeing that particular ladder.
13   We have a whole bunch of ladders at the company.

14   Q.  Okay.

15   A.  They're all -- most of them are orange like
16   that one (indicating).

17   Q.  This one is what color?

18   A.  Orange, orange reddish.

19   Q.  Looks reddish orange to me.

20   A.  Yeah.

21   Q.  All right.  What brand of ladders does your
22   company, E & E, currently have?

23   A.  Good question.  I couldn't tell you.  I don't
24   know exactly.  I don't remember the names.  I mean,
25   there's -- I think there's probably a couple of Bauers.

1  company on that -- on that property.  Well, not that

2  property; it's next to it.  It's an old warehouse.

3      Q.  Do you own the warehouse next door?

4      A.  No.  All the property is owned by my mother.

5      Q.  Does she own the warehouse next door?

6      A.  Yes.

7      Q.  When you went to your mother's property, did

8  you go by yourself, or were you accompanied by these

9  gentlemen that you've just named?

10     A.  Probably one of them was with me in a truck

11 when we got there.  The rest of them got there on their

12 truck -- on their cars.

13     Q.  Was it your purpose, you and your friend and

14 your employees at that time, to go there for a

15 particular purpose?

16     A.  Yeah, we were going to work on the property.

17     Q.  Okay.  And were you working for pay?

18     A.  Yes.  We get -- I get very good -- well,

19 normally we cover only the expenses for the employees.

20 That's what I charge my mother, and we get a good deal

21 on the rent on the warehouse.

22     Q.  And specifically what chores or what job were

23 you going to do the day of the accident?

24     A.  There was some painting to be done.  There was

25 some doors to be adjusted, light fixtures to be

1    adjusted, cleanup.

2              One of the apartments had gotten vacant,

3    and we were fixing -- we were going to fix it up.  I

4    was thinking for a while to renting one of them.

5    That's what we -- we normally help my mother with --

6    with those apartments.  We fix them up.

7         Q.  You were thinking of renting one for yourself?

8         A.  Yes, from my mother.

9         Q.  For your mother, I see.

10        A.  Well, no, for myself from my mother.

11        Q.  Yes, sir.  And there were three units?  Were

12    the other two units rented out?

13        A.  I believe so, yeah.  At that time that's the

14    one that needed work.  That's why we were in there.

15        Q.  What had you been doing earlier that day?

16        A.  We had been cleaning outside.  It was -- it was

17    almost -- we got there at almost -- you see, since we

18    work, that's when we got there at that time.  It was

19    after hours --

20        Q.  All right.

21        A.  -- so we don't have -- we don't have that

22    much -- we take care of our work first.  And we had

23    cleaned up, and then -- we were looking around,

24    actually, to see what had to be done.

25        Q.  Let me ask you:  Before you got to your

1  Q. Did any of your employees bring a ladder with

2 them?

3  A. No, not that I know of.

4  Q. Okay.

5  A. I don't recall.

6  Q. And when you got in the apartment where you

7 were to do the work, were there any ladders in there?

8  A. Not that I -- no, I don't remember, sir.  I do

9 not remember, really.  Normally, I ask my workers to

10 get me what I need, and I asked for a ladder, and they

11 brought me a ladder.

12  Q. All right.  Who did you ask for a ladder to be

13 brought to you?

14  A. Raymundo, if I'm not mistaken.  He's the one

15 that brought me a ladder.

16  Q. And he brought you the subject ladder in this

17 case; is that correct?

18  A. Yes, he did.

19  Q. Where did he get the ladder?

20  A. It could have been there.  I don't recall.  I

21 don't know.  We need to ask him, I guess.  If it was

22 there, it was outside or it was in the warehouse.  I

23 don't know.

24  Q. Have you ever asked Raymundo where he got the

25 ladder?

1    A.  No, not really.

2    Q.  Following this accident or following the

3  institution of this initiation of this lawsuit, you've

4  never asked Raymundo where he got the ladder?

5    A.  No.  That was a question that Barry asked me

6  the other day, and I forgot to ask him, really.  I

7  mean, it was there.  I know it was part of our

8  equipment.  I don't know if it's -- I need to explain,

9  more or less, maybe --

10          MR. BENTON:  Well, no, he'll ask you.

11  He'll bring it up.

12          In fact, what I'd like you to do, Tom, is

13  when you reach a natural breaking point, say, in the

14  next 10, 15 minutes, I'd love to just go --

15          MR. GENDRY:  Why don't we take a break

16  right now, and then I'll ask you some questions about

17  the ladder.

18          MR. BENTON:  Okay, I appreciate it.

19          THE VIDEOGRAPHER:  Off the record.

20    (Brief recess taken from 2:00 p.m. to 2:16 p.m.)

21          THE VIDEOGRAPHER:  We're back on the

22  record.

23    Q.  I was asking you questions concerning where the

24  ladder came from, and I think it's my understanding

25  that you don't know where it came from; is that

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

1   correct?

2       A.  It was on the property.  I don't know exactly

3   where.

4       Q.  So we established that, in fact, it was on the

5   property when you and your friend and employees got to

6   your mother's property; is that correct?

7       A.  Yes.

8       Q.  Have you spoken with your mother since this

9   accident about where the ladder came from?

10      A.  Not really.  Well, probably mentioned it a

11  couple of times.  She knew that it was -- that we had

12  put it there some -- sometime.

13      Q.  When you say that your mother knew that -- did

14  you say you had put it there?

15      A.  Well, either me or -- well, E & E Builders or

16  Paisano put it there, the workers.  See, we clean up --

17  normally how this -- let me explain to you how we get

18  there.  We finish a job, and we clean up everything,

19  and we send -- we send it to that place.

20      Q.  So as I understand it, there is a possibility

21  that ladder may have come from a cleanup site and been

22  placed in the warehouse; is that correct?

23      A.  That is correct.

24      Q.  All right.  And when I say "a cleanup site,"

25  that would be one of your E & E job cleanup sites?

1    A.   That is correct.

2    Q.   Have you considered that possibly this ladder

3 was a ladder that had been discarded or thrown away by

4 someone?

5    A.   No.

6    Q.   Why not?

7    A.   Because we were using it at the job site.  We

8 had, you know -- I mean, it was -- it was being used.

9    Q.   When you are -- strike that.  When you take on

10 a job of cleaning up a site, are you given permission

11 to take the property and debris that is on the site?

12    A.   I am the one that controls that.  I am the

13 general contractor.  We call and we -- all the subs

14 need to remove their equipment and their debris or

15 whatever, and there is a time that comes that, you

16 know, we can't wait anymore, and whatever is there,

17 they come and pick it up later or something, whatever.

18        Yeah, but we remove most of the equipment

19 and everything that is left there.  Normally we have

20 storages where we -- where all this gets stored during

21 the construction period.

22    Q.   Does E & E maintain any sort of safety manual?

23    A.   Not really.  We go by whatever books I have

24 from -- information I have from OSHA.  We have, you

25 know, scaffolding and ladders and harnesses, the

1    I mean, we work -- if the ladder is in good condition

2    or it's working, standing there, we use it.

3        Q.   And you think that probably it was you that

4    opened the ladder; is that correct?

5        A.   Yes.

6        Q.   Do you normally inspect the ladder yourself

7    before you get on the ladder to see if it's in good

8    operating order?

9        A.   Yes, I do.

10       Q.   Did you inspect this ladder?

11       A.   Yes.  I don't know how to say that word.  I

12   didn't go into the meticulous inspection of the ladder.

13   I saw it.  I -- you know, I grabbed it.  Normally, you

14   know, we look at it, and if it's working -- I mean, it

15   looks -- it's in good condition, we use it.

16       Q.   How did the ladder appear to you to be?

17       A.   In good condition.

18       Q.   When you say it appeared to be in good

19   condition, what specifically do you recall about the

20   ladder?

21       A.   Nothing special.  Just it was a ladder like the

22   ones we use every day.  That's it.

23       Q.   Did you check out the spreaders?

24       A.   I don't know what the spreaders are.  I mean, I

25   don't understand that.

1    concrete, paint.  Most of the ladders that we have are

2    like that.

3        Q.  If you noticed that the ladder -- the spreaders

4    were, in fact, a little bit bent, did that prompt you

5    to further inspect the ladder?

6        A.  No.

7        Q.  Did you look at any of the rails to determine

8    whether or not they were in an unbroken fashion?

9        A.  What other rails?  You mean the legs?

10       Q.  Yes, the legs.

11       A.  They didn't seem to be broken.  Like I said, I

12   didn't do -- what word can I use -- meticulous

13   inspection on that -- on the ladder.  They -- they

14   weren't -- they weren't broken to my -- to my

15   knowledge.  They were in good condition.  The ladder

16   was standing.  I had been working for a little while up

17   there.

18       Q.  I assume that E & E in the past has encountered

19   broken ladders and thrown them away; is that correct?

20       A.  No.

21       Q.  You've never had a broken ladder?

22       A.  I don't recall, no.

23       Q.  Okay.

24       A.  These ladders last forever.  They're supposed

25   to last for a long time, and we've been in business for

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755    (956) 542-1020

1   about three and a half years.

2       Q.  Have you in your career in the construction

3   business ever had to throw away or reject a ladder

4   because it was damaged or broken?

5       A.  Probably, sir.  Probably, yeah.

6       Q.  I mean, you know that can happen; is that

7   right?

8       A.  Oh, yeah, of course, it can happen.  You know,

9   if we run over it with a forklift or something, it

10  happens a lot of times.  We run over things.  But, no,

11  I don't recall, really.  These are issues that I don't

12  pay attention to.  While I was doing it, I never done

13  it myself; let's put it that way.

14      Q.  If you had noticed that there was a break in

15  the, as you put it, the legs, or as I think it's

16  technically known as the rails --

17      A.  The rails.

18      Q.  -- you would not have used the ladder; is that

19  correct?

20      A.  No, I would not.

21      Q.  You realize in your experience, especially your

22  experience, that that would have been dangerous to do

23  that?

24      A.  Definitely.

25      Q.  Did anyone that was with you actually see you

1    the pictures right now, I should not have gotten on --

2    gotten on by -- I would not -- I wouldn't have gotten

3    on it.

4        Q.  Before this accident did you read any of the

5    labeling on the ladder?

6        A.  No, not this particular ladder.

7        Q.  All right.  Before this accident had you read

8    the labeling on similar ladders?

9        A.  Yes, I have.

10       Q.  And you are aware, of course, of warnings on

11    ladders that if they're damaged or broken, the ladder

12    should be thrown away, disposed of?

13       A.  Yes.

14       Q.  Have you made any efforts yourself to find out

15    how it is that Mr. Garza got this ladder that belonged

16    to the school district at one time?

17       A.  I don't think so, sir.  No, I haven't.

18       Q.  Is Mr. Garza a friend of yours?

19       A.  Yeah, you can say that.

20       Q.  Is he a social friend?

21       A.  No, never.

22       Q.  Let me ask you just a bit, Mr. Escudero, about

23    your medical treatment, okay?

24           As I understand it, if this is your

25    understanding, you broke your heel?

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

1          I know it's not Barry.

2     A.   It's probably my mother.

3     Q.   You think that might be your mom?

4     A.   Yeah, I think it was my mom.  Yeah, I think so.

5     Q.   Did your mother take these photographs?  Do you

6  know?

7     A.   I'm not sure.  I don't know.  Probably him --

8  her and my dad, probably.

9     Q.   The ladder here in one of these pictures is

10  next to a building.  Do you recognize that building?

11     A.   Yeah, that is the building.  That is the house.

12     Q.   That's the house where the accident occurred?

13     A.   That's correct.

14     Q.   This particular picture of the ladder has a

15  label on the side of it, OSHA, and ANSI under that.  Do

16  you see that?

17     A.   Yes.

18     Q.   Is that something you look for when you

19  purchase a ladder?

20     A.   Yes, sir.

21     Q.   And why is that?

22     A.   Like I said, because we can get -- we can get

23  inspections by OSHA, and you get penalized or fined if

24  you don't -- you're not complying with them.

25     Q.   Okay.  Is it your understanding that you need

1     to have on-the-job equipment that is -- that does not

2     violate any OSHA or ANSI standards?

3        A.   That's correct.

4        Q.   All right.   What is your understanding of -- if

5     you have one -- of what went wrong with the ladder?

6        A.   Just by looking at the pictures, the -- those

7     legs split open; fiberglass.   I fell.   That is my

8     understanding that's what happened.

9        Q.   Okay.   When you fell, did the ladder fall, as

10    well?

11        A.   Yeah.

12        Q.   Did it fall over?

13        A.   What do you mean?   Over me?

14        Q.   Did it fall on -- did the ladder come off of

15     its footing?   Did it fall down on its side?

16        A.   It fell down.   I fell -- I fell down behind the

17     ladder.

18        Q.   I see.

19            MR. GENDRY:   If we could, Barry, I

20     would -- if you could allow the court reporter to make

21     laser copies of these, and then she can get the

22     originals back to you?   Is that all right with you?

23            MR. BENTON:   That will be fine.   I'm sure

24     she will be very careful with the threat of ruining my

25     life.

BRYANT & STINGLEY, INC.
McAllen       Harlingen       Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

# EXHIBIT - 5

CVisPDF – www.fastio.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

JOSE ESCUDERO, JR.            )

    Plaintiff              )

                        )

VS.                          ) CIVIL ACTION NO. B-00-193

                        )

BAUER CORPORATION D/B/A   )

BAUER LADDER CORPORATION )

    Defendant              )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VIDEO ORAL DEPOSITION OF RICHARD POREMBA

JULY 27, 2001

VOLUME 1 OF 1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

      ORAL AND VIDEOTAPED DEPOSITION OF
RICHARD POREMBA, produced as a witness at the
instance of the Defendant, and duly sworn, was taken
in the above-styled and numbered cause on the 27th of
July, 2001, from 1:02 p.m. to 3:39 p.m., before DANDY
ELLIS, CSR in and for the State of Texas, reported by
machine shorthand, at the offices of Gendry &
Sprague, 645 Lockhill Selma, San Antonio, Texas
78216, pursuant to the Rules of Civil Procedure and
the provisions stated on the record or attached
hereto.

COPY

      \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

4

1          VIDEOGRAPHER:  We're on the record.

2     The time on screen is 1:02.  Today's date is July

3     27th, 2001.  My name is Rodney Cuellar with Esquire

4     Deposition Services in San Antonio.  The court

5     reporter today is Dandy Ellis, also with Esquire

6     Deposition Services.  We're at the law office of

7     Gendry & Sprague in San Antonio to take the

8     deposition of Richard Poremba in the cause styled

9     Jose Escudero, Jr. versus Bauer Corporation, et al in

10    the United States District Court for the Southern

11    District of Texas, Brownsville Division, Civil Action

12    No. B-00-193.  And now all counsel present will state

13    their appearance, please.

14          MR. GENDRY:  Tom Gendry for Defendant,

15    Bauer Corporation.

16          MR. BENTON:  Barry Benton for the

17    Plaintiff, Jose Escudero

18          RICHARD POREMBA,

19    having been first duly sworn, testified as follows:

20          E X A M I N A T I O N

21    BY MR. GENDRY:

22       Q.   Please state your name.

23       A.   Richard A. Poremba.

24       Q.   And what is your current business or home

25    address, Mr. Poremba?

1      Q.   All right.  What is your profession?

2      A.   I'm a licensed engineer and also a certified

3  indoor air quality professional.

4      Q.   Okay.  What was the last, certified what?

5      A.   Indoor air quality professional.

6      Q.   Indoor air quality, okay.  Let me ask you

7  about your education.  Did you attend schools in

8  Boston, Mass?

9      A.   I attended school in Massachusetts.  I went

10  to the University of Massachusetts undergraduate

11  where I have my civil engineering degree.  I went to

12  graduate school at Western New England College.  And

13  I have an MBA with a concentration in accounting.

14      Q.   When did you get your civil engineering

15  degree?

16      A.   1969.

17      Q.   All right.  And do you have any professional

18  licenses?  Are you a licensed or certified engineer?

19      A.   Just as a civil.  And I'm a licensed Texas

20  engineer as a civil engineer.

21      Q.   Okay.  And is that license currently on

22  file?

23      A.   Yes, sir.

24      Q.   Okay.  Any other advanced education that you

25  had or courses that you've undertaken in connection

1   with the work that you do currently?

2       A.   I've been to a variety of higher education

3   schools, I guess seminars, whatever you want to --

4   from -- that would deal with my field, you know,

5   either with -- and also investigative engineering

6   related courses also.

7       Q.   All right.  I'm going to have the court

8   reporter mark your professional resume as Deposition

9   Exhibit 1.

10               (Exhibit 1 marked.)

11      Q.   **(BY MR. GENDRY)** Let me hand you what has

12  been marked as Deposition Exhibit 1 and ask you if

13  you recognize that as your professional resume?

14      A.   Yes, sir, that's what I provided to you.

15      Q.   Is that resume current concerning your

16  qualifications and experience in practice as an

17  engineer?

18      A.   Yes, sir.

19      Q.   All right.  If you could, for the jury,

20  please describe what your professional experience has

21  been over the past, let's say ten years.

22      A.   Well, my past experience over ten years has

23  basically been in consulting engineering, involved in

24  both civil engineering and environmental

25  investigative engineering work.

1    petrochemical industry.  I've worked for insurance

2    clients, for attorneys, for builders, almost anyone

3    that would require those type of services.

4         Q.   All right.  And the name of your business

5    today that you work for is what?

6         A.   HNP.

7         Q.   HNP Consulting Engineers?

8         A.   Environmental and consulting engineers.

9         Q.   All right.  And how long have you been with

10   HNP?

11        A.   Actually, since May this year.

12        Q.   All right.  Have you previously

13   investigated, from an engineering standpoint, ladder

14   failure cases or ladder accident cases?

15        A.   Probably since, my previous employer being

16   Naismith Engineering, probably since 1994 I think we

17   got into investigative area.  And I probably have

18   been involved in maybe seven, seven ladder cases.

19        Q.   All right.  Any involving any fiberglass

20   ladders?

21        A.   Yes, I think there were about 50/50

22   probably, --

23        Q.   All right.

24        A.   -- as I recall.

25        Q.   And what other types of ladders have you

1    been involved in from the standpoint of investigative

2    engineering?

3        A.    Wooden, wooden ladders.

4        Q.    Wooden ladders?

5        A.    Yes, sir.

6        Q.    Any metal or aluminum ladders?

7        A.    I don't really recall.  I recall the

8    fiberglass, and again going back to 1994 or '93,

9    whatever it was, there might have been a metal one in

10   there.  I think --

11       Q.    Okay.

12       A.    Most -- Wooden rings the bell most.  But

13   fiberglass -- it was probably 50/50, as I stated.

14       Q.    In the field of investigative engineering,

15   have you in the past been asked to give deposition

16   testimony?

17       A.    Yes, sir.

18       Q.    And have you done so?

19       A.    Yes, sir.

20       Q.    Have you been asked to testify in court and

21   have you --

22       A.    Yes, sir.

23       Q.    And have you done so?

24       A.    Yes, sir.

25       Q.    All right.  Which courts have you testified

1   assignments that you've had over, say over the past

2   five to ten years?

3       A.   I've had -- either been involved or been the

4   principal in charge of probably 1500.

5       Q.   Okay.  Let me direct your attention to the

6   ladder that is involved in this particular case.  Did

7   you, on or about June 9, 1999 receive a ladder with

8   an assignment to investigate an accident concerning

9   the ladder?

10      A.   Yes, sir.

11      Q.   All right.

12      A.   Is it okay to --

13      Q.   Yes.

14      A.   Thank you.

15      Q.   And as I understand it, you have your

16  investigative file here with you today; is that

17  correct?

18      A.   Yes, sir.

19      Q.   And at the time that this investigation

20  occurred, you worked for Naismith Investigative

21  Engineering Services; is that correct?

22      A.   Naismith Engineering, and the investigative

23  engineering services is a branch of the company, yes,

24  sir.

25      Q.   And at that time you were working in what

1    capacity?

2        A.    At -- On this investigation or --

3        Q.    Yes, sir.

4        A.    Well, I was the principal in charge of all

5    investigative work at Naismith, therefore being the

6    engineer -- I was the engineer and the principal in

7    charge in this investigation.

8        Q.    Okay.  And was this investigation concerning

9    this ladder that you received on June 9, 1999, was

10   that investigation ever completed?

11       A.    Yes, sir.

12       Q.    Okay.  And did you render any reports in

13   connection with the investigation that was done?

14       A.    Yes, sir.

15       Q.    And you have those reports in front of you;

16   is that correct?

17       A.    Yes, sir.

18       Q.    Okay.  Did you determine that this

19   particular ladder had been involved in an accident

20   concerning Mr. Jose Escudero?

21       A.    We were told that the -- the ladder was

22   involved in an accident.  I wasn't there at the time

23   of the accident.

24       Q.    All right.  Do you know -- Did you see the

25   ladder upon its receipt?

1      A.    Yes, sir.

2      Q.    All right.  Where was it received?

3      A.    I believe we received -- Well, it was

4   received at our office ultimately.

5      Q.    Okay.  And I did not ask you to do this

6   particular investigation; is that correct?

7      A.    No, sir.

8      Q.    And Mr. Benton, the opposing attorney for

9   plaintiff did not ask you to do the investigation; is

10   that correct?

11      A.    No, sir.

12      Q.    All right.  And you are a professional.  I

13   am reimbursing you, I think at the rate of $125 an

14   hour for your work.

15      A.    Yes, sir.

16      Q.    What did you do when the ladder arrived at

17   Naismith Engineering?

18      A.    Well, when I -- as I recall, when the ladder

19   arrived at our place, it was set up in the hallway

20   outside of Clark Hudson's office.  And from that

21   point on we inspected it.

22      Q.    All right.

23      A.    The ladder may have been inspected in

24   Brown- -- in McAllen, or wherever it was in this

25   case, Harlingen.  Prior to it coming up here, I saw

1    some notes in there.  But I was not involved in that.

2        Q.   All right.  When it was set up at Naismith

3    Engineering, when you mean set up, it was spread out,

4    set up as if someone could get on it; is that

5    correct?

6        A.   Well, we received the ladder.  And

7    obviously, we -- the first time I saw it it was

8    collapsed and folded up, for lack of a better word.

9    And we opened it to perform our inspection on it,

10   which we were requested to do.

11       Q.   All right.  Did you, at that time, do a

12   general inspection of the ladder?

13       A.   Yes, sir.

14       Q.   All right.  And can you recall for us your

15   impression of the appearance of the ladder when

16   you -- when you first saw it?

17       A.   Well, the ladder was -- it was badly worn.

18   I mean, it had seen its better days.

19       Q.   All right.  And when you say that the ladder

20   appeared to be badly worn, specifically can you

21   describe how it appeared to be worn as you initially

22   saw the ladder?

23       A.   Well, I -- I mean, we had some splits in the

24   rail, cracking in the rails on the ladder, which are

25   the legs.  It has four legs on it.  And we also --

1    the spreader, you could see that the spreader was --

2    had been damaged on one side.  And you have two

3    spreaders on the ladder which hold the ladder in

4    place, fix it in place when it's open.

5         Q.    Okay.  When you say that the spreader was

6    damaged, can you tell us to what extent it was

7    damaged?

8         A.    It was -- it was bent, you know, and would

9    not -- it was bent inward where it should be

10   straight.  And the effect of that would be that the

11   ladder probably would not sit correctly on the

12   ground.

13        Q.    When you -- Did you observe whether or not

14   the ladder would sit correctly on the ground?

15        A.    Yes, sir.  We set the ladder up, I believe

16   it was on a table, if I recall.  And in looking at

17   some of the pictures that I have now received from

18   Naismith was -- it was off by about approximately an

19   inch on one of the legs.

20        Q.    All right.  Do you have an opinion as to why

21   the leg was off approximately an inch from the table

22   on which it rested?

23        A.    Yeah.  I mean the spreader had something to

24   do with it.  And as I recall, I mean I believe the

25   legs were all the same length.  So something was

1     A.    All these photographs were taken by Clark

2 Hudson.

3     Q.    With Naismith?

4     A.    Yes, sir.

5     Q.    In connection with the investigation of this

6 ladder?

7     A.    Yes, sir.

8     Q.    All right.

9     A.    And the -- I found that where the lettering

10 was on leg #2, which was S.R. ISD Maintenance

11 Department.  And it was on a photo here, but as you

12 can see, I don't have the original report on this.

13     Q.    All right.

14          **MR. GENDRY:**  And we'll mark this

15 photograph as Deposition Exhibit 5, please.

16          (Exhibit 5 marked.)

17     Q.    **(BY MR. GENDRY)** Okay.  Let me hand you

18 Deposition Exhibits 4 and 5.  Do they show the

19 markings on the ladder, J.R.E., and the stenciling on

20 the side of the ladder?

21     A.    Yes, they do.

22     Q.    Okay.  What task or goals were you seeking

23 initially in doing the investigation of this ladder?

24     A.    Well, initially in -- which we cited in our

25 first report on August 30th, 1999, we were asked to

1    do an analysis to include the composition and

2    description of the ladder.  We were also asked to

3    identify any defects and/or damages noted on the

4    ladder, any manufacture seal and any other readily

5    available information relating to the ladder's

6    present condition.

7          Q.    All right.  And generally your observations

8    with regard to that -- those tasks, what was the

9    result?

10         A.    Well, the conclusions of our report was that

11   damage to the ladder is a result of excessive usage,

12   wear and tear and/or misuse.

13         Q.    And what is the basis for that conclusion?

14         A.    As far as saying the damage, what we did was

15   we went through and we documented, leg by leg, the

16   ladder having four legs called rails, any damage that

17   we saw on it.  And there was numerous cracks, the

18   ladder being -- as we discussed earlier, the ladder

19   being unlevel due to the spreader.  The -- Also,

20   seeing wear and tear on the feet of the ladder that

21   would not allow the ladder to sit completely flat.

22   And you could see where it had -- but normal, you

23   know, wear and tear.  The ladder was in -- was not in

24   very good shape.  I mean, our consensus was it was

25   normal wear and tear or misuse.

1    Q.   Let me ask you, in your experience with

2    ladders, do ladders such as these wear and tear to

3    the point where they should not be used, just

4    generally speaking?

5    A.   Yes.  In fact OSHA states certain things

6    that would define when you should retire a ladder.

7    But most of it is good common sense.

8    Q.   All right.  And you mentioned OSHA.  What is

9    OSHA?

10   A.   Occupation -- Occupational Safety Health

11   Administration.

12   Q.   All right.  And is that a U.S. government

13   organization?

14   A.   Yes, sir.

15   Q.   All right.  Let me ask you to go through in

16   your initial report, and I think you said that was

17   given on August the 30th, 1999, you -- did you

18   inspect each of the legs of the fiberglass ladder?

19   A.   Yes, sir.

20   Q.   All right.  With respect to the numbering of

21   the legs, how did you number them?  You've got four

22   legs; is that right?

23   A.   Yes, sir.  We took a picture.  We

24   referenced, which was our photo number 1, and I don't

25   think I've been able to find that in those pictures

1   there, it references the two legs with the steps on

2   it, which we would call the front legs would be legs

3   1 and 2.  And the two back -- back legs without the

4   steps would be legs 3 and 4.

5        Q.   And as you're looking at the ladder from the

6   front where the steps are that you stand on, the

7   leg #1, would that be the right front rail or the

8   left?

9        A.   That would be the left front rail.

10        Q.   All right.

11        A.   #2 would be the right front rail.  #3 would

12   be the left back rail.  And #4 would be the right

13   back rail in looking at the ladder from the front.

14        Q.   Do you have a page number on the copy of the

15   photograph you're looking at?

16        A.   It's photograph number 1.  And it's been

17   stenciled down here 00162.

18        Q.   162?

19        A.   Yes, sir.  It's in the first report.  It's

20   the first photograph, if that helps any.

21             **THE WITNESS:**  I don't think that

22   picture's in there.  Did you see it?

23             **MR. BENTON:**  No.

24             **MR. GENDRY:**  Why don't we go off the

25   camera for a second.

1          **VIDEOGRAPHER:** Off the record at 1:29.

2          (Exhibit 6 marked.)

3          **VIDEOGRAPHER:** Back on the record at

4     1:30.

5          Q.   **(BY MR. GENDRY)** Mr. Poremba, let me show you

6     what has been marked as Deposition Exhibit 6 and ask

7     you if you recognize that copy of photograph?

8          A.   Yes, sir.

9          Q.   All right.  And what is it?

10         A.   It's a photograph of the ladder in which we

11    have designated certain -- certain components of the

12    ladder for identification purposes.

13         Q.   All right.  And does it depict the numbering

14    of the legs as you have previously described them?

15         A.   Yes, sir.

16         Q.   All right.  Did we mark your curriculum --

17    your resume?

18              **MR. BENTON:** Yes.

19         Q.   **(BY MR. GENDRY)** Okay.  Let's go to leg 1

20    then, Mr. Poremba.  What did you find upon your

21    inspection of leg 1?

22         A.   Being specific, I'll refer to my report.  We

23    found a crack at the bottom of the leg on the

24    front/side corner, approximately one inch.  We found

25    a rating and usage label which was only partially

1    legible due to paint, concrete and masking tape over

2    it.  We found a usage label, which was only partially

3    legible due to paint, concrete and masking tape also.

4        Q.   And this would have been the left front leg;

5    is that correct?

6        A.   Yes, sir.

7        Q.   And in other testimony in this case we call

8    them rails.  Is that another name for ladder leg?

9        A.   Yes, sir.  Yes, sir.

10       Q.   All right.  What did you find with respect

11   to rail or leg #2?

12       A.   We found a crack at the bottom of the leg on

13   the front/side corner, approximately six inches

14   long.  And we also found a crack at the bottom of the

15   leg on the back/side corner, approximately four

16   inches long.

17       Q.   All right.  And again, that would have been

18   the right front rail of the ladder as you're facing

19   the ladder; is that correct?

20       A.   Yes, sir.

21       Q.   And directing your attention to the rear leg

22   or rail #3, what did you find there?

23       A.   I found a crack at the bottom of the leg on

24   the back/side corner, approximately 15 inches long.

25   We found intermittent cracking near the bottom of the

1   leg on the front/side corner approximately 16 inches

2   long.  The initials J.R.E. were etched on the side of

3   the leg near the top of it.  We found a crack at the

4   top of the leg on the back/side corner, approximately

5   five inches long.  We also found a crack at the top

6   of the leg on the front/side corner approximately

7   four and a half inches long.  And we found a worn

8   area on the leg adjacent to the aluminum spreader on

9   the inside front edge of the leg.

10       Q.  Are you able to describe with any more

11   particularly what you meant by worn area on the leg

12   adjacent to the aluminum spreader on the inside front

13   edge of the leg?

14       A.  I don't recall that, sir.

15       Q.  All right.  So in fiberglass leg #3 that

16   you've just described multiple cracks, both at the

17   bottom of the leg and at the top of the leg, is that

18   a fair statement based upon what you've written?

19       A.  Yes, sir.

20       Q.  All right.  Directing your attention to

21   rail #4, or as you put it, fiberglass leg #4, what

22   did you find?

23       A.  I found a crack at the bottom of the leg on

24   the front/side corner, approximately 26 inches long.

25   I found a crack at the bottom of the leg on the

1    back/side corner, approximately 34 inches long.  I

2    found a crack near the fourth step of the ladder on

3    the back/side corner of the leg.  Found notches near

4    the third step of the ladder on the front/side corner

5    of the leg.  And found a worn area on the leg

6    adjacent to the aluminum spreader on the inside front

7    edge of the leg.

8         Q.   All right.  Did you inspect the plastic top

9    to the ladder?

10        A.   Yes, sir.  We found two holes approximately

11   1/8 inch in diameter in the top piece of the ladder.

12        Q.   All right.  And you've already -- excuse

13   me.  You've already commented on the aluminum

14   spreader.  What did you find with respect to the

15   aluminum spreader?

16        A.   We found that the spreader adjoining

17   fiberglass legs 1 and 3, which would be a front leg

18   and a back leg on the left side of the ladder is bent

19   from its original shape when compared to the

20   spreader -- the other spreader of the ladder.  The

21   bent spreader does not allow all four fiberglass legs

22   of the ladder to rest on the supporting surface or

23   ground when the ladder is fully opened.  We also

24   noted that leg #2 is approximately one inch off the

25   supporting surface when the ladder is fully opened.

```
 1        Q.   Did you conclude in your initial inspection,

 2   investigation of the ladder whether or not it posed

 3   any sort of safety problem to anyone who may have --

 4   may want to use the ladder?

 5        A.   We said that the cracking and the bent

 6   spreader that were observed in our visual inspection

 7   of the ladder is excessive and presents a safety

 8   problem and the ladder should not be used.

 9        Q.   All right.  You've made reference, and you

10   have in the past in this deposition, but also in your

11   report, requirements of OSHA or Occupational Safety

12   and Health Administration regulations.  And

13   specifically can you refer us to the regulations that

14   you are referencing and what they say?

15        A.   Well, when the people pulled it up, it looks

16   like off the internet in my office, although we might

17   have copies of it, it's usually easier to find it

18   there.  And basically it refers -- it's from

19   standards 29 CFR.  And it's applicable to ladders.

20   And the two things that we pointed out here,

21   additionally OSHA regulations require that portable

22   ladders are to be inspected on a daily basis and

23   subsequent to any incident that might damage to the

24   ladder -- might do damage to the ladder.  It also

25   says in the regulation that maintenance and
```

1    inspections, it says that the employer shall maintain

2    portable ladders in safe condition.  Ladders with the

3    following defects shall not be used and either shall

4    be tagged as unusable if kept on the premises or

5    shall be removed from the worksite.  And one of the

6    things in here would be either broken or split side

7    rails or legs, as they've been referred to back and

8    forth here, and any other structural defect on the

9    ladder which would also include the spreader in this

10   case.

11        Q.   All right.  When this OSHA regulation refers

12   to a employer, would that include an employer of

13   someone who ran a construction business?

14        A.   Well, OSHA would have authority.  Their

15   regulations would apply to all employers.

16        Q.   All right.  As you looked at the ladder, and

17   based upon your inspection, did the OSHA regulations

18   require that this particular ladder, due to the

19   cracking and splitting and the spreader being bent,

20   did that require the ac- -- the ladder to be removed

21   from service?

22        A.   Yeah.  I think we quoted that the regulation

23   said that any portable ladder with such defects, and

24   we put in quotes, shall not be used and shall be

25   tagged as unusable if kept on the premises or removed

1   from the worksite, unquote.

2      Q.   All right.  Does OSHA require any sort of

3   inspection on the part of an employer in -- before

4   using the ladder?

5      A.   I think there's a clause in here where --

6      Q.   Down on (e)(2) of --

7      A.   Right.  Ladders shall be -- (e)(2) states it

8   out.  Ladders shall be inspected for defects prior to

9   each day's use, and after any occurrence, such as a

10  fall, which could damage the ladder.

11     Q.   Let me --

12          MR. GENDRY:  Let's mark this.

13          (Exhibit 7 marked.)

14     Q.   **(BY MR. GENDRY)** Let me hand you what has

15  been marked as Deposition Exhibit 7 and ask you if

16  that is in fact the OSHA regulation that you have

17  just quoted from, or a copy of it?

18     A.   That is correct, sir.

19     Q.   Did you gather any of the details of how

20  Mr. Escudero fell from the ladder in your

21  investigation?

22     A.   I -- The only knowledge that I have of that

23  was a -- was a sketch that was provided at one point

24  in time that sort of indicated that the ladder fell

25  to the backside.  That's the only knowledge I have or

1    we were provided.

2        Q.    While he was on the ladder?

3        A.    While he was on the ladder.

4        Q.    All right.  Based upon your experience and

5    your training, in your opinion could the, as you put

6    it, considerable wear and tear on this ladder have

7    resulted from that fall?

8        A.    The condition of the ladder was probably

9    paramount in his fall, if that's what you're asking.

10       Q.    And by that, paramount at the time of his

11   fall, what do you mean by that?

12       A.    Well, I mean we examined the condition of

13   the ladder.  And the state of the ladder was such

14   that would be, as we stated in our report, would be

15   unsafe to go on.

16       Q.    All right.  And was the considerable wear

17   and tear observable to the naked eye?

18       A.    Yes, sir.

19       Q.    Were the splits and cracks observable to the

20   naked eye?

21       A.    Yes, sir.

22       Q.    And did OSHA regulations require that a

23   ladder with splits and cracks not be used and taken

24   out of service?

25            MR. BENTON:  Objection to form.

1     Q.    (BY MR. GENDRY) You can go ahead and
2   answer.
3     A.    Yes, sir.
4     Q.    You mentioned earlier, Mr. Poremba, that you
5   were asked to do some work or supplemental work in
6   connection with the ladder; is that correct?
7     A.    Yes, sir.
8     Q.    And that resulted in a second report dated
9   September 29, 1999?
10     A.    Yes, sir.
11     Q.    What additional tasks were you told to
12   investigate in connection with this ladder?
13     A.    We were asked to, basically do three
14   things.  We were asked to determine if damage to the
15   ladder was present prior to the accident.  We were
16   asked to try to determine which step Mr. Escudero was
17   standing on when the accident occurred.  And three,
18   we were asked how high could 150- to 200-pound person
19   on the ladder -- climb on -- safely on that ladder in
20   its present condition.
21     Q.    In connection with the first task, to
22   determine if the damage to the ladder was present
23   prior to the accident, what did you do to make that
24   determination?
25     A.    We reexamined the ladder and looked for any

1   kind of signs that might lead -- lead us to determine

2   whether the cracks or other damage on the ladder was

3   there prior to the fall as we were asked to do.

4        Q.   All right.  Was your attention in doing so

5   then directed to leg #2 of the ladder?

6        A.   Well, we examined all the legs on the entire

7   ladder.

8        Q.   All right.  Did you find anything

9   significant with respect to any of the legs in this

10  supplemental investigation?

11       A.   Yes, sir.

12       Q.   And in the report I see that you've

13  mentioned at least two legs; is that correct?

14       A.   Yes, sir.

15       Q.   Well, you mentioned three, three legs.

16       A.   Yes, sir.  We mentioned leg #2, 3 and 4.

17       Q.   All right.  Let me then direct your

18  attention to leg 2.  What did you find?

19       A.   What we found on leg 2 is that at the very

20  bottom of the front edge it shows signs of wear that

21  are not likely to have occurred at the time of the

22  ladder failure.  And we referenced this to photograph

23  number 1.

24       Q.   Do you have that photograph?

25       A.   I believe I do.  Again, I tried to match

1    these up.  What we noted there was, because of some

2    displacement of the front and side pieces would be

3    required in order to allow the wear that was observed

4    to take place.

5         Q.    Let me mark this before you go on.

6         A.    Okay.

7                   (Exhibit 8 marked.)

8         Q.    **(BY MR. GENDRY)** And I've had the court

9    reporter mark Deposition Exhibit 8.  Does that show

10   leg #2 which you've just now spoken about?

11        A.    Yes, sir.

12        Q.    With a -- With your pen, could you point, as

13   the camera focuses in on it, I don't know how good

14   it's going to come out at trial, where you see the

15   displacement of the front and side pieces and wear.

16        A.    Well, you can see it's not worn evenly.

17   It's not worn evenly across the bottom of the ladder,

18   it's worn to the side.

19             **VIDEOGRAPHER:**  Can you tip it forward

20   so it doesn't glare.

21             **THE WITNESS:**  That way?  How's that?

22             **MR. GENDRY:**  Tip it a little bit

23   forward.

24             **THE WITNESS:**  Better?  Of course it's

25   going to be difficult for me to point now, but I'll

1    see what I can do here.

2        A.    You can see just the bottom part where it

3    shows in black there, which looks like a rubbery

4    surface, that it's worn.  It's not worn flat, as if

5    sitting flat on a surface, but is worn to the sides.

6    And we concluded that that was there prior.

7        Q.    (BY MR. GENDRY) Simply because of the wear?

8        A.    Yes, sir.

9        Q.    All right.  Let me direct your attention to

10   leg 3 in your supplemental inquiry.  What did you

11   find with regard to leg 3.

12       A.    Well, on leg 3 we found a spot of brown

13   paint was observed inside the crack on the back/side

14   corner of the leg approximately three inches from the

15   bottom of the leg.  And we referred to this in our

16   photograph number 2, which I think I've picked out

17   one or the other.

18       Q.    All right.

19            MR. GENDRY:  And we'll mark this as

20   Deposition Exhibit 9.

21            (Exhibit 9 marked.)

22       Q.    (BY MR. GENDRY) Let me hand you Deposition

23   Exhibit 9 and ask you if that photograph depicts the

24   spot of brown paint that you were just referencing?

25       A.    It does, sir.

1    Q.   And does the location of that spot of brown

2 paint have any significance to you with regard to

3 your search of previous wear and tear or damage to

4 this ladder?

5    A.   Well, what we concluded was this brown paint

6 right here appears to be the same paint that we found

7 adjacent on undamaged parts on this ladder.  It was

8 sort of like they had a paint job previously, or

9 whatever, and it sprinkled on the ladder.  So we

10 concluded that that paint was there for a while.

11          You want me to try to hold this up

12 too?

13    Q.   I want to ask you to draw an arrow pointing

14 to that piece of brown paint, and then we'll hold it

15 up to the camera.

16    A.   (Witness complies.)

17    Q.   And if you'd hold that up to the camera,

18 Mr. Poremba.

19    A.   (Witness complies.)

20    Q.   It appears to be pointing to a spot along

21 the side of the rail where the rail has separated; is

22 that correct?

23    A.   Yes, sir.  It's right -- it's right within

24 the crack separation to be one of the sides of that

25 crack.

1    Q.   All right.  And you stated that you found

2  evidence of the same sort of paint on other undamaged

3  portions of the ladder; is that correct?

4    A.   That's correct.

5         MR. BENTON:  Objection, form.

6    A.   That's correct, sir.

7    Q.   (BY MR. GENDRY) Did you find paint like that

8  on any other portion of the ladder?

9    A.   Yes, we did.

10   Q.   All right.  On any other undamaged portion

11 of the ladder?

12   A.   Yes, sir.

13   Q.   All right.  What did that tell you?

14   A.   Well, that concluded that the paint probably

15 came in in the same time span, and basically the

16 paint was there prior to the accident occurring.

17   Q.   All right.  As to leg #3, did you find

18 anything with regard to matching up of the separated

19 portions which gave you any enlightenment as to

20 whether or not the separation of the rails had been

21 there before this particular accident?

22   A.   Yes.

23   Q.   What did you find?

24   A.   We found that pieces up on the leg, when

25 they were put back together, previous cracking did

1    not adjoin smoothly together.

2        Q.   Do you have a photograph depicting that

3    where maybe you pinched together leg #3 to show this

4    mismatch?

5        A.   I think we have a photograph showing that

6    basically on leg #4.  But we didn't provide a

7    photograph here.  But I think the same idea.

8        Q.   All right.

9        A.   But the premise was if you take the crack --

10   if you take the two sides of the cracked portions and

11   you put the crack -- put it back together again, if

12   it was a recent crack, they should bind pretty

13   close.  When we put the crack together we had gaps in

14   the crack, which would indicate that it's worn by

15   wobble or movement or whatever over time.  And

16   therefore, it indicated to us, and we cited it

17   several places here, that that was there for some

18   period of time.

19       Q.   And by some period of time, meaning before

20   this particular accident?

21       A.   Yes, sir.

22       Q.   All right.  Any other paint or material that

23   you found inside any of the cracks which were

24   significant to you?

25       A.   We also found, on leg #3, white paint or

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 84 of 231

1    Sheetrock joint compound visible inside the crack at

2    the top of the leg on the back/side corner.  Because

3    separation of the two pieces, again, just like the

4    other paint, the brown paint we noted earlier, would

5    be necessary to allow the paint or the joint compound

6    to be present inside the crack, we concluded that the

7    cracking was present prior to the accident.

8         Q.   All right.  Let's move from leg 3 or rail 3

9    to leg or rail 4.  Did you make further investigation

10   of leg 4 to answer your question whether or not there

11   was preexisting wear and tear to this ac- -- to this

12   ladder?

13        A.   Well, we also found some brown paint again

14   visible inside the crack, a crack approximately 9

15   inches and 16 inches from the bottom of the leg.

16        Q.   Can you -- Do you have a picture of that?

17        A.   I don't think, without -- I don't think I

18   was able to locate it in here.

19        Q.   Okay.

20        A.   And we would not provide -- Basically what

21   we did in our reports was we retained pictures in the

22   file, but we didn't provide a picture of every

23   circumstance.  The picture of the original brown

24   paint, in our opinion at the time, was just to

25   provide one of them, I would assume at this time.

1    Q.   All right.  What else did you find -- In

2    addition to the brown paint 9 and 16 inches what else

3    did you find --

4    A.   We found --

5    Q.   -- on leg 4?

6    A.   We also found that the back piece at the

7    bottom of the leg showed signs of wear and tear that

8    could only occur if the back and side pieces were

9    displaced for some time.  And we cited photograph

10   number 3 for that.

11   Q.   Do you have that available?

12   A.   It's a difficult process here.  But I do,

13   sir.

14   Q.   All right.

15        MR. GENDRY:  Let's mark this, please.

16        (Exhibit 10 marked.)

17   Q.   **(BY MR. GENDRY)** Let me hand you what has

18   been marked as Deposition Exhibit 10.  And is that

19   the photograph that you were just referring to?

20   A.   Yes, sir.

21   Q.   And what does that photograph show?  And if

22   you could, point it out to the camera as best you

23   can.

24   A.   Do you want me to use your black --

25   Q.   Yeah, you can draw an arrow to it.

1          If you could point out -- You've drawn

2    arrows to an area on the bottom of the rail #4,

3    leg #4; is that correct?

4          A.   Yes, sir.

5          Q.   And what, again, does it show?

6          A.   Well, you can see right here where you have

7    this gapped area that has been worn away here.  And

8    that's been there, too, for some time.  I mean, it's

9    worn down from -- from use or misuse.

10         Q.   Could you determine how the wearing down

11   could occur as you looked at the ladder?

12         A.   I don't believe we determined that.  But it

13   would be obvious that that was either -- would have

14   to be broken off at some earlier point on that rail.

15   And by the wear and tear you can see being rounded

16   and everything, it would be prior to the accident.

17   That was our main --

18         Q.   Okay.  And where -- On Exhibit 10, what you

19   just referred to where you showed the wear and tear

20   also that you just referred to, was that particular

21   rail separated at that point?

22         A.   There's a separation that would be

23   considered a crack in the rail right there at that

24   point.

25         Q.   All right.  And how about -- and how about

1    up the rail?

2        A.    There was some other -- I think we

3    documented on this rail that there was some other

4    cracking on that rail as we went through earlier.

5        Q.    Okay.  Anything else that you found with

6    reference to rail #4?

7        A.    Oh, in the -- in addition, approximately 20

8    inches at the back/side of the -- the back and side

9    piece edges do not match up when they're adjoined.

10   And we also referenced that to a photo which was

11   photograph number 4 in our report.

12       Q.    All right.  Do you have that photograph?

13       A.    Let's see.  Yes, sir.

14              MR. GENDRY:  Let's mark it.

15              (Exhibit 11 marked.)

16       Q.    (BY MR. GENDRY) Let me hand you what has

17   been marked as Deposition Exhibit 11.  And is that

18   the photograph you were just referring to regarding

19   matching up?

20       A.    Yes, sir.

21       Q.    And could you explain what you found that is

22   shown in that particular photograph?

23       A.    Well, in this photograph -- You want me to

24   use your marker again?

25              Thank you, sir.

1      Q.   If that will help you.

2      A.   Thank you.

3           As you can see in the photograph here,

4  what I've shown is a -- by putting the two arrows

5  there, is we have a gap in the rail.  And you can see

6  that the -- when you press them together when they

7  come together they didn't match up, indicating to us

8  that they had been there for a while and wear and

9  tear had created an additional gap in the rail.  In

10 fact, we looked right above this in our report and

11 noted the fact that where the rail had split recently

12 where you had recent fiberglass splitting, they will

13 match up perfect.

14     Q.   And that was -- The gap goes up to, I think

15 you said to 20 inches above the bottom of the rail;

16 is that correct?

17     A.   I believe that's what we -- yes, sir, that's

18 what we said in our report.

19     Q.   All right.  And when you initially looked at

20 the ladder, was that gap observable to you?

21     A.   Yes, sir.

22     Q.   All right.  Do you have an opinion whether

23 or not it would have been observable to a contractor

24 such as Mr. Escudero?

25     A.   I would think it would be, sir, yes, sir.

1     Q.    Anything else on rail or leg 4 that you
2   found regarding your supplemental investigation?
3     A.    No.
4     Q.    All right.
5     A.    No, sir.
6     Q.    There's been testimony in this case, I'll
7   ask you to assume that Mr. Escudero was standing on
8   either the fourth or fifth step of the ladder at the
9   time that the accident occurred.  Did you do any
10  investigation in that regard?
11    A.    Yes, sir.
12    Q.    All right.  And was the outcome of your
13  investigation the same, that the gentleman must have
14  been on the fourth or fifth step?
15    A.    That is correct, sir.
16    Q.    Okay.  Following your supplemental
17  investigation, did you have any conclusion or
18  additional opinion with regard to your supplemental
19  investigation?
20    A.    We concluded two things.  We concluded that
21  what you just mentioned, Mr. Escudero was standing on
22  either the fourth or fifth step of the ladder at the
23  time of the accident.  We also concluded that the
24  cracking at the bottom of leg #2 on the front/side
25  corner of the leg, at the bottom at leg 3 on the

1    back/side corner of the leg, at the top of leg 3 on

2    the back/side corner of the leg, and at the bottom of

3    leg #4 on the back/side corner of the leg was present

4    prior to the accident.  We said that because the

5    cracking was present prior to the accident, it should

6    not have been used by Mr. Escudero or any other user.

7        Q.   Did you note with respect to the fifth --

8    fifth step of the ladder any warning device on the

9    ladder?

10       A.   I did not see that, no, sir.

11       Q.   Okay.  Did you observe, when you looked at

12   the ladder, as to whether or not the fifth step was

13   intended for use?

14       A.   I didn't look at the ladder from that

15   perspective, sir.

16       Q.   Okay.

17            Do you have -- Strike that.

18            (Exhibit 12 marked.)

19       Q.   **(BY MR. GENDRY)** I'm going to hand you,

20   Mr. Poremba, what has been marked as Deposition

21   Exhibit 12.  And do you recognize that as your

22   initial report?

23       A.   Yes, sir.

24       Q.   And the date of that report?

25       A.   August 30th, 1999.

# EXHIBIT - 6

CVISPDF – www.fastio.com

1

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE SOUTHERN DISTRICT OF TEXAS

4                 BROWNSVILLE DIVISION

5

6   JOSE ESCUDERO, JR.,

7

8              Plaintiff,

9

10         vs.                No. B-00-193

11

12   BAUER CORPORATION D/B/A

13   BAUER LADDER CORPORATION,

14

15              Defendant.

16   -------------------------------x

17

18         DEPOSITION OF DR. JAMES PUGH

19            Mineola, New York

20         Thursday August 16, 2001

21

22

23   Reported by:

    LINDA SALZMAN

24   Job No 124356a

25

COPY

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 93 of 231

Page 4

1

2  J A M E S     P U G H,   called as a witness,

3        having been duly sworn by a Notary Public,

4        was examined and testified as follows:

5  EXAMINATION BY

6  MR. GENDRY:

7        Q.    Would you please state your name.

8        A.    My name is James Pugh, spelled

9  P-U-G-H.

10       Q.    And it's Dr. Pugh; is that correct?

11       A.    That's correct.

12       Q.    You have a Ph.D.; is that correct,

13  sir?

14       A.    That's correct.

15       Q.    Let me identify myself as Tom Gendry.

16             I represent the defendant in this

17  case, Bauer Ladder Corporation.

18             Do you understand that?

19       A.    Yes, sir.

20       Q.    You and I have not previously met

21  before this day; is that correct?

22       A.    I believe that to be correct, sir.

23       Q.    And you and I have never talked about

24  this case which is entitled Jose Escudero, Jr.

25  versus Bauer Ladder Corporation?

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 94 of 231

1                    Pugh

2    caused by one, and I will add or more of the

3    following or a combination of the following;

4    improper curing of the fiberglass, improper

5    proportion of components, improper control of

6    moisture during the curing, improper use of the

7    woven glass materials.

8         Q.   All of those are based upon your

9    inference as a result of inspecting

10   microscopically the corner; is that correct?

11        A.   My deduction, yes.

12        Q.   If you had improper proportion of

13   components, improper control of moisture during

14   the curing and improper use of the woven glass

15   materials, testing such as compression testing,

16   tensile strength testing, and tests such as

17   conducted by Dr. Johnson would demonstrate

18   whether or not that was true, would you agree

19   with that?

20        A.   Only comparative testing.  These

21   defects can exist and still allow compliance with

22   the standard.

23        Q.   Object as nonresponsive.

24             What do you mean when you say in your

25   report "improper use of woven glass materials"?

Page 54

1                         Pugh

2        A.      High energy absorption.

3        Q.      Practically speaking, if you drive

4    over a ladder it may crack and split; is that

5    correct?

6        A.      That could happen.

7        Q.      If you throw a ladder around and bang

8    it around over a consistent period of time it

9    could wear out; is that correct?

10        A.      Surely.

11        Q.      By wearing out it could split, could

12    it not?

13        A.      Well, when you say "split," you mean

14    split the corner now?

15        Q.      Split at any part if you hit it hard

16    enough.

17        A.      Well, it's typically going to split in

18    an area where there is a geometric discontinuity,

19    which is going to be the corner of the rails,

20    which is why they need to be reinforced.

21               Yes, it can split anywhere.

22        Q.      Object as not responsive.

23               When a ladder splits for whatever

24    reason at the corner or any other portion, you've

25    agreed that it should be taken out of service; is

Page 55

                              Pugh

1

2    that correct?

3         A.     Yes, it should be.

4         Q.     In this --

5         A.     But it's not quite as simple as that

6    and I would like to be able to complete that

7    answer if I could.

8         Q.     In this particular case, and I've read

9    your report here, you've said that obviously

10   there was preexisting cracking and splitting of

11   this ladder before Mr. Escudero got on it; is

12   that correct?

13        A.     Yes, there was.

14        Q.     You've pointed out the back rails to

15   me on this particular ladder and I see that a

16   portion of the rail where there is separation or

17   splitting has been worn so that there is actually

18   a gap between the split members; is that a

19   correct statement?

20        A.     Would you please point out to me what

21   you're talking about?

22        Q.     Sure.  You pointed this out where you

23   could see through, push this back together.

24               Do you see this big wide gap?

25        A.     Okay.

Page 56

1                         Pugh
2              MR. BENTON:  What's the question?
3        A.    Yes, they appear to be about one inch
4    where this material is missing, if that's what
5    you're referring to.
6              We should say that's on leg No. 4.
7        Q.    Do you find the same phenomenon --
8        A.    Excuse me, that was on leg No. 3.
9    Sorry.
10       Q.    Do you find the same phenomenon of the
11   preexisting gap or a wearing portion on leg No.
12   4?
13       A.    Yes.
14       Q.    And when referring to leg No. 4 we
15   mean the, if we set this ladder up we mean the
16   right rear leg as we face the ladder; is that
17   correct, sir?
18       A.    It's upside down, so that's kind of an
19   ambiguous --
20       Q.    Flip it up.  Set this thing down, this
21   is going be on your right as you face the ladder;
22   is that correct?
23       A.    Well, it's going to be on your left as
24   you face the back of the ladder.
25       Q.    No, face the front of the ladder.

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 98 of 231

1                    Pugh

2        A.    It's going to be on your right.

3              That's why I labeled it leg 1, 2, 3

4    and 4.   3 and 4 are the back legs.   Legs 1 and 2

5    are the front legs.

6        Q.    OSHA requires somebody like

7    Mr. Escudero in the construction business to

8    inspect ladders daily for any damage, would you

9    agree with that?

10       A.    I believe that's correct.

11       Q.    And failure to inspect this ladder to

12   note the cracking, the preexisting cracking in

13   the ladder was a failure to use ordinary care on

14   the part of Mr. Escudero; is that correct?

15       A.    I don't agree with that.   He said he

16   inspected it.

17       Q.    From your observation of the ladder,

18   Dr. Pugh, it was obvious that the ladder had

19   preexisting cracking on it if it had been

20   inspected, would you agree with that?

21             MR. BENTON:   Objection to form.

22       A.    Depends on what the nature of the

23   inspection is.

24       Q.    If you inspect it for any gaps or

25   cracks such as may have been present on this

Page 58

1                          Pugh

2    ladder they would have been observable; would you

3    agree with that?

4         A.    To the trained eye, keeping in mind

5    that the ladder in this configuration now is not

6    the way it was when Mr. Escudero got on it at the

7    time of his accident.

8         Q.    Have you read Mr. Poremba's

9    deposition?

10        A.    Yes, I did.

11        Q.    Did you read in his deposition the

12   testimony that it was obvious that the ladder was

13   broken, had excessive wear and tear, had

14   preexisting cracks and splits before Mr. Escudero

15   got on it?

16        A.    Yes.  As an investigative engineer he

17   would be aware of that as much as I would be,

18   particularly with experience with these types of

19   ladders.

20             However, with a lay person it's a

21   different story.

22        Q.    Mr. Escudero wasn't exactly a lay

23   person, was he?

24             He was in the construction business

25   who had the duty to inspect the ladders to ensure

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 100 of 231

1                               Pugh
2     their safety, did he not?
3          A.    I didn't get from his testimony that
4     he was a specialist in failure analysis or
5     fracture instabilities, no.
6          Q.    What is your understanding of what
7     OSHA says about having split or cracked rails,
8     what you're supposed to do with the ladder?
9          A.    You're supposed to discard the ladder.
10         Q.    Let me go on to the next part of your
11    report.
12               You say there was a failure to use an
13    encapsulating foot; is that correct?
14         A.    That's correct.
15         Q.    What would this have done, increase
16    the longevity of the rail of the ladder?
17         A.    As testified to by Mr. Vasichko.
18         Q.    Do you agree it would have increased
19    the longevity of the rail?
20         A.    Among other things.
21         Q.    When were encapsulating foots, or feet
22    I should say, put on fiberglass ladders in the
23    industry?
24         A.    I believe the late '80s, time of
25    manufacture of this ladder.

CitiPDF - www.texia.com

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 101 of 231

1                          Pugh

2       A.    Well, Naismith Engineering pointed out

3   that there was paint and spackle inside the

4   cracks, indicating that they -- as proof that

5   they preexisted the subject accident.

6              And when I examined the cracks in

7   detail I in fact could not find that, the paint

8   and the spackle was inside those cracks.  It was

9   beside the crack, but it was not on the actual

10  fracture surface.

11             So the basis for their conclusion that

12  the crack had to preexist up to that point was

13  wrong, and I'm saying the preexisting cracks were

14  not nearly as extensive as implied by Naismith

15  Engineering because they misinterpreted the

16  marking on the legs.

17      Q.    Did you see any of the photographs

18  produced by Mr. Poremba at his deposition?

19      A.    Yes.  But beyond that I have taken the

20  actual indications and measurements of Poremba

21  and have gone to the subject ladder and examined

22  in detail the marks that he is referring to, and

23  they do not extend under the fracture surface.

24      Q.    Did you see the photograph with the

25  spot of brown paint in the area of the crack?

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 102 of 231

1                          Pugh

2       A.    Yes.  It surely is adjacent to the

3    crack.  There is no question of that.  It's not

4    on the fracture surface.

5       Q.    Can you point this out on this

6    particular ladder?

7       A.    Show me which photograph you are

8    referring to of his if you would please, and I

9    will do my best.  Or if you would show me the

10   photograph that would be a big help and I can

11   answer the question specifically.

12            It's on the abraded outside surface of

13   the fracture.  This is missing material in here

14   where the fracture surface was.

15       Q.    When you say "missing material," in

16   other words, that obviously was an old fracture?

17       A.    No, it's on the outside surface of the

18   fracture -- the brown paint depicted in -- what

19   do you want to call this photograph?

20       Q.    Poremba photograph.

21       A.    -- in the Poremba photograph, the

22   fracture surface is in here.

23            That's the outside abraded edge of the

24   ladder leg.  That's not the fracture surface.

25       Q.    It's right next to where there is a

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 103 of 231

1                          Pugh

2    split and there is a rather large gap between the

3    flange and the web; is that correct?

4         A.    Yes.  I wouldn't say "rather large."

5    There is missing material from the fracture

6    surface, yes.

7         Q.    And it's obvious from looking at that

8    particular portion of the ladder that that split

9    had been there for some time, would that be a

10   correct statement?

11        A.    The split there predated the failure

12   of the -- yes, but there are other indications

13   he's made where the crack had not propagated to

14   before the accident.

15             That's just one example of it.

16        Q.    You made the statement in your report,

17   and again I'm on page 3 of your report, you state

18   that --

19        A.    I just want to state I believe my

20   labels have been taken off of this ladder and put

21   on in the wrong positions.  They have obviously

22   been untied.

23             Well, in producing the sections that

24   were removed for testing by Dr. Johnson, they

25   were put back on in the wrong positions.

1                    Pugh

2    and everything I have discussed with you up to

3    date.

4             But noticing that that crack hasn't

5    propagated down below the cross-brace.  It hasn't

6    propagated down beyond the angle brace either.

7        Q.   Given sufficient use, abuse, damage,

8    all ladders eventually can wear out.

9             Would you agree with that general

10   statement?

11       A.   Sure.

12       Q.   And it would not be unusual to see

13   cracks beginning in the corner of a U joint made

14   out of fiberglass given enough time, wear, tear

15   and abuse?

16       A.   If they're going to start somewhere,

17   that's where they're going to start.

18             To expect a user to be cognizant of

19   the principles of stress concentration, though,

20   is a lot to ask.

21       Q.   Object to the nonresponsiveness of the

22   last part of the answer.

23       A.   I'm doing my best.

24       Q.   You state, Doctor, on page 4 of your

25   report, it's your opinion that the ladder had not

1                       Pugh

2    been abused nor misused on prior occasions; is

3    that correct?

4         A.    That's correct.

5         Q.    Is that speculation on your part?

6         A.    Where are you reading now?

7         Q.    Last paragraph on page 4 of your

8    report.

9         A.    Okay.  It looks like just normal wear

10   and tear to me.

11        Q.    Do you know at all the history of this

12   ladder before Mr. Escudero ever got on it?

13        A.    I've read a variety of testimony and

14   tracing of the whereabouts of the ladder and the

15   hands it's gone through, yes.

16        Q.    We really don't have any information

17   at all as to how this ladder was treated or who

18   may have known what about it before Mr. Escudero

19   got on it, would that be a correct statement?

20        A.    But we do know various places it's

21   been.

22        Q.    But we don't know the condition of it

23   or what condition it may have been in before it

24   got into Mr. Escudero's hands?

25        A.    I would generally agree with that.

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 106 of 231

1                         Pugh
2              By that question I'm interpreting you
3    to mean we don't know all the damage was
4    sustained to this while it was in Mr. Escudero's
5    hands.
6         Q.    For all we know, this ladder may have
7    been disposed of by someone and Mr. Escudero
8    picked it up at a job site or somebody who worked
9    for him picked it up at a job site?
10        A.    I know that intimation or contention
11   has been made by defendant in this, yes.
12        Q.    It's possible, isn't it?
13        A.    Anything is possible.  But the
14   problem, if I let that answer stand and just add
15   this and let you object to it, the problem is the
16   failure mode necessitating retiring the ladder is
17   not something that one would notice and is a mode
18   that makes the ladder rather dangerous to
19   continue using.
20              The failure mode promotive of or
21   indicating of retiring should be something that's
22   not hazardous to the user in the successive use.
23        Q.    Objection to the nonresponsiveness to
24   the last part of the answer.
25              You stated that warnings and

# EXHIBIT - 7

CVisPDF – www.fastio.com

Case 1:00-cv-00193    Document 19    Filed in TXSD on 09/28/2001    Page 108 of 231

1

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE SOUTHERN DISTRICT OF TEXAS

4                  BROWNSVILLE DIVISION

5

6    JOSE ESCUDERO, JR.,

7

8                    Plaintiff,

9

10          vs.                    No. B-00-193

11

12    BAUER CORPORATION D/B/A

13    BAUER LADDER CORPORATION,

14

15                    Defendant.

16    -------------------------------x

17

18       VIDEOTAPED DEPOSITION OF DR. JAMES PUGH

19                 Mineola, New York

20              Thursday August 16, 2001

21

22

23    Reported by:

     LINDA SALZMAN

24    Job No 124356b

25

Page 4

1

2          THE VIDEOGRAPHER:  This is the tape

3     labeled No. 1 of the videotape deposition of

4     Dr. James Pugh.  We're now going on the

5     record.  The time is 2:55 p.m.

6          Counsel will state their appearances

7     for the record.

8          MR. BENTON:  Barry Benton for the

9     plaintiff, Jose Escudero.

10          MR. GENDRY:  Tom Gendry representing

11     Bauer Ladder Corporation.

12          THE VIDEOGRAPHER:  Will the court

13     reporter please swear in the witness.

14  J A M E S    P U G H,   called as a witness,

15     having been duly sworn by a Notary Public,

16     was examined and testified as follows:

17  EXAMINATION BY

18  MR. BENTON:

19          Q.    Please state your name.

20          A.    My name is James Pugh.  That's spelled

21  P-U-G-H.

22          Q.    And do people refer to you as

23  Dr. Pugh?

24          A.    That's correct, sir.

25          Q.    Can you give the jury a history of

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 110 of 231

```
 1                         Pugh
 2    about.
 3         Q.    I thought we would start with one
 4    first and then the next.
 5              MR. GENDRY:  Objection to the form.
 6         A.    They were both very similar by my
 7    recollection.
 8              They both involved situations where
 9    the gentlemen were using a Bauer ladder,
10    fiberglass ladder much as we have here today,
11    climbing up on the ladder, performing ordinary
12    routine activity when the ladder precipitously
13    collapsed on them, throwing them to the
14    horizontal surface and resulting in significant
15    injury.
16              And both of those ladders exhibited
17    the same failure mechanism, I should add, as was
18    exhibited in the Escudero ladder.
19         Q.    Namely what?
20         A.    Maybe it would be best to have the
21    ladder in front of us, or a photograph, but
22    basically it was -- can you focus in on this?
23              Basically what happened was there was
24    a splitting of the rear legs that caused the rear
25    legs, if you will, to turn to rubber, as it was
```

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 111 of 231

Page 16

1                     Pugh

2   described, and caused the ladder to collapse.

3             The rear legs split in an upward

4   manner which caused them to lose their structural

5   integrity and failed to support the weight of the

6   person on the ladder.

7        Q.    How were the ladders similar in the

8   two previous cases to the Escudero case?

9        A.    Well, all three of these ladders were

10  Bauer manufactured fiberglass ladders and they

11  all had very similar, if you will, foot

12  treatments.

13            That is, the bottom of the legs were

14  very similar in each of the three types of --

15  they were virtually identical ladders in all

16  three cases.

17       Q.    When I contacted you about your

18  services, what was your assignment?

19       A.    Well, you asked me to examine the

20  ladder that Mr. Escudero was using at the time of

21  his accident, to advise you about the way the

22  failure occurred that caused him to sustain

23  severe injury to his foot and ankle area, and to

24  let you know what could have been done to prevent

25  this occurrence.

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 112 of 231

1                              Pugh

2    appropriate treatment of either the subsequent

3    Bauer type or the Werner type or other types that

4    we know of now, that this accident would have

5    never occurred.

6         Q.    Now, there is expected to be testimony

7    that alleges or contends that Mr. Escudero caused

8    his own accident because he failed to observe the

9    cracks that were in the rails at the time he went

10   to use this ladder.

11             Is there -- are these kind of cracks

12   that are present in the subject ladder, and I'm

13   not talking post-accident, I'm talking

14   preaccident, the extent of the cracks, are they

15   something that the average layman or even the

16   average construction worker would be looking for

17   when they took a ladder?

18             MR. GENDRY:  Object to form.

19        A.    No, they are not.

20             And let me just demonstrate by using

21   the front rails here.  I will turn the ladder

22   around.

23             The front rails here in fact are also

24   cracked, but these really are stable cracks, at

25   least they didn't propagate in this accident.

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 113 of 231

1                          Pugh
2              And the cracks that existed in the
3    back rails in my opinion were not dissimilar from
4    what existed in the front rails.  In fact, they
5    were similar to this what we see here prior to
6    the subject accident.
7              And this would be interpreted by a
8    worker as being an acceptable structure.  In
9    fact, they wouldn't be inclined to even identify
10   this as a major problem because the ladder with
11   this crack when you put it down is relatively
12   stable.  You can move it and it's stable.
13             The problem is when you get on the
14   ladder, at least with the rear cracks, and put a
15   load or twist it a little bit, which is normal
16   action, the crack will shoot way up the leg
17   immediately and collapse the ladder.
18             It's called an incipiently unstable
19   crack.
20             MR. GENDRY:  Object to responsiveness.
21        Q.    In your studies have you found that
22   when a worker goes to look at the ladder before
23   he uses it, that he understates the importance of
24   inspecting the back rails, the skinnier rails?
25             MR. GENDRY:  Object to form.

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 114 of 231

1                              Pugh

2         Q.     In your study did you have certain

3    opinions about the integrity or the quality of

4    the fiberglass involved with the subject ladder?

5              MR. GENDRY:  Object to form.

6         A.     Yes, sir.

7         Q.     And what were your conclusions about

8    the -- let me ask you, how did you study the

9    quality of the fiberglass itself where it's

10   relevant on this ladder?

11             MR. GENDRY:  Object to form.

12        A.     I examined the failed -- if you can

13   pick that up for me -- thank you.

14             I examined the fracture surfaces, the

15   key fracture surfaces that resulted in the

16   collapse of the ladder under the microscope, and

17   I determined that in fact the failure of these,

18   the joint or the edge or surface between the

19   flanges and the web, was what we call a brittle

20   failure.  That is, you can fit the pieces back

21   pretty much together.  It's a very low energy

22   absorptive failure.

23             And in examination I noticed that the

24   fiberglass fibers, the actual cloth, the way it

25   failed along here was predominantly between

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 115 of 231

1                    Pugh

2   fibers running this way rather than across fibers

3   running this way.

4               And of course the nature of the

5   failure being brittle is unacceptable in an

6   engineering sense, and would demand there be an

7   enhancement of properties by the use of a boot or

8   some stabilizing device to accommodate this.

9               MR. GENDRY:  Object to responsiveness.

10      Q.    In a little more simpler terms for

11  someone like myself, did you believe that the

12  quality of the fiberglass was not sufficient?

13              MR. GENDRY:  Object to form.

14      A.    I felt that the fiberglass was not of

15  sufficient quality given the absence of an

16  encapsulating boot or encapsulating type of

17  assembling at the bottom of the leg.

18              That in conjunction with the lack of

19  the boot, the weakness at that edge there was

20  promotive of the failures that we see here.

21      Q.    If there were more cross-fibers of

22  fiberglass going across instead of just

23  long-wise, would that have strengthened this

24  vital area where the crack occurred?

25              MR. GENDRY:  Object to form.

Page 48

                           Pugh

1

2        A.      Yes, it would have.

3        Q.      Now, I anticipate that there is going

4   to be some testimony that Mr. Escudero or someone

5   was using this ladder at a time when the cracks

6   or fractures were quite extensive like they are

7   today.

8                And some of the evidence there in

9   their attempt to show that is with either paint

10  or spackling in the cracks.

11               Did you take a look at those cracks to

12  see if you saw things like spackling or paint in

13  them?

14       A.      Yes, I did.

15       Q.      What did you find?

16       A.      I did not find any evidence of spackle

17  or paint on the specific fracture surfaces

18  involved with the splitting of the rail or flange

19  to web joint in the back rails.

20       Q.      You testified earlier that you had an

21  opportunity to read the two reports of Dr.

22  Johnson, the Bauer Corporation's expert; is that

23  right?

24       A.      Yes, sir.

25       Q.      Starting with the first report, did

Page 53

1                              Pugh

2              And it's also not the way to manage

3     the hazard.  The hazard should be eliminated, not

4     warned against.

5                   MR. GENDRY:  Object to responsiveness.

6                   MR. BENTON:  I will pass the witness.

7                   MR. GENDRY:  Let's take a short

8        break.

9                   THE VIDEOGRAPHER:  We're now going off

10       the record.

11              The time is 3:54 p.m.

12              (Recess.)

13                   THE VIDEOGRAPHER:  We're now going on

14       the record.

15              The time is 4:08 p.m.

16    EXAMINATION BY

17    MR. GENDRY:

18        Q.    Dr. Pugh, my name is Tom Gendry.

19              We have met this day for the first

20    time; is that correct, sir?

21        A.    Yes, sir.

22        Q.    Previous to this what we call a trial

23    deposition, you gave a discovery deposition

24    wherein I asked you a series of questions and you

25    responded; is that right?

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 118 of 231

Page 60

1                          Pugh
2     talking about the shoe similar to the particular
3     ladder involved in this lawsuit.
4          A.    Could you repeat the question,
5     please?
6          Q.    Yes.  Have you examined any other
7     ladders besides the Bauer ladder showing a shoe
8     similar to the shoe on the ladder involved in
9     this lawsuit?
10         A.    I don't recall.
11         Q.    Other than the cases that you have
12    been involved with in the Bauer case, the
13    fiberglass ladders, have you been involved in any
14    other cases involving fiberglass ladders?
15         A.    I do not recall any.
16         Q.    What has been your background
17    concerning the analysis and testing of fiberglass
18    ladders before you ever became involved in this
19    particular case?
20         A.    Fiberglass ladders per se.
21            The only -- well, I'm not sure --
22    well, before this particular case I analyzed the
23    other two Bauer ladder cases, but before that I
24    don't recall any analysis of any fiberglass
25    ladders.

Case 1:00-cv-00193  Document 19  Filed in TXSD on 09/28/2001  Page 119 of 231

Page 61

1                        Pugh

2        Q.    You have never up to today's date done

3   any sort of failure analysis or testing of any

4   fiberglass ladders, would that be a correct

5   statement?

6        A.    With the exception of microscopic

7   analysis.

8        Q.    Microscopic, you mean some sort of I

9   think you called it a stereo microscopic --

10       A.    Yes.

11       Q.    -- viewing of this particular ladder

12   that we have here today?

13       A.    And the other ladders I have analyzed,

14   yes.

15       Q.    And as I understand it, there is no

16   literature specific to ladders that microscopic

17   examination is sufficient to show that there is

18   an insufficient or imperfect weaving of the

19   fiberglass structure of the fiberglass composite?

20       A.    Specifically for ladders, I do not

21   know that.

22       Q.    And before today's deposition you have

23   done no testing on any fiberglass ladders to make

24   the determination that any of the fiberglass mat,

25   meaning the weaving, the longitudinal or

1                    Pugh

2  transverse weaving is insufficient?

3       A.    Aside from the microscopic analysis,

4  correct.

5       Q.    And previously in the discovery

6  deposition you mentioned that there are a number

7  of tests which could have been utilized to

8  determine the strength of the corner of a ladder

9  as you have put it; is that correct?

10      A.    Yes, sir.

11      Q.    And you mentioned specific tests such

12  as the peel test, the crush test, the torsion

13  test and the microhardness test and the

14  quantitative microscopy; is that correct, sir?

15      A.    Yes, sir.

16      Q.    And you have done none of those tests?

17      A.    That's correct, sir.

18      Q.    In essence you are not able to say

19  within a reasonable degree of engineering

20  probability that the fiberglass mat or the

21  weaving of this ladder was insufficient?

22      A.    I cannot say that to a reasonable

23  probability, that's correct.  I strongly suspect

24  it though.

25      Q.    I object to the responsiveness of the

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 121 of 231

                              Pugh

 1
 2    last part of the answer.
 3              As I understand it, you're telling the
 4    ladies and gentlemen of this jury that you did
 5    some sort of microscopic examination here in this
 6    facility that we're in here today?
 7         A.    Yes, sir.
 8         Q.    Is that machine still available for us
 9    to look at?
10         A.    If you care to, yes.
11         Q.    In previous testimony you indicated
12    that you can attach a camera to that stereo
13    microscope which you used to look at this
14    particular ladder.
15         A.    Yes, sir.
16         Q.    And with that camera you could take
17    photographs showing what you're saying is
18    insufficient weaving of the fiberglass?
19         A.    Yes, sir.
20         Q.    Is that a costly thing for you to do?
21         A.    It's timely, it's not costly.
22         Q.    What sort of time does it take to do
23    that?
24         A.    Well, this ladder is quite bulky and
25    has to be positioned.  The time consumption is

Page 64

                         Pugh

1    the position, adequate positioning and the fixing

2    of the camera in the location to take an adequate

3    photograph.

4        Q.    And as I understand it, the micron --

5    strike that.

6            The stereo microscopy would what,

7    illustrate to the jury what you're trying to say,

8    that there is insufficient fibers going

9    transversely?

10       A.    Well, in part, but it also doesn't

11   show anything that -- I'm not demonstrating right

12   here -- that is, that the splitting is straight

13   up the edge of the ladder without any splitting

14   going into the flat pieces of the material.

15           That's basically what that's saying.

16       Q.    I object as nonresponsive.

17           My question to you, Doctor, is would

18   the microscope enlarge the area such that the

19   jury could see it to determine whether or not

20   there is in fact some sort of insufficient

21   weaving in this case?

22       A.    On their part I wouldn't be able to

23   demonstrate them.

24       Q.    You would not be able to demonstrate

Page 65

1                    Pugh

2     that with a microscope?

3         A.      Not to the jury, no.

4         Q.      In other words, the only way to make a

5     clear determination within a reasonable degree of

6     engineering probability is to have done one of

7     these other tests which I've mentioned, the peel

8     test, the crush test and so forth, to make

9     certain that the corner, as you say, had

10    insufficient weaving?

11        A.      No, it's determinable from microscopy

12    but it takes a trained eye to make the

13    determination.

14              And the point of taking a photograph

15    and not being able to demonstrate it is -- taking

16    a photograph is not convincing.

17              It's the analysis and the observation

18    of the fracture surface and the way the

19    striations run that make it probable that there

20    was lack of adequate crossing over of fibers

21    around the corner.

22        Q.      Do you have any, other than this

23    ladder, any demonstrable evidence to prove that

24    the weaving of the fiber transversely as opposed

25    to longitudinally was insufficient?

Page 66

                              Pugh

1

2      A.      Yes, I do.

3      Q.      What?

4      A.      The test results of Dr. Johnson.

5      Q.      And how do the test results of

6  Dr. Johnson show that the fiber was weaved

7  inadequately transversely?

8      A.      Well, it shows the failure mode of

9  samples tested along the flat surface of the

10  flange, and it shows a very different fracture

11  than what is exhibited on the edge.

12          And properly molded -- to complete the

13  answer, and properly molded fiberglass at the

14  edge should show the same fracture

15  characteristics or more closely the fracture

16  characteristics demonstrated by Dr. Johnson in

17  his test samples.

18      Q.      In the discovery deposition you

19  admitted to me that the testing done by

20  Dr. Johnson met the ANSI standards; is that

21  correct?

22      A.      Correct.

23      Q.      In other words, there is an

24  industrywide standard that manufacturers of

25  ladders must meet in order to put the product on

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 125 of 231

1                            Pugh

2     the market.

3                    Dr. Johnson has tested for that and

4     the ladder met and exceeded those standards?

5          A.    I don't know that there is a

6     requirement that the ladders meet the ASTM

7     standards or ANSI standards.

8                    It's a good idea for the manufacturers

9     to comply with them, but I don't know of any

10    statutory requirement.

11         Q.    I stand corrected on that with respect

12    to there being a statute.

13                   I said industrywide standard.  There

14    is an industrywide standard on the part of ladder

15    manufacturers to meet the ANSI or ASTM standards?

16         A.    I believe it's what we call a

17    consensus standard; that is, a manufacturer can

18    decide to comply with ANSI or not.

19                   If it complies and it's tested to

20    comply they're entitled to put an ANSI sticker on

21    the ladder; otherwise they can't just put an ANSI

22    sticker on.

23         Q.    And you know that Bauer Company did

24    that?

25         A.    I believe they did, yes.

Page 69

1                          Pugh

2    different than what this is here, the splitting

3    of the corner piece.

4                What I am saying is that the corner

5    piece should have shown at least the failure

6    characteristics of these pieces that he tested on

7    the flat surfaces, and they don't.

8                That points to a deficiency in the

9    corner of the ladder.

10        Q.    Object to responsiveness.

11                You previously stated that the weakest

12    point of a structure would be the corner; is that

13    correct?

14        A.    Correct.

15        Q.    That not only applies to fiberglass,

16    it applies to many structures?

17        A.    Correct.

18        Q.    We asked you, Doctor, to produce at

19    your depositions today any professional articles

20    you have reviewed to serve as a basis for your

21    opinions in this case.

22                And as I understand from your

23    discovery deposition, you have no professional

24    articles to support your theories; is that

25    correct?

1                              Pugh

2        A.     I have not relied on any, no.  It's

3   not that I don't have any, I have not relied on

4   any.

5        Q.     And you have not produced in response

6   to our request for production in the depositions

7   in this case, you have not produced any

8   scientific studies to support your opinions in

9   this case?

10       A.     I have not relied on any scientific

11  studies.

12              I relied on the sum total of

13  scientific knowledge in general on the failure

14  characteristics of composites, plastics and

15  materials.

16       Q.     Do you have, Dr. Pugh, any peer review

17  articles supporting your theories of failure in

18  this case?

19              MR. BENTON:  I object to the form.

20       What kind of failure?

21       A.     I'm not sure I understand the question

22  also.

23       Q.     Have your theories that you expressed,

24  your opinions in this case, have they been

25  subjected to peer review by your contemporary

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 128 of 231

1                          Pugh

2    engineers?

3              MR. BENTON:   Objection to form.

4         A.    No.  It would be akin to subject

5    Newton's laws to physics to peer review.

6              These principles have been time-tested

7    and proven, and they are part of the general core

8    curriculum taught to engineering students in

9    materials science.

10             They are common concepts and tenets,

11   T-E-N-E-T-S, of materials science, materials

12   science and engineering.

13        Q.    I object to the responsiveness.

14             Yes or no, have you seen any articles

15   by your contemporaries supporting the theories of

16   failure which you have outlined in this case?

17             MR. BENTON:   Objection to form.

18        A.    Everything I see is consistent and

19   supportive of that.

20        Q.    Any specific journal articles?

21        A.    I would only recall an article that

22   would tend to sway me from the commonly accepted

23   principles.  I have never seen such an article.

24             If you have any in mind I would be

25   happy to take a look at it and advise you to the

Page 72

                              Pugh

 1

 2    validity of it.

 3         Q.    Apparently there are certain tests

 4    which you mentioned which if your theory was true

 5    about what happened here, which would support

 6    your theories, that being the peel test, the

 7    crush test and the torsion test and the

 8    microhardness test and the quantitative

 9    microscopy test.

10         A.    Is that a question?

11         Q.    Yes.

12         MR. BENTON:    Objection to the form.

13         A.    I didn't get the question.

14              It sounded like a statement to me, but

15    I will be happy to answer it if you care to

16    phrase it in a natural form.

17         Q.    You have already stated that there are

18    tests which may give support to your theory of

19    how the failure took place.

20         A.    I don't think I testified to that.

21              You had asked me were there tests that

22    could be done on the edge of this particular, you

23    know, that would, though, show the difference in

24    mechanical properties.

25              And I said yes, there are tests that

Page 73

1                          Pugh

2    can be done.

3              I said I don't think it's necessary to

4    do them because the demonstration of the brittle

5    nature of this failure and the way it zips right

6    up this edge without any propagation indicates

7    the weakness in that particular corner.

8              The way you want these things to fail,

9    if a crack starts you want to promote the bulk of

10   failure to the remainder of the material here, to

11   the bulk of the leg.  You don't want to be

12   concentrated all the way up and collapse the

13   ladder.

14             That's a basic concept of design,

15   mechanical science and engineering.

16        Q.    I object to the responsiveness.

17             In your discovery deposition did you

18   not say that a person could test the strength of

19   the corner of the ladder by these various tests

20   which you have outlined, the peel, the crush, the

21   torsion, the electron microscopy -- strike that

22   -- the microhardness and the quantitative

23   microscopy?

24        A.    Yes, sir.

25        Q.    You have done none of those?

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 131 of 231

Page 74

1                              Pugh

2          A.     That's correct, I have not done them.

3          Q.     Most of your work has been involved in

4    biomechanics and ergo economics did you say?

5          A.     Ergonomics.

6          Q.     Ergonomics.

7          A.     I have done considerable work in

8    biomechanics and ergonomics, yes.

9          Q.     Can you explain to the jury what

10   subspecialty that is or what that involves?

11         A.     Ergonomics is that science that has to

12   do with, for example, man-machine interactions

13   such that operators of machinery or equipment can

14   produce useful work without injuring themselves

15   and without injuring bystanders.

16                This particular ladder situation would

17   fall in the area of ergonomics.  Having a worker

18   on a ladder producing a task in a manner that

19   would not be injurious to himself or bystanders

20   and the ergonomics features of this ladder were

21   part of the analysis that I did on this

22   particular case.

23         Q.     And what is the field of biomechanics?

24         A.     Biomechanics is that branch of

25   bioengineering that applies the laws of physics,

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 132 of 231

```
 1                        Pugh
 2    mechanical engineering and material science to
 3    the human body to, for example, to explain how
 4    certain injuries are produced in certain
 5    circumstances, and how they can be prevented.
 6         Q.    And your curriculum vitae contains
 7    articles that you have published concerning
 8    bioergo -- how do you say that?
 9         A.    Ergonomics.
10         Q.    Bioergonomics --
11         A.    It's just ergonomics and biomechanics.
12         Q.    And you have published in that area;
13    is that correct?
14         A.    Yes, sir.
15         Q.    You have not published in the area of
16    ladder failure; is that correct?
17         A.    I have not published a paper on ladder
18    failure, that's correct.
19         Q.    In the discovery deposition I think we
20    learned from you that you agree that this ladder
21    bore cracking and splitting before Mr. Escudero
22    ever got on the ladder.
23         A.    That's correct, sir.
24         Q.    And you understand the history of
25    Mr. Escudero and his family, that they were in
```

Page 76

Pugh

1  the construction business?

3       A.     Yes, sir.

4       Q.     They were required to abide by the

5  OSHA standards concerning inspection of ladders?

6       A.     In principle, yes.

7       Q.     And you understand that Mr. Escudero,

8  Jr., the person who was injured, that he was the

9  manager and at least a part owner of the

10 construction business?

11      A.     I believe that's correct, yes, sir.

12      Q.     You learned from his deposition that

13 he had been involved in many jobs concerning

14 construction?

15      A.     Yes, sir.

16      Q.     And it's your understanding, is it

17 not, that OSHA required him to inspect daily a

18 ladder to see whether or not it had any cracking

19 or splitting or damage to the parts such that it

20 should have been removed from service?

21      A.     That's correct, sir.

22      Q.     If this ladder had been looked at it

23 was obvious, was it not, that the cracks were

24 visible?

25      A.     If one looks for the cracks one could

                            Pugh

1
2     find them, yes.
3         Q.     In other words, some of these cracks,
4     especially on the back rails that· we're talking
5     about, were even widened and worn so extensively
6     that there were gapes or gaps, would that be
7     correct?
8         A.     There were small gaps a fraction of an
9     inch.  A small gap that if one looked for that
10    gap one could find it, but it wasn't something
11    that could jump out to the casual observer.
12        Q.     Objection as to the responsiveness to
13    the last part of the answer.
14               In other words, if one were to look at
15    those cracks they would be seen as through and
16    through, you could see daylight?
17        A.     No, I would answer in the affirmative
18    to the question if someone were looking for these
19    cracks they could find them.
20        Q.     So if a person or contractor who is
21    required to abide by OSHA to inspect for cracks,
22    if he had looked at the ladder to look for cracks
23    they would have been visible?
24        A.     Yes.
25        Q.     And it's a failure to exercise

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 135 of 231

1                          Pugh

2     pieces that come apart.

3          Q.     In other words, you're telling the

4     jury that there had been such an abraded area,

5     that sometime before where the area was abraded

6     away next to the crack there was a spot of paint?

7          A.     I would agree with that, yes.  And of

8     course that occurred on one of the legs down

9     rather low, down around the area of the rivet for

10    the angle reinforcement of the bottom

11    cross-brace.

12               THE VIDEOGRAPHER:  We're now going off

13          the record.

14               The time is 4:38 p.m.

15               (Recess.)

16               THE VIDEOGRAPHER:  We're now going on

17          the record.

18               The time is 4:40 p.m.

19          Q.     In reviewing the depositions in this

20    case, particularly of Mr. Escudero and some of

21    his employees, it became obvious that this ladder

22    originally came from the Santa Rosa Independent

23    School District near Brownsville, Texas?

24          A.     I wouldn't disagree with that.

25          Q.     In fact, there has been stenciling

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 136 of 231

Page 82

1                          Pugh

2    shown on the side of the front rail or the ladder

3    to that effect?

4         A.    I am aware of that, yes.

5         Q.    You don't know and nobody has

6    testified as to when this ladder left the hands

7    of the Santa Rosa Independent School District?

8         A.    I would agree with that.

9         Q.    In effect, nobody knows the history of

10   this ladder from the time that it left the Santa

11   Rosa Independent School District, whatever time

12   that may have been, up to the time that

13   Mr. Escudero used it?

14        A.    I would basically agree with that,

15   yes.

16        Q.    All ladders eventually can become

17   broken, worn out, damaged, abused and have to be

18   taken out of service; is that, generalized, a

19   correct statement?

20        A.    All of that falls within the realm of

21   possibility, yes.

22        Q.    You read the testimony of Mr. Escudero

23   that his business had the job of cleaning up job

24   sites at various construction sites?

25        A.    I believe that was one of his

Page 83

1                           Pugh

2      activities, yes.

3          Q.     For all you know or we know, this

4      ladder may have been disposed of as that it

5      should have been taken out of service at some job

6      site, somebody left it there and somebody picked

7      it up and provided it to Mr. Escudero's company?

8          A.     That may have happened, but then that

9      would have been a disposal contrary to OSHA

10     requirements.

11         Q.     I understand if you are going to take

12     one of these out of service you tie it up and you

13     mark it that it should be taken out of service

14     and then you take some means to cut it up and

15     destroy it?

16         A.     You break it.

17         Q.     Right.  And that was not done in this

18     particular case, was it?

19         A.     That's correct.

20         Q.     It is within the realm of possibility

21     that someone had concluded before Mr. Escudero

22     got on this ladder that it was broken and it

23     should not be used?

24              MR. BENTON:  Objection to form.

25         A.     Is a conjecture, yes.

Page 84

1                          Pugh

2        Q.     It's a possibility?

3        A.     It's a possibility.

4        Q.     You cannot say that this ladder was

5   not damaged because of abuse?

6               MR. BENTON:   Objection to form.

7        A.     I do not believe this ladder was

8   abused.

9        Q.     Ladders can suffer, such as these

10  fiberglass ladders can suffer cracks if enough

11  pressure is placed against the ladder that it

12  starts cracking?

13       A.     Absolutely.

14       Q.     Or as you mentioned, if the ladder

15  hits the floor, that could make a ladder crack

16  further than what it had already cracked?

17       A.     That's correct.

18       Q.     If a ladder is misused, by that I mean

19  banged around, thrown around, things placed on

20  top of it, eventually it can suffer cracking?

21       A.     Absolutely.

22       Q.     And OSHA speaks to that requiring that

23  the ladder be removed from service if that is

24  noticed in the ladder?

25       A.     That's correct.

Page 85

1                          Pugh

2        Q.    At the time that this ladder left the

3    manufacturer sometime in 1988 to 1990, I think

4    that's when we believe that the testimony has

5    been when this ladder was manufactured; is that

6    correct?

7        A.    That's correct, sir.

8        Q.    You know of no scientific evidence

9    demonstrating that at that time the ladder was

10   defective in manufacture?

11       A.    Could you please read that question

12   back to me.

13             (Record read.)

14       Q.    Let me repeat the question, rephrase

15   the question.

16             At the time that this ladder left the

17   manufacturer's hands when it was manufactured in

18   1988 to 1990, you know of no scientific evidence

19   demonstrating that this ladder was defective in

20   the manufacturing process?

21       A.    I have not seen produced in discovery

22   anything by Bauer that they did any testing to

23   reveal the inherent flaws in this ladder,

24   correct.

25       Q.    And you have not been provided with

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 140 of 231

1                          Pugh
2    any testing data demonstrating to the jury proof
3    that the materials were defective in any fashion
4    when they left -- when it left the hands of Bauer
5    manufacturing?
6          A.    You're talking about absolute proof
7    now?
8          Q.    Yes, sir.
9          A.    Rarely is anything like this rendered
10   to absolute proof.
11         Q.    Is the answer no, you have not?
12         A.    Not to absolute proof, no.
13         Q.    You have been provided with no
14   materials and you have none demonstrating by any
15   scientific means that the materials in this
16   ladder were defective when it left the hands of
17   the manufacturer?
18         A.    You're talking about the materials
19   now, not the design?
20         Q.    The materials, integrity of the
21   materials.
22         A.    Again, I didn't receive in discovery
23   the results of any testing, nor do I know of any
24   testing that Bauer did to verify the safety of
25   the ladder.

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 141 of 231

1               Pugh

2          Q.    If a ladder has a boot on it, that

3     does not mean necessarily that the rail which is

4     inside the boot will not fracture at some time?

5          A.    That's correct.

6          Q.    In other words, if we took this

7     particular ladder here and we had a boot on it up

8     to here, that doesn't mean that, depending upon

9     how the ladder was used or what happens to the

10    ladder, some ten years later it might have a

11    crack somewhere up the rail?

12         A.    That could happen.

13         Q.    And if so, the ladder again should be

14    taken out of service whether or not it has a boot

15    on it?

16         A.    That's correct.

17         Q.    Are you aware of ladders produced

18    today that are almost identical with respect to

19    the shoe and the cross-bracing and the angle

20    bracing as on this particular ladder?

21         A.    Only through the brochures.

22         Q.    There are some, are there not?

23         A.    Apparently.

24         Q.    Do you know that there is a Werner

25    ladder which is almost identical to this sold on

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 142 of 231

1                        Pugh
2    the market today with the same type of shoe, with
3    the same single brace to the rear flange rail
4    attached to the cross bar?
5         A.    I believe that, but I do not see any
6    of those in service.
7         Q.    Let me just represent to you to assume
8    that one will be produced at trial bought from
9    Home Depot just a week ago, would you say that
10   that ladder is defective?
11        A.    Absolutely.
12        Q.    Why?
13        A.    Well, I would have to see it, but if
14   it doesn't encapsulate the bottom of the leg and
15   the fiberglass is not sheathed up or beefed up
16   it's going to split and cause a problem.
17             But I would have to see the specific
18   Werner ladder.  It's not in front of me, so I
19   can't really pass judgment on it adequately.
20        Q.    I think what you are saying, is it
21   not, Doctor, that a ladder with a sheath or a
22   boot on it may last longer than one that doesn't
23   have a boot on it?
24        A.    It will surely last longer, yes.
25        Q.    Just because one product will outlast

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 143 of 231

1                      Pugh
2    another doesn't make the product with the least
3    life on it defective, does it, in design?
4         A.    Well, if that increase· in longevity
5    also has a commensurate reduction in hazard, then
6    there is a benefit to be accrued from that
7    longevity, a safety benefit to be accrued from
8    that longevity.
9         Q.    If you have a BMW with a strong shock
10   in it versus a Ford with a weaker shock, that
11   doesn't make the Ford vehicle defective, does it?
12        A.    Depends if the shock fails at a
13   thousand miles in the weaker one and causes an
14   accident and kills somebody, then that's been
15   demonstrated to be a hazard that causes
16   significant problems.
17        Q.    Generally speaking, Doctor, in just
18   about every line of products you're going to find
19   differently designed models?
20        A.    I would agree with that.
21             MR. BENTON:  Objection to form.
22        Q.    And to take my analogy, and it may not
23   be the greatest analogy, for example, in the
24   automotive industry, it's well-known that some
25   shocks are better than others, it will last

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 144 of 231

Page 90

1                            Pugh

2    longer; is that right?

3         A.    I would generally agree with that.

4         Q.    Some engines are built better than

5    other engines, they will last longer?

6         A.    Absolutely.

7         Q.    So simply to say that this ladder when

8    manufactured in 1988 because it did not have a

9    boot on it, that in and of itself does not make

10   it a defective design, would you agree?

11        A.    Not, I don't agree with that.

12        Q.    You're telling the ladies and

13   gentlemen of the jury that just because this

14   ladder did not have a boot on it, given its other

15   characteristics, that it was defectively

16   designed?

17        A.    Yes.

18        Q.    And by "other characteristics," it's

19   your belief, or what you're telling the jury is

20   that the cross-bracing, you could have had more

21   cross-bracing, is that one of the features?

22        A.    Well, what I'm saying specifically is

23   this ladder as produced, if anyone, an ergonomist

24   for example, such as me, had come into the

25   company to evaluate this prior to production, I

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 145 of 231

Pugh

1
2   surely would have been able to tell them just by
3   proofing this without failure testing it even,
4   that there was structural inadequacies that was
5   going to lead to failure, make this prone to
6   failure, and that would lead me to do some
7   additional testing to duplicate this and to
8   describe to them the countermeasures.
9               I would have them tie these
10  cross-braces to both flanges and also put a boot
11  or encapsulation on the bottom of the leg,
12  knowing what I know about the materials science
13  of fiberglass.
14              Now this was not designed by someone
15  that was a specialist in fiberglass by my
16  understanding.
17      Q.    I object to the responsiveness.
18      A.    That's all in the deposition
19  testimony.
20      Q.    I object to the responsiveness.
21      A.    A manufacturer has a responsibility to
22  produce a safe product, and part of producing a
23  safe product is examining the failure modes of
24  that product.
25      Q.    Object to the responsiveness.

Page 92

 1                          Pugh

 2        A.     Examination of the failure modes of a

 3   product would have revealed the weaknesses and

 4   indicated the propriety of putting a boot and/or

 5   reinforcing the flanges.

 6        Q.     Doctor, I think it's -- we just went

 7   through a long discussion, but I think what

 8   you're saying is that a boot would have made this

 9   ladder last longer and not be subject to

10   splitting; is that what you're saying?

11               MR. BENTON:  Objection to form.

12        A.     No.  What I'm saying, a boot would

13   have eliminated the hazard and made this ladder

14   last longer.

15        Q.     Have you done any sort of statistical

16   analysis or failure testing of any ladders with

17   boots indicating that that's the case?

18        A.     No.  That was done in the subsequent

19   studies, reports of statistical claims after the

20   modifications were made.

21        Q.     Have you yourself done any statistical

22   study or testing to determine what it takes, how

23   much use it takes to cause a ladder with a boot

24   to fail?

25        A.     Not quantitatively, no.  But I will

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 147 of 231

1                    Pugh

2    add that in my practice I see a cross-section of

3    failures of products occurring across the

4    country, and it's surprising to me I have not

5    seen a Werner ladder failure.

6         Q.    Objection.

7         A.    And I have seen at least five Bauer

8    ladders fail in this mode.

9         Q.    Objection to the responsiveness of the

10   last part of the answer.

11              You mentioned that Mr. Escudero was

12   possibly on the fifth step of this ladder; is

13   that correct?

14        A.    I think he said fourth or fifth in his

15   dep testimony.

16        Q.    And the fifth step says "Don't step on

17   it," or something to that effect?

18        A.    I believe that's correct.  Not a step.

19        Q.    If Mr. Escudero was on the fifth step

20   of this ladder having been warned not to step on

21   it, that was a breach of the standard of ordinary

22   care on his part?

23        A.    Well, it was a function permissible by

24   the ladder.  It was not in accordance with the

25   recommendations on the ladder.

PHONE #(210)377-3027          ESQUIRE DEPOSITION SERVICES          FAX #(210)344-6016
7800 IH-10 WEST, SUITE 100       SAN ANTONIO, TEXAS 78230              1-800-969-3027

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 148 of 231

1                    Pugh

2        Q.    Are you telling the ladies and

3    gentlemen of the jury that Mr. Escudero, it was

4    okay for him to stand on the fifth step if he

5    did, even though it was marked "Do not step"?

6        A.    I don't recommend stepping on the

7    fifth step, but I don't believe that bore any

8    role in the failure of this ladder.

9        Q.    I object to the responsiveness.

10          If Mr. Escudero stepped on a step

11    which was marked "Do not step," or words to that

12    effect, did he fail to exercise ordinary care?

13        A.    That sounds like a legal term to me.

14        Q.    Was he negligent?

15        A.    It was in violation of the

16    recommendations of the ladder.

17          He was assuming a certain amount of

18    risk if he was aware of that.

19        Q.    Have you looked at the label on the

20    front of the step?

21        A.    Yes.

22        Q.    What does it say?

23        A.    I didn't memorize it.  Let me just --

24    it says "Danger, do not stand on or above this

25    step.  You can lose your balance."

CMxPDF - www.fatola.com

1                          Pugh

2          It doesn't say that the ladder can

3     fail and throw you to the floor.

4          Q.    Object to the responsiveness to the

5     last part of the answer.

6          A.    The implication of that warning is if

7     you can keep your balance it's not a problem.

8          Q.    Object to the responsiveness.

9               On direct examination you mentioned

10    that if a boot had been on the ladder it may have

11    lasted for an indefinite period of time.

12         A.    Yes.

13         Q.    Have you made any analysis of how long

14    the ladder would have lasted with the boot on it?

15         A.    No, I haven't.

16              THE VIDEOGRAPHER:  We're going off the

17         record.

18              The time is 4:58 p.m.

19              (Recess.)

20              THE VIDEOGRAPHER:  We're now going on

21         the record.

22              The time is 4:59 p.m.

23              MR. GENDRY:  I want to ask you to mark

24         the Notice of Deposition as a defense

25         exhibit, Defendant's 1.

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 150 of 231

Page 96

1                            Pugh

2              (Defendant's Exhibit 1, Notice of

3         Deposition, marked for identification, as of

4         this date.)

5         Q.    Dr. Pugh, let me hand you Defendant's

6    Exhibit 1, and that is the Notice that I prepared

7    and sent out for your deposition.

8              Have you seen that before today's

9    deposition?

10        A.    No, sir.

11        Q.    You're accustomed to seeing documents

12   requesting you to produce items at your

13   deposition, are you not?

14        A.    Yes, sir.  I believe I produced

15   everything responsive to this.

16        Q.    Okay.  As I understand your deposition

17   testimony, the test that Dr. Johnson conducted,

18   they did show that the parts that he tested met

19   the ANSI-ATSM standards; is that correct?

20        A.    Yes, sir.

21        Q.    And you have done no testing with

22   regard to the strength of the ladder at the

23   corners?

24        A.    Correct.

25        Q.    And there are tests which we have

Page 97

1                          Pugh

2     already listed which could be done?

3          A.     Yes, sir.

4               MR. GENDRY:  I pass the witness.

5          Thank you, sir.

6     FURTHER EXAMINATION

7     BY MR. BENTON:

8          Q.     Just one, maybe two questions,

9     Dr. Pugh.

10               While Mr. Escudero does not admit or

11    necessarily believe that he was on the fifth

12    step, if he was on the fifth step, would that

13    have prevented this accident from happening?

14         A.     You mean if he weren't --

15         Q.     Let me rephrase it.  I'm sorry.  It's

16    been a long day.

17               If he was on the fifth step, did that

18    cause the accident to happen?

19         A.     No, it didn't.

20         Q.     And why?

21         A.     Because a properly designed and built

22    ladder would have been resistant to failure even

23    if he were on the fifth step.

24         Q.     I want you in answering these

25    questions to follow these definitions that I am

# EXHIBIT - 8

CitiPDF – www.fastio.com

Leg #4 were applied to the ladder to clearly indicate each leg as numbered and depicted in the August 30, 1999, report of Naismith Engineering, Photograph 1. References in the present report to the legs by number shall thus be similar to references in the Naismith Engineering reports, in regard to identification of the legs.

Regarding the August 30, 1999, report of Naismith Engineering, while I generally agree with the description of the ladder, I disagree with the entry under <u>Discussion</u> that "The cracking and other damage observed on the ladder is the result of excessive useage and/or misuse." The extent of the longitudinal cracking of the legs, particularly the back legs, was due to the propagation of pre-existing cracks at the time of the accident on May 10, 1999. Exclusive of this, the other damage and wear is from normal use, <u>not misuse</u>. The bent spreader is incidental and minor.

Additionally, regarding the August 30, 1999, report of Naismith Engineering, there is mention of an inability to obtain from Bauer Corporation any history of problems with this type of ladder or any known defects. I personally, to correct this miscommunication from Bauer to Naismith, gave a detailed deposition in the case of <u>Scott v. Bauer</u>, taken by attorneys representing Bauer, on August 15, 1994, almost <u>five years before the Escudero accident</u>. In that deposition, I gave detailed analysis of the failure mechanisms of a ladder similar to the Escudero ladder, outlined the hazards and defects, and testified as to proper means of control of same.

Regarding the September 29, 1999, report of Naismith Engineering, the "spot of brown paint" referenced in the section captioned <u>Leg #3</u>, represented by Naismith to be inside the crack, is clearly outside the crack on the exterior surface of the fiberglass. The "white paint or sheetrock joint compound" referenced in that section was found to be clearly on the exterior surface of the fiberglass and not inside the crack at the top of Leg #3. Further, regarding section captioned <u>Leg #4</u>, the "brown paint . . . visible inside the crack at approximately nine (9) and sixteen (16) inches from the bottom of the leg" clearly is on the surface of the fiberglass away from the crack and not inside that crack. In the section entitled <u>Injured Location on Ladder</u>, I wish to point out that Mr. Escudero clearly indicated in deposition when questioned that he was on step 4 or step 5, positions clearly permitted by the construction of the ladder, with step 4 clearly being permitted by the labelling on the ladder.

I have personally examined three ladders manufactured by Bauer, including the Escudero ladder, of substantially similar construction, which failed due to leg splitting, causing injuries to the users (Scott, Smith, Escudero). Further, I have in my possession a Bauer ladder, apparently discarded by the Long Island Rail Road, for reasons unrelated to leg splitting, which also demonstrates leg splitting. Finally, I have examined an un-used Bauer ladder demonstrating leg splitting due to the nature of storage and handling, as I testified to in detail in my deposition in <u>Scott v. Bauer</u>. Thus, I personally have examined in detail five Bauer fiberglass ladders, all showing similar defects and split legs, three of which resulted in accidents that caused injuries.

1

<pre>
 1           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   JOSE ESCUDERO, JR.           )
         Plaintiff               )
 4                               )
     VS.                         )  CIVIL ACTION NO. B-00-193
 5                               )
     BAUER CORPORATION D/B/A      )
 6   BAUER LADDER CORPORATION    )
         Defendant               )
 7   *********************************************************

 8           ORAL DEPOSITION OF DR. JOHN JOHNSON

 9                    AUGUST 29, 2001

10                    VOLUME 1 OF 1

11   *********************************************************

12                    ORAL DEPOSITION OF DR. JOHN JOHNSON,

13   produced as a witness at the instance of the

14   Defendant, and duly sworn, was taken in the

15   above-styled and numbered cause on the 29th of

16   August, 2001, from 12:30 p.m. to 3:18 p.m., before

17   DANDY ELLIS, CSR in and for the State of Texas,

18   reported by machine shorthand, at the offices of

19   Gendry & Sprague, 645 Lockhill Selma, San Antonio,

20   Texas 78216, pursuant to the Rules of Civil Procedure

21   and the provisions stated on the record or attached

22   hereto.

23

24                                         COPY

25           *   *   *   *   *   *   *   *   *   *
</pre>

1                    DR. JOHN JOHNSON,

2    having been first duly sworn, testified as follows:

3                E X A M I N A T I O N

4    BY MR. BENTON:

5         Q.   Please state your name.

6         A.   John E. Johnson.

7         Q.   Mr. Johnson, my name is Barry Benton.   We

8    just met today, right?

9         A.   That's correct.

10        Q.   I'm going to -- I represent a man named Jose

11   Escudero in a lawsuit filed against Bauer

12   Corporation.   Do you understand my position in this

13   lawsuit?

14        A.   Yes, sir.

15        Q.   I'm going to ask you some questions.   And if

16   you don't understand my question, would you tell me?

17        A.   I certainly will.

18        Q.   Okay.   In preparation for this deposition

19   today we sent a notice of deposition to the opposing

20   counsel, Mr. Gendry, in which we made a request that

21   certain items be produced today.   Are you familiar

22   with that?

23        A.   Yes.

24        Q.   We're going to attach this as Exhibit 1 to

25   your deposition.

1                    EXAMINATION

2     BY MR. GENDRY:

3          Q.   Mr. Johnson, my name is Tom Gendry.  And of

4     course we have met previously in this case; is that

5     correct?

6          A.   Yes, sir.

7          Q.   And I retained you to work on this

8     particular case?

9          A.   Yes.

10         Q.   All right.  You have prepared reports in

11    this case, which I don't think we've attached them to

12    the deposition.

13              MR. GENDRY:  So let's mark this.

14              (Exhibits 6 and 7 marked.)

15         Q.   **(BY MR. GENDRY)** We've marked as Deposition

16    Exhibits 6 and 7 the two reports that you have issued

17    in connection with your study of this case; is that

18    correct?

19         A.   Yes.

20         Q.   And is there a curriculum vitae in your

21    report?

22         A.   Yes, sir.  There is in the first report.

23         Q.   First one.  Is the curriculum vitae attached

24    to your report, Deposition Exhibit 6, is it current

25    as to your education, training and experience?

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 157 of 231

1      A.   Yes.

2      Q.   Okay.  Could you explain to us your

3   experience in the study of fiberglass as a material.

4      A.   Actually, I began studying fiberglass

5   probably in 1960 when I became a graduate student,

6   Ph.D. student at Perdue.  There I developed

7   structural -- construction systems involving plastics

8   and building technology.  Then I spent three years at

9   Dow Chemical Company in the plastics development and

10  research department, first, as I explained earlier,

11  as a technical fireman, and the last two years as a

12  laboratory director in the long range plastics

13  applications laboratory.  And I worked with plastics

14  all during those years.

15           Then I continued my research in

16  plastics at the University of Wisconsin.  I had a

17  number of projects involving plastics, sandwich

18  panels, behavior of plastics, composites in general.

19  I published a number of papers which developed new

20  theories on how to analyze and design and reinforce

21  plastics.  And I even taught seminar courses in

22  plastics and fiberglass at the University of

23  Wisconsin.  I became chairman of the ANSI A14.5

24  committee in 1970 -- actually, a little bit for that

25  time.  But it became official in 1970.  I have

1    conducted, you know, testing and research in plastics

2    on an intermittent basis over the past 30, 35 years.

3        Q.    When you say plastics, does that include

4    fiberglass?

5        A.    Yes, sir.

6        Q.    All right.  Go ahead.

7        A.    And I have analyzed plastics, tested them.

8    I worked with companies developing plastics and

9    fiberglass products over the years.  Over the past,

10   I'd say 25 years, I've done this.

11       Q.    Okay.  With respect to fiberglass ladders,

12   can you explain what has been your part in connection

13   with either testing ladders, researching ladders,

14   study of such ladders?

15       A.    Certainly.  As I mentioned earlier, in 1970

16   I became chairman of the A14.5.  And my task was then

17   to assemble a subcommittee to develop the standard

18   which has resulted in a number of reiterations, and

19   the last one being the 2000 version.

20                 Then in about 1975 I started on what

21   still is the largest research program that's been

22   done in ladders for the Consumer Product Safety

23   Commission.

24       Q.    What is the Consumer Product Safety

25   Commission?

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 159 of 231

1      A.    It's a government agency that is more or

2  less a watchdog over consumer products, etcetera.

3  And it was the Commission's charge to ladder

4  committees to develop a standard and improve the

5  standards, you know, that they had.  And so they

6  funded a program to do research.  And there were

7  literally hundreds of engineers that were involved in

8  this study.  It was a two-year program.  It was under

9  my direction.  And, I mean, it tested all sorts of

10  ladders; wood, aluminum, fiberglass, extension

11  ladders, stepladders, special ladders, trestle

12  ladders, and so on.  We instrumented these ladders

13  with strain gauges, we instrumented them with

14  accelerometers with all three axes to determine the

15  natural frequency of the ladders and how they respond

16  to the frequency of a climber, the type of dynamic

17  forces that they developed and so on.

18            And we developed all sorts of data in

19  slip resistance.  We evaluated all of the

20  certification tests that existed at that time.  And

21  at the end of that two-year study, then in 1977 we

22  presented that to the A14 committees, and the results

23  of that were then what's incorporated into the

24  succeeding standards of 1980 on.  And they have

25  formed much of the basis on which we use the ladder

1    technology today.

2         Q.    When you say the ANSI 14.5 committee, what

3    is ANSI?

4         A.    American National Standards Institute.

5    That's their -- that's the acronym for them, ANSI

6    is.  And it consists of one main committee, which is

7    the A14, which is called the main committee, and

8    which has risk charged the development and the

9    support of subcommittees then for each specific type

10   of ladder, whether it be wood, aluminum, fiberglass,

11   fixed ladders, job made ladder, whatever.  And so it

12   then coordinates the efforts of the various

13   subcommittees.

14        Q.    Okay.

15        A.    Now, I've also sat -- sit in on the

16   subcommittees of both wood and metal, as well as

17   being the chairman of A14.5, the fiberglass.  And

18   I've worked on laboring -- with laboring committees.

19   Much of the laboring that you find in the standards,

20   again, has been a result of the work that I have

21   done.

22        Q.    Is there a industry standard for the -- for

23   fiberglass ladders?

24        A.    The industry standard is A14.5.

25        Q.    Of which you are the chairman of the

1     A.   No, it would not.

2     Q.   Any of the testing that Dr. Pugh mentioned

3 or any -- is any of it mentioned in ANSI as a test

4 for determining the strength of the materials of the

5 fiberglass ladder?

6     A.   Not one.

7     Q.   All right.  He also mentioned that he

8 examined the ladder with a, I think he said a

9 stereomicroscope.  Do you recall that?

10    A.   Yes, sir.

11    Q.   What was your understanding of what -- what

12 he said about --

13    A.   Well, he said that he looked at the

14 fractured surfaces through a stereomicroscope.

15    Q.   Is the stereomicroscope, according to ANSI

16 or according to any industry standards, a proper

17 authoritative method of determining the strength of

18 fiberglass materials?

19    A.   It is not.

20    Q.   What is your understanding of what

21 stereomicroscopy could do with respect to examining a

22 piece of material such as fiberglass?

23    A.   Well, it's very limited what you can do.

24 First of all, you can only see the surface, and you

25 can't see below the surface.  And when you view a

1   fracture, you only are looking at the surface.  And I

2   remember from his deposition that he claimed that he

3   could then determine that the transverse fibers were

4   inadequate.  Well, you can't even see the transverse

5   fibers in a microscope because they're random fibers

6   to begin with.

7       Q.   When you say random fibers, what do you

8   mean?

9       A.   They're chopped fiber, between a half --

10  about a half inch long, typically, and then are just

11  blown in there at random.  So to have -- I mean, at

12  any given time you can average them all out.  And

13  they're made into mats.  And there's layers of mats

14  and layers of uniaxial material.  Now, that -- the --

15  he could see that there is a different orientation,

16  but that's all he could see.  He also mentioned that

17  he could tell -- that it was also a test to determine

18  the cure of the fiberglass.

19      Q.   Is that possible?

20      A.   No, that's absurd.

21      Q.   Can you explain why?

22      A.   Yes.  Because the cure is a function of the

23  indentation strength, and this is determined by the

24  Barcol hardness tester.

25      Q.   Did you do the Barcol hardness tester?

1    good for is simply a viewing.  It -- In this

2    particular case here, it had no application, no value

3    whatsoever.

4        Q.   How is it that it became evident to you that

5    the rails had preexisting damage on them?

6        A.   Well, I point this out in my report that

7    there are significant areas of wear, both in the

8    fiberglass as well as on the metal parts that, you

9    know, show that -- that there had been a great deal

10   of movement in it, and this could only come about if

11   there had been extensive preexisting damage.

12       Q.   And I'm going to ask you to be a little bit

13   specific about how you could tell there was a great

14   deal of movement and what you mean by that,

15   reflecting preexisting damage.

16       A.   I'll have to look at my report.

17       Q.   That's fine.

18       A.   Well, do you want me to focus only on the

19   back rails or the entire ladder?

20       Q.   You can focus on the back rails.

21            First of all, you're looking at a

22   report, which is Deposition Exhibit 6.  And it

23   contains a number of photographs; is that correct?

24       A.   Yes, the report is dated August 3rd.

25       Q.   All right.

1    A.    Okay.  If we look at the lower left rail,

2    these are my figures 3-5 and 3-6.  And you can see

3    here that there is a -- a movement.  Obviously this

4    has been cracked for a long time.  The next picture

5    then shows the end of this looking perpendicular down

6    into the shoe.  This is the left rear rail.  And we

7    can see that this -- there's a polished surface of

8    the metal part of the shoe.  And then when I raise it

9    up, we can see the effect of that polish that's been

10   occurring for a long period of time.  And here we can

11   see the end by looking at the end of this broken

12   flange.  Here we can see the -- the various grinding

13   of that aluminum rail -- or aluminum shoe on it.

14        Q.    And you're directing our attention to figure

15   3 --

16        A.    9.

17        Q.    -- -9; is that correct?

18        A.    Yes, 3-9.

19        Q.    And other published areas that you were

20   directing us to were figures 3-7 and 3-8 of

21   Deposition Exhibit 6?

22        A.    Yes, these are all the left rear rail.  Now,

23   there's -- there's another damage to the left rear

24   rail near the top cap.  Obviously this had an impact

25   force quite some time ago.

1      Q.   How can you tell that?

2      A.   Well, again, I looked at the -- actually at

3   the type of fracture, and this fracture has existed,

4   I would say -- I want to say for years, certainly

5   more than six months.

6      Q.   And that's figure 3-10?

7      A.   Yes.

8      Q.   But that is not at the bottom of the rail?

9      A.   No, that is not.  Whether or not how much

10  influence this had, it had some.  But how much, I

11  can't tell you.

12     Q.   All right.

13     A.   Now, the right rail, again, figures 3-11 and

14  3-12 show the bottom right rail at two different view

15  points, one side view and one head on.

16     Q.   All right.

17     A.   And then again, the same story here, we can

18  see this excessive wear.

19     Q.   And you're pointing to figure which?

20     A.   3-13 and 3-14.  See the scouring on the

21  shoe.  And here when I lifted the flange up, then we

22  can see the remnants of it here.

23     Q.   And that is on 3- --

24     A.   14.

25     Q.   14.

1    A.   Yes, sir.

2         Now, taking -- Now I'm taking a head-on

3    view, looking down on that flange, we can see how

4    rounded it is on what -- on figure 3-15, which is the

5    bottom right side.

6    Q.   And what does that rounded portion show you?

7    A.   Well, this is there -- this has been wear

8    that's been taking place over the years.

9    Q.   Okay.

10   A.   And --

11   Q.   And with that kind of wear, that roundness,

12   what does that indicate to you with respect to any

13   cracks that may have been present at the fillet or

14   the corner between the web and the flange?

15   A.   Okay.  In order for this to have occurred,

16   there had to be a separation, otherwise this shoe

17   would have protected this flange.  And this

18   photograph here, 3-16, shows the end view of that.

19   And we can then see the discoloration or the damage.

20   Q.   What does that discoloration on 3 -- figure

21   3-16 indicate to you?

22   A.   Well, again, this is a movement -- the

23   result of the movement on that shoe that was on that

24   bottom.

25   Q.   For how long?

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 167 of 231

1    A.   Oh, for a long period of time.  I'm going to

2    say year -- years.  I mean, not a day, not a month,

3    not six months.  More than that.

4    Q.   Okay.

5    A.   And figure 3-16A, I put in an enlargement,

6    enlarged view showing --

7    Q.   Of 3-16?

8    A.   Of 3-16, showing the end view, how it's

9    virtually masticated, and which has been just

10   repeatedly, you know, been stuck in the ground, stuck

11   in the ground, or who knows what.

12            Then on the inside of the bottom right

13   rear rail, then there's a -- a portion of the rail

14   that had been kind of broken up in the back.  And

15   here in this -- photograph 3-17 and 3-18 then show

16   where the brace is that is worn by excessive movement

17   onto the inside of the rear rail.

18   Q.   How long would that take?

19   A.   A year.  Years.  I mean, more than a day,

20   more than a month.

21   Q.   Now, the horizontal line that you're

22   pointing to at -- on figures 3-17 and 3-18, that

23   comes from what member of the -- of the fiberglass

24   ladder?

25   A.   That -- That comes from a brace.

1      Q.   And that brace on the fiberglass ladder

2   would have been approximately how far from the --

3   from the bottom of the rail?  How far up?

4      A.   Well, I'm going to say roughly about 8 to 10

5   inches.  Say 10 inches plus or minus a little.

6      Q.   Okay.  What does that indicate to you with

7   respect to the -- if any, with respect to the length

8   of any preexisting crack at the back rails?

9      A.   Again, it simply supports the evidence that

10  there was extensive -- very extensive preexisting

11  damage.

12     Q.   Assume with me that Mr. Poremba in this

13  case, an engineer, inspected the ladder and found at

14  least one of the rear rails to have a preexisting

15  crack of approximately 20 inches.  Would that be

16  consistent with your inspection of the ladder?

17     A.   Yes, sir.

18     Q.   And I'm talking about 20 inches from the

19  bottom.

20     A.   Yes, sir.

21     Q.   Would that be sufficient to cause that kind

22  of marking or wear that you see on 3-17 and 3-18 of

23  Deposition Exhibit 6?

24     A.   Certainly.

25     Q.   Okay.  Does Deposition Exhibit 6 reflect

1    your opinions in this case?

2        A.    Yes, sir.

3        Q.    All right.  You mentioned that OSHA has

4    requirements for someone to inspect the ladder for

5    cracks and splitting; is that correct?

6        A.    That's correct.

7        Q.    Have you seen that particular OSHA

8    requirement?

9        A.    Yes, sir.

10       Q.    Do you have that with you today?

11       A.    Yes, sir.

12       Q.    And Mr. Benton has handed you a copy of

13   Deposition Exhibit 7 to Mr. Poremba's deposition.  Do

14   you recognize that?

15       A.    Yes, sir.

16       Q.    And what requirement was there upon an

17   employer with respect to inspection of ladders and to

18   do what if necessary?

19       A.    Well, I'm referring to OSHA standard

20   1917.119 and -- specifically.  And under that section

21   E(1), E, as in echo, 1, and I'm reading here, quote,

22   the employer shall maintain portable ladders in a

23   safe condition.  Ladders with the following defects

24   shall not be used and either shall be tagged as

25   unusable if kept on the premises or shall be removed

1    from the work site.

2                    And then it goes down, and in

3    particular, E(1)(ii), it says, broken or split side

4    rails.

5        Q.    And E(2), what does it say?

6        A.    It's a follow-up.  Ladder shall be inspected

7    for defects prior to each day's use and after any

8    occurrence, such as a fall which could damage the

9    ladder.

10        Q.    And section E(1)(i), did you -- does that

11    does that apply at all in this case?  No, it does

12    not.

13        A.    No.

14        Q.    No, it does not.

15                    Okay.  Do you have an opinion whether

16    or not Mr. Escudero failed to exercise ordinary care

17    for his own safety in the use of this latter?

18        A.    Yes, sir.

19        Q.    What is your opinion?

20        A.    I believe he -- in fact, let me go back to

21    my report, if I may.

22        Q.    All right.

23        A.    I want to be a little more succinct.

24                    I guess the -- I feel that

25    Mr. Escudero, by his own negligence in failing to

1   properly examine or inspect the ladder, or by

2   ignoring what he saw, was causal to his own accident.

3       Q.   Okay.  Do you have an opinion whether or not

4   the cracks and splits in this ladder were evident or

5   obvious if a person had inspected the ladder?

6       A.   Absolutely, yes.  And as I have mentioned in

7   my conclusion, that this ladder had more preexisting

8   damage than any ladder that I've seen over a 30-year

9   period.

10          MR. BENTON:  Objection to response.

11      Q.   (BY MR. GENDRY) Have you inspected many

12  ladders in your career in dealing with ladders?

13      A.   Hundreds.  Hundreds.

14      Q.   And comparatively speaking, how did this

15  ladder appear to be with -- in comparison with other

16  ladders that you have inspected, concerning

17  preexisting damage?

18      A.   This is the worst preexisting damage to a

19  stepladder I've ever seen.

20      Q.   Okay.  There's been an allegation made that

21  there was a design defect in this case.  And I think

22  Mr. Benton has explained their side's position.

23      A.   Yes, sir.

24      Q.   All right.  Assuming that this ladder had

25  preexisting cracks in it, one even as much as 20

Case 1:00-cv-00193   Document 19   Filed in TXSD on 09/28/2001   Page 172 of 231

1    inches up the rear rail, do you have an opinion

2    whether or not the ladder would have failed whether

3    or not it had a slip-on shoe or additional bracing at

4    the bottom of the rails, such as is suggested in

5    other ladders?

6         A.    Yes, sir.

7         Q.    What is that opinion?

8         A.    It still would have failed.

9         Q.    Can you explain why?

10        A.    Because of the -- of the tendency for that

11   free flange to buckle.  It had -- it has no strength

12   whatsoever, because any bending strength was totally

13   destroyed when it became separated.  So it was acting

14   purely as a column, not as a structural member that

15   was resisting force as a unit.

16        Q.    Okay.  And in terms of loading, in other

17   words when a person got on the ladder, such as

18   Mr. Escudero, what would happen to that rail, whether

19   or not you had a slip-on boot or shoe on the bottom

20   of the foot?

21        A.    Well, assuming that he went above the first

22   step, that he climbed the ladder, it certainly -- it

23   was -- what would have happened was what did happen,

24   that it -- it was ready to buckle.  And depending on

25   how he set it up, which I presume he was inside, so I

1    presume it was a level floor, and so that was not --

2    the only other possibility was buckling of the

3    flange, which it did.

4        Q.   Okay.  Why wouldn't a shoe have made any

5    difference?

6        A.   A shoe?

7        Q.   A slip-on boot or shoe.

8        A.   A slip-on shoe or boot or whatever simply

9    would have changed the mode of buckling.  But once

10   Mr. Escudero was on the top of that ladder or on the

11   fourth step, or wherever it's deemed that he was,

12   then simply his movements would create torsional

13   forces, torsional movements at the top.  And it's

14   just a matter of when it would buckle, and -- which

15   it did.

16       Q.   Okay.  I'm going to hand -- ask the court

17   reporter to mark this.

18            **MR. GENDRY:**  Why don't you mark it on

19   the back.

20            (Exhibit 8 marked.)

21       Q.   **(BY MR. GENDRY)** I'm going to hand you

22   Deposition Exhibit 8.  Do you recognize that label?

23       A.   Yes, sir.

24       Q.   And you have referred to it previously with

25   regard to inspecting the ladder.  What does it say?

1    A.   Well, it says -- There are five items here.

2    Number one, inspect for warn, damaged or missing

3    parts before each use.   Number two, never use a

4    ladder with damaged, missing, worn or loose parts.

5    Three, make sure all rivets, nuts, bolts, braces and

6    joints are tight; feet, steps and rungs secure;

7    spreaders and pail shelf function properly.   Four,

8    never make temporary repairs of damaged ladders or

9    parts.   Five, all parts must be in good working

10   order.   Remove worn, damaged or defective ladders

11   from service.

12   Q.   I want to direct your attention under proper

13   care and storage, paragraph six.   Would you read that

14   into the record from Deposition Exhibit 8.

15   A.   Destroy ladder if broken, warn or exposed to

16   fire or any corrosive material.   Never misuse or

17   abuse a ladder.

18   Q.   Was Deposition Exhibit 8, the label, was

19   that the same as was on the Escudero ladder?

20   A.   Yes, sir.

21   Q.   All right.   And is Deposition Exhibit 8 or

22   labels of that sort in any way referred to by ANSI?

23   A.   Yes, sir.

24   Q.   Can you explain that.

25   A.   Well, in the appendix of ANSI -- In fact,

1   this label I think is number 9.  There's a whole

2   series of labels there that have been developed,

3   specifically with a language specific to ladders and

4   ladder safety.

5        Q.   All right.  Is this the label recommended or

6   mandated by ANSI standards?

7        A.   Yes, sir.

8        Q.   All right.  There's been some testimony in

9   this case that Mr. Escudero may have been on the

10  fifth step of the ladder.  Was that your

11  understanding of reading the depositions and the

12  matters in this case -- materials in this case?

13       A.   He may have been.

14       Q.   Right?

15       A.   I don't know, but he may have been.

16       Q.   And let me hand you another label.

17       A.   No, I'm sorry.  No, I didn't answer you

18  correctly.  He was on the fifth step.  It was the top

19  step that was in question.  So yes, I'm sorry, he was

20  on the fourth -- at least on the -- one, two,

21  three -- yeah, that would be on the fifth step, the

22  one that the plastic is covering up.

23       Q.   I think there was testimony, if I remember

24  correctly, he could have been on the fourth, could

25  have been on the fifth step, correct?

# EXHIBIT - 10

CVisPDF – www.fastio.com



# ENGINEERING FORENSICS & TESTING, LTD.

**TO:**  **Gendry & Sprague, P.C.**
**Attorneys at Law**
**645 Lockhill Selma**
**San Antonio, Texas 78216**

**ATTN:**      **Mr. Thomas W. Gendry**

**CASE REFERENCE:**      **Jose Escudero, Jr.  vs Bauer Corporation**

**United States District Court**
**Southern District of Texas**
**Brownsville Division**

**Case No.**      **Civil Action No. B-00-193**

**EF&T REPORT NO:**      **210115.1**

**REPORT TYPE:**      **Expert**

**REPORT DATE:**      **August 3,  2001**

The following report is issued to document the technical investigatory work conducted at your request by the undersigned individual and those persons performing such work at his direction. In preparing this report, every effort has been made to insure objectivity and to comply with accepted standards of professional ethics, technical expertise and engineering practices. The opinions offered as a result of this investigation are based on the writer's academic training and experience as summarized in the curriculum vitae attached at the end of the report.

**ENGINEERING FORENSICS & TESTING, LTD.**

by: _John E. Johnson_

John E. Johnson, Ph.D., P.E.

---

# TABLE OF CONTENTS

**1.0   INTRODUCTION**

    **1.1   Material Provided and Reviewed**

**2.0   LADDER INSPECTION & OVERALL APPEARANCE**

**3.0   PRE-EXISTING DAMAGE TO LADDER**

    **3.1   Right Front Rail**

    **3.2   Left Front Rail**

    **3.3   Left Rear Rail**

    **3.4   Right Rear Rail**

**4.0   DAMAGE INCURRED AT TIME OF ACCIDENT**

**5.0   ADDITIONAL COMMENTS AND DISCUSSION**

    **5.1   Critical Deposition Statements Made by Mr. Escudero**

    **5.2   Response to Mr. Escudero's Deposition Statements**

**6.0   ACCIDENT SCENARIO TO AN ENGINEERING PROBABILITY**

**7.0   OPINIONS & CONCLUSIONS**

## 1.0   INTRODUCTION

On May 10, 1999 at approximately 6:30 pm, the plaintiff, Jose Escudero, Jr. was changing a lamp and some bulbs in an apartment building owned by his mother. He was using a Type IA Bauer six (6) ft fiberglass step ladder that apparently was obtained from a warehouse next to the property (which his mother owned) when Mr. Escudero, Jr. alleges it suddenly broke and as a result he injured his left foot and ankle.

*Without any question, most of the damage observed had occurred prior to the accident. In my examinations of damaged ladders for over 30 years, I cannot remember a ladder which had more pre-existing damage than the one involved in this accident and which should have been taken out of service. This report will focus on the amount and extent of the pre-existing damage, the probable accident scenario and my opinions and conclusions based on the information available.*

### 1.1   Material Provided and Reviewed

| | |
|---|---|
| 1 | Plaintiff's Original Petition |
| 2 | Plaintiff's Answers to Disclosures |
| 3 | Statement of Jose Escudero, Jr. dated May 17, 1999 |
| 4 | Deposition of Carmen Escudero taken May 3, 2001 |
| 5 | Deposition of Jose Escudero, Sr. taken May 3, 2001 |
| 6 | Deposition of Jose Escudero, Jr. taken May 3, 2001 |
| 7 | Deposition of Jesse Ramirez taken May 4, 2001 |
| 8 | Deposition of Reymundo Medina taken May 4, 2001 |
| 9 | Expert Report dated September 29, 1999 from Naismith Engineering, Inc. |
| 10 | Expert Report dated May 22, 2001 by James Pugh, Ph. D., P.E. |

## 2.0   Ladder Inspection & Overall Appearance - Photographs

CutePDF – www.fwsia.com

## 2.0    LADDER INSPECTION & OVERALL APPEARANCE

The accident step ladder was received at the laboratory of Engineering Forensics & Testing, Ltd. (EF&T) on February 22, 2001 for examination.   Numerous photographs were taken of the overall ladder as well as specific close-up views.  Following this section are selected photographs (Figures 2-1 through 2-8) which depict the overall condition of the ladder as received.

A stencil on the right front side rail was still visible even though attempts had been made to remove it.   The stencil reads,"S.R.  I.S.D.  MAINT.  DEPT.", which signifies it once belonged to the Santa Rosa Independent School District.

The following Section 3.0 will focus on specific examples of the pre-existing damage and includes photographs (Figures 3-1 through 3-18) showing specific details.

CutePDF - www.tevisa.com



Figure 2-2

OVERALL FRONT OBLIQUE VIEW OF LADDER
FROM LEFT SIDE



Figure 2-1

OVERALL FRONT OBLIQUE VIEW OF LADDER
FROM RIGHT SIDE



Figure 2-4

OVERALL REAR OBLIQUE VIEW OF LADDER FROM
RIGHT SIDE



Figure 2-3

OVERALL REAR OBLIQUE VIEW OF LADDER FROM
LEFT SIDE

## 3.1   Pre-Existing Damage - Right Front Rail - Photographs

## 3.0     PRE-EXISTING DAMAGE TO LADDER

### 3.1     Right Front Rail

Figure 3-1 shows the pre-existing damage to the <u>front</u> side at the bottom of the front rail. Note the wear on the rounded portion of the flange.  Also, split between the flange and the web had to be pre-existing since the rounding of the flange could not have occurred without the separation of the flange and web having occurred considerably earlier.

Figure 3-2 shows an inside view of the bottom of the front right rail.  Note the pre-existing separation.

Figure 3-3 shows the <u>back</u> side of the bottom of the front right rail.  Note the scuff marks on the flange and the resulting pre-existing separation.

### 3.2     Left Front Rail

Figure 3-4 shows a close up view at the bottom of the front left rail.   Note the pre-existing split between the flange and the web along the edge of the shoe.

### 3.3     Left Rear Rail

Figure 3-5 shows a part of the split between the flange and the web at the lower portion of the left rear rail.   Most of this split was pre-existing; the additional length of the split as it now exists was exacerbated by the fall.

Figure 3-6 shows a close up view of the lower portion of the left rear rail.  This is also another example of pre-existing damage as is evidenced by the wear between the fracture surfaces of the split.

Figure 3-7 shows a close up view of the bottom of the left rear rail showing the pre-existing separation and a portion of a polished area at the end of the split flange.    Figure 3-8 shows a close up view of the same location as Figure 3-7 but with the split flange raised in order to see the polished area caused by the repeated movements of the previously split flange.  It must be pointed out that the polished area could only have happened if the split was pre-existing.

CVisPDF - www.fenrir.com

Figure 3-9 shows an end view of the split flange depicted in Figures 3-7 and 3-8. Note the discoloration coinciding with the polished areas (wear areas) in Figures 3-7 and 3-8. This discoloration was caused by the previously split flange rubbing against the bottom shoe.

Figure 3-10 shows a previously damaged area at the top of the left rear rail just below the top cap.

## 3.4    Right Rear Rail

Figure 3-11 shows a part of the split between the flange and the web at the lower portion of the right rear rail.   Most of this split was pre-existing; the additional length of the split as it now exists was exacerbated by the fall.

Figure 3-12 shows a close up view of the lower portion of the right rear rail.  This is also another example of pre-existing damage as is evidenced by the wear between the fracture surfaces of the split.

Figure 3-13 shows a close up view of the bottom of the right rear rail showing the pre-existing separation and a portion of a polished area at the end of the split flange.   Figure 3-14 shows a close up view of the same location as Figure 3-13 but with the split flange raised in order to see the polished area caused by the repeated movements of the previously split flange.  Again it must be pointed out that the polished area could only have happened if the split was pre-existing.

Figure 3-15 shows a close up view of the separated flange, the subject of Figures 3-13 and 3-14.  Note the rounded edges of the end of the flange.   Figure 3-16 shows an end view of the separated right rear flange depicted in Figure 3-15.   Again note the discoloration coinciding with the wear marks in Figures 3-13 and 3-14.  Figure 3-16A is an enlargement of Figure 3-16.

Figure 3-17 is an inside view of the bottom portion of right rear rail showing wear marks from bottom cross piece.   Figure 3-18 shows a close up view of Figure 3-17.

CVISPDF – www.fenrio.com



Figure 3-1   FRONT SIDE OF BOTTOM OF FRONT RIGHT RAIL
(Note Wear on Rounded Portion of Flange)

CVisPDF – www.fasoo.com



Figure 3-3   BACK SIDE OF BOTTOM OF FRONT RIGHT RAIL.



Figure 3-2   INSIDE VIEW OF BOTTOM OF FRONT RIGHT RAIL.

CVISPDF – www.fastio.com

## 3.2   Pre-Existing Damage - Left Front Rail - Photograph

CVisPDF – www.fastio.com



Figure 3-4    BOTTOM FRONT CLOSE UP OF FRONT LEFT RAIL
(Note Old Split In Flange Along Edge of Shoe)

## 3.3   Pre-Existing Damage - Left Rear Rail - Photographs



Figure 3-6   CLOSE UP OF LEFT REAR RAIL AT BOTTOM
(Note Old Split Along Edge of Flange)



Figure 3-5   LOWER PORTION OF LEFT REAR RAIL

CVISPDF – www.fastio.com



Figure 3-8    INSIDE CLOSE UP AT BOTTOM OF LEFT REAR RAIL SHOWING POLISHED AREA ON FOOT CAUSED BY PREVIOUSLY SEPARATED FLANGE



Figure 3-7    CLOSE UP OF BOTTOM OF LEFT REAR RAIL SHOWING PREVIOUS SEPARATION



Figure 3-9    END VIEW OF SEPARATED LEFT REAR OUTSIDE FLANGE
(Note Discoloration Coinciding With Wear Mark in Figures 3-7 & 3-8)



Figure 3-10    PREVIOUS DAMAGE AT TOP OF LEFT REAR RAIL NEAR TOP CAP

CVisPDF - www.fasiio.com

## 3.4   Pre-Existing Damage - Right  Rear Rail - Photographs



Figure 3-12    CLOSE UP OF RIGHT REAR RAIL AT BOTTOM

Figure 3-11    BOTTOM PORTION OF RIGHT REAR RAIL

CVisPDF – www.fastio.com



Figure 3-13   CLOSE UP OF BOTTOM OF PREVIOUSLY
SEPARATED RIGHT REAR RAIL FLANGE



Figure 3-14   INSIDE CLOSE UP AT BOTTOM OF RIGHT
REAR RAIL SHOWING POLISHED AREA ON
FOOT CAUSED BY PREVIOUSLY
SEPARATED FLANGE   (See Figure 3-13)



Figure 3-15   CLOSE UP OF END OF PREVIOUSLY
SEPARATED BACK RIGHT REAR FLANGE



Figure 3-16   END VIEW OF SEPARATED RIGHT REAR
FLANGE
(Note Discoloration Coinciding with Wear Mark in
Figures 3-13 & 3-14)



Figure 3-16A   ENLARGED VIEW OF FIGURE 3-16
(Note the Wear and Discolorations Due to Movement of Pre-existing Fractured Flange)



Figure 3-17   INSIDE VIEW OF BOTTOM OF RIGHT REAR
RAIL SHOWING WEAR MARKS FROM
BOTTOM CROSS PIECE



Figure 3-18   CLOSE UP INSIDE VIEW OF BOTTOM OF
RIGHT REAR RAIL SHOWING WEAR MARKS
FROM BOTTOM CROSS PIECE

CVisPDF – www.fesho.com

## 4.0    DAMAGE INCURRED AT TIME OF ACCIDENT

As has been shown and discussed in Section 3, the major amount of damage was pre-existing. However, there are some areas of additional damage as a result of the accident. Some of the pre-existing fractures were made larger (longer), also as a result of the fall. It is possible that the left spreader was bent inward as a result of Mr. Escudero falling on top of the step ladder although Mr. Escudero said in deposition that the spreaders were a little bent. The bottom portion of the right rear rail is in a permanently twisted configuration which may or may not have been the result of the fall.

It is important to note that if the step ladder had been in good condition immediately prior to the accident, the most likely resulting damage would have been a bent spreader and nothing else.

CVAPDF - www.fasina.com

## 5.0   ADDITIONAL COMMENTS AND DISCUSSION

### 5.1   Critical Deposition Statements Made by Mr. Escudero.

P. 51   When asked, "would you agree based upon what you know about the ladder, the pictures you've seen and what you know about it, that the ladder was broken before you got on it" he answers, "No, I don't agree with that".

P. 53   When asked, "How did the ladder appear to you to be?" he answers, "in good condition".

P. 54   When asked, "Were the spreaders in any way bent or broken or malformed?"  He answers "Probably there were a little bit bent or they're dirty, have concrete, paint. Most of the ladders that we have are like that".

P. 55   When asked if the rails were in an unbroken condition he answers", "They didn't seem to be broken.  They were in good condition".

P. 55   When asked, you've never had a broken ladder?  He answers, "I don't recall, no".

P. 56   When asked, "if you had noticed that there was a break in the legs, or the rails, you would not have used the ladder".  He answers, "No, I would not"

P. 61   When asked what sort of movement he did on the ladder, he responded, "I would be up there and move a little bit to the side, turn, grab a plier".

P. 62   When asked if he sensed by hearing, seeing,  notice anything at all at the time he fell, he responded "Nothing, I just all of a sudden I was on the floor"

P. 70   He believed that ladder came from a Mr. Alejandro Garza because he was missing a ladder at one of his jobs and his mother or somebody related to him (Garza) works for the Independent School District.

P. 73   He didn't notice that the ladder was broken.

P. 73   When asked, "would you agree that if the evidence shows in this case that it was a broken ladder before you got on it, it should have been thrown away instead of used?  He answers, "If it was broken, I agree, yeah, it would have been thrown away, I think it wasn't broken when I was there working"

P. 74   When asked, "Are you aware of warnings, on ladders that if they're damaged or broken, the ladder should be thrown away, disposed of?  He answers, "Yes".


## 5.2     Response to Mr. Escudero's Deposition Statements

It is inconceivable that anyone who had looked at the ladder immediately prior to the accident could not have seen the prior damage.  It is also inconceivable that Mr. Escudero said that the ladder appeared in good condition.

Mr. Escudero said that when he fell, he didn't see or hear anything but that all of a sudden he was on the floor.  This is consistent with the facts.  A sudden collapse could only have been the result of buckling.  The ladder could not have buckled under the weight of Mr. Escudero unless it had been severely damaged as was the case with this ladder.  Furthermore, the amount of damage observed could not possibly have been the result of a single event.

## 6.0   ACCIDENT SCENARIO TO AN ENGINEERING PROBABILITY

The most probable accident scenario to an engineering probability can be developed based on Mr. Escudero's deposition statements and the condition of the ladder at the time of the accident. The pre-exisiting damage to the stepladder would greatly reduce the stability of the ladder. Furthermore, Mr. Escudero stated on Page 61-62 in his deposition he was on the fourth or fifth step (note that the 4th step is the highest standing position permitted on a 6 ft. step ladder).

The most probable accident scenario is that Mr. Escudero, while standing and undergoing some movements required by the job he was performing, caused the ladder, which was already unstable due to its condition, to collapse  when one or both of the rear rails buckled. This scenario is consistent with the facts brought out by deposition statements and the condition of the ladder.

## 7.0   OPINIONS & CONCLUSIONS

7.1   The ladder had more pre-existing damage than any ladder that I have seen over a 30 year period of time.

7.2   The ladder had been used in a damaged condition for an extended period of time (for many months or possibly years).

7.3   The bottom of all four side rails had extensive pre-existing damage.

7.4   The ladder should have been taken out of service long before May 10, 1999.

7.5   Mr. Escudero could not have examined or inspected the ladder prior to use without becoming aware of the condition of the ladder.

7.6   If Mr. Escudero did examine or inspect the ladder prior to use, then he ignored the condition of the ladder.

7.7   Mr. Escudero, by his own negligence in failing to properly examine or inspect the ladder or by ignoring what he saw, was causal to his own accident.

7.8   If the Type IA step ladder had been in good condition, it should have been able to support a weight of 1,000 lbs. (over 5 times the weight of Mr. Escudero at the time of the accident) without failure.

7.9   There is no evidence that the ladder was defectively designed.

7.10   There is no evidence that the ladder was defectively manufactured.

7.11   There is no evidence that the ladder was defective when it left the control of the Bauer Corporation.

7.12   It would be impossible for a person of Mr. Escudero's size and weight (or any other person) to have produced the damage incurred to the ladder.

**Note: The writer reserves the right to amend, modify, or extend his opinions and conclusions if new materials or facts become available.**

# Curriculum Vitae of John E. Johnson, Ph. D., P.E.

CVisPDF – www.fastio.com

# CURRICULUM VITAE OF JOHN E. JOHNSON, Ph.D, P.E.

W9240 US HWY 18
CAMBRIDGE, WI 53523
608/423-4330

**EDUCATION**

Ph.D., Purdue University, 1963
M.S., Civil Engineering, Stanford University, 1957
B.S., Civil Engineering, Gonzaga University, 1956

**PREVIOUS POSITIONS**

| | |
|---|---|
| 1987-Present | President<br>Engineering Forensics & Testing, Ltd. |
| 1973-1995 | President<br>Engineering Research Corporation |
| 1990-Present | Emeritus Professor of Civil Engineering<br>University of Wisconsin-Madison |
| 1972-1990 | Professor of Civil Engineering<br>University of Wisconsin-Madison, WI |
| 1984-1985 | Associate Director<br>Wisconsin Structural and Materials Testing Laboratory<br>University of Wisconsin-Madison, WI |
| 1973-1976 | Associate Director<br>University-Industry Research Program<br>University of Wisconsin-Madison, WI |
| 1968-1972 | Associate Professor of Civil Engineering<br>University of Wisconsin-Madison, WI |
| 1965-1968 | Assistant Professor of Civil Engineering<br>University of Wisconsin-Madison, WI |
| 1962-1965 | Research Engineer<br>Dow Chemical Company, Midland, Michigan |
| 1960-1962 | Research Associate, Purdue University<br>LaFayette, Indiana |
| 1958-1960 | Structural Engineer, Detroit Edison Co.<br>Detroit, Michigan |
| 1957-1958 | Structural Engineer, National Lead Co. of Ohio<br>Fernald, Ohio |

**PROFESSIONAL ORGANIZATIONS**

Fellow, National Academy of Forensic Engineers (NAFE)
Fellow, American Society of Civil Engineers (ASCE)
National Society of Professional Engineers (NSPE)
National Forensic Center (NFC)
American Society for Testing and Materials (ASTM)
American Concrete Institute (ACI)
American Society for Engineering Education (ASEE)
American Association for the Advancement of Science (AAAS)
American Institute of Steel Construction (AISC)

**PROFESSIONAL COMMITTEES**

Chairman, American National Standard Institute (ANSI) A14.5, Committee on Code Standards for Fiber Glass Reinforced Ladders

American National Standard Institute (ANSI) A14, Steering Committee

Member, American Society of Civil Engineers (ASCE), Materials Development Committee

Member, ASTM Committee C-17 on Fiber-Cement Products

Member, ASTM Committee E-6 on Performance of Building Constructions

**PROFESSIONAL ACTIVITIES**

A. University Teaching and Research
1. Senior and Graduate courses include: Steel Design, Concrete Design, Applied Mathematics, Structural Analysis, Construction Methods and Building Systems.

2. Continuous research since 1965 in structurally related fields with graduate students at both the M.S. and Ph.D. levels.

B. Typical Forensic Specialty Areas
1. Structural Investigation
Commercial and Industrial Buildings; Roof Systems
2. Failure Analysis
Structural and Material
3. Construction/Industrial Accidents
Investigation; Codes and Procedures; Safety; Equipment
4. Product Liability

C. Research, Analysis and Testing (Brief Listing of Typical Areas)
1. Developed and conducted major research programs in roofing and insulation systems.

2. Developed and conducted major research programs in roofing and lightweight concrete.

3. Developed and conducted major research and testing programs in structural fiberglass sections resulting in a major design manual.

4. Developed and conducted a major program investigating the static and dynamic behavior of wood, aluminum and fiberglass ladders for the Consumer Product Safety Commission.

5. Developed the Industry Standard for the Design of Concrete Stave Silos for the National Silo Association.

6. Developed computer design programs for designing air supported structures.

**HONORS AND AWARDS**

Dow Chemical Company Fellowship
Gypsum Association Fellowship
American Men and Women of Science
Z.W. Craine Award (International Silo Association)
Member of the Society of Sigma Xi
Member of the Research Society of America (RESA)
Member of Chi Epsilon

**PRINCIPAL**
**PUBLICATIONS**

Textbooks:

1. STEEL STRUCTURES DESIGN AND BEHAVIOR, by Charles G. Salmon and John E. Johnson. Published by Harper Collins, 1996 (Fourth Edition).
2. STEEL STRUCTURES DESIGN AND BEHAVIOR, by Charles G. Salmon and John E. Johnson. Published by Harper & Row, 1990 (Third Edition).
3. STEEL STRUCTURES DESIGN AND BEHAVIOR, by Charles G. Salmon and John E. Johnson. Published by Harper & Row, 1980 (Second Edition).
4. STEEL STRUCTURES DESIGN AND BEHAVIOR, by Charles G. Salmon and John E. Johnson. Published by Intext Educational Publishers, 1971.

Papers:

1. JOHNSON, John E., "The Pitfalls of the Limited Investigation", Journal of the National Academy of Forensic Engineers, December, 1993.
2. JOHNSON, John E., and SHEAHAN, James P., "Computer Simulation of Ponded Roofs", Proceedings of the Third International Symposium on Roofing Technology, Montreal, Quebec, April, 1991.
3. JOHNSON, John E., and SHEAHAN, James P., "Non-Destructive Methods for Determining The Waterproof Integrity of Roof Membranes and Seams", Proceedings of the Third International Symposium on Roofing Technology, Montreal, Quebec, April, 1991.
4. JOHNSON, John E., "Forensic Engineering Laboratory Preparation For Litigation", Journal of the National Academy of Forensic Engineers, December, 1990.
5. ZURASKI, Patrick D., and JOHNSON, John E., "Fatigue Strength of Deteriorated Steel Highway Bridges", ASCE Journal of Structural Engineering, Vol. 116, No. 10, October, 1990.
6. JOHNSON, John E., and JOHNSON, Eric N., "Expansion and Contraction Characteristics of Lightweight Insulating Concrete in Roofing Systems", presented at the Second International Symposium on Roofing Technology, Gaithersburg, Maryland, September 18-20, 1985.
7. JOHNSON, John E., and JOHNSON, Eric N., "Investigation of the Potential of Ice Lenses Under Built-Up Roofs on Lightweight Insulating Concrete", presented at the Second International Symposium on Roofing Technology, Gaithersburg, Maryland, September 18-20, 1985.
8. ZURASKI, P.D., and JOHNSON, John E., "Research on the Remaining Life in Steel Bridges", Second Bridge Engineering Conference, Minneapolis, Minnesota, September, 1984.
9. ZURASKI, P. D., and JOHNSON, John E., "The Remaining Life in Deteriorated Steel Girder Highway Bridges", Probabilistic Mechanics & Structural Reliability Specialty Conference, University of California, January, 1984.
10. JOHNSON, John E., and SHEAHAN, James P., "The Role of Aging on The Splitting of Organic Built-Up Roofing Systems", Second International Symposium on Roofs and Roofing, Brighton, England, September, 1981.
11. JOHNSON, John E., and SHEAHAN, James P., "The Role of Moisture on The Splitting of Built-Up Roofing Systems", Second International Symposium on Roofs and Roofing, Brighton, England, September, 1981.
12. JOHNSON, John E., and SHEAHAN, James P., "The Role of Temperature on The Splitting of Built-Up Roofing Systems", Second International Symposium on Roofs and Roofing, Brighton, England, September, 1981.
13. DUPUIS, R. M., LEE, J. W., and JOHNSON, John E., "Field Measurement of Asphalt Temperature During Cold Weather Construction of BUR Systems", presented at the Symposium on Roofing Technology sponsored by the National Bureau of Standards and the National Roofing Contractors Association, Washington, D.C., September, 1977.
14. LEE, J. W., DUPUIS, R. M., and JOHNSON, John E., "Experimental Determination of Temperature Induced Loads in BUR Systems", presented by the National Bureau of Standards and the National Roofing Contractors Association, Washington, D.C., September, 1977.
15. JOHNSON, John E., DUPUIS, R. M., and LEE, J. W., "Physical Properties of BUR Membranes Tested at Low Rates of Loading", presented at the Symposium on Roofing Technology sponsored by the National Bureau of Standards and the National Roofing Contractors Association, Washington, D.C., September, 1977.

**PRINCIPAL
PUBLICATIONS
(cont.)**

16. JOHNSON, John E., SADLER, John E., STANEK, "Design Standards for Concrete Stave Silos", National Silo Association, July, 1974.

17. JOHNSON, John E., "Reinforced Plastic in Construction", appeared in Spring issue of "Building Design and Construction", 1973.

18. JOHNSON, John E., "Steel Design Review", Lecture Notes for Extension Engineering, University of Wisconsin.

19. LEE, J. W., and JOHNSON, J. E., "Anisotropic Beams by Moment-Differential Method", ASCE Journal of the Engineering Mechanics Division, Vol. 99, No. EM6, December, 1973.

20. JOHNSON, John, E., and SADLER, John E., "Summary of National Silo Association Industry Questionnaires for Stave Silos", National Silo Association, December, 1973.

21. JOHNSON, John E., BAEHR, Donald O., and WENK, Robert J., "Research on an Extremely Rapid Setting High Strength Concrete", ASCE Annual and National Environmental Engineering Meeting, Preprint 2097, November, 1973.

22. JOHNSON, John E., JATCZAK, E.J., and MARCHELLO, M.J., "Diaphragm Behavior of a Gypsum Plank Floor System", presented at the ASCE Structural Conference, San Francisco, California, April, 1973.

23. JOHNSON, John E., MACEMON, W.J., and STANEK, B.E., "Comparative Studies of Silo Pressures", presented at 60th Annual Convention of National Silo Association, December, 1972.

24. JOHNSON, John E., DUPUIS, R.M., and LEE, J.W., "Structural Behavior of Reinforced Plastic Beam Shapes", abstract presented at the ASCE, EMD Specialty Conference, Pittsburgh, Pennsylvania, and published in their proceedings, November, 1972.

25. JOHNSON, John E., and DUPUIS, R.M., "The Structural Behavior of Fiberglass Reinforced Wide Flange Sections", presented at the Sixth St. Louis Symposium on Composite Materials in Engineering Design, St. Louis, Missouri, and published in their proceedings, May, 1972.

26. JOHNSON, John E., JATCZAK, E. J., and MARCHELLO, M.J., "Diaphragm Action of a Gypsum Plank Floor System", presented at the Annual ASCE Structural Engineering Conference, Cleveland, Ohio, Meeting Preprint 1672, April, 1972.

27. JOHNSON, John E. and HARRIS, James A., "Structural Sections from Fiberglass Reinforced Polyesters", presented at the Annual Meeting of Society of the Plastics Industry, Washington, D.C., February, 1972.

28. JOHNSON, John E., MACEMON, Wallace J., and STANEK, Bernard, "Conditions Affecting Design of Concrete Stave Silos", presented at the Annual International Silage and Research Conference, Washington, D.C., December, 1971.

29. JOHNSON, John E., Book Review of "The Finite Element Method in Structural and Continuum Mechanics," by Zienkiewicz, Journal of the Franklin Institute, September, 1971.

30. JOHNSON, John E. and HARRIS, James A., "Structural Sections from Reinforced Plastics", presented at the Annual Meeting of the American Society of Civil Engineers at Baltimore, Maryland, Meeting Preprint 1381, April, 1971.

31. JOHNSON, John E., "Sandwich Panels With Unique Cores", presented at the Annual Meeting of the American Society of Civil Engineers at Seattle, Washington, Conference Preprint 495, May, 1967.

32. JOHNSON, John E. and LEWIS, Albert D.M., "Structural Behavior in a Gypsum Roof Deck System", Journal of the Structural Division, American Society of Civil Engineers, No. ST2, (Paper No. 4789) April, 1966.

33. JOHNSON, John E., "A Survey of Adhesive Structural Connections", presented at the Annual Meeting of the American Society of Civil Engineers, Kansas City, Conference Preprint 253, October, 1965.

34. JOHNSON, John E. and HUMBERT, Wayne E., "A Novel Use of Plastic Foams in Highway Construction", presented at the 20th Annual Fall Scientific Meeting hosted by Dow Chemical Company, Midland, Michigan, November, 1963.

35. JOHNSON, John E., "Factors Relating to Plastering Over Plastic Foams", presented at the Annual Meeting of the Gypsum Association in Buffalo, New York in August, 1963.

36. JOHNSON, John E., "Investigation of Composite Structural Action in a Gypsum Roof Deck System," Purdue University, (Ph.D. Thesis) Microfilm No. 65-8564, University Microfilm, Inc., Ann Arbor, Michigan, 1963.

**PARTIAL LISTING RESEARCH AND DEVELOPMENT COMPLETED**

1. Development of a new method of forming hyperbolic paraboloid shells, including design and construction of a four-unit hyperbolic paraboloid as a permanent building on the campus of Purdue University.
2. Research in composite behavior which resulted in a new method of designing gypsum concrete roof decks.
3. Prestressed construction of hyperbolic paraboloids.
4. Development of a spiral generation method of forming thin shells of revolution. This technique afforded a method of constructing thin shells from plastics up to 100 feet in diameter.
5. The use of structural sandwich panels in folded plate structures.
6. Investigation of the structural use of insulating panels under roadways to prevent frost heaving.
7. A property and behavioral study of materials making up sandwich panels.
8. A theoretical and experimental investigation of a unique type of structural sandwich panel.
9. Buckling strength of structural sandwich panels.
10. Use of the Moire Method in structural analysis.
11. A study of fiber reinforced composite materials.
12. A study of limit analysis of reinforced concrete slabs.
13. Analysis of homogeneous isotropic slabs by central difference methods.
14. A study on the effect of axial force and percentage of steel on moment-Curvature (M-$\phi$) characteristics of reinforced concrete sections.
15. Cable roofs in structures.
16. Analysis of hyperbolic paraboloid wood shell roofs subjected to wind loadings.
17. Static analysis of stiffened shells by the Finite Element Method.
18. Five hybrid elements for the analysis of thick, thin or symmetrically layered plates and shells.
19. The application of discrete programming techniques in structural optimization.
20. A study on pneumatic structures.
21. Matrix analysis of articulated space structures.
22. Reinforced transverse wall beams.
23. A study of the bond between steel and concrete.
24. Projection of shear properties of hard board webbed I-beams.
25. Seismic analysis of buried pipe conduit in nuclear power plants.
26. Design of lamella structures and application as form work for circular cylindrical shells.
27. Weight comparison of simple and rigid frames.
28. Beam column analysis.
29. Research on the strength of hybrid columns.
30. Limit analysis by linear programming methods.
31. A method of determining the relative contributions of the diver and the springboard to the vertical ascent of the forward three-and-one-half somersaults tuck.
32. A mathematical and cimetographical analysis of the propulsive effects in the Dolphin Butterfly.
33. Comprehensive research investigation of membrane roofing systems.
34. Behavioral study of fiber glass sheets.
35. Failure systems in masonry walls.
36. Development of an automobile door crash beam.
37. A statistical study of silo failures.
38. Development of an air supported athletic center.
39. Wind load analysis on movable doors.
40. Moisture studies in built-up roof systems.
41. Full scale testing of prestressed concrete bridge girders.
42. Effect of strain rates on ultimate strength.
43. Fiberglass applications in large wind tunnels.
44. Support structures for wind generators.
45. Temperature induced loads on built-up roof membranes.
46. Evaluation of air force crash rescue vehicles.
47. Development of surveyor's fiberglass leveling rods.
48. Evaluation of high strength mortar systems.

**RESEARCH AND
DEVELOPMENT
(cont.)**

49. Flow properties of granular materials.
50. Development of composite door systems.
51. Formulation of asphalt concrete.
52. Economics of semi-rigid framing.
53. New testing applications for the testing of step ladders.
54. A study of circular arc bow girders.
55. The behavior of the modulus of elasticity of fiberglass versus temperature.
56. Optimum proportioning of three span continuous steel plate girders.
57. Design of plate girders made with different grades of steel.
58. Full scale experimental evaluation of silo subjected to simulated wind load.
59. Full scale field testing of precast-prestressed concrete T-beams.
60. Design of fiberglass turning vanes for a wind tunnel testing facility.
61. Full scale instrumentation (strain gaging and thermocouple) of single ply roof systems.
62. Field and laboratory testing of new and existing elastomeric roof membranes.
63. Analysis and field testing of hemispherical fiberglass roof structure.





Figure 2-5

BOTTOM PORTION OF LEFT REAR
RAIL (in Foreground)

Figure 2-6

BOTTOM PORTION OF RIGHT REAR
RAIL



Figure 2-7

VIEW OF SPREADERS FROM FRONT (Note Spreader on Left)



Figure 2-8

PREVIOUS OWNER'S STENCILED IDENTIFICATION ON OUTSIDE OF RIGHT FRONT SIDE RAIL. FROM THE DISCOLORATIONS ON EITHER SIDE OF THE STENCIL IT APPEARS THAT AN ATTEMPT TO REMOVE THE STENCIL WAS MADE PRIOR TO ACCIDENT

# EXHIBIT - 11

CVsPDF – www.fastio.com

# CURRICULUM VITAE OF JOHN E. JOHNSON, Ph.D, P.E.

W9240 US HWY 18
CAMBRIDGE, WI 53523
608/423-4330

**EDUCATION**

Ph.D., Purdue University, 1963
M.S., Civil Engineering, Stanford University, 1957
B.S., Civil Engineering, Gonzaga University, 1956

**PREVIOUS POSITIONS**

| | |
|---|---|
| 1987-Present | President<br>Engineering Forensics & Testing, Ltd. |
| 1973-1995 | President<br>Engineering Research Corporation |
| 1990-Present | Emeritus Professor of Civil Engineering<br>University of Wisconsin-Madison |
| 1972-1990 | Professor of Civil Engineering<br>University of Wisconsin-Madison, WI |
| 1984-1985 | Associate Director<br>Wisconsin Structural and Materials Testing Laboratory<br>University of Wisconsin-Madison, WI |
| 1973-1976 | Associate Director<br>University-Industry Research Program<br>University of Wisconsin-Madison, WI |
| 1968-1972 | Associate Professor of Civil Engineering<br>University of Wisconsin-Madison, WI |
| 1965-1968 | Assistant Professor of Civil Engineering<br>University of Wisconsin-Madison, WI |
| 1962-1965 | Research Engineer<br>Dow Chemical Company, Midland, Michigan |
| 1960-1962 | Research Associate, Purdue University<br>LaFayette, Indiana |
| 1958-1960 | Structural Engineer, Detroit Edison Co.<br>Detroit, Michigan |
| 1957-1958 | Structural Engineer, National Lead Co. of Ohio<br>Fernald, Ohio |

**PROFESSIONAL ORGANIZATIONS**

Fellow, National Academy of Forensic Engineers (NAFE)
Fellow, American Society of Civil Engineers (ASCE)
National Society of Professional Engineers (NSPE)
National Forensic Center (NFC)
American Society for Testing and Materials (ASTM)
American Concrete Institute (ACI)
American Society for Engineering Education (ASEE)
American Association for the Advancement of Science (AAAS)
American Institute of Steel Construction (AISC)



DEPOSITION
EXHIBIT 8/
5
Johnson de

**PROFESSIONAL COMMITTEES**

Chairman, American National Standard Institute (ANSI) A14.5, Committee on Code Standards for Fiber Glass Reinforced Ladders

American National Standard Institute (ANSI) A14, Steering Committee

Member, American Society of Civil Engineers (ASCE), Materials Development Committee

Member, ASTM Committee C-17 on Fiber-Cement Products

Member, ASTM Committee E-6 on Performance of Building Constructions

**PROFESSIONAL ACTIVITIES**

A. University Teaching and Research
  1. Senior and Graduate courses include: Steel Design, Concrete Design, Applied Mathematics, Structural Analysis, Construction Methods and Building Systems.

  2. Continuous research since 1965 in structurally related fields with graduate students at both the M.S. and Ph.D. levels.

B. Typical Forensic Specialty Areas
  1. Structural Investigation
     Commercial and Industrial Buildings; Roof Systems
  2. Failure Analysis
     Structural and Material
  3. Construction/Industrial Accidents
     Investigation; Codes and Procedures; Safety; Equipment
  4. Product Liability

C. Research, Analysis and Testing (Brief Listing of Typical Areas)
  1. Developed and conducted major research programs in roofing and insulation systems.

  2. Developed and conducted major research programs in roofing and lightweight concrete.

  3. Developed and conducted major research and testing programs in structural fiberglass sections resulting in a major design manual.

  4. Developed and conducted a major program investigating the static and dynamic behavior of wood, aluminum and fiberglass ladders for the Consumer Product Safety Commission.

  5. Developed the Industry Standard for the Design of Concrete Stave Silos for the National Silo Association.

  6. Developed computer design programs for designing air supported structures.

**HONORS AND AWARDS**

Dow Chemical Company Fellowship
Gypsum Association Fellowship
American Men and Women of Science
Z.W. Craine Award (International Silo Association)
Member of the Society of Sigma Xi
Member of the Research Society of America (RESA)
Member of Chi Epsilon

**PRINCIPAL
PUBLICATIONS**

Textbooks:

1.<u>STEEL STRUCTURES DESIGN AND BEHAVIOR</u>, by Charles G. Salmon and John E. Johnson. Published by Harper Collins, 1996 (Fourth Edition).

2.<u>STEEL STRUCTURES DESIGN AND BEHAVIOR</u>, by Charles G. Salmon and John E. Johnson. Published by Harper & Row, 1990 (Third Edition).

3.<u>STEEL STRUCTURES DESIGN AND BEHAVIOR</u>, by Charles G. Salmon and John E. Johnson. Published by Harper & Row, 1980 (Second Edition).

4.<u>STEEL STRUCTURES DESIGN AND BEHAVIOR</u>, by Charles G. Salmon and John E. Johnson. Published by Intext Educational Publishers, 1971.

Papers:

1. JOHNSON, John E., "The Pitfalls of the Limited Investigation", Journal of the National Academy of Forensic Engineers, December, 1993.

2. JOHNSON, John E., and SHEAHAN, James P., "Computer Simulation of Ponded Roofs", Proceedings of the Third International Symposium on Roofing Technology, Montreal, Quebec, April, 1991.

3. JOHNSON, John E., and SHEAHAN, James P., "Non-Destructive Methods for Determining The Waterproof Integrity of Roof Membranes and Seams", Proceedings of the Third International Symposium on Roofing Technology, Montreal, Quebec, April, 1991.

4. JOHNSON, John E., "Forensic Engineering Laboratory Preparation For Litigation", Journal of the National Academy of Forensic Engineers, December, 1990.

5. ZURASKI, Patrick D., and JOHNSON, John E., "Fatigue Strength of Deteriorated Steel Highway Bridges", ASCE Journal of Structural Engineering, Vol. 116, No. 10, October, 1990.

6. JOHNSON, John E., and JOHNSON, Eric N., "Expansion and Contraction Characteristics of Lightweight Insulating Concrete in Roofing Systems", presented at the Second International Symposium on Roofing Technology, Gaithersburg, Maryland, September 18-20, 1985.

7. JOHNSON, John E., and JOHNSON, Eric N., "Investigation of the Potential of Ice Lenses Under Built-Up Roofs on Lightweight Insulating Concrete", presented at the Second International Symposium on Roofing Technology, Gaithersburg, Maryland, September 18-20, 1985.

8. ZURASKI, P.D., and JOHNSON, John E., "Research on the Remaining Life in Steel Bridges", Second Bridge Engineering Conference, Minneapolis, Minnesota, September, 1984.

9. ZURASKI, P. D., and JOHNSON, John E., "The Remaining Life in Deteriorated Steel Deck Girder Highway Bridges", Probabilistic Mechanics & Structural Reliability Specialty Conference, University of California, January, 1984.

10. JOHNSON, John E., and SHEAHAN, James P., "The Role of Aging on The Splitting of Organic Built-Up Roofing Systems", Second International Symposium on Roofs and Roofing, Brighton, England, September, 1981.

11. JOHNSON, John E., and SHEAHAN, James P., "The Role of Moisture on The Splitting of Built-Up Roofing Systems", Second International Symposium on Roofs and Roofing, Brighton, England, September, 1981.

12. JOHNSON, John E., and SHEAHAN, James P., "The Role of Temperature on The Splitting of Built-Up Roofing Systems", Second International Symposium on Roofs and Roofing, Brighton, England, September, 1981.

13. DUPUIS, R. M., LEE, J. W., and JOHNSON, John E., "Field Measurement of Asphalt Temperature During Cold Weather Construction of BUR Systems", presented at the Symposium on Roofing Technology sponsored by the National Bureau of Standards and the National Roofing Contractors Association, Washington, D.C., September, 1977.

14. LEE, J. W., DUPUIS, R. M., and JOHNSON, John E., "Experimental Determination of Temperature Induced Loads in BUR Systems", presented by the National Bureau of Standards and the National Roofing Contractors Association, Washington, D.C., September, 1977.

15. JOHNSON, John E., DUPUIS, R. M., and LEE, J. W., "Physical Properties of BUR Membranes Tested at Low Rates of Loading", presented at the Symposium on Roofing Technology sponsored by the National Bureau of Standards and the National Roofing Contractors Association, Washington, D.C., September, 1977.

**PRINCIPAL PUBLICATIONS (cont.)**

16. JOHNSON, John E., SADLER, John E., STANEK, "Design Standards for Concrete Stave Silos", National Silo Association, July, 1974.

17. JOHNSON, John E., "Reinforced Plastic in Construction", appeared in Spring issue of "Building Design and Construction", 1973.

18. JOHNSON, John E., "Steel Design Review", Lecture Notes for Extension Engineering, University of Wisconsin.

19. LEE, J. W., and JOHNSON, J. E., "Anisotropic Beams by Moment-Differential Method", ASCE Journal of the Engineering Mechanics Division, Vol. 99, No. EM6, December, 1973.

20. JOHNSON, John E., and SADLER, John E., "Summary of National Silo Association Industry Questionnaires for Stave Silos", National Silo Association, December, 1973.

21. JOHNSON, John E., BAEHR, Donald O., and WENK, Robert J., "Research on an Extremely Rapid Setting High Strength Concrete", ASCE Annual and National Environmental Engineering Meeting, Preprint 2097, November, 1973.

22. JOHNSON, John E., JATCZAK, E.J., and MARCHELLO, M.J., "Diaphragm Behavior of a Gypsum Plank Floor System", presented at the ASCE Structural Conference, San Francisco, California, April, 1973.

23. JOHNSON, John E., MACEMON, W.J., and STANEK, B.E., "Comparative Studies of Silo Pressures", presented at 60th Annual Convention of National Silo Association, December, 1972.

24. JOHNSON, John E., DUPUIS, R.M., and LEE, J.W., "Structural Behavior of Reinforced Plastic Beam Shapes", abstract presented at the ASCE, EMD Specialty Conference, Pittsburgh, Pennsylvania, and published in their proceedings, November, 1972.

25. JOHNSON, John E., and DUPUIS, R.M., "The Structural Behavior of Fiberglass Reinforced Wide Flange Sections", presented at the Sixth St. Louis Symposium on Composite Materials in Engineering Design, St. Louis, Missouri, and published in their proceedings, May, 1972.

26. JOHNSON, John E., JATCZAK, E. J., and MARCHELLO, M.J., "Diaphragm Action of a Gypsum Plank Floor System", presented at the Annual ASCE Structural Engineering Conference, Cleveland, Ohio, Meeting Preprint 1672, April, 1972.

27. JOHNSON, John E. and HARRIS, James A., "Structural Sections from Fiberglass Reinforced Polyesters", presented at the Annual Meeting of Society of the Plastics Industry, Washington, D.C., February, 1972.

28. JOHNSON, John E., MACEMON, Wallace J., and STANEK, Bernard, "Conditions Affecting Design of Concrete Stave Silos", presented at the Annual International Silage and Research Conference, Washington, D.C., December, 1971.

29. JOHNSON, John E., Book Review of "The Finite Element Method in Structural and Continuum Mechanics," by Zienkiewicz, Journal of the Franklin Institute, September, 1971.

30. JOHNSON, John E. and HARRIS, James A., "Structural Sections from Reinforced Plastics", presented at the Annual Meeting of the American Society of Civil Engineers at Baltimore, Maryland, Meeting Preprint 1381, April, 1971.

31. JOHNSON, John E., "Sandwich Panels With Unique Cores", presented at the Annual Meeting of the American Society of Civil Engineers at Seattle, Washington, Conference Preprint 495, May, 1967.

32. JOHNSON, John E. and LEWIS, Albert D.M., "Structural Behavior in a Gypsum Roof Deck System", Journal of the Structural Division, American Society of Civil Engineers, No. ST2, (Paper No. 4789) April, 1966.

33. JOHNSON, John E., "A Survey of Adhesive Structural Connections", presented at the Annual Meeting of the American Society of Civil Engineers, Kansas City, Conference Preprint 253, October, 1965.

34. JOHNSON, John E. and HUMBERT, Wayne E., "A Novel Use of Plastic Foams in Highway Construction", presented at the 20th Annual Fall Scientific Meeting hosted by Dow Chemical Company, Midland, Michigan, November, 1963.

35. JOHNSON, John E., "Factors Relating to Plastering Over Plastic Foams", presented at the Annual Meeting of the Gypsum Association in Buffalo, New York in August, 1963.

36. JOHNSON, John E., "Investigation of Composite Structural Action in a Gypsum Roof Deck System," Purdue University, (Ph.D. Thesis) Microfilm No. 65-8564, University Microfilm, Inc., Ann Arbor, Michigan, 1963.

**PARTIAL LISTING**
**RESEARCH AND**
**DEVELOPMENT**
**COMPLETED**

1. Development of a new method of forming hyperbolic paraboloid shells, including design and construction of a four-unit hyperbolic paraboloid as a permanent building on the campus of Purdue University.
2. Research in composite behavior which resulted in a new method of designing gypsum concrete roof decks.
3. Prestressed construction of hyperbolic paraboloids.
4. Development of a spiral generation method of forming thin shells of revolution. This technique afforded a method of constructing thin shells from plastics up to 100 feet in diameter.
5. The use of structural sandwich panels in folded plate structures.
6. Investigation of the structural use of insulating panels under roadways to prevent frost heaving.
7. A property and behavioral study of materials making up sandwich panels.
8. A theoretical and experimental investigation of a unique type of structural sandwich panel.
9. Buckling strength of structural sandwich panels.
10. Use of the Moire Method in structural analysis.
11. A study of fiber reinforced composite materials.
12. A study of limit analysis of reinforced concrete slabs.
13. Analysis of homogeneous isotropic slabs by central difference methods.
14. A study on the effect of axial force and percentage of steel on moment-Curvature ($M-\phi$) characteristics of reinforced concrete sections.
15. Cable roofs in structures.
16. Analysis of hyperbolic paraboloid wood shell roofs subjected to wind loadings.
17. Static analysis of stiffened shells by the Finite Element Method.
18. Five hybrid elements for the analysis of thick, thin or symmetrically layered plates and shells.
19. The application of discrete programming techniques in structural optimization.
20. A study on pneumatic structures.
21. Matrix analysis of articulated space structures.
22. Reinforced transverse wall beams.
23. A study of the bond between steel and concrete.
24. Projection of shear properties of hard board webbed I-beams.
25. Seismic analysis of buried pipe conduit in nuclear power plants.
26. Design of lamella structures and application as form work for circular cylindrical shells.
27. Weight comparison of simple and rigid frames.
28. Beam column analysis.
29. Research on the strength of hybrid columns.
30. Limit analysis by linear programming methods.
31. A method of determining the relative contributions of the diver and the springboard to the vertical ascent of the forward three-and-one-half somersaults tuck.
32. A mathematical and cimetographical analysis of the propulsive effects in the Dolphin Butterfly.
33. Comprehensive research investigation of membrane roofing systems.
34. Behavioral study of fiber glass sheets.
35. Failure systems in masonry walls.
36. Development of an automobile door crash beam.
37. A statistical study of silo failures.
38. Development of an air supported athletic center.
39. Wind load analysis on movable doors.
40. Moisture studies in built-up roof systems.
41. Full scale testing of prestressed concrete bridge girders.
42. Effect of strain rates on ultimate strength.
43. Fiberglass applications in large wind tunnels.
44. Support structures for wind generators.
45. Temperature induced loads on built-up roof membranes.
46. Evaluation of air force crash rescue vehicles.
47. Development of surveyor's fiberglass leveling rods.
48. Evaluation of high strength mortar systems.

CStPDF - www.tanto.com

**RESEARCH AND**
**DEVELOPMENT**
**(cont.)**

49. Flow properties of granular materials.
50. Development of composite door systems.
51. Formulation of asphalt concrete.
52. Economics of semi-rigid framing.
53. New testing applications for the testing of step ladders.
54. A study of circular arc bow girders.
55. The behavior of the modulus of elasticity of fiberglass versus temperature.
56. Optimum proportioning of three span continuous steel plate girders.
57. Design of plate girders made with different grades of steel.
58. Full scale experimental evaluation of silo subjected to simulated wind load.
59. Full scale field testing of precast-prestressed concrete T-beams.
60. Design of fiberglass turning vanes for a wind tunnel testing facility.
61. Full scale instrumentation (strain gaging and thermocouple) of single ply roof systems.
62. Field and laboratory testing of new and existing elastomeric roof membranes.
63. Analysis and field testing of hemispherical fiberglass roof structure.

# EXHIBIT - 12

CildPDF - www.fastio.com

# ENGINEERING FORENSICS & TESTING, LTD.

**TO:**   **Gendry & Sprague, P.C.**
**Attorneys at Law**
**645 Lockhill Selma**
**San Antonio, Texas 78216**

**ATTN:**   **Mr. Thomas W. Gendry**

**CASE REFERENCE:**   Jose Escudero, Jr.  vs Bauer Corporation

United States District Court
Southern District of Texas
Brownsville Division

Case No.    Civil Action No. B-00-193

**EF&T REPORT NO:**   210115.2

**REPORT TYPE:**   Expert - Testing Report

**REPORT DATE:**   August 10, 2001

The following report is issued to document the technical investigatory work conducted at your request by the undersigned individual and those persons performing such work at his direction. In preparing this report, every effort has been made to insure objectivity and to comply with accepted standards of professional ethics, technical expertise and engineering practices. The opinions offered as a result of this investigation are based on the writer's academic training and experience.

**ENGINEERING FORENSICS & TESTING, LTD.**

by: _John E. Johnson_

John E. Johnson, Ph.D., P.E.

DEPOSITION
EXHIBIT 8/2a
7
Johnson    ds

# Table of Contents

1.0    Introduction

2.0    Preparation of Specimens

3.0    Compression Tests

4.0    Tensile Tests

5.0    Flexural Tests

6.0    Burn Out Tests

7.0    Barcol Hardness Tests

8.0    Opinions and Conclusions

# List of Figures

1      View From Left Side Showing Location of Removed Samples

2      View From Right Side Showing Location of Removed Samples

3      Outside View of Sample Cut From Right and Left Rear Rail

4      Inside View of Sample Cut From Right and Left Rear Rail

5      Prepared Specimens Prior To Testing

6      Typical Overall View of Test Set Up

7      Close Up View of Compression Test

8      Compression Specimens After Testing

9      Close Up View of Tensile Test

10      Tensile Specimens After Testing

11      Close Up View of Flexural Test

12      Flexural Specimens After Testing

13      Burnout Specimens After Testing

## 1.   INTRODUCTION

Allegations have been raised as to the integrity of the design and manufacture of the 6 ft Type IA
Bauer Fiberglass Step Ladder used by Mr. Jose Escudero, Jr. during the time he was injured.  To
answer those allegations, it became necessary to perform physical property tests on the rear rails
to determine their integrity.   The designated standard applicable to fiberglass ladders is ANSI
A14.5, American National Standard for Ladders - Reinforced Plastic - Safety Requirements.

ANSI A 14.5 specifies various physical properties that coupons cut from fiberglass rails must
meet in order to insure a structurally sound rail.   The testing procedure to determine those
properties are specified by the applicable ASTM Standards.

Individual specimens were cut from a 33-inch sample taken from each rear rail and tested in
accordance with the applicable ASTM Standard (American Society For Testing And Materials).
In addition, all specimens were conditioned according to ASTM Standards prior to testing.

The specimens were prepared using a diamond Tensilsaw and a Tensilkut milling machine and
appropriate ASTM templates.   All strength and modulus tests were performed on an MTS
Sintech G Universal Testing Machine.

The specific ASTM tests performed to determine the physical properties were:

**D695   Standard Test for Compressive Properties of Rigid Plastics**

**D638   Standard Test for Tensile Properties of Plastics**

**D790   Standard Test Methods for Flexural Properties of Unreinforced and
        Reinforced Plastics and Electrical Insulating Materials**

**D2584 Standard Test Method for Ignition Loss of Cured Reinforced Resins**

**D2583  Standard Test Method for Indentation Hardness of Rigid Plastics by Means
        of a Barcol Impressor**

## 2.    PREPARATION OF SPECIMENS

Figure 1 shows a view from the left side showing location of the removed samples; and similarly, Figure 2 shows a view from the right side showing location of the removed samples. Figures 3 & 4 show outside and inside views respectively of samples taken from the rear rails.

Figure 5 shows the individual specimens prepared for the samples prior to testing.

Figure 6 shows an overall view of a typical test set up.


**The specimen identification system is as follows:**

Example: LFT-1

1st Character:  L = Left (Rail)        R = Right (Rail)

2nd Character:        F = Flange      W = Web

3rd Character:        T = Tensile    C = Compression      F = Flexural

4th Character:        1 = Specimen Number


## NOTES:

1    Close up views of the specific tests, close up views of the tested specimens, tables summarizing the test results, and computer printouts (when applicable) are included in each specific group of tests.

2    Comparison of experimentally determined values to the minimum values required by ANSI A14.5 are included in the summaries of test results where applicable.

## 8.   OPINIONS AND CONCLUSIONS

8.1   The compressive, tensile, and flexural strength properties of the step ladder met and exceeded the ANSI A14.5 requirements.

8.2   The compressive, tensile, and flexural modulus of the step ladder met and exceeded the ANSI A14.5 requirements.

8.3   The Barcol Hardness of the step ladder met and exceeded the ANSI A14.5 requirements.

8.4   The step ladder was not defectively designed.

8.5   The step ladder was not defectively manufactured.

8.6   The step ladder was not defective when it left the control of the Bauer Ladder Co.

8.7   The step ladder was adequate for the purpose it was manufactured.

8.9   The step ladder, at the time it left the control of the Bauer Ladder Co., was capable of sustaining a weight of more than five (5) times the weight of Mr. Jose Escudero.

8.10  The step ladder, at the time it left the control of the Bauer Ladder Co., was suitable for use as a Type 1A step ladder.

## 2.   PREPARATION OF SPECIMENS

Figure 1 shows a view from  the left side showing location of the removed samples; and similarly, Figure 2 shows a view from the right side showing location of the removed samples. Figures 3 & 4 show outside and inside views respectively of samples taken from the rear rails.

Figure 5 shows the individual specimens prepared for the samples prior to testing.

Figure 6 shows an overall view of a typical test set up.

**The specimen identification system is as follows:**

Example: LFT-1

1st Character:   L = Left (Rail)          R = Right (Rail)

2nd Character:          F = Flange      W = Web

3rd Character:          T = Tensile     C = Compression        F = Flexural

4th Character:          1 = Specimen Number

## NOTES:

1    **Close up views of the specific tests, close up views of the tested specimens, tables summarizing the test results, and computer printouts (when applicable) are included in each specific group of tests.**

2    **Comparison of experimentally determined values to the minimum values required by ANSI A14.5 are included in the summaries of test results where applicable.**

CVisPDF - www.heslo.com

## 8.   OPINIONS AND CONCLUSIONS

8.1   The compressive, tensile, and flexural strength properties of the step ladder met and exceeded the ANSI A14.5 requirements.

8.2   The compressive, tensile, and flexural  modulus of the step ladder met and exceeded the ANSI A14.5 requirements.

8.3   The Barcol Hardness of the step ladder met and exceeded the ANSI A14.5 requirements.

8.4   The step ladder was not defectively designed.

8.5   The step ladder was not defectively manufactured.

8.6   The step ladder was not defective when it left the control of the Bauer Ladder Co.

8.7   The step ladder was adequate for the purpose it was manufactured.

8.9   The step ladder, at the time it left the control of the Bauer Ladder Co., was capable of sustaining a weight of more than five (5) times the weight of Mr. Jose Escudero.

8.10   The step ladder, at the time it left the control of the Bauer Ladder Co., was suitable for use as a Type 1A step ladder.