

# COPY

United States District Court
Southern District of Texas
FILED

OCT 1 9 2001

Michael N. Milby
Clerk of Court

24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

JOSE ESCUDERO, JR.　　　　　　*
　　　　　　　　　　　　　　　　*
VS　　　　　　　　　　　　　　　*　　CIVIL ACTION NO. B-00-193
　　　　　　　　　　　　　　　　*
BAUER CORPORATION D/B/A　　　 *
BAUER LADDER CORPORATION　　 *

### PLAINTIFF, JOSE ESCUDERO, JR.'S RESPONSE TO DEFENDANT, BAUER CORPORATION'S RULE 702 MOTION OBJECTING TO AND/OR TO EXCLUDE THE OPINIONS AND CONCLUSIONS OF DESIGNATED EXPERT, DR. JAMES PUGH, MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON ECONOMIC DAMAGES

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

COMES NOW, Plaintiff, JOSE ESCUDERO,JR., and files this his response to Defendant, Bauer Corporation's Rule 702 Motion Objecting to and/or to Exclude the Opinions and Conclusions of Designated Expert, Dr. James Pugh, Motion for Summary Judgment on Liability and Motion for Partial Summary Judgment on Economic Damages, and in support thereof would respectfully show as follows:

### *PRELIMINARY STATEMENT*

1.

Since the issue of Dr. James Pugh's suitability as an expert and the reliability of his methodology, conclusions and opinions are interwoven with the

pinjury\fed\extddline\escudero

facts and issues Defendant raises in its motion for summary judgment as to liability, Plaintiff's responses to all of Defendant's pending motions are contained in this one document.

## *PLAINTIFF'S CAUSES OF ACTION*

2.

In this diversity action, Plaintiff has alleged four causes of action: (1) That Defendant was negligent in the design, testing and manufacture of the ladder; (2) That the ladder was unreasonably dangerous and defective in its design and manufacture in violation of *Restatment* (Third Edition) of Torts: Product Liability, section 2(b) (1998); (3) That Defendant breached the warranty of fitness and purpose; and, (4) That Defendant breached the implied warranties set out in sections 2.314 and 2.35 of the Texas version of the Uniform Commercial Code.

3.

Plaintiff intends to seek leave of court to amend his lawsuit to delete the defect in manufacturing claim and breach of warranty causes of action. Thereupon much of Defendant's objections to Plaintiff's expert's opinions on the quality of the fiberglass in the subject ladder will be moot.

pinjury\fed\extddline\escudero

## *PLAINTIFF'S VERSION OF THE CASE*

### 4.

Jose Escudero, Jr., is 33-year-old-man who did various jobs until he started building homes with his own labor and the help of others in about 1997. His business grew and he started obtaining contracts to build hotels, motels, office buildings and condominiums throughout the Rio Grande Valley.[1] Unfortunately on May 10, 1999 he was at the former homestead of his deceased, maternal grandparents to repair items in the house, which was being leased as separate apartments, and in the process of repairing a light fixture with the use of a six-foot ladder manufactured by Defendant, the ladder collapsed, sending him hurling to the floor. He severely fractured his left heel with resultant permanent and progressive disability. [2]

### 5.

According to Defendant the ladder was manufactured between 1988 and 1990.[3] Multiple and thorough examinations of the ladder by many persons indicate that the legs or rails were already cracked when Mr. Escudero climbed it but that cracks between the flanges and the webs of the back rails suddenly

---

[1] Ex. 1. p. 23, L 20 to p. 24, L 11.

[2] Ex. 1. p.38, L1 to p. 39, L9.

[3] Ex. 2. p.15 - L to L20.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702 MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 3

split upward or propagated and caused the ladder to instantly loose stability, sending Plaintiff to the floor.[4] It is uncontradicted and corroborated that Mr. Escudero inspected the ladder before he used it and did not notice the cracks in the rails.[5] The extent of the cracks in the ladder's legs or rails before Plaintiff climbed the ladder is hotly disputed. Plaintiff's employee, Reymundo Medina, who handed the ladder to Plaintiff, testified that he did not see the cracks or splits before the accident.[6] All three experts whom have testified agreed that the cracks or splits substantially propagated or expanded at the time or immediately before Plaintiff fell.

6.

Bauer Corporation was formed about 75 years ago.[7] Now it makes about 20 different models of fiberglass ladders.[8] Bauer Corporation, hereafter "Bauer" or Defendant, is one of several subsidiaries of a larger holding company called B.C. Investments.[9] Prior to the manufacture of the ladder in question,

---

[4] Defendant admitted this at p. 8 of its motion for summary judgment as to liability.

[5] Ex. 1. p. 51, L17 to p.55, L17.

[6] Ex. Rey. p. 21, L20 to p. 25,L7.

[7] Ex. 2. p.6,L11.

[8] Ex. 2. p. 16, L10 to L14.

[9] Ex. 2. p. 7, L9 to p. 9, L24

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 4

pinjury\fed\extddline\escudero

Defendant was well aware that rails could crack and cause serious injury.[10] Without a reasonable explanation, Defendant has lost its records regarding claims or suits resulting from cracked rails which occurred before 1990, the last year the subject ladder was allegedly manufactured with the same design. This has created a spoilation issue.  In a case of possible fraudulent concealment, defendant denied the existence of critical documents, one of which is tantamount to the proverbial "smoking gun," and later claimed that the response of "none" to specific requests for production meant "except for the documents already produced."   In fact the documents had not previously been produced by defendant, but obtained by Plaintiff from another lawsuit against Bauer, and *later* supplied to Defendant's counsel.  [11] In any event, the occurrence of cracked, split or fractured rails in fiberglass ladders is such a known or anticipated occurrence that is specifically addressed in OSHA Standards.[12]  The fact that a crack might suddenly propagate and cause a serious injury like here is not so apparent, especially to an average worker.[13]

---

[10] Ex. 2, p.35, L4-20

[11] Ex. 2, p. 18, L18 to p. 59, L11.

[12] Ex. 4. p.111, L3 to p. 112, L4

[13] Ex. 5. p. 57 to p. 77.

pinjury\fed\extddline\escudero

7.

Cracks or splits which develop at the bottom or footing of the back rails are the most treacherous because the typical user tends to check the front rails more closely because they support the steps upon which the user will climb. Since at least the 1930's ladder manufacturers have attempted to address such fractures by fortifying the bottom of the rails.[14] At the time the subject ladder was manufactured, the Werner Ladder Company developed an encapsulating shoe and support system which greatly reduces the likelihood of cracks, splits or fractures in the rails and secures or binds the bottom of the rails to prevent propagation of cracks that do occur.[15] From 1991 to 1995 Defendant developed a vinyl boot or "slip-on-shoe" which covers the feet of the rails and to a large degree achieves the same  result as the Werner encapsulating shoe.[16]  Before this design change, Bauer had doubled-layered the fiberglass at the bottom of rails, ostensibly to address the same hazards.[17]

Tests of the slip-on-shoe by Bauer clearly showed the boot substantially deters splitting between the flange and web of the back rails, the location of the

---

[14] Ex. 5. p. 34

[15] Ex. 5. p. 32 to p. 25 and Ex. 6. no. 2,3,4 to Dr. Pugh's deposition.

[16] Ex. 2. p. 53, L2-14 + Ex. 5, 6.

[17] Ex. 6.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 6

critical cracks in the subject ladder. [18]

In a report dated March 6, 1995, Bauer's corporate representative John

Vasichko wrote:

> "In summary, the slip-on-shoe when tested against the standard shoe appears to offer excellent protection against rail flange and web separation. It appears to extend the useful life of the ladder once a crack has formed in the rail. The potential for a sudden and catastrophic failure will be less with the new shoe." [19]

## 8.

In the real world Bauer's test results have been duplicated. Claims or

complaints of leg fracturing have dropped more than half since the slip-on-shoe

was added.[20]   This evidence proves that such a design modification was

feasible, effective and economical. Vasichko testified that it is actually cheaper

to manufacture a stepladder with a slip-on-shoe than with the shoe on the

subject ladder. [21]

## 9.

Despite the foregoing and to Plaintiff's good fortune, Defendant denies

---

[18] Ex. 2, Ex. 5.

[19] Ex. 2, Ex. 5.

[20] Ex. 2, p. 36, L11-22

[21] Ex. 2, p. 64, L13 to p. 65, L10.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 7

CMxPDF - www.fexisi.com

that the encapsulating shoe is a subsequent, remedial measure.[22]  Defendant
insists that the design change was merely to extend the life time of the product,
with reduction of leg fracturing being a mere benefit, and that the shoe was not
introduced to address a known hazard or dangerous condition.  Vasichko claims
that Bauer does not think that fractured rails is a "significant issue." [23]

## *THE EXPERTS*

### 10.

Both parties retained experts to address the liability issues. Plaintiff hired
Dr. James W. Pugh, Ph.D. and Defendant Dr. John Johnson, Ph.D. Not
surprisingly Defendant, which has been sued many times in connection with
these ladders, obtained the expert with the most experience in ladders.[24] Dr.
John Johnson has been the chairman of the A14.5 subcommittee of the
American National Standards Institutes on fiberglass ladders since 1970.  He
is joined on the committee by Vasichko.  Dr. Johnson also headed up a large
research program in 1975 sponsored by the Consumer Product Safety
Commission which led to the initial A.N.S.I. Standards on fiberglass stepladders.

---

[22] Ex. 2, p. 57, L18-25

[23] Ex.2, p. 34, L14-19

[24] Ex. 5, p. 14, L9-15

[25] These standards, Dr. Johnson made perfectly clear, apply to performance and not design. ANSI does not specify or recommend any particular designs.[26] Though Dr. Johnson has expansive experience with fiberglass stepladders, he has never designed a stepladder or published on the subject. All the opinions he has expressed in this case regarding design are based on his working knowledge of engineering and material science.[27] While he opines in his report that there is no evidence of a design defect in the subject ladder, he did not survey or analyze any of the different ladder designs or address the test results or field experience of Bauer which show that the slip-on-shoe greatly reduces leg fracturing and propagation of existing cracks. He personally knows of no studies or papers which have addressed the advantages or disadvantages of an encapsulating shoe. He testified that although such information may exist with the ladder manufactures, they may have chosen not to divulge it. A quick review of Dr. Johnson's curriculum vitae reflects that the subjects upon which he has published touch only tangentially upon fiberglass ladders. Mostly they relate to roofing materials.[28]

---

[25] Ex. 4

[26] Ex. 4, p. 90 to p. 94.

[27] Ex. 4, p. 12 to p. 17.

[28] Ex. 4, Ex. 5.

11.

Dr. James W. Pugh, Ph.D. is Director of Biomedical Engineering, Metallurgy and Material Science of Inter-City Testing and Consulting Corporation in Mineola, New York.  He has a Ph.D. in Biomedical Engineering and a Bachelor's of Science in Metallurgy and Materials both from Massachusetts Institute of Technology.  He has taught engineering, material science and ergonomics at various universities in New York City and Long Island, New York.  His curriculum vitae reflects 73 publications which he has authored or co-authored.  He is licensed in New York as a professional engineer and is a member of multiple professional societies and organizations, including the American Society for Mechanical Engineers, American Society for Testing and Materials, National Society for Professional Engineers, Society of Plastic Engineers and National Association for Professional Accident Reconstruction Specialists.[29]  Dr. Pugh describes his present  work as involving forensic engineering, which he describes as analyzing injuries under  engineering circumstances.[30] Having been retained in two other cases against Bauer, and having analyzed the ladders in those cases, Dr. Pugh is both an expert and fact witness.

---

[29] Ex. 5, Ex. 1

[30] Ex. 5, p. 10-11.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 10

pinjury\fed\extddline\escudero

## <u>RESPONSE TO DEFENDANT'S RULE 702 MOTION</u>

### 12.

Defendant seeks to have Dr. Pugh's opinions and conclusions excluded under Rule 702 of the Federal Rules of Evidence.  Rule 702 was amended in 2000 in response to *Daubert vs Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Company vs Carmichael*, 119 S.Ct. 1167 (1999) It now reads:

> "If scientific , technical, or other specialized knowledge will assist the trier fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, knowledge, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principals and methods, and (3) the witness has applied the principal and methods reliably to the facts of the case."

### 13.

While Daubert set out a checklist for a trial court to use in its "gatekeeping" responsibilities, the Supreme Court later held in Kumbo Tire Company that the "factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. . . .  To much depends on the particular circumstances of the particular case at issue."  119 S.Ct. 1170. A trial judge has "broad latitude" in deciding in a particular case how to

go about determining whether the particular expert testimony is reliable. Id. A court's ruling on admissibility will not be disturbed unless it is "manifestly erroneous". *Eiland vs Westinghouse Elec. Corp*. 58 Fd. 3d 176, 180 (5th Cir. 1995).   A Rule 702 motion should not substitute for "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof as the traditional and appropriate means of attacking shaky, but admissible evidence." Daubert, supra, at 509 U.S. 596.

<p style="text-align:center">14.</p>

According to the notes of the Rule's Advisory Committee, "Nothing in this amendment is intended to suggest that experience alone - - or experience in conjunction with other knowledge, skill, training or education - - may provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience," citing *Tassen vs Sears Roebuck*, 946 F. Supp. 1241, 1248 (M.D. La. 1996) (Design engineer's testimony can be admissable when the expert's opinions "are based on facts, reasonable investigation, and traditional technical/mechanical expertise and he provides a reasonable link between the information and the procedures he uses and the conclusions he reaches).  Or as the court said in *Kumho Tire Company,* "No one denies that an expert might draw a conclusion from a set of observations based on extensive and

CVisPDF - www.fesisa.com

specialized experience." 119 S. Ct. at 1178.

<div align="center">15.</div>

In the instance case, without being over simplistic, the design of a fiberglass ladder does not appear to be as complicated as say the nature of the tire described in the Kumho Tire Company case. The subject ladder was primarily designed by John Vasichko. Vasichko was initially hired by Bauer in 1983 as a plant manager. He has a degree in industrial engineering, a discipline he describes as dealing with manufacturing, as opposed to design, processes. According to Vasichko he was asked to design the "slip- on- shoe" and he did. Vasichko states that it was not his decision not to hire a design engineer to design the slip-on-shoe.[31] Despite his apparent lack of expertise, his design proved quite effective and has reportedly been imitated by other companies.[32] Both Dr. Johnson and Dr. Pugh in their depositions state that they are relying on textbook engineering principles in coming to their conclusions about design, causation and reconstruction of the accident. [33]

---

[31] Ex. 2, p. 8, L15 to p. 9, L 22, p. 10, L11-25.

[32] Ex. 2, p. 75, L24 to p. 77, L5.

[33] Ex. 4, p. 70, Ex. 4, P. 12-17.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 13

16.

Dr. Pugh's core opinions and conclusions are:

1.   Based on his inspection and analysis of the subject ladder and similar ladders, in the instant case, pre-existing cracks between the flanges and webs of the back legs suddenly spread or ran up the legs after Plaintiff was on the ladder, resulting in sudden, extreme destablization and the fall.

2.   The subject ladder contained a design defect because it lacked an encapsulating shoe of the type utilized on Werner ladders and presently on Bauer ladders; That such an encapsulating shoe is economical and technically feasible and serves to tie together the longitude geometry of each leg, preventing not only the initiation of cracks, which serve as a prelude to catastrophic failure, but also guards against rail geometry separation or cracks suddenly propagating while the ladder is being used.

3.   For additional stabilization and strength the cross braces on the back rails should be attached on each side of the rail like the steps on the front rails.

4.   That it is foreseeable that the back rails will develop cracks during normal usage, especially during loading and unloading.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 14

5.    That the pre-existing cracks were not nearly as extensive as stated by Richard Poremba and Dr. Johnson and would not be particularly recognizable to the average construction worker during an inspection as being dangerous and indicative of the necessity to discard the ladder.[34]

## 17.

The first opinion and conclusion is not particularly controversial. Dr. Pugh's training as a forensic engineer or reconstruction expert and examination of similarly damaged Bauer ladders makes him qualified to examine the subject ladder and determine that sudden propagation of pre-existing cracks in the rails caused Plaintiff to fall.  Defendant admitted in its motion for summary judgment that same triggered Plaintiff's fall.

## 18.

The three engineers that have examined the subject ladder all agree that there was pre-existing cracks in the legs and that to some extent or another they spread or opened up at the time of the accident, resulting in Mr. Escudero's fall.[35]

---

[34] Ex. 5, Ex. 7.

[35] Ex. 7, p. 74, L14 to p. 75, L6, Ex. 4, p. 71, L23 to p.73, L15.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 15

CMPDF - www.fesisi.com

19.

As to the critical issue, Doctors Pugh and Johnson disagree that the subject ladder's failure to have an encapsulating foot is a design defect.  Dr. Johnson in his report has no analysis of the merits or demerits of encapsulating feet and only opined in his deposition that Mr. Escudero would have fallen anyway because of the severity of the pre-existing cracks. Neither expert thought that any particular paper or publication was on point. The proof, of course, is in the pudding: Bauer's tests and field experience after introducing its slip-on-shoe.  The tests indicated "a clear advantage" and Bauer's in house survey after marketing the new design showed fracturing complaints and claims dropped by over fifty percent.

20.

The definition of a design defect is set out in section 82.05 of the Texas Civil Practices and Remedies Code and Texas Pattern Jury Charge 71.4B. The failure to have some type of encapsulating shoe neatly fits the definition: It is a alternative design which in reasonable probability would have significantly reduced the risk of injury without substantially impairing the product's utility and was economically and technologically feasible at the time the ladder left Bauer's control.

pinjury\fed\extddline\escudero

### 21.

In regard to Dr. Pugh's opinion that the subject ladder was defective for failure to have the cross braces on the back rails secured like the front legs - - - where they are secured with rivets to flanges on both sides of the web instead of one side - - it is a simple engineering conclusion which Plaintiff submits is probably recognizable to the average person.  It is not junk science, but  simple application of engineering principles.   Defendant discussed the exact same design change in its critical INTER-OFFICE MEMORANDUM dated March 6, 1995 from Vasichko to the company's president, Norman L. Miller, Jr.[36]

### 22.

The foreseeability of rails cracking and fracturing upon being loaded or stored should not be disputed by Bauer. Bauer developed little "pads" to address that exact problem.[37]

### 23.

In conclusion, Dr. Pugh is qualified to make the rather generic and somewhat obvious conclusions and opinions regarding how that accident happened and the merits of an encapsulating shoe.  Although his conclusions are not easily applicable to the Daubert checklist, they have been tested in the

---

[36] Ex. 2, Ex. 5

[37] Ex. 2, p. 25, L12-16.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 17

pinjury\fed\extddline\escudero

real world and are readily subject to challenge. Defendant claims that Dr. Pugh

should not be able to testify about the merits of the encapsulating shoe or foot

because he has not personally tested its effectiveness.  He did not need to.

Bauer conducted the test and surveyed the feedback from the public after

marketing the slip-on-shoe.   As Vasichko said in his deposition, "We know

what's occurring."[38]

## *RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT REGARDING LIABILITY*

### 24.

Defendant has moved for summary judgment claiming that there is no

evidence or insufficient evidence that the ladder in question had a

manufacturing or design defect and that Plaintiff cannot adduce sufficient

evidence that the failure of the subject ladder to have encapsulating feet was

the producing cause of the accident . As stated  earlier, Plaintiff is no longer

claiming that the subject ladder contained a manufacturing defect.  However,

there is ample evidence to create a fact issue as to the existence of a design

defect and whether that design defect was a producing cause of Plaintiff's

injuries.

---

[38] Ex. 2, p. 16, L16-20.

## **_DESIGN DEFECT_**

### 25.

Plaintiff assumes that the court is familiar with the standards and rules for determining when summary judgment is appropriate.

### 26.

Plaintiff submits that there is sufficient summary judgment evidence, based on Bauer's admissions alone, to submit the issue of a design defect to the jury. Bauer, through its corporate representative, admitted that cracked rails are a known occurrence on fiberglass ladders and that splitting rails have resulted in claims by severely injured persons. The extent of those prior claims is unknown due to Bauer's inability to explain the destruction of supporting documents. Vasichko admitted that the technology for reinforcing the feet of ladder rails has been known for at least seventy years and that the cost to add encapsulating shoes at the bottom of rails can actually cost less than the shoes on the subject ladder. Defendant admitted in its motion for summary judgment that "the failure mechanism in this accident was a splitting of the rear legs upwards so that they lost their structural integrity and failed to support the Plaintiff's weight." To quote Vasichko, the encapsulating shoe or boot "offer[s] excellent protection against rail flange and web separation. It appears to extend the useful life of the ladder once a crack has formed in the rail. The

pinjury\fed\extddline\escudero

potential for a sudden and catastrophic failure will be less with the new shoe."[39]

Most importantly use and experience by the public with the slip-on-shoe has confirmed Vasichko's conclusions.

## *CAUSATION*

### 27.

Plaintiff readily admits that there is conflicting evidence as to causation. Plaintiff and his employee, Reymundo Medina, both testified that the ladder was not broken immediately before Plaintiff used it. Plaintiff testified that he inspected the ladder before he fell, though not meticulously, and that the ladder looked in good condition. He specifically testified that the rails were in good condition. In fact Plaintiff was on the ladder anywhere from five to fifteen minutes before it collapsed.[40] Dr. Pugh admitted that there was some pre-existing cracks in the front and back rails, with only the fractures in the back rails contributive to the fall. It is Dr. Pugh's opinion that the average construction worker would not particularly notice the significance of cracks, that they could easily propagate and cause instant instability.[41] Both the engineers which testified on behalf of Defendant, testified that there were parts

_____

[39] Ex. 2, Ex. 5.

[40] Ex. 3, p. 27, L7-13, Ex. 1, p.60, L13-22

[41] Ex. 5, p. 42-44.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 20

of the fractures that were old and parts that were new. Neither measured the extent of the new cracks to determine exactly how much they propagated just before or during Plaintiff's fall.[42]  Dr. Pugh and Richard Poremba are in frank disagreement about whether brown paint and spackle were actually inside the fractures so as to suggest how long the rails had been split.  Poremba puts the paint and spackle inside the fractures. Dr. Pugh puts it beside the fractures.[43] Despite its present claim that any ladder with cracks in the rails should by discarded, Vasichko implies that a ladder will still have a "useful life . . . once a crack has formed in the rail." [44]

<div align="center">28.</div>

Under Texas law there is proportionate responsibility in a product liability cases. Tex. Civ. Prac. & Rem. Code, section 33.001, et seq.  Therefore Defendant will be able to argue to the jury that the accident was more than fifty percent Plaintiff's fault because he climbed on a ladder with cracked rails and thereby attempt to absolve itself of liability.  But based on the conflicting deposition testimony, summary judgment is not appropriate based on causation.

---

[42] Ex. 7, p. 58, L11 - p. 59, L6.

[43] Ex. 7, p. 39, L22-p. 40, L15, Ex. 5, p. 48

[44] Ex. 2, Ex. 5.

<div align="center">MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702<br>MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY<br>PAGE - 21</div>

## *RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO ECONOMIC DAMAGES*

### 29.

Plaintiff grew up in Monterrey, Mexico, though his mother and her family are from the Lower Rio Grande Valley.  He studied architecture and business administration at Monterrey Tech. and the University of Monterrey. He is one year shy of a degree.[45] After he quit college he worked at the Hotel Monterrey and then he help set up the first legal sports book in the State of Nueva Leon, Mexico.[46] When he arrived in the Lower Rio Grande Valley he painted airplanes at the Bayview Airport and he started building homes, doing a substantial amount of the carpentry and sheetrock himself. Eventually he was able to obtain larger, commercial contracts to build offices, condominiums, motels and hotels.[47] As the size of his construction projects grew his duties turned mostly to supervision.  The name of his company was originally Paisano Construction, a partnership with his father, Jose Escudero, Sr.  In 1999 he incorporated the

---

[45] Ex. 1, p. 7-8.

[46] Ex. 1 p. 27-28.

[47] Ex. 1, p. 23-24.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 22

pinjury\fed\extddline\escudero

business to become E & E Builders Inc., doing business as Paisano Construction.

30.

As a result of the accident in May of 1999, Plaintiff suffered a fractured heel and was unable to work full-time for about five months. [48] The displaced bone parts in his heel were re-secured through the use of pins by Dr. Donald Vargas of Harlingen.  About one year after the accident, he had a second surgery, done by Dr. John Bishop of Houston, in which his heel was narrowed on each side and the sural nerve was decompressed.[49]  After that surgery he was unable to work full-time for another five months.

31.

According to Dr. Mayo Galindo, Jr., an orthopedic surgeon who specializes in foot and ankle surgery and who saw Plaintiff per Bauer's request for an independent medical examination, Plaintiff's fractured heel has completely healed, but he has developed arthritis in the subtalar joint, which is just below the ankle.  Plaintiff has lost substantial range of motion and still suffers such pain that somedays he can hardly walk and uses a cane.  According to Dr. Galindo, Plaintiff's condition is chronic and permanent, and he can expect the arthritis to get worse.  The best analogy Dr. Galindo could offer is ". . . if you

---

[48] Ex. 8.

[49] Ex. 9, p. 9-10.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 23

have a worn out or wearing tire, the harder your drive it, the faster it is going to wear out.  So a lot may depend on how hard he pushes himself."[50]

## 32.

Dr. Galindo opines that Mr. Escudero will probably require some future treatment, such as a brace, and might ultimately need surgery to fuse his subtalar joint.  He estimates that the cost of the brace would be about $600 and $800 dollars every two years; anti-inflammatory medication between $1 and $3 dollars per day; and, if fusion is necessary, it would cost about $15 thousand dollars. Dr. Galindo states that walking on uneven surfaces, typical of construction sites ,stress this type of joint disorder, causing significant pain. Basically Dr. Galindo opined that if Plaintiff walks or works on his left foot it will hurt him.

## 33.

Not surprising Plaintiff reports that since his heel injury he has great difficulty supervising his construction jobs.[51]   He states that most of the buildings he erects are over three stories and he has a difficulty going up and down the stairs and walking on the slanted roofs.  Plaintiff concludes that such problems prevent him from going back to building houses himself, if he needed

---

[50] Ex. 9, p.11-28.

[51] Ex. 8.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 24

to, something he could rely on in the past.  He testified that because of his injury he has had to hire  several men to help supervise jobs and as a result some of the projects have been poorly managed, resulting in monetary penalties.  He avers that he lost $78 thousand dollars on an office building that he constructed for Dr.Vargas because of poor supervision, including the $24,352 dollars he paid to Mr. Eric Gutierrez to supervise the project.[52]

### 34.

Although Plaintiff's business had gross receipts of $1.1 million dollars in 1999 and close to $2.8 million in 2000, his company has not been profitable. The company's gross profits for 1999 were $595 dollars.[53]  The books to Plaintiff's business are not in good shape.  His new accountant, Mr. Bob Peaster, is going through the papers for 2000 and testified that the business may just break even for the year 2000 and will probably loose money in 2001.  This is despite the fact that the company continues to obtain large contracts to build motels. [54]

### 35.

---

[52] Ex. 9.

[53] Ex. 10, p. 14-16

[54] Unfortunately, for Mr. Escudero his biggest project presently is construction of a Quality Inn on South Padre Island for $1.7 million dollars. Damage to the causeway is compounding his problems.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY

CVisPDF - www.fenito.com

## 35.

Throughout the years since the accident, Mr. Escudero has continued to pay himself a draw every month of between three and four thousand dollars.[55] This apparently is regardless whether the company itself makes a profit.  Mr. Escudero believes that his falling off the ladder was the starting point of a series of problems and misfortune.

## 36.

Defendant claims it is entitled to summary judgment because there is insufficient evidence of documentation of economic damages, meaning loss of earnings in the past and loss of earning capacity.  While Plaintiff would admit that his bookkeeping and tax return preparation is not what he wants it to be, the law does not require a Plaintiff to prove his economical damages only through documentation.  Likewise, the mere fact that Mr. Escudero has continued to paid himself a regular draw does not mean that he has not suffered economic damages.  In his attached affidavit Plaintiff explains how he has been paying various persons about $2,200 to $2,500 dollars a month to supervise projects in his place. Plaintiff submits that there is enough summary judgment evidence to go to the jury as to loss of earnings in the past due to his increased costs associated with hiring others to supervise his construction

---

[55] Ex. 10, p. 51, L11-18.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 26

pinjury\fed\extddline\escudero

projects.[56]

### 37.

There is also ample evidence of loss of earning capacity.  Loss of earning capacity is a form of damages that the jury may award based on evidence of the injured person's age, health and physical condition prior to the injury and the permanance of the injury.  *Harris vs Blue*, 974 S. W. 2d 386, 395 (Tex. App. - Tyler 1998, pet. denied). A Plaintiff's loss of earning capacity in the future is always uncertain and is left largely to the jury's sound judgment and discretion.  A jury however should not be left to mere conjecture where facts upon which a jury could base an intelligent  answer could be readily obtained. *Border Apparel- East, Inc. vs Guadian*, 868 S.W. 2d 894, 897 (Tex. App. - El Paso 1993.) Recovery for loss of future incapacity does not require a showing of actual lost earnings; each case is judged on its particular facts and damages need to be proved only to a degree to which they are ascertainable. Id.

### 38.

In the instant case Mr. Escudero testified that he was physically in good shape before this accident.[57] He testified that he now has difficulty supervising

---

[56] Ex. 8.

[57] Ex. 1, p. 78-87.

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 27

CMzPDF - www.faxia.com

sites.   There is summary judgment evidence regarding the cost to employ substituted supervisors, namely about $30,000.00 per year.[58] In addition, there is substantial evidence that Plaintiff can not personally return to doing carpentry, sheetrock or painting work as he did within a year or two of the accident.    In his attached affidavit, he explains what the average skilled carpenter or framer earns per hour in the Rio Grande Valley and what that would average to per year, about $30,000.00.  Despite the difficulty in showing how much money Mr. Escudero will loose because of all the possible financial ramifications of not being able to personally supervise work sites as before, there is sufficient summary judgment evidence that he has lost substantial future earning capacity and how a jury could readily calculate it.

<div align="center">39.</div>

WHEREFORE, Plaintiff prays that Defendant's Rule 702 motion, motion for summary judgment as to liability and motion for summary judgment as to economic damages be in all things DENIED.

---

[58] Ex. 8.

pinjury\fed\extddline\escudero

Respectfully submitted,

BARRY R. BENTON
284 Ebony Avenue
Brownsville, Texas 78520
Telephone (956) 546-9900
Facsimile (956) 546-9997
State Bar No. 02176500
Fed. I. D. No. 3968
ATTORNEY-IN-CHARGE FOR
JOSE ESCUDERO, JR., PLAINTIFF

pinjury\fed\extddline\escudero

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _____ day of October, 2001, a true and correct copy of the foregoing Plaintiff's Response to Defendant's Motion for Summary Judgment on Liability and Motion for Summary Judgment on Economic Damages was forwarded to attorney of record to wit:

Mr. Thomas Gendry
GENDRY & SPRAGUE, P.C.
645 Lockhill Selma
San Antonio, Texas 78216

BARRY R. BENTON

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANT'S RULE 702
MOTION AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY
PAGE - 30

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOSE ESCUDERO, JR.        )(
    Plaintiff         )(
                      )(
VS.                       )(   CIVIL ACTION NO.
                      )(   B-00-193
BAUER CORPORATION D/B/A   )(
BAUER LADDER CORPORATION  )(
    Defendant         )(

---

ORAL AND VIDEOTAPED DEPOSITION OF
JOSE ESCUDERO, JR.
MAY 3, 2001

---

ORAL AND VIDEOTAPED DEPOSITION OF JOSE
ESCUDERO, JR., produced as a witness at the instance of
the DEFENDANT, taken in the above styled and numbered
cause on MAY 3, 2001, reported by LINDA LOCKLEAR,
Certified Court Reporter No. 6326, in and for the State
of Texas, at the offices of Barry Benton, 284 Ebony
Avenue, Brownsville, Texas, pursuant to the Texas Rules
of Civil Procedure.

24
25

**Page 2**

APPEARANCES

COUNSEL FOR PLAINTIFF:

    BARRY BENTON
    LAW OFFICE OF BARRY BENTON
    284 Ebony Avenue
    Brownsville, Texas  78520

COUNSEL FOR DEFENDANT:

    THOMAS GENDRY
    GENDRY & SPRAGUE, P.C.
    645 Lockhill Selma
    San Antonio, Texas  78216

ALSO PRESENT:

    Chad Newman, Videographer

INDEX

| | PAGE |
|---|---|
| Appearances ................. ............. .... | 2 |
| JOSE ESCUDERO, JR. | |
| Examination by Mr. Gendry ..... ............. | 3 |
| Errata Sheet/Signature Page ............ ...... | 96 |
| Reporter's Certificate ......................... | 98 |

Attached to the end of the transcript:  Stipulations

EXHIBITS

| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | Picture ..... ............. ... | 68 |
| 2 | Pictures ............................ ... | 75 |

**Page 3**

1     (proceedings began at 1:09 p.m.)
2         VIDEOGRAPHER:  We're on the record
3              JOSE ESCUDERO, JR.,
4     having been duly sworn, testified as follows:
5              EXAMINATION
6     BY MR. GENDRY:
7     Q.  Please state your name for the record.
8     A.  Jose R. Escudero.
9     Q.  And, Mr. Escudero, have you ever gone by any
10    other names?
11    A.  No, sir.
12    Q.  Okay.
13    A.  Well, they call me Pepe.
14    Q.  Pepe?
15    A.  Yeah.
16    Q.  All right.  Let me explain that I am Tom
17    Gendry, and I represent Bauer Ladder Corporation in
18    this particular case.  And you understand that you're
19    giving your deposition today, of course; is that right?
20    A.  Yes, sir.
21    Q.  And I assume that you've had a chance to talk
22    over with Mr. Benton about what a deposition is?
23    A.  Yes.
24    Q.  All right.  You have to make sure that you make
25    an oral response so the court reporter can take it

**Page 4**

1     down.  She cannot take down shakes of the head, huh-uh
2     or uh-huhs or that sort of thing.  Is that agreeable?
3     A.  Understood.
4     Q.  If you don't understand any of my questions,
5     you just let me know, and I'll try to rephrase the
6     question to see that we can get on the same waive
7     length.  Is that agreeable?
8     A.  Agreeable.
9     Q.  Okay.  What is your current address, sir?
10    A.  Well, I live at 1665 Turkey Trot at this time,
11    Mercedes, Texas.
12    Q.  Okay.  And how long have you lived there, sir?
13    A.  A little bit over -- probably about a year.
14    Q.  Okay.  Is that a home, apartment or --
15    A.  It's a home.
16    Q.  And do you own that home or do you rent?
17    A.  We're in the process of buying it, yeah.  We
18    built the house.
19    Q.  When you say "we are in the process of buying"
20    your current residence --
21    A.  It's my wife and me.
22    Q.  Your wife and you?  One other thing, you need
23    to make sure that you wait until I complete my question
24    before you make a response.
25    A.  Yes.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 32 of 328

**5**

1    Q.  Agreeable?

2    A.  I understand.

3    Q.  And so you're married, right?

4    A.  Yes, sir.

5    Q.  And what is your wife's name?

6    A.  Alicia.

7    Q.  And do you and Alicia have any children?

8    A.  She has one from a previous marriage, and I

9    adopted him.

10    Q.  Okay.  And what is your child's name?

11    A.  Diego.

12    Q.  Diego?

13    A.  Yes, sir.

14    Q.  And how old is he?

15    A.  Three years.

16    Q.  Have you been married in the past before your

17    marriage with Alicia?

18    A.  No, I haven't.

19    Q.  Okay.  Where did you live before you lived at

20    the 1665 Turkey Run, did you say?

21    A.  Turkey Trot.

22    Q.  Turkey Trot Drive.  Where did you live before

23    that?

24    A.  I lived in Weslaco.

25    Q.  Do you remember the address in Weslaco where

**6**

1    you lived?

2    A.  Not exactly.  It was an apartment.  It was on

3    Pleasantview; 924, if I'm not mistaken, Pleasantview.

4    Q.  Okay.  How long did you live at the

5    924 Pleasantview address?

6    A.  About 12 months -- 12, 13 months.

7    Q.  Where did you live before that, sir?

8    A.  In Los Fresnos, Texas, 106 Anacua.

9    Q.  Is that a home or an apartment?

10    A.  It's a home, my parent's home.

11    Q.  And let me get from you -- what is your date of

12    birth?

13    A.  May 22nd, 1968.

14    Q.  So you've got a birthday coming up, right?

15    A.  Yes, sir.

16    Q.  Where were you born?

17    A.  Brownsville, Texas.

18    Q.  Tell me a bit about where you were raised.  Was

19    it here in Brownsville?

20    A.  No.  I -- I was born in Brownsville, and

21    then -- I lived here about -- until about I was three

22    years old.  Then we went -- my father got a job in

23    Michigan.  We lived in Michigan for a while, and then

24    he got -- he was offered a job in Mexico, Monterrey, so

25    we moved to Monterrey, and I was -- most of my life --

**7**

1    most of the time I was raised over there.

2    Q.  All right.

3    A.  We would come here a lot.  My family's from

4    here, you know, my mother's family.  She was -- she was

5    born in Brownsville.

6    Q.  Let me get your -- let me just run through some

7    of this.  Did you go to schools in Michigan?

8    A.  No.

9    Q.  Where did you go to school?

10    A.  I went to school in Monterrey, montessori.

11    Q.  I see.  And that would be your primary

12    education; is that correct?

13    A.  Excuse me?

14    Q.  Your primary education was at montessori in

15    Monterrey?

16    A.  Yes.  And then American Institute of Monterrey,

17    also.

18    Q.  Did you receive a degree or certificate

19    graduating from school in Monterrey?

20    A.  No, sir.  I didn't finish my -- I studied

21    business administration in in --

22    Q.  Okay.

23    A.  -- Monterrey.  We're in the process -- I have a

24    little -- I can go back and get it any time, I guess.

25    I haven't finished yet.

**8**

1    Q.  Okay.  Let me ask you, in terms of U.S.

2    education, how far in school did you get?

3    A.  To college I have one year left at Monterrey

4    Tech.

5    Q.  One year left in college, is that correct?

6    A.  Yes.

7    Q.  And you're working on the business

8    administration degree?

9    A.  Yes.  I studied two years architecture, and

10    then I went to business administration.

11    Q.  And you're one year shy of that; is that right?

12    A.  Yes, sir.

13    Q.  And the name of this school in Monterrey for

14    the business administration --

15    A.  It's -- I was in Monterrey Tech --

16    Q.  Monterrey Tech?

17    A.  -- and the University of Monterrey.  I studied

18    in both schools.

19    Q.  Do you plan to go back to school?

20    A.  Not -- no, not really.  Not for right now.

21    Q.  Okay.  Have you had any special training or

22    schools other than strictly classroom work?

23    A.  I don't understand that question, I think.

24    Q.  Okay.  Have you gone to any other sort of

25    training schools or vocation schools?  Any other

**9**

```
1   training beyond the education that you've described to
2   me?
3      A. No.
4      Q. Okay.
5      A. No, I haven't.
6      Q. Let me ask you the name of your mother. What
7   was her maiden name?
8      A. Carmen -- Maria del Carmen Solis.
9      Q. Solis?
10     A. Yes.
11     Q. And her family is from Brownsville?
12     A. She was born in Brownsville. Her family --
13  my -- they lived in Santa Maria from the Valley. Santa
14  Maria -- it's a town on Military Highway, a small town.
15     Q. About how far from here?
16     A. About 25 miles, maybe.
17     Q. Okay. Is that in the county here?
18     A. It's in Cameron County, yes, sir.
19     Q. Cameron County? All right. How about her
20  brothers and sisters? Any that live in Cameron County?
21     A. No. Her brother is -- works for the border
22  patrol in Laredo, and my sister is a psychologist. I
23  think she's in -- she got her Master's in Austin. I
24  don't know if -- she was working in either California
25  and Austin -- or Austin right now; I'm not sure.
```

**10**

```
1      Q. Okay. So not in the Brownsville area; is that
2   correct?
3      A. No, sir, not at this time.
4      Q. And how about cousins and aunts and so forth?
5   Does your mother have any here in the Cameron County
6   area?
7      A. Most of them are in Cameron County right now.
8      Q. Okay. Can you give me the last names of her
9   relatives here in Cameron County?
10     A. Yes.
11     Q. As best you can recall.
12     A. I can try.
13     Q. This is in case we have to pick a jury just so
14  I know what the names are.
15     A. Yes. There's -- okay. Okay, my -- my
16  grandmother's sister, Agripina, has most of her sons
17  here. Virginia Ward is one of them.
18     Q. All right.
19     A. Harry Ward is another one.
20     Q. Okay.
21     A. And, gee, who else could be around here? I
22  have another aunt. It's Esperanza Bettenhauser.
23     Q. Bettenhauser?
24     A. She's my grandmother's sister, another one.
25  She lives here in Cameron County.
```

**11**

```
1      Q. All right.
2      A. There's also Christina Ward, which if I'm not
3   mistaken, she lives here in Cameron County.
4      Q. Okay.
5      A. And let me see. Well, their husbands; I don't
6   even know if you need their names.
7      Q. No, I don't need their names. We've got the
8   last names; is that correct?
9      A. Yes.
10     Q. All right.
11     A. And I think that's about it.
12     Q. And your father is also named Jose Escudero, is
13  that right?
14     A. Yes, sir.
15     Q. And does your father have any close relatives
16  here in Cameron County, such as brothers and sisters?
17     A. No. No, sir.
18     Q. How about your dad? Do you know where he was
19  born?
20     A. Piedras Negras, Coahuila, Mexico.
21     Q. Okay. What is your Texas driver's license
22  number?
23     A. 06535715.
24     Q. 0653 --
25     A. 06535715.
```

**12**

```
1      Q. Okay, thanks. And your social security number?
2      A. 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.
3      Q. And how about your current employment? Where
4   do you work currently?
5      A. I'm in the construction business. I am
6   self-employed.
7      Q. In your self-employment, do you have a business
8   entity such as a corporation or a sole proprietorship?
9      A. It's E & E Builders, Incorporated.
10     Q. E & E?
11     A. E & E.
12     Q. E & D?
13     A. No, E & E.
14     Q. E & E, all right. E & E --
15     A. Builders, Incorporated.
16     Q. And is that a corporation established here in
17  Texas, the State of Texas?
18     A. Yes, sir.
19     Q. A Texas corporation?
20     A. Yes, it is.
21     Q. And who are the shareholders in E & E Builders,
22  Inc.?
23     A. Jose Escudero, Sr., and me, myself.
24     Q. You and your father; is that right?
25     A. Yes, sir, me and my father.
```

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 33 of 328

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 34 of 328

**13**

```
 1       Q.  Are you 50/50 shareholders?
 2       A.  Yes, sir.
 3       Q.  How long has E & E Builders, Inc., been in
 4  business?
 5       A.  Okay, we started off as a partnership.  It was
 6  Paisano Construction.  It was in 1998.
 7       Q.  And it was started as -- what was the name of
 8  that?
 9       A.  Paisano, P-a-i -- P-a-i-s-a-n-o.
10       Q.  Paisano Construction?  And where was that out
11  of?
12       A.  It's a Texas --
13       Q.  Okay.
14       A.  -- partnership.  And then in '90 -- right after
15  that -- I'm sorry.  Paisano started in 1997.  I
16  apologize for that.  And in '98 it was incorporated
17  into E & E it was made a corporation.
18       Q.  So then it became E & E Builders in 1998; is
19  that correct?
20       A.  Yes, that's correct.
21       Q.  Are you involved in any other businesses
22  besides E & E currently?
23       A.  No.  Well, not really.  I help -- I help a
24  friend in an auction -- auction services, and, you
25  know, I get commission out of it and some kind of
```

**14**

```
 1  partnership, but it's not, you know -- it's Unlimited
 2  Auction Services, really.
 3       Q.  Is that the name of it, Limited Auction
 4  Services?
 5       A.  Unlimited Auction Services.
 6       Q.  Unlimited, all right.  How long have you been
 7  involved with your friend in Unlimited Auction
 8  Services?
 9       A.  A little bit over two years.
10       Q.  And what is your friend's name?
11       A.  Jesse Ramirez.
12       Q.  What are your duties or what is your
13  involvement with Unlimited Auction Services?
14       A.  Well, let's say, sales mainly.  And I help him
15  with my people to clean up places that we buy, and --
16  you know, old hotels and -- everything started when I
17  demolished a hotel here in Brownsville, and -- and
18  that's when we became involved in this together.
19       Q.  All right.
20       A.  But mainly sales and -- and to organize
21  whatever auction we have.
22       Q.  In your connection are you a partner to
23  Mr. Ramirez?
24       A.  Yes.  Well, yeah, in a way.  It's not -- yes,
25  in a way I am a partner.
```

**15**

```
 1       Q.  Do you want to qualify that in any way?  You
 2  say "in a way."  What do you mean by that?
 3       A.  The thing is, it's not registered -- I'm not
 4  registered as partnership legally right now -- yet.
 5  That's -- you know, we haven't done it.
 6       Q.  All right.  And you stated that your function
 7  primarily is to clean up sites; is that correct?
 8       A.  No.  To -- I sell -- I help get customers --
 9       Q.  All right.
10       A.  -- and run the -- the auctions where we have
11  it -- help him.
12       Q.  What do you do to get customers?  Can you
13  explain that to me briefly?
14       A.  Yeah.  For example, I'm a builder, you know,
15  and --
16       Q.  Yes, sir.
17       A.  -- the three or four auctions that we have up
18  to now -- up to now has been hotels that -- that I
19  remodeled.  So since I'm involved with them -- with the
20  owners of the hotels, we -- you know, we auction
21  whatever old furniture they have or sometimes we buy
22  it.  That's how I get them mainly.  The customers that
23  I get are like that, mainly in the hotel business,
24  and --
25       Q.  Anything besides old furniture that you arrange
```

**16**

```
 1  for you and your partner to auction off?
 2       A.  We've auctioned the Kmart here in Brownsville.
 3  We -- we kept all the racks and, you know, desks,
 4  everything inside, and we auctioned them, also.
 5       Q.  It sounds like -- correct me if I'm wrong --
 6  whatever looks like a good opportunity, if you can make
 7  the right deal, you'll get the stuff, and you'll
 8  auction it; is that correct?
 9       A.  We try to buy it.  If it's not possible, we
10  auction for the -- for the customer, and we -- we
11  charge a percentage of it, yes.
12       Q.  Do you have any current property that you've
13  bought at this particular time that's going to be put
14  up for auction?
15       A.  No, we don't have anything yet.
16       Q.  Okay.  Does the partnership maintain an income
17  tax return?
18       A.  Yes, it does.  Well, I -- I get -- whenever I
19  get paid -- whatever I get paid on my commission, I
20  declare as -- you know, under mine, and the company has
21  their own income tax and everything.
22       Q.  And let me ask you about that just briefly.
23  How are you paid by commission?  What sort of
24  percentage do you get?
25       A.  Sometime -- most of the time I get 10 percent
```

17

```
1    of whatever the sales.  The company makes around 20,
2    25, 30.  It depends on the negotiations with the
3    customer.
4         Q.  And do you declare that income on your personal
5    income tax return?
6         A.  Yes, sir, we've done it.
7         Q.  Okay.  Any other businesses that you're
8    involved with currently?
9         A.  That's it.  Construction and that.  Mainly
10   construction.  That's -- this is only like a side
11   thing, you know.
12        Q.  I see.  Let me ask you about E & E Builders,
13   Inc.  That business maintains a loss and -- I mean,
14   income and loss statement or profit and loss statement?
15        A.  Yes, it does.
16        Q.  Okay.  How are you reimbursed in connection
17   with your duties at E & E Builders, Inc.?
18        A.  I get a salary, and then we divide profits at
19   the end of the year --
20        Q.  All right.
21        A.  -- or losses.
22        Q.  What is your current salary at E & E Builders,
23   Inc.?
24        A.  It's $33,000, more or less, yearly.
25        Q.  That was for the year of 2000?
```

18

```
1         A.  2000, yeah, I received 33,000 or close to it.
2         Q.  You're saying an average -- do you have a set
3    salary, or is your salary dependent upon something
4    else?
5         A.  I have a set salary.  That's the main thing.
6    The company pays me.  I'm the manager, let's say, in
7    this particular case, the corporation, and -- like --
8    like, the secretary or anybody else, you know.
9         Q.  Okay.  And you get a bonus, annual bonus; is
10   that correct?
11        A.  Yes, I do.  We get a bonus.  The company pays
12   me a bonus if we finish a job on time, whatever jobs
13   I'm running.  And, yeah, yearly bonus -- if there was
14   profits in the company, I get -- I get a bonus.
15        Q.  What is the bonus calculated on?  How do you
16   figure that out?
17        A.  Well, we try -- we leave a percentage for the
18   company for operation when -- when there is some, and
19   the rest we divide it, my father and me.
20        Q.  50/50; is that right?
21        A.  Yes.  We lost -- in 2000 we lost money and '99,
22   too.  '99 and 2000 have been losses.
23        Q.  Say that again.
24        A.  I've been -- in '99 there was losses in the
25   company and 2000, too -- also.
```

19

```
1         Q.  Did you receive a bonus in 1999?
2         A.  No.  No, I did not.
3         Q.  Did you receive a bonus in the year 2000?
4         A.  We haven't closed 2000.  I asked for an
5    extension.  We're looking into everything.
6         Q.  Do you anticipate receiving a bonus in the year
7    2000?
8         A.  No, sir.  Like I said, there was -- we lost
9    money in 2000.
10        Q.  Do you have an accountant that handles your
11   financial affairs with E & E Builders, Inc.?
12        A.  It's -- he's a bookkeeper.  He's not a
13   registered CPA.  He's a bookkeeper, and, yeah -- yes, I
14   do.
15        Q.  What is his name?
16        A.  Bob Peaster.
17        Q.  Spell that last name.
18        A.  P-e-a-s-t-e-r.
19        Q.  s-t-e-r?
20        A.  Yes.
21        Q.  Is he in Brownsville?
22        A.  Yes, sir.  Oh, he's in McAllen.
23        Q.  McAllen?
24        A.  Yeah.
25        Q.  Anybody else besides Mr. Peaster that handles
```

20

```
1    the books or financial data with respect to E & E
2    Builders, Inc.?
3         A.  Not at this time.
4              MR. BENTON:  Is it Beaster or Peaster?
5              THE WITNESS:  Peaster with a "P."
6              MR. BENTON:  With a "P" as in Paul?
7              MR. GENDRY:  Beaster.
8              THE WITNESS:  Peaster, yeah.
9              MR. BENTON:  As in boy?
10             THE WITNESS:  No, "P" as in Paul.
11             MR. BENTON:  That's what I thought,
12   Peaster.
13             MR. GENDRY:  Okay, I'm sorry.
14             THE WITNESS:  Peaster, yeah.
15             MR. GENDRY:  You were right, Barry.
16   Thanks.
17        Q.  Anybody else with -- that handles the -- not
18   with but that handles the financial data with respect
19   to E & E Builders, Inc.?
20        A.  Not at this time.  There's -- I mean, he's the
21   only one handling my --
22        Q.  Okay.  And direct your attention to Paisano
23   Construction, who was the bookkeeper for Paisano
24   Construction?
25        A.  The same person, Mr. Peaster.
```

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 36 of 328

21

```
 1       Q.   What is your position at E & E Builders, Inc.?
 2  I know you mentioned manager.
 3       A.   I am a vice president in the corporation.
 4       Q.   All right.  And your dad, I guess, is
 5  president?
 6       A.   Yes, sir.
 7       Q.   Does the corporation have any other officers?
 8       A.   No, sir.
 9       Q.   What are your duties as -- strike that.
10            You mentioned earlier in response to a
11  question -- maybe inadvertently -- you said that you
12  were the manager of E & E?
13       A.   Well, I'm the one taking care of E & E right
14  now.  My father is in Mexico.
15       Q.   Okay.  So that makes you the current manager;
16  is that correct?
17       A.   I run the company, yes, sir --
18       Q.   You run the company?
19       A.   -- since 19 -- well, he left last year -- in
20  '99 he left.
21       Q.   Okay.  Where did your dad go to in Mexico?
22       A.   He's working in Congress in Mexico.
23       Q.   Okay.  Is he a member of the Congress or --
24       A.   He's a member of the Congress, yes.
25       Q.   And what is his official title?
```

22

```
 1       A.   He's a congressman.  He's -- he's in the -- I
 2  don't know what he explained to you today, and -- well,
 3  he's for -- he's for the State of Mexico, Estado
 4  Mexico, and he had different commissions.  I mean, I --
 5  I really don't know how it operates over there.  I
 6  don't know.  And --
 7       Q.   I don't either, so that's --
 8       A.   Well, he's in --
 9       Q.   Is it an elected office?
10       A.   It was -- it's an appointed --
11       Q.   Okay.
12       A.   But it has to do with elections, I guess.
13       Q.   Tell me, if you would, sir, your duties in
14  running E & E Builders, Inc.  What do you do?
15       A.   I supervise job sites.  First of all, let's
16  go -- I get jobs first.  I need to sell, and then I --
17  my main duty was to supervise the job sites.
18            And now -- with my father it has been
19  always off and on.  He lives over there; he lives here
20  and there, you know, and -- but, anyway, mainly I've
21  been taking care of the company most of the -- my
22  father was more in administration, and -- and I was in
23  the operation of the company.
24       Q.   Does your father maintain a residency here in
25  the U.S.?
```

23

```
 1       A.   Yes, sir.
 2       Q.   Does he have a home here?
 3       A.   Yes.  My mother lives here.  She's a teacher.
 4       Q.   Okay.  Where does your mother teach?
 5       A.   Los Fresnos High School.
 6       Q.   Has she taught at any other schools?
 7       A.   She taught in Mexico.
 8       Q.   In Cameron County?
 9       A.   Oh, I don't think so, no.  Maybe when she was
10  younger; I don't know.
11       Q.   With E & E, then, you're involved in sales; is
12  that correct?
13       A.   Sales and the -- well, the operation of the
14  company.
15       Q.   All right.  What sort of construction is E & E
16  involved in?
17       A.   Commercial mainly right now.  I don't know
18  if -- do we need background from -- do you want me to
19  explain it to you?
20       Q.   Why don't we start currently.  What sort of --
21  well, yes, that sounds like -- if you can explain to me
22  what E & E has done up to the current date.
23       A.   I started the company mainly, and I was --
24  well, I was building houses, residential first, and I
25  would do that with -- with a three -- four-man crew.
```

24

```
 1  It was three guys and me.  I would do them -- build
 2  them myself.
 3            And then from there we got to commercial,
 4  and that's when we incorporated the company, and that
 5  was when E & E was born, let's say.
 6            And our main -- main projects have been
 7  hotels.  We've done Orthopedic Clinic.  We've done real
 8  estates -- real estate office -- offices, remodeled
 9  hotels, demolished hotels and build new ones and
10  condominiums.  I'm working on some condominiums on
11  South Padre Island at this time, also.
12       Q.   All right.
13       A.   So we're focused on commercial mainly.
14       Q.   So in '98 it appears that that's about when you
15  went mostly commercial; is that correct?
16       A.   Yes, that's correct.
17       Q.   Currently, any building projects going on right
18  now?
19       A.   I have a hotel, the Quality Inn Hotel on South
20  Padre Island, in addition to a remodeling -- to a job
21  we did in Brownsville, also -- I mean, Harlingen.  It
22  was a gatehouse for Days Inn.  We have a house at South
23  Padre Island, also, and that's it.
24       Q.   When you say that you're the contractor
25  building Quality Inns, do you qualify yourself as the
```

25

```
1    general contractor?
2        A.  I am the general contractor.
3        Q.  You're the general contractor?  Is that
4    generally the nature of the duties of E & E to be the
5    general contractor on these commercial projects?
6        A.  We combine both.  Sometimes we sub out, and
7    sometimes we do the whole job ourselves.
8        Q.  So as general contractor you might be in charge
9    of the site?  You may hire in subs or you may have --
10   on the other hand, you may have job sites where you
11   have your own employees, and you do all the work?  Is
12   that what you're saying?
13       A.  When I'm a general contractor, yes, I hire all
14   the subs.  We manage the -- the work, the monies,
15   everything.  And when we sub out, we -- we have some
16   employees at certain jobs.  We do a lot of masonry
17   work.
18       Q.  Okay.  And how many employees does E & E have?
19       A.  We do everything as contract labor, sir.
20       Q.  You don't have any employees?
21       A.  Well, three guys.
22       Q.  Three guys?
23       A.  Yeah.
24       Q.  Okay.
25       A.  And --
```

26

```
1        Q.  Well, how many -- if you -- I don't want you to
2    guess at anything during the deposition, but how many
3    independent contractors would you have access to?
4        A.  You mean subcontractors?
5        Q.  Subcontractors, right.
6        A.  Maybe 40.
7        Q.  Okay.  The three -- I'm sorry.
8        A.  Sorry.  I just wanted -- not all work in one
9    particular job.  That's how much in our list of
10   subcontractors --
11       Q.  I understand.
12       A.  -- is more or less what we have.
13       Q.  The three employees currently employed, what
14   are their names?
15       A.  There's Raymundo Medina.
16       Q.  Is he here in Brownsville?
17       A.  Yes.  Well, no, he lives in Weslaco.
18       Q.  Okay.
19       A.  My offices are in Mercedes.
20       Q.  All right.  Who else?
21       A.  Jorge Medina.  It's his brother.  Hector
22   Trevino.  And we just got rid of our secretary.  We're
23   getting a new one.  I don't know if you want her name.
24       Q.  You don't know that yet?
25       A.  Huh-uh.
```

27

```
1        Q.  Any of your employees that you mentioned, are
2    they from Brownsville?
3        A.  No.  The closest is Hector Trevino, and he's
4    from Rio Hondo.
5        Q.  Were any of your employees witnesses or have
6    knowledge of this particular accident that we're here
7    for today?
8        A.  Raymundo was there.
9        Q.  Raymundo.  And what's his last name?
10       A.  Medina, M-e-d-i-n-a.
11       Q.  Okay.
12       A.  Jorge, his brother, was outside.  He was -- he
13   was -- you know, they all know about the accident, of
14   course.
15       Q.  We've talked about your work with E & E and
16   before that in the construction business.  Have you had
17   any other past employment since you've gotten out of
18   school?
19       A.  I was -- I had -- not really.  I worked in
20   Mexico -- in Monterrey with the Hotel Monterrey.
21       Q.  What did you do there?
22       A.  We managed -- I helped put up a -- a sports
23   book, the first legal one in Mexico and in the State of
24   Nuevo Leon.
25       Q.  What is it?
```

28

```
1        A.  Legal -- legal betting on sports --
2        Q.  Oh, I see.
3        A.  -- racehorses and all that -- racehorses and
4    dogs.  And then I was involved in a -- as a salesperson
5    in aluminum and glass window, also, for a while when I
6    was studying.
7        Q.  While you were in school?
8        A.  Aluminum and glassware.
9        Q.  Was that in Mexico, as well, right?
10       A.  Yes.
11       Q.  And when did you leave school?  What year was
12   that?
13       A.  '95, if I'm not mistaken.  I would go on and
14   back and in and -- about '95 or '94.
15       Q.  Any other work employment that you've had up to
16   the current date?
17       A.  No.
18       Q.  Okay.
19       A.  I painted some -- yeah, well, here in the
20   Valley, in Cameron County.  I don't remember when I --
21   in '97 or -- '97, yeah.  I painted some airplanes at
22   Bayview Airport, me, myself.
23       Q.  Currently do you have any restrictions from
24   work, physical restrictions from work?
25       A.  I don't understand that.
```

29

1      Q.  Currently are you in any way physically unable
2   to do your work?
3      A.  Yes.  Yes, I am.
4      Q.  How is that?
5      A.  Like I said, I supervise the jobs sites.  Most
6   of them are over three stories.  You know, I have a
7   hard time going up and down the stairs and check the
8   upper floors.  The sites are very rough, and, you know,
9   we -- we do it since the -- since the foundation --
10  there's -- the land is pretty uneven, you know, the
11  territory.  It's just -- since the accident I got
12  limited now.  I can't go back to doing what I was
13  doing, building the houses myself.
14     Q.  When did you last build homes for yourself?
15     A.  On '97.
16     Q.  1997?
17     A.  1997.
18     Q.  Okay.
19     A.  Probably the first one's in '98 I finished
20  another one.
21     Q.  And this accident occurred in '99; is that
22  correct?
23     A.  Yes, that's correct.
24     Q.  In connection with your duty as a supervisor or
25  manager building commercial sites or buildings, have

30

1   you had to hire anyone to assist you to do any of that
2   because of this accident?
3      A.  Yes, we hired Hector.  That was the last person
4   we hired.
5      Q.  When did you hire Hector?
6      A.  I'm not 100 percent sure, around the first
7   trimester of '99.  I mean, '99 -- the first -- about
8   June, July, maybe second -- of '99.
9      Q.  And what's his last name, again?
10     A.  Trevino.  Hector Trevino.
11     Q.  Trevino?  And what are his duties?
12     A.  He's superintendent, job superintendent.
13     Q.  Before this accident for which we're here
14  today, have you ever --
15     A.  I'm sorry, sir, to interrupt you.  I hired also
16  Eric Gutierrez.  He worked for me for a little over
17  eight months.
18     Q.  Eric Gutierrez?
19     A.  Yes.
20     Q.  He's been with you about eight months?
21     A.  He was with me for about eight months.  We got
22  rid of him.
23     Q.  He no longer works with you?
24     A.  I mean -- I didn't mean it that way, no.
25     Q.  He no longer works with you.  Why did you dump

31

1   him?  Why did you get rid of him?
2      A.  No, I didn't -- well, I put Hector -- I put
3   Hector in that big job that we -- he was -- Hector did
4   a better job than him.
5      Q.  Has your job volume since the date of this
6   accident, comparatively speaking, is it any greater or
7   less than it was before the date of the accident?
8      A.  It's a new company, E & E.  And on '98 -- at
9   the end of '98, we, you know, were closing some
10  projects.  At the beginning of '98 -- about '99, that's
11  when we closed a lot of them or some of them, good
12  ones.  And -- and then that's when the accident
13  occurred, and my volume has decreased; yes; yes.
14          Last -- last year, '98 and '99, I built --
15  I did probably ten jobs.  And since I've -- I'm still
16  working one of them.  But since then, no, I only got
17  three for this year.  It's decreased.
18     Q.  All right.  You've signed on -- let me see if I
19  can sort that out.  You've signed on for the year 2001
20  three jobs; is that correct?
21     A.  I've signed three jobs, that's correct.
22     Q.  What are they?
23     A.  Quality Inn Hotel, gatehouse for Days Inn Hotel
24  and a residence at South Padre Island.
25     Q.  And any other jobs that you're bidding on

32

1   currently that have not been signed?
2      A.  Yeah, we're bidding on a -- I believe it's a
3   Best Western in Rio Grande City.  There's another one
4   in San Benito.  And we have a big project for the
5   Island.  We're looking for investors.  We haven't
6   signed -- I mean, we're working on it.
7      Q.  What is the big project, if you can tell me,
8   that you're planning for the Island?
9      A.  It's a 21 -- 21-unit -- 21 condominiums.  It's
10  a ten-story building.
11     Q.  Do you own the property, the land?
12     A.  No.  It's owned by some people from Monterrey.
13     Q.  All right.  So the condos that you're wanting
14  to do a job on South Padre Island, that hinges on
15  getting investors; is that correct?
16     A.  Getting investors, yeah.  Somebody who will be
17  interested in -- we have the land there as collateral
18  by owner.  He's willing to put that.  All we need is
19  the name of somebody that would back up the
20  construction.
21     Q.  You feel confident you can handle that job?
22     A.  With my superintendents, yes.  I would have --
23  I would have to have two there.
24     Q.  Any other jobs that you're currently bidding
25  on?

Case 1:00-cv-00193 Document 24 Filed in TXSD on 10/19/2001 Page 39 of 328

33

1    A.  No, sir.

2    Q.  Any other jobs that you're currently interested

3  in?

4    A.  No, not -- not for right now.

5    Q.  Have you ever done any work for the Santa Rosa

6  Independent School District?

7    A.  No, sir.

8    Q.  The lettering on the side of the ladder, which

9  is the subject of this litigation, do you take that to

10  the -- coming from the Santa Rosa Independent School

11  District?

12    A.  Excuse me?

13    Q.  Yes, sir, let me repeat my question.

14        The lettering on the side of the ladder

15  involved in this litigation -- I think it says SRISD --

16    A.  Uh-huh.

17    Q.  -- do you take that to be from the Santa Rosa

18  Independent School District?

19    A.  We've discussed it, and we think -- we think it

20  is, yeah.

21    Q.  Okay.  Have any of your -- strike that.

22        Any of your employees at the time of this

23  accident work for the Santa Rosa Independent School

24  District?

25    A.  No, sir.

34

1    Q.  To your knowledge, any former employees that

2  you have had ever work at the Santa Rosa Independent

3  School District?

4    A.  Not to my knowledge.

5    Q.  Do you know anyone in connection with the

6  maintenance department of the Santa Rosa Independent

7  School District?

8    A.  No.

9    Q.  The ladder involved in this particular

10  accident, had you ever seen that ladder before the

11  accident?

12    A.  I don't recall seeing that particular ladder.

13  We have a whole bunch of ladders at the company.

14    Q.  Okay.

15    A.  They're all -- most of them are orange like

16  that one (indicating).

17    Q.  This one is what color?

18    A.  Orange, orange reddish.

19    Q.  Looks reddish orange to me.

20    A.  Yeah.

21    Q.  All right.  What brand of ladders does your

22  company, E & E, currently have?

23    A.  Good question.  I couldn't tell you.  I don't

24  know exactly.  I don't remember the names.  I mean,

25  there's -- I think there's probably a couple of Bauers.

35

1  There's --

2        THE WITNESS:  Like the one you have down

3  there, Barry, we have that brand, also.  I've seen it

4  around.

5    Q.  All right.  At your company you've seen some

6  Bauer ladders; is that correct?

7    A.  I couldn't tell you, sir.  Really, I -- I don't

8  recall.  I don't know.  I know that there's ladders.

9  If I -- I can call one of the job sites and ask him

10  what brands we have, you know, if that would help.

11    Q.  Who is in charge of purchasing ladders for

12  E & E?

13    A.  Normally the superintendents do that.  Whenever

14  they need a ladder, they go and buy it.  They call me

15  or the office, and they get authorization to get

16  whatever they need, in the case of a ladder, and we buy

17  it.  Sometimes we order it from our suppliers.  I need

18  to know, but they are the ones that order them, the

19  superintendents at the job sites.

20    Q.  All right.  Before this accident, had you ever

21  heard of the Bauer Ladder Company or Bauer Ladder

22  Corporation?

23    A.  No.

24    Q.  Before this accident, had you ever used a Bauer

25  ladder?

36

1    A.  Probably.

2    Q.  And before this accident, had you ever had any

3  problems with any ladders that may have been Bauer

4  ladders?

5    A.  No, we've never had a problem.  We -- we're

6  very specific on the safety on the job sites getting

7  inspections and all that stuff.  Of course, we don't

8  use aluminum ladders, and we don't use wood ladders.

9  All we do is buy fiberglass ladders.  That's all we

10  use.

11    Q.  So all that E & E uses are fiberglass ladders;

12  is that correct?

13    A.  That's correct.

14    Q.  And why don't you use wooden?

15    A.  Most of the time they're weak.  OSHA does not

16  permit them; neither aluminum, I don't think.

17    Q.  All right.  And that was going to be my next

18  question.  Why do you not use aluminum ladders?

19    A.  Because they're -- if I'm not mistaken, they're

20  not permitted because they're -- they -- they conduct

21  electricity.

22    Q.  All right.

23    A.  I don't know if I said it right, but --

24    Q.  That's your understanding, anyway?

25    A.  That is my understanding, yes.

37

1      Q.  Okay.  And is it your understanding that OSHA
2   prohibits you or restricts you from using wooden or
3   aluminum ladders at your job site?
4      A.  It's my -- the main -- here at -- when we get
5   ladders, well, it's OSHA approved.  That's really the
6   main thing.
7      Q.  Is that the basis for your getting ladders for
8   E & E being something that is OSHA approved?
9      A.  It's the main thing, yeah, because we get
10  inspections by them.
11     Q.  Okay.  Would it be fair to say, then, you, of
12  course, want to be in compliance with OSHA with regard
13  to the type of ladder that you have?
14     A.  Yes.
15     Q.  Before this accident had anyone, be it somebody
16  from OSHA or anyone else, ever told you that a Bauer
17  ladder was a ladder not to use at any of your job
18  sites?
19     A.  No.  We have never mentioned any brands of
20  ladders, really.  Never touched that.
21     Q.  Before this accident had your company, E & E,
22  or any business that you've been associated with, had
23  any problems with ladders?
24     A.  We've never had a problem before.
25     Q.  As I understand it, according to your pleading,

38

1   the date this accident occurred was on May the 10th,
2   1999; is that correct?
3      A.  That is correct.
4      Q.  What time of the day did the accident occur?
5      A.  Around, 5:00, 5:30, 6:00.  Between 5:00 and
6   6:30, somewhere around that time.
7      Q.  P.M.?
8      A.  P.M., yes, sir.
9      Q.  Do you recall what day of the week it was?
10     A.  Monday.
11     Q.  And where did the accident occur?
12     A.  At the property that is owned by my mother.
13  It's on Military Highway, Cameron County, Santa Maria.
14     Q.  Do you know the address of the property owned
15  by your mother where the accident occurred?
16     A.  I don't know the physical address, no, I don't.
17     Q.  What sort of property was it?  Can you describe
18  it?
19     A.  Yes.  It's a house, and it was turning into
20  three apartments, to be rented to the Housing
21  Authority.
22     Q.  Did you have any ownership in the premises?
23     A.  No, I don't.
24     Q.  Did you at that time?
25     A.  No, I didn't.

39

1      Q.  Have you ever?
2      A.  No.
3      Q.  And where did your mother get that property?
4      A.  It was inherited to her by her mother.
5      Q.  When did she inherit it?
6      A.  I couldn't tell you.
7      Q.  Inherited from her mother -- do you know about
8   when her mother passed away, or has that been a long
9   time ago?
10     A.  It's been a long time ago.
11     Q.  Did you go over to the property just before the
12  accident happened with -- accompanied by anyone?
13     A.  Yeah, with -- there was workers with me.
14     Q.  Okay.  And who were the workers that were with
15  you?
16     A.  Jorge Medina was there.  Raymundo also was
17  there.  There was -- there was a friend, architect,
18  Flavio, who was helping us at that time.
19     Q.  Frank Flavio?
20     A.  No, a friend.
21     Q.  Oh, a friend.
22     A.  He's from Mexico.  He was helping us.  He just
23  came for a few months to help us.  He's an architect,
24  and he was there at that time.  There was a couple more
25  guys out there working on something.

40

1      Q.  What is Flavio's last name?
2      A.  Correa.
3      Q.  C-o-r-r-e --
4      A.  e-a.
5      Q.  You've mentioned three:  Jorge Medina,
6   Raymundo -- what's his last name?
7      A.  I got -- yeah, they were -- they got with me
8   there.
9          MR. BENTON:  Medina.
10         MR. GENDRY:  Medina?
11     A.  Brothers.  They were brothers.  There was a
12  couple more guys, sir.  I don't remember their names.
13  Probably they're still working around there on some of
14  the jobs.  I don't know.  And also my partner, Jesse,
15  got there that day, later.
16     Q.  Jesse who?
17     A.  Jesse Ramirez, my partner.
18     Q.  Ramirez?
19     A.  Yeah.
20     Q.  Was Jesse already on board as an employee of
21  yours at the time of this accident?
22     A.  No, he's never been an employee of mine.  He's
23  a friend and my partner on the -- on the auctions.
24     Q.  Oh, that's right.  I'm sorry.
25     A.  We -- we stored some goods there from that

**41**

1  company on that -- on that property. Well, not that
2  property; it's next to it. It's an old warehouse.
3      Q. Do you own the warehouse next door?
4      A. No. All the property is owned by my mother.
5      Q. Does she own the warehouse next door?
6      A. Yes.
7      Q. When you went to your mother's property, did
8  you go by yourself, or were you accompanied by these
9  gentlemen that you've just named?
10     A. Probably one of them was with me in a truck
11 when we got there. The rest of them got there on their
12 truck -- on their cars.
13     Q. Was it your purpose, you and your friend and
14 your employees at that time, to go there for a
15 particular purpose?
16     A. Yeah, we were going to work on the property.
17     Q. Okay. And were you working for pay?
18     A. Yes. We get -- I get very good -- well,
19 normally we cover only the expenses for the employees.
20 That's what I charge my mother, and we get a good deal
21 on the rent on the warehouse.
22     Q. And specifically what chores or what job were
23 you going to do the day of the accident?
24     A. There was some painting to be done. There was
25 some doors to be adjusted, light fixtures to be

**42**

1  adjusted, cleanup.
2          One of the apartments had gotten vacant,
3  and we were fixing -- we were going to fix it up. I
4  was thinking for a while to renting one of them.
5  That's what we -- we normally help my mother with --
6  with those apartments. We fix them up.
7      Q. You were thinking of renting one for yourself?
8      A. Yes, from my mother.
9      Q. For your mother, I see.
10     A. Well, no, for myself from my mother.
11     Q. Yes, sir. And there were three units? Were
12 the other two units rented out?
13     A. I believe so, yeah. At that time that's the
14 one that needed work. That's why we were in there.
15     Q. What had you been doing earlier that day?
16     A. We had been cleaning outside. It was -- it was
17 almost -- we got there at almost -- you see, since we
18 work, that's when we got there at that time. It was
19 after hours --
20     Q. All right.
21     A. -- so we don't have -- we don't have that
22 much -- we take care of our work first. And we had
23 cleaned up, and then -- we were looking around,
24 actually, to see what had to be done.
25     Q. Let me ask you: Before you got to your

**43**

1  mother's at 5:00 or 6:00 p.m., what had you done that
2  morning -- in the afternoon before you got there?
3      A. I would run up and down all day. I don't
4  know -- I don't know where I was.
5      Q. Okay. You think you probably were working
6  somewhere; is that correct?
7      A. I definitely was working somewhere.
8      Q. And had you had any of your employees or anyone
9  else under your control or authority over at your
10 mother's before you arrived at 5:00 to 6:00 p.m.?
11     A. Not that I recall. Probably they all got there
12 maybe 20 minutes -- the guys that got -- the earliest
13 that they got there was 20 minutes before me.
14     Q. Did you take any equipment with you to your
15 mother's?
16     A. We had some hammers and stuff like that in our
17 trucks. But most of -- we stored there a lot of
18 equipment and material at that -- at the property next
19 to it, the warehouse.
20     Q. All right. When you say you store equipment
21 next door at the warehouse, do you mean equipment used
22 in your construction business?
23     A. Yes, sir. And also goods for the auction
24 company.
25     Q. All right. In storage of equipment in the

**44**

1  warehouse, any place else that you stored equipment?
2      A. In my office.
3      Q. At your office.
4      A. I have a warehouse at my office.
5      Q. Did I get your office address?
6      A. No, I don't think you did, sir.
7      Q. What is it?
8      A. 216 North Texas Avenue.
9      Q. Okay. How long have you been at that office?
10     A. About two years.
11     Q. You had that office at the time of this
12 accident?
13     A. Yes.
14     Q. And is it a commercial building, or can you
15 describe it to me?
16     A. Yes. It's -- the property -- it's an old gas
17 station that's closed up now. We have -- this
18 building, it's behind -- it's on the back -- on the
19 rear part of the property, and it's made out of metal.
20 It's a metal building we conditioned for offices. So
21 half of it is office, and the other half is a little --
22 we use storage -- for storage.
23     Q. At your office did you store ladders?
24     A. Yes, we do. Yes, I did and I do, yes.
25     Q. At the time of the accident, did you?

45

```
1        A.  Yes.
2        Q.  You currently do, is that right?
3        A.  Yes.
4        Q.  And at the warehouse next to your mother's
5    property, did you store ladders?
6        A.  Yes, we did.
7        Q.  And do you still?
8        A.  Yes, we do.
9        Q.  Okay.  Before you used the ladder involved in
10   this case, what had you been doing at your mother's?
11       A.  Looking around to see what needed to be done so
12   I can organize people to start working.
13       Q.  Okay.  What did you decide needed to be done?
14       A.  Well, there was some painting involved.  There
15   was -- we had to do some painting.  And that particular
16   room where I was working on -- when I started working
17   there, was just mainly the light fixture.
18               The screen door at the entrance was all,
19   you know, crooked.  Also, the doorknob there had to be
20   changed.  There was, you know, several stuff.  The
21   drawers at the kitchen needed to be -- kitchen cabinet
22   needed to be adjusted, just stuff like that.
23       Q.  When you arrived at your mother's to do this
24   work, did you have a ladder with you on your truck?
25       A.  No, I didn't.
```

46

```
1        Q.  Did any of your employees bring a ladder with
2    them?
3        A.  No, not that I know of.
4        Q.  Okay.
5        A.  I don't recall.
6        Q.  And when you got in the apartment where you
7    were to do the work, were there any ladders in there?
8        A.  Not that I -- no, I don't remember, sir.  I do
9    not remember, really.  Normally, I ask my workers to
10   get me what I need, and I asked for a ladder, and they
11   brought me a ladder.
12       Q.  All right.  Who did you ask for a ladder to be
13   brought to you?
14       A.  Raymundo, if I'm not mistaken.  He's the one
15   that brought me a ladder.
16       Q.  And he brought you the subject ladder in this
17   case; is that correct?
18       A.  Yes, he did.
19       Q.  Where did he get the ladder?
20       A.  It could have been there.  I don't recall.  I
21   don't know.  We need to ask him, I guess.  If it was
22   there, it was outside or it was in the warehouse.  I
23   don't know.
24       Q.  Have you ever asked Raymundo where he got the
25   ladder?
```

47

```
1        A.  No, not really.
2        Q.  Following this accident or following the
3    institution of this initiation of this lawsuit, you've
4    never asked Raymundo where he got the ladder?
5        A.  No.  That was a question that Barry asked me
6    the other day, and I forgot to ask him, really.  I
7    mean, it was there.  I know it was part of our
8    equipment.  I don't know if it's -- I need to explain,
9    more or less, maybe --
10           MR. BENTON:  Well, no, he'll ask you.
11   He'll bring it up.
12           In fact, what I'd like you to do, Tom, is
13   when you reach a natural breaking point, say, in the
14   next 10, 15 minutes, I'd love to just go --
15           MR. GENDRY:  Why don't we take a break
16   right now, and then I'll ask you some questions about
17   the ladder.
18           MR. BENTON:  Okay, I appreciate it.
19           THE VIDEOGRAPHER:  Off the record.
20   (Brief recess taken from 2:00 p.m. to 2:16 p.m.)
21           THE VIDEOGRAPHER:  We're back on the
22   record.
23       Q.  I was asking you questions concerning where the
24   ladder came from, and I think it's my understanding
25   that you don't know where it came from; is that
```

48

```
1    correct?
2        A.  It was on the property.  I don't know exactly
3    where.
4        Q.  So we established that, in fact, it was on the
5    property when you and your friend and employees got to
6    your mother's property; is that correct?
7        A.  Yes.
8        Q.  Have you spoken with your mother since this
9    accident about where the ladder came from?
10       A.  Not really.  Well, probably mentioned it a
11   couple of times.  She knew that it was -- that we had
12   put it there some -- sometime.
13       Q.  When you say that your mother knew that -- did
14   you say you had put it there?
15       A.  Well, either me or -- well, E & E Builders or
16   Paisano put it there, the workers.  See, we clean up --
17   normally how this -- let me explain to you how we get
18   there.  We finish a job, and we clean up everything,
19   and we send -- we send it to that place.
20       Q.  So as I understand it, there is a possibility
21   that ladder may have come from a cleanup site and been
22   placed in the warehouse; is that correct?
23       A.  That is correct.
24       Q.  All right.  And when I say "a cleanup site,"
25   that would be one of your E & E job cleanup sites?
```

49

1    A.  That is correct.

2    Q.  Have you considered that possibly this ladder
3  was a ladder that had been discarded or thrown away by
4  someone?

5    A.  No.

6    Q.  Why not?

7    A.  Because we were using it at the job site.  We
8  had, you know -- I mean, it was -- it was being used.

9    Q.  When you are -- strike that.  When you take on
10  a job of cleaning up a site, are you given permission
11  to take the property and debris that is on the site?

12    A.  I am the one that controls that.  I am the
13  general contractor.  We call and we -- all the subs
14  need to remove their equipment and their debris or
15  whatever, and there is a time that comes that, you
16  know, we can't wait anymore, and whatever is there,
17  they come and pick it up later or something, whatever.

18        Yeah, but we remove most of the equipment
19  and everything that is left there.  Normally we have
20  storages where we -- where all this gets stored during
21  the construction period.

22    Q.  Does E & E maintain any sort of safety manual?

23    A.  Not really.  We go by whatever books I have
24  from -- information I have from OSHA.  We have, you
25  know, scaffolding and ladders and harnesses, the

50

1  regular stuff, yes.  Yes, I do -- I have a list of the
2  items that need to be taken care of and taken into
3  consideration doing the jobs.

4        For example, extension cords that have
5  been -- that have been cut with the black tape, refixed
6  or something, that kind of stuff, we don't accept
7  there, and no wood ladders, no aluminum ladders.
8  People need to be with their boots, regular stuff,
9  yeah.

10    Q.  Let me ask you:  Do you maintain any safety
11  manual?

12    A.  I have a list of safety items that need to be
13  taken into consideration.

14    Q.  And that list is maintained by E & E; is that
15  right?

16    A.  By E & E and the superintendents, yes.

17    Q.  Is the subject of "ladder" included on the
18  safety list at E & E?

19    A.  I believe so, yes.

20    Q.  Was E & E doing the job at your mother's
21  apartment?

22    A.  Yes.

23    Q.  Is part of the safety requirement of E & E to
24  inspect a ladder before its use?

25    A.  Not thoroughly.  I mean, we get a ladder, we

51

1  look at it.  If it's in good condition, we use it.  I
2  mean, we don't inspect inch by inch or whatever on the
3  ladders or -- I mean, we -- we look at it, and if it's
4  working, then we use it.

5    Q.  Is part of the safety requirements at E & E to
6  generally inspect a ladder to make certain that it
7  doesn't bear any gross deformities or breakage on it?

8    A.  Like I said, not specifically look thoroughly
9  through -- through a ladder.  If it is working -- if
10  it's standing there and, you know, if it's strong, we
11  use it.

12    Q.  You've looked at the ladder involved in this
13  case since the accident; is that correct?

14    A.  Only in pictures.

15    Q.  Have you not seen it physically?

16    A.  No.

17    Q.  All right.  You would agree based upon what you
18  know about the ladder, the pictures you've seen and
19  what you know about it, that the ladder was broken
20  before you got on it; is that correct?

21    A.  No, I don't agree with that.  I wouldn't have
22  fallen from top -- up there.

23    Q.  Tell me about -- did Raymundo directly hand the
24  ladder to you?  Was it sitting somewhere, or how did
25  you first get your own hands on it?

52

1    A.  Well, he brought it.  I don't know if he's the
2  first one that -- that first got it open or me, and
3  then I got it and I got up.

4    Q.  It's got the initials, I think, JRE on the side
5  of it.  Did you put those initials in there?

6    A.  I think it was my father that did that.  When
7  this happened, the insurance, they -- he went with the
8  insurance guy to the property.

9        And if I'm not mistaken, he's the one that
10  ordered to be -- that ladder to be -- well, he needed
11  the ladder, and he had it marked so that we knew that
12  it was the -- you know, that he would know that we
13  would know that that was the ladder that was taken out
14  of the property.  I think that's what it was.  You can
15  ask my father that tomorrow.

16    Q.  Okay.  Let me just ask you a real simple
17  question.  Did you, yourself, put the initials --

18    A.  Oh, no, I didn't.

19    Q.  -- on the side of the ladder?

20    A.  No, I didn't.  I did not.

21    Q.  You do not know who opened the ladder?

22    A.  Probably -- probably me.

23    Q.  All right.

24    A.  These are issues that I don't think -- you
25  know, we don't pay much attention when we're working.

**53**

1    I mean, we work -- if the ladder is in good condition
2    or it's working, standing there, we use it.
3        Q. And you think that probably it was you that
4    opened the ladder; is that correct?
5        . A. Yes.
6        Q. Do you normally inspect the ladder yourself
7    before you get on the ladder to see if it's in good
8    operating order?
9        A. Yes, I do.
10       Q. Did you inspect this ladder?
11       A. Yes. I don't know how to say that word. I
12   didn't go into the meticulous inspection of the ladder.
13   I saw it. I -- you know, I grabbed it. Normally, you
14   know, we look at it, and if it's working -- I mean, it
15   looks -- it's in good condition, we use it.
16       Q. How did the ladder appear to you to be?
17       A. In good condition.
18       Q. When you say it appeared to be in good
19   condition, what specifically do you recall about the
20   ladder?
21       A. Nothing special. Just it was a ladder like the
22   ones we use every day. That's it.
23       Q. Did you check out the spreaders?
24       A. I don't know what the spreaders are. I mean, I
25   don't understand that.

**54**

1        Q. The spreaders, as I understand it, is the
2    mechanism between the front and the back rails that
3    spread open and lock as you open the ladder.
4        A. Yeah, well, I open -- we open it and we lock
5    it. That's the first thing when you do -- when you
6    get -- when I -- I do when I get on a ladder.
7        Q. Did you notice anything at all about the
8    spreaders when you opened the ladder?
9        A. No. The spreaders -- let me show it to you to
10   see if --
11       Q. Sure.
12       A. -- to make sure that we have the same
13   understanding. These (indicating) are the spreaders,
14   right? That's what you mean? Wait a minute. Let me
15   get a better picture. This one right here
16   (indicating), you mean?
17       Q. Yes.
18       A. Yeah, those are locked. Yeah, they were in
19   good condition. They locked. I mean, the steps --
20   normally, you look at the steps. I looked at the -- I
21   mean --
22       Q. Were the spreaders in any way bent or broken or
23   malformed?
24       A. Probably they were a little bit bent or
25   something. There was nothing -- they're dirty, have

**55**

1    concrete, paint. Most of the ladders that we have are
2    like that.
3        Q. If you noticed that the ladder -- the spreaders
4    were, in fact, a little bit bent, did that prompt you
5    to further inspect the ladder?
6        A. No.
7        Q. Did you look at any of the rails to determine
8    whether or not they were in an unbroken fashion?
9        A. What other rails? You mean the legs?
10       Q. Yes, the legs.
11       A. They didn't seem to be broken. Like I said, I
12   didn't do -- what word can I use -- meticulous
13   inspection on that -- on the ladder. They -- they
14   weren't -- they weren't broken to my -- to my
15   knowledge. They were in good condition. The ladder
16   was standing. I had been working for a little while up
17   there.
18       Q. I assume that E & E in the past has encountered
19   broken ladders and thrown them away; is that correct?
20       A. No.
21       Q. You've never had a broken ladder?
22       A. I don't recall, no.
23       Q. Okay.
24       A. These ladders last forever. They're supposed
25   to last for a long time, and we've been in business for

**56**

1    about three and a half years.
2        Q. Have you in your career in the construction
3    business ever had to throw away or reject a ladder
4    because it was damaged or broken?
5        A. Probably, sir. Probably, yeah.
6        Q. I mean, you know that can happen; is that
7    right?
8        A. Oh, yeah, of course, it can happen. You know,
9    if we run over it with a forklift or something, it
10   happens a lot of times. We run over things. But, no,
11   I don't recall, really. These are issues that I don't
12   pay attention to. While I was doing it, I never done
13   it myself; let's put it that way.
14       Q. If you had noticed that there was a break in
15   the, as you put it, the legs, or as I think it's
16   technically known as the rails --
17       A. The rails.
18       Q. -- you would not have used the ladder; is that
19   correct?
20       A. No, I would not.
21       Q. You realize in your experience, especially your
22   experience, that that would have been dangerous to do
23   that?
24       A. Definitely.
25       Q. Did anyone that was with you actually see you

57

```
 1   fall?
 2       A.  Yes.
 3       Q.  Who saw you fall?
 4       A.  I know there was Jesse Ramirez.
 5    .  Q.  Jesse Ramirez --
 6       A.  Yes.
 7       Q.  -- saw you fall?
 8       A.  Yes.  Raymundo saw me fall and probably Flavio
 9   was there.  Flavio and Raymundo were inside the room,
10   each of them coming in and out getting stuff.  You
11   know, one -- they would go out and give a screwdriver
12   or whatever.  But, yeah, Raymundo and Jesse saw me
13   fall.
14       Q.  And Flavio, you think?
15       A.  Probably he, yeah, because I -- he's there --
16   he was there in the -- he was there in the room.
17       Q.  All right.  And how about your mother?  Where
18   was your mother when this happened?
19       A.  Probably, she was -- well, maybe at home.
20       Q.  Oh, she wasn't there at the job site?
21       A.  No, no.
22       Q.  Okay.
23       A.  No, no, she was in San -- she was in San
24   Antonio with my sister; I remember.
25       Q.  All right.
```

58

```
 1       A.  Yeah, or Austin, something like that.
 2       Q.  We've gotten to the point where you probably
 3   spread the ladder and set it down for what you were
 4   going to do; is that correct?
 5       A.  I got the ladder.  I opened it and sat it down
 6   and -- yes.
 7       Q.  All right.  And upon opening the ladder, what
 8   was your intention?  What were you going to do?
 9       A.  We were going to work on the light fixture.
10       Q.  How high was that ceiling?  Do you recall?
11       A.  Yeah.  Yeah, I know it's about 11 feet.
12       Q.  What room of the apartment was this?  Is this
13   the living room?
14       A.  No, it's one of the bedrooms.
15       Q.  One of the bedrooms?  And how tall a man are
16   you?
17       A.  Six -- with boots about 6'1", 6'2" -- probably
18   6'1".
19       Q.  What do you weigh?
20       A.  What do I weigh?
21       Q.  Yes, sir.
22       A.  I don't know.  About 190, 200 pounds, maybe;
23   190.  I been gaining weight.  Got married, you know.
24       Q.  Were you about the same height and same weight
25   at the time of the accident?
```

59

```
 1       A.  Yes.  Yes, I was.
 2       Q.  So what did you do next?  You got up to --
 3   you've got the ladder out there.  You've got the light
 4   fixture that you're going to take a look at.  What did
 5   you do next?
 6       A.  I got up there.  I was -- I was working there.
 7   I was -- I remember -- I recall -- I remember moving a
 8   little bit, and that's when I came down.
 9       Q.  All right.  When you -- strike that.
10           From the time that you climbed onto the
11   ladder until the time that you had the fall, about how
12   long was that?
13       A.  I don't think it was more than ten minutes.
14       Q.  What were you doing with the light fixture?
15   Were you replacing it or --
16       A.  It didn't work.  It was loose.  I was
17   checking -- I was about to check -- I was checking it.
18       Q.  Was it loose?  The light fixture, was it loose
19   where it joins the ceiling?
20       A.  No, no, no.  It has, like, a little chain, if
21   I'm not mistaken.  I mean, there's light fixtures --
22   different light fixtures all over the house.  But, no,
23   it's not -- it's not flat or on the ceiling.  You know,
24   it has -- you know, it goes down a little bit -- comes
25   down a little bit.
```

60

```
 1       Q.  About how far down from the ceiling does the
 2   light fixture hang?
 3       A.  Oh, probably six inches, seven inches.
 4       Q.  Is it still there?
 5       A.  Should be there, yes.
 6       Q.  Have you or anyone to your knowledge taken
 7   photographs of the light fixture or of the scene where
 8   the accident occurred?
 9       A.  Not to my knowledge.  Maybe the insurance guy.
10   I don't know.
11       Q.  You haven't seen any; is that right?
12       A.  No.
13       Q.  What were you doing up there for about ten
14   minutes?  What was --
15       A.  Well, it was less than ten minutes.  I don't
16   remember if -- well, I was working on that fixture.  I
17   was trying to -- I was finding out -- trying to find
18   out what was wrong with it.
19       Q.  Are you saying that between -- it was less than
20   ten minutes but more than how many minutes were you up
21   there?
22       A.  More than three.
23       Q.  Okay.
24       A.  Let's put it that way.
25       Q.  All right.  Were you interacting with any of
```

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 46 of 328

**61**

1 the other people there in what you were doing?

2   A. Yes. Raymundo was down there and -- you mean,

3 interacting with -- talking to them or --

4   Q. Talking, they're helping you, handing you

5 anything or you're handing them anything --

6   A. Yeah, I think he was --

7   Q. -- anything at all going on?

8   A. He was handing -- he was -- Raymundo was -- or

9 Flavio, both of them, need to -- were handing me

10 tools -- were going to hand me the tools up there.

11 See, it was loose. I was going to change the light

12 bulb, also. I was going to work on that light fixture

13 while I was up there.

14   Q. What tasks had you accomplished up to the time

15 that you had fallen?

16   A. It wasn't working -- I don't know -- I hadn't

17 fixed it. I don't know if that's what you mean.

18   Q. Okay. You stated that you had done some

19 movement on the ladder; is that correct?

20   A. Yes.

21   Q. What sort of movement did you do?

22   A. Well, movement. I would be up there and move,

23 you know, a little bit to the side, turn, grab a plier.

24 I believe he gave me a set of pliers, and then I fell.

25   Q. What step of the ladder were you on?

**62**

1   A. Four or five.

2   Q. And what -- you say then fell. I'm going

3 to ask you about your senses. At the time that you

4 fell at that time, did you by your senses, either

5 through hearing, seeing, notice anything at all at the

6 time that you fell?

7   A. I don't understand. Like what?

8   Q. The way you put it in response to a previous

9 question, I believe you said you just fell.

10   A. Yeah, I just --

11   Q. Tell me what happened.

12   A. Nothing. I just -- all of a sudden I was on

13 the floor.

14   Q. Did you hear anything?

15   A. Nothing. It's just -- I mean, I don't recall

16 hearing anything.

17   Q. Did you see anything with respect to the ladder

18 itself at the time that you fell?

19   A. No, sir. I fell and I -- they cut my boot, and

20 I left immediately to the hospital. I was in

21 tremendous pain --

22   Q. Did you --

23       MR. GENDRY: Object to the responsiveness,

24 the last part of the answer.

25   Q. Did you notice anything about the ladder just

**63**

1 before you fell or as you fell, such as any sort of

2 twisting or other motion in the ladder?

3   A. No, I don't recall. I don't -- not that I --

4 not that I recall.

5   Q. What sort of footwear did you have on?

6   A. Work boots.

7   Q. Work boots? When you fell you mentioned that

8 you injured your foot; is that correct?

9   A. That's correct.

10   Q. And that was your -- was it your right?

11   A. Left.

12   Q. Your left heel?

13   A. Left heel.

14   Q. Did you perceive what your left heel hit? Did

15 it hit the floor or do you know?

16   A. I think it hurt -- it hit -- it hit a piece of

17 metal that was there.

18   Q. A piece of metal on the floor?

19   A. Yeah. It was like a trailer hitch or something

20 like that.

21   Q. What was the trailer hitch doing up there?

22   A. I don't know.

23   Q. Is this an upstairs apartment or --

24   A. No, first floor.

25   Q. First floor? Okay.

**64**

1   A. I don't know really. I don't know.

2   Q. Anyway, you think your foot hit some object,

3 such as possibly a trailer hitch on the floor?

4   A. Raymundo told me that.

5   Q. You learned that after; is that correct?

6   A. Well, I -- you could say that. It was -- I

7 know that I hit something. It was on the floor. I

8 don't know -- I learned that it was probably a trailer

9 hitch is what he said, and it's probably still there.

10   Q. What exactly were you doing when you fell?

11 Were you reaching for anything? Were you talking or

12 what were you doing?

13   A. No, I don't think I was talking. I was just

14 working there.

15   Q. Working at the light fixture?

16   A. Yeah.

17   Q. After you fell and hit your heel, did you learn

18 from any of the other workers or your friend,

19 Mr. Ramirez, who were out there, what had happened to

20 the ladder? Did they describe anything to you?

21   A. When was this? I mean --

22   Q. After the accident.

23   A. Yes. And as I recall, it was probably my

24 father who told me.

25   Q. Okay.

**65**

1    A. He's the one that went there afterwards. I
2  don't remember who it was; but, yes, I learned after
3  it.
4    Q. Your father was not there when the accident
5  occurred?
6    A. No, no, no.
7    Q. Okay.
8    A. He was with my mother.
9    Q. Has either Jorge or Raymundo Medina or Jesse
10 Ramirez or Flavio Correa, have they ever told you what
11 they saw happened?
12    A. Raymundo probably did tell me. Probably even
13 Jorge when he looked -- that the ladder -- the ladder
14 broke. It split the legs, let's put it that way; they
15 had split.
16    Q. Okay. And what about your father? What do you
17 think that -- no, not what you think. What did he tell
18 you that he thought?
19    A. That the ladder was defective -- it was pointed
20 out by the insurance guy -- or broken.
21    Q. Do you believe -- strike that.
22        Did you talk with an insurance man about
23 what had happened?
24    A. Yes, I did.
25    Q. Who was that?

**66**

1    A. If I'm not mistaken, his name is -- last name
2  is Becerra.
3    Q. What did Mr. Becerra tell you?
4    A. He asked me questions only like you are doing.
5    Q. All right. Did you give a recorded statement
6  to Mr. Becerra?
7    A. Yes, I did.
8    Q. Have you given recorded statements to anyone
9  else besides Mr. Becerra?
10    A. No. This is the second time.
11    Q. When you gave the recorded statement to
12 Mr. Becerra, was it over the telephone or were you in a
13 room?
14    A. Over the telephone. I had just gotten out of
15 the hospital.
16    Q. Have you inspected the ladder since this
17 accident occurred?
18    A. No, I haven't seen the ladder since I fell.
19    Q. Have you inspected any other ladders for
20 comparative purposes?
21    A. Yes, many. Well, every time we go to
22 Home Depot I look at them. And mainly at the job
23 sites, yes, I do, sir. I pay a lot more attention now.
24    Q. But do you have any ladders at E & E similar
25 insofar as the footing is or was on this particular

**67**

1  ladder?
2    A. Yes.
3    Q. Would that include both stepladders and
4  extension ladders?
5    A. Same height. They're more -- they're extension
6  ladders, yeah, but we have a lot of -- some -- I mean,
7  they're -- how do you call this -- they open. They're
8  the stepladders. We have both kinds of ladders. At
9  that time we had them and we still do. Some are new
10 and some aren't.
11    Q. Currently on the job you have -- not on the
12 job, but at E & E you have for use on your job sites
13 stepladders similar to this Bauer ladder; is that
14 correct?
15    A. Yes, I do.
16    Q. And by "similar" I mean in the leg system.
17    A. Yes.
18    Q. All right.
19    A. Yeah, similar. The materials are similar,
20 yeah, also.
21    Q. If you could show me just one with the bottom
22 of the legs or the rails.
23    A. I don't know which one -- this (indicating) --
24    Q. This is fine.
25    A. -- probably looks better.

**68**

1    Q. You currently have at E & E for use on your job
2  sites ladders without any footing at the bottom of the
3  legs or the rails. Would that be a correct statement?
4    A. Footing like this one down here (indicating),
5  you mean?
6    Q. Well, strike that.
7    A. I don't know what footing.
8    Q. Let me rephrase the question. Let me see this
9  one here again. Let me ask you: Do you have ladders
10 with this sort of device (indicating) at the bottom of
11 the leg or the rail as shown in this photograph?
12    A. Probably we do, yes.
13    Q. All right.
14    A. That, and a different kind, also.
15    Q. Right.
16        MR. GENDRY: Let's mark this.
17        (Deposition Exhibit No. 1 marked)
18    Q. Let me hand you what has been marked as
19 Escudero Exhibit No. 1 for this deposition and ask you
20 if that is the photograph just referred to showing a
21 similar rail or leg to ladders that you have at E & E
22 currently that you use on job sites?
23    A. I couldn't confirm that 100 percent, but, yes,
24 probably we do have something like this.
25    Q. Okay. And do you currently still buy ladders

**69**

1   with rails similar to that, in an unbroken manner, I
2   mean, of course?
3       A.  No, we have -- I've seen ladders that have --
4   we have -- they're designed different.  They have
5   support on the bottom.  They have extra -- extra
6   reinforcement, and that's the ladders that I've been
7   looking into.
8       Q.  Since the accident, have you bought any ladders
9   with similar footing to the ladder in Deposition
10  Exhibit 1?
11      A.  Since the accident -- probably right after the
12  accident, maybe.  I don't -- I don't recall.  I need to
13  go into my notes and see -- in my invoices and see when
14  I bought ladders.  I don't know -- I bought ladders
15  that have -- that are reinforced -- better
16  reinforcement now, and that's the ones I look at.
17  Probably, yes, we have bought some that are similar to
18  this one, yes.
19      Q.  So far as you know, what became of the ladder
20  after the accident?
21      A.  It was picked up or taken by the insurance
22  company.
23      Q.  By either Mr. Becerra or somebody that works
24  with Mr. Becerra?
25      A.  Somebody related probably with him.

**70**

1       Q.  Did you find out after the accident whether or
2   not anyone had ever used the ladder before?  Anyone
3   that you know of?
4       A.  Yes.
5       Q.  Who had used the ladder before?
6       A.  My workers.  And there was particularly a -- a
7   person that does welding work.
8       Q.  Had used this particular ladder?
9       A.  Yes.
10      Q.  What's his name?
11      A.  Alejandro Garza.
12      Q.  And where does Mr. Alejandro Garza live?
13      A.  In Mission.  I don't know exactly where.
14      Q.  Does he still do work for you?
15      A.  No.
16      Q.  When did you find out from Mr. Alejandro Garza
17  that he had used this particular ladder before?
18      A.  I think the ladder came from him.
19      Q.  What makes you think the ladder came from
20  Mr. Alejandro Garza?
21      A.  Because he -- he was missing a ladder at that
22  time at one of the jobs -- my jobs.  And his mother
23  works or somebody related to him works for that
24  Independent School District.
25      Q.  Did you talk with Mr. Garza about his using the

**71**

1   ladder beforehand?
2       A.  Yeah, something like that.  He said that he --
3   that I -- we had a ladder in my warehouse that belonged
4   to him.  I said, "Well, it probably is the one that I
5   fell off."  And he says, "I don't think so.  Mine was
6   in good condition."
7           And, anyway -- and then that's what -- you
8   know, I asked him about it.  I think it came from him.
9   I think it's from his company, because he knows -- he
10  described it with that Independent School District.
11      Q.  Does Alejandro Garza, does he have his own
12  business?
13      A.  Yes.
14      Q.  And what is it?
15      A.  AJ Steel Directors.
16      Q.  AJ?
17      A.  AJ, yes.  A and -- just AJ.
18      Q.  Okay.
19          MR. BENTON:  AJ Steel?
20          THE WITNESS:  Directors, yeah.
21      Q.  And is AJ Steel Directors, is their place of
22  business out of Mission?
23      A.  I think that he probably works out of his
24  house, yes.  But, yeah, he has a shop there at his
25  house.

**72**

1       Q.  Any other person that you know of that may have
2   had possession or had use of that ladder?
3       A.  No, not that I know of; him and us.
4       Q.  What jobs for you had Mr. Alejandro Garza done?
5       A.  He -- normally he does -- at that time or -- he
6   does steel work for us.
7       Q.  Before the accident he did steel work?
8       A.  Yes.  And after the accident, also.
9       Q.  Any particular job site that he was on that you
10  recall before this accident?
11      A.  Yes, the Comfort Inn in Mission.  The Comfort
12  Inn Hotel in Mission, Texas.  And let me see.  Before
13  the accident I think that was it.
14      Q.  Did you notice that it had the initials SRISD
15  on the side of the ladder before you used it?
16      A.  Yes, I did.  I believe I did, yes.  Probably
17  not.  I don't know.  I guess.
18          MR. BENTON:  Please don't guess is all I
19  ask.
20      Q.  I don't want you to guess.  Just --
21      A.  Well, I don't remember.  I really -- to be
22  honest, I think I did.  I mean, it's dirty.  I saw it.
23  I looked at it and it had letters.  I don't know
24  exactly what it said.  As you can see, they're not
25  clear.

73

1     Q. From what you have seen of this ladder by
2 pictures, your being involved in the accident and what
3 you know about the ladder, either through your
4 employees or through your mother or through Mr. Garza,
5 do you agree that that ladder should have been thrown
6 away before you used it that day?
7     A. No, I don't agree with that.
8     Q. Do you agree that if the evidence shows in this
9 case that it was a broken ladder before you got on it,
10 it should have been thrown away instead of used?
11     A. If it was broken, I agree, yeah, it should have
12 been thrown away. I think it wasn't -- it wasn't
13 broken when I was there working.
14     Q. You don't -- you didn't notice that it was
15 broken, is what you're saying; is that correct?
16     A. I didn't notice that it was broken. Yeah, I
17 didn't notice that it was broken. But it wasn't broken
18 when I got on it. With this ladder, I couldn't have
19 gotten up there, not even the first step, if it would
20 have been broken.
21     Q. Would you agree, as the contractor, that if
22 this ladder -- if the evidence shows that this ladder
23 had been damaged or broken before this accident, it
24 should not have been used by you?
25     A. Yes, I agree, if it was broken. Like it is in

74

1 the pictures right now, I should not have gotten on --
2 gotten on by -- I would not -- I wouldn't have gotten
3 on it.
4     Q. Before this accident did you read any of the
5 labeling on the ladder?
6     A. No, not this particular ladder.
7     Q. All right. Before this accident had you read
8 the labeling on similar ladders?
9     A. Yes, I have.
10     Q. And you are aware, of course, of warnings on
11 ladders that if they're damaged or broken, the ladder
12 should be thrown away, disposed of?
13     A. Yes.
14     Q. Have you made any efforts yourself to find out
15 how it is that Mr. Garza got this ladder that belonged
16 to the school district at one time?
17     A. I don't think so, sir. No, I haven't.
18     Q. Is Mr. Garza a friend of yours?
19     A. Yeah, you can say that.
20     Q. Is he a social friend?
21     A. No, never.
22     Q. Let me ask you just a bit, Mr. Escudero, about
23 your medical treatment, okay?
24     As I understand it, if this is your
25 understanding, you broke your heel?

75

1     A. Yes.
2     Q. All right. Do you currently wear any sort of
3 prosthesis or use any sort of walking device to help
4 you in your walking?
5     A. Sometimes only a -- a -- it's not a device.
6 It's a -- a -- like a bandage, but it's an elastic band
7 that I put around and around. And on the times when I
8 can't walk, I use my boot, the orthopedic boot that I
9 used back then when I was in the hospital after the --
10 after the accident.
11     Q. When is the last time that you used the
12 orthopedic boot?
13     A. Let me see. Maybe in about December, probably.
14 Let's see, I got married in --
15           (interruption)
16          MR. GENDRY: Could we go off the record.
17          THE VIDEOGRAPHER: Off the record.
18     (Brief recess taken from 2:52 p.m. to 3:05 p.m.)
19          THE VIDEOGRAPHER: We're back on the
20 record.
21         (Deposition Exhibit No. 2 marked)
22     Q. Mr. Escudero, I spread out these photographs
23 here in front of me, and I'm not going to refer to all
24 of these, but I do want to ask you if who know who the
25 person is in this particular photograph (indicating)?

76

1         I know it's not Barry.
2     A. It's probably my mother.
3     Q. You think that might be your mom?
4     A. Yeah, I think it was my mom. Yeah, I think so.
5     Q. Did your mother take these photographs? Do you
6 know?
7     A. I'm not sure. I don't know. Probably him --
8 her and my dad, probably.
9     Q. The ladder here in one of these pictures is
10 next to a building. Do you recognize that building?
11     A. Yeah, that is the building. That is the house.
12     Q. That's the house where the accident occurred?
13     A. That's correct.
14     Q. This particular picture of the ladder has a
15 label on the side of it, OSHA, and ANSI under that. Do
16 you see that?
17     A. Yes.
18     Q. Is that something you look for when you
19 purchase a ladder?
20     A. Yes, sir.
21     Q. And why is that?
22     A. Like I said, because we can get -- we can get
23 inspections by OSHA, and you get penalized or fined if
24 you don't -- you're not complying with them.
25     Q. Okay. Is it your understanding that you need

**77**

1    to have on-the-job equipment that is -- that does not
2    violate any OSHA or ANSI standards?
3        A.  That's correct.
4        Q.  All right.  What is your understanding of -- if
5    you have one -- of what went wrong with the ladder?
6        A.  Just by looking at the pictures, the -- those
7    legs split open; fiberglass.  I fell.  That is my
8    understanding that's what happened.
9        Q.  Okay.  When you fell, did the ladder fall, as
10   well?
11       A.  Yeah.
12       Q.  Did it fall over?
13       A.  What do you mean?  Over me?
14       Q.  Did it fall on -- did the ladder come off of
15   its footing?  Did it fall down on its side?
16       A.  It fell down.  I fell -- I fell down behind the
17   ladder.
18       Q.  I see.
19           MR. GENDRY:  If we could, Barry, I
20   would -- if you could allow the court reporter to make
21   laser copies of these, and then she can get the
22   originals back to you?  Is that all right with you?
23           MR. BENTON:  That will be fine.  I'm sure
24   she will be very careful with the threat of ruining my
25   life.

**78**

1        Q.  Were you taken to the hospital by one of your
2    employees?
3        A.  By Raymundo, yes, in his car.  He was driving.
4        Q.  You've had two surgeries on your foot?  Am I
5    correct in that?
6        A.  Well, I had the first one right after --
7    Wednesday after the accident.  And then I had one other
8    one -- you can probably call it one -- to remove the
9    pins that they had -- probably it's another surgery,
10   you know, and then the third one, yes.  I had three.
11       Q.  Okay.  The removal of the pins, was that done
12   in the doctor's office?
13       A.  No, in another -- no, in his patient -- no, it
14   wasn't in the doctor's office.  I don't recall the
15   name, but it wasn't in there.
16       Q.  Was that a --
17       A.  Little private hospital outside --
18       Q.  Did you have to stay all night?
19       A.  No, not when I -- not when they removed the
20   pins, no.
21       Q.  Okay.  And then you had a third surgery; is
22   that correct?
23       A.  Yes.
24       Q.  Had you ever before this accident had any
25   problems with your feet or your legs?

**79**

1        A.  Can you repeat that question?
2        Q.  Before this accident had you ever had any
3    previous problems with your feet or your legs?
4        A.  Never.
5        Q.  Ever any injuries or accidents involving your
6    legs or your feet or you heels before this accident?
7        A.  Never, sir.
8        Q.  Before this accident had you ever suffered any
9    fractures to any part of your body?
10       A.  Never.
11       Q.  Is the injury -- only injury that you're
12   complaining of in this case is the injury to your heel?
13       A.  Yeah, it's the injury I got from falling down
14   that ladder.
15       Q.  Yes, sir.  My question is:  Is the injury
16   limited to your heel, or did it involve any other part
17   of your body, such as your back or your neck or
18   something like that?
19       A.  No.  It's mainly my heel.
20       Q.  Okay.
21       A.  My -- my left leg.  My heel, there was a lack
22   of -- you know, I got a osteoporosis deal.  I got
23   arthritis in the leg.  I mean, I got -- it's the leg
24   itself after the accident -- this happened.
25       Q.  What is your understanding what your injury is?

**80**

1    What happened?  Your understanding.  I know you're not
2    a doctor.
3        A.  Well, when I first -- when I was in the first
4    time surgery, I was told it was going to be
5    something -- no more than a year I would be okay, if
6    everything came out okay.  I was told -- I'm telling
7    you -- my understanding is that I -- it's been two
8    years.  I can't walk.  Some days I need even a crutch
9    or a -- a -- what do you call it -- cane to get to --
10   some days to get to the bathroom.  Some days I'm pretty
11   good or okay, I guess.  It hurts all day.  That's what
12   I can tell you.
13       Q.  And you mentioned a word, osteo --
14       A.  Well, one of the doctors told me that I had
15   lack of calcium, you know, because of the lack of use.
16   And then another doctor told me that I had -- arthritis
17   had developed in one my joints there in the heel and
18   the -- and the ankle.  And that could be -- that was
19   going to be permanent, he says.  That's the last doctor
20   I saw.
21       Q.  Have you had any injury to your heel or your
22   leg -- your left heel or leg since this accident?
23       A.  No.  You mean, an accident, you said, on the
24   same foot?
25       Q.  Yes, sir.

81

```
1        A.   No, I haven't.
2        Q.   Have you had any accidents since this accident
3    that we're here for today?
4        A.   Not really accident.  I mean, I fell in the
5    shower the other day, slipped there and --
6        Q.   Did you hurt yourself when you fell in the
7    shower?
8        A.   No.  It was the same thing.  You know, it was
9    the same problem, I guess.  No, I had a big bruise only
10   on one of the legs, but no -- nothing major.  Nothing
11   major.
12       Q.   Do you have any doctor's appointments scheduled
13   in the future for your heel?
14       A.   Yes, I have one.  I didn't bring the card.  The
15   one that you recommended to me and the one that you --
16   I think -- I believe you -- you were suggesting for me
17   to go or somebody is.
18       Q.   No, I didn't suggest --
19       A.   San Antonio doctor's appointment I have --
20       Q.   Oh, I see.
21       A.   -- on the 18th.
22       Q.   Okay.
23       A.   And on May the 30th I think I have another one
24   here in McAllen with Kartalian.
25       Q.   You're going to see somebody in McAllen; is
```

82

```
1    that correct?
2        A.   Yes, I'm going to see somebody in McAllen.
3    I'm -- I'm thinking next week I need to schedule one
4    with the person that did the third surgery on my foot.
5        Q.   All right.  Who was the doctor that did the
6    third surgery to your foot?
7        A.   John Bishop from Houston.
8        Q.   Did you have that done in Houston?
9        A.   In Houston, yes.
10       Q.   Which hospital?
11       A.   Let me see.
12       Q.   Well, that's all right.  I think your lawyer
13   has given us that.  Have you scheduled an appointment
14   in the future with Dr. John bishop?
15       A.   Not yet.
16       Q.   And are you going to?
17       A.   Yes.
18       Q.   And why is that?
19       A.   Pos, so he can check my foot after this --
20   again.
21       Q.   Did he tell you to make another appointment
22   with him?
23       A.   If it bothered me, yes.
24       Q.   Is your foot bothering you?
25       A.   Yes, sir.
```

83

```
1        Q.   And in what manner is it bothering you
2    currently?
3        A.   It hurts.  The whole foot hurts.  It's --
4    sometimes it's -- well, I tolerate the pain all day or
5    whatever, whenever it hurts a few -- a little or a lot,
6    but most of the day it hurts.
7        Q.   Is there anything that precipitates it
8    hurting -- causes it to hurt?
9        A.   Not that I know of.  Just sometimes it hurts
10   more than others -- than other times.
11       Q.   Are you currently taking any medications for
12   your foot?
13       A.   No, sir.
14       Q.   Do you have any other claims against any
15   medical providers for any treatment that you've
16   received in connection with your foot?
17       A.   Can you repeat that for me?
18       Q.   Yes.  Have you made or have you considered
19   making any claims against any medical providers for the
20   treatment that you've received to your foot?
21       A.   What do you mean "claims"?
22       Q.   That any of the medical doctors did anything
23   wrong in treating your foot.
24       A.   No, I don't -- no, I don't think they did.
25       Q.   Okay.
```

84

```
1        A.   I mean, I don't know.  I have not thought about
2    that, like you said.
3        Q.   What has Dr. John Bishop told you is wrong with
4    your foot?
5        A.   Well, that -- he went in there -- he -- he
6    performed the surgery because the tendons were all --
7    tendons and ligaments were, let's say, not -- not
8    situated right in my foot after the first surgery or
9    anything, because never -- they didn't open my foot the
10   first time like he did the third.
11            And so he cleaned -- this is the words he
12   used.  He cleaned -- that's what I understood.  The
13   others ones I didn't understand them.  But he cleaned
14   the tendons of the bones and he cleaned there in the --
15   he sanded -- I don't know what you call that -- he
16   scraped the bone; that it was, you know, rough.
17       Q.   All right.
18       A.   It didn't heal right, according to him, the
19   first time.
20       Q.   Has Dr. Bishop or anyone told you you need any
21   additional surgery to your foot?
22       A.   More likely, yes.
23       Q.   Who told you that?
24       A.   Bishop, Vargas and Kartalian, all three of
25   those doctors, same thing.
```

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 52 of 328

85

1  Q.  And what has Dr. Bishop told you why you need
2  additional surgery?
3  A.  No, he didn't say that I will need another one.
4  Probably if it didn't -- if this didn't fix the problem
5  100 percent, which it didn't, that the only solution
6  could be to fuse my joint forever, permanently.  So
7  that would ease the pain.  I would lose the mobility on
8  the foot, some of it, but it would -- it would
9  eliminate the pain -- that's what he says -- because
10  the joint is worn out.
11  Q.  Did you have arthritis in that foot before this
12  accident?
13  A.  No, sir.
14  Q.  Did you have pain or any symptoms to your left
15  foot before this accident?
16  A.  No, sir.  Two months ago I had a motorcycle
17  race, and there was no pain whatsoever in my -- in any
18  of my body.
19  Q.  Do you still ride a motorcycle?
20  A.  I can't anymore.
21  Q.  Do you own one?
22  A.  No, I sold it.
23  Q.  Do you drive a car?
24  A.  Yes, sir, a truck.
25  Q.  You drive a truck?

86

1  A.  A truck.
2  Q.  A pickup?  What kind?
3  A.  Chevrolet.
4  MR. BENTON:  Chevrolet.
5  A.  Chevrolet.  In Mexico it's Chevrolet.  It's a
6  Chevrolet, Z71 Chevy.  Z71 Chevy.
7  Q.  Z71?
8  A.  Yeah.  I should have said Chevy.
9  Q.  There you go?
10  MR. BENTON:  Or with an accent, Chevy.
11  MR. GENDRY:  My wife would love it.
12  THE WITNESS:  Chevy or Chevy?  From
13  General Motors.
14  MR. BENTON:  There you go.
15  MR. GENDRY:  Barry, could I just ask you
16  on the record, I think you've given us the ID of all
17  the medical records.  I don't need to go through all
18  that with him.
19  MR. BENTON:  There hasn't been any
20  changes.
21  MR. GENDRY:  Okay.
22  Q.  Let me ask you this:  Do you have a family
23  doctor, somebody you see for regular things like colds,
24  flu, that sort of thing?
25  A.  I haven't visited a doctor in years.  No, I

87

1  don't -- I never -- I really don't go to the doctor,
2  never.
3  Q.  You have settled with your mother's insurance
4  company in connection with your injury; is that
5  correct?
6  A.  Yes.
7  Q.  And what did you receive in that settlement?
8  A.  What did I receive?
9  Q.  How much money was it worth?
10  A.  I think it was -- total, it was about 11,000.
11  I don't know.
12  Q.  Okay.  I've seen a number that says $13,500.
13  Does that sound right to you?
14  A.  Probably, yes.
15  Q.  Okay.
16  A.  There was, you know, fees paid here and there.
17  Q.  Have you settled with any other party or
18  person, corporation, insurance company besides your
19  mother's insurance company?
20  A.  No, sir.
21  Q.  All right.
22  A.  The money that I received the first time didn't
23  even cover the first surgery.
24  MR. GENDRY:  For the record, I'm going to
25  object to responsiveness.

88

1  MR. BENTON:  You've got to listen to the
2  questions, and answer --
3  THE WITNESS:  Sorry.
4  MR. BENTON:  That's all right.
5  Q.  Any workers' compensation benefits paid in
6  this?
7  A.  No.
8  Q.  Are you claiming loss of wages or loss of
9  income in connection with your injury?
10  A.  Yes, I guess.
11  Q.  As of -- strike that.  Have you calculated up
12  to the current date the amount of income that you've
13  lost as a result of your injury?
14  A.  Hardly none.  I haven't finished really.  I
15  don't know.
16  Q.  How would you go about calculating that?  What
17  documents, numbers, figures would you use to do that?
18  A.  Well, there was delays on several jobs that I
19  had under my control.  And, also, the only thing I can
20  tell you -- I don't know if you want to write down this
21  here -- after this -- this accident, everything has
22  been going pretty bad.
23  I have several -- many problems right now
24  at the present, which got originated either that month
25  or months after that, but it's been -- I mean, I've

89

1  been losing -- I mean, I can't be at the job sites.
2  Sometimes I have to stay at home.
3          And I've lost almost nine months -- almost
4  ten months after that accident that I haven't been able
5  to work because of the surgeries.  It was six -- four,
6  five -- five to six months every surgery -- after every
7  surgery that I was --
8      Q.  You've given me a number here I think we can
9  start with.  You've stated that you've missed nine to
10  ten months from work as a result of the surgeries in
11  recovery, postsurgery, is that right?
12      A.  Probably 70 percent of the time of that --
13  those nine months -- 80 percent to the rest of the
14  months since the accident, maybe 30 -- I've been losing
15  40 percent of my time trying -- not being able to go up
16  in the roofs and the upper floors on the jobs.
17  Sometimes I need to stay in and rest on a Saturday when
18  I used to work Saturdays.
19      Q.  Now, has your salary remained constant since
20  the accident?
21      A.  Yes, it has been; my salary, yes.
22      Q.  Has the actual money that you would have
23  expected to receive, if not for this accident, has it
24  in any way changed?
25      A.  Can you repeat that question, please?

9

1      Q.  Actually, what you're talking about is a loss
2  to E & E; is that correct?
3      A.  Yeah, which it falls directly on me, loss or
4  gain.
5      Q.  As well as the split with your father; is that
6  correct?
7      A.  Yes.  My father was going to get -- we are
8  owners of the shares 50/50 percent.  The jobs we take
9  care of, we take 70, or that's negotiable, you know.
10  Yeah, it's between both of us, yes.
11      Q.  What documents does E & E maintain which would
12  in your mind best show what your cash flow, your profit
13  and your loss and your expenses have been over, say,
14  the past -- well, since its inception in 1998?
15      A.  What documents would show my cash flow in my
16  movement and my sales and everything, you mean, the
17  jobs?
18      Q.  Correct.
19      A.  I guess the -- I don't know if -- the 2000 is
20  not ready, the report for the financial statement, but
21  that would be one -- one of the documents; maybe my
22  checkbook statements; that could also help so you could
23  see my cash flow; the contracts that I have signed and
24  finished of the jobs I have done; the reports on
25  every -- each of the jobs.

90

1      Q.  You would ask me that.  Has the money that you
2  have actually received, has it in any way changed from
3  what you would have expected to receive if the accident
4  had not occurred?
5      A.  Yes, I think it had been -- would have been a
6  lot different.
7      Q.  How so?  Can you explain that?
8      A.  Well, right in the middle of the second surgery
9  I had -- I was working on an office building that got
10  delayed.  It started with one month and went all the
11  way to three or four months.  Just on that job I lost
12  $78,000 alone, just one job alone.
13      Q.  How much?
14      A.  78,000, just that job alone.
15      Q.  And was the job completed?
16      A.  Yeah, it was completed, but I got penalized 30
17  something thousand.  And then we had to hire new subs
18  and it was terrible.  That was one of them.  And there
19  was another one that the clinic -- the owner that
20  operated on my foot of the first time, Vargas,
21  Dr. Vargas, we lost -- we had -- we took a loss
22  there -- hit there of about 30,000, so it's been -- I
23  was supposed to make $300,000 this year, and I'm losing
24  money.  The rest is in a job that we're finishing right
25  now.

92

1      Q.  Okay.  Did you reinjure your ankle on December
2  the 6th, 1999?
3      A.  December the 6th, did I reinjure it?
4      Q.  Yes, sir.
5      A.  No.  December the 6th, 1999?
6      Q.  Well, the reason I asked that is I saw a
7  document --
8      A.  By Vargas, probably.  Dr. Vargas?
9      Q.  Let me see if I can find it.
10      A.  Yeah, I -- I think I recall what you're talking
11  about.
12      Q.  One of the medical records states -- this is
13  dated on December 6th, 1999.  I'll show it to you if
14  you want to see it.  "Patient recently about one week
15  ago sustained an injury in which he twisted his ankle
16  first with a contusion, and as he landed on the leg,
17  went into inversion."
18      A.  I was on top of the -- that's what I was
19  talking about.  I was on the roof of the Days Inn Hotel
20  there remodeling.  And, yeah, I couldn't walk.  I was
21  there -- I couldn't -- I didn't hurt -- I didn't
22  rehurt.  I mean, I just made a rough movement, maybe.
23  Something that just started hurting again.  I mean, it
24  hurts -- it hurts, yeah.  It hasn't ever stopped
25  hurting.  I mean, it just -- it just made it worse that

93

```
 1   time -- particular day.
 2      Q.  Okay.
 3          MR. GENDRY:  Let's take a little break.  I
 4   think I'm done.
 5          THE VIDEOGRAPHER:  Off the record.
 6      (Brief recess taken from 3:26 p.m. to 3:30 p.m.)
 7          THE VIDEOGRAPHER:  We're back on the
 8   record.
 9          MR. GENDRY:  I just want to check up on
10   one or two things.  I've got three minutes left on this
11   tape.
12      Q.  The warehouse next to your mother's place, what
13   would you keep in that warehouse?
14      A.  What did I keep.
15      Q.  Well, I know you kept equipment that you used,
16   such as ladders, so that you could use on the job
17   sites.
18      A.  Ladders, scaffolding, some materials, building
19   materials.
20      Q.  Would you keep in there items that you had
21   obtained from job sites that you cleaned up?
22      A.  Normally that's where we take everything, and
23   then -- and then when somebody needs something, it goes
24   in -- you know, goes and pick it up there.
25      Q.  And would you keep items in there that were
```

94

```
 1   going to be considered for use in the auction business?
 2      A.  No.  Well, yeah -- not from my -- well,
 3   probably from my company, but not -- I had never
 4   thought about it that way, no.  The things that we
 5   store there from E & E Builders are things that we keep
 6   on using.
 7      Q.  All right.  And what else is stored out there?
 8      A.  There's racks, clothes racks.  There's a couple
 9   of combination boxes -- I'm losing my words, my
10   English -- safe boxes.  We have that.  We have chairs.
11      Q.  Were you in the auction business at the time of
12   this accident with your friend?
13      A.  Yes, sir.
14      Q.  All right.  Would you place in storage items in
15   the warehouse next to where your mother -- next to your
16   mother's property where this accident occurred that
17   were going to be considered for auction?
18      A.  Yes, I do.
19      Q.  Okay.  And did you at the time of the accident?
20      A.  Did we have things there that we were
21   considering for auction or for --
22      Q.  Yes.
23      A.  -- yeah, for sale.  Yeah, for sale.
24          MR. GENDRY:  That's all I have.  Thank
25   you, sir.
```

```
 1          MR. BENTON:  I'll reserve my questions.
 2          THE VIDEOGRAPHER:  Off the record.
 3      (Deposition concluded at 3:32 p.m.)
 4
 5
```

96

JOSE ESCUDERO, JR. - ERRATA SHEET

Reasons for changes:  (1)  Clarify the record
                      (2)  Conform to the facts
                      (3)  Correct transcription errors.

PAGE LINE  CHANGE FROM/CHANGE TO                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

97

## SIGNATURE OF JOSE ESCUDERO, JR.

I have read the foregoing transcript of my deposition and it is a true and accurate record of my testimony given on MAY 3, 2001, except as to any corrections I have listed on Page 96 herein.

_____
JOSE ESCUDERO, JR.

THE STATE OF TEXAS

COUNTY OF CAMERON

SUBSCRIBED AND SWORN TO BEFORE ME, the

undersigned authority on this the _____ day of

_____, 2001.

_____
Notary Public in and for
The State of Texas

My commission expires:

_____

---

98

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE ESCUDERO, JR. | ) ( | |
| Plaintiff | ) ( | |
| | ) ( | |
| VS. | ) ( | CIVIL ACTION NO. |
| | ) ( | B-00-193 |
| BAUER CORPORATION D/B/A | ) ( | |
| BAUER LADDER CORPORATION | ) ( | |
| Defendant | ) ( | |

### REPORTER'S CERTIFICATE

I, LINDA LOCKLEAR, Certified Court Reporter, certify that the witness, JOSE ESCUDERO, JR., was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on MAY 3, 2001; that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this _____ day of _____, 2001.

_____
LINDA LOCKLEAR, Texas CSR 6326
Expiration Date: 12-31-02
Bryant & Stingley, Inc.
4900 North 10th, Building A, Suite 3
McAllen, Texas 78504
(956) 618-2366

BRYANT & STINGLEY, INC.

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION
 3    JOSE ESCUDERO, JR.          )
           Plaintiff             )
 4                               )
      VS.                        )  CIVIL ACTION NO. B-00-193
 5                               )
      BAUER CORPORATION D/B/A    )
 6    BAUER LADDER CORPORATION   )
           Defendant             )
 7    ********************************************************
 8             ORAL DEPOSITION OF JOHN VASICHKO
 9                     JULY 26, 2001
10                     VOLUME 1 OF 1
11    ********************************************************
12             ORAL DEPOSITION OF JOHN VASICHKO,
13    produced as a witness at the instance of the
14    Defendant, and duly sworn, was taken in the
15    above-styled and numbered cause on the 26th of July,
16    2001, from 10:04 a.m. to 12:43 p.m., before DANDY
17    ELLIS, CSR in and for the State of Texas, reported by
18    machine shorthand, at the offices of Gendry &
19    Sprague, 645 Lockhill Selma, San Antonio, Texas
20    78216, pursuant to the Rules of Civil Procedure and
21    the provisions stated on the record or attached
22    hereto.
23
24
25         *    *    *    *    *    *    *    *    *    *
```

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 57 of 328

2 (Pages 2 to 5)

---

**Page 2**

```
1        A P P E A R A N C E S
2
   FOR THE PLAINTIFF,
3
     ATTORNEY AT LAW
4    MR  BARRY BENTON
     284 Ebony Ave
5    Brownsville, Texas  78520;
6
   FOR THE DEFENDANT,
7
     GENDRY & SPRAGUE
8    MR  THOMAS GENDRY
     645 Lockhill Selma
9    San Antonio, Texas  78216,
10
11
12
13
14
15
16
17
18
           * * * * * * * * * * *
19
20
21
22
23
24
25
```

---

**Page 4**

```
1   23  Blueprints              55
    24  Blueprints              55
2   25  Blueprints              56
    26  Insurance Policy          59
3   27  Photograph              79
    28  Bauer Catalog           81
4   29  Retention Policy        87
    30  Retention Policy - Revised    88
5   31  Product Return Authorizations   98
6
7           * * * * * * * * * * *
8
9
```
```
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1        INDEX
                        PAGE
2   Appearances         2
3
   JOHN VASICHKO
4
     Examination by Mr Benton     5
5
   Changes and Signature         101
6
   Reporter's Certificate        102
7
     EXHIBIT INDEX
   NO    DESCRIPTION       PAGE
9
10  1  Bauer Claim Records et cetera    20
    2  Claims Records       21
11  3  Photograph           32
    4  Photograph           33
12  5  Interoffice memorandum     46
    6  Communications Regarding
13     Modification of Shoe     46
    7  Communications Regarding
14     Modification of Shoe     46
    8  Communications Regarding
15     Modification of Shoe     46
    9  Communications Regarding
16     Modification of Shoe     46
    10 Communications Regarding
17     Modification of Shoe     46
    11 Communications Regarding
18     Modification of Shoe     46
    12 Communications Regarding
19     Modification of Shoe     46
    13 Communications Regarding
20     Modification of Shoe     46
    14 Communications Regarding
21     Modification of Shoe     46
    15 Blueprints           55
22  16 Authorizations for Destruction
       of Merchandise       46
23  17 Blueprints           54
    18 Blueprints           54
24  19 Blueprints           54
    20 Blueprints           55
25  21 Blueprints           55
    22 Blueprints           55
```

---

**Page 5**

```
1           JOHN VASICHKO,
2   having been first duly sworn, testified as follows:
3           E X A M I N A T I O N
4   BY MR. BENTON:
5     Q.  Please state your name for the record.
6     A.  John D. Vasichko.
7     Q.  Mr. Vasichko, I'm Barry Benton, and I
8   represent Jose Escudero in this case against Bauer
9   Ladder Company.  Am I saying the name of the company
10  right?
11    A.  I think it's Bauer Corporation.
12    Q.  Okay.  Thank you.
13    A.  So you'd be more correct.
14    Q.  Okay.  And I want to be correct.
15        You understand that Mr. Escudero has
16  filed a personal injury suit in this case alleging
17  defects in a ladder he was using at the time of an
18  accident, correct?
19    A.  Yes.
20    Q.  Okay.  You've had your deposition taken
21  before, right?
22    A.  A few times, yes.
23    Q.  So all I ask is a couple things.  If you
24  don't understand my question, you tell me so I can be
25  clear.
```

Page 6

1       A.   I will do that.
2       Q.   And if you want to change your answer,
3   you're welcome to pause and say, you know, I may have
4   misstated something and I'd like to correct it.
5       A.   I will do that.
6       Q.   Okay.  Let's start off with a brief history
7   of the Bauer --
8       A.   Corporation.
9       Q. -- Corporation.  Okay.  What do you know
10  about its history, just in a brief chronology?
11      A   Bauer started about 75, 78 years ago, I
12  believe now.  It has produced a variety of products,
13  most generally ladders.  During the war years it
14  produced product for the war effort.  It also was
15  associated with a -- or at least owned a company
16  called Toy Craft which made wood toys back in the
17  1940's, and then progressed to basically wood ladders
18  in the 50's and 60's.  And it was acquired by Mr.
19  Miller in the 70's, early 70's.  And the product line
20  then has changed pretty much over to fiberglass
21  completely with the exception that we do produce a
22  small number of aluminum ladders.
23      Q.   But the wood ladders are out now?
24      A.   We do not manufacture wood ladders.  We have
25  not for about four years.  We do supply wood

Page 7

1   ladders.  We have a company that makes them for us.
2       Q.   Your home headquarters is where?
3       A.   Wooster, Ohio.
4       Q.   And is that where your manufacturing is
5   done, as well?
6       A.   We manufacture the ladders in Wooster.  We
7   have a sister company in Medina, Ohio which produces
8   fiberglass rail for us.
9       Q.   And I know a little bit about your
10  corporation from having read your deposition in
11  another case styled Robert Smith versus Bauer
12  Corporation, which was taken on September 7th of
13  2000.  Do you remember that deposition being taken?
14      A.   Yes, I do.
15      Q.   Okay.  There's some other subsidiary
16  companies owned by Bauer; is that right,
17  transportation companies and things like that?
18      A.   Bauer Transportation.  The company called
19  Ladder Man is a distribution sales arm of the company
20  as well.
21      Q.   And these are all wholly owned by Bauer?
22      A.   Actually, they're owned by a holding
23  company.  And Bauer is one of those companies in the
24  holding company.
25      Q.   What is the big holding company's name?

Page 8

1       A   You know, I knew you were going to ask me.
2   And for the moment I just can't remember it
3       Q.   We'll fill in a blank
4       A   Yes
5       Q   You're going to read this  That will be an
6   easy one to fill in
7       A   Okay
8            Holding company's name _____
9   _____
10           THE WITNESS  Do you remember, Tom?
11           Isn't that awful  I'm sorry, I just
12  can't remember that  I've drawn a blank
13           MR. BENTON.  Blanks happen
14           THE WITNESS  It will come up
15      Q   (BY MR BENTON) Your connection to the
16  company started when?
17      A.   In 1983
18      Q.   Okay.  And you were hired as what?
19      A   As a factory or plant manager
20      Q   Now, you have a degree, is it, from Ohio
21  State?
22      A   Yes, sir.
23      Q   And it's in industrial engineering?
24      A   Yes, sir
25      Q   And what -- what do you learn in industrial

Page 9

1   engineering?  And I don't mean any of your liberal
2   arts courses you might have had to take.  But I'm
3   talking about real core industrial engineering
4   classes.
5       A.   Well, industrial engineering has to do with
6   essentially manufacturing.  When I was in the program
7   I was in the manufacturing option.  And it had mostly
8   to do with the economics and the mechanics of
9   manufacturing products.
10      Q.   Okay.  I notice that your -- you said in
11  this earlier deposition that you weren't a design
12  engineer.
13      A.   That is correct.
14      Q.   And can you compare or contrast an
15  industrial engineer who's involved in the manufacture
16  of things and the design engineer.  I mean, sure, the
17  names show some of the --
18      A.   A design engineer primary is an outgrowth of
19  mechanical engineering, which is a discipline
20  itself.  And industrial engineering is a separate
21  discipline that has to do with manufacturing
22  processes as opposed to design processes.
23           BC Investments is the name of the
24  holding company.
25      Q.   Okay.  Is that wholly owned by Norman

Page 10

1 Miller?
2    A.  It is owned in the majority by Norman
3 Miller.  There are a few very minor shareholders as
4 well.
5    Q.  Okay.  Has your role -- And I'm just going
6 to call them Bauer, call the company Bauer.
7    A.  That's fine.
8    Q.  Has your role with Bauer changed since '83?
9    A.  Yes, it has.  I am now vice president,
10 engineering for Bauer.
11    Q.  I'm going to jump ahead real quick because
12 it's on my mind.  I noticed when you redesigned the
13 bottom of the rails for your fiberglass ladders to
14 include the boot, if I could use that word -- is that
15 a good word, the boot or sleeve?
16    A.  You can use that.
17    Q.  What do you call it?
18    A.  We call it a boot shoe or slip-on shoe.
19    Q.  Slip-on shoe.
20       -- that it seemed like you were very
21 much involved in the design of that; is that correct?
22    A.  That is correct.
23    Q.  Why wouldn't you have hired out to get a
24 design engineer to do it?
25    A.  Well, I didn't make that decision,

Page 11

1 obviously.  But I was asked to design a shoe if I
2 could.  And I felt I could, so I did.
3    Q.  And how is it working?
4    A.  It has worked very well.
5    Q.  I guess it means to some extent you didn't
6 need a fancy design engineer to do that?
7       MR. GENDRY:  Object to the form.
8    A.  I don't know how to answer that.
9    Q.  (BY MR. BENTON) I -- It seems like the
10 proof's in the pudding, right?
11    A.  Well, certainly the design that was arrived
12 at was not necessarily all my design.  We have -- We
13 had, at the time, another individual, who I think you
14 probably have reference to, by the name of Vick
15 Leaneno (phonetic) who was with the company.  And it
16 was a collaborative effort.  So I put the design on
17 paper, but we obviously came up with it as a joint
18 effort.
19    Q.  Is he a design engineer?
20    A.  He is -- He has a degree, I'm not sure what
21 it's in.
22    Q.  Okay.  Is it an engineering degree?
23    A.  I'm not sure what it's in and I don't want
24 to speculate.
25    Q.  Okay.  That's good.

Page 12

1       There were good reasons for moving away
2 from wood and to fiberglass in making these ladders;
3 is that right?
4    A.  Are you asking are there good reasons why we
5 no longer manufacture wood?
6    Q.  Well, I guess what I'm getting to is there
7 are advantages, as I understand, to fiberglass that
8 are different than wood.  And I'd like you to tell me
9 what those are.
10    A.  Well, generally speaking one of the
11 advantages of fiberglass is that it does not rot or
12 it's not subject to bug infestations and fungus and
13 things that wood products generally do.
14    Q.  And I believe it doesn't conduct electricity
15 like --
16    A.  It does not conduct electricity, but neither
17 does wood as long as wood is dry.  So that's not a
18 major advantage, although it is a major advantage
19 over aluminum products.
20    Q.  And they seem lighter.  Are they lighter?
21    A.  Fiberglass is not particularly lighter than
22 wood.  And it is heavier than aluminum.
23    Q.  Okay.  Is it about the same as wood?
24    A.  It's about the same as wood, product for
25 product.

Page 13

1    Q.  Okay.  Describe briefly the product line of
2 Bauer.  And I'll start with -- Let me back up and let
3 me strike that question.
4       The ladder here in question, did you
5 see the photographs of the ladder here that we're
6 dealing with?
7    A.  I have seen some photographs of the ladder,
8 yes.
9    Q.  Did you get to see the actual ladder?
10    A.  I have not.
11    Q.  Okay.  I didn't bring my answers to
12 interrogatories from Bauer.  But my recollection to
13 those answers is that you-all speculated that the
14 lad- -- subject ladder, I'm going to call it subject
15 ladder, was manufactured between '88 and '90; is that
16 your recollection?
17    A.  Yes, that's correct.
18    Q.  Okay.  Now, is there any printing on a
19 ladder that tells someone how old its date of
20 manufacture?
21    A.  When the ladder leaves the factory, one of
22 the labels has the manufacture date on it.
23    Q.  Okay.
24    A.  After time that information may fade to the
25 point where it's unreadable.

Page 14

1    Q.  And you're here representing Bauer
2  Corporation because that's who I've noticed, actually
3  the corporation.  And I set out in my notice various
4  questions I was going to ask.  And they produced you
5  as sort of the appropriate person that could
6  answer, --
7    A.  Yes, sir.
8    Q.  -- at least most of the questions.
9         Whatever nature the agents may be;
10  attorneys, investigators or whatever, have y'all
11  looked at the subject ladder to try to read the
12  manufacture date on it?
13    A.  Well, since I have not seen the ladder, I
14  haven't.  I've not been able to determine anything
15  from the photographs.  And I can't speak directly as
16  to what others may have seen or not seen in their
17  investigation of the product.
18    Q.  Okay.  Well, are you the one that put the
19  age on it between 1988 and '90?
20    A.  Yes.
21    Q.  And how did you arrive at that?
22    A.  I arrived at that in two ways, by knowing
23  the nature of the top that's on the ladder and by
24  knowing the nature of the bracing that's underneath
25  the steps.

Page 15

1    Q.  Okay.  So implied in that answer is there
2  were some changes made and that's what dates, in your
3  mind, the range of age?
4    A.  Yes, sir
5    Q.  Okay.  What were the changes that were made
6  that makes you think that it was '88 to '90?
7    A.  This ladder has a top design that was
8  discontinued about that time.  And it also has
9  aluminum bracing which was discontinued and replaced
10  with steel braces about that time.  So we know that
11  it was made at least prior to 1990.  I can't tell you
12  the exact date.
13    Q.  And why did you put a -- a number of '88 on
14  it?  Is there some features that were brought in
15  about 1988 --
16    A.  Because we --
17    Q.  -- that were on that ladder?
18    A.  Yes, that introduced this model about that
19  time, late 1987 early 1988.  So it would have been
20  produced in that two-year time period.
21    Q.  And I've got some photos of the
22  subject ladder if you ever need to refresh your
23  memory about what it looks like and so on.
24         Just briefly describe the product
25  lineup. I don't know the word I want to use, but

Page 16

1  array of products that you-all manufacturer right now
2  and sell.
3    A.  Bauer manufactures a variety of fiberglass
4  ladders, including extension ladders, two-way and
5  one-way stepladders, platform stepladders,
6  combination ladders, which are basically a ladder
7  that will -- can be used in a stepladder and
8  extension ladder position both.  And we manufacture
9  most of these products in aluminum versions as well.
10    Q.  How many different ladders do you make, more
11  or less?
12    A.  Major series and styles, probably 15 or 20.
13  Variations on those, depending upon customer
14  requests, it could be many, many more than that.
15    Q.  You have -- You have different qualities of
16  stepladders, is that right?
17    A.  No, all of our stepladders are top quality
18  ladders.
19    Q.  No, that's not what I'm saying.  Is -- Don't
20  you have like a -- is it a 304 versus a 350, and one
21  is considered more heavier duty than the other?
22    A.  We have different models that are made of
23  different materials with slightly different designs.
24  And some of those may be rated higher or contain more
25  materials than other products.

Page 17

1    Q.  Do I remember from my studies on this that
2  the -- that the 350 had actually thicker rails than
3  the 304?
4    A.  That is correct.
5    Q.  Okay.  And would I be incorrect in assuming
6  that the 350 costs more than the 304?
7    A.  The cost to manufacture for a 350 is more
8  than a 304.
9    Q.  Do you guys charge more for them?
10    A.  I'm not in the sales department, but I know
11  in certain instances products that are sold in
12  quantities may be sold at lesser price than other
13  products that normally would be sold in lesser
14  quantities that would be sold cheaper.
15    Q.  So is it fair to say you don't really know
16  whether generally a 350 is more expensive than a 304?
17    A.  Generally speaking, a 350 would be more
18  expensive than a 304.
19    Q.  Does the greater amount of -- or thickness
20  of the rails in a 350, does that make cracking, or
21  fracturing is the word I've learned from this, less
22  likely because it's thicker?
23    A.  You can't say that as a generality, no.
24  Neither rail is particularly prone to splitting,
25  cracking or failure.  Generally, the heavier weight



Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 61 of 328

Page 18

1  rails will support a heavier load under test
2  conditions. And that's about all we can say for
3  them.
4     Q. So to put that in more of an application
5  description, the thicker rails of the 350 will
6  support more weight person, or person carrying
7  objects than the 304 version?
8     A. That is correct, yes.
9     Q. And the ladder -- the subject ladder here is
10  a 304; is that right?
11     A. Yes, sir.
12     Q. Is there different versions of the 304?
13     A. We make certain products under private label
14  or that are labeled for a specific customer that
15  would be a different series number that would be the
16  same design as a 304. But it's essentially the same
17  ladder, we just call it a different number.
18     Q. And then the -- this company, in turn,
19  markets it under their name, sells it under their
20  name?
21     A. Or has it in their inventory under their
22  name, such as if they were a major contractor they
23  may want their own name on the ladder.
24     Q. Like do you still have the GTE contract?
25     A. We do not have the GTE contract, but we have

Page 19

1  a Southwestern Bell Telephone contract, for instance.
2     Q. And they put Southwestern Bell right on
3  their ladders?
4     A. On some of the products they do, yes.
5     Q. And you do it for them?
6     A. Yes.
7     Q. You put that labelling on for them?
8     A. Yes.
9     Q. Let's go to knowledge of fracturing rails.
10  Do you understand that this case, Mr. Escudero is
11  claiming that the back rails split and caused him to
12  fall off the ladder?
13     A. Yes, I do.
14     Q. Okay. Bauer Corporation has had knowledge
15  that rails can and do split for what, virtually as
16  long as they've been making fiberglass ladders?
17     A. Well, I can't speak to that because I was
18  not with the company when they started making
19  fiberglass ladders. But certainly since I have been
20  there, we know that fiberglass can fracture for a
21  variety of reasons.
22     Q. I have many of the, like Bauer claim records
23  and authorization for destruction of merchandise.
24  And most of this all dates from about 1990 to
25  present. Were you-all keeping similar records before



Page 20

1  1990?
2           MR. GENDRY: I'm going to object to the
3  form. If you could identify more specifically.
4     Q. (BY MR. BENTON) All right. I'm going to
5  mark this whole group here as Exhibit 1. And I'm
6  going to call this one 1A. And then if I need to
7  further identify the pack. then I'll go into
8  lettering. And if I run out of letters I'll go to
9  AA.
10           MR. BENTON: Is that all right with
11  you?
12           MR. GENDRY: That's fine.
13     Q. (BY MR. BENTON) I'll show you these. And
14  the heading says Bauer Claim Record. And I'm going
15  to put a sticker on it.
16           (Exhibit 1A marked.)
17     Q. (BY MR. BENTON) Did you-all keep those kind
18  of records about claims before like 1990?
19     A. I believe someone in the company did have
20  claim records prior to 1990. I can't tell you who
21  that person was.
22     Q. Do they still exist?
23     A. No.
24     Q. Do you know when they were destroyed?
25     A. Oh, I thought you were asking about the

Page 21

1  person.
2     Q. No, no.
3     A. I'm sorry.
4     Q. The records. Do those records still exist?
5     A. I believe they do not exist at the company,
6  no.
7     Q. Because I saw in your deposition in the
8  other case they asked you to go look for those. And
9  were you able to produce the ones before 1990?
10     A. We produced everything that we could find.
11     Q. Okay. Do you have a recollection of whether
12  you were able to go back and find some older ones?
13     A. My recollection is that we produced
14  everything that we could find. And if there were
15  older ones, we would have produced them if we could
16  find them. So they must not have been available if
17  we didn't -- didn't produce them.
18           MR. GENDRY: Just to be clear, we're
19  talking about the Smith -- talking about the Smith --
20           MR. BENTON: Case, yes, sir.
21           MR. GENDRY: Okay.
22     Q. (BY MR. BENTON) I'm going to show you what
23  I'm marking right now as Exhibit No. 2 to your
24  deposition.
25           (Exhibit 2 marked.)

Page 22

1   Q.  (BY MR. BENTON) And this one has some bold
2   letters that says, Claims Made Prior to 7/4/91.  Do
3   you recognize that document?
4   A.  Yes, I do.
5   Q.  Is that stapled together?
6   A.  Yes, it is.
7   Q.  At the bottom.  Okay.
8        Can we tell from that list the dates of
9   those claims?
10   A.  Not from this list, no.
11   Q.  Do you know if any more specific information
12   about those claims listed there are available, say in
13   the form of Exhibit 1, where it actually talks a
14   little bit about the type of defect, complaint and
15   injury?
16   A.  I suspect that the information -- or any
17   information we may have on these claims would not be
18   available currently in this form.
19   Q.  Okay.  What is the most common defect or --
20   Let me rephrase that.
21        What's the most common complaint you
22   hear from the field about your fiberglass ladders?
23   And let me back this up, because it changes, I'm
24   sure, with time.  Let's say in 19-- between 1988
25   and 1990, what were you hearing from the field, and I

Page 23

1   say from the field, I'm talking about either claims
2   from lawyers, letters from lawyers, lawsuits,
3   customers who just are -- you know, send back a
4   ladder, contacting y'all in some form or another, the
5   distributors of ladders contacting your company?
6   What was the most common complaint?
7   A.  Wobbly ladders.
8   Q.  And what was causing wobbly ladders?
9   A.  Quite honestly, if we knew, we would be able
10   to address the same issue as it arises today, because
11   that's still the most common complaint.
12   Q.  Is that a problem with fiberglass, that it
13   just isn't as stout as wood or aluminum?
14   A.  It's a common problem between both aluminum
15   and fiberglass.  And it has not been a problem with
16   wood ladders.  And it's -- I would speculate that
17   it's exactly what you said, because the rails in
18   fiberglass and aluminum will flex more than wood
19   rails.  And as the industry moved from wood to
20   fiberglass, they noticed a difference in the way
21   ladders felt when they stepped on them.
22   Q.  And did -- -- and of course you can only
23   speak from the time you got involved in '83.
24   A.  Yes.
25   Q.  And I think you said they started

Page 24

1   manufacturing fiberglass in the late 70's to middle
2   70's; is that right?
3   A.  Yes.
4   Q.  Okay.  But what did y'all do to try to make
5   them less wobbly?
6   A.  Essentially the problem, as we understood
7   it, was in the final assembly of the ladder.  If the
8   back section and the front section were not perfectly
9   in line when you connected those, when you stand the
10   ladder, one leg will appear to not touch the floor,
11   since it's a four-legged ladder.
12        We addressed that issue at the final
13   assembly area so that we basically were as accurate
14   as possible in producing square sections and sections
15   that would mate together squarely when we put them
16   together so they would stand on all four legs.
17   Q.  Proper balance of the weight?
18   A.  Well, not so much proper balance of the
19   weight as it was -- the weight of the ladder itself
20   is not enough to overcome whatever flex or slight
21   variations in assembly would occur.  When a person
22   would stand on the ladder, there would be enough
23   weight that it would stand on all four.  But as soon
24   as you'd step off of it, one of those legs may raise
25   up a 16th of an inch, and then the ladder would then



Page 25

1   appear to be -- would be wobbly.  And that would be
2   the common complaint.
3   Q.  Could you put more fiberglass in it to
4   make it less wobbly?
5   A.  It would have no effect.
6   Q.  Okay.  What would be the next biggest
7   complaint?
8   A.  In what period, again?
9   Q.  I would say from the time you got on board
10   in '83 to 1990.
11   A.  Probably freight damage.
12   Q.  Okay.  Is that the -- the problem that
13   develops when the -- the two sets of rails are not
14   exactly identical height and one of them would bang
15   into the other that cause a mark that you ultimately
16   put a little pad in for?
17   A.  That is -- was a major part of the issue in
18   1988, '89, '90, '91.  The other issue, which
19   continues today, is just handling of the product in
20   shipment causes damage.
21   Q.  Okay.  Now, when I look at Exhibit 1, almost
22   all of those complaints seem to have to do with
23   fractured rails.  Is that because you were asked to
24   pull out just fractured rail complaints, or is this
25   all the complaints and there really were a lot of

Page 26

1   fractured rails relative to the number of complaints?
2      A.  No, we were actually asked to pull out
3   fractured rail complaints.
4      Q.  Okay.  Would you agree that -- that ladders
5   have great utility?
6      A.  Yes, I would.
7      Q.  Would you agree that there is significant
8   risk associated with the use of a ladder, period?
9      A.  I could not necessarily state what
10  significant means, but certainly there is risk
11  involved whenever you climb anything.
12     Q.  Exactly.  I mean, when I was growing up we
13  didn't wear helmets when we rode our bikes.
14     A.  I still don't.
15     Q.  And some people almost think it's child
16  abuse today if you don't have a helmet on your child
17  when he's riding a bike.  The clear implication is
18  they're afraid they'll fall off and hit their head --
19     A.  That's right.
20     Q.  -- and suffer a head injury.
21         Those same kind of risks are involved
22  anytime you scale a ladder, aren't they?
23     A.  Well, certainly anytime you climb anything
24  there is a risk of fall, that's correct.
25     Q.  Do you believe that because of the risk

Page 27

1   associated naturally with climbing something puts a
2   higher -- or a duty upon manufacturers of those
3   ladders to make sure they're as safe as possible?
4      A.  Regardless of whether there was a specific
5   risk or not, I certainly believe the manufacturer has
6   a duty to produce a safe product.
7      Q.  Now, you ultimately redesigned the 304 and
8   the 350 both to include a shoe, a boot.
9      A.  Yes, sir.
10     Q.  Okay.  Did they go on the 350 first?
11     A.  They went on the 304 first.
12     Q.  Okay.  All right.  And that was
13  approximately 1995?
14     A.  Approximately.
15     Q.  Okay.  Is it safe to assume that you had
16  complaints or the company -- I say you, when I say
17  you, I'm really referring to Bauer, had notice or
18  complaints that fracturing was occurring on rails
19  causing people to fall and get hurt?
20         MR. GENDRY:  Object to the form.
21     Q.  (BY MR. BENTON) And I'll say from 1983 when
22  you came on.
23     A.  We had a limited number of instances that
24  would fit that description, yes.
25     Q.  And the number of ladders that you -- that

Page 28

1   Bauer has been selling, say since you've been on
2   board, has increased, hasn't it?
3      A.  Yes. it has.
4      Q.  The numbers I saw in the deposition were
5   about 30,000 a year.  Does that sound about right?
6      A.  For what year, sir?
7      Q.  Each year, is I think the answer I read.
8   About 30,000 each year.
9      A.  It would depend upon the individual model.
10  But in aggregate, sales for stepladders this year
11  would be in the range of 70,000.
12     Q.  Okay.  And what were they, say in 1990?
13     A.  Probably in the range of 30,000 to 35,000.
14     Q.  Okay.  Is it true that while you had -- you,
15  the company, had notice of rails fracturing at least
16  as early as 1983 when you came on, that the reason
17  that there was no change in design until about 1995
18  was because Werner, your competitors, were coming out
19  with a more supportive shoe or brace down at the
20  bottom?
21         MR. GENDRY:  Object to the form.
22     A.  Actually no, that is not correct.  We had a
23  very limited number of claims or complaints of split
24  rails.  Our competitor, major competitor, R.D. Werner
25  Company, introduced a fiberglass -- actually,

Page 29

1   initially introduced an aluminum repair sleeve for
2   their product, which they quickly realized was a
3   major problem, because it made their product
4   conductive to the first step.
5         They then replaced that with a
6   fiberglass shield that went on the outside of the
7   rail as a standard feature on certain of their
8   products.  And Bauer, as a response to that from a
9   marketing standpoint, introduced a similar fiberglass
10  shield to its product line.
11     Q.  (BY MR. BENTON) Has Bauer ever done a nu- --
12  numerical check to see what percentage of its ladders
13  people complain to them about, fiberglass ladders of
14  course, complain about their rails splitting?
15         MR. GENDRY:  Time frame?
16     Q.  (BY MR. BENTON) Has it ever done it?
17     A.  To my knowledge, there has never been a
18  complete study of that on a percentage basis.  We
19  have looked at over, for instance, a year what
20  number or what percentage of product we would hear
21  that had a split rail problem or a crack problem
22  compared to the number of ladders that we would
23  produce that year.
24     Q.  So for a given -- Do you remember what year
25  it was you did that for?

Page 30

1    A.  We did that in the early 90's.
2    Q.  Okay.  And did you come up with a hard
3  number for that year of what was reported to you
4  for -- of those kind of complaints?
5    A.  There were anywhere from six to ten reported
6  instances out of 30,000, 35,000 ladders.
7    Q.  Now, when you say six, is that what you
8  said?
9    A.  Uh-huh.  Yes, sir.
10    Q.  Are we are talking about six that resulted
11  in personal injury or six in which the rails cracked?
12    A.  Six that reported as cracked rails, whether
13  there was personal injury or not.  So over the four-
14  or five-year period, there would have been, in
15  aggregate, maybe 30 or 40 claims.
16    Q.  Okay.  And just to make sure I understand
17  you, it was 1990, was that a year that we're talking
18  about?
19    A.  That would --
20    Q.  Because I can go to these records and count
21  how many I see.
22    A.  That would have been the three or four
23  years -- early 1990's.
24    Q.  You used the number six.  Was that -- was
25  that for the year 1990?

Page 31

1    A.  I can't be specific to year.  But there
2  were -- there were a low number of claims, probably
3  under ten for any given year.  In aggregate, maybe,
4  as I say, 40 or 50.
5    Q.  Do you have any documentation where -- that
6  shows that you tabulated that?
7    A.  No, sir, I don't.
8    Q.  So it was pretty much done just in your own
9  mind?
10    A.  Well, it was pretty much done in conjunction
11  with our sales department.
12    Q.  But it never reached the written stage?
13    A.  Not that I'm aware of as a summary, no.
14    Q.  And of course I'm no expert on analyzing the
15  validity of a testing procedure.  There's actually a
16  word for that, I can't think of it right now, but
17  the -- the problem with that would be the idea of
18  reporting versus occurring could be widely varied,
19  wouldn't you agree?
20    A.  Yes.
21    Q.  I may have asked this, but when you did
22  redesign the 304's footing to include a boot or shoe,
23  have you noticed appreciable differences, reductions
24  in the number of leg fracturing cases?
25    A.  Yes.

Page 32

1    Q.  And I'll show you what I'm going mark as
2  Exhibit 3 to your deposition.
3       (Exhibit 3 marked.)
4    Q.  (BY MR. BENTON) And I'll represent to you
5  this is a photograph of a Werner ladder.  And
6  corroborated quickly by the name on the rail.
7    A.  Yes.
8    Q.  All right.  Looking at the -- the lower part
9  where you-all have a shoe now, is that yellow
10  plastic -- is that plastic or fiberglass?  What would
11  you call that?  It looks like plastic.
12    A.  If you're talking about the yellow piece at
13  the bottom, it looks like plastic to me.
14    Q.  If you know, is that design to reduce rail
15  fracturing and support the rail in the event a
16  fracture occurs?
17       MR. GENDRY:  Object to form.
18    A.  Well, I did not design the product, so I
19  can't --
20    Q.  (BY MR. BENTON) Doesn't it seem that that's
21  its purpose?
22       MR. GENDRY:  Object to form.
23    A.  It appears to be a bracing.  I can't tell
24  you specifically what Werner was trying to accomplish
25  because I didn't talk to them or was not involved in

Page 33

1  this design.  I can tell you this is a relatively new
2  design from Werner.  It's not been on the market for
3  very long.
4    Q.  (BY MR. BENTON) And here's another photo of
5  the same ladder.  We'll mark it as Exhibit 4 to your
6  deposition.
7       (Exhibit 4 marked.)
8    Q.  (BY MR. BENTON) That ladder -- or the
9  picture was taken with the ladder upside down.  And
10  that has some sort of a shoe or encapsulating shoe,
11  doesn't it?
12    A.  I would describe this as a plastic
13  combination brace and shoe.
14    Q.  Maybe a cap, is that -- do you like that
15  word, cap?  Because it's not -- it doesn't go up the
16  rail as high as yours does, does it?
17    A.  No, I wouldn't -- I'd call it a combination
18  brace and shoe.
19    Q  Okay.
20    A.  I don't know what else to call it.
21    Q.  And I don't have any problems, we can all
22  it -- it is a shoe?
23    A.  Yes.
24    Q.  And you -- Do you have an opinion whether
25  that would help in the -- to reduce fracturing of the

JOHN VASICHKO VOL. 1 OF 1                                    JULY 26, 2001

10 (Pages 34 to 37)

Page 34

1  effects of fracturing if it occurred?
2      MR. GENDRY: Object to form.
3      A.  I have no opinion.
4      Q.  (BY MR. BENTON) While you-all designed a
5  shoe for your model 304, there are some alternative
6  design methods that could reduce fracturing or reduce
7  the effect of fracturing if it occurred, wouldn't you
8  agree?
9      A.  Yes, I would agree with that.
10     Q.  Meaning the boot's not the only way do it?
11     A.  That's correct.
12     Q.  There are other ways to -- deal with the
13 fracturing issue, right?
14     A.  If fracturing is a significant issue, then
15 there are potentially more than one way to deal with
16 it.
17     Q.  And it's Bauer's position that fracturing is
18 not a significant issue?
19     A.  That's our contention, yes.
20     Q.  Now, in these claims on Exhibit No. 1 --
21 Have you looked at these before?
22     A.  Yes, I have.
23     Q.  If you want, you can take some time and look
24 at them. Some of those look like significant
25 injuries.



Page 35

1      MR. GENDRY: Object to form.
2      MR. BENTON: Okay. I just made a
3  statement. You're right.
4      Q.  (BY MR. BENTON) If you want to take a look
5  at them and see if -- as you look through those,
6  whether you consider some of those to be significant
7  injuries, at least as reported.
8      A.  In some cases there are no injuries. In
9  some cases there are slight injuries. And in some
10 cases there are serious injuries.
11     Q.  The fact that serious injuries are -- some
12 serious injuries are coming from fracturing, doesn't
13 that concern Bauer?
14     A.  The fact that an injury occurs at all, for
15 whatever reason, concerns Bauer.
16     Q.  But there's not enough injuries there that
17 you think for safety purposes, the -- some sort of
18 design adjustment needs to be made to reduce the
19 chances or effects of fracturing?
20     A.  Some of these injuries may have been caused
21 by conditions or situations that were not a failure
22 of the product. A split rail could be a result of a
23 fall and a person landing on the ladder as well as
24 the ladder splitting causing a fall. And in some
25 cases, this was the case.

Page 36

1      Q.  Meaning the fracturing didn't occur until
2  the person's body slammed against the ladder?
3      A.  That is correct.
4      Q.  Okay. But the fact that we know there are
5  some serious injuries that are the result of
6  fracturing, doesn't that concern Bauer enough to want
7  to address the design issue of reducing the
8  occurrence of effect of fracturing?
9      A.  Well, as I said before, every situation
10 involving an injury is a concern to Bauer.
11     Q.  Do you have an idea about the percentage
12 reduction of fracturing complaints since you've put
13 the shoe on the -- or boot on the 304? Have they
14 dropped in half, a third?
15     A.  They have dropped more than half.
16     Q.  And is that just based on your sort of
17 internal estimate, or have you actually done a study
18 on it a little bit?
19     A.  Both. Actually, we've looked at the numbers
20 and we know what is occurring.
21     Q.  Is that in written form?
22     A.  Probably not.
23     MR. BENTON: Well, if it is,
24 Mr. Gendry, would you agree to produce that? I think
25 that's covered in sort of my broad request for

Page 37

1  production.
2      MR. GENDRY: What is the document
3  specifically?
4      MR. BENTON: They've done studies as to
5  reduction in number of complaints regarding
6  fracturing since they redesigned the boot or the
7  bottom to put a boot on it
8      THE WITNESS: Well, we review claims
9  and we review product returns on a regular basis.
10 And based on those reviews, which are not necessarily
11 written, we know that it has resulted in a reduction.
12     MR. BENTON: And my request is, if they
13 are written. I'd like them.
14     MR. GENDRY: (Moving head up and down.)
15     MR. BENTON: Can we agree on that?
16     MR. GENDRY: Sure.
17     MR. BENTON: Okay.
18     Q.  (BY MR. BENTON) While we're on the subject
19 of documentation, we'll stick with the complaints.
20 I'm going to show you what I guess we will -- I hate
21 to make a full copy of this. I'm just going to, if
22 it's all right Mr. Gendry. we'll make a copy of the
23 responses to the request for production without the
24 actual attachments, okay. And we'll mark this as
25 Exhibit 6

PHONE #(210)377-3027        ESQUIRE DEPOSITION SERVICES        FAX #(210)344-6016
7800 IH-10 WEST, SUITE 100      SAN ANTONIO, TEXAS 78230        1-800-969-3027

Page 38

1      (Exhibit 6 marked.)
2      Q. (BY MR. BENTON) Take a look at that. And
3  then I think on the last page it's got your
4  affidavit. Can you confirm that for me.
5      MR. BENTON: And while he's looking at
6  that, can we take a quick break?
7      MR. GENDRY: Sure.
8      (Break taken.)
9      (Read back.)
10     Q. (BY MR. BENTON) Let me rephrase that
11  question. Looking at the first pages of Exhibit 6,
12  which is -- it's going to be all of Exhibit 6 once we
13  detach the attachments, are you familiar with those
14  answers, and is that your affidavit on what will be
15  the last page?
16     A. That is my signature, yes.
17     Q. And when you signed that, what did you
18  think -- did you understand you were swearing under
19  oath?
20     A. Yes.
21     Q. And what did you understand you were
22  swearing to under oath that?
23     A. The answers that -- or the information
24  provided here was consistent with what was
25  interpreted by counsel to be necessary.

Page 39

1      Q. Okay. We'll go to question number 1 -- or
2  request we call it, request for production number 1.
3  Doesn't that basically say produce any documents
4  associated with alternative designs that in
5  reasonable probability will significantly reduce the
6  risk or occurrence of injury due to fracturing?
7      A. I don't see that in this particular
8  document, no.
9      Q. I got the wrong one. Strike that.
10     It's request -- it's request for
11  production number 2, claims in ten years -- Well, why
12  don't you just go ahead, and if you don't mind, read
13  number 2 for me.
14     A. Documents or tangible things regarding
15  claims or lawsuits made against defendant with
16  allegations similar to the incident in question, to
17  wit, cracking or splitting of legs of similar ladders
18  within the past ten years.
19     Q. Okay. And the response was?
20     A. None.
21     Q. Okay. Now, is that true? You-all don't
22  have any documents of other people who claimed, at
23  least, that they were hurt because of leg fracturing?
24     A. My understanding of what we produced was
25  anything in addition to information that you already

Page 40

1  had. And there was nothing in addition to
2  information you already had.
3      Q. Okay. Well, I want you to know -- Well, how
4  can I address this? What did -- When you swore to
5  it, what was your understanding that I already had?
6      A. You had information -- all information
7  provided by Bauer in the Smith case.
8      Q. What's the date of that affidavit?
9      A. 21st day of May, 2001.
10     Q. For the record, I didn't.
11     A. It was my understanding you did.
12     Q. No. In fact, I supplied your counsel with
13  what I got from the Smith case.
14     A. Well, it was my understanding you did.
15     Q. Okay. Let's go to number 4. Would you read
16  it?
17     A. The complete contents of any investigation
18  file of Defendant or its insurer regarding
19  Plaintiff's claim prior to any reasonable
20  anticipation of litigation.
21     Q. Is that number 4?
22     A. That's what I'm reading.
23     Q. I think you did.
24     Number 5.
25     A. Any accident reports, accident memorandums

Page 41

1  or other writings recording any information between
2  Defendant's employees or agents regarding the
3  tendency of the subject ladder or similar ladders to
4  crack or split at the legs.
5      Q. Answer?
6      A. None.
7      Q. Now, you actually have substantial writings
8  between your employers regarding splitting; isn't
9  that right?
10     A. I understand this question to mean a
11  tendency of the subject ladder or similar ladders to
12  crack or split. And I do not contend that there is a
13  tendency for those ladders to do that.
14     Q. Isn't it true that there's multiple
15  memorandums that occurred as the decision to put the
16  shoe or boot on the 304 was coming to fruition? Did
17  you understand my question?
18     A. Would you restate that. I'm sorry.
19     Q. Yeah, to put it real simple, you-all put a
20  lot of stuff in writing talking about whether you
21  should or should not -- the pros and cons, the
22  reasons for putting a shoe on the 304 before you ever
23  actually did it.
24     A. That is correct, yes.
25     Q. And wouldn't -- and one of the main things

Page 42

1  that that shoe does is prevent fracturing or reduce
2  the effects of fracturing if it occurs; isn't that
3  right?
4      A.  The main reason for that shoe is to prolong
5  the life of the ladder.
6      Q.  And to prolong the life of the ladder, we're
7  talking about preventing fracturing from reducing the
8  life of the ladder?
9      A.  It may prevent fracturing in some cases.
10     Q.  Well, how else does it prolong the life of
11 the ladder if it isn't to prevent fracturing?
12     A.  It protects the end of the rail better than
13 the existing shoe we had at the time.
14     Q.  And protects it from what?
15     A.  From damage.
16     Q.  And fracturing is a part of damage, isn't
17 it?
18     A.  Wear is the major problem with the bottom
19 end of the rail of the ladder, not fracturing.
20     Q.  When you say wear, what do you mean by
21 wear?  Are you talking about it actually starts to
22 become a shorter ladder because it's wearing out from
23 friction and use at the bottom?
24     A.  Our investigation of product complaints and
25 product returns and products that we had seen

Page 43

1  returned with damaged side rails, it appeared to be
2  the result of handling the product on and off racks
3  on vans or pickup trucks that actually wore away the
4  fiberglass at the bottom of the ladder.  And the shoe
5  prevents that.
6      Q.  Okay.  And if it wears out, what happens if
7  it wears down?  I mean the --
8      A.  Then the ladder is not serviceable.
9      Q.  And why isn't it serviceable?
10     A.  Because it no longer will support the weight
11 of the user.
12     Q.  Why won't it support the weight of the user?
13     A.  Because the rails are damaged.
14     Q.  How -- How are they damaged?  That's what
15 I'm trying -- because I really think it has to do
16 with fracturing.
17         MR. GENDRY:  Object to the form.
18         MR. BENTON:  I understand.
19     A.  Because they're worn out.
20     Q.  (BY MR. BENTON)  And when they wear out,
21 what's the mechanic of it not being able to be used.
22 I mean, if you just had a blunt end on the end of the
23 foot of a ladder leg, the fact that it is worn down,
24 scratched up, that in and of itself isn't going to
25 change its function.  I mean, if there's a shoe on it

Page 44

1  like, say the Louisville has or something and it
2  knocks that portion out, the part that actually
3  moves, you know what I'm describing, with the rubber
4  at the bottom and what do you call --
5      A.  No, I don't.  I don't really know what
6  you're describing.
7      Q.  What is the -- Well, at the time of this 304
8  ladder, the subject ladder, you had some sort of a
9  little -- What did you call the thing at the very end
10 of the rails?
11     A.  We had a shoe.
12     Q.  Okay.  It was called a shoe?
13     A.  Yes, uh-huh.
14     Q.  And the shoe, did it -- it moved, right?
15     A.  It did not.
16     Q.  It was fixed?
17     A.  Yes.
18     Q.  Some do move; is that right?  Other
19 manufacturer's move?
20     A.  On extension ladders they move.  I know of
21 no manufacturer that has a moving shoe on a
22 stepladder.
23     Q.  Okay.  So if it's wearing out from putting
24 it on racks, whether it be van, pickup truck, how is
25 that making it unusable?

Page 45

1      A.  It would eat through the fiberglass until
2  the rail would separate, it would come apart.
3      Q.  It would fracture?
4      A.  No, it would come apart from wearing away.
5  It would not fracture, it would come apart from
6  wearing way.
7      Q.  It would then crack, split?  What word --
8      A.  Separate.
9      Q.  Separate.  I'm using fracturing synonymously
10 with separation.  Am I -- Is that a bad use of the
11 word?
12     A.  Yes, it is a bad use of the word.
13     Q.  Tell me the difference so I can be more --
14     A.  Fracturing would be an otherwise
15 structurally sound component that would simply crack
16 apart.
17     Q.  That is what?
18     A.  That's fracturing.
19     Q.  Fracturing.  Okay.  And what's --
20     A.  In our case we have a situation of a rail
21 that is basically worn away to the point where it
22 separates.
23     Q.  The end result is the same, right?
24     A.  It may --
25     Q.  A longitudinal line develops up the ladder

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 68 of 328

Page 46

1   leg causing it -- what was once one piece to go into
2   one or more pieces, right?
3       A.   It may be the same, yes.
4       Q.   Going back to the request for production
5   number 5.
6            (Exhibit 5, 6, 7, 8, 9, 10, 11,
7            12, 13, 14 and 16 marked.)
8            THE WITNESS:   While he's doing that,
9   could you show me to the bathroom.
10           (Break taken.)
11      Q.   (BY MR. BENTON) I'm jumping out of line
12  here, but I'm going to show what's been marked as
13  Defendant's -- well, your Exhibit No. 16.  You want
14  to take a look at that.  It's multiple pages there.
15  And tell us what they are.
16      A.   These, without going through every one,
17  appear to be copies of a document called
18  Authorization for Destruction of Merchandise.
19      Q.   And in some of those, it deals with
20  complaints about fractured rails, doesn't it, or
21  splitted rails or cracked rails?
22      A.   That is correct.
23      Q.   And those documents would be responsive to
24  request for production number 2 where we asked for
25  documents or tangible things regarding claims

Page 47

1   alleging cracking or splitting of legs of similar
2   ladders within the past ten years?
3       A.   Yes.
4       Q.   Those documents, No. 16, would be responsive
5   to that request, would they?
6       A.   They appear to be, yes.
7       Q.   And your -- the reason that -- and what is
8   your reason for swearing to none?
9       A.   These are not claims or lawsuits.  I guess
10  I --
11      Q.   Well, those people are asking for some sort
12  of either replacement ladder or credit, aren't they?
13      A.   In some cases, yes, they may.
14      Q.   And that's a claim, isn't it, even though
15  it's not a personal injury claim, --
16      A.   Well, it's --
17      Q.   -- it's a product -- property claim isn't
18  it?
19      A.   That's not what I define to be claim.  A
20  personal injury is what we define to be a claim.
21      Q.   If you -- If someone ran into you in your
22  car and it was their fault and you were not injured
23  but they damaged your car, wouldn't you be making a
24  claim for the repair of your car?
25      A.   Yes.  I probably would.

Page 48

1       Q.   So wouldn't you think that if someone says
2   that a product is no good and they want either a
3   refund or another ladder, isn't that a claim?
4       A.   Well, we don't consider a claim as such.  We
5   may consider it a product return or a customer
6   complaint, but not a claim, as such.
7       Q.   Who decides whether the complaining consumer
8   in those records, No. 16, gets some sort of
9   compensation?
10      A.   That's a sales decision.
11      Q.   I'm going to show you Exhibit No. 5.  Can
12  you tell us what that is?
13      A.   This is an interoffice memorandum addressed
14  to Norman Miller from me dated March 6th, 1995 with a
15  subject of, Slip-on Shoe Evaluation.
16      Q.   And doesn't it say that the slip-on shoe
17  would prevent cracking in the rails?
18      A.   It appears to indicate that it would delay
19  cracking in the rails.
20      Q.   Don't you think that would relate to request
21  for production number 5 when we asked for any kind of
22  writings between Bauer employees regarding the
23  tendency of the subject ladder or similar ladders to
24  crack or split at the legs?
25      A.   This particular document is an evaluation of

Page 49

1   one design against another.  It has, I don't think,
2   anything to do with tendencies.
3       Q.   Are you saying that the shoe did not -- was
4   not addressed -- if I may see this so I can read it.
5   Are you saying that the shoe that you added was not
6   addressed to prevent splitting of side rails at the
7   bottom of the ladder?
8       A.   The document says, to recap the testing,
9   each ladder was subjected to a series of simulated
10  abuse tactics to evaluate whether the slip-on shoe
11  would prevent splitting of side rails at the bottom
12  of the ladder.
13           And I stand on that statement.
14      Q.   Right.  That -- That was about designing
15  something to -- to reduce or prevent splitting of or
16  cracking of the rails; is that right?
17      A.   Yes.  This was -- this was a test protocol
18  to evaluate one product against another.
19      Q.   For the -- to try to reduce cracking of the
20  rails?
21      A.   Prevent splitting of side rails at the
22  bottom of the ladder.
23      Q.   So that's a yes?
24      A.   Yes.
25      Q.   Okay.  And therefore it would relate to

Page 50

1　request for production number 5 asking for
2　communication between employees regarding the
3　tendency of ladders or similar ladders to crack or
4　split at the legs. It would relate to leg cracking.
5　wouldn't it.
6　　A. It would relate to leg cracking. Again. I'm
7　going to say that this information, I was informed,
8　you already had. So I did not provide it again.
9　　Q. Okay. All right. So it would be
10　applicable, but the reason you said none --
11　　A. Because I have no more --
12　　Q. And so --
13　　A. -- than what you already have.
14　　Q. -- are you saying you really should have
15　said, I don't have any other than what has already
16　been produced? Would that have been a more accurate
17　answer?
18　　A. That probably would have been more
19　accurate. But on the advice of counsel we wrote the
20　word "none."
21　　Q. Okay. Okay.
22　　　　My recollection is that this -- putting
23　on this shoe to reduce cracking of the rails
24　initially came up in some sort of a meeting you-all
25　had, and then you were assigned to go out and look

Page 51

1　into it. Is that how all that developed?
2　　A. Yes.
3　　Q. And there was some -- and in the meeting, at
4　one point or another somebody, you or someone said,
5　you know, the legs can crack and why don't we see
6　what we can do about coming up with something to help
7　that
8　　A. Why don't we see if we can come up with
9　something to make the ladders last longer.
10　　Q. Right. And when they're cracked they can't
11　be used, so it's sort of the same thing, right?
12　　　　MR. GENDRY: Object to form.
13　　A. When they're cracked they should not be
14　used, that is correct. And if you can prevent that
15　cracking for a longer period of time, then you get
16　more life out of the ladder, which was our
17　objective.
18　　Q. (BY MR. BENTON) I'm going to show you
19　Exhibit No. 7. Is this the first time that something
20　was written down, to your recollection, about this
21　issue, that is y'all met in a meeting, it's oral.
22　you're all just talking, and is that the first
23　document that came out of that discussing. hey, what
24　do you say we look into a design about reducing
25　cracking of rails? Or was there one before that?

Page 52

1　That's what I'm -- why I got this group of stuff out
2　here.
3　　A. I provided in the case, Smith versus Bauer,
4　a series of documents that related to this issue.
5　And I do not recall which was first and which was
6　latter.
7　　Q. Okay Fair enough.
8　　A. What you have is what you have.
9　　Q. And I'm going to show you Exhibits 8 and 9
10　and 10 and 11 and 12 and 13. And do those all relate
11　to the communications going on about the improvement
12　or modification of the shoe on the 304?
13　　A. These all appear to be related to the issue
14　of the slip-on shoe. Without reading them in detail,
15　I can't state more than that at this time.
16　　Q. The date on No. 13 is what?
17　　A. October 24th, 1991.
18　　Q. So there was a three- to four-year time span
19　from the time that you first started considering that
20　there were fracturing going on, or at least cracking
21　going on, and perhaps we might come up with some
22　options to improve that; is that right?
23　　A. I'm sorry, I don't understand your question
24　in that form. Would you please clarify a little bit.
25　　Q. Sure. And I'll -- Yeah, I'll try to get

Page 53

1　away from being a lawyer and talk plain.
2　　　　Doesn't 13 reflect that y'all were at
3　least thinking about trying to improve the shoe to
4　reduce cracking as early as '91, but you really
5　didn't get around to actually designing the new shoe
6　until '94 or '95?
7　　A. This was late 1991, yes.
8　　Q. So whatever that is, three years then.
9　Three plus years, four years, somewhere in there; is
10　that right?
11　　A. And obviously part of that was the time
12　frame that the tooling was being produced when we
13　made the decision to produce the shoe. And that's a
14　long, fairly long period.
15　　Q. Do you know the dates on the blueprints,
16　because they -- once you got your blueprints, then
17　you can send it over to your tool-making people,
18　right?
19　　A. Yes.
20　　Q. So the dates on the blueprints would reflect
21　when you had your specifications necessary for them
22　to make tools?
23　　A. Yes.
24　　Q. Do you know the dates on those offhand? Do
25　you remember more or less?

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 70 of 328

Page 54

1    A.  If you have a copy I'd be happy to review it
2  and tell you.
3    Q.  I'll mark Exhibit 17.
4       (Exhibit 17 marked.)
5    Q.  (BY MR. BENTON) Is that one of the
6  blueprints involved?
7    A.  Yes, sir, it is.
8       (Exhibit 18 marked.)
9    Q.  (BY MR. BENTON) No. 18, is that one of the
10  blueprints involved in our discussion here?
11    A.  This one would not directly relate to the
12  shoe. no.
13    Q.  What is that one about?
14    A.  This was rail.  Actually, it's back
15  assembly.
16    Q.  And what -- were there some changes, is that
17  why these blueprints were made?  And what -- and if
18  so -- Well, go ahead.  I'll ask that first.
19    A.  They were just the general assembly prints
20  of the ladder provided.
21    Q.  Is that -- That's before you got into
22  modifying the shoe?
23    A.  These prints were produced before, yes.
24       (Exhibit 19 marked.)
25    Q.  (BY MR. BENTON) And how about 19, what are

Page 55

1  those about, those blueprints?
2    A.  This is the front assembly.  It will be,
3  again, predating the shoe prints.
4       (Exhibit 20 marked.)
5    Q.  (BY MR. BENTON) And 20?
6    A.  This was a final assembly.  And it, again,
7  would predate the shoe prints.
8       (Exhibit 21 marked.)
9    Q.  (BY MR. BENTON) 21, which is in two parts
10  here?
11    A.  This one marked as Exhibit 21 is the back
12  rail slip-on shoe.
13       (Exhibit 22 marked.)
14    Q.  (BY MR. BENTON) No. 22?
15    A.  Is back rail assembly, and it predates the
16  slip-on shoe.
17       (Exhibit 23 marked.)
18    Q.  (BY MR. BENTON) 23?
19    A.  Final assembly, and it predates.
20       (Exhibit 24 marked.)
21    Q.  (BY MR. BENTON) 24?
22    A.  This was a front section assembly, and it
23  predates.
24       (Exhibit 15 marked.)
25    Q.  (BY MR. BENTON) Out of order.  No. 15?

Page 56

1    A.  This is a rail profile for ladder channel.
2  And it predates.
3       (Exhibit 25 marked.)
4    Q.  (BY MR. BENTON) No. 25?
5    A.  25 is another fiberglass ladder channel.
6  And it predates.
7    Q.  Okey.  All these predating ones that we
8  spoke of, they didn't have any sort of supportive
9  shoe to prevent cracking, right?
10       MR. GENDRY:  Object to the form.
11    A.  The drawings that predate the shoe drawings
12  either are drawings of rail profiles, which have
13  nothing to do with the shoe whatsoever, or they are
14  drawings of ladder sections or final assemblies which
15  do include a metal and rubber combination shoe at the
16  bottom of the rails.
17    Q.  I'm talking about the new shoe that was
18  introduced in '95.
19    A.  Uh-huh.  Yes.
20    Q.  Do any of these exhibits here that we're
21  calling predating, do they have anything -- do they
22  have any -- do they reflect anything about the new
23  shoe that was introduced in '95?
24    A.  No, I do not believe they do.
25    Q.  Okay.  Now I think we were going to look at

Page 57

1  dates because we have this 19- -- October of '91
2  memo, No. 13.  And then we were going to -- we got
3  some blueprints here that show when we could have got
4  those over -- or around the time we would have got
5  those over to the toolmakers for the manufacturing
6  process.
7    A.  And they are dated September 15 and
8  September 20th 1994.
9    Q.  Three years, more or less, then?
10    A.  More or less, yes.
11    Q.  Is there a reason for that three-year delay?
12    A.  There are several reasons for that time
13  frame.  One is there was no compelling reason to
14  makes a change.  Two, we were attempting to compete
15  with competition product.  And three, we were unsure
16  as to whether a vinyl type shoe would have any effect
17  whatsoever on the longevity of the rails.
18    Q.  So is it Bauer's position that the shoe that
19  was developed in '95 on the 304, that really wasn't
20  trying to remedy any problem with the safety of the
21  ladder?
22    A.  It was attempting primarily to extend the
23  life of the product.
24    Q.  But not remedy any dangerous condition?
25    A.  That is correct, yes.

## Page 58

1    Q. And I -- We get our yes's -- you know, when
2  I asked the question weird and then you don't know
3  what a "yes" means or a "no" means --
4    A. Yes, it was not attempting to remedy any
5  dangerous condition.
6    Q. Thank you.
7        In request for production number 11, if
8  I may read it, it says documents or tangible things
9  which reflect expenses or labor to repair or modify
10 the subject ladder or similar ladders to make them
11 safer. Now, you said none. And I think when we look
12 at these memos that we've talked about, you know, in
13 Exhibit -- oh, for example, Exhibit No. 13 where it
14 talks about tooling costs and the cost of ladder and
15 I think the other ones have some of that stuff in
16 them, now those deal with -- what is -- number 11
17 that deals with talking with the costs involved in
18 modifying the ladder, right?
19    A. Again, I am going to say that this
20 information -- or information provided in this
21 request for production would reflect anything in
22 addition to what you already had.
23    Q. Okay.
24    A. So I knew you had -- or I was told you had
25 access to that information, so there was nothing more

## Page 59

1  to provide.
2    Q. And again, "none" may not be the most
3  accurate answer. Perhaps it should have said
4  something like no more --
5    A. In addition to, yes.
6    Q. Because there are documents that we have
7  that do talk about the cost of modifying the ladder?
8    A. Yes. And there was no intent here to not
9  include those, but I was informed that you had access
10 to all those documents and there was no reason to
11 duplicate them.
12    Q. Okay. I want to talk sort of briefly about
13 the insurance policy. I've been provided a copy of
14 the insurance policy.
15       MR. GENDRY: There's our copy.
16       MR. BENTON: Do you want me to attach
17 that one or do you want that one?
18       MR. GENDRY: Just so we can make a copy
19 for the --
20       MR. BENTON: The court reporter?
21       MR. GENDRY: -- the court reporter.
22 That's my only copy I have.
23       (Exhibit 26 marked.)
24       MR. BENTON: I'm marking the insurance
25 policy as Exhibit 26.

## Page 60

1       MR. GENDRY: And we'll get a copy of
2  that before we leave.
3    Q. (BY MR. BENTON) It's a 2 million policy,
4  right?
5    A. Limits of liability, 2 million each
6  occurrence, 2 million aggregate.
7    Q. Okay. It's a claims made policy, right?
8    A. Yes, I believe it is.
9    Q. Okay. And the coverage period is from
10 October 1st of '99 to October 1st of 2000, right?
11    A. That's correct.
12    Q. Have you-all continued to have the same
13 policy in the subsequent years to that 10/1 of 2000?
14    A. We have continued insurance. I would not
15 necessarily say it's identical with this insurance.
16    Q. Is it through the same company?
17    A. We have had more than one company. I
18 believe we are still with Lexington.
19    Q. Okay. Okay. The company has what they call
20 a self-insured retention of $100,000 per occurrence.
21    A. That is correct.
22    Q. And that -- and that the expenses of claims
23 such as lawyers and legal fees -- I mean legal
24 expenses and so on, those are paid by Bauer as part
25 of their self-retention?

## Page 61

1    A. That is correct.
2    Q. Since it -- the policy is the type that says
3  2 million aggregate, have there been any other claims
4  or is there any pending claims that would influence
5  the availability of coverage?
6    A. I would not want to give a definitive answer
7  to that until I checked for sure. So I would say
8  it's possible there could be, but I don't know for
9  sure.
10    Q. And I think you understood what I'm talking
11 about.
12    A. Yes.
13    Q. Okay. So what I'd like to do is can we
14 leave a space in the deposition big enough to say
15 either none, or yes, the following claims are either
16 A, have been resolved and "X" number of dollars was
17 paid out of that 2 million, or B, it's pending?
18    A. Rather than leave a space in the deposition,
19 why don't we just say that we will supplement the
20 information with information to you.
21    Q. Okay. We can do it that way. Just that
22 you'll agree to produce any documents about those
23 claims that might affect that aggregate 2 million.
24    A. Certainly.
25    Q. And you know what I mean, that means they've

Page 62

1 already paid 1 million, there's only 1 million of
2 coverage left for that period.
3     A. Yes.
4     Q. And if there's someone else out there who
5 died who may be asking for 5 million, we might be,
6 Mr. Escudero, in competition for the 2 million?
7     A. Yes. I understand.
8     Q. Okay. I knew you did, I just kind of wanted
9 to make it express.
10     A. Yes.
11       MR. GENDRY: Are you going to send me
12 something in that regard, or --
13       MR. BENTON: Would you like me to?
14       MR. GENDRY: I'm making a note here,
15 but --
16       MR. BENTON: All right. I'll do it
17 right now.
18       MR. GENDRY: Just send me a letter.
19       THE WITNESS: I just thought it would
20 make the deposition complete if we did it the other
21 way.
22       MR. BENTON: And I'm not picky about
23 how I get it.
24     Q. (BY MR. BENTON) The idea of supporting the
25 foot of ladder rails is not -- which will reduce

Page 64

1     A. Yes, it can be. The state of the art,
2 however, has progressed as fiberglass ladders have
3 been produced for longer periods of time.
4     Q. And the idea of the technology being
5 available, that is whether you're wrapping it with
6 metal, which may be a bad idea because of its
7 conductivity for electricity, or rubber or vinyl or
8 plastic, but the technology of wrapping something
9 around the rails, either riveting, gluing it, all of
10 the above, that technology has been around for a
11 long, long time, hasn't it?
12     A. Yes, it has.
13     Q. And then you got into the cost analysis of
14 reinforcing the foot of the rail before you modified
15 the 304 model, didn't you?
16     A. Yes, we did.
17     Q. And what is your recollection as to how much
18 that modified shoe increased the cost of a ladder, do
19 you remember?
20     A. There was a relatively significant increase
21 with the addition of a fiberglass sleeve. There was
22 a substantial up-front cost for tooling to produce
23 the vinyl shoe. But the vinyl shoe itself ultimately
24 proved to be less expensive than the conventional
25 metal and rubber shoe that we were using at the

Page 63

1 cracking is not new, is it?
2     A. I don't think I fully understand your
3 question.
4       MR. GENDRY: Yeah. I object to the
5 form.
6     Q. (BY MR. BENTON) Okay. In the previous
7 deposition, the plaintiff's counsel talked with you
8 about a patent in the 1930's where somebody had
9 patented the concept of, I believe it was putting
10 metal of some kind around the foot of wooden ladders
11 to support them.
12     A. I believe I recall that, yes.
13     Q. Okay. And so in one form or another, the
14 idea of putting something on the foot of the rail of
15 ladders to support the rail is not a new idea, is it?
16     A. No, it's not a new idea.
17     Q. And it may well have been around as long as
18 70 years, maybe?
19     A. In relation to ladders made from wood, yes,
20 that's correct.
21     Q. But the same concept can still be
22 transferred to another material from which ladders
23 are made of, right?
24     A. Yes, it can be done.
25     Q. In fact it was done here.



Page 65

1 time.
2     Q. So once you had your cost of having the
3 design, your testing of the design, your retooling of
4 the tools to manufacture, once those costs were
5 spent, the -- and you had your tools to make this new
6 kind of sleeve, it actually was cheaper to make them
7 than the old ones, huh?
8     A. That is correct, yes.
9     Q. And it improved your product, right?
10     A. Yes, it did.
11     Q. On these claim records that we spoke of much
12 earlier, I asked you if you had any that predated the
13 ones that are exhibits to your depositions. And you
14 said you didn't think so. Is that a for sure, you
15 don't have them?
16     A. We don't have them.
17     Q. Okay. Had your new boot on the 304 been in
18 place on the ladder that Mr. Escudero was on, would
19 that have significantly reduced the chances of that
20 rail cracking?
21       MR. GENDRY: Object to form.
22     A. I have not seen the ladder. I don't know
23 how the ladder was used or abused. I really can't
24 comment.
25     Q. (BY MR. BENTON) But it would have

**PHONE #(210)377-3027**
**7800 IH-10 WEST, SUITE 100**

**ESQUIRE DEPOSITION SERVICES**
**SAN ANTONIO, TEXAS 78230**

**FAX #(210)344-6016**
**1-800-969-3027**

Page 66

1   substantially reduced the chance of cracking in and
2   of itself, right, by reinforcing the end?
3       A.  It would have substantially reduced the
4   damage from situations such as I mentioned before in
5   handling where the ladder may have been subject to
6   abrasion at the bottom of the rail.
7       Q.  But --
8       A.  That's the most I can say.
9       Q.  But it does hold it together at the end,
10  doesn't it?
11      A.  It holds it together as far as those
12  portions which are encapsulated within the shoe. But
13  if a rail has been damaged, worn away, cracked,
14  abused, or otherwise, the ladder could still not
15  support the weight of the user, whether that shoe was
16  on there or not.
17      Q.  But you're not design -- denying that the
18  shoe itself gives support so that -- so that it holds
19  the rail together if there is some sort of an occult
20  crack in there or something, right?
21      A.  I certainly am not design -- denying the
22  fact that it will hold the rail together at the end.
23      Q.  And isn't that where these cracks start?
24      A.  It will not -- it will --
25      Q.  They don't start at the top, do they?  I

Page 67

1   don't mean to interrupt you.
2       A.  In viewing photographs of the ladder, there
3   are cracks at the top of some of the rails.  So I
4   don't think that your statement is correct.
5       Q.  You'll agree that the shoe, in addition --
6   and I'm talking about the modified shoe -- in
7   addition to supporting or protecting the foot from
8   abrasion and scuffing and tearing, it also gives
9   support to the rail as far as cracking and splitting
10  are concerned, right?
11      A.  Only at the very bottom of the rail.
12      Q.  Okay.  Have you become adept at looking at
13  these ladder rails and seeing cracks?
14      A.  I don't know how you define the word
15  "adept."  But I've seen ladder rails with cracks in
16  them.
17      Q.  Many, many, right?
18      A.  I've seen some.  Many is a relative number.
19      Q.  Is it something -- If there were cracks, is
20  it something that the average consumer might miss?
21          MR. GENDRY:  Object to form.
22      A.  Cracks of the nature that would be
23  detrimental to the safety of the user would be
24  noticeable by the user if he did a conscientious look
25  at the ladder.

Page 68

1       Q.  (BY MR. BENTON)  Would you agree that some
2   consumers might not think to look for rail cracking.
3   They might tend to look for the spreader being broken
4   or steps missing or -- or some condition that makes
5   it -- it not sit flat on the ground, but they might
6   not look at the rails particularly to see if they're
7   cracked?
8       A.  One of the specific instructions on the
9   label on the side of the ladder instructs the user to
10  look for damaged rails.
11      Q.  Does it say cracked or split rails?
12      A.  It says damaged rails.
13      Q.  Would you agree that cracked or split might
14  be more informative to the consumer?
15      A.  I'm sorry?
16      Q.  Would you agree that if the wording was
17  damage, cracked or split, would be more helpful to
18  the consumer when he's looking at the rail?
19          MR. GENDRY:  Object to the form
20      A.  Well, damage is damage.  If I were reading
21  it, I would a assume that any type of damage to the
22  rail would be included under the term damage.
23      Q.  (BY MR. BENTON)  But would it be more helpful
24  if we used the terms cracked or split?
25          MR. GENDRY:  Object to form.

Page 69

1       A.  I'm not competent to answer that question.
2       Q.  (BY MR. BENTON)  Okay.  Do you ever have --
3   Strike that.
4           Do rails ever crack or split because of
5   innate defect in the fiberglass itself?
6       A.  Are you asking universally or are you asking
7   in rails in my personal knowledge?
8       Q.  It's got to be in your personal knowledge.
9   And that's my question, is sometimes do you find --
10  have you learned or seen or heard, you know
11  secondhand even, that rails can crack or split
12  because of the lack of good quality of the
13  fiberglass?
14      A.  If fiberglass was mismanufactured, it could
15  be manifest in cracks that would result from
16  processing or handling.
17      Q.  Or in consumer use?
18      A.  Generally, a ladder that has been in service
19  this length of time of the subject ladder, would have
20  failed far prematurely if it were a defect in the
21  fiberglass.
22      Q.  Is that what you've learned being in the
23  ladder business now --
24      A.  Yes.
25      Q.  -- for 17 years. if the fiberglass is bad it

Page 70

1    shows up right away?
2        A.  Right away.
3        Q.  And in the past sometimes that has
4    happened.  And when it did, it showed up right away.
5        A.  Rarely.  And it shows up in our
6    manufacturing process.
7        Q.  Okay.  How long is a fiberglass ladder, such
8    as the subject ladder, reasonably expected to last?
9        A.  That's impossible to answer.
10       Q.  And it's impossible to answer, because if
11   you put it in a closet and never use it, it could
12   last a long, long time, couldn't it?
13       A.  That is correct.
14       Q.  And on the other hand, if you're using it
15   and abusing it, it could break almost on the first
16   day you use it?
17       A.  That also is correct.
18       Q.  That makes sense.
19           I'm going to ask you what they call
20   contention questions.  Do you know what I mean by
21   that?
22       A.  No, sir, I don't.
23       Q.  In a lawsuit, the plaintiff has certain
24   contentions.  Like they say, we believe your ladder
25   is defective.  That's a contention, okay?

Page 71

1        A.  I understand.
2        Q.  The defense has contentions.  We think you
3    misused our ladder.  That's a contention.  Do you --
4    Does Bauer contend that Jose Escudero misused the
5    Bauer ladder?
6        A.  Bauer's contention is Mr. Escudero used a
7    ladder that was unfit for use.  I don't know
8    specifically how he was using the ladder when the
9    incident occurred, so I can't make a contention as to
10   whether he was misusing it.  That he used a ladder
11   that was not safe to use is our contention.
12       Q.  Do you believe in his case that had a shoe
13   been on his particular ladder, a shoe or some other
14   method of reinforcing the bottom of the rail, do you
15   think that it would have made his accident less
16   likely?
17           MR. GENDRY:  Object to form.
18       A.  I believe that regardless of what shoe was
19   on that ladder, the ladder was in a condition that it
20   should not have been used. and that Mr. Escudero, as
21   a contractor, was certainly under the restrictions
22   and guidelines of OSHA which require him to not use a
23   ladder with damaged side rails.
24           MR. BENTON:  Okay.  I'm going to object
25   to the responsiveness.

Page 72

1        Q.  (BY MR. BENTON) And my question is, had the
2    ladder that Mr. Escudero was using, had, say the shoe
3    you have on it now, would it have made Mr. Escudero's
4    accident less likely to have occurred?
5        A.  I don't know that.
6        Q.  Does Bauer admit that Mr. Escudero was using
7    a Bauer ladder at the time of his accident?
8        A.  All evidence indicates that he was, yes.
9        Q.  Does Bauer admit that there was no
10   intentional modifications made to that Bauer ladder
11   after it left Bauer's hands?
12           MR. GENDRY:  Object to form.
13       A.  As far as we understand, there were no
14   modifications.  Let me just add, there were no
15   modifications other than markings that would have
16   been placed on the rail because there were some
17   markings on the rail that were not there when we sold
18   the ladder.
19       Q.  (BY MR. BENTON) Identifying markings?
20       A.  Yes.
21       Q.  Stencils, handwritten initials, that sort of
22   stuff?
23       A.  Yes.
24       Q.  They wouldn't have affected the function of
25   the ladder at all, would they?

Page 73

1        A.  We don't believe so, no.
2        Q.  Does Bauer admit that as a result of the
3    accident with the Bauer ladder, that Mr. Escudero was
4    injured?
5        A.  We admit that Mr. Escudero was injured, and
6    allegedly when using a Bauer ladder, yes.
7        Q.  I mean, you're --
8        A.  I wasn't there to see him use the ladder,
9    but that -- as we understand it, he was using a Bauer
10   ladder and he was injured.
11       Q.  Yeah.  And that's what I'm saying.  You
12   don't have any different knowledge?
13       A.  No.
14       Q.  Okay.  Does Bauer admit that Mr. Escudero's
15   injury is permanent?
16           MR. GENDRY:  Object to the form.
17       A.  Bauer has been given information that
18   Mr. Escudero's injury was serious.  We can't
19   speculate as to the nature or continuing nature of
20   the injury.
21       Q.  (BY MR. BENTON) Besides Mr. Escudero
22   allegedly using an unsafe ladder, is there any other
23   contention -- or is there a contention of Bauer that
24   he misused the ladder?
25           MR. GENDRY:  Other than what he

Page 74

1  stated?
2        MR. BENTON: I don't understand what
3  you're saying.
4     A.  Only from the standpoint that he used a
5  ladder that was unsafe to use. We have no other
6  indication that he was doing something else with the
7  ladder that was unsafe.
8     Q  (BY MR. BENTON) Okay. That is the
9  question. Thank you
10       MR. BENTON: Let's go off the record a
11  minute.
12       (Off the record.)
13    Q.  (BY MR. BENTON) I'm going to jump around a
14  little bit here now. Who is the first, if you know,
15  manufacturer of ladders, and we'll say any ladders,
16  that did some sort of similar -- something similar to
17  your shoe on the 304, basically something similar to
18  304?
19    A.  On a standard stepladder like the 304?
20    Q.  Yes.
21    A.  We were.
22    Q.  You were ahead of Werner?
23    A.  Yes.
24    Q.  Now, didn't we talk earlier that they were
25  done before with wooden ladders?

Page 75

1        MR. GENDRY: Object to the form.
2        You can answer, if you can.
3     Q.  (BY MR. BENTON) You understand what I'm
4  saying, we --
5     A.  We're talking about actually -- Our earlier
6  wood ladder models had some metal wraparound type
7  sleeves on those rail bottoms. Who did it first, I
8  can't tell you.
9     Q.  But as far as your knowledge is concerned,
10  some sort of a wraparound -- And let me ask, when we
11  look at the exhibits that were the two pictures of
12  the Werner ladders, --
13    A.  Yes.
14    Q.  -- would you agree those are wraparound?
15    A.  I wouldn't agree they're wraparound. I
16  believe they are a supporting brace structure, as we
17  talked about before. It's a combination shoe and
18  brace. I wouldn't necessarily call it a wraparound.
19    Q.  Okay. Then I really want to address that,
20  supporting structures.
21    A.  Okay.
22    Q.  Okay. Were you the first to do a supporting
23  structure on a fiberglass ladder?
24    A.  We were the first to put a slip-on shoe on a
25  conventional stepladder.

Page 76

1     Q.  Now, are we talking about wood or
2  fiberglass?
3     A.  Fiberglass.
4     Q.  Okay.
5     A.  Now, R.D. Werner company was the first, to
6  my knowledge, to put a fiberglass -- actually, they
7  put an aluminum and then a fiberglass sleeve at the
8  bottom of their stepladders.
9     Q.  What year was that, more or less?
10    A.  More or less it was about 1990.
11    Q.  About the time of the manufacture of the
12  subject ladder?
13    A.  About that time, yes. Possibly a little --
14  it might have been '91. It was -- At the time we
15  manufactured this ladder, to the best of my
16  knowledge, nobody in the industry had any kind of a
17  wraparound or reinforcing sleeve at the bottom of the
18  standard fiberglass stepladder.
19    Q.  And when you say sleeve, going up several
20  inches high up onto the rail?
21    A.  That's correct, yes.
22    Q.  Does anyone do that now, except for you now?
23    A.  Green Bull Ladder copied our shoe design.
24  R.D. Werner has a variety of different brace/shoe
25  combination items. I believe Louisville Ladder also

Page 77

1  puts a fiberglass sleeve at the bottom of some of
2  their ladders. And many ladders today are
3  manufactured exactly the same way that the 304 in
4  question here was manufactured, are still
5  manufactured that way today.
6     Q.  And in your opinion, are those ladders as
7  safe as your present 304?
8     A.  As safe, yes. Last as long, probably not.
9     Q.  Your modification to 304 also included
10  modifying the cross braces, right?
11    A.  You'd have to refresh my memory there. I
12  don't believe so. Originally the 304 ladder was
13  introduced with cross bracing --
14       MR. GENDRY: If I could just chime in.
15  Are you talking about steel, aluminum versus steel?
16       MR. BENTON: Any kind. Any kind. I
17  just thought I noticed in an earlier deposition that
18  he testified that there had been some sort of a cross
19  brace --
20       MR. GENDRY: Modification?
21       MR. BENTON: -- modification.
22    A.  Well, let me try to clarify. Originally
23  when the ladder was introduced, the back cross braces
24  were every other foot. It was then changed to every
25  12 inches.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 76 of 328

Page 78

1    Q.  (BY MR. BENTON) And when I'm talking about
2  cross braces, I'm talking about the supporting that
3  goes from the bottom of the foot up to --
4    A.  Okay.  Those are angle braces or knee
5  braces.
6    Q.  Okay.  So I'm glad I --
7    A.  These --
8    Q.  Did you change the angle or knee braces of
9  the 304?
10    A.  We changed them from aluminum extrusion to
11  steel.
12    Q.  Okay.  Now, when you look at, say Exhibit
13  No. 4, you see that their -- what do you call this?
14    A.  I would call it a combination brace and
15  shoe.
16    Q.  Okay.  But they -- the section of the shoe
17  that goes across and braces?
18    A.  An angle or a knee brace.
19    Q.  Okay.  I'll call it an angle brace, --
20    A.  That's fine.
21    Q.  -- because it certainly is an angle.
22        You see how their angle brace attaches
23  to the full extent of the rail?
24    A.  Well, it fits -- I can't tell you exactly
25  from the picture, but it appears to fit on the inside

Page 79

1  of the flange and is attached by at least one rivet
2  through the flange.  That's all I can see in this
3  photo.
4        MR. GENDRY:  While you're looking that,
5  Barry, have you provided to us all these Werner
6  pictures.
7        MR. BENTON:  They were developed
8  yesterday at 7 o'clock.
9        MR. GENDRY:  I didn't think I had seen
10  them before.
11        MR. BENTON:  You want the negatives?
12        MR. GENDRY:  Well, we can do that
13  later.
14        (Exhibit 27 marked.)
15    Q.  (BY MR. BENTON) All right.  No. 27 -- I'm
16  marking as 27 -- this is, I'm going to submit to you,
17  is a photograph of the subject ladder.
18    A.  I can neither confirm nor refute that.
19  It's --
20    Q.  No, I'm just going to submit that to you as
21  true, okay.
22        The angle brace here, it's not
23  connected to the full width of the rail, is it?
24    A.  The angle brace is connected to the flange
25  of the rail and it's connected to the back cross



Page 80

1  brace.
2    Q.  Which by definition, since you didn't
3  include attached directly to the body of the rail, it
4  isn't connected to the body of the rail, is it?
5    A.  Let's call that the web of the rail.  And
6  it's not connected to the web of the rail.
7    Q.  Okay.  And thank you.  So the flange is the
8  part that kind of sticks out?
9    A.  That's correct.
10    Q.  And the web, is that what we call it?
11    A.  Yes.
12    Q.  The web.
13        Now have you adjusted that at all on
14  the 304?
15    A.  The 304 is made with the same geometric
16  configuration of angle or knee brace.  But it now has
17  a vinyl slip-on boot shoe.
18    Q.  Do we have a picture of that?
19    A.  We probably --
20        MR. GENDRY:  Let's go off the record.
21    A.  If you have a copy of our catalogue, we
22  certainly show it in that catalogue.
23        THE REPORTER:  Are we off?
24        MR. BENTON:  Yeah, let's go off the
25  record.

Page 81

1        (Off the record.)
2        MR. BENTON:  I'm marking, Exhibit 28, a
3  page out of a Bauer catalog.
4        (Exhibit 28 marked.)
5    Q.  (BY MR. BENTON) And I'm going to ask you,
6  can you tell me what -- what vintage of catalog this
7  is?
8    A.  This is a June of 2001.  It's a current
9  catalog.
10    Q.  Okay.
11        MR. GENDRY:  We got a page number on
12  that?
13        THE WITNESS:  Page 12.
14    Q.  (BY MR. BENTON) Okay.  At the bottom, the
15  orange ladder depicted, that's how the 304 looks now?
16    A.  Yes, sir, that's correct.
17    Q.  And the little black parts at the foot,
18  that's the shoe or boot we've been talking about?
19    A.  Yes, sir, that's correct.
20    Q.  Okay.  And then the angle brace, it's still
21  connected to -- What do you call that part right
22  there?
23    A.  Well, this is the step because it's the
24  front section.
25    Q.  Okay.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 77 of 328

Page 82

1    A.   And this is the cross brace which is on the
2  back section.
3    Q.   All right.  Cross brace is what you call
4  this thing right here?
5    A.   Yes, sir.
6    Q.   Okay.  Is it still just connected to the
7  cross brace and connected to the flange, or is it
8  connected to the full web of the back rail?
9    A.   The angle brace is connected to the cross
10  brace and the flange.
11    Q.   Okay.  So there was no modification of that?
12    A.   That is correct.
13    Q.   Okay.  When you compare the Werner that has
14  the cross brace actually connecting to the web of the
15  rail, wouldn't that give more protection to the
16  consumer in the event a splitting occurred?
17          MR. GENDRY:  Object to the form.
18    A.   I cannot give you an evaluation of the
19  Werner product, I'm not qualified to do that.
20    Q.   (BY MR. BENTON) Well, let me just ask you
21  this, if your angle brace was attached to the web,
22  and a splitting occurred between the flange and the
23  web of the rail, wouldn't that keep the structure
24  intact better?
25          MR. GENDRY:  Object to the form.



Page 83

1    A.   I would have to evaluate that design through
2  testing to be able to answer that.  I really can't
3  answer that.
4    Q.   (BY MR. BENTON) Would you agree the cross
5  brace on the Werner is connected to the web of the
6  rail?
7          MR. GENDRY:  By looking at the picture?
8    A.   By looking at the pictures, there appear to
9  be -- this is, again, a front section.  If I would
10  look at the other picture, Exhibit No. 3, which
11  depicts the whole ladder, it appears as if there are
12  two rivets attaching the plastic cross -- or I'm
13  sorry, the plastic angle brace combination shoe to
14  the web.
15    Q.   (BY MR. BENTON) So if I understand, the
16  answer is yes, it looks like the cross brace is
17  attached to the web in the Werner ladder?
18    A.   The knee brace, the angle brace.
19    Q.   Angle brace?
20    A.   Is attached to the web.
21    Q.   Okay.
22    A.   It appears that that is correct.
23    Q.   Okay.  And you have no opinion as to whether
24  that would create greater strength and stability in
25  the event of fracturing of the line between the

Page 84

1  flange and the web, like in Exhibit No. 27?
2    A.   I have no opinion as to the performance of
3  the Werner product at all.
4    Q.   Okay.  I'm going to go through my request
5  for production that was attached to my notice of your
6  deposition.  I would usually attach it as an exhibit,
7  but I'm not going to pull it out.  I don't think it's
8  necessary, unless counsel does.
9          Number one is photographs of the
10  subject ladder.  I have those.
11          MR. GENDRY:  You've got your own, you
12  mean?
13          MR. BENTON:  I think we've shared all
14  we have.  Or do you --
15          MR. GENDRY:  I think we sent you some.
16  And we got more coming to you from that Naismith.
17          THE WITNESS:  I personally --
18          MR. BENTON:  Do you have those yet?
19          MR. GENDRY:  Yeah.
20    Q.   (BY MR. BENTON) I'm sorry.
21    A.   Yeah, I personally don't have any other than
22  what counsel has.
23          MR. GENDRY:  These are Naismith laser
24  photos.
25          MR. BENTON:  These are for me?

Page 85

1          MR. GENDRY:  What does that say?  Has
2  it got a note on it?
3          MR. BENTON:  It just says Naismith
4  photos.
5          MR. GENDRY:  I'll have to ask Jamie.
6          MR. BENTON:  Okay.
7          MR. GENDRY:  I think that's our only
8  copy.  We prepared supplemental responses to
9  discovery and those are about to go out to you.
10          MR. BENTON:  Okay.
11          MR. GENDRY:  Because we just got them.
12          MR. BENTON:  Okay.
13          MR. GENDRY:  While you're looking, do
14  you want me to have a copy of this page made?
15          MR. BENTON:  Yeah, would you.
16          THE WITNESS:  Tom, you may want to copy
17  the front and back of that to reference what it came
18  from.
19          MR. BENTON:  Good idea.
20          We can go off the record.
21          (Off the record.)
22          MR. BENTON:  Okay.  Mr. Gendry has just
23  proffered to me some photos taken by Naismith
24  Engineering which I'm going to get copies of.
25          MR. GENDRY:  That's correct.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 78 of 328

Page 86

1          MR. BENTON: Okay. Then the next one
2  was the ANSI and OSHA standards. I don't need those
3  right now to be honest with you.
4          The next one, defendant's policy, I
5  have that, insurance policy. Memoranda relating to
6  modification of the design of ladders. including
7  committee reports.
8      Q.  (BY MR. BENTON) I have those, right?
9      A.  You have everything that we have.
10     Q.  Any documents relating to consumer
11  complaints regarding rail fracturing or -- on
12  fiberglass ladders from '80 to present.
13     A.  Whatever we had. you had up to the Smith
14  case.
15     Q.  Okay.
16     A.  And through the Smith case.
17     Q.  I got the Bauer ladder catalogs.
18          MR. BENTON: I'll tell you what, I have
19  some.
20          MR. GENDRY: I know you've got some.
21          MR. BENTON: I just know you have them
22  if I want particular pages, all right.
23          MR. BENTON: All right.
24          THE WITNESS: These are archive copies
25  that I can't leave here. If you want copies of them,

Page 87

1  I -- you know, I can produce them later.
2          MR. BENTON: Okay.
3          THE WITNESS: But we just don't have a
4  lot of copies of these left. These are like the last
5  ones in some cases.
6      Q.  (BY MR. BENTON) Okay. And then I have
7  copies of pleadings from prior lawsuits from '80 to
8  present. What do we have on that?
9          MR. GENDRY: He doesn't have any.
10         Is that correct?
11         THE WITNESS: That is correct.
12     Q.  (BY MR. BENTON) But didn't I see on your --
13     A.  Again, that's in addition to what you --
14  what already was produced in the Smith case.
15     Q.  Okay. Well, I don't have any pleadings in
16  the Smith case and I don't have any pleadings in the
17  Scott case. I don't have any pleadings from any
18  other lawsuit.
19     A.  Anything that would have been already
20  settled, we would not keep copies of those
21  pleadings.
22          (Exhibit 29 marked.)
23     Q.  (BY MR. BENTON) You have a policy regarding
24  document retention, right?
25     A.  Yes, we do.

Page 88

1      Q.  And do you remember offhand how long y'all
2  were going to keep lawsuit files?
3      A.  The original document retention policy that
4  we had provided in the Smith case didn't address that
5  directly, as I recall.
6          And that document has been revised
7  since the one you have there.
8      Q.  Okay. And I marked it as No. 29. When was
9  it revised?
10     A.  It was revised February 19th, 2001.
11     Q.  And is that the one right now?
12     A.  Yes.
13     Q.  I'm sorry, did you say it was revised in
14  '94?
15     A.  No, I said it was revised February 19th,
16  '01, where it says effective on the second line
17  there under policy bulletin.
18     Q.  Oh, okay. I see. And we'll mark this --
19          MR. BENTON: Can I mark this one?
20          MR. GENDRY: Sure.
21          (Exhibit 30 marked.)
22          MR. GENDRY: Is that No. 30?
23          MR. BENTON: Yes, it is.
24     Q.  (BY MR. BENTON) All right. Looking at
25  No. 29, did you see any areas there that addressed

Page 89

1  how long you keep lawsuit files?
2      A.  Unless I've looked over it. I don't see a
3  specific reference to that.
4      Q.  All right. It says accident reports after
5  settlement. So when it says settlement that assumes,
6  doesn't it, that there was some sort of claim made.
7      A.  And I would agree. And I missed it when --
8  in reading it over.
9      Q.  So this says one year?
10     A.  Yes.
11     Q.  Which when you look over these, that's one
12  of the shortest one. In fact there's like only one
13  other that talks -- that is one year, I think,
14  through here. No, there's a second one, expense
15  reports.
16          That's a pretty short duration, isn't
17  it, relative to the other ones.
18          MR. GENDRY: Object to the form.
19     A.  It is what it is. I didn't write the
20  policy, so --
21     Q.  (BY MR. BENTON) Case records. what do they
22  mean by case records?
23     A.  I have no idea.
24     Q.  That would be like lawsuit cases?
25     A.  I have no idea.

**JOHN VASICHKO VOL. 1 OF 1**                     **JULY 26, 2001**

24 (Pages 90 to 93)

Page 90

1    Q.  It says permanent.  "P" for permanent,
2  right?
3    A.  "P" stands for permanent.  I don't know what
4  case record stands for.  Because the problem we had
5  with that policy is there were a number of items in
6  there, many items in there that we did not know what
7  they meant, and many entries that were no longer
8  pertinent at all.
9    Q.  Well, let me just ask you this, when you
10  changed the policy -- Let's assume that case records
11  meant lawsuit cases.  When you passed your new --
12  your new policy in February of this year, did -- was
13  there a big destruction process?
14    A.  None.
15    Q.  Do you know what happened to the -- where
16  would those records be kept regarding old lawsuits?
17    A.  They would be in the accounting department.
18    Q.  Okay.  And did you get -- did you have
19  occasion to check to see what's there?
20    A.  Yes.
21    Q.  And what did you find?
22    A.  There are records of current cases, and
23  that's basically all.
24    Q.  What current cases do you have beside this
25  is one?

Page 91

1    A.  We have a ladder -- a wood stepladder
2  situation here in Texas.
3    Q.  Okay.
4    A.  We have a wood stepladder situation in New
5  York.
6    Q.  Okay.
7    A.  We have a fiberglass extension ladder
8  situation in Maine.
9    Q.  Okay.
10    A.  And we have a very old and inactive
11  fiberglass situation in New York.
12    Q.  Do any of those involve cracking of rails?
13    A.  The extension ladder case in Maine is an
14  alleged rail defect.
15    Q.  Did it crack?
16    A.  It folded in half.  The ladder basically
17  folded in half.
18    Q.  Like almost broke, but just bent?
19    A.  It broke.
20    Q.  Snapped off?
21    A.  Yes.
22    Q.  Two pieces?
23    A.  Yes.  But, you know, obviously our
24  contention is the rails are not defective and there
25  are some circumstances that indicate that the ladder

Page 92

1  fell on a tote box when it fell down, and that's what
2  caused to it break in half.
3    Q.  Any involvement in cracking of rails like we
4  have in the Escudero case?
5    A.  No.
6    Q.  Did you talk to anyone about, hey, what did
7  we do with those old records, case records on Scott
8  or on the other cases?  Did you talk to your -- the
9  people there?
10    A.  I talked to the controller.
11    Q.  And -- Is it a she?
12    A.  She, yes.
13    Q.  And what did she say?
14    A.  She said that basically when the cases are
15  settled and the statute of limitations has run for
16  filing appeals or whatever, we no longer keep
17  those -- that information.
18    Q.  What's her name?
19    A.  Heather Sprang (phonetic).
20    Q.  Okay.  Isn't it true that it became apparent
21  that after long use that the bottom ends could
22  separate as far as -- far back as 1987?
23    MR. GENDRY:  Object to the form.
24    A.  That's a generality that I would not agree
25  with.  I have a ladder that -- one of the very first

Page 93

1  three or four that was ever produced, and it's not
2  split.
3    Q.  (BY MR. BENTON) I'm going to show you your
4  prior deposition where the question was, how did that
5  come to Bauer's attention or what was discussed in
6  the meeting and how did it come to your company's
7  attention that this was happening.
8    Over a period of 1987 to 1991 when we
9  had introduced a product up to the point of this
10  meeting, we had received field comments and some
11  ladders back from the field that showed that a
12  particular condition -- this particular condition.
13    And they're talking about the bottom
14  ends of the rails.
15    A.  I agree with that.  And I stated that
16  earlier today, that we had --
17    Q.  Okay.
18    A.  -- field records that --
19    Q.  As far back to '87 that with a lot of use
20  the bottom ends would separate?
21    A.  With a lot of use or abuse.
22    Q.  Okay.  Either one?
23    A.  Sure.
24    Q.  Sure.  Okay.
25    You found, did you not, that when



**Page 94**

1  placed on a rack, and I may be reiterating a little
2  bit, that the end would become abraded away, was the
3  word you used.
4      A.  Yes.
5      Q.  And weaken the structure.
6      A.  Yes.
7      Q.  And that's one of the reasons also that you
8  put the new sleeve on, right?
9      A.  Yes.
10     Q.  Okay.  And also, placing it on racks would
11 wear away the rivets that attach the cross brace; is
12 that right?
13     A.  The rivets, yes, uh-huh.
14     Q.  But the slip doesn't change that at all,
15 does it?
16     A.  No.
17     Q.  And that would -- and that also would start
18 tearing into the fiberglass when --
19     A.  It could in very severe cases, yes.
20     Q.  Do you remember any other claims similar to
21 Escudero when someone claimed that the -- a rail
22 cracked and caused them to fall?
23     A.  Specifically by name?
24     Q.  Yeah.
25     A.  I mean, we have listed several obviously

**Page 95**

1  that we know --
2      Q.  Do you know --
3      A.  -- that occurred.
4      Q.  Yeah.
5      A.  I don't remember details of any of them.  I
6  know they were there.  I know we investigated them
7  and we took action on them at the time.  But
8  specifically, no.
9      Q.  How many do you think you've experienced
10 since you've been on in '83?
11     A.  That were either a complaint or a claim or a
12 lawsuit or whatever, in other words the whole
13 banana?
14     Q.  Uh-huh.
15     A.  As I said before, maybe 40 or 50.
16     Q.  Okay.  Does this refresh your memory about
17 what case records means, because the question was
18 asked, who's in charge of the customer service
19 department.  And then you answered, I guess, I hate
20 to say unresponsively, but it was, there is a caption
21 called case records which is permanent.
22         And the question, well, what is a case
23 record?  And then it was repeated again, what is a
24 case record?
25         And your answer, my way of

**Page 96**

1  understanding a case record is a record of a claim or
2  a lawsuit involving the ladder.
3      A.  If I said it, then I stand corrected.
4      Q.  And so prior to February of this year, those
5  would have been records that were kept permanently?
6      A.  According to the policy they would have been
7  kept permanently.
8      Q.  So if they're not in existence today, then
9  they've been destroyed since the new policy has come
10 into effect; isn't that right?
11     A.  Unless somebody did not abide by the
12 provision of the original policy, yes.  See, we have
13 had a number of people in that position, in the
14 controller's position.  And they may have rearranged
15 files.  They may have moved things in and out that
16 I'm not aware of.  There was no directed attempt to
17 remove files from anywhere and destroy them, that I'm
18 aware of.
19     Q.  Y'all still have about 75 employees?
20     A.  At the ladder company, yes.  Maybe a little
21 less today.
22     Q.  You developed a formal quality control
23 program as a result of a request by GTE; is that
24 right?
25     A.  That is correct.

**Page 97**

1      Q.  What did that really mean?  What did that
2  mean?
3      A.  Basically, it meant that we put down in
4  writing, in a formal form, the things that we
5  essentially were doing anyway.  We just didn't have
6  it written down in a form that we could hand them in
7  a book and say, here's our quality policy manual.
8  And we did that.
9      Q.  So every step along the way, every time you
10 checked to make sure the product was right, now it
11 was written down of how you checked it off?
12     A.  Yes, in fact, it was.
13         MR. BENTON:  There's probably something
14 I've missed.
15         MR. GENDRY:  Well, in the request you
16 had asked for -- this looks like it comes under
17 number 5.
18         MR. BENTON:  Product returns?
19         MR. GENDRY:  Yeah.  Complaints
20 regarding rails fracturing in fiberglass ladders from
21 1980 to present.  I think most of those pertain to
22 year 2000, year 2001.
23         THE WITNESS:  Most of what's in there
24 is freight damage, but you're welcome to the
25 information.

Page 98

MR. BENTON: You're good at this.
Q. (BY MR. BENTON) Let me -- I better ask the question. I'll frame it in accordance with your answer.
MR. BENTON: Can we -- we'll attach these, then I'll have them --
MR. GENDRY: Yeah.
MR. BENTON: Okay. These are yours, are they not? Or are these mine? You don't know, do you?
MR. GENDRY: That's the only copy we have.
MR. BENTON: Okay. Can I put a sticker on it?
MR. GENDRY: Yeah, that will be fine.
MR. BENTON: I'm marking this group, this has tendered to me by Mr. Gendry, Deposition Exhibit No. 31.
(Exhibit 31 marked.)
Q. (BY MR. BENTON) I haven't had a chance to look at these. Have you had a chance to look at those?
A. Very briefly.
Q. Okay. Summarize what's in there for me, to the best of your ability.

Page 99

A. We audited the year 2000 and to date year 2001 product return authorizations. And I asked for a copy of every one that referenced a fiberglass ladder with any cracking mentioned, whether it be freight damage or whether it be in a complaint form. And that's what those represent.
Q. What did you find? Did anything come out of the page?
A. 95 percent of them were freight damage.
Q. And the ones that weren't, anything significant about those?
A. There were -- Most of them don't even involve stepladders. There's a lot of extension ladder rails here. There are a few stepladders. Some were field inspections by our sales agents and say, I saw a crack, we'll send it back, we'll tender a new ladder or we'll give credit, or whatever.
I don't think there were -- I don't know of any that involved any injury. I think they're all just product returns.
Q. And any pattern as to why they cracked when they cracked? Was it bad fiberglass? Do you know what it was?
A. Again, 95 percent of them are freight damage. And the rest of them are so scattered you

Page 100

can't draw a pattern.
Q. Okay.
Anything you've thought about that you might want to change your answer?
A. Nothing specifically, nope.
MR. BENTON: Okay. I'll pass the witness.
MR. GENDRY: I guess we'll reserve our questions for the time of trial.
(Deposition concluded.)

Page 101

CHANGES & SIGNATURE PAGE

RE Escudero vs Bauer Corporation
PAGE LINE CHANGE REASON

I, JOHN VASICHKO have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above

JOHN VASICHKO

THE STATE OF TEXAS )
COUNTY OF BEXAR )

Before me, __________________, on this day personally appeared JOHN VASICHKO, known to me (or proved to me under oath or through ______________) (description or identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed

Given under my hand and seal of office this ______ day of ____________, 2001

Notary Public in and for the State of Texas
* * * * * * * * * * *

Page 102

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              BROWNSVILLE DIVISION
 3   JOSE ESCUDERO, JR      )
        Plaintiff          )
 4                         )
     VS                    ) CIVIL ACTION NO  B-00-193
 5                         )
     BAUER CORPORATION D/B/A )
 6   BAUER LADDER CORPORATION )
        Defendant          )
 7
            REPORTER'S CERTIFICATION
 8          DEPOSITION OF JOHN VASICHKO
                 JULY 26, 2001
 9
            I, DANDY ELLIS, a Certified
10
11   Shorthand Reporter in and for the State of Texas, do
12   hereby certify that the foregoing deposition is a
13   full, true and correct transcript,
14          That the foregoing deposition of JOHN
15   VASICHKO, the Witness, hereinbefore named was at the
16   time named, taken by me in stenograph on JULY 26,
17   2001, the said Witness having been by me first duly
18   cautioned and sworn to tell the truth, the whole
19   truth, and nothing but the truth, and the same were
20   thereafter reduced to typewriting by me or under my
21   direction   The charge for the completed deposition
22   is $_____ due from Defendant,
23     ( x ) That, by agreement of counsel, the
24   deposition officer is instructed to release the
25   original deposition transcript, and the deposition
```

# Claims Made Prior To 07/04/91

30-Aug-94

| CLAIMANT | UPC |
|---|---|
| Sims, Brady | 10204 |
| Strambi, William | 10206 |
| Surma, Joseph | 10206 |
| Bozarth, Nathaniel | 10208 |
| McPeake, William | 10210 |
| Manzo, Mario | 10506 |
| Weideman, Dale | 10506 |
| Castillo, John | 10508 |
| Redmond, Glenn | 10508 |
| Hedlund, John | 10510 |
| Pedresen, Robert | 10510 |
| Bailey, Curtis | 10512 |
| Symanski, John | 10712 |
| Gentile, Donald | 12124 |
| Heit, Dann | 12128 |
| Dyke, Douglas | 12140 |
| Shaffer, Stephen | 26010 |



DEPOSITION EXHIBIT 7/6

Vasichko

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 84 of 328



DEPOSITION
EXHIBIT
5
Va Sichko...

**BAUER CORPORATION**
**INTER-OFFICE MEMORANDUM**

SUBJECT: Slip-On Shoe Evaluation          DATE: March 6, 1995

TO: Norman L. Miller, Jr.

As you know, we have been testing the slip-on shoe versus the standard shoe on series 30406 ladders for the past several days. The preliminary results are in and it appears the slip-on shoe offers a significant advantage over the standard shoe. I have halted the testing as both ladders have now reached a point where they are unsafe to use.

To recap the testing, each ladder was subjected to a series of simulated abuse tactics to evaluate whether the slip-on shoe would prevent splitting of the side-rails at the bottom of the ladder. Each cycle consisted of the following sequence:

1. The ladder was "walked" a distance of six feet by a person standing on the bottom step.
2. The ladder was turned around and "walked" back to the starting point.
3. The ladder was turned around then slid or "scooted" across the floor a distance of six feet.
4. The ladder was turned around and slid or "scooted" back to the starting point.
5. The ladder was closed and dropped onto the bottom of the front rail from a height of 2 feet.
6. The ladder was turned over and dropped onto the opposite front rail from a height of 2 feet.
7. The cycle was recorded on the test data sheet and item "1" was started again.

At the completion of 5 complete cycles the ladder was inspected for damage and wear and the process was begun again. Every 5 cycles the two individuals involved traded ladders to remove bias from the results.

The test results indicate a clear advantage was obtained from the slip-on shoes although this was unclear early in the test sequence. The test ladder with the standard shoes showed evidence of cracking in the radius on the bottom of the back rails after 45 cycles. The ladder with the slip-on shoes showed evidence of the same type of cracking after 55 cycles. Continued testing demonstrated the advantage of the slip-on shoes.

After 85 cycles the right rear rail on the ladder with standard shoes began to show signs of separation in the radius joining the flange and web. The rails with the slip-on shoes were still solid even though they had a hairline crack. The right rear rail with the standard shoe began total separation after 115 cycles but the rails with the slip-on shoe remained essentially unchanged.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 85 of 328

At 125 cycles both ladders exhibited bending of the braces attaching the bottom step to the front rails and a crack developing in the right front rail flange at the point of brace attachment. The split rear rail with the standard shoe continued to separate but the rails with the slip-on shoes remained relatively unchanged. I halted testing on the ladder with standard shoes after 135 cycles as the web and flanges had separated sufficiently to render the ladder unstable.

The ladder with slip-on shoes was tested through 240 cycles. The crack at the rail to brace connection continued to progressively worsen and the ladder is now unstable. The minor radius cracks at the bottom of the rear rails became more pronounced but the rails have not begun to separate. The slip-on shoes are holding the flange and web together and the back rails are still stable. The tread on the bottom of the standard shoes is approximately 40% worn away. The tread on the slip-on shoes is approximately 85% worn away. The slip-on shoes still have nearly all of the tread back-up vinyl remaining and are still quite serviceable.

It is interesting to note that the rear rails with the slip-on shoe cracked in the radius on the unbraced side. The rear rails with the standard shoe cracked first on the unbraced side. With the current crossbar we do not have an easy way to brace the inside flange on the rear rails. This area is a definite stress point when the ladder is "walked" or "scooted". The rail begins to fail here first as there is no support to the flange. The slip-on shoe appears to greatly help the rail flange from separating from the web. It is unclear whether it helps to prevent cracking on the unbraced side.

There are several less than desirable solutions for this situation. The easiest from a mechanical standpoint is to use a U-shaped bottom crossbar and double brace the rails similar to what is done on the front rails. This option will require special crossbars for all bottom crossbar sizes. Another option is to make a special Z-bend brace that would attach to the current crossbar. This brace would have to be made from a flat material to fit flush on both the rail flange and crossbar flange. One more option is to install some sort of reinforcing bracket to the rail itself. A U-bracket affixed to the inside or outside of the rail in the area of the bottom crossbar would help.

In summary, the slip-on shoe when tested against the standard shoe appears to offer excellent protection against rail flange and web separation. It appears to extend the useful life of the ladder once a crack has formed in the rail. The potential for a sudden and catastrophic failure will be less with the new shoe. All this sounds great but I caution that these results and conclusions are based on the tests conducted on only two ladders. The real performance can only be ascertained through field testing the shoes. I am still waiting for the test ladders to be completed and sent to the field. Actual user results may differ significantly one way or the other from what we have found so far. At this point however, I am pleased with what I see. The test ladders are available for your inspection.

John Vaduskpo

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION



DEPOSITION
EXHIBIT 7/26

Vasichko do

| | | |
|---|---|---|
| JOSE ESCUDERO, JR. | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. B-00-193 |
| BAUER CORPORATION D/B/A | § | |
| BAUER LADDER CORPORATION | § | |

## DEFENDANT BAUER CORPORATION D/B/A
## BAUER LADDER CORPORATION'S RESPONSES AND OBJECTIONS
## TO PLAINTIFF'S REQUEST FOR PRODUCTION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES BAUER CORPORATION D/B/A BAUER LADDER CORPORATION,

Defendant in the above-styled and numbered cause, and herein responds and objects to Plaintiff's

Requests for Production as follows:

Respectfully submitted,

GENDRY & SPRAGUE, P.C.

By:_____

RON A. SPRAGUE
State Bar No. 18962100
Federal I.D. No. 151
THOMAS W. GENDRY
State Bar No. 07797000
Federal I.D. No. 27525
645 Lockhill Selma
San Antonio, Texas 78216
Telephone: (210) 349-0511
Facsimile: (210) 349-2760

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading was mailed, certified mail, return receipt requested, to Mr. Barry Benton, 284 Ebony Avenue, Brownsville, Texas 78520, on this 18th   day of June, 2001.

THOMAS W. GENDRY

t:\ras\escudero\RFP-RES

2



# REQUEST FOR PRODUCTION

1.  Photographs, drawings, video tapes, film or sketches relevant to this lawsuit, including but not limited to the scene of the alleged incident or the subject ladder or a similar ladder or Plaintiff.

RESPONSE:   See attached copies of photographs of the subject ladder.  See previous response to disclosure for drawings.  See copies of photos in State Farm Insurance company records obtained by deposition on written questions and equally available to all parties.

2.  Documents or tangible things regarding claims or lawsuits made against Defendant with allegations similar to the incident in question, to wit, cracking or splitting of legs of similar ladders within the past ten years.

RESPONSE:  None.

3.  Documents or tangible things that Defendant intends to offer into evidence at the trial of this case.

RESPONSE:   See documents provided in response to disclosure.  See response to Request for Production No. 1.

4.  The complete contents of any investigation file of Defendant or its insurer regarding Plaintiff's claim prior to any reasonable anticipation of litigation.

RESPONSE:  None.

5.  Any accident reports, accident memorandums, or other writings recording any information between Defendant's employees or agents regarding the tendency of the subject ladder or similar ladders to crack or split at the legs.

RESPONSE:  None.

6.  Documents created by Defendant regarding the inspection and/or maintenance of Bauer ladders.

RESPONSE:  See labels previously provided in responses to disclosure.

3

7.      Documents or tangible things which in anyway relate to the subject ladder, including, but not limited to sale, distribution, advertising, warranties, brochures or product descriptions.

RESPONSE:      Objection as non-specific, overly-broad and asking for items not relevant or reasonably calculated to lead to relevant information. Without waiving objection, see documents provided in response to disclosure. No written warranties.

8.      Documents or tangible things which in any way relate to the instability of the "subject ladder" or a similar ladder.

RESPONSE:      None.

9.      Documents or tangible things which in any way describe the qualities or characteristics of the subject ladder or similar ladders.

RESPONSE:      Objection as over-broad and non-specific. Without waiving objection, see catalogs, design drawings and other drawings provided in response to disclosure.

10.      Documents or tangible things which relate to any print, radio or television advertising for the past ten (10) years which describe the characteristics or qualities of the subject ladder or similar ladders.

RESPONSE:      See catalogs provided in response to disclosure. No radio or TV advertisements.

11.      Documents or tangible things which reflect expenses or labor to repair or modify the subject ladder or similar ladders to make them safer.

RESPONSE:      None.

12.      Documents or tangible things which reflect that your insurance carrier is reserving its alleged right to deny any obligation to indemnify you for this claim.

RESPONSE:      None.

13.      Documents or tangible things which Defendant or its agents provided to or received from any expert who may testify at trial or an expert whose opinions or information may be relied upon by a testifying expert in formulating his opinions and conclusions.

4

RESPONSE:   See xerox copies of photographs responsive to Request for Production No. 1.   See response to Request for Production No. 6.   See photos and reports of Mr. Poremba in the State Farm Insurance company records.   See the records of State Farm Insurance Company regarding Mr. Escudero's claim against his mother's homeowner's policy, which records were obtained by deposition on written questions with subpoena duces tecum, with notice given to Plaintiff.   The State Farm records are equally available to Plaintiff.

14.   A copy of any potential, applicable insurance policy.

RESPONSE:   See attached insurance contract with Lexington Insurance Company.

15.   Documents discussions or tangible things which reflect statements or discussions by any party or witness in this lawsuit.

RESPONSE:   See State Farm Insurance Company records obtained by deposition on written questions with due notice given to all parties and equally available to Plaintiff for Plaintiff's statement and discussion of the ladder and incident by Mr. Poremba.

STATE OF ~~TEXAS~~ OHIO   *   *S.B.M 5/21/01*

COUNTY OF _WAYNE_   *

## **AFFIDAVIT**

BEFORE ME, the undersigned authority on this day personally appeared , _John D. Vasichko_ and after being by me first duly sworn, upon his/her oath, deposes and says that he/she is duly qualified and authorized in all respects to make this affidavit; that he/she has read the above and foregoing answers to interrogatories and that every statement contained therein is within his/her knowledge and is true and correct.

_John D. Vasichko_
Affiant

SWORN TO AND SUBSCRIBED BEFORE ME, this _21st_ day of _May_ ,2001.

SUSAN K. BOYKIN
State of Ohio
Exp. 3/04

_Susan Boykin - Meade_
Notary Public, State of ~~Texas~~ Ohio   S.B.M
Notary's printed name:
_Susan Boykin - Meade_

My commission expires: _March, 2004_

SEAL:



DEPOSITION
EXHIBIT:
7
Vasichko

## BAUER CORPORATION
## INTER-OFFICE MEMORANDUM

SUBJECT:  Fiberglass Stepladder Rail Shields/Shoes     DATE:  August 26, 1994

TO:  Vic Leonino

During our last Product Committee Meeting, considerable discussion took place
regarding the development of a ladder safety shoe for our 304 series fiberglass
stepladder similar to the ones that we are currently using on series 371 and 372.

The basis of the discussion was to improve the performance of these
ladders and to gain an advantage over competition by addressing this issue ahead of
competition.  I understand John has investigated sources for the tooling and parts
and has now determined a preferred source.

My reason for bringing this to your attention is that we are now aware that
Werner is prepared to provide fiberglass rail shields on all of their fiberglass
stepladders.  At this juncture, we believe they are only being supplied on a retrofit
basis; however, Pete Griffin called me yesterday to inform me that Werner will
announce a new 6300 series fiberglass stepladder that will include the shields as
part of their standard design.

Equally important, this product, apparently, has been designed for the
professional end user market and will only be available through distributors who
serve this market segment.  I understand Werner has indicated the 6300 series
will not be available to mass marketers.  This is an important strategic move on the
part of Werner to differentiate their product lines through different distribution channels.

Page 2

This is similar to Black and Decker's very successful marketing effort in supplying Home Depot, Lowes, etc. under the DeWalt brand name and reserving their more professional product line for STAFDA and industrial type distributors.

I realize we have a lot on our plate at this time; however, this issue needs immediate priority attention. My preference is to move forward immediately with a new shoe design along the lines we discussed for 3.16 and 1.75 rails. Further, I believe we should consider that it may be to our advantage to have both the new shoe design plus reinforcement shields. On the surface, this may seem to be overkill; however, the battle with fiberglass stepladders is going to be fought at the ground level over the next few years.

At this point, I am not suggesting that we commit ourselves to anything more than a new shoe design; however, if there is an advantage to consider the flexibility of tooling that will accommodate shields for the above rails we should do so. Similarly, if there is an advantage to accommodate a larger shoe for our heavier stepladder rails, we should look at this option as well.

I would like to discuss this issue early next week. Please let Earlyn know today what day/time you can be available for a Product Committee Meeting. I would prefer Thursday afternoon.

Norman L. Miller, Jr.

ejk
Attachment
cc: Dick Frase
    John Vasichko
shoes.doc/g



# BAUER CORPORATION
## INTER-OFFICE MEMORANDUM

SUBJECT: Product Committee Project Status     DATE: May 31, 1994

TO: Product Committee Members

The following is a status report of activities related to the items discussed at the April 11, 1994 meeting of the Product Committee.

# REDACTED

REDACTED

6. Series 304 Rail Protector/Slip-On Shoe

Norex has been given a revised set of blueprints for both the front and back rail shoes. I discussed our desire to provide an increased measure of support to the flanges as well as providing protection to the end of the rail. The Norex quote for the proposed design has been received and reflects a mold cost of $22,200 with a piecepart cost estimate of $.55. An additional quote from Rainbow Plastics in Mentor, Ohio gives a mold cost of $32,900 for the same number of cavities but the piecepart cost is quoted as low as $.336 for the back shoe and $.481 for the front shoe. These lower costs represent an approximate $.02 per shoe saving over our current hard shoe design. At the present annual usage of 63,500 shoes a savings of $1270 would be realized each year.

REDACTED

REDACTED

John D. Vasichko

CribPDF – www.fastio.com



DEPOSITION
EXHIBIT
10
Vasichko

# BAUER CORPORATION
## PRODUCT COMMITTEE MEETING
### APRIL 11, 1994 MINUTES

The April 11, 1994 meeting of the Bauer Product Committee was attended by:
Richard Frase, Victor Leonino, Norman Miller and John Vasichko

The Following items were discussed:

REDACTED

REDACTED

6. Series 304 Rail Protector/Slip-On Shoe
      Vic Leonino stated the mold cost had been estimated at about $17,000 for a 4
cavity mold. Norman Miller asked whether the new shoe would enhance the performance
of the product. Vic Leonino stated there was no doubt the shoe would enhance product
performance and could be used as a marketing advantage. There was general consensus
that this was an important project and it was given top priority behind the new top
project. John Vasichko stated the design had not yet been finalized. Vic Leonino
suggested we contact suppliers for their input on design and materials. John Vasichko
stated that Santoprene had been suggested as potential material and Mr. Leonino stated he
had heard of this material and we should consider it. It was agreed that the color of the
shoe will be black.

REDACTED

CVisPDF – www.fesivo.com

REDACTED

CVisPDF – www.fastio.com

REDACTED

Submitted by:
John Vasichko
April 13, 1994



BAUER CORPORATION
PRODUCT COMMITTEE MEETING
BAUER CONFERENCE ROOM
MONDAY, APRIL 11, 1994
4:30 P.M.


REDACTED

6  Series 304 rail protector/slip-on shoe - A preliminary design and cost analysis of a slip-on shoe was submitted on March 3, 1994. Although the final design is subject to revision the cost estimates for piece parts and tooling will be relatively accurate. The cost increase per ladder will be approximately $0.50 or an annual cost based on 1993 sales of about $16,040. The 4 cavity mold cost was quoted at $17,640  Adding rail protectors similar to the series 350 would cost approximately $5.80 per ladder with a tooling cost of about $12,000. This project is currently on hold pending a decision by this committee

REDACTED

Summary of activities related to Bauer Corporation Product Committee projects

Status of active projects as of April 7, 1994

REDACTED

ClickPDF - www.fastio.com

REDACTED

Submitted by:

John Vasichko

CutePDF – www.texio.com


DEPOSITION
EXHIBIT 7/
12
Vasichko

# BAUER CORPORATION
## INTER-OFFICE MEMORANDUM

SUBJECT: Slip on shoe for Series 304          DATE: March 3, 1994

TO: Vic Leonino/Norman L. Miller, Jr.

I have completed a preliminary drawing for a slip on vinyl shoe for the 3.16" fiberglass rail. I have also received an updated quotation from American Plastic Molding Corporation for a similar shoe. The quote is based on a shoe similar in size and design to the current Series 371 shoe.

When designing the shoe for the 3.16" rail it became obvious that a somewhat larger shoe would be required in order to provide a measure of rail protection . The shoe shown on the attached drawing will cover the rail to just below the bottom step brace attachment point on the rail flange. The rear shoe would be designed in a similar manner. In so doing the shoe becomes larger and heavier than that quoted by American Plastic Molding. For the front shoe this amounts to about 25% more material. The rear shoe would be approximately 25% larger as well.

The quantity of shoes used on 3.16" and 1.75" rails in 1993 totals 63,500 each. The quoted price from American Plastic Molding for the front shoe is $.6044 each at an order quantity of 25,000 pieces. The larger shoe shown on the drawing will cost approximately $.10 more or $.7044 per piece (increased material only). The back shoe will cost approximately $.4222 per piece. The currently used shoe assembly costs $.509 for the front rail and $.365 for the rear rail. At the estimated cost for the vinyl slip on shoes the annual cost increase based on 1993 sales will be $16,040 per year. The increased cost per ladder will be $.5052.

The vinyl shoe will provide some degree of protection to the rail ends. It will not however add to the strength of the shoe/rail assembly. As an example, it will not protect the end of the rails from being crushed whereas the metal shoe possibly could provide some small measure of protection. The vinyl shoe would help protect the bottom of the rail from scuffing and abrasion whereas the metal shoe does not. How this affects the overall life of the ladder rail I cannot say. We don't have any field data one way or the other.

The cost for a 4 cavity mold is quoted at $17,640. This would produce a right and left hand front and rear shoe in one shot. There will be no provision to produce a given quantity of any individual shoe so our inventory will have to be closely watched so we don't get out of balance. Lead time for the tooling is approximately 13 weeks.

I will not proceed further until we make a decision on the desirability of this option  The risk is significant since we are not sure of the performance of the shoe and the die cost is substantial. Please advise me if you need more information or how you wish me to proceed

John D. Vasichko





BAUER CORPORATION
INTRA-OFFICE MEMORANDUM

SUBJECT:  Product Improvement          DATE:  October 24, 1991

TO:  Norman L. Miller, Jr.

On October 4, 1991, John Vasichko, Neil Thomas and I held a
meeting to discuss potential design changes that would address the
needs you outlined in our product committee meeting on September 24,
1991.  The design improvement alternatives and recommendations are as
follows:

I.  Fiberglass Stepladder Shoe Area - Rail Fracturing

    Alternatives:  1)  Molded wrap-around foot

                  Pros:  1)  Wear resistance from rail edges and
                           corners.
                        2)  Shoe failure before rail.

                  Cons:  1)  Minimal rail support.
                        2)  Shoe would/could break off easier
                           than current design.

        2)  Outer reinforcement sleeve - plastic

                  Pros:  1)  Wear resistance.

                  Cons:  1)  Minimal support.

        3)  Outer reinforcement sleeve - aluminum

                  Pros:  1)  Wear resistance.
                        2)  Improved strength.

                  Cons:  1)  Conductive.
                      2)  Complicates minor sub-assembly.

        4)  Inner reinforcement sleeve - aluminum

                  Pros:  1)  Improved support - strength.

                  Cons:  1)  No wear resistance.

Recommendation:  Outer reinforcement sleeve - plastic

Page 2

II. Spreader Loosen

Alternatives:  1)  Use a lock-nut and bolt at semi-tubular
connections.
2)  Use a stronger clip with bolt and lock nut
on clip connection.
3)  A "Wing Type" hinge assembly.

Recommendation:  Use a lock-nut and bolt at semi-tubular connections.
If testing proves this improvement not satisfactory,
implement stronger clip design.

III. Top - Front Section Connection Loosen

Alternatives:  1)  Solid aluminum rivet front rail reinforcement
plate to rail.
2)  Solid aluminum rivet on outside reinforcement
plate to "sandwich" top and rail to inside
reinforcement plate.
3)  A "352 style" type hinge assembly on inside of
top and front section.

Recommendation:  Solid aluminum rivet front rail reinforcement plate
to rail, test/evaluate.

| RECOMMENDED IMPROVEMENT | TOOLING COST (EST.) | LEAD TIME | COST/LADDER (EST.) |
|---|---|---|---|
| F/R Reinf. Sleeve | $500 | 4 weeks | $2.50 |
| B/R Reinf. Sleeve | 500 | 4 weeks | 2.05 |
| Threaded Fastener Spreader | — | 2 weeks | 4.60 |
| Top - F/S Connection | — | — | .75 |
| TOTAL | | | $9.90 |

Victor E. Leonino

ejr

cc:  Neil Thomas
John Vasichko

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOSE ESCUDERO, JR.          ) (
                            ) (
VS.                         ) (   CIVIL ACTION NO. B-00-193
                            ) (
BAUER CORPORATION D/B/A     ) (
BAUER LADDER CORPORATION    ) (

---

ORAL DEPOSITION OF
REYMUNDO MEDINA
MAY 4, 2001

---

ORAL DEPOSITION OF REYMUNDO MEDINA, produced as

a witness at the instance of the DEFENDANT, taken in

the above styled and numbered cause on MAY 4, 2001,

reported by CORINNA N. GARCIA, Certified Court Reporter

No. 5210, in and for the State of Texas, at the offices

of Barry Benton, Attorney at Law, 284 Ebony Avenue,

Brownsville, Texas, pursuant to the Federal Rules of

Civil Procedure.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 112 of 328

**Page 2**

APPEARANCES

COUNSEL FOR PLAINTIFF

BARRY BENTON
284 Ebony Avenue
Brownsville, Texas 78520

COUNSEL FOR DEFENDANT

THOMAS GENDRY
GENDRY & SPRAGUE
645 Lockhill Selma
San Antonio, Texas 78216-5707

ALSO PRESENT·
Cecelia Caso, Interpreter

INDEX

| | PAGE |
|---|---|
| Appearances . . . . . | 2 |
| REYMUNDO MEDINA | |
| Examination by Mr Gendry | 3 |
| Errata Sheet/Signature Page . | 33 |
| Reporter's Certificate . . . | 34 |
| Attached to the end of the transcript Stipulations | |

**Page 3**

1        REYMUNDO MEDINA,
2 having been duly sworn, testified through the
3 interpreter, Cecelia Caso, as follows·
4        EXAMINATION
5 BY MR. GENDRY:
6    Q. Would you please state your name?
7    A. Reymundo Medina.
8    Q. Mr. Medina, my name is Tom Gendry and I
9 represent Bauer Corporation d/b/a Bauer Ladder
10 Corporation in this case, which has been filed by Jose
11 Escudero, Jr.
12    A. Yes
13    Q. You and I have not previously met; is that
14 right?
15    A. No.
16    Q Sitting next to you is Mr Barry Benton who
17 represents Mr Escudero. Have you met with him before?
18    A. No
19    Q Do you understand English?
20    A. No.
21    Q All right. And we have an interpreter here who
22 will be interpreting everything that I say and you say
23 Do you understand that?
24    A. Yes.
25    Q Have you ever given your deposition -- anything

**Page**

1 like this before?
2    A No.
3    Q Let me explain a few things. You have to make
4 an audible response so that the court reporter here can
5 take it down.
6    A It's okay.
7    Q And if you don't understand any of my
8 questions, just tell me so and I'll repeat the question
9 in a different way to try to make it clear.
10    A. Okay. It's okay.
11    Q. Do you go by any other names besides Reymundo
12 Medina?
13    A. No.
14    Q. And what is your current address?
15    A. In Weslaco.
16    Q. Can you give me the exact street address?
17    A. 2500 South Lane.
18    Q. How long have you lived there?
19    A. Five years.
20    Q Is that a home or an apartment?
21    A Four. Four, or something like that. No, it's
22 a private home.
23    Q Okay. Do you own that home?
24    A Yes, we are owners.
25    Q And are you married?

**Page 5**

1    A. Yes.
2    Q. And your wife's name?
3    A. Yvonne Medina.
4    Q. And what was her maiden name?
5    A. Yvonne Chavez.
6    Q. Do you have any children?
7    A. No, not now.
8    Q. Have you been married before?
9    A No.
10    Q. And how old are you, sir?
11    A. 28 years old.
12    Q Your date of birth?
13    A April the 15th, 1973.
14    Q Where were you born?
15    A In Reynosa -- Reynosa, Tamaulipas.
16    Q Okay. And how about your younger years, up to
17 say age 20, where were you raised?
18    A. In Rio Bravo, Tamaulipas.
19    Q And that's in Mexico, right?
20    A. Yes.
21    Q. Are you a Mexican citizen or U.S. citizen?
22    A. I'm an American resident.
23    Q How long have you been an American resident?
24    A. For about four years.
25    Q. Let me ask you a bit about your education,

**Page 6**

1 okay?

2 A. Okay.

3 Q. How far in school did you go?

4 A I went to elementary school, a secondary
5 school, and then I went for three semesters to a
6 technical school by the name of Conalep.

7 Q How do you spell that?

8 A. This way.

9 THE INTERPRETER: For interpretation
10 purposes, C-O-N-A-L-E-P.

11 Q Three semesters in the technical school; what
12 did you study?

13 A Operation and maintenance in agricultural
14 machine -- machinery, gas and oil.

15 Q. As I understand it, you finished secondary
16 school; is that right?

17 A. Yes.

18 Q What is your current employment?

19 A I -- I am in charge of the company by name of
20 Paisano Construction. I'm a foreman.

21 Q. How long have you been with Paisano
22 Construction?

23 A. For about four or five years. Five years or
24 something like that.

25 Q. And who owns Paisano Construction?

**Page 7**

1 A. Jose Escudero.

2 Q. Have you ever worked for E&E Builders, Inc.?

3 A. It's the same -- it's the same company.

4 Q. Can you tell me what sort of work you do for
5 Paisano and/or E&E Builders?

6 A. I'm in charge of the people. I have to see
7 that the people -- what the people do and carry their
8 -- their material.

9 Q You do that as a foreman; is that correct?

10 A. Yes. Not as a foreman. Just as a friend,
11 because we are all workers; not as a foreman.

12 Q. Do you have a job title at Paisano or E&E?

13 A. Yes, there I have worked all my -- all the
14 time. He must have me on the payroll.

15 Q. Do you have a job title?

16 A No, I didn't get any title. I didn't finish my
17 profession.

18 Q. Are you a supervisor with Paisano or E&E?

19 A. It's the same company. E&E is the base of
20 everything; and Paisano. Both of them are the same
21 company.

22 Q And are you a supervisor of other workers?

23 A. No, only -- only from Paisano's workers.

24 Q. Okay. Tell me, just generally, what your
25 duties are. What do you do during the day?

**Page** [8]

1 A I -- I am in charge of the people, for them to
2 have their material and -- and for the people to do the
3 -- the type of work that they are supposed to do.

4 Q Okay. Is Jose Escudero a friend of yours as
5 well?

6 A Not -- not really my friend. Well, he's my
7 boss. He's a friend too, let's say.

8 Q And when I talk about Jose Escudero, I'm
9 talking about Jose Escudero, Jr. Do you understand?

10 A. Yes.

11 Q Do you know Jose Escudero, Jr.'s father, who
12 also is named Jose Escudero?

13 A Yes.

14 Q Do you have any relationship with him at this
15 particular time, with Jose Escudero, Sr.?

16 A No. In fact, no. At the beginning, yes, I
17 did, because he was working together with us. But --

18 Q What sort of work does Paisano and E&E do?

19 A They do construction in general, homes and
20 hotels.

21 Q Did you learn to do construction work on the
22 job?

23 A Yes.

24 Q Have you ever owned your own business?

25 A No, not now.

**Page 9**

1 Q Have you ever in the past?

2 A. Maybe. Maybe, yes.

3 Q. Okay. And when would that have been?

4 A Five years ago -- no, five years more in order
5 to be able to -- to have my own company.

6 Q Before today's date, have you ever owned your
7 own business?

8 A No.

9 Q You hope to own your own business in five years
10 or so. Is that what you're saying?

11 A. Yes.

12 Q. Okay. Have you ever been arrested?

13 A. No.

14 Q. Ever been convicted of any criminal offenses?

15 A. No.

16 Q Do you have a Texas driver's license number?

17 A. I have had tickets, but that's all. Speed
18 limits.

19 MR. GENDRY: Okay. Let the record show
20 that Mr. Medina has shown me a driver's license with
21 his name on it, and the number is 15429266 and expires
22 4/15/03. Thank you.

23 Q. Do you carry a social security number?

24 A. Yes.

25 Q What is it?

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 114 of 328

## Page 10

1   A   638 --

2   Q.   What was that?

3   A   638 --

4   Q.   Oh, 638.

5   A.   -- 56-4756.

6   Q   Do you know Mrs. Escudero, Jose's mother?

7   A.   Yes, a little bit.

8   Q   And is it Jorge Medina that is your brother?

9   A   Yes.

10   Q.   Okay. Does Jorge still work for E&E?

11   A.   Yes.

12   Q.   And do you know Jesse Ramirez?

13   A   Yes, he's a friend.

14   Q   Does he work for E&E?

15   A   I think they were partners once during the

16 auction that they place at the hotel when they bring

17 all the furniture out and things like that. He works

18 -- he is the auctioneer. He works at an auction shop.

19   Q.   And do you know Flavio Correa?

20   A.   Yes, I did meet him.

21   Q   Does Flavio Correa work for E&E?

22   A.   He worked there, not anymore.

23   Q.   Do you know where Flavio -- Flavio Correa

24 lives?

25   A   Right now, I don't know where he lives. He

## Page 11

1 used to live in Mercedes, but right now I don't know

2 where he lives.

3   Q.   Was Flavio Correa a friend of yours?

4   A.   Not really a friend.

5   Q   Let me direct your attention to the date of May

6 the 10th, 1999.

7   A   Uh-huh.

8   Q.   And Mr. Escudero is saying that on that date

9 that he injured himself when he fell off of a ladder.

10 Do you understand that?

11   A.   Yes.

12   Q.   Were you present when the ladder accident

13 happened?

14   A.   Yes, I was on his side when I realized he was

15 already on the floor.

16   Q   You were outside when the fall took place; is

17 that right?

18   A   I was in the -- in the side of the door.

19   Q.   Were you outside or inside the building?

20   A.   Inside the building.

21   Q   Were you inside the same room where it was that

22 Mr. Escudero fell?

23   A.   I was by the door at the entrance of the room.

24   Q   Did you see Mr. Escudero fall?

25   A.   No, I was not able to see it. I only saw him

## Page 12

1 when he was on the floor.

2   Q   Just before, or at the time that Mr. Escudero

3 fell, did you hear anything?

4   A   No. He only sent me to get him a screwdriver.

5   Q   Okay. What was the reason for you going to --

6 strike that. Where did this accident take place?

7   A   In Santa Maria, in an apartment.

8   Q   Was this Carmen Escudero's apartment?

9   A.   Yes, I think it's on her name.

10   Q   What time did you go there?

11   A.   Around 4:30 or 4:00.

12   Q   In the afternoon, right?

13   A.   Yes, in the afternoon.

14   Q.   Who did you go with?

15   A.   I went with Flavio Correa, and Jose and Jesse

16 were there. We went there because they were fixing a

17 lamp or something there in the apartment, a light.

18   Q   Did you go by truck?

19   A.   Yes.

20   Q.   Did you carry any equipment with you?

21   A.   No, I didn't have any equipment.

22   Q   Before today's deposition, have you given a

23 written or recorded statement about what happened?

24   A   What do you mean?

25   Q   Did somebody ask you questions and tell you

## Page 13

1 that your -- your answers and the questions would be

2 recorded?

3   A   Yes.

4   Q   Okay. Who took a statement from you?

5   A.   You -- didn't you tell me that I had to

6 declare, referring to the interpreter, and that I

7 that you were going to translate for me?

8   Q.   Right. I am -- I am taking a statement from

9 you. Have you -- have you given a statement, such as

10 this, or over the telephone or face to face to anyone

11 else besides me?

12   A   No.

13   Q   Glad we got that cleared up. Have you spoken

14 with anybody about -- strike that. Have you spoken

15 with Mr. Escudero, I mean Jose Escudero, Jr., about

16 what happened at the accident?

17   A   No.

18   Q   Did you speak with anybody about what happened

19 at the accident before today's deposition?

20   A   No.

21   Q   Were you here at Mr. Benton's office yesterday?

22   A   Yes, I came here.

23   Q.   And did you talk to anybody about the accident

24 yesterday?

25   A   No, I just came here because I brought Jose

Case 1:00-cv-00193 Document 24 Filed in TXSD on 10/19/2001 Page 115 of 328

**Page 14**

1 Escudero here. We had some work at the Island. And
2 then I came here and I was told that I had to be here
3 at 8:30.
4    Q. Okay. Was Mr. Escudero out at the Island on
5 the job yesterday at any time?
6    A. No, no. We only -- we only came -- went to
7 pick up the payroll.
8    Q Is there any work going on on the Island right
9 now that you're involved in?
10    A. I'm carrying material.
11    Q Carrying material for whom?
12    A For the construction of the Sands. It's a
13 motel that we're building.
14    Q Okay. Is E&E building the Sands Motel on the
15 Island?
16    A. Peacock Construction is building it, and
17 Peacock Construction hired E&E Building for help.
18    Q. Okay. Go back to the day of the accident,
19 okay?
20    A Yes.
21    Q. Did you -- do you know where the ladder came
22 from that Mr. Escudero used the day of the accident?
23    A. Yes, I took it. I got it from the -- from the
24 warehouse.
25    Q Did you carry any ladder with you in your truck

**Page 15**

1 when you went to -- to the apartment?
2    A. No. There at the same place, there is a
3 warehouse where we keep our tools.
4    Q. Do you keep other ladders there or -- strike
5 that. Did you keep other ladders there at the time at
6 the warehouse?
7    A. Yes, ladders, tools, paint.
8    Q. Why did you get the ladder from the warehouse?
9    A. I was -- I was asked for one inside the -- the
10 apartment, but they were going to fix up a light.
11    Q. Who asked you to get a ladder?
12    A Jose Escudero.
13    Q And he was going to use it to work on a light;
14 is that correct?
15    A. Yes.
16    Q Had you ever seen that ladder before?
17    A We have several.
18    Q And that ladder specifically, had you ever seen
19 it before?
20    A. Yes, we pick up the tools and we go and -- and
21 keep it. We always have ladders.
22    Q. Do you know how long that ladder had been at
23 the warehouse?
24    A. Maybe 20 days.
25    Q Do you know where it came from before 20 days?

**Page 16**

1    A I think that we picked it up from Mission --
2 Mission, or I don't know where.
3    Q Did you pick it up at a particular place in
4 Mission or some other town?
5    A. No, I'm not sure, because we do a lot. But we
6 do one job, we go pick up everything and then -- and
7 then we need to go and keep everything at the
8 warehouse.
9    Q Okay. This ladder -- let me show you a
10 picture. It has on the side of one of the legs, or the
11 rail, SRISD Maint, M-A-I-N-T, Department. You see
12 that, Mr. Medina?
13    A. Yes.
14    Q Okay. And I take that to mean Santa Rosa
15 Independent School District maintenance department.
16 Does that sound correct to you?
17    A No. I don't know. There are several companies
18 working with us.
19    Q Did you ever see this particular ladder with
20 this lettering on it before the accident when Mr.
21 Escudero fell?
22    A. No, I don't pay attention to the ladders. I --
23 it's one of the many ladders that we have.
24    Q. In your experience working for E&E or Paisano,
25 where did you get your ladders?

**Page 17**

1    A. We buy them at different stores.
2    Q Have you ever bought any ladders for E&E or
3 Paisano?
4    A I don't think so. Ladders, I haven't bought.
5    Q Who would be your ladder buyer in the -- the
6 company?
7    A Jose Escudero buys them or -- or the workers
8 that are with us.
9    Q Are ladders sometimes picked up at job sites
10 that you've cleaned out?
11    A Yes, we pick them up because when we finish
12 with the construction, we need to pick everything up.
13    Q All right. As I understand it, sometimes
14 Paisano and E&E has a job of doing the final cleanup of
15 a construction site; is that right?
16    A Yes, we are in charge of having everything
17 clean.
18    Q All right. Do you sometimes pick up property,
19 such as ladders, that may have belonged to some other
20 company?
21    A Maybe we -- we have picked up things that don't
22 belong to us. But since all the contractors work with
23 us, sometimes they go and pick them up at the shop.
24    Q Did you -- as to this ladder that Mr. Escudero
25 used, did you ever inspect the ladder?

Page 18

1  A  No, I just gave it to him and he's the one who
2  opened it.
3  Q  As I understand it, then, you went to the
4  warehouse, you got the ladder, you did not inspect it
5  and you took it to Mr. Escudero; is that right?
6  A  Yes, it's correct.
7  Q.  Who set up the ladder in the apartment?
8  A.  I gave it to Pepe, to Jose Escudero, and he
9  opened it and set it there, and he went up and climbed
10  it and started to do what he needed to do.
11  Q.  Did you see Mr. Escudero actually set the
12  ladder on the floor, set it up?
13  A  Yes, he was already on top of the ladder.  He
14  was working there.
15  Q  Did you see him climb the ladder?
16  A  Yes, he did climb it.
17  Q  Did you see Mr. Escudero do any inspection of
18  the ladder?
19  A  Yes, he opened it.  He set it the way it should
20  be set and he climbed it.
21  Q.  All right.  And anything else that you saw him
22  do before he climbed the ladder?
23  A  No.
24  Q  All right.  As I understand it, you did not see
25  Mr. Escudero inspect the ladder to see whether or not

Page 19

1  it was damaged or broken, is that correct?
2      MR BENTON: Object to that
3  A  Yes, it's correct
4  Q  In other words, he just set the ladder down and
5  he -- I mean, set it up and he climbed the ladder?
6  A  Uh-huh
7  Q.  Is that yes?
8  A  Yes
9  Q  You saw him climb the ladder; is that right?
10  A  Yes, he was on top.  He had been working there
11  for a while fixing what he needed to fix.
12  Q.  Was he working on a light fixture?
13  A.  Yes.
14  Q  What step -- if you know, what step of the
15  ladder was he standing on?
16  A.  No, I don't remember well.
17  Q.  Okay.  Did you have any interaction with Mr
18  Escudero as he was working on the ladder; that is, by
19  talking with him, exchanging tools with him or anything
20  like that?
21  A.  No, I got there, he was working, he asked me
22  for a screwdriver  I took it to him, I left the room,
23  I was awhile on the side when suddenly he -- he fell
24  down together with the ladder
25  Q.  Okay  When you saw Mr. Escudero working on the

Page 20

1  light fixture, was his -- was the light fixture
2  directly in front of his face or was he reaching for
3  it?
4  A  He was working there just above him.
5  Q  Okay.  Just above his head; is that what you're
6  saying?
7  A  Not directly above, but here, more or less.
8  Q  All right.  By "here, more or less," you've
9  pointed about a little bit above your eye level; is
10  that correct?
11      MR. BENTON:  Object to that.  I don't
12  think that's a correct representation.
13  A.  What I do know is that he was there and that he
14  was doing that work.  That's the only thing that I do
15  know, and when I turned, he was already on -- on the
16  floor.  And we had to break his boot and -- and take
17  him home -- and take him -- and I took him to the
18  hospital.
19  Q.  Okay.  When you saw him -- did you see him do
20  anything with the screwdriver?
21  A.  Yes, he was -- he was taking some screws off.
22  Q.  Okay.  Were the screws -- screws next to the
23  ceiling?
24  A  Yes.
25  Q  Or were the screws in the light fixture itself?

Page 21

1  A.  I don't remember where they were, but they were
2  in a -- a light or something like that.
3  Q  The ladder has in it the initials JRE.  Do you
4  know anything about that?
5  A  It must be Jose Escudero.  I don't know.  I
6  don't know.
7  Q  Did you have anything to do with placing the
8  initials JRE in the ladder?  I will show you a picture
9  of the -- this is of the ladder, the front leg or rail.
10  A.  No.
11  Q.  You don't know anything about those initials,
12  how they got in there?
13  A.  No.
14  Q  Did you inspect the ladder after Mr. Escudero
15  had fallen?
16  A  No, I didn't have the time.
17  Q  Did you ever, at any time up to today's
18  deposition, inspect the ladder?
19  A  No.
20  Q  Do you have any knowledge of what went wrong
21  with the ladder, why it came down along with Mr.
22  Escudero?
23  A.  It just fell down.  There are pictures.  It's
24  all cracked.  I don't know.  He was working.  When I
25  turned, the ladder was already on the floor together

Page 22

1 with him.
2     Q  You mentioned that the ladder was cracked; is
3 that right?
4     A  No, it was not cracked.  He was standing there
5 and the ladder came down with him together.
6     Q  Okay.  Did you ever see the ladder cracked
7 after the accident?
8     A  After the accident, when I -- when I -- when we
9 came back and everything, I saw that it was all
10 cracked, and I went to see what had happened because
11 they had said that it had broken apart in three pieces.
12 And we saw that there was a piece of iron from a
13 trailer, and that's where he fell with his foot.
14     Q  The piece of metal from the trailer is what you
15 think that he hit his foot on; is that right?
16     A  Yes, I think that's where he fell.  When he
17 fell, he fell on top of that metal.
18     Q  Okay.  And did you at that same time see that
19 the ladder was cracked, as you say, or split?
20     A  Not at that time.
21     Q  Okay.  Did you ever see the ladder in a split
22 condition?
23     A  No.  When we went back to see what had
24 happened, we -- we realized that the ladder had broken.
25     Q  You actually saw that it was broken; is that

Page 23

1 right?
2     A  Yes, I saw that it was broken.
3     Q  Did you do anything with the ladder after the
4 accident?
5     A  No, I don't think so.  I think we just moved
6 it.  That's all.
7     Q  Does Paisano or E&E have any safety manual
8 concerning the inspection of ladders before they use
9 them?
10     A  No, I don't know.  We use them.  We check them
11 to set it up.  We check it -- we check that they are
12 right and then we climb it.
13     Q  How do you inspect a ladder?
14     A  To see that it's well set up.
15     Q  And -- and do you inspect any of the -- the
16 parts of the ladder after it's set up?
17     A  Not always, but only to see that it's okay.
18 Logically, if you see that the ladder is not well,
19 well, you don't climb up.
20     Q  You agree, then, that if you see that a ladder
21 is broken, damaged or abused, you don't use it; is that
22 right?
23     A  No, I don't use it.  If I know that it's not
24 well, I don't use it.
25     Q  Have you ever, in your experience in the

Page 2

1 construction industry, thrown away ladders that have
2 been damaged or broken?
3     A  Yes, they have been thrown out.  Personally,
4 me, I have seen cases in which they say that it's not
5 good and they throw it away.
6     Q  Has that also been the case with respect to
7 fiberglass ladders, in your experience?
8     A  With any type of ladder.
9     Q  Okay.  You would agree that it is dangerous for
10 a construction worker such as yourself to get on a
11 ladder that already has split legs; is that right?
12     A  Yes, if the -- the ladder is not well, well,
13 that's correct.
14     Q  All right.  Did you observe that before Mr.
15 Escudero got on the ladder that the legs were already
16 split?
17     A  Yes, he opened them, he set up the ladder and
18 he climbed it to do whatever he needed to do.
19     Q  Did you notice before you gave the ladder to
20 Mr. Escudero that -- that the legs were already
21 damaged?  And by damaged, I mean split.
22     A  No.
23     Q  For example, this ladder here shows a split up
24 the side of the leg or the rail.  Do you see that?
25     A  Yes.

Page 25

1     Q  Was the ladder like that when you gave it to
2 Mr. Escudero to use?
3     A  No.
4     Q  You -- at least you didn't see it; is that
5 right?
6     A  At least, no, I didn't.  And I would have seen
7 it --
8        MR. GENDRY:  Object to the --
9     A  -- I wouldn't have taken it -- taken it to him.
10        MR. GENDRY:  Objection.  Object to the
11 responsiveness.
12     Q  Have you used -- strike that -- this is a Bauer
13 ladder that we're talking about.  Do you understand
14 that?
15     A  We are talking about what type ladder?
16     Q  A Bauer, made by Bauer Manufacturer or Bauer
17 Corporation?
18     A  I don't know who manufactures them.
19     Q  Okay.  My question following that is have you
20 ever had any experience with Bauer ladders showing
21 damage of the -- of the sort that I've shown you in
22 some of these pictures?
23     A  Not up to now.
24     Q  You have used ladders like or similar to this
25 once before this accident; is that correct?

Case 1:00-cv-00193  Document 24  Filed in TXSD on 10/19/2001  Page 118 of 328

## Page 26

1  A. Yes, I have used them.

2  Q. And you've used them since the accident; is

3  that right?

4  A. Yes, I have used ladders.

5  Q. Have you ever seen any ladders, like or similar

6  to this, with -- with splitting in the legs or the

7  rails that I've shown you in the pictures?

8  A. No, not up to now.

9  Q. Do you have any personal knowledge of how the

10  Santa Rosa Independent School District ladder got into

11  the possession of E&E?

12  A. Maybe it was taken by another worker from

13  another contractor, because there are several

14  contractors there, and when we pick things up, we

15  picked it up ourselves.

16  Q. Are you at all involved in the auction

17  business, Paisano I think it's called?

18  A. No, not too involved, but they call us to go

19  and take trailers, to move merchandise. But related,

20  really related, no, I'm not.

21  Q. Do you know Alejandro Garza?

22  A. Yes.

23  Q. Where is --

24  A. I think he's a welder.

25  Q. All right. And where does he live; do you

## Page 27

1  know?

2  A. I have no idea. I think in Mission or Rio

3  Grande.

4  Q. Is he a friend of yours?

5  A. No.

6  Q. Where do you know Mr. Alejandro Garza from?

7  A. I think he's a welder. He's hired to do some

8  welding -- welding -- welding work.

9  Q. Has he -- Alejandro Garza done work on jobs

10  where E&E has been before?

11  A. Yes.

12  Q. Have you ever spoken with Jose Escudero about

13  where the ladder that he -- from which he fell, where

14  it came from?

15  A. No.

16  Q. Okay. When Mr. Escudero fell, what is the

17  first thing that you noticed?

18  A. That he was holding his foot and that we had to

19  -- had to tear his boot.

20       MR. BENTON: Had to what his foot?

21  A. Tear -- tear or --

22  Q. Tear?

23  A. -- chop his boot.

24  Q. You -- you took his boot -- you cut his boot

25  off; is that correct?

## Page 28

1  A. Yes, and we -- and we put him to my -- my car.

2  Q. Okay. And did you take Mr. Escudero to the

3  emergency room then?

4  A. Yes.

5  Q. Where did you take him?

6  A. To Harlingen.

7  Q. How long had Mr. Escudero been on the ladder

8  before he fell?

9  A. He must have been there for 10 or 15 minutes

10  already.

11  Q. And when you say 10 to 15 minutes, you mean

12  actually on the ladder?

13  A. Yes, he was already on top of the ladder.

14  Q. Did anyone else climb the ladder besides Mr.

15  Escudero?

16  A. Not that I know of. Only him. He's the only

17  one that was there.

18  Q. Did anybody -- excuse me -- did anybody climb

19  the back part of the ladder?

20  A. No, he was just by himself there.

21  Q. Okay. And was Mr. Escudero on the front part

22  of the ladder?

23  A. Yes, where you climb the steps.

24  Q. When you say climb the steps, you mean these

25  right here; is that correct?

## Page 29

1  A. Yes.

2  Q. Okay. And that's the side in which it says --

3  that's the side in which it says Bauer on the front.

4  I'm going to show you two pictures to compare. This

5  picture and then this one. Is that correct?

6  A. Well, it says there.

7  Q. Okay. And it -- it's this portion of the

8  ladder that Mr. Escudero was on, is that right, leading

9  up to the word Bauer in yellow?

10  A. I don't know. He was -- he was up there where

11  you climb.

12  Q. Okay. What I'm trying to find out is was he on

13  the steps or was he on the back crossbeams of the

14  ladder?

15  A. He was on top where you normally climb.

16  Q. Okay. You see back here there are some braces.

17  He was not on those is what you're saying?

18  A. No.

19  Q. Okay. Did anybody get on the ladder with Mr.

20  Escudero?

21  A. Not that -- not that I saw. He was only there.

22  Q. Let me ask you, when you gave him the ladder,

23  you stated that you handed him a screw at some point --

24  a screwdriver at some point in time; is that right?

25  A. Yes. Yes, I gave him a screwdriver.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 119 of 328

Page 30

1   Q  How long were you there while -- in the room
2 while he was on the ladder?
3   A. Around three or four minutes and then -- then I
4 went out.
5   Q. And you did not see him fall; is that correct?
6   A. Not exactly see him.  I was -- I was in the
7 room and I was in the side of the door.  When I went
8 in, he was on the floor.
9   Q. Okay.  You did not see any movement in the
10 ladder before he fell, just before he fell; is that
11 right?
12   A  No, everything was okay.
13   Q. Okay.  Have you seen, besides the photographs
14 that I've shown you, any photographs of the ladder?
15   A. No.
16   Q. Does Jose Escudero, Jr. -- does he come on to
17 the jobsite that you're currently working on out at
18 Padre Island?
19   A  He doesn't come anymore.  He normally goes, but
20 he's not going anymore to where we are here.  He
21 doesn't go.
22   Q  And who is the supervisor for E&E on the
23 current jobsite?
24   A. Right now, it's my brother.
25   Q  Have you observed Mr. Escudero's physical

Page 31

1 condition over the past six months?
2   A. Yes.  I see him every day.
3   Q. And how does he appear to you to be?
4      MR. GENDRY:  Are you okay?
5   A  He's all twisted.
6   Q  Okay.  What do you mean that he's all twisted?
7 Can you be more --
8   A. He's always limping with his -- limping -- the
9 leg.
10   Q  Okay. .And that's the leg that was injured, the
11 left leg; is that correct?
12   A. Yes.
13   Q. Have you seen him climb ladders in the past six
14 months?
15   A  No.
16   Q  Have you seen him up on any buildings in the
17 past six months?
18   A. No, I haven't seen him.
19   Q  And have you in the past six months seen him
20 out at any jobsites?
21   A. Yes, he goes to the -- to the job where we are.
22      MR. GENDRY:  Okay.  I think that's all I
23 have.  Thank you, sir.
24      MR. BENTON:  I have no questions at this
25 time.  Thank you for your time.

Page 3

1      (Deposition concluded)

Page 3

ERRATA SHEET/SIGNATURE PAGE

PAGE LINE CHANGE        REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

   I, REYMUNDO MEDINA, have read the foregoing
transcript and hereby affix my signature that same is
true and correct, except as noted above.

_____
     REYMUNDO MEDINA

THE STATE OF TEXAS

COUNTY OF CAMERON

     SUBSCRIBED AND SWORN TO BEFORE ME, the

undersigned authority on this the _____ day of

_____, 2001.

    _____
    Notary Public in and for
    The State of Texas

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 120 of 328

Page 1

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
2                      BROWNSVILLE DIVISION

3    JOSE ESCUDERO, JR.              )
           Plaintiff                 )
4                                    )
     VS.                             )  CIVIL ACTION NO. B-00-193
5                                    )
     BAUER CORPORATION D/B/A         )
6    BAUER LADDER CORPORATION        )
           Defendant                 )
7    ****************************************************

8            ORAL DEPOSITION OF DR. JOHN JOHNSON
9                    AUGUST 29, 2001
10                   VOLUME 1 OF 1
11   ****************************************************

12           ORAL DEPOSITION OF DR. JOHN JOHNSON,
13   produced as a witness at the instance of the
14   Defendant, and duly sworn, was taken in the
15   above-styled and numbered cause on the 29th of
16   August, 2001, from 12:30 p.m. to 3:18 p.m., before
17   DANDY ELLIS, CSR in and for the State of Texas,
18   reported by machine shorthand, at the offices of
19   Gendry & Sprague, 645 Lockhill Selma, San Antonio,
20   Texas 78216, pursuant to the Rules of Civil Procedure
21   and the provisions stated on the record or attached
22   hereto.

23

24

25           *   *   *   *   *   *   *   *   *   *

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 121 of 328

---

**Page 2**

```
 1          A P P E A R A N C E S
 2
     FOR THE PLAINTIFF,
 3
        ATTORNEY AT LAW
 4      MR  BARRY BENTON
        284 Ebony Ave
 5      Brownsville, Texas  78520,
 6
     FOR THE DEFENDANT,
 7
        GENDRY & SPRAGUE
 8      MR  THOMAS GENDRY
        645 Lockhill Selma
 9      San Antonio, Texas  78216,
10
11
12
13
14
15
16
17
18            * * * * * * * * * * * *
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1          DR. JOHN JOHNSON,
 2   having been first duly sworn, testified as follows:
 3          E X A M I N A T I O N
 4   BY MR. BENTON:
 5      Q.  Please state your name.
 6      A.  John E. Johnson.
 7      Q.  Mr. Johnson, my name is Barry Benton.  We
 8   just met today, right?
 9      A.  That's correct.
10      Q.  I'm going to -- I represent a man named Jose
11   Escudero in a lawsuit filed against Bauer
12   Corporation.  Do you understand my position in this
13   lawsuit?
14      A.  Yes, sir.
15      Q.  I'm going to ask you some questions.  And if
16   you don't understand my question, would you tell me?
17      A.  I certainly will.
18      Q.  Okay.  In preparation for this deposition
19   today we sent a notice of deposition to the opposing
20   counsel, Mr. Gendry, in which we made a request that
21   certain items be produced today.  Are you familiar
22   with that?
23      A.  Yes.
24      Q.  We're going to attach this as Exhibit 1 to
25   your deposition.
```

---

**Page 3**

```
 1          INDEX
                         PAGE
 2
     Appearances              2
 3
     DR  JOHN JOHNSON
 4
        Examination by Mr  Benton        4
 5      Examination by Mr  Gendry       89
        Further Examination by Mr  Benton   121
 6
 7   Changes and Signature          125
 8   Reporter's Certificate         126
          EXHIBIT INDEX
 9
10   NO     DESCRIPTION            PAGE
11
        1  Notice of Deposition        5
12      2  Billing Statements          7
        3  ANSI A14 5-2000            13
13      4  Listing of Cases           14
        5  Curriculum Vitae           15
14      6  Expert Report 8/3/01       89
        7  Expert Testing Report - 8/10/01   89
15      8  Warning Label             115
        9  Ladder Rail - Broom        124
16
17
18
19
20
21
22            * * * * * * * * * * * *
23
24
25
```

---

**Page 5**

```
 1          (Exhibit 1 marked.)
 2      Q.  (BY MR. BENTON) I'm going to go down this
 3   list with you just to make sure we cross our T's and
 4   dot our I's.
 5          The first one says, any and all factual
 6   observations, tests, supporting data, calculations,
 7   opinions of the witness recorded and reduced to
 8   tangible form, including but not limited to all
 9   notes, memorandum, test data prepared by the witness
10   or under the supervision of the witness concerning
11   any and all kind or manner of testing done by the
12   witness in connection with the ladder with -- which
13   is made the subject of this litigation.
14          Do we have all those here today?
15      A.  I have -- I have tried to comply with
16   everything that you asked to the best I could.
17      Q.  And basically it looks like just we're
18   asking for --
19      A.  Everything.
20      Q.  -- your tests and your opinions and recorded
21   stuff.
22      A.  Sure.
23      Q.  Okay.  Tangible reports, physical models,
24   data compilations, what do we have here today in that
25   regard?  I see a Bauer -- I mean a Werner ladder over
```

---

3 (Pages 6 to 9)

Page 6

1   there.  Is that something that's a physical model
2   that you've used?
3       A.  No.
4       Q.  Okay.  Why is the ladder here?
5       A.  It belongs to Mr. Gendry.
6       Q.  Okay.  Do we have any physical models that
7   you're using to come to your opinions with?
8       A.  The only physical model I -- which may
9   supplement an opinion would be the broom we have over
10  here that we may introduce at some later time.
11      Q.  Which looks like a rail in which the
12  fiberglass strands have been exposed.  Is that what
13  we're talking about?
14      A.  In which the fiberglass is exposed, yes.
15      Q.  Okay.  We've got all photographs here in
16  your file; is that right. --
17      A.  Yes, sir.
18      Q   -- that you've relied on?
19          And you don't have any motion pictures
20  or videotapes that you're using; is that right?
21      A.  No.
22      Q.  Okay.  You don't have any other kind of
23  physical models or demonstrative aids that you're
24  going to use other than what we have here and what's
25  already been identified?

Page 7

1       A.  Just the photographs that are in my
2   reports.  Some of them are digital photographs.
3   which -- as opposed to photographic prints.  And the
4   digital ones, they have been discarded once I print
5   and save the particular picture that you see on my
6   report.
7       Q.  Okay.
8       A.  But in other words. anything -- any
9   photograph that I'm going to rely on or refer to has
10  been produced and is lying in front of you. that is
11  with the exception of whatever I may want to do with
12  that broom.
13      Q.  As far as ladders that you've used in this
14  case. you've had access. twice I believe. to the
15  subject ladder. right?
16      A.  Correct.
17      Q.  Is there any other ladders that you've used.
18  either as examples or otherwise?
19      A.  In this -- For this particular case?
20      Q.  Right.
21      A.  No.
22      Q.  I see that we have here -- And I want to
23  mark this as Exhibits No. 2.
24          (Exhibit 2 marked.)
25      Q.  (BY MR. BENTON) -- something that has been

Page 8

1   described, I'm sorry, on your stationery head that
2   sure looks like a bill.  Is that what that is,
3   Exhibit No. 2?
4       A.  Correct.
5       Q.  Is that complete for your time logged and
6   billed fees up to today, not including today?
7       A.  It's -- It represents the total that's been
8   billed up to today.  I -- There will be some more
9   time, but I can't tell you how much time right now.
10  But there will be some more time.  But how much it
11  is, I'm not exactly sure right now.
12      Q.  Sure.  Does that include the extensive
13  testing you did on material on the subject ladder?
14      A.  Let me see if I can locate that.
15          No, it does not.  It does not include
16  the testing portion of it.
17      Q.  That looked like pretty extensive work.  Was
18  it?
19      A.  Certainly.
20      Q.  Got an idea, an estimate of how much that
21  cost?
22      A.  Not really, as far as precise.  I can guess
23  if you'd like me to guess at it.
24      Q.  Sure.
25      A.  5,000, 6,000 probably, in that range.

Page 9

1       Q.  Okay.
2       A.  But that's a guess, now.  That's not a
3   statement of fact.
4       Q.  I anticipate that you -- a bill will be
5   generated for that work, right?
6       A.  I plan to, yes.
7       Q.  And so your earlier representation that this
8   is your billings up to today is not quite an accurate
9   statement, right?
10      A.  Yes, it is up to today, because I haven't
11  made any billing since this last billing.
12      Q.  Okay.  Well, what I mean is does it reflect
13  your services rendered up to today then?
14      A.  No. No.  It's -- There will be some of the
15  testing.  And then for whatever time and the costs
16  associated with the deposition will be in addition to
17  that.
18      Q.  Can we have an agreement that you will
19  forward back to the court reporter a copy of your
20  most latest billings at the time that you're reading
21  this deposition?
22      A.  Well, I think you -- you should ask
23  Mr. Gendry that question.
24      Q.  Well, I'm just thinking I just want it
25  produced.

4 (Pages 10 to 13)

Page 10

1          MR. GENDRY: Would that be doable?
2          THE WITNESS: Yeah. I have no problem
3    with it.
4          MR. GENDRY: Yeah, okay.
5      Q.  (BY MR. BENTON) And then we'll just have the
6    court reporter attach it to Exhibit No. 2 and it will
7    all be part of No. 2.
8      A.  Okay. Excuse me. That precludes the fact
9    that I'm going to get the billing out by the time the
10   deposition -- and I may not.
11     Q.  I understand.
12     A.  I may not have the time.
13     Q.  I understand you're going on vacation. So
14   whatever exists at the time you're sending that
15   deposition back is what I want.
16     A.  Okay.
17     Q.  Is that fair enough?
18     A.  Fair enough.
19     Q.  And let's go ahead and just get that part
20   out of the way right now. How are you billing for
21   your services in this case to Mr. Gendry or to Bauer?
22     A.  How was I?
23     Q.  Yeah. By the hour?
24     A.  Yes, sir.
25     Q.  And you have a set rate; is that right?

Page 11

1      A.  Yes, sir.
2      Q.  And it depends on what you're doing, that is
3    deposition time versus working around your office
4    time?
5      A.  Yes, sir.
6      Q.  And can you tell the jury those rates.
7      A.  185 for research time. And 250 per hour for
8    deposition and court testimony.
9      Q.  And then you charge for assistant's time?
10     A.  Whatever they -- If they apply time to it,
11   yes.
12     Q.  Okay. And this billing here that's
13   Exhibit 2 that we have at this time, that billing
14   covers up to what date? What's the cutoff date?
15     A.  Through July 31st of 19- -- through July
16   31st, 2001.
17     Q.  That's through July 31st, did I hear you?
18   I'm sorry. I wasn't --
19     A.  Yes, that's correct.
20     Q.  And not including your deposition time today
21   you think maybe 5,000 or 6,000 will probably be added
22   to that bill?
23     A.  That's a guess.
24     Q.  Okay. And your total charges up to July
25   31st were how much?

Page 12

1      A.  I scanned these just a few minutes ago. And
2    it looks like about, oh, I'm going to say probably
3    about 25,000.
4      Q.  Okay. The next request for production, it
5    says, all professional articles you have reviewed
6    that serve as a basis for your opinions. What
7    articles have you reviewed that serve the basis for
8    your opinions?
9      A.  Well, I -- Articles, I didn't scan any
10   specific articles. I have been involved with ladders
11   for well over 30 years. I've been involved with the
12   standards for well over 30 years. I don't need to
13   extract articles, you know, per se. So these are all
14   background information which I have.
15     Q.  So you haven't reviewed any very recent
16   articles on stepladder designs, fiberglass stepladder
17   designs?
18     A.  Well, no, that's not true. I mean, there's
19   a new standard that came out, in fact, less than a
20   year ago. And I'm the chairman and author of that
21   standard. So certainly I reviewed it, but not
22   necessarily for this case. But I certainly am well
23   aware of what's going on.
24     Q.  Is that -- Was that standard part of the
25   ANSI A14.5-2000?

Page 13

1      A.  Yes.
2      Q.  And that report --
3      A.  You're going too fast here, if you're
4    looking for -- I believe it was right there.
5      Q.  And that committee came out with a report in
6    what year?
7      A.  2000.
8      Q.  2000. And that was regarding reinforced
9    plastic ladders, is that what -- or just stepladders
10   or articulating ladders?
11     A.  No, it's the document that you're paging
12   through now, the entire document.
13     Q.  Now, this document that we're looking
14   at right now, which I'll go ahead and mark as No. 3
15   to your deposition.
16          (Exhibit 3 marked.)
17     Q.  (BY MR. BENTON) Now, this entire document
18   wasn't started from scratch, was it? Did you just
19   amend it?
20     A.  Well, it was started in 19- -- in fact, the
21   first standard came out in 1970, and I was chairman
22   at that time and I wrote it at that time. I've been
23   working with them for 30 years.
24     Q.  So the 2000 version is just amending certain
25   portions. Some of it is the same as it used to be;

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 124 of 328

Page 14

1  is that right?
2      A.  Some is the same.  Some has changed.
3      Q.  Okay.  As long as we're on the subject, what
4  changed in 2000?
5      A.  Oh my. without having my marked up galley of
6  proof, I couldn't begin to tell you everything
7  there.  There are probably 40, 50 different areas
8  that were changed, at least that many.
9      Q.  And I see that on that committee that helped
10  produce it, and you were the chairman, John Vasichko,
11  who's the representative for Bauer. is on that
12  committee also.
13      A.  That's correct.
14      Q.  Have you become personal friends at all with
15  John?
16      A.  Business only.
17      Q.  Have you ever had dinner together?
18      A.  No, not my knowledge.  I can't remember.
19  No, I have not.
20      Q.  All right.  Let's mark this as I think
21  No. 4.
22          (Exhibit 4 marked.)
23      Q.  (BY MR. BENTON) This has been produced
24  today, which is -- is this a list of depositions or
25  court appearances you've participated in since, it

Page 15

1  looks like 1996?
2      A  Since 1997.
3      Q.  Okay.
4      A.  To 2001.  Yes, I produced this. yes.
5      Q.  Is it complete?
6      A.  I think it is.  My secretary maintains
7  these, and I -- it looks -- it looks right to me.
8  yes.
9      Q.  Okay.  And this "P", "D" designation, is
10  that plaintiff or defendant, who you were testifying
11  for?
12      A.  That's correct.
13      Q.  Okay.  And we'll attach as No. 5 --
14          (Exhibit 5 marked.)
15      Q  (BY MR. BENTON) Is this your curriculum
16  vitae?
17      A.  Yes.
18      Q.  Okay.  And as far as publishing on the
19  subject of ladders, has your sole writing been in
20  connection with the ANSI standards?
21      A.  Well. yes and no.  The publication directed
22  only to ladders. perhaps.  I have conducted what's --
23  what still is the largest study that's ever been done
24  on ladder research that was sponsored by the Consumer
25  Product Safety Commission.  This was back in '75

Page 16

1  through '77.  It was a two-year study.  The results
2  of that work was brought into the standard, both the
3  A14.1, 2 and 3 -- I'm sorry 1, 2 and 5.  And so that
4  was a large writing.
5          I have supervised some students' theses
6  at the lower -- or at the masters level only in
7  ladder technology.  I have published articles in the
8  analysis of fiberglass -- fiberglass behavior, which
9  is used in designing fiberglass.  And so much of what
10  I've done has been involved in ladders and in
11  fiberglass in particular.
12      Q.  In this case we're focusing on the support
13  of rails generally at the bottom of the rails, at the
14  feet.
15      A.  Is that what you're focusing on?
16      Q.  Yes.
17      A.  Okay.
18      Q.  And have you written on that particular
19  subject?
20      A.  Well, when -- when a person studies, for
21  example ladders, they don't focus on one item.  You
22  know, they look at the whole ladder.  I spent a great
23  deal of time studying ladders, the slip resistance on
24  the floor, for example, that sort of thing, the
25  strength of the connections and so on.  And so it

Page 17

1  applies to the entire ladder, not only just the one
2  point, as apparently you're focusing on.
3      Q.  Is there any part of any document that
4  you've prepared or written in which it addresses the
5  alternative designs of supporting the feet on
6  ladders?
7      A.  No.
8      Q.  Okay.  And when we address the feet in
9  ladders -- looking at the ANSI standards, and I'm
10  pointing to 6.1.8, is that the only reference in
11  these standards about the proper design of feet on
12  this type of ladder we're talking about, which we
13  have in our case, a 6-foot fiberglass stepladder,
14  which I think is that also -- I'm kind of -- Let me
15  rephrase this question.
16          First I want to be able to talk terms
17  as Vultar would say.  If we don't understand the
18  terms we're using, we can't communicate anything.
19      A.  You're doing fine.
20      Q.  Is a stepladder and an articulating ladder
21  the same thing?
22      A.  No.
23      Q.  Okay.  An articulating ladder might bend
24  multiple different ways?
25      A.  Correct.

Page 18

1    Q.   Where a stepladder basically just bifolds?
2    A.   Correct.
3    Q.   I'll just call it a stepladder.
4    A.   Okay.
5    Q.   That will make it easier.
6         The 6.1.8. if I'm reading that right
7   upside down, feet, --
8    A.   Yes.
9    Q.   -- is that the only ANSI standard dealing
10  with design of the feet of a ladder?
11   A.   Yes.
12   Q.   And is it a fair reading of this to say
13  that -- let me just read it. It's six lines long.
14  The bottoms of the four rails shall be made of or
15  covered with slip resistant material. The dimensions
16  of the slip-resistent surface shall not be less than
17  the dimensions of the projected area outlined by the
18  cross section of the end of the rail.
19        That doesn't deal much with the various
20  alternative designs of feet coverings and so on that
21  are in the marketplace today. does it?
22   A.   It wasn't intended to. This is a
23  performance standard. And this allows any
24  manufacturer the leeway to produce any ladder design,
25  you know, that they feel meets the standard and will

Page 19

1   serve the purpose. This is not a design standard as
2   opposed to other types of standards. This is a
3   performance standard.
4    Q.   There are no design standards for -- for
5   stepladders, the feet of stepladders in ANSI: is that
6   right?
7    A.   No, there are only performance standards.
8    Q.   And a prudent manufacturer would adjust
9   their design based on their experience from use of
10  their ladders, wouldn't they?
11       MR GENDRY  I'm going to object to the
12  form. Overbroad.
13   A.   Could you narrow that down a little bit for
14  me?
15   Q.   (BY MR. BENTON) Sure. What I'm saying is a
16  company manufactures ladders.
17   A.   Yes.
18   Q.   They do some information retrievals as far
19  as product coming back, claims against them, all the
20  various ways they can get information about problems
21  that can develop with their ladder.
22   A.   Yes. of course.
23   Q.   And then based on that, they should adjust
24  their designs to meet known risks: isn't that right?
25   A.   Well. l think you're taking a quantum jump.

Page 20

1   Certainly based on the, if I can use the word
2   feedback of information that they get. they certainly
3   need to review this and see how it impacts their
4   design. But I think whether you call it defect or
5   not or a hazard or not or a danger or whatever you
6   want to call it. this needs to be examined. And I
7   just -- I don't want to just give you a blanket
8   statement on that.
9        But they certainly should look at it.
10  evaluate it, and see if it merits a change,
11  certainly. To that extent I would agree with it.
12   Q.   Well, let's -- let's follow the format now
13  that I prepared. this deposition form.
14       Okay. Tell me your education, please.
15   A.   Beginning with college perhaps?
16   Q.   Yeah, that would be a good start.
17   A.   Okay. I received my Bachelors of Science
18  degree in civil engineering from Gonzaga University.
19  Then I received my masters from Stanford and my Ph.D.
20  from Purdue.
21   Q.   Were they all in engineering?
22   A.   Yes, sir.
23   Q.   Okay. And what did you do after you got
24  your Ph.D.? Well, when was your first engineering
25  job?

Page 21

1    A.   Probably when I was still an undergraduate
2   at Gonzaga.
3    Q.   That's in Washington, state of Washington?
4    A.   Yes, Spokane. Washington. Yes. I worked for
5   the Washington Water Power company as the -- I won't
6   say engineer because that's probably too grandiose
7   position to call it. But I would do a lot of the
8   topo studies. I would go walking, dig for section
9   monuments when they were condemning land for the
10  Noxon Rapids Dam. And all -- and I worked in the
11  systems operations office. I worked in it from
12  midnight to 8:00 in the morning during my entire
13  undergraduate career.
14   Q.   It must have been difficult being in the
15  field at night?
16   A.   Then summers. I went out in the field to
17  do -- and Christmas vacations. in fact we'd have to
18  dig through like ten feet of snow to find the section
19  markers.
20   Q.   Okay. And so what's your next job that you
21  remember as an engineer?
22   A.   The next job. Well, let's see. well at
23  Stanford I did various design jobs when I was a
24  student there designing buildings. I proofread one
25  of the textbooks for a professor. It was a book in

Case 1:00-cv-00193 Document 24 Filed in TXSD on 10/19/2001 Page 126 of 328

Page 22

1 mathematic analyses. And, let's see, then after that
2 I worked for a year, after Stanford, for the National
3 Lead Company of Ohio. There I was a plant engineer.
4   Q. The National --
5   A. Lead Company of Ohio.
6   Q. Lead.
7   A. Company of Ohio. And then I went to the
8 Detroit Edison Company in their steel design
9 department for two years, did quite a bit of design
10 work for them. And --
11   Q. Was this after or before you got your
12 Ph.D.?
13   A. Before.
14     And then after Edison, then I went back
15 to Purdue and worked towards and received my Ph.D.
16 Then I went to the Dow Chemical Company, and the
17 first year I was a fireman.
18   Q. What is a fireman?
19   A. Putting out technical fires throughout the
20 company.
21   Q. Not literally fires?
22   A. No, no, no, no, no.
23   Q. More like a problem solver?
24   A. Problem solver. And then the next few years
25 I was a laboratory director.

Page 23

1   Q. Did you work in Midland for Dow?
2   A. Doesn't everybody? Yes.
3     And then I guess I haven't worked after
4 that. I suppose you don't call teaching work, of
5 course.
6   Q. Oh, I disagree.
7   A. Thank you. I agree with you.
8   Q. Okay. So -- So after you stopped working
9 with Dow and you had your Ph.D., you went into
10 teaching for the most part for the rest of your
11 career except for this consulting business you have
12 now?
13   A. Oh, no, no. I think everyone should have
14 three careers. I'm only on my second one now. I
15 taught for 25 years as a full professor.
16   Q. At?
17   A. University of Wisconsin.
18   Q. Madison?
19   A. Yes, in the College of Engineering. And did
20 the usual good things, had graduate students,
21 conducted research, did everything that professors
22 are supposed to do. Then I retired about 12 years
23 ago. And then I just enlarged the practice that I
24 had started on a limited basis when was teaching.
25   Q. Are we talking about this forensic side of

Page 24

1 it?
2   A. Well, it didn't start out that way. It
3 started out -- I actually started the company to
4 employ graduate students and give them a chance to
5 earn money so they could go to school.
6   Q. What's the name of the company?
7   A. Well, the company at that time was called
8 Engineering Research Consultants. And I would take
9 on contracts and research work that the university
10 didn't work. The university always had first choice,
11 first refusal. And so basically I had a staff of MS
12 and Ph.D. students and provided the same benefits to
13 them that the university did. And --
14   Q. And what kind of jobs were those?
15   A. Oh, all engineering design work.
16   Q. Ladders involved, or not usually?
17   A. Oh, no, we did -- we did a lot of ladder
18 work too, yes.
19   Q. Designing ladders?
20   A. No, not designing ladders. As I tried to
21 point out to you, this is not a design standard.
22 It's a performance standard. And so --
23   Q. No, I know. I'm just saying, did you ever
24 get into designing ladders?
25   A. No. I have designed cross sections for

Page 25

1 ladders. I've designed ladder rails.
2   Q. The back support braces, you mean?
3   A. Oh, no, no. No, much more esoteric than
4 that. The actual makeup of the fiberglass.
5   Q. Okay.
6   A. And interstitiary shear distribution and all
7 that sort of thing.
8   Q. The material?
9   A. The material, yes.
10     And then the -- then in about 1989,
11 about 10, 11, 12 years ago now, then is when I
12 retired from the university. And then the forensic
13 activity became a little more prevalent than before,
14 so that's when I formed another company called
15 Engineering Forensics & Testing, which heading is on
16 my reports. And then some years ago, then I simply
17 merged the two companies into Engineering Forensics,
18 so is that all.
19   Q. How -- What's the physical address? What
20 town are you in?
21   A. Cambridge.
22   Q. And that's close to Madison?
23   A. Yes.
24   Q. How many employees?
25   A. Total, four.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 127 of 328

8 (Pages 26 to 29)

Page 26

1    Q.  How many Ph.D.'s?
2    A.  One.
3    Q.  You?
4    A.  Yes. sir.
5    Q.  Okay.  And do you -- do you have -- Well.
6  let me strike that.
7        Describe the kind of work you do.
8    A.  Well. actually in three areas.  Forensics.
9  as we're involved with here today.
10   Q.  Which means what?  You may have an idea, but
11  the jury may not.
12   A.  Oh. certainly in any manner which has a
13  propensity to end up in litigation.
14        And then another part of it is product
15  development work, we do some of that.  And we also do
16  some basic research.
17   Q.  What does product development mean?
18   A.  Well, if you decided that you -- we're
19  talking about fiberglass.  For example, if you came
20  to me and said Dr. Johnson, I'd like to get involved
21  with making a fiberglass product and here's my idea
22  and here's my model, would you test it for me.  I
23  could then work with you and say well, gee, you've
24  got to put more stuff here or less stuff over here,
25  change the shape of it. make it thicker. make it

Page 27

1  smaller, make it taller, make it shorter, or
2  whatever, and just work with you.  That would be
3  product development.
4    Q.  Okay.  And the last part you do, you said
5  what?
6    A.  Research.
7    Q.  And when we talk about research, what kind
8  of research are we talking about?
9    A.  Basically material science, behavioral
10  materials.  When -- when an object, and I use the
11  term broadly, say is tested, and I wouldn't define a
12  test, the results are usually either it breaks or it
13  doesn't break.  But between the time the test is
14  started and it breaks, there's a lot of things that
15  go on.  And it's the understanding of that behavior
16  that can then lead to a much, much better product,
17  much better thing, better use of materials and so
18  on.  And that's the area that I do some work in.
19   Q.  And I saw something about boron, taking
20  boron out of ladders or something.  What was that
21  about?
22   A.  You have to tell me.  I don't know what
23  you're talking about.
24   Q.  Okay.  I saw something when I was reading
25  this today.

Page 28

1    A.  Boron?
2    Q.  Yeah.
3    A.  Oh, you're thinking about borosilicate,
4  perhaps.
5    Q.  Yes, I think I am.
6    A.  Well, a borosilicate is a type of glass,
7  borosilicate glass.  And in particular from the
8  coatings and the process in which this -- the
9  particular glass is made, it's called a borosilicate
10  glass.
11   Q.  And there's been a change in fiberglass
12  ladders away from using that material?
13   A.  Well, it's more of an EPA situation, that
14  boron is becoming one of the suspect materials in
15  waste products, although it's -- whether it is or is
16  not, I can't comment on that, and no one else seems
17  to be able to.  Anyway -- But they are trying to use
18  materials that are such that they do not use boron,
19  and to avoid that particular objection, if indeed it
20  has any merit, which has not really been established
21  yet.
22   Q.  Who pays you to do research, peer research?
23  Corporations?
24   A.  Sometimes.  Sometimes I do it for the sheer
25  love and joy of it.

Page 29

1    Q.  And your forensic clients, is there a
2  pattern there?  Do you have any repeat clients on
3  this forensic work?
4    A.  Yes.  Many of my clients are repeat
5  clients.  And in fact, many of the persons whom I
6  have opposed have become my clients afterwards to a
7  large extent.
8    Q.  Who are some of your clients?  And I don't
9  want to really know about ones that aren't -- Strike
10  that.
11        If you have a particularly regular
12  client, I'd love to know their names.
13   A.  If I did, I'd love to have one.  But I don't
14  have one.  In fact, I'm a pluralist.  I intentionally
15  will not have a single client.  I simply can't --
16  Mentally, I can't handle it.
17   Q.  Do you -- Are any of the ladder companies
18  your clients besides Bauer in this case?
19   A.  Well, I worked with Lynn Ladder Company,
20  L-y-n-n, with the Werner Company, with the Chesebro
21  Company. Louisville Ladder Company. Green Bull Ladder
22  Company.  Those are just -- that's what comes off the
23  top of my head.
24   Q.  Have you worked with Bauer before this case?
25   A.  Yes. sir.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 128 of 328

---

Page 30

1    Q.  How many cases do you think you've had?
2    A.  Oh, over the, say many years, oh, I'd say
3  probably -- someplace between four and six cases,
4  somewhere in that order.  Not ten or twenty, not
5  two.  But some place, I say -- If I say six, I think
6  I'm covering them all.
7    Q.  Were they personal injury cases?
8    A.  Yes.
9    Q.  And did they -- Did all of them or most of
10  them involve cracked or split rails?
11    A.  No.  They involved -- Let me back up from
12  the very beginning.  When you say cracked or split
13  rails, now you're defining the result of an accident
14  or the result of abuse or the result of some other
15  action.  And so that -- I guess in a broad sense that
16  if there is a break, it's a break.  So then all --
17  they would be only breaks, otherwise, I wouldn't be
18  investigating it.  So I'm not hav- -- I'm having a
19  little trouble following exactly what you mean.
20    Q.  Well, you've given opinions already in this
21  case in writing, right?
22    A.  Yes, sir.
23    Q.  Okay.  And what caused the accident in
24  question here with Mr. Escudero, right?
25    A.  Correct.

---

Page 31

1    Q.  And you've seen our lawsuit, right?
2    A.  Oh, I've seen the complaint.  I guess
3  that's -- I'm limited to that.
4    Q.  And you've seen the report of Dr. Pugh, our
5  expert in this case, right?
6    A.  Yes.
7    Q.  Okay.  And you have a general idea, don't
8  you, of what we're focusing on as far as a design
9  defect?
10    A.  What you are terming -- or focusing on, I
11  don't agree with obviously.  That's why I'm here.
12  But I -- I think I answered your question.
13    Q.  Well, my question is, you understand what
14  we're alleging, whether we're -- you may have a
15  180-degree different opinion.  But do you comprehend
16  what we're claiming?
17    A.  I understand what you're claiming, yes.
18    Q.  We're claiming that the foot of these things
19  are improperly designed.  Do you understand what I'm
20  saying?
21    A.  I understand that's what you're saying.
22    Q.  That's right.  Okay.  So long as we
23  understand what -- Now, my -- And we're claiming, for
24  your information, just to be sure, that the bottom
25  rails on the subject ladder cracked, and then

---

Page 32

1  existing cracks propagated, causing my guy to fall
2  off, and that those rails could have been designed in
3  such a way as to manage cracks to reduce the chance
4  of -- of the instability that caused Mr. Escudero to
5  fall.  Do you understand what we're saying now?
6    A.  That's what you're saying.  I understand
7  what you're saying, yes.
8    Q.  Right.  I'm not saying that's what you're
9  saying, I'm saying that's what we're saying and that
10  you understand what we're saying.
11    A.  Yes.
12    Q.  Okay.  Going back to other Bauer cases that
13  you've had, did any of the cases you had involve
14  claims similar to ours, that the foot was not
15  designed properly, and as a result cracks, either
16  preexisting or not, were allowed to propagate and
17  cause someone to fall off a ladder?
18    A.  The one case this comes to mind was brought,
19  I believe in Richmond, Virginia, regarding -- and I
20  think you're very well aware of the case, the Smith
21  versus Bauer.
22    Q.  Okay.
23    A.  Am I correct?  I don't want to go on unless
24  we're together here.
25    Q.  No, no --

---

Page 33

1    A.  You're aware of --
2    Q.  And Mr. Shapiro was the plaintiff's lawyer.
3  Is that the one you're referring to?  And he was
4  from, I think Virginia Beach, Virginia?
5    A.  Yeah, I think you're correct.  Exactly.
6    Q.  Okay.
7    A.  Now, that was a case where -- another case,
8  in my opinion, of blatant misuse and abuse.  I don't
9  know whether or not exactly what the allegation was.
10  I don't remember.  I know the case did settle.  I do
11  know that.  But --
12    Q.  But that had allegations of rail cracking
13  and objections to design?
14    A.  Well -- Well, the rail cracked, and I'm sure
15  there was objection to design.  That's -- I think I
16  will stipulate it -- stipulate to that.
17    Q.  Any other cases of that -- Did you work on
18  the Scott case that came out of Tennessee?
19    A.  That does not sound familiar.
20    Q.  All right.  Is there any other Bauer cases
21  that you remember involving where the alleged defect
22  had to do with the cracking or splitting of rails?
23    A.  Not in the way that we have in this case,
24  no.
25    Q.  Okay.  Have you ever represented -- Strike

---

CMPDF - www.tsois.com

Page 34

1  that.
2        Have you ever helped any plaintiff's
3  lawyers whose allegations were bad ladder design?
4     A.  Yes.
5     Q.  Okay. Can you tell me which ones those
6  were?
7     A.  Oh. this goes back a while -- ways. It -- I
8  know I had a case involving a Keller ladder. But I
9  can tell you right now they're -- they no longer
10  exist. They went into Chapter 11 and were bought
11  out.
12     Q.  And what -- Do you remember what the defect
13  in the design of that ladder was?
14     A.  Well, as I recall, my objection to it was
15  that the spreaders were grossly under designed and --
16  and the ladder did not have the torsional stability
17  that it required.
18     Q.  I may have asked this, but I want to be
19  clear. Have you ever had a case, besides perhaps the
20  one we've mentioned in Richmond, Virginia already, in
21  which you were asked to give opinions about the
22  design. and I'm going to divorce that totally from
23  material. the design of the ends of the rails?
24     A.  I can't recall. I -- I can't recall that.
25  No.

Page 35

1     Q.  Okay. Do you -- Do you have any patents at
2  all, yourself?
3     A.  Yes.
4     Q.  For what?
5     A.  One is a mathematical model.
6     Q.  Okay. The next one?
7     A.  Is a design for a crash beam in an
8  automobile.
9     Q.  And the next one?
10     A.  Oh, I just have two. I'm not very
11  inventive.
12     Q.  Well -- But you're great at the
13  understatement, let me tell you.
14        Okay. I've -- Your curriculum vitae
15  looks like the last time you published, outside of
16  taking part in these ANSI standards, was about 1993;
17  is that right?
18     A.  Yeah, I think that sounds about right.
19     Q.  Okay.
20     A.  And that is in regular referee journals.
21     Q.  And then to look at your curriculum vitae,
22  and outside of your participation in the ANSI
23  standards, you haven't published on fiberglass
24  ladders in particular; is that right?
25     A.  Not on fiberglass ladders. I publish, of

Page 36

1  course. For example, I've published four textbooks,
2  and each over a thousand pages.
3     Q.  Do they deal with fiberglass ladders?
4     A.  Structural -- Structural behavior of steel,
5  which is very, very similar to the behavior of
6  fiberglass, as in a ladder, as in buckling strength,
7  as in bending strength, as in column strength, as in
8  sheer strength, and so on.
9     Q.  As due to the materials?
10     A.  No, as do to the structural behavior.
11     Q.  The design and how it puts pressures?
12     A.  Yes, how the forces distribute themselves.
13  That's very, very similar. Very much alike. The
14  only differences are in the macro sense -- in the
15  micro sense rather than the overall sense.
16     Q.  You've had a chance to look at Dr. Pugh's
17  education at MIT and Dr. Pugh's writings and past
18  work history; is that right?
19     A.  Yes.
20     Q.  Okay. Is a lot of his education and
21  practice similar to yours in that you're both
22  focusing on materials, his in the prosthetic area of
23  medicine, but in yours, perhaps in other areas of
24  industry, but you're both studying materials and
25  properties of materials?

Page 37

1     A.  Oh, I couldn't begin to give you that. I do
2  not know his field in biomechanics or -- etcetera. I
3  don't know what he does. I do know that he knows
4  very little about fiberglass. I can tell you that.
5     Q.  Okay. We've already -- You've already
6  testified that you are a member of the committee on
7  fiberglass ladders, right?
8     A.  Correct.
9     Q.  And that has a name. What is it? A14.5, is
10  that what that committee is?
11     A.  Yes.
12     Q.  Now. there is a standing committee; is that
13  right? Is that what this is?
14     A.  You have to point for me what you're looking
15  at there.
16     Q.  Is this what we call the standing committee,
17  and then this was the subcommittee? Or what is that
18  on page -- Well. there's no page number. It's at the
19  beginning.
20     A.  Okay. I can help you.
21     Q.  Go ahead.
22     A.  This is the A14 committee.
23     Q.  Okay.
24     A.  With no additional number, A14. The A14,
25  you might call it the standing committee, because

Case 1:00-cv-00193 Document 24 Filed in TXSD on 10/19/2001 Page 130 of 328

Page 38

1    that's a good name for it. And the A14 committee
2    has, as its jurisdiction then, a promulgation of
3    ladder standards as a whole. Then there's
4    subcommittees. 14.1, which is wood. 14.2, which is
5    metal. And so on and so on. Then we go on to 14.5,
6    which is fiberglass. And each one of these
7    subcommittees then develop the standards and then
8    they are then submitted to the A14 committee for
9    approval. Of course a lot of information that passed
10   before, it has go out on ballot, it has to go out for
11   public review and many, many, many other things. But
12   basically the subcommittees report back to the A14
13   committee.
14       Q. And your A14.5 is on reinforced plastic
15   ladders?
16       A. Correct.
17       Q. Okay. Now, when you say that -- that the
18   portion of the A14.5 standard 6.1.8 on feet is a
19   performance and not a design standard, what do you
20   mean?
21       A. Well, let me have a moment and see what you
22   have here.
23            At section 8.3.11 we have a foot slip
24   test. And then this refers to a table here with
25   various types of forces, and I mean it's a very

Page 39

1    detailed test, and there are a lot of them here. And
2    then this gives a performance, what the ladder must
3    undergo, without movement, without deformation, and
4    so on. So that is the performance part of the test.
5        Q. Is it fair to say that the ANSI standards
6    that you helped promulgate, basically say that if you
7    use a design that passes these tests, that's all that
8    matters. We don't care about how you design it, as
9    long as it passed the tests?
10       A. That's correct. It's a performance test.
11   If it performs all the certification tests and all
12   the performance tests, has all the strength
13   properties, then that will ensure that you have a
14   good, workable ladder, yes, sir.
15            In other words, if you, yourself,
16   decided that you wanted to go into the ladder
17   manufacturing business and you wanted to change the
18   design of it, you would have every right to do so.
19   Provide all the tests, and it will be fine.
20       Q. And on these tests, one of them is called
21   the cyclic loading test, right?
22       A. Let me -- Let me see what you're looking
23   at.
24            Yes.
25       Q. And can you tell the jury what that test

Page 40

1    is.
2        A. Well, there's -- there's a lot of pages
3    involved here. There's cyclical horizontal bending
4    tests where we'll take the rail, for example,
5    horizontally, and then we have to -- and there are
6    figures showing how to load it. Then there's a
7    shearing of the side rail test. There's a bending
8    test for the step itself. There's a whole series of
9    different tests that are undergone. And these vary
10   up to 10,000 cycles to do the test.
11       Q. Is part of the cyclical loading test trying
12   to see how well they were -- the product will endure
13   over multiple uses?
14       A. It's -- The answer is yes to that fact,
15   based on normal use. It does not include designing
16   or testing for possible abuse.
17       Q. And the -- And to some extent, manufacturers
18   can anticipate misuse of products, can't they?
19            MR. GENDRY: Object to form. It's
20   overbroad.
21       A. Well, manufacturers certainly are aware, or
22   they will become aware their products can be abused,
23   that is correct. And in recognizing that, then they
24   also then warn, they put warning labels as to what
25   certain things occur. And so that -- they realized

Page 41

1    that and they met that challenge by issuing warning
2    labels.
3        Q. (BY MR. BENTON) Here under 8.7 I'm going to
4    the read this to you. It says, the purpose of these
5    cyclic tests is to evaluate only the side rails.
6    Hence, wear, abrasion, permanent deformation (set) or
7    ultimate failure of other ladder parts shall not
8    constitute a failure test.
9            Does that mean that these tests are
10   performed on new ladders and they're not designed to
11   test older ladders that have already been worn
12   somewhat?
13       A. All these tests are made to be done on new
14   ladders. And the different parts and accessories,
15   these are tested separately.
16       Q. And these standards that we're talking about
17   here, these are voluntary, right? There's no United
18   States law that says you shall obey these rules, is
19   there?
20       A. Well, that's not exactly true. They are
21   voluntary standards, but OSHA makes them mandatory.
22       Q. Okay. Explain that for me.
23       A. OSHA quotes and specifies, in particular,
24   these ANSI standards. And they extract, you know,
25   certain information from them. And they are very

Page 42

1 explicit as far as what -- that they must be used.
2    Q.  But there's no -- Since -- There is no OSHA
3 standards for designs of fiberglass ladders. is
4 there?
5    A.  OSHA does not get into design.
6    Q.  And neither does ANSI. does it?
7    A.  Correct.
8    Q.  So there are no hard and fast rules
9 regarding design?
10    A.  No, only the performance.  It has to
11 perform.
12    Q.  I'm looking at 6.1.10 here, plastic top
13 caps.  There's an allegation or a suggestion in this
14 case that Mr. Escudero may have gone on too high of a
15 step.
16    A.  Okay.
17    Q.  Isn't it possible to totally block in, with
18 plastic or otherwise. the top two steps so that no
19 one is tempted to use those as a step?
20    A.  Is it possible?  The answer is yes.
21 Practical. no.
22    Q.  Why isn't it practical?
23    A.  You're going to end up -- you're going to
24 make someone take -- if they decide that they want to
25 go on the top step, then if Mr. Escudero did, they're

Page 43

1 going to have to take one giant step, and that's
2 going to be far worse than a warning, do not step on
3 it.
4    Q.  But I'm talking about to prevent him from
5 stepping on the two steps before the top step.
6 Because if I remember right, four is the stop number
7 on this ladder in particular.  There's a fifth step.
8    A.  Four is the stop, as you termed, one.
9    Q.  So -- And then I guess the sixth is the very
10 top of the plastic cap, correct?
11    A.  That is -- That's correct.
12    Q.  Okay.  So to prevent them from stepping on
13 the next to the last one, next to the cap, the fifth
14 step, couldn't they fill that in to prevent that?
15    A.  I don't -- I don't see that it would be
16 practical or -- at all, no.
17    Q.  Because you're afraid that they'll try to
18 make a large step up onto the cap?
19    A.  That's a possibility.
20    Q.  But they may not need to reach that high?
21    A.  Well, that's -- presumably they should
22 recognize that when they use a six-foot ladder in
23 this case.
24    Q.  Okay.  What kind of tests did you do on the
25 subject ladder?

Page 44

1    A.  Well, you have my report.  Shall I read it
2 to you?
3    Q.  Can you describe generally what kind of test
4 you did.
5    A.  Why you don't give me my report.
6    Q.  Sure.  This is the ladder --
7    A.  I don't -- I mean, we can waffle around all
8 over the place.  But I did compression tests, tensile
9 tests, flexural tests, burn out tests, barcol
10 hardness tests.
11    Q.  And those tests were designed to determine
12 what?
13    A.  The physical properties of the fiberglass
14 comprising the rails.
15    Q.  And your conclusion was what?
16    A.  That all the properties were met or
17 exceeded.
18    Q.  Now, you -- Now, we had a failure of the
19 plastic or the fiberglass along what we're calling
20 the junction of the web in the flange.
21    A.  Can I introduce another term for you?
22    Q.  Sure.
23    A.  Fillet.
24    Q.  Is that what they call --
25    A.  Yes.

Page 45

1    Q.  What Mr. Vasichko, I think called the
2 flange, which is the part that -- that does a 90
3 degree bend from the web?  Is that part --
4    A.  Yeah, that's the flange.
5    Q.  Okay.  Okay.  So the broad part of the rail,
6 is that called the web?
7    A.  Yes.
8    Q.  Okay.
9    A.  Whether it's a web or a flange is depending
10 on how it's used structurally.
11    Q.  Okay.  I'm not that concerned, as long as we
12 know what we're talking about, what we call these
13 things.
14    A.  Sure.
15    Q.  And so I think Mr. Vasichko talked about web
16 and flange.
17    A.  That's fine.
18    Q.  Can we do that, too, and without abusing
19 the --
20    A.  Well, are you talking about the connect- --
21 the interface between the two?
22    Q.  Yeah.  I know -- This area right here?
23    A.  Right.  That's the fillet.
24    Q.  Fillet. okay.  So this is the flange.  This
25 is the web.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 132 of 328

Page 46

1    A.  Yes.
2    Q.  And their junction is called the fillet?
3    A.  Yes.
4    Q.  Like fill it up with regular?
5    A.  No.  More like a fillet.
6    Q.  Okay.  That's where there was a lot of
7  cracking on the ladder, subject ladder, right?
8    A.  Correct.
9    Q.  On the fillets on both sides of the back
10  rails?
11    A.  Correct.
12    Q.  Okay.  Now, did you test that material in
13  the fillet right there at the junction?
14    A.  I examined it, yes.
15    Q.  Okay.  I'm -- Those are different words to
16  me, examine versus tests.
17    A.  Well, they -- This came out in the burn out
18  test.  And in the burn out test, the -- the material
19  that you see in the fillet, which I'll call the
20  fillet, if you don't mind, is the same distribution
21  as you have in the flange or in the web.  It's simply
22  wrapped around.
23    Q.  Horizontal wrapping as opposed to just
24  vertical wrapping of the strands?
25    A.  No, there are vertical strands -- I call

Page 47

1  them longitudinal strands.
2    Q.  That's fine.
3    A.  Then there are -- then also transverse.
4    Q.  Which is latitudinal then?
5    A.  Longitudinal.
6    Q.  All right.  Longitudinal is up and down.
7    A.  Okay.  Latitudinal, if you --
8    Q.  It would be across.
9    A.  Okay.  Whatever.
10        And then this is in the form of random
11  mat.  There are three random mats in there, and so
12  on.  And so consequently, it had -- there is a total
13  distribution all the way around that fillet.
14    Q.  So it's your position that -- that a lack of
15  quality of the material at those stress points we're
16  talking about was not an issue or a problem?
17    A.  Well, there is not a lack of quality there,
18  definitely not.
19    Q.  It was uniform quality throughout?
20    A.  The -- You would find, if you examined an
21  actual distribution of the fibers, that you'll find a
22  preponderance of longitudinal fibers.  That is where
23  the major stresses and forces occur.  On the
24  transverse direction there are very, very low and
25  little.  In fact, they're, for the most part,

Page 48

1  inconsequential.  And all they basically do is
2  connect the flange and the web.
3    Q.  But this Weber (sic) ladder that we're
4  looking at right now, the six footer, which is -- I
5  don't see their model number on here.
6    A.  How about FS106.
7    Q.  Okay.  Now, that's not an ANSI, that's their
8  model number?  Is that Werner's?
9    A.  I would presume it is.
10    Q.  Okay.
11    A.  ANSI does not give a model number.
12    Q.  Okay.
13    A.  They designate a type, but not a model
14  number.
15    Q.  And by the way, this type of ladder we're
16  looking at right here today, which is a yellow
17  ladder, six foot, blue on top, it says Werner here,
18  it's not an A1 --
19    A.  You mean a 1A, perhaps.
20    Q.  1A, yes.  It's not a 1A, which -- like the
21  subject ladder in question, right?
22    A.  Correct.
23    Q.  Which means the subject ladder in question,
24  which is a 1A, is designed for 300 pounds.  And this
25  is just a type one which is designed for 50 pounds

Page 49

1  less, right?
2    A.  Correct.
3    Q.  And this is for heavy duty.  And I think the
4  language is extra heavy duty on the subject ladder;
5  is that right?
6    A.  Correct.
7    Q.  Okay.  But -- But a lot of the design
8  features, especially around the feet, are very
9  similar to the subject ladder, this Werner ladder's,
10  right?
11    A.  Yes.
12    Q.  Okay.  Now, the -- The back rails, the cross
13  brace and the angle brace, those are similar to the
14  subject ladder, aren't they?
15    A.  Yes.
16    Q.  And the angle braces are tied in only to the
17  flange and not to the web; is that right?
18    A.  Correct.
19    Q.  And so it's safe to presume that these
20  ankle -- angle braces, excuse me, are designed to
21  give strength to the back rails; is that right?
22    A.  They're there to prevent the inward
23  deflection and outward deflection of the rails, not
24  necessarily the strength.  But they do that in a
25  serendipitous way perhaps, but it's primarily to

Page 50

1    control deflection.
2        Q.  And in this case, do we understand that the
3    back rails probably contorted or twisted on
4    Mr. Escudero?  Is that a reasonable recreation of how
5    it fell?
6        A.  I'm not exactly sure.  The type of fractures
7    that existed in the ladder immediately prior to
8    Mr. Escudero getting on it were so severe that they
9    could have twisted, bent.  All we know is that they
10   buckled, and that's a given.  I mean, we can
11   stipulate to that.  It's the only way the ladder
12   would have failed, by buckling.  And they buckled
13   because the cross sectional geometry was destroyed
14   because of those longitudinal cracks.
15       Q.  Along the fillet?
16       A.  Correct.
17       Q.  And this back brace would have been given
18   greater strength to supporting the back rails had the
19   back cross bit brace been tied into the web and the
20   angle braces tied into the web; isn't that true?
21       A.  No.
22       Q.  Isn't that how Werner has it designed today
23   on other ladders?
24       A.  That may be.
25       Q.  And isn't that the purpose, to tie it all

Page 51

1    into the thickest part of the back rails?
2        A.  Well, in a way, that -- the rear rails will
3    put force back into that brace.  You would not want
4    to necessarily hook it into the web because it would
5    not have what we call in structural engineering, a
6    hard point.  And it would be much less effective than
7    hooking it into the flange, as you have here.
8        Q.  Well, when they hooked it into the flange
9    and the flange dissolves cracks in the fillet, didn't
10   that mean that the cross brace and the angle braces
11   now have no greater grounding than the -- than the
12   cracked flange?
13       A.  But what you're not seeing here, Mr. Benton,
14   is that that brace and that plane is going in the
15   plane of the brace.  When the cracking in the fillet
16   occurred, then it's normal for -- in this direction,
17   and they have totally different structural behaviors.
18       Q.  So it's your testimony that -- that under
19   this design like we're looking at the Werner, which
20   is a similar design, almost identical to the subject
21   ladder. --
22       A.  Yes.
23       Q.  -- that when there are cracks in the
24   fillets, that that doesn't render the angle braces
25   and the cross brace less effective for supporting the

Page 52

1    ladder.  Is that what your opinion is?
2        A.  When there's a crack as we had in the
3    Escudero ladder, and even if we had tied it into the
4    flanges, they still -- the integrity of that section
5    would have been destroyed and it would -- it would
6    have buckled just as easily.
7        Q.  Why?
8        A.  Well, I'd have to give you a mechanics 101
9    to walk you through that.
10       Q.  Well, we're claiming that had they designed
11   it differently like the other Werner ladders, that
12   that accident wouldn't have happened.  So that's a
13   pretty critical question.
14       A.  Well, whatever you say.
15           MR. GENDRY:  Objection to form.
16       A.  But what I'm telling you here is that, for
17   one thing, if that ladder had been examined properly
18   and had been examined, it would have been taken out
19   of service or should have been taken out of service
20   and the accident would have never happened in the
21   first place.
22       Q.  (BY MR. BENTON) But fracturing or cracking
23   of these rails is a known phenomena, isn't it?
24       A.  Only with abuse.  And when that occurs, then
25   the ladder needs to be taken out of service.  You

Page 53

1    don't use a broken ladder.
2        Q.  And if a -- And if a risk is a known
3    phenomena, if you can design something to adjust to
4    that risk, a manufacturer should, shouldn't they?
5        A.  Well, this risk that you're talking about,
6    there is no risk involved if you -- if you use a
7    ladder that has not been fractured.  And that type --
8    and if it is fractured, then it shouldn't be used.  I
9    mean, we're becoming circular here.
10       Q.  You found fractures in all four rails of
11   that ladder; is that right?
12       A.  That is correct.
13       Q.  But not all of those fractures were
14   causative of the accident, were they?
15       A.  They probably had some influence, but I
16   can't tell you to what degree the others did.
17       Q.  Well, you found some fractures in the top of
18   the front rails.
19       A.  Yes.
20       Q.  And they didn't have anything to do with him
21   falling, did they?
22       A.  I as far as I know.  I don't think so.
23       Q.  So therefore, you can have fractures, and
24   fractures -- and still not have -- and still have a
25   very usable ladder; isn't that right?

**Page 54**

1    A.  No, if you have fracture, then the ladder is
2  not usable.  It should not -- I will not give you
3  that.
4    Q.  Well, didn't your report say that it looked
5  like that the ladder had been used while it was
6  fractured or cracked for a long time?
7    A.  Yes, I said that this is probably, in my 30
8  years of examining ladders like this, this is
9  probably the worst case I've seen of preexisting
10  fractures.
11      MR. BENTON:  Objection to form.
12      Would you read that question back for
13  me please.
14      (Read back.)
15    A.  Correct.  I stated that very specifically in
16  my report.
17    Q.  (BY MR. BENTON) So isn't it implied in that,
18  that that ladder might have had some cracks but
19  someone was still using it --
20    A.  Yes.
21    Q.  -- for service?
22    A.  Yes.  But a manufacturer can't be held
23  responsible if someone has a death wish.
24    Q.  But it does establish that the ladder will
25  still function with some cracks and apparently not

**Page 55**

1  function with others; is that right?
2    A.  Well, I -- that question doesn't have an
3  answer.  It's open ended.  And I would go back to
4  what I said before.  There -- the users warn -- And
5  especially for an experienced user like Mr. Escudero,
6  who is familiar with ladders, to have used that
7  ladder in that condition, it -- to me is unthinkable.
8      MR. BENTON:  Objection to form -- or
9  response.
10    Q.  (BY MR. BENTON) All right.  Let's -- let's
11  move on.
12      Now, are you claiming that your
13  reports -- And you have two of them, are dated, what,
14  August 3rd and August 10th if my memory serves me
15  right.
16    A.  Correct.
17    Q.  Are you claiming that you did a thorough
18  survey of the different designs of the ends of the
19  rails of fiberglass ladders being manufactured in the
20  United States right now?
21    A.  No.
22    Q.  In fact, there's just about no discussion of
23  design in there, is there?
24    A.  No, there's no need to.
25    Q.  But there's a conclusion that there's no

**Page 56**

1  evidence of a design problem, isn't there a
2  conclusion to that effect?
3    A.  Correct.
4    Q.  Did you survey the various designs of the
5  rails, the ends of the rails of -- of different
6  manufacturers in preparation for your testimony in
7  this case?
8    A.  No.
9    Q.  Do you feel like you have a working
10  knowledge of the different type of rail ends, shoes,
11  or however -- supporting structure they have below?
12    A.  Yes.
13    Q.  Why don't you tell the jury the different --
14  Different manufacturers support the ends of those
15  rails differently, don't they?
16    A.  Well, basically they're all -- basically all
17  kind of the same, just variations on a very minor
18  theme.  Some reinforce it with a back plate, some
19  don't.  Some have two rivets in the top, as -- in the
20  front end back, some have one in the back and two in
21  the front.  It varies.  But basically they're simply
22  metal shoes with a rubber or a nonskid surface on the
23  bottom.  But they're basically all the same.
24    Q.  That's not the way the Bauer ladders look
25  today, is it?

**Page 57**

1    A.  Not today.
2    Q.  They have some sort of a, oh, what did we
3  call that, a slip-on shoe, I think is the way
4  Mr. Vasichko called it.
5    A.  Sure.
6    Q.  With rubber that goes all the way up.
7    A.  Sure.  I'm aware what they are, yes.
8    Q.  Okay.  And that's substantially different
9  than, say, this Werner ladder we're looking at,
10  right?
11    A.  Yes.
12    Q.  And substantially different than the Bauer
13  ladder --
14    A.  I said --
15    Q.  -- that was involved in this accident,
16  right?
17    A.  Well, I think I've been led down a path here
18  that I -- I should have listened to your question
19  more carefully.  I was referring to this type of a
20  shoe we have here on this ladder when I responded
21  earlier.  I know there are other types of shoes now
22  being installed.  But this is largely a marketing --
23  a marketing decision and not necessarily a safety
24  decision.
25    Q.  Did you read Mr. Vasichko's deposition in

Page 58

1  this case?
2      A.  I scanned it, yes.
3      Q.  Did you notice that he said that -- that
4  they noticed a marked decrease in fracturing of rails
5  when they redesigned the slip-on shoe?
6          MR. GENDRY: Object to the form.
7      A.  Well, taken out of context, it's a simple
8  yes.  But I also notice that he says there was --
9  they made something like 75,000 ladders, and they had
10 like three or four.  I'm not so sure that that's a
11 significant decrease.  I -- I don't exactly know that
12 there's a -- a parallel with what you say here.
13     Q.  (BY MR. BENTON) So you're disagreeing with
14 the testimony of Mr. Vasichko on that?
15     A.  No.  No.  I'm -- You asked me if I agreed
16 with you.  I guess I'm trying to interpret what he
17 said.  Would it -- And I think if you were to ask me
18 that question, and I'll volunteer it, that would it
19 have increased the service life of the ladder?
20 Possibly.  Would it make it any more safe?  No.
21     Q.  Did you notice in Mr. Vasichko's deposition
22 that he noticed that there -- that they had a history
23 of problems with the rails splitting at the bottom?
24     A.  I -- I'll have to -- You have to point to
25 what you're referring to.  I didn't memorize it.

Page 59

1      Q.  Okay.  You don't recall that?
2      A.  I didn't say that.  I said I'd have to see
3  what you're pointing to there.
4      Q.  The question to Mr. Vasichko on page 36 was,
5  Do you have an idea about the percentage reduction of
6  fracturing complaints since you've put the shoe on or
7  the boot on the 304?  Have they dropped in half, a
8  third?
9          They have dropped more than a half.
10         Now, don't you think that that
11 alternative design that Bauer did itself was a safer
12 design for coping with a known risk of fracturing.
13         MR. GENDRY: Object to the form.
14     A.  There's two answers to your question.
15 Number one, it dropped in half.  And I'm not sure if
16 we're talking about from six down to three, or 600
17 down to 300.  I think it makes a big difference in
18 terms of the total amount of ladders they produced.
19         And as far as -- I don't think the
20 splitting is what you call a known hazard.  It's like
21 when you drive your car, when your brakes wear out,
22 you replace them.  You don't keep on driving until
23 the car won't stop.  And if they see there's a crack
24 in the ladder, for whatever reason, the ladder should
25 simply be taken out of service and not used.  So with

Page 60

1  that premise, it doesn't make it any safer.  It may
2  reduce complaints, but that does not necessarily mean
3  it's any safer.
4      Q.  (BY MR. BENTON) Would you agree that certain
5  products are more inherently dangerous than others?
6      A.  Certainly
7      Q.  Certainly a ladder is more dangerous than a
8  piece of paper?
9      A.  I would have to grant you that
10     Q.  Okay.  Because of the nature of people being
11 off of the ground at varying levels in heights, a
12 manufacturer needs to design in accordance with the
13 increased risk of being on a ladder; isn't that
14 right?
15     A.  They do.
16     Q.  People, even if it's not in the thousands or
17 the hundreds, people can fall off ladders and be very
18 seriously hurt, can't they?
19     A.  Certainly.
20     Q.  So when you talk about not thinking that the
21 number of cases of rail fracturing to be a
22 significant number, if -- if we just dealt with the
23 number of personal injury cases with somewhat alleged
24 serious injuries against Bauer, how many do you think
25 you need to have until it becomes a serious issue?

Page 61

1          MR. GENDRY: Object to the form.
2      A.  To me this is vague, the whole question.
3  And I have no response to that.  I'll repeat my
4  earlier one, that it -- there's not a hazard of
5  cracking.  If it cracks it should be taken out of
6  service.  There is -- I mean, the labels, OSHA, are
7  very clear about that.  And to continue using
8  something that you know is broken makes no sense.  I
9  think even a jury would understand that.  It makes no
10 common sense at all.
11     Q.  There are all levels of cracking though,
12 isn't there?
13     A.  When there's a separation, that's a
14 separation of the flange from the web, that is
15 serious cracking.  That, anyone, I believe, would
16 recognize as a failure.
17     Q.  So if it was a one- or two-inch crack,
18 you're -- at the end where the -- at the fillet
19 location, you think that the average worker is going
20 to realize that that's going to cause the whole
21 ladder to be useless and dangerous?
22         MR. GENDRY: Object to form.  Assumes
23 facts not in issue.
24     A.  The labels clearly state that a fractured
25 ladder should be taken out of service.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 136 of 328

Page 62

1    Q.  (BY MR. BENTON) That's not what the label
2  says. is it. You have the labels here, right?  You
3  want to review the labels.  Does it say fractured
4  ladder anywhere on those -- rails anywhere on those
5  labels?
6    A.  Never use a ladder with damaged. missing or
7  worn or loose parts.  Never use a ladder with damaged
8  parts.
9    Q.  It doesn't say anything about fractured
10  rails or any -- or cracked or split rails or anything
11  like that, right?
12    A.  Well. that's damaged.  Mr. Benton, I mean,
13  like please don't eat the daisies now.  We're into
14  semantics here.
15    Q.  Well. I'm just saying you used specific
16  words. and I want to see if those words were there on
17  the label.  And they're not. are they?
18    A.  If you're looking for the word, it is -- it
19  says, in my opinion, never use a ladder with damaged
20  parts.  And that is a damaged part.
21    Q.  Okay.
22    A.  There is no question about that.
23    Q.  Doesn't use the word cracks. splits?
24    A.  Doesn't have to.
25    Q.  Okay.

Page 63

1    A.  OSHA does in its place.  OSHA does use it.
2  And it should be taken out.  So in -- From either
3  direction, that ladder should not have been used.
4    Q.  Let's go back to my original questions
5  here.  You're telling the jury that you have a
6  working knowledge of the various types of designs of
7  the -- the feet and rails on fiberglass ladders;
8  is that right?
9    A.  Okay. Let's define, first of all, what you
10  call a working knowledge.  Would you like to define
11  what you're telling me.
12    Q.  Yeah.  You're familiar with what virtually
13  most or all of the other manufacturers are doing with
14  the design at the bottom of the back rails.
15    A.  That's correct.  Or have been, or whatever.
16  certainly up to the time of. let's see -- we're not
17  talking about tomorrow, we're talking about today,
18  and particularly at the time that Mr. Escudero's
19  accident and the time that that ladder was
20  constructed, right.
21    Q.  You have a working knowledge of that, right?
22    A.  Certainly.
23    Q.  And there are some different designs down
24  here, isn't there?
25    A.  Some. yes.

Page 64

1    Q.  We pointed out Weber's -- Werner's design
2  that's different than the one here with us today,
3  right?
4    A.  I'm sorry, say that again please.
5    Q.  We've talked about the alternative design of
6  Werner ladders where they have the plastic down here
7  in a form of a cap, and then the --
8    A.  Yes.
9    Q.  -- plastic goes down into the web.
10    A.  Yes.
11    Q.  You're familiar with that, right?
12    A.  Yes.
13    Q.  Are you saying that that's not a superior
14  design to this?
15    A.  No. From a point of safety, no, because
16  that ladder can fail -- if there's a fracture, if the
17  fracture occurs, it all -- it makes no difference if
18  the shoe, as you call it, is there.  I did tell you
19  that having a shoe there may allow it to -- allow
20  some force to be put on it without fracturing, I
21  mean, abusive force, and simply lengthen the time the
22  ladder can be used.  But once there is a crack, then
23  whatever kind of shoe they have on there, it's over.
24    Q.  Well, by saying it extends the time it can
25  be used, you're saying it can still be used as a

Page 65

1  functioning ladder if there's cracking up here, if
2  it's all -- if it's still tied in with that
3  alternative design at the bottom, right?
4    A.  That's not what I'm saying at all.  That's
5  not what I'm saying.
6    Q.  Well, when you say extend the use, what do
7  you mean by that phrase?
8    A.  In other words, I'm -- if you abuse this
9  ladder, and I can show you ways to abuse a ladder, I
10  mean, you know, just pick it up and drop it, for
11  example, dropped on end time and time again, thrown
12  in the truck, you know. etcetera, you know, throw it
13  on -- in gravel, just really. you know, put it
14  through its paces, certainly a cap, you know, would
15  extend the time you could do that.  But sooner or
16  later you're still going to have the same cracking
17  occur.  It's not going to prevent it.  And at that
18  time you're simply delaying the time that that ladder
19  is taken out of service. but you're not changing any
20  of the safety features.
21    Q.  Okay.  Werner has designed -- has an
22  alternative design to this Werner ladder, right?
23    A.  Correct.
24    Q.  Okay. And Bauer has an alternative design,
25  correct?

**DR. JOHN JOHNSON  VOL. 1 OF 1**                                **AUGUST 29, 2001**

18 (Pages 66 to 69)

Page 66

1    A.  Correct.
2    Q.  Any other companies have alternative
3  designs?
4    A.  Not that I'm aware that are on the market
5  today.  There may be in a year or so.  There's a lot
6  of movement going out with a lot of foreign
7  manufacturers coming in, a lot of -- a lot of -- I'd
8  just say a lot of activity occurring in the ladder
9  industry that may change that.  But at the present
10  time I'm not aware of it.
11    Q.  So is it your testimony that if I went out
12  and tried to buy another ladder that had an
13  alternative design to this -- to the subject ladder
14  we're dealing with in this lawsuit, as well as this
15  Werner that we have in front of us, that I won't be
16  able to find any other different alternative designs
17  at the bottom except for the Werner and the Bauer?
18    A.  I don't know that for fact.  You asked me my
19  opinion.
20    Q.  No, I'm really trying to question -- I don't
21  want to say question.  I'm trying to understand the
22  extent of your knowledge of alternative designs by
23  other manufacturers in the industry.  And just want
24  to know if I --
25    A.  Sure.  That's fair.

Page 67

1    Q.  And you're -- And I'm saying that I
2  shouldn't be able to go out and find another one
3  besides a Werner or a Bauer that's got an alternative
4  design; is that right?
5    A.  I'm not sure.
6    Q.  So you may not have a really good working
7  understanding of the alternative designs of different
8  ladders in the industry?
9    A.  Oh, I think I have a good working.  But
10  you're asking me do I have total knowledge.  I hope
11  that no one would tell you that.
12    Q.  Okay.  The idea of reinforcing the bottom
13  rails of ladders, whether it be with some sort of a
14  shoe, some sort of a wrap or a shoe, that idea has
15  been around for decades, hasn't it?
16    A.  I don't -- the idea has been around for
17  decades.  It -- I don't think it's been augmented
18  until the last few years to my knowledge.
19    Q.  Wasn't there wooden ladders, extension
20  ladders that all the way back to the '30's they put
21  some sort of a reinforcing wrap around the bottom of
22  the rails?
23    A.  I'm not sure.  They may have done it in
24  wood.  But again, they don't make very many wooden
25  extension ladders anymore.

Page 68

1    Q.  In fact, didn't Bauer have an alternative
2  design to reinforce the fiberglass at the bottom of
3  the rails in the past, besides the boot?
4    A.  They may have.
5    Q.  Do you recall the one where they basically
6  doubled up on the plas- -- on the fiberglass?
7    A.  I've seen these, yes.
8    Q.  And what was the reason for them doing that?
9    A.  Again, to increase the longevity of the
10  ladder.
11    Q.  And by increasing the longevity, wouldn't
12  they increase the strength at the bottom in the event
13  of, say a cracking of the inner part of the
14  fiberglass of the rail?
15    A.  Only until some impact force came that would
16  cause the crack.  And then beyond that, it wouldn't
17  do any good.
18    Q.  Couldn't you have a crack on the inside
19  layer of fiberglass and still have the exterior layer
20  of the fiberglass holding it together?
21    A.  Yes.  But why would you want it?  That would
22  be dangerous.
23    Q.  But if there was one cracked on the inside
24  and someone got on it, if that outside layer of
25  fiberglass gave it support, it might be the

Page 69

1  difference between a guy falling on his head or not,
2  right?
3    A.  Well, if it developed a crack then it
4  should -- again, it should be removed.  And for some
5  reason I'm not -- apparently I'm not making that
6  point clear enough.
7      MR. BENTON:  I'm going to object to the
8  responsiveness.
9    Q.  (BY MR. BENTON) Even if there was a crack on
10  the inside portion of the fiberglass, wouldn't the
11  outside wrap of fiberglass that was on some of the
12  older Bauers have given that rail stability for
13  someone to use the ladder even though there was a
14  crack on the inside?
15      MR. GENDRY:  Object to the form.
16    A.  That depends on where the crack was located
17  and the severity of it.  I mean, you can't make a
18  blanket statement to that effect.
19    Q.  (BY MR. BENTON) Okay.  We've talked about
20  the Werner alternative design.  We've talked about
21  the present Bauer alternative design.  We've talked
22  about the old Bauer alternative design of just
23  putting another layer of fiberglass on.  Do you know
24  of any other rail support designs that have been
25  implemented besides those three I've just given you?

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 138 of 328

Page 70

1    A.  Oh, I think Werner had a retrofit of some
2  kind years ago, and if there was a ladder that was
3  cracked and -- and there are places throughout the
4  country that you can send ladders to and have them
5  repaired.  And there are a lot of ways that it --
6  that issue can be dealt with.  But accepting the one
7  that Werner put together, I'm going to say is
8  probably closer to, I want to say 10, 12 years ago.
9  And I don't know how long-lived that was.  But other
10  than that, as I sit here today, I can't recall.  I'm
11  not saying that there weren't any, but I can't recall
12  any right now.
13    Q.  The technology was present all the way 20
14  years ago to do the kind of reinforcing of the bottom
15  rails that Werner is doing and Bauer is doing now,
16  right?
17    A.  Yes.
18    Q.  And are you familiar with the cost to
19  manufacture of the new Bauer ladder versus the old
20  one?
21    A.  No.
22    Q.  Do you believe that there's an economic
23  feasibility problem with trying to support these
24  rails at the bottom like the way Werner has done, the
25  way Bauer now does?

Page 71

1    A.  I'm not into marketing, I don't know.  I
2  can't give you an answer to that.
3    Q.  Are you familiar with whether any
4  manufacturer has patents with -- in the design of
5  reinforcing the bottoms of these rails?
6    A.  I'd be surprised if they didn't, but I don't
7  know that for a fact.  I really don't get into patent
8  situations with the various manufacturers.
9    Q.  Did you read how Bauer came up with their
10  alternative shoe, who did it and the history of it?
11    A.  I could guess.  Maybe Victor Leonino comes
12  to mind.  He was a former president at Bauer.  Victor
13  was -- was fairly knowledgeable in fiberglass.
14    Q.  And did you know what kind of degree John
15  Vasichko has?
16    A.  He's either mechanical engineering or
17  industrial engineering.  I think one of the two.
18    Q.  And I think he's taken at least partial
19  credit for the new design of the Bauer foot, and that
20  he had absolutely no experience in the area before he
21  sat down to create something.
22    A.  I don't know that.
23    Q.  Okay.  Did you measure how much you thought
24  of the cracks in the subject ladder were because of
25  the incident by Mr. Escudero and which were old?

Page 72

1    A.  I looked at it.  I didn't -- I made some
2  measurements just to get a rough idea.  I think some
3  of them I measured, the old cracks, and again I'm --
4  I'd have to verify this by looking at the accident
5  ladder again.  But 30 inches -- two feet, 30 inches,
6  I think is fair, certainly on one of them, or maybe
7  even slightly more.
8    Q.  And I didn't quite understand that.  Would
9  you explain that a little more fully.
10      THE WITNESS:  Would you read the
11  question back.
12      MR. BENTON:  I'll rephrase it.
13    Q.  (BY MR. BENTON) My question is, did you
14  measure, at least based on your opinion, the cracks
15  involved in this subject ladder, how much of it was
16  new crack and how much of it was old crack?
17    A.  I did take some measurements.  I examined
18  it, yes.
19    Q.  Okay.  How much was new crack?  And we --
20  Let's do it the way the numbering went, if I remember
21  right.  It goes left to right like you read, front to
22  back; is that right?
23    A.  Correct.
24    Q.  So one to the left is the front rail?
25    A.  The numbering system, that's -- I mean,

Page 73

1  that's garbage.  It should be front rail, front right,
2  front left.  I mean, it's the only way to define it.
3    Q.  Okay.  Then let's do it that way.
4    A.  Yeah.
5    Q.  All right.  The back left rail, how much was
6  new, how much was old?
7    A.  I'd have to go back to the accident ladder
8  to look at that.  I didn't write those down.  But I
9  can tell you this, it was certainly that there was a
10  major portion of it, large portions of it were
11  preexisting.
12    Q.  And is it also fair to say that the crack
13  expanded or propagated because of the incident?
14    A.  I believe that it did, yes.  I even indicate
15  that in my report.
16    Q.  Okay.  All right.  Now, let's go to the back
17  right rail.  Did you measure that one for how much
18  was new crack and how much was old crack?
19    A.  Same answer as before.
20    Q.  And did the accident in question expand or
21  propagate the crack on the back right rail?
22    A.  I believe it did, yes.
23    Q.  Now, we've already determined that there
24  were cracks in all four rails at some place, right?
25    A.  Correct.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 139 of 328

Page 74

1    Q.  Okay.  Now, how did any cracks in the front
2  rails cause this accident?
3    A.  Whatever influence they had, they, in my
4  opinion, were peripheral.  But the major cause of the
5  buckling was obviously in the rear rails.  They
6  certainly would cause it to be, that is the cracks in
7  the front rail to be less rigid, certainly have more
8  propensity to twist.  It could have been additive,
9  but it was not the principal cause.
10   Q.  Very small influence, if any, on the back
11 rails buckling, right?
12   A.  It -- I can't quite say that.  I think
13 you're probably mostly correct.  Again, I think it
14 depends on where Mr. Escudero was standing, how he
15 was turning, how he was leaning, how the weight
16 distribution developed between front and back, how
17 the distribution of weight or momentum was on the
18 left rear rail versus the right rear rail.  These are
19 things that we'll never know.
20        But to -- It had some slight extent,
21 but certainly the major effect was the fracturing of
22 the rear rail -- rear rails.
23   Q.  Do you think it's an adequate position for a
24 manufacturer to say that a ladder could be designed
25 safer but they're just doing the same thing everyone

Page 75

1  else is?
2        MR. GENDRY:  Object to the form.
3    Q.  (BY MR. BENTON) You understand my question?
4  Would you like me to rephrase it?
5    A.  Yeah, I would.  I think it's like, have you
6  beaten your wife today.
7    Q.  Well, you're familiar, being a seasoned
8  expert who testifies in product liability cases, that
9  frequently there is the standard in the industry
10 defense, right?
11        MR. GENDRY:  Object to the form.
12   Q.  (BY MR. BENTON) Are you familiar with that
13 defense?
14   A.  You'll have to tell me.  I'm just a
15 layperson, I'm not an attorney.  You'll have to help
16 me out here.
17   Q.  Well, you've heard that defendants in
18 products cases will sometimes say, well, we're -- our
19 design is the same as everybody else's.
20        MR. GENDRY:  Object to the form.
21   Q.  (BY MR. BENTON) Have you ever seen that
22 before?
23   A.  No.
24        MR. GENDRY:  Object to the form.
25   A.  No.

Page 76

1    Q.  (BY MR. BENTON) I think that in this case
2  you're probably going to find that the defense is
3  going to bring out some ladders that are similar in
4  design to theirs saying, look, ours is normal to
5  theirs.
6        MR. GENDRY:  Object to the form.
7    Q.  (BY MR. BENTON) Are you familiar with that?
8        MR. GENDRY:  Object to the form.
9    A.  Am I familiar with the fact that they may
10 say it?
11   Q.  (BY MR. BENTON) Yes.
12   A.  Well, I'll wait until I hear it, I guess.
13   Q.  Okay.  If a manufacturer can come up with a
14 better, safer design, they need to do that regardless
15 of what the other manufacturers in the industry are
16 doing; isn't that right?
17        MR. GENDRY:  Object to the form,
18 overbroad.
19   A.  Sure.  I'll agree with that, sure.
20   Q.  (BY MR. BENTON) And even if the number of
21 injuries is not many relatively, if the cost to
22 change a design is negligible or little, and they can
23 design out a risk or improve a risk by design change,
24 they should do it, shouldn't they?
25   A.  I'll answer -- certainly the answer is yes,

Page 77

1  but not -- but with the caveat that I would have to
2  have you define what you are going to call a risk
3  here, because I know we're dealing with semantics
4  now.
5    Q.  Well, if I lined up a bunch of names of
6  people and their injuries, is that what it would take
7  for you to agree that there's a certain risk?
8    A.  No, not at all.
9    Q.  What would it take for you to call something
10 a risk?
11   A.  In other words, to say that -- that the risk
12 of someone driving an old car with defective brakes
13 is the responsibility of the brake manufacturers is
14 about what you're saying here.  That, you know, a
15 manufacturer of, say, the brakes in your car, when
16 that car becomes so old or the brakes so worn and
17 someone keeps on driving it until the rivets grind
18 and all that and it won't stop the car, the
19 manufacturer can't be blamed for that.
20        And when the manufacturer of a ladder
21 specifically puts on the labels whether it is broken
22 or whatever, the ladder is damaged that it must be
23 discarded or don't use it and the user uses it in
24 spite of those warnings, are you asking does the
25 manufacturer have to make it idiot proof?

21 (Pages 78 to 81)

Page 78

1    Q.  I want you to assume some things.  And you
2    may totally disagree with these assumptions.  But for
3    my analysis, I want you to assume them.
4    A.  This is a hypothetical now?
5    Q.  Yes.
6        I want you to assume that -- that rails
7    crack on ladders.  I want you to assume that the
8    cracks may not represent a significant risk of danger
9    to a user, that they would not understand that these
10   cracks may suddenly propagate and split right up high
11   and cause their whole ladder to fall.  I want you to
12   assume that there are alternative designs in which
13   the bottoms of these rails can be fortified by
14   supporting braces, by shoes, by doubling up on the
15   fiberglass.  And I want you to assume that the
16   results are that by fortifying the bottom of these
17   rails, the number of incidents and complaints about
18   cracked rails goes down by over half.  Don't you
19   think a reasonable manufacturer makes those design
20   adjustments.
21       MR. GENDRY:  Let me object to assumes
22   facts not in evidence.  Object to form.
23   A.  What you're not allowing in your
24   hypothetical is that, number one, I don't believe
25   there's been a long enough history, today, of these

Page 79

1    ladders that have these shoes, as you call them on
2    it, to really make that assumption that they have
3    done -- that after putting shoes on it, it has done
4    anything but postpone the time when cracks do
5    develop.  I don't think that's been established yet.
6    I think your hypothetical is flawed and in error.
7    Q.  (BY MR. BENTON)  Well, what sort of studies
8    have been done?
9    A.  At the moment, I'm not -- I don't know that
10   there have been studies because this is a -- rather a
11   new entry into the market.
12   Q.  12 years?
13   A.  Well, there haven't been that many of them
14   out for that time.
15   Q.  Well, we've got Werner for about 12 year,
16   don't we?
17   A.  Well, they make ladders like this today.
18   Q.  I understand.  That's not the point.  The
19   point is they are improving the safety of ladders.
20   And if we've got 12 years, do you know of any studies
21   that have looked at the data?
22       MR. GENDRY:  Let me object to the
23   form.  It assumes facts not in evidence.
24   A.  Well, the safety here is -- this is to say
25   if I happen to drive a Mercedes and you drive a Ford

Page 80

1    Pinto, therefore your car is defective because it
2    can't -- won't last as long as mine.  I mean, I don't
3    understand what you're getting at here.
4        MR. BENTON:  Okay.  But I'm going to
5    object to the form.
6    Q.  (BY MR. BENTON)  And I want you to think
7    about the question I'm answering (sic) and try to
8    tailor your answer to the question.  The question is
9    are you familiar with any studies that have been done
10   regarding the reduction of complaints or injuries
11   resulting from fracturing at the ends of rails
12   because of shoes or similar support systems?
13   A.  Now, such studies, if there are any, would
14   be held by the individual ladder manufacturers.  I --
15   I am saying, with almost certainty, that I don't
16   think the Consumer Product Safety Commission records
17   anything except deaths and serious -- very serious
18   injuries and most -- but not due to shoes, as you say
19   it.
20       I know NIASH has -- is studying this
21   area.  To what extent they're progressing, I don't
22   know.  There are other governmental agencies that are
23   looking at this as we speak.
24   Q.  So your knowledge is none; is that right?
25   A.  I'm aware that the studies are being done by

Page 81

1    individual companies, I mean, certainly, because they
2    want to know how their product is doing.  But am I
3    privy to those?  No.  And you may be in the form of
4    depositions, but I am not.
5    Q.  Isn't it true that liability lawsuits have
6    improved a lot of products' designs?
7        MR. GENDRY:  Object to the form.
8    Overbroad.
9    A.  Well, certainly I can't help but believe
10   that's true.
11   Q.  (BY MR. BENTON)  Is it your testimony that
12   Mr. Escudero's accident -- Let me rephrase that.
13       Isn't it true that it is less likely
14   that Mr. Escudero would have fell -- fallen from the
15   subject ladder had there been some sort of rail
16   support system in place similar to the Werner ladder
17   or the Bauer new design ladder?
18   A.  In the condition that I saw that ladder,
19   no.
20   Q.  Why?
21   A.  Because still -- Because it had been so
22   weakened by the fracturing, the preexisting
23   fractures, that whether or not those shoes would have
24   been there, it would have still had -- it would have
25   had a propensity to buckle.  And this is a buckling

Page 82

1  failure.
2     Q.  Wouldn't a protective shoe or boot or
3  supporting structure, cap, whatever we're going to
4  call it, wouldn't that have held in place the
5  fractured parts so that they wouldn't have expanded
6  like they did on Mr. Escudero?
7     A.  They would -- still would have buckled.
8  They would have buckled possibly in a different way.
9  Rather than springing out, they would have buckled
10  like in a bow, but they still would have buckled.
11  And again, we're going back to what we apparently
12  aren't getting, that with that kind of damage, even
13  with a shoe on it, it should never have been used.
14     Q.  I understand what your position is. I
15  understand what Bauer's position is. But my question
16  is you're saying that a support structure around the
17  bottom wouldn't have held those fractured pieces
18  together?
19     A.  It would have held them together at the
20  bottom, but it -- but the way it would have buckled,
21  it would have buckled anyway.
22     Q.  Okay. Can you demonstrate for me how it
23  would have buckled, or put into words how it would
24  have buckled even if the fractured parts were kept
25  together at the bottom by a boot?

Page 83

1     A.  Can I have a piece of paper.
2     Q.  Sure.
3        THE WITNESS:  Can you hold that pen
4  down for me.
5        MR. GENDRY:  Sure.
6     A.  Now, the way it -- this is the flange, I
7  call it a free, correct. It -- free. It had been
8  destroyed, it -- preexisting, okay?
9     Q.  (BY MR. BENTON)  Sure.
10     A.  So it could have come out like this.
11     Q.  All right.
12     A.  Now we have a shoe on here.
13     Q.  Uh-huh.
14     A.  Now rather than come out this way, it would
15  buckle this way. You see, it had a different mode of
16  buckling, but it still would have buckled, because
17  there is no structural continuity between this flange
18  which takes that torsion and the web. So it would
19  buckle this way or buckle this way. It still would
20  have buckled.
21     Q.  Well, wouldn't the cross brace have given it
22  more support if the -- if the shoe went up to the
23  first cross brace?
24     A.  No, because the cross brace would strengthen
25  it in this direction, and the brace. But we're

Page 84

1  buckling in this direction. We're buckling around a
2  different axis. It still would have had the
3  propensity to buckle.
4     Q.  The buckling itself caused the propagation
5  or expansion of the crack, right?
6     A.  No. No, no. The buckling -- boy. When
7  something buckles, for example, if you -- can you
8  imagine a fishing pole, an end, it can hold a certain
9  load without buckling, or a yardstick. And then once
10  you get to the critical buckling load, it starts to
11  buckle. But once it does. then it just keeps on
12  going. It can take no more load whatsoever. But
13  it's just --
14     Q.  But it did -- but the weakness in the ladder
15  in this case didn't start halfway up or even a third
16  up.
17     A.  Oh, I believe it did.
18     Q.  It started at the bottom, didn't it?
19     A.  No. No, no, no, no. You're totally --
20  you've got the accent on the wrong syllable here. We
21  had a whole area here that was disconnected.
22     Q.  After the accident.
23     A.  No, before the accident. This is
24  preexisting damage, sir.
25     Q.  Well, that's subject to factual dispute.

Page 85

1  But okay. Go ahead.
2        MR. GENDRY:  Object to the form.
3     A.  You're joking.
4     Q.  (BY MR. BENTON)  How much? I mean, I asked
5  you the measurements and you couldn't give them
6  today. So it's a matter of how much.
7     A.  I've answered your question.
8     Q.  So if I understand what you're saying, had
9  this whole end of this rail been secured, the angle
10  braces and the cross braces tied right into the web,
11  and this was a solid part. even if there was a crack
12  that was. say, above that support area --
13     A.  Well, move your hand another foot by your --
14     Q.  (Attorney complies.)
15     A.  Now you're -- Now you're talking about
16  reality.
17     Q.  Okay. Then in that instance you're saying
18  that it would have buckled forward. is that what
19  you're saying?
20     A.  Yes, sir. Yes, sir.
21     Q.  Did you test that to see if that was true?
22     A.  I don't need to. That's simple structural
23  behavior.
24     Q.  If someone wanted to -- to be sure that what
25  you -- your conclusion was accurate. is there any --

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 142 of 328

Page 86

1  any literature you could refer them to to see where
2  there's been studies done that even if the bottom is
3  secured you're still going to have instability higher
4  up?
5      A.  Well, I could refer you to Chapter 6 in my
6  latest textbook.  It's a whole chapter on buckling.
7  It's all in there.  And virtually every design
8  textbook in buckling will develop those theories for
9  you.
10     Q.  What's the title of that book?
11     A.  "Steel Structures Design and Behavior."
12  It's listed in my CV.
13     Q.  Okay.  And I call the student bookstore in
14  Madison to get it?
15     A.  You can call up any university in the
16  country.  Half the universities in the country are
17  using it.
18     Q.  Is that right?
19     A.  Yes, sir.
20     Q.  And the fact that it's steel structures is
21  just as relevant to fiberglass?
22     A.  Yes.  Buckling is buckling is buckling.  It
23  applies to wood.  It applies to steel, aluminum,
24  fiberglass, even concrete.  Yes, sir.
25          In fact, I believe they use it, and I'm

Page 87

1  not quite sure, but I know they did, and I think they
2  still use that book at the University of Texas.
3      Q.  But you know of no tests that have
4  demonstrated what you just concluded, as far as
5  fiberglass ladders and the support structures we're
6  talking about?
7      A.  Well, if you're talking about buckling,
8  there's a plethora of information on that.
9      Q.  And I'm talking about not as it relates to
10  steel or wood.
11     A.  I --
12     Q.  I'm talking about fiberglass ladders.
13     A.  I didn't finish my answer.  I have
14  personally conducted buckling strengths of
15  fiberglass.  I wrote a design manual for how to
16  design fiberglass structural sections.  And I spent a
17  whole year developing a -- testing programs and I
18  tested the buckling strength of columns.
19     Q.  And I'm talking about under controlled
20  situations like we're describing.
21     A.  Yes, sir.
22     Q.  Where you're supported at the bottom to that
23  extent up with a boot or a foot.
24     A.  Well, I mean, if you're saying this
25  identical situation, of course there is no such

Page 88

1  thing.
2      Q.  Or very similar situation.
3      A.  Buckling is buckling.  And -- and the
4  situations that I investigated were certainly similar
5  to this.  And it's just a matter of --
6      Q.  Can you tell us how they were similar?
7      A.  Well, once you know the cross sectional
8  geometry, you know the radius of gyration, you know
9  the slenderness ratios, it's a simple computation.
10     Q.  Then how do you explain the lack of
11  complaints coming from the customers of Bauer's when
12  they made this foot change?
13         MR. GENDRY:  Object to form.
14  Speculation.
15     A.  I don't know.  I don't have an answer to
16  that.  I need to know -- I don't know the sampling.
17  I don't know the period of time.  All those are
18  important.  And we're simply, you know, talking in
19  the dark here.
20         MR. BENTON:  I'll pass the witness.
21         THE WITNESS:  Before you think of any
22  more questions, I'm going to ask for a head call.
23         MR. BENTON:  Okay.
24         (Break taken.)
25

Page 89

1              EXAMINATION
2  BY MR. GENDRY:
3      Q.  Mr. Johnson, my name is Tom Gendry.  And of
4  course we have met previously in this case; is that
5  correct?
6      A.  Yes, sir.
7      Q.  And I retained you to work on this
8  particular case?
9      A.  Yes.
10     Q.  All right.  You have prepared reports in
11  this case, which I don't think we've attached them to
12  the deposition.
13         MR. GENDRY:  So let's mark this.
14         (Exhibits 6 and 7 marked.)
15     Q.  (BY MR. GENDRY)  We've marked as Deposition
16  Exhibits 6 and 7 the two reports that you have issued
17  in connection with your study of this case; is that
18  correct?
19     A.  Yes.
20     Q.  And is there a curriculum vitae in your
21  report?
22     A.  Yes, sir.  There is in the first report.
23     Q.  First one.  Is the curriculum vitae attached
24  to your report, Deposition Exhibit 6, is it current
25  as to your education, training and experience?

Page 90

1    A.  Yes.
2    Q.  Okay.  Could you explain to us your
3  experience in the study of fiberglass as a material.
4    A.  Actually, I began studying fiberglass
5  probably in 1960 when I became a graduate student,
6  Ph.D. student at Perdue.  There I developed
7  structural -- construction systems involving plastics
8  and building technology.  Then I spent three years at
9  Dow Chemical Company in the plastics development and
10  research department, first, as I explained earlier,
11  as a technical fireman, the last two years as a
12  laboratory director in the long range plastics
13  applications laboratory.  And I worked with plastics
14  all during those years.
15       Then I continued my research in
16  plastics at the University of Wisconsin.  I had a
17  number of projects involving plastics, sandwich
18  panels, behavior of plastics, composites in general.
19  I published a number of papers which developed new
20  theories on how to analyze and design and reinforce
21  plastics.  And I even taught seminar courses in
22  plastics and fiberglass at the University of
23  Wisconsin.  I became chairman of the ANSI A14.5
24  committee in 1970 -- actually, a little bit for that
25  time.  But it became official in 1970.  I have

Page 91

1  conducted, you know, testing and research in plastics
2  on an intermittent basis over the past 30, 35 years.
3    Q.  When you say plastics, does that include
4  fiberglass?
5    A.  Yes, sir.
6    Q.  All right.  Go ahead.
7    A.  And I have analyzed plastics, tested them.
8  I worked with companies developing plastics and
9  fiberglass products over the years.  Over the past,
10  I'd say 25 years, I've done this
11    Q.  Okay.  With respect to fiberglass ladders,
12  can you explain what has been your part in connection
13  with either testing ladders, researching ladders,
14  study of such ladders?
15    A.  Certainly.  As I mentioned earlier, in 1970
16  I became chairman of the A14.5.  And my task was then
17  to assemble a subcommittee to develop the standard
18  which has resulted in a number of reiterations, and
19  the last one being the 2000 version.
20       Then in about 1975 I started on what
21  still is the largest research program that's been
22  done in ladders for the Consumer Product Safety
23  Commission.
24    Q.  What is the Consumer Product Safety
25  Commission?

Page 92

1    A.  It's a government agency that is more or
2  less a watchdog over consumer products, etcetera.
3  And it was the Commission's charge to ladder
4  committees to develop a standard and improve the
5  standards, you know, that they had.  And so they
6  funded a program to do research.  And there were
7  literally hundreds of engineers that were involved in
8  this study.  It was a two-year program.  It was under
9  my direction.  And, I mean, it tested all sorts of
10  ladders; wood, aluminum, fiberglass, extension
11  ladders, stepladders, special ladders, trestle
12  ladders, and so on.  We instrumented these ladders
13  with strain gauges, we instrumented them with
14  accelerometers with all three axes to determine the
15  natural frequency of the ladders and how they respond
16  to the frequency of a climber, the type of dynamic
17  forces that they developed and so on.
18       And we developed all sorts of data in
19  slip resistance.  We evaluated all of the
20  certification tests that existed at that time.  And
21  at the end of that two-year study, then in 1977 we
22  presented that to the A14 committees, and the results
23  of that were then what's incorporated into the
24  succeeding standards of 1980 on.  And they have
25  formed much of the basis on which we use the ladder

Page 93

1  technology today.
2    Q.  When you say the ANSI 14.5 committee, what
3  is ANSI?
4    A.  American National Standards Institute.
5  That's their -- that's the acronym for them, ANSI
6  is.  And it consists of one main committee, which is
7  the A14, which is called the main committee, and
8  which has risk charged the development and the
9  support of subcommittees then for each specific type
10  of ladder, whether it be wood, aluminum, fiberglass,
11  fixed ladders, job made ladder, whatever.  And so it
12  then coordinates the efforts of the various
13  subcommittees.
14    Q.  Okay.
15    A.  Now, I've also sat -- sit in on the
16  subcommittees of both wood and metal, as well as
17  being the chairman of A14.5, the fiberglass.  And
18  I've worked on laboring -- with laboring committees.
19  Much of the laboring that you find in the standards,
20  again, has been a result of the work that I have
21  done.
22    Q.  Is there a industry standard for the -- for
23  fiberglass ladders?
24    A.  The industry standard is A14.5.
25    Q.  Of which you are the chairman of the

25 (Pages 94 to 97)

Page 94

1   committee; is that correct?
2       A.  Correct.
3       Q.  And with respect to the A14 -- the ANSI
4   standards, do they relate to the strength of
5   fiberglass ladders?
6       A.  Well, they specify the minimum structural
7   properties that are required in the fiberglass
8   ladders, yes, sir.
9       Q.  Okay.  And in connection with your work in
10  this case, were you asked to do any testing of the
11  subject ladder, the ladder that Mr. Escudero had been
12  on, to determine whether or not it had the -- that it
13  met the ANSI standards for strength?
14      A.  Yes.
15      Q.  What did you do?
16      A.  Well, I did a number of tests.  I did a
17  tensile test, a compression test, a flexural test, a
18  burn out test, and Barcol test.
19      Q.  And have you read Dr. Pugh's deposition in
20  this case?
21      A.  Yes, sir.
22      Q.  And did you read the list of tests that he
23  thought may be appropriate for testing the ladder,
24  particularly, as you call it, the fillet or the
25  corner of the ladder between the flange and the web?

Page 95

1       A.  Yes, I did.
2       Q.  And are any of those tests, to your
3   knowledge, appropriate for determining whether or not
4   the ladder has insufficient strength to the
5   fiberglass?
6       A.  No.
7       Q.  All right.
8       A.  They do not.
9       Q.  For example, he mis-- he mentioned a peel
10  test.
11      A.  Yes.
12      Q.  Can you explain what that is?
13      A.  Well, a peel test, according to ANSI, is a
14  test in which you're essentially testing the shear
15  strength or the peel strength between two membranes,
16  whether -- it can be in a roofing membrane or it can
17  be in scotch tape.  I mean, they all have --
18  basically the test is that -- peeling one surface
19  against -- away from the other.  But the -- the only.
20  and I'm very familiar with most of ANSI tests in that
21  area that they are -- strictly regarding flexible in
22  use, or flexible membranes.
23      Q.  Okay.  Does the peel test, according to
24  ANSI, in any way apply or is it helpful in
25  determining whether or not a portion of a fiberglass

Page 96

1   ladder, as suggested in this case, the fillet, is
2   insufficient in strength?
3       A.  No.  You can gain absolutely no knowledge
4   from that whatsoever.
5       Q.  All right.  He mentioned also a crush test.
6   Do you know what that is?
7       A.  Well, he described it in his deposition, but
8   I've never heard of it.  From the way he described it
9   it has no bearing whatsoever to the strength of the
10  ladder.
11      Q.  What was your understanding of how he
12  described the crush test with respect to testing a
13  fiberglass ladder?
14      A.  Well, he says cutting a piece of ladder and
15  then putting a compressive force on it and -- I don't
16  know whether you crush, squish it or bust it, or
17  whatever, but that will tell you nothing.
18      Q.  Does that test -- Is that test or anything
19  like it contained in the -- the testing listed in
20  ANSI?
21      A.  No.  No, sir.
22      Q.  Okay.  In your opinion, would it have any
23  effect at all in determining the strength of the
24  fiberglass ladder which is the subject matter of this
25  case?

Page 97

1       A.  No, it would not.
2       Q.  Any of the testing that Dr. Pugh mentioned
3   or any -- is any of it mentioned in ANSI as a test
4   for determining the strength of the materials of the
5   fiberglass ladder?
6       A.  Not one.
7       Q.  All right.  He also mentioned that he
8   examined the ladder with a, I think he said a
9   stereomicroscope.  Do you recall that?
10      A.  Yes, sir.
11      Q.  What was your understanding of what -- what
12  he said about --
13      A.  Well, he said that he looked at the
14  fractured surfaces through a stereomicroscope.
15      Q.  Is the stereomicroscope, according to ANSI
16  or according to any industry standards, a proper
17  authoritative method of determining the strength of
18  fiberglass materials?
19      A.  It is not.
20      Q.  What is your understanding of what
21  stereomicroscopy could do with respect to examining a
22  piece of material such as fiberglass?
23      A.  Well, it's very limited what you can do.
24  First of all, you can only see the surface, and you
25  can't see below the surface.  And when you view a

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 145 of 328

Page 98

1    fracture, you only are looking at the surface. And I
2    remember from his deposition that he claimed that he
3    could then determine that the transverse fibers were
4    inadequate. Well, you can't even see the transverse
5    fibers in a microscope because they're random fibers
6    to begin with.
7        Q.  When you say random fibers, what do you
8    mean?
9        A.  They're chopped fiber, between a half --
10   about a half inch long, typically, and then are just
11   blown in there at random. So to have -- I mean, at
12   any given time you can average them all out. And
13   they're made into mats. And there's layers of mats
14   and layers of uniaxial material. Now, that -- the --
15   he could see that there is a different orientation,
16   but that's all he could see. He also mentioned that
17   he could tell -- that it was also a test to determine
18   the cure of the fiberglass.
19       Q.  Is that possible?
20       A.  No, that's absurd.
21       Q.  Can you explain why?
22       A.  Yes. Because the cure is a function of the
23   indentation strength, and this is determined by the
24   Barcol hardness tester.
25       Q.  Did you do the Barcol hardness tester?

Page 99

1        A.  Yes, sir.
2        Q.  And what did you determine from that?
3        A.  Again, and each and every time it was above
4    the minimum required for a proper cure.
5        Q.  Okay. Did you in any way find that the
6    results of the Barcol hardness test that you did
7    determined that there was any insufficiency or
8    weakening of the fiberglass you were testing?
9        A.  No, sir.
10       Q.  All right. We have here with us today what
11   you've referred to which is a -- you called it a
12   broom, I think, did you not?
13       A.  Yes, sir. Yes.
14       Q.  And let me represent to you that that was
15   sent to us from -- from Bauer Ladder Company because
16   you asked to have one available for your deposition,
17   did you not?
18       A.  Correct.
19       Q.  All right. And can you just point out. I
20   know we -- we'll have to describe it to the court
21   reporter, the layers that you're talking about, some
22   being longitudinal and some being random layers of
23   fiberglass.
24       A.  Okay. Well, to begin with, fiberglass rails
25   are made by what's called a pultrusion process.

Page 100

1        Q.  What does that mean?
2        A.  I think everyone knows what extrusion is.
3    like you push it out. And a pultrusion, you're
4    pulling it through. And in a pultrusion line, at one
5    end you have a lot of bobbins that look like little
6    sewing machine bobbins, except that they're two feet
7    wide and -- or whatever, and two feet in diameter.
8    And they are rolls of then either fabric, surface
9    veil or -- then the actual fibers. And they are
10   coming in at various levels into this die. And then
11   they are pulled through the other end. And when you
12   first start up, when you have a polyester resin, then
13   this is what you find. And then as it progresses,
14   then you begin to see a hardened section. This is
15   the start of the line.
16       Q.  All right.
17       A.  And what we have here is then --
18       Q.  You're talking about the broom end of it?
19       A.  Yeah, the broom end of it. And all of this
20   material, by the way, which is -- there's a lot, it
21   all goes into that cross sectional area there. And
22   on the outside and inside we have a veil, which is
23   called a Nexus veil. And this is principally to
24   reduce brooming effect of the fiberglass.
25           Then there is a mat, that goes all the

Page 101

1    way around the structure, of random fibers. And
2    these fibers, you can see here, are all different
3    directions, etcetera. Then there is a layer of what
4    is called directional -- unidirectional fibers. Then
5    there is another layer of mat. And then there's
6    another layer of unidirectional fibers, and then
7    there's another random mat.
8        Q.  So three layers of random mat; is that
9    correct?
10       A.  Yes.
11       Q.  With cross fibers going in all different
12   directions?
13       A.  Going in all different directions. And they
14   totally wrap around the entire section. So whatever
15   is here is here. They're totally wrapped around.
16       Q.  And that would be including wrapped around
17   the fillet or the corner between the flange and the
18   web?
19       A.  Exactly.
20           MR. BENTON: Object to form.
21       A.  So this -- I mean, this is then the makeup,
22   or the composite. And the design of the composite is
23   simply the determining of the number and amount of
24   fibers and a few other little design details.
25       Q.  (BY MR. GENDRY) And how is all this held

Page 102

1 together, by some sort of glue or epoxy or something?
2      A.  The matrix, the liquid, the liquid when it
3 starts that -- each fiber goes through, then have --
4 they're mostly a -- they're mostly polyester resin
5 and -- as opposed to a -- they're polyester resin.
6 And there's a certain amount of dye put into here,
7 because if you want a green ladder, you can get a
8 green dye.  If you want a blue one, you can get a
9 blue one.  And you've seen different colors, and
10 different manufacturers want all this -- their
11 ladders to be the same, so they make them different
12 colors to suit whatever their design is.  There's
13 also a certain amount of fillers then to add
14 stability, other fillers to prevent, say, fire
15 retardantcy, others to prevent UV, etcetera.  So
16 there's a chemical makeup.
17          But basically what we have then is a
18 polyester resin, which then is catalyzed.  You can
19 catalyze it several different ways.  But this time in
20 this particular process here, it's catalyzed by
21 heat.  And as this material is pulled through this
22 die, then the material then hardens to the point
23 where it's -- at the beginning it's fluff.  And then
24 you can see this is soft, and then here it becomes
25 hard.  And so then from that point on then the

Page 103

1 material is rigid and fully formed.  And we can check
2 and -- the criteria to whether or not this is fully
3 cured is the Barcol hardness test.  And this has been
4 the standard of the industry in. I'd say not only --
5 I'd say for at least 50 years, if not 75.
6      Q.  And you did the Barcol hardness test at your
7 lab; is that correct?
8      A.  Yes, sir.
9      Q.  How do you do that?
10     A.  Well, you have to have a special measuring
11 device, a special Barcol tool that is made by the
12 Barcol corporation.
13     Q.  Why don't you talk to her so she can see
14 your lips.
15     A.  Okay.  I'd rather look at her anyway.
16     Q.  Go ahead.  A special tool?
17     A.  Yes, it's a special device that's used, you
18 know, for the sole purpose of measuring hardness.
19 It's used in measuring aluminum hardness, for
20 example.  It's -- sometimes it's used for steel,
21 sometimes a rock will have hardness, but they're all
22 standard industry measuring devices that are used to
23 determine the hardness.
24     Q.  And when you determine the hardness, is that
25 relative in any way to the strength of the material?

Page 104

1      A.  No, it's the measure of the cure.
2      Q.  Okay.
3      A.  In other words, if the cure is not proper,
4 then no matter how much material you put in there,
5 it's not going to hold up.
6      Q.  And why is the cure important?
7      A.  Because then -- Once it's cured to the
8 extent that I mentioned, the requirement of the
9 Barcol test, then the polyester resin is then what we
10 call stabilized and won't change its form.  And I --
11 I should maybe begin at the opposite saying that this
12 is a thermal set as opposed to a thermal plastic.
13 Example, eggs, you fry an egg, you can't get it back
14 into the yolk again.  Butter, you can melt it and
15 mold it into anything and then remelt it and get it
16 back, etcetera.  And so this a thermal set material.
17          And once a thermal set material has
18 indeed had -- is properly cured, it becomes
19 stabilized.
20     Q.  Did Dr. Pugh do anything at all upon your
21 review of his deposition, his analysis of the ladder,
22 inspection of the ladder, to determine whether or not
23 the cure of this material was improper?
24     A.  He did nothing.  He said he used the
25 microscopic analysis.  But the only thing that is

Page 105

1 good for is simply a viewing.  It -- In this
2 particular case here, it had no application, no value
3 whatsoever.
4      Q.  How is it that it became evident to you that
5 the rails had preexisting damage on them?
6      A.  Well, I point this out in my report that
7 there are significant areas of wear, both in the
8 fiberglass as well as on the metal parts that, you
9 know, show that -- that there had been a great deal
10 of movement in it, and this could only come about if
11 there had been extensive preexisting damage.
12     Q.  And I'm going to ask you to be a little bit
13 specific about how you could tell there was a great
14 deal of movement and what you mean by that,
15 reflecting preexisting damage.
16     A.  I'll have to look at my report.
17     Q.  That's fine.
18     A.  Well, do you want me to focus only on the
19 back rails or the entire ladder?
20     Q.  You can focus on the back rails.
21          First of all, you're looking at a
22 report, which is Deposition Exhibit 6.  And it
23 contains a number of photographs; is that correct?
24     A.  Yes, the report is dated August 3rd.
25     Q.  All right.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 147 of 328

Page 106

1     A.  Okay.  If we look at the lower left rail.
2   these are my figures 3-5 and 3-6.  And you can see
3   here that there is a -- a movement.  Obviously this
4   has been cracked for a long time.  The next picture
5   then shows the end of this looking perpendicular down
6   into the shoe.  This is the left rear rail.  And we
7   can see that this -- there's a polished surface of
8   the metal part of the shoe.  And then when I raise it
9   up, we can see the effect of that polish that's been
10  occurring for a long period of time.  And here we can
11  see the end by looking at the end of this broken
12  flange.  Here we can see the -- the various grinding
13  of that aluminum rail -- or aluminum shoe on it.
14     Q.  And you're directing our attention to figure
15  3 --
16     A.  9.
17     Q.  -- -9; is that correct?
18     A.  Yes, 3-9.
19     Q.  And other published areas that you were
20  directing us to were figures 3-7 and 3-8 of
21  Deposition Exhibit 6?
22     A.  Yes, these are all the left rear rail.  Now,
23  there's -- there's another damage to the left rear
24  rail near the top cap.  Obviously this had an impact
25  force quite some time ago.

Page 107

1     Q.  How can you tell that?
2     A.  Well, again, I looked at the -- actually at
3   the type of fracture, and this fracture has existed,
4   I would say -- I want to say for years, certainly
5   more than six months.
6     Q.  And that's figure 3-10?
7     A.  Yes.
8     Q.  But that is not at the bottom of the rail?
9     A.  No, that is not.  Whether or not how much
10  influence this had, it had some.  But how much, I
11  can't tell you.
12     Q.  All right.
13     A.  Now, the right rail, again, figures 3-11 and
14  3-12 show the bottom right rail at two different view
15  points, one side view and one head on.
16     Q.  All right.
17     A.  And then again, the same story here, we can
18  see this excessive wear.
19     Q.  And you're pointing to figure which?
20     A.  3-13 and 3-14.  See the scouring on the
21  shoe.  And here when I lifted the flange up, then we
22  can see the remnants of it here.
23     Q.  And that is on 3- --
24     A.  14.
25     Q.  14.

Page 108

1     A.  Yes, sir.
2         Now, taking -- Now I'm taking a head-on
3   view, looking down on that flange, we can see how
4   rounded it is on what -- on figure 3-15, which is the
5   bottom right side.
6     Q.  And what does that rounded portion show you?
7     A.  Well, this is there -- this has been wear
8   that's been taking place over the years.
9     Q.  Okay.
10    A.  And --
11    Q.  And with that kind of wear, that roundness,
12  what does that indicate to you with respect to any
13  cracks that may have been present at the fillet or
14  the corner between the web and the flange?
15    A.  Okay.  In order for this to have occurred,
16  there had to be a separation, otherwise this shoe
17  would have protected this flange.  And this
18  photograph here, 3-16, shows the end view of that.
19  And we can then see the discoloration or the damage.
20    Q.  What does that discoloration on 3 -- figure
21  3-16 indicate to you?
22    A.  Well, again, this is a movement -- the
23  result of the movement on that shoe that was on that
24  bottom.
25    Q.  For how long?

Page 109

1     A.  Oh, for a long period of time.  I'm going to
2   say year -- years.  I mean, not a day, not a month,
3   not six months.  More than that.
4     Q.  Okay.
5     A.  And figure 3-16A, I put in an enlargement,
6   enlarged view showing --
7     Q.  Of 3-16?
8     A.  Of 3-16, showing the end view, how it's
9   virtually masticated, and which has been just
10  repeatedly, you know, been stuck in the ground, stuck
11  in the ground, or who knows what.
12        Then on the inside of the bottom right
13  rear rail, then there's a -- a portion of the rail
14  that had been kind of broken up in the back.  And
15  here in this -- photograph 3-17 and 3-18 then show
16  where the brace is that is worn by excessive movement
17  onto the inside of the rear rail.
18    Q.  How long would that take?
19    A.  A year.  Years.  I mean, more than a day,
20  more than a month.
21    Q.  Now, the horizontal line that you're
22  pointing to at -- on figures 3-17 and 3-18, that
23  comes from what member of the -- of the fiberglass
24  ladder?
25    A.  That -- That comes from a brace.

Case 1:00-cv-00193  Document 24  Filed in TXSD on 10/19/2001  Page 148 of 328

Page 110

1    Q.  And that brace on the fiberglass ladder
2  would have been approximately how far from the --
3  from the bottom of the rail?  How far up?
4    A.  Well, I'm going to say roughly about 8 to 10
5  inches.  Say 10 inches plus or minus a little.
6    Q.  Okay.  What does that indicate to you with
7  respect to the -- if any, with respect to the length
8  of any preexisting crack at the back rails?
9    A.  Again, it simply supports the evidence that
10  there was extensive -- very extensive preexisting
11  damage.
12    Q.  Assume with me that Mr. Poremba in this
13  case, an engineer, inspected the ladder and found at
14  least one of the rear rails to have a preexisting
15  crack of approximately 20 inches.  Would that be
16  consistent with your inspection of the ladder?
17    A.  Yes, sir.
18    Q.  And I'm talking about 20 inches from the
19  bottom.
20    A.  Yes, sir.
21    Q.  Would that be sufficient to cause that kind
22  of marking or wear that you see on 3-17 and 3-18 of
23  Deposition Exhibit 6?
24    A.  Certainly.
25    Q.  Okay.  Does Deposition Exhibit 6 reflect

Page 111

1  your opinions in this case?
2    A.  Yes, sir.
3    Q.  All right.  You mentioned that OSHA has
4  requirements for someone to inspect the ladder for
5  cracks and splitting; is that correct?
6    A.  That's correct.
7    Q.  Have you seen that particular OSHA
8  requirement?
9    A.  Yes, sir.
10    Q.  Do you have that with you today?
11    A.  Yes, sir.
12    Q.  And Mr. Benton has handed you a copy of
13  Deposition Exhibit 7 to Mr. Poremba's deposition.  Do
14  you recognize that?
15    A.  Yes, sir.
16    Q.  And what requirement was there upon an
17  employer with respect to inspection of ladders and to
18  do what if necessary?
19    A.  Well, I'm referring to OSHA standard
20  1917.119 and -- specifically.  And under that section
21  E(1).  E. as in echo. 1. and I'm reading here. quote.
22  the employer shall maintain portable ladders in a
23  safe condition.  Ladders with the following defects
24  shall not be used and either shall be tagged as
25  unusable if kept on the premises or be removed

Page 112

1  from the work site.
2        And then it goes down, and in
3  particular, E(1)(ii), it says, broken or split side
4  rails.
5    Q.  And E(2), what does it say?
6    A.  It's a follow-up.  Ladder shall be inspected
7  for defects prior to each day's use and after any
8  occurrence, such as a fall which could damage the
9  ladder.
10    Q.  And section E(1)(i), did you -- does that
11  does that apply at all in this case?  No, it does
12  not.
13    A.  No.
14    Q.  No, it does not.
15        Okay.  Do you have an opinion whether
16  or not Mr. Escudero failed to exercise ordinary care
17  for his own safety in the use of this latter?
18    A.  Yes, sir.
19    Q.  What is your opinion?
20    A.  I believe he -- in fact, let me go back to
21  my report, if I may.
22    Q.  All right.
23    A.  I want to be a little more succinct.
24        I guess the -- I feel that
25  Mr. Escudero, by his own negligence in failing to

Page 113

1  properly examine or inspect the ladder, or by
2  ignoring what he saw, was causal to his own accident.
3    Q.  Okay.  Do you have an opinion whether or not
4  the cracks and splits in this ladder were evident or
5  obvious if a person had inspected the ladder?
6    A.  Absolutely, yes.  And as I have mentioned in
7  my conclusion, that this ladder had more preexisting
8  damage than any ladder that I've seen over a 30-year
9  period.
10        MR. BENTON:  Objection to response.
11    Q.  (BY MR. GENDRY)  Have you inspected many
12  ladders in your career in dealing with ladders?
13    A.  Hundreds.  Hundreds.
14    Q.  And comparatively speaking, how did this
15  ladder appear to be with -- in comparison with other
16  ladders that you have inspected, concerning
17  preexisting damage?
18    A.  This is the worst preexisting damage to a
19  stepladder I've ever seen.
20    Q.  Okay.  There's been an allegation made that
21  there was a design defect in this case.  And I think
22  Mr. Benton has explained their side's position.
23    A.  Yes. sir.
24    Q.  All right.  Assuming that this ladder had
25  preexisting cracks in it. one even as much as 20

Page 114

1   inches up the rear rail, do you have an opinion
2   whether or not the ladder would have failed whether
3   or not it had a slip-on shoe or additional bracing at
4   the bottom of the rails, such as is suggested in
5   other ladders?
6      A.  Yes, sir.
7      Q.  What is that opinion?
8      A.  It still would have failed.
9      Q.  Can you explain why?
10     A.  Because of the -- of the tendency for that
11  free flange to buckle.  It had -- it has no strength
12  whatsoever, because any bending strength was totally
13  destroyed when it became separated.  So it was acting
14  purely as a column, not as a structural member that
15  was resisting force as a unit.
16     Q.  Okay.  And in terms of loading, in other
17  words when a person got on the ladder, such as
18  Mr Escudero, what would happen to that rail, whether
19  or not you had a slip-on boot or shoe on the bottom
20  of the foot?
21     A.  Well, assuming that he went above the first
22  step, that he climbed the ladder, it certainly -- it
23  was -- what would have happened was what did happen,
24  that it -- it was ready to buckle.  And depending on
25  how he set it up, which I presume he was inside, so I

Page 115

1   presume it was a level floor, and so that was not --
2   the only other possibility was buckling of the
3   flange, which it did.
4      Q.  Okay.  Why wouldn't a shoe have made any
5   difference?
6      A.  A shoe?
7      Q.  A slip-on boot or shoe.
8      A.  A slip-on shoe or boot or whatever simply
9   would have changed the mode of buckling.  But once
10  Mr. Escudero was on the top of that ladder or on the
11  fourth step, or wherever it's deemed that he was,
12  then simply his movements would create torsional
13  forces, torsional movements at the top.  And it's
14  just a matter of when it would buckle, and -- which
15  it did.
16     Q.  Okay.  I'm going to hand -- ask the court
17  reporter to mark this.
18        MR. GENDRY:  Why don't you mark it on
19  the back.
20        (Exhibit 8 marked.)
21     Q.  (BY MR. GENDRY)  I'm going to hand you
22  Deposition Exhibit 8.  Do you recognize that label?
23     A.  Yes, sir.
24     Q.  And you have referred to it previously with
25  regard to inspecting the ladder.  What does it say?

Page 116

1      A.  Well, it says -- There are five items here.
2   Number one, inspect for warn, damaged or missing
3   parts before each use.  Number two, never use a
4   ladder with damaged. missing, worn or loose parts.
5   Three, make sure all rivets, nuts, bolts, braces and
6   joints are tight; feet, steps and rungs secure;
7   spreaders and pail shelf function properly.  Four,
8   never make temporary repairs of damaged ladders or
9   parts.  Five, all parts must be in good working
10  order.  Remove worn. damaged or defective ladders
11  from service.
12     Q.  I want to direct your attention under proper
13  care and storage, paragraph six.  Would you read that
14  into the record from Deposition Exhibit 8.
15     A.  Destroy ladder if broken, warn or exposed to
16  fire or any corrosive material.  Never misuse or
17  abuse a ladder.
18     Q.  Was Deposition Exhibit 8, the label, was
19  that the same as was on the Escudero ladder?
20     A.  Yes, sir.
21     Q.  All right.  And is Deposition Exhibit 8 or
22  labels of that sort in any way referred to by ANSI?
23     A.  Yes, sir.
24     Q.  Can you explain that.
25     A.  Well, in the appendix of ANSI -- In fact,

Page 117

1   this label I think is number 9.  There's a whole
2   series of labels there that have been developed,
3   specifically with a language specific to ladders and
4   ladder safety.
5      Q.  All right.  Is this the label recommended or
6   mandated by ANSI standards?
7      A.  Yes, sir.
8      Q.  All right.  There's been some testimony in
9   this case that Mr. Escudero may have been on the
10  fifth step of the ladder.  Was that your
11  understanding of reading the depositions and the
12  matters in this case -- materials in this case?
13     A.  He may have been.
14     Q.  Right?
15     A.  I don't know, but he may have been.
16     Q.  And let me hand you another label.
17     A.  No, I'm sorry.  No, I didn't answer you
18  correctly.  He was on the fifth step.  It was the top
19  step that was in question.  So yes, I'm sorry, he was
20  on the fourth -- at least on the -- one, two,
21  three -- yeah, that would be on the fifth step, the
22  one that the plastic is covering up.
23     Q.  I think there was testimony, if I remember
24  correctly, he could have been on the fourth, could
25  have been on the fifth step, correct?

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 150 of 328

Page 118

1    A.  Right.
2    Q.  All right.  And as in this Werner ladder as
3  we have here today, is it marked with a label about
4  standing on the fifth step?
5    A.  Yes.
6    Q.  What does it say?
7    A.  It says, danger, do not stand at or above
8  this level.  You can lose your balance.
9    Q.  And the label that I've handed you, which is
10  a free label, says the same thing; is that correct?
11    A.  Exactly the same words.
12    Q.  All right.  And is that label related in any
13  way to ANSI standards?
14    A.  Yes.  This is specifically identified by
15  ANSI.
16    Q.  As the type of label to put on a step not to
17  step on; is that correct?
18    A.  Correct.
19    Q.  Do you have an opinion whether or not the
20  labeling and the warnings referenced the Escudero
21  ladder, the Bauer ladder met the standards of the
22  industry for fiberglass ladders?
23    A.  If the labels met the industry standards?
24    Q.  Yes, sir.
25    A.  Yes, they did.

Page 119

1    Q.  And do you have an opinion whether or not
2  they gave sufficient warning that if a ladder in fact
3  had cracking and splitting, that it should be taken
4  out of service and not utilized?
5    A.  Yes.
6    Q.  What's your opinion?
7    A.  Yes, they certainly did.
8    Q.  On Deposition Exhibit No. 7, could you
9  explain to the court and the jury what that portion
10  of your test, which is dated August the 10th. 2001 as
11  opposed to Deposition Exhibit 6, what does it
12  reflect?
13    A.  The testing report dated August 10th, these
14  are a series of tests that are specified by ANSI to
15  determine the physical properties.  And the reason is
16  because certain allegations were raised regarding the
17  integrity of the -- of the design and the manufacture
18  of the ladder.  So in response to that. I was
19  requested to perform these tests and to determine
20  whether or not the ladder did indeed meet these
21  specifications.
22    Q.  And let me interrupt you just for a second.
23  Is that based upon what you had read in Dr. Pugh's
24  report, that there may be something wrong with the
25  manufacturing process or a manufacturing defect in

Page 120

1  this case?
2    A.  Yes, sir.
3    Q.  Go ahead.  Continue your explanation.
4    A.  And so then we did the various tests.  We
5  did the compression tests, the tensile tests, the
6  flexural tests, the burn out tests and the Barcol
7  hardness test.
8    Q.  And those tests are prescribed by ANSI; is
9  that correct?
10    A.  Correct.
11    Q.  And did the Bauer ladder meet the ANSI
12  standards?
13    A.  They met all of them.
14    Q.  All right.  Did they exceed the standards?
15    A.  Yes, sir.
16    Q.  All right.  Do you have an opinion, based
17  upon a reasonable degree of engineering, whether or
18  not the fiberglass ladder, the Escudero ladder, the
19  Bauer ladder, was a safe ladder?
20    A.  Yes.  Yes, it was.
21    Q.  Was it in any way unreasonably dangerous?
22    A.  No. sir.
23    Q.  Okay.  Do you have an opinion whether or not
24  a ladder with a boot on it is a safer alternative
25  design?

Page 121

1    A.  I do.
2    Q.  What is it?
3    A.  It's not a safer design.  It's simply a
4  design which may prolong the -- the life, but it's
5  not a safer design.
6    Q.  And when you say prolong the life, in what
7  fashion?
8    A.  Mostly as the result of abuse.
9    Q.  Okay.  So it would take more abuse, is that
10  what you're saying?
11    A.  It might, I mean, in certain types of abuse,
12  but not necessarily all.  It's -- I've answered your
13  question.
14    Q.  Okay.
15       MR. GENDRY:  Pass the witness.
16       FURTHER EXAMINATION
17  BY MR. BENTON:
18    Q.  A couple of follow-up questions.  This
19  Consumer Product Safety Commission study that was
20  done that started some changes in the ANSI standards
21  about 1980 you were part of --
22    A.  Well, they actually started in 1975.  I
23  don't -- I don't want to --
24    Q.  Well. but I want to be right about what
25  we're talking about.

Case 1:00-cv-00193    Document 24    Filed in TXSD on 10/19/2001    Page 151 of 328

Page 122

```
 1      A.  Sure.
 2      Q.  Tell us again about what that was.
 3      A.  From the beginning?  The whole thing?
 4      Q.  Well, just the -- Yeah. I guess summarize
 5   basically about the --
 6      A.  It was -- Well, it's already in deposition.
 7   but I can simply say it was a two-year study that was
 8   done to determine the various characteristics of
 9   ladders.
10      Q.  And what year was that study done?
11      A   1975 to 1977.
12      Q.  And as a result of that there were changes
13   in the ANSI standards?
14      A.  Yes, sir.
15      Q   Substantial changes?
16      A.  Yes, sir.
17      Q.  So those changes weren't generated by ANSI
18   itself, they were generated by the impetus of the
19   study done by the Consumer Product Safety Commission?
20      A.  Well, I'll have to correct the vernacular
21   here. ANSI never creates anything.  There's people
22   on committees that do.  I don't mean to split hairs,
23   but ANSI -- all ANSI is is a governing body that
24   simply takes the standards and promulgates them.  But
25   they're developed by committees.  I don't mean to --
```

Page 123

```
 1   just you said ANSI, and ANSI doesn't -- doesn't
 2   sponsor anything.
 3      Q.  Okay.  But the -- My point is that the ANSI
 4   standards changed significantly because of this
 5   outside impetus from the Consumer Product Safety
 6   Commission?
 7      A.  Again, I don't want to dwell on the word
 8   significantly.  There was -- There were a lot of
 9   changes to it, yes, I can tell you that.  I -- But
10   remember that was 25 years ago.  I can't tell you,
11   part and parcel. what each one of them were at this
12   time.
13      Q.  Does ANSI intend to do any studies to
14   determine whether a secured boot or shoe makes for a
15   safer ladder or not?
16      A.  Well, ANSI doesn't do anything like that.
17   That's not ANSI's charge.  ANSI's charge is to
18   publish and approve the standards.  So -- Well, I've
19   answered your question.
20      Q.  So if that change is going to come, where is
21   it going to come from?
22      A.  It will probably come from the setting up of
23   some task force to investigate that.
24      Q.  And your position is at this point there's
25   not sufficient data to determine that one way or the
```

Page 124

```
 1   other; is that right?
 2      A.  No, I didn't say that.  As far as
 3   establishing a task force. I told you earlier that
 4   such information is the purview of the ladder
 5   companies themselves.  Now. to what extent that was
 6   to be disclosed, developed. sent to a task force. I
 7   don't know.  I don't know that there's been any
 8   movement in that direction yet.
 9      Q.  And it's not beyond ANSI at some point to
10   prescribe shoes or boots around the bottom rails of
11   ladders; is that right?
12      A.  I would have serious doubts about that
13   statement because ANSI doesn't specify anything, they
14   simply specify the performance.  And it's not ANSI's
15   position to tell you how to do something.
16          MR. BENTON:  Okay.  I'll pass the
17   witness.
18          MR. GENDRY:  The only thing I want to
19   do is mark this broom as an exhibit.  And if you
20   don't mind, I'll hang on to it.
21          MR. BENTON:  That's all right with me.
22          (Exhibit 9 marked.)
23          (Deposition concluded.)
24
25
```

Page 125

```
 1
 2       CHANGES & SIGNATURE PAGE
 3   RE Escudero  vs  Bauer Corporation
 4   PAGE    LINE   CHANGE  REASON
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
         I, DR JOHN JOHNSON, have read the foregoing
12   deposition and hereby affix, my signature that same is
     true and correct  except as noted above
13   _____
14       DR JOHN JOHNSON
15   THE STATE OF TEXAS )
16   COUNTY OF BEXAR )
17      Before me, _____, on this day
     personally appeared DR  JOHN JOHNSON, known to me (or
18   proved to me under oath or other document) _____)
     (description or identity card or other document) to
19   be the person whose name is subscribed to the
     foregoing instrument and acknowledged to me that they
20   executed the same for the purposes and consideration
     therein expressed
21      Given under my, hand and seal of office this
     _____ day of _____ 2001
22
23       Notary Public in and for the
24       State of Texas
25   * * * * * * * * * *
```

Page 126

```
 1           IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 BROWNSVILLE DIVISION
 3  JOSE ESCUDERO, JR      )
         Plaintiff          )
 4                         )
         VS               ) CIVIL ACTION NO  B-00-193
 5                         )
    BAUER CORPORATION D/B/A  )
 6  BAUER LADDER CORPORATION )
         Defendant          )
 7
              REPORTER'S CERTIFICATION
 8          DEPOSITION OF DR  JOHN JOHNSON
                  AUGUST 29, 2001
 9
              I, DANDY ELLIS, a Certified
10
11  Shorthand Reporter in and for the State of Texas, do
12  hereby certify that the foregoing deposition is a
13  full, true and correct transcript,
14          That the foregoing deposition of
15  DR  JOHN JOHNSON, the Witness, hereinbefore named was
16  at the time named, taken by me in stenograph on
17  August 29, 2001, the said Witness having been by me
18  first duly cautioned and sworn to tell the truth, the
19  whole truth, and nothing but the truth, and the same
20  were thereafter reduced to typewriting by me or under
21  my direction  The charge for the completed
22  deposition is $_____ due from Defendant,
23   ( x ) That, by agreement of counsel, the
24  deposition officer is instructed to release the
25  original deposition transcript, and the deposition
```

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 153 of 328

Page 1

```
 1

 2              IN THE UNITED STATES DISTRICT COURT

 3              FOR THE SOUTHERN DISTRICT OF TEXAS

 4                     BROWNSVILLE DIVISION

 5

 6   JOSE ESCUDERO, JR.,

 7

 8                    Plaintiff,

 9

10         vs.                      No. B-00-193

11

12   BAUER CORPORATION D/B/A

13   BAUER LADDER CORPORATION,

14

15                    Defendant.

16   -------------------------------x

17

18            DEPOSITION OF DR. JAMES PUGH

19                 Mineola, New York      MORNING

20            Thursday August 16, 2001

21

22

23   Reported by:

     LINDA SALZMAN

24   Job No 124356a

25
```

**PHONE #(210)377-3027**                                    **FAX #(210)344-6016**
**7800 IH-10 WEST, SUITE 100**          78230               **1-800-969-3027**

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 154 of 328

2 (Pages 2 to 5)

Page 2

```
 1
 2
 3
 4
 5
 6              August 16, 2001
 7              11:50 a.m.
 8
 9         Deposition of DR. JAMES PUGH, held at
10   the offices of Inter-City Testing &
11   Consulting Corp., 167 Willis Avenue,
12   Mineola, New York, pursuant to Notice,
13   before Linda Salzman, a Notary Public of the
14   State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4       BARRY R. BENTON, ESQ.
 5       Attorney for Plaintiff
 6          284 Ebony Avenue
 7          Brownsville, Texas 78520-8014
 8   BY:  BARRY R. BENTON, ESQ.
 9
10       GENDRY & SPRAGUE, P.C.
11       Attorneys for Defendant
12          645 Lockhill Selma
13          San Antonio, Texas 78216-5057
14   BY:  THOMAS W. GENDRY, ESQ.
15
16   ALSO PRESENT:
17       SILVIO FACCHIN, Videographer
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2        J A M E S   P U G H,  called as a witness,
 3           having been duly sworn by a Notary Public,
 4           was examined and testified as follows:
 5        EXAMINATION BY
 6        MR. GENDRY:
 7           Q.   Would you please state your name.
 8           A.   My name is James Pugh, spelled
 9        P-U-G-H.
10           Q.   And it's Dr. Pugh; is that correct?
11           A.   That's correct.
12           Q.   You have a Ph.D.; is that correct,
13        sir?
14           A.   That's correct.
15           Q.   Let me identify myself as Tom Gendry.
16              I represent the defendant in this
17        case, Bauer Ladder Corporation.
18              Do you understand that?
19           A.   Yes, sir.
20           Q.   You and I have not previously met
21        before this day; is that correct?
22           A.   I believe that to be correct, sir.
23           Q.   And you and I have never talked about
24        this case which is entitled Jose Escudero, Jr.
25        versus Bauer Ladder Corporation?
```

Page 5

```
 1        Pugh
 2           A.   I believe that's correct, sir.
 3           Q.   Let me ask you just briefly, sir,
 4        could you explain your occupation, your business?
 5           A.   I am a self-employed consulting
 6        engineer, practicing consulting engineering in
 7        the broad areas of biomedical engineering,
 8        materials science and engineering, which includes
 9        the science of what we call accident
10        reconstructions of all types; that is, to
11        determine how accidents occur and of course how
12        they can be prevented, the injuries aspects of
13        those accidents, how the injuries occurred and
14        could be prevented.
15              And it also includes material science
16        analyses, failure analyses, determination of the
17        source of failed products and parts, hazard
18        management, warnings and instructions in
19        biomechanics.
20              And I should continue the answer, to
21        complete, I am a licensed professional engineer.
22        I am licensed as a PE in the State of New York.
23        I have been licensed continuously since 1984.
24              I am a principal in the company
25        Inter-City Testing and Consulting Corporation,
```

Page 6

Pugh
1
2   which is where we are today.  We are in the New
3   York offices of Inter-City Testing and Consulting
4   Corporation.
5        And I have served as an independent
6   contractor to Inter-City Testing and Consulting
7   Corporation since 1978.
8        Q.   Is most of your work, does it come
9   about as a result of being hired by attorneys?
10       A.   Predominantly yes, sir.
11       Q.   And of your annual income, what
12  percentage of your work is related to being hired
13  by attorneys?
14       A.   Probably 90 to 95 percent, depending.
15       Q.   In these types of cases we usually ask
16  what your involvement is with respect to working
17  for the plaintiff's side in a case or working for
18  the defense side in a case.
19       I'm sure you have heard that question
20  before.
21       A.   Yes, sir.
22       Q.   And predominantly is your work done
23  for the plaintiff's side or the defense side?
24       A.   My workload is split pretty much
25  evenly between plaintiffs and defendants.

Page 7

Pugh
1
2        However I do wind up going to court
3   more frequently for plaintiffs than defendants.
4        Q.   In going to court for plaintiffs more
5   frequently, can you break that down in terms of
6   percentages?
7        A.   I haven't computed it.
8        My guesstimate would be I probably go
9   surely twice as often to court for plaintiffs as
10  for defendants.
11       Q.   This case involves a Bauer ladder; is
12  that correct?
13       A.   Yes, sir.
14       Q.   Have you been involved in the analysis
15  of any other ladder besides a Bauer ladder?
16       A.   I'm sure I have.
17       I didn't review that or attempt to
18  identify that prior to today in preparation
19  though.
20       Q.   Do you recall specifically of being
21  involved as a consulting engineer or an expert
22  with respect to the analysis of any ladder other
23  than a Bauer ladder?
24       A.   Actually I do recall, yes.
25       There have been several ladders

Page 8

Pugh
1
2   aluminum in type, and I don't recall the
3   manufacturer, but they were other than Bauer
4   ladders, yes.
5        Q.   As you know, this case involves a
6   fiberglass ladder.
7        A.   Yes, sir.
8        Q.   Let me ask you the same question with
9   respect to fiberglass ladders.
10       Have you been involved as a consulting
11  expert or an expert in connection with a lawsuit
12  in the analysis of a fiberglass ladder?
13       A.   By surely two prior cases involving
14  Bauer fiberglass ladders, yes.
15       Q.   Any besides the Bauer ladder?
16       A.   Not that I recall.
17       Q.   Have you been asked to analyze the
18  materials, the composite materials in any ladders
19  besides the Bauer ladder in the past?
20       A.   Do you mean now as a specific
21  assignment of the case?
22       Q.   Yes, sir.
23       A.   Or I have decided to do some sort of
24  analysis?
25       I don't know what you mean by

Page 9

Pugh
1
2   "analysis."
3        Any ladder I analyze, fiberglass or
4   otherwise, I do my best to analyze the materials
5   at least non-destructively, and ordinarily it's
6   my practice, as I did in the Escudero matter that
7   we're talking about today, I did do microscopic
8   analysis of the materials involved.
9        But whether I was assigned that or
10  not, I don't recall receiving that specific
11  assignment when I get these cases.
12       Q.   Have you done any microscopic
13  materials analysis of any ladder other than a
14  Bauer ladder?
15       A.   I'm sure I have.
16       Q.   Can you name any specific ladder that
17  you have done that on?
18       A.   I'm sorry. I just didn't review those
19  prior cases in preparation for today.
20       I did review the prior Bauer cases to
21  a degree though.
22       Q.   When you say "a microscopic analysis
23  was done in this case," what do you mean by
24  that?
25       Describe that, please.

**DR. JAMES PUGH - MORNING SESSION**                                    **AUGUST 16, 2001**

4 (Pages 10 to 13)

Page 10

```
1                Pugh
2      A.   I examined the fracture surfaces of
3    this particular Bauer ladder under the
4    microscope, the light microscope.
5      Q.   Is that a scope that you have here
6    where we're giving the deposition?
7      A.   Yes.
8      Q.   And what was the purpose of your
9    examining the Bauer ladder in this case with the
10   microscope?
11     A.   To determine the nature of the fiber
12   failure.
13     Q.   Did you get any results in connection
14   with your determining the nature of the fiber
15   failure by use of the microscope?
16     A.   Yes, as reported in my report I
17   believe.
18     Q.   All right.
19         Is a microscope a methodology for
20   determining the nature of fiber failure in a
21   ladder such as the Bauer ladder?
22     A.   Absolutely.
23     Q.   Is there any literature to that
24   effect?
25     A.   You mean dating back from Anton Van
```

Page 11

```
1                Pugh
2    Leeuvenhoek's discovery or invention of the
3    microscope in the 11th Century or whenever it
4    was?
5          I just don't know how to answer a
6    question with that.
7          The use of the microscope is an
8    accepted scientific tool for the determination of
9    a wide variety of features in a wide variety of
10   situations.
11         Failure analysis and fracture surface
12   analysis of the ladder is termed fractography,
13   and that by its nature involves the use of the
14   light microscope to examine the surface of the
15   fracture.  That's a routine and ordinary practice
16   and custom in the analysis of failed products.
17         I should add it is quite a bit more
18   precise than Dr. Johnson's attempts to test
19   mechanically parts of the ladder which were quite
20   removed from the area of weakness of these
21   ladders.  Said area of weakness being the corner
22   where the two flanges join.
23         No tests to my knowledge were done by
24   him in that area.
25     Q.   Object as nonresponsive.
```

Page 12

```
1                Pugh
2          The light microscopic examination --
3    am I saying that correctly?
4      A.   Yes.
5      Q.   -- that you did, that determines what,
6    there has been a fracture?
7      A.   Well, before we harp on this too long,
8    I'm not regarding this as a major causative
9    factor in the failure of this ladder.
10         I am just doing my best when I write
11   my reports and doing my analyses to do as
12   complete a job as I possibly can.
13         And to answer your question, when I
14   examined the fracture surface with the microscope
15   I noted, as in my report on page 3, last sentence
16   of paragraph 2, it was apparent that the
17   longitudinal splitting of the rails was between
18   fibers of the glass rather than across those
19   fibers predominantly, and that indicates that the
20   layup of the glass fibers was such that this
21   failure of these -- of this joint between the
22   rails was probable and to be expected.
23         And my opinion is it was contributory
24   but not causative.
25         And my opinion further is that had
```

Page 13

```
1                Pugh
2    there been an adequate encapsulation of the
3    bottom of the legs, all four legs by means of a
4    boot or a Werner type through bolted
5    reinforcement, that the ladder would have been
6    tolerant of this deficiency in the fiberglass.
7      Q.   Object as nonresponsive.
8          Let me ask you, Dr. Pugh, you made one
9    statement that you do not regard something as
10   being a major or contributing cause to the
11   failure of this ladder.
12     A.   Causative factor.
13         It is a contributing factor in this
14   situation, but if the defect, main defect were
15   not there, it would be extraneous.
16     Q.   Your microscopic light examination,
17   then, by that you determined what exactly?
18     A.   "The longitudinal splitting of the
19   rails," paren, "legs," close paren, "was between
20   fibers of the glass rather than across those
21   fibers, predominantly," period.
22     Q.   And then you stated that that is not a
23   causative factor of the failure of this ladder in
24   your opinion; is that correct?
25     A.   That's correct.
```

**DR. JAMES PUGH - MORNING SESSION**      **AUGUST 16, 2001**

5 (Pages 14 to 17)

Page 14

1           Pugh
2    Q.   You did state that you feel it is a
3  contributing factor.
4    A.   Yes, it was.
5    Q.   And in what way would it have been a
6  contributing factor in your opinion?
7    A.   It's an excessively weak part of the
8  leg, and because of that it's much more
9  imperative that reinforcement, adequate
10  reinforcement be provided for those two adjoining
11  rails.
12    Q.   Have you done any testing to determine
13  the strength of the fiberglass in this ladder?
14    A.   At that edge which is the key question
15  that we're talking about, no, I have not done
16  that, nor has anyone else to my knowledge, nor
17  has Bauer to my knowledge.
18    Q.   Object as nonresponsive.
19         Have you done any testing to determine
20  the strength of the fiberglass materials?
21    A.   I thought I just answered that.
22         Did I misinterpret the question when
23  you asked it a second ago?
24    Q.   No.  Please let me stop for a second.
25        MR. GENDRY:  Off the record.

Page 15

1           Pugh
2         (Discussion off the record.)
3        MR. GENDRY:  Could you read back the
4  last question.
5        (Record read.)
6    A.   I did no mechanical testing, no.
7    Q.   Is there any such mechanical testing
8  that can be utilized to determine the strength of
9  the fiberglass composites?
10    A.   As much as Dr. Johnson did in his most
11  recent report that I just got a copy of today, is
12  that what the question is?
13    Q.   The question is to your knowledge is
14  there any testing known to you which can be
15  utilized to test for the composite strength of
16  fiberglass?
17    A.   Any material can be tested
18  mechanically.
19    Q.   Do you know of any specific test with
20  regard to fiberglass rails or legs of ladders
21  that can be utilized to test for the strength of
22  the composite materials?
23    A.   Help me out, please.
24         I have a copy of the report here,
25  August 10, 2001, from Dr. Johnson.  It clearly

Page 16

1           Pugh
2  outlines the test that he did.
3        I'm having a hard time with this.
4        Quite obviously the test that he did
5  are tests that can be done, in response to your
6  question that you're asking me.
7        If the question is can the properties
8  of the composite at the joint between the two
9  rails be tested, yes, they surely can.  That's
10  called a peel test, and that's quite a common
11  test and I don't believe that Dr. Johnson did
12  that.
13        If I misinterpreted the question,
14  please ask it again.
15    Q.   Object as nonresponsive.
16        My question to you is is there any
17  test, specific test that can be utilized to test
18  the strength of fiberglass composites?
19    A.   The test as reported by Dr. Johnson in
20  his August 10, 2001 report, yes.
21    Q.   Did you utilize or do any of those
22  tests?
23    A.   No, I did not.
24    Q.   Do you disagree with any of the
25  results of Dr. Johnson's test?

Page 17

1           Pugh
2    A.   Yes, I do.
3    Q.   What do you disagree with?
4    A.   They don't shed any light at all in
5  the area of critical loading of this particular
6  ladder, and they do not test the plane of failure
7  of the legs of these ladders; i.e., none of the
8  samples that were cut from the ladder and tested
9  included or contained areas of failure of the
10  ladder.
11        By "areas of failure" I mean areas of
12  failure that caused collapse of the ladder.
13    Q.   And by areas that you feel samples
14  were not taken and tested, what do you mean,
15  which areas are you talking about?
16    A.   The vertical joints between the rails
17  of each leg where the plane of each surface of
18  the leg joins in a line.
19        MR. GENDRY:  Could we set that ladder
20  over here, Barry?
21    A.   Very simply, the area of cracking
22  reported by everyone that's examined this ladder.
23    Q.   Object as nonresponsive.
24        Could you point to me, Dr. Pugh, where
25  it is you feel that additional testing should

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 158 of 328

Page 18

Pugh
1
2   have been -- samples should have been taken by
3   Dr. Johnson in doing his testing?
4       A.   Mr. Benton, can you please just hand
5   me the ladder, if you can prop it up on the edge
6   of the table.  I have a short cord here.
7       Q.   You don't need that cord right now,
8   Doctor.
9       A.   Thanks for letting me know that.
10      This edge here corners.
11      Q.   Okay.
12      A.   I can relax now.  I may loosen my tie
13  up.  I was under the impression that everything
14  was being videotaped.
15      Couldn't we save a bit of time by
16  videotaping everything, because the credentials
17  are coming out?
18      MR. BENTON:  Not really.
19      THE WITNESS:  Fine, you're the boss.
20  Just asking.
21      Q.   It's your opinion, then, that
22  additional testing of the ladder could have been
23  done; is that correct?
24      A.   Well, my opinion is that the tests
25  done by Dr. Johnson don't reveal anything.

Page 19

Pugh
1
2   They're non-probative.
3       Q.   Object as nonresponsive.
4       Are you of the opinion that additional
5   testing could have been done on the ladder by
6   Dr. Johnson?
7       A.   Surely.
8       Q.   And are there any specific tests that
9   you're referring to?
10      A.   It's called a peel test.
11      Q.   What is a peel test?
12      A.   A peel test is a test where you cut a
13  section of the flange out and you peel the two
14  parts of the flange away from each other so that
15  you split the rails as they failed in the subject
16  ladder in the subject accident.
17      Q.   And what would that test show?
18      A.   It will give you a measure of the
19  strength of that joint should you choose to test
20  for that in comparison to certain other
21  configurations, such as a test of a ladder, and
22  it should be done on an exemplar ladder.
23      It should be done on ladders with
24  boots, with bottom reinforcements, with riveted
25  rail components.

Page 20

Pugh
1
2       It will give you a comparative
3   assessment of the relative strength of various
4   configurations.
5       Q.   The peel test, then, you say as I
6   heard you, I think I heard you, you're saying
7   that you spread out the joint?
8       Is that correct, you spread out the
9   flange and the web at the joint?  Is that what
10  you said?
11      A.   That's correct.
12      You want to test a product or a device
13  in the mode that it failed in the subject
14  accident.  That's the whole point of doing
15  testing.
16      What you want to do is you want to
17  simulate -- I'm giving a complete and thorough
18  answer to your question which I believe an expert
19  witness is entitled to do -- what you want to do,
20  you want to simulate or measure the properties
21  associated with the subject failure.
22      Q.   Object as nonresponsive.  We will get
23  to all that, okay.
24      A.   We just did.  We don't have to get to
25  it.  We have gotten to it already.

Page 21

Pugh
1
2       Q.   Object as nonresponsive.
3       All I want to ask you is how you do
4   the peel tests, not what the results are.
5       You lay open the flange and the web;
6   is that correct?
7       A.   Mr. Benton, I think I have answered
8   that question already.  I am happy to repeat it.
9       What you do is you peel apart the two
10  sides of the leg.
11      Q.   And what would that show, the strength
12  of the joint?
13      A.   Yes, it would.
14      Q.   Did you conduct any such testing to
15  show the strength of the joint by doing the peel
16  test?
17      A.   I was not supplied with an exemplar
18  ladder to do such tests on, nor did I do them.
19      Q.   Could you have done them -- if you had
20  asked for an exemplar ladder or if you had used a
21  sample of the subject ladder in this case could
22  you have done the peel test?
23      A.   If I wanted to and deemed it
24  necessary, which I didn't.
25      Q.   By not doing the peel test you have

Case 1:00-cv-00193    Document 24    Filed in TXSD on 10/19/2001    Page 159 of 328

Page 22

Pugh
1
2   not demonstrated by any scientific method the
3   strength or the weakness of the joint you're
4   talking about; is that correct?
5       A.   That's correct.
6           It's not necessary.  It's been
7   demonstrated by the actual ladders in service.
8       Q.   Object as nonresponsive to the last
9   part of the answer.
10          Did you suggest to Mr. Benton that you
11  do a peel test?
12      A.   No, I did not.
13      Q.   Have you ever done a peel test before?
14      A.   I should add I was not afforded the
15  opportunity to understand exactly what testing
16  Dr. Johnson was going to be doing on the ladder
17  before it was destructively altered, so there was
18  no way that I could give any input into the said
19  testing that would perhaps shed some light on the
20  questions you're asking now.
21          That's a complete answer to the
22  question.
23      Q.   Object as nonresponsive.
24      A.   I'm sorry, I didn't mean to step on
25  his last question.

Page 23

Pugh
1
2           Can you read his last question back to
3   me, please.
4       Q.   Before you do that, object as
5   nonresponsive.
6       A.   Before I give the answer?
7       Q.   Nonresponsive to your last answer.
8           You know what I'm talking about,
9   Doctor.  You're not fooling me one bit.
10          You may be a nice guy, but you're not
11  fooling me one bit, okay.
12          MR. BENTON:  Listen to the question,
13      answer the question, and that's the way we
14      will get through this thing.
15          MR. GENDRY:  Read back the last
16      question.
17          (Record read.)
18      A.   Surely.
19      Q.   Have you ever done a peel test on a
20  fiberglass ladder?
21      A.   That I don't recall.
22      Q.   Do you have the equipment here at your
23  place of business, Inter-City Testing, to do a
24  peel test?
25      A.   With modification.

Page 24

Pugh
1
2       Q.   Could you have done a peel test on the
3   ladder, subject ladder in this case if you had
4   been asked?
5       A.   If I had that assignment, yes, I could
6   have done it.
7       Q.   Is there any other methodology besides
8   the peel test which would show the strength of
9   the joint that is the line between the -- I
10  should say the bend between the flange and the
11  web of a ladder such as this one?
12      A.   You could do a crush test.
13          There is a wide variety of tests you
14  could do.
15      Q.   To show the strength of the fiberglass
16  composite?
17      A.   At the corner, that's what you're
18  asking about?
19          We're limiting these questions to the
20  corner of where the rails join, correct?
21      Q.   Well, maybe I need to ask you
22  something.
23          Are you saying that the -- you did say
24  there was a weakness in your opinion; is that
25  correct?

Page 25

Pugh
1
2       A.   Absolutely.
3       Q.   And you say the weakness is at the
4   corner; is that correct?
5       A.   Correct.
6       Q.   And when you say "corner," could you
7   point out on that ladder over there what you're
8   talking about?
9       A.   This is beyond me.
10          I just did that.  Maybe he's not
11  hearing me, but this is the corner right here.
12      Q.   Okay.
13      A.   I am wasting time by asking additional
14  questions.
15          MR. BENTON:  Let's just get through
16      this.
17          Just be patient.
18      A.   We have to understand where the --
19      Q.   Object as nonresponsive.
20          Any test besides the peel test that
21  can be utilized to test the strength of the
22  corner which I think you mean as the bend between
23  the flange and the web; is that correct?
24      A.   Asked and answered, yes, sir.
25      Q.   Which other tests can be utilized to

Page 26

            Pugh
1
2   test the strength of the composite fiberglass at
3   the corner?
4       A.   Crush test.
5       Q.   How is a crush test done?
6       A.   It's done by taking a section out of
7   the ladder, putting it in a compression machine
8   and flattening it.
9       Q.   By "flattening it," you mean at the
10  corner?
11      A.   Squashing it flat.
12      Q.   At the corner?
13      A.   Cutting a section out of the piece of
14  ladder, putting it between two plates and
15  flattening it so that the corner flattens out.
16      Q.   And what would the crush test, what is
17  it designed to do?
18      A.   It will give a measure of the strength
19  of the corner.
20      Q.   Did you do that?
21      A.   No, I did not.
22      Q.   And is that a standard accepted
23  methodology to determine the measure of strength
24  of the corner of the fiberglass member such as on
25  this ladder?

Page 27

            Pugh
1
2       A.   Yes, it is.
3       Q.   Were you asked to do a crush test?
4       A.   No, I was not.
5       Q.   And did you suggest that a crush test
6   be utilized to support your theory of a weakness
7   in the corner?
8       A.   No, sir.
9       Q.   And why not?
10      A.   Because it's quite obvious that the
11  corner is weak and fails repeatedly in ladders of
12  this nature, Bauer ladders, without foot
13  reinforcings.
14      Q.   Any other tests that could have been
15  utilized which would have demonstrated the
16  strength or weakness of the corner of a ladder
17  between the flange and the web as in this
18  particular ladder?
19      A.   Torsion testing.
20      Q.   Can you explain the torsion testing to
21  me, please?
22      A.   It's where a section of the ladder is
23  cut out and twisted to cause that same piece to
24  split.
25      Q.   That would be including the corner; is

Page 28

            Pugh
1
2   that correct?
3       A.   It would fail the corner, yes.
4       Q.   And what is the purpose of the torsion
5   test?
6       A.   To measure a level of strength of the
7   corner.
8       Q.   Did you do a torsion test?
9       A.   No.
10      Q.   Is the torsion test an accepted
11  methodology to determine the strength or the
12  weakness of the corner?
13      A.   Yes, it is.
14      Q.   And why didn't you do the torsion
15  test?
16      A.   Non-probative.
17      Q.   Are there any other tests, Dr. Pugh,
18  which in your opinion is an acceptable
19  methodology to test the strength of the corner of
20  a fiberglass ladder such as this one?
21      A.   Well, there are a wide variety of
22  tests, sir, that can be done if one chooses to.
23      Q.   Any specific ones?
24      A.   Well, we discussed a couple in
25  detail.  We could go on and on with this.

Page 29

            Pugh
1
2       Electromicroscopy could be done with
3   fracture surfaces which is regarded as a test.
4       Sections can be cut and micro hardness
5   can be done on cross-sections.
6       Q.   Would the electron microscopic test
7   and/or the micro hardness test serve to
8   demonstrate the strength or weakness of the
9   corner of the fiberglass ladder?
10      A.   In principle.
11      Q.   And you did none of those, right?
12      A.   That's correct.
13      Q.   Any other specific test which would be
14  an acceptable methodology to determine whether or
15  not the corner of the fiberglass ladder was weak
16  or acceptably strong?
17      A.   Quantitative microscopy on the fiber
18  orientations in that area.
19      Q.   Did you do that?
20      A.   No, I didn't.
21      Q.   Any other acceptable test?
22      A.   We could talk all day about these
23  tests.
24      That's the main test in response to
25  your question, none of which I think are

9 (Pages 30 to 33)

Page 30

Pugh
1  Pugh
2  necessary.
3     Q.   Object to the responsiveness to the
4  last part.
5        You listed specifically six tests,
6  Dr. Pugh, and you've done no test to determine --
7  strike that.
8        You have exercised no test to
9  determine by any scientific methodology the
10  strength or weakness of the corner of the
11  fiberglass ladder; is that a correct statement?
12     A.   No.  The microscopic analysis that I
13  did is a scientific method, to my satisfaction
14  demonstrated the relative weakness of the corner.
15     Q.   Is there any literature in your field
16  or in the field of engineering demonstrating that
17  microscopic analysis as you have done is
18  acceptable methodology to determine the strength
19  or weakness of the corner of a fiberglass ladder?
20     A.   That's a different question now.
21        The strength and weakness is a
22  mechanical characterization that requires
23  mechanical testing.
24        I can infer the strength and weakness
25  from a microscopic assay knowing what the

Page 31

1  Pugh
2  structure of fiberglass is.
3     Q.   Is there any literature establishing
4  that microscopic analysis is an acceptable
5  methodology to determine the strength or weakness
6  of the corner of flange and web of a fiberglass
7  ladder?
8     A.   If you change the word to "inferring"
9  I will answer in the affirmative, establishing
10  you'd really need to do some scientific tests,
11  some mechanical testing on it, as I said before.
12        The use of microscopy is an accepted
13  methodology for material assay to answer these
14  basic questions.
15     Q.   Microscopic analysis does not directly
16  serve as a methodology to determine in fact the
17  strength or weakness of the corner of a
18  fiberglass ladder; is that correct?
19     A.   It's a semi-quantitative assay.
20     Q.   Can you answer my question yes or no?
21     A.   No, it's not answerable yes or no.  A
22  yes or no answer would not be truthful.
23     Q.   Can one take the -- what do you call
24  the microscope that you use, does it have a name?
25     A.   Stereo microscope.

Page 32

1  Pugh
2     Q.   Stereo microscope?
3     A.   S-T-E-R-E-O, just like a stereophonic
4  sound.
5     Q.   Can you take the stereo microscope
6  that you have utilized in this case and apply it
7  to the corner of the ladder and directly come up
8  with a result to tell you that the corner has
9  some interval weakness in it?
10     A.   Yes.
11     Q.   How does it do that?
12     A.   By noting the pattern of fiber failure
13  in the corner area of the ladder.
14     Q.   Do you have any results of -- strike
15  that.
16        Do you have any written or published
17  results of your noting a pattern of fiber failure
18  in the corner of the Bauer ladder?
19     A.   Yes, my report, page 3, paragraph 2.
20     Q.   Other than what you say in your
21  report, do you have any demonstration from doing
22  the microscopic analysis, such as photographs,
23  graphs, anything at all which would support your
24  theory that the pattern was of a certain -- was a
25  certain way in this particular ladder?

Page 33

1  Pugh
2     A.   Actually you can look at the fracture
3  surfaces and see what I saw microscopically also
4  to a degree, but that's the answer to your
5  question.
6     Q.   Object as nonresponsive.
7        Have you produced any photographs or
8  any tangible thing that we can look at other than
9  the ladder, showing the results of your
10  microscopic analysis of the corner of the ladder?
11     A.   But the ladder is a tangible thing
12  that we have right in front of us.
13        Why would we need to produce
14  photographs when we can just look right at the
15  evidence itself.
16        No, I did not take photographs of that
17  for that reason.
18     Q.   Object as nonresponsive.
19        You have not taken any photographs to
20  demonstrate to the jury in this case that there
21  was a pattern of fibers in this particular case
22  which would demonstrate that there was a
23  weakness; is that correct?
24     A.   Correct.
25     Q.   Can the stereo microscope that you

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 162 of 328

Page 34

Pugh

2  have referred to, can it be utilized in such a
3  fashion when you use it to take photographs to
4  demonstrate the pattern that you're referring to?
5      A.   I would say photographically it's
6  difficult to demonstrate.
7      Q.   Does the stereo microscope have a
8  feature to it which allows photography to
9  demonstrate what you're looking at with the
10  microscope?
11     A.   Yes, sir.
12     Q.   Have you done that in this case?
13     A.   No, sir.
14     Q.   Have you been asked to do that by
15  Mr. Benton, the plaintiff's attorney?
16     A.   No, sir.
17     Q.   And why have you not produced any
18  photographs showing what you say in your report
19  you have found as to the pattern of the fibers?
20     A.   Because I can point it out on the
21  ladder.
22         And secondly, I regard this as
23  contributory, not causative, and I regard as a
24  very minor part of my opinion in this case.
25         It's contained in one paragraph out of

Page 35

Pugh

2  -- one small paragraph out of 15 paragraphs in
3  my report.
4      Q.   When you say it's contributory, are
5  you saying that the pattern of the fibers which
6  you've talked about here in any way caused the
7  failure of this ladder when Mr. Escudero was on
8  it?
9      A.   I said it's contributory, not
10  causative.
11     Q.   At trial in this case are you going to
12  say that it was contributory as part of the
13  failure of the ladder Mr. Escudero was standing
14  on?
15     A.   If asked.
16     Q.   When you say it was contributory, in
17  what fashion, what do you mean as opposed to as
18  not being causative?
19     A.   That it's probable even without that
20  weakness in the absence of foot reinforcement,
21  that the same failure would have occurred.
22         However, the ladder would have been
23  more resistant to failure had there not been the
24  weakness in the corner.
25         That's what contributory means.

Page 36

Pugh

2      Q.   Dr. Pugh, please show me on the ladder
3  what you say is a demonstration of the pattern
4  which demonstrates weakness.
5      A.   If you look and see, as an example
6  here, the way there are multiple longitudinal
7  splits.  There is a piece multiple splitting.
8         That is an indication of failure to
9  longitudinal or longitudinal running fibers with
10  a significant absence of cross-fibering across
11  the joint.
12         And I should add that a joint like
13  this should have a high fraction of transverse
14  fibers that will make it resistant to that sort
15  of failure.
16         We should say particularly high
17  content of transverse fibers rather than
18  longitudinal fibers, and in fact the nature of
19  all the fracture surfaces here are such that you
20  can see air through this portion here in the back
21  rail.
22     Q.   What do you mean "air"?
23     A.   See right in here, right there where
24  it's split, where there is a recipient
25  longitudinal splitting.

Page 37

Pugh

2         It's multiple -- it's not as simple as
3  these edges failed in one plane.  The
4  longitudinal fibers are spalling out because
5  there is significant lack of transverse
6  reinforcement.
7      Q.   What test would be utilized to
8  determine whether or not there was not
9  significant lack of transverse reinforcement?
10     A.   Well, microscopic results showing that
11  there were not multiple longitudinal fracture
12  surfaces resulting from parting of predominantly
13  running longitudinal fibers; i.e., had there been
14  adequate strength the fracture surface would be
15  significantly different in appearance.
16         And very simply, the fracture surface
17  would extend, wouldn't be concentrated exactly at
18  the corner, it would extend in the body of the
19  rails.
20         It would require that the body of the
21  rails fail in a very highly energy absorptive
22  fashion which would hardly ever occur in real
23  life use.
24         Well, it's a complete answer to the
25  question.

Page 38

Pugh
1
2      Because you don't like the answer
3   doesn't mean it's objectionable.
4        MR. BENTON:  Let's not comment how we
5   feel about things.
6      Q.   Object as nonresponsive.
7      A.   Just telling the truth, sir.  Just
8   telling the truth.
9      Q.   Object as nonresponsive.
10       You're saying that microscopic
11   analysis, by that you can determine whether or
12   not there is insufficient transverse fibers; is
13   that correct?
14     A.   Absolutely.
15     Q.   Is that an accepted scientific
16   methodology to determine whether or not the
17   transverse fibers are sufficient or insufficient?
18     A.   Yes, it is.
19     Q.   Are there any peer review studies
20   supporting that as methodology?
21     A.   Absolutely.
22     Q.   Can you reference some?  Have you
23   referenced any in this particular case?
24     A.   No, it's not necessary.  And I will
25   tell you what the references are.

Page 40

Pugh
1
2   photograph post-test of the samples.
3        MR. BENTON:  Flexural testing.
4      A.   You can see the test that he did.
5        There is a tortuous -- there is a
6   delamination that occurs during the body or the
7   bulk of the material.
8        The fractures are not occurring in
9   these positions right like you're snapping a
10   brittle twig, but the damage is extending quite a
11   bit away from where the thing is broken.  That's
12   the hallmark.
13       It's not surprising to me that these
14   samples satisfy those ASTM requirements, whereas
15   these fractures depicted in Figure 12 of
16   Johnson's report are quite than the
17   fracture that the subject ladder shows at the
18   edge, basically proving my last sentence in
19   paragraph 2 of page 3 of my report.
20     Q.   Objection as nonresponsive.
21       Can you name any literature which
22   supports your idea that simply by looking at the
23   fracture you can tell that there are insufficient
24   transverse fibers?
25     A.   There are references to that.

Page 39

Pugh
1
2      It lies in the difference between what
3   is called brittle failure and ductile failure.
4        Brittle failure is a very low energy
5   absorption process much like glass will fail, in
6   which after the failure has occurred you can
7   pretty much piece the parts exactly back
8   together, much as the ladder.  You can put the
9   fracture surfaces pretty much back together.
10       Now, ductile failure, on the other
11   hand, is a highly energy absorptive failure which
12   is very difficult to produce and which results in
13   a distortion of the fracture surfaces such that
14   they cannot be put back together.
15       And I can show you on another product
16   what a ductile failure is and what proper failure
17   of fiberglass is when it's properly laid up.  I
18   might have an example of fiberglass demonstrating
19   failure, ductile failure or proper failure.
20       Let me review Dr. Johnson's
21   photographs here, because his samples that he
22   tested may have shown --
23       MR. BENTON:  I have the original
24   here.
25       THE WITNESS:  I am looking for the

Page 41

Pugh
1
2      There are many, many textbooks that
3   have been written.  One of my colleagues wrote
4   several, his name is Herzberg, H-E-R-Z-B-E-R-G,
5   on fracture of engineering materials.
6        Those are common concepts that run
7   through these textbooks.  It's more an accepted
8   concept in materials failure than even
9   debatable.
10       It's not -- it's like Newton's law --
11   Newton's laws.
12     Q.   Can you cite for me any publications,
13   professional publications stating that by merely
14   looking at the crack or cracks, as you say,
15   multiple cracks, by that you can come to the
16   scientific conclusion that the cross-fibers,
17   transverse cross-fibers are insufficient?
18     A.   Well, yes, it's contained in the
19   publications of Herzberg.  There are many
20   textbooks written by Herzberg.
21     Q.   Can you give me a title specifically
22   stating that that is an acceptable methodology to
23   prove that the matting of the fiberglass is
24   insufficient from the standpoint of there being
25   insufficient transverse fibers?

12 (Pages 42 to 45)

Page 42

Pugh

 2    A.   In exactly those words?
 3    Q.   Yes.
 4    A.   Probably not.
 5         You can make a statement and go
 6  looking for some book that has that exact
 7  sentence in it and you're not going to find it.
 8  It's a losing proposition.
 9         But I just demonstrated to you to your
10  own satisfaction that your testing by Johnson has
11  shown test samples, acceptable ASTM that show a
12  very, very different fracture pattern than the
13  fracture of the subject ladder.
14    Q.   Object as nonresponsive.
15    A.   Well, the inherent truth of what I'm
16  telling you should be obvious.
17    Q.   Object as nonresponsive.
18         Mr. Benton referred you to Figure 12
19  of Dr. Johnson's report of August 10, 2001 where
20  it states "Flexural Specimens After Testing."
21    A.   Yes.
22    Q.   You have looked at that, right, sir?
23    A.   Yes.
24    Q.   Did you do that sort of testing to
25  determine whether or not there was insufficient

Page 43

Pugh

 2  transverse fibers of the corner which you say
 3  indicates weakness in the corner?
 4    A.   We need to move on now because he's
 5  asking the same question over and over again.
 6         He knows I didn't do any mechanical
 7  testing.
 8         MR. BENTON:  If you just say "No," we
 9  will move along.
10         THE WITNESS:  We're wasting a
11  significant amount of time answering the
12  same question.
13         MR. BENTON:  Off the record.
14         (Discussion off the record.)
15    Q.   Did you do any testing such as
16  indicated in Figure 12 in Dr. Johnson's report of
17  August 10, 2001 entitled Flexural Specimens After
18  Testing?
19    A.   No, sir.
20    Q.   Could you have done that with the
21  corner of the subject ladder?
22    A.   That's difficult to do, flexural
23  testing, with the geometric configuration of the
24  corner.
25    Q.   And as I understand your previous

Page 44

Pugh

 2  testimony, it looks to you like the testing done
 3  by Dr. Johnson under Figure 12, Flexural
 4  Specimens, after testing indicates that there was
 5  proper transverse fibers of the fiber mat; is
 6  that correct?
 7    A.   Well, I would say better transfer than
 8  at the corner.  Proper I'm not sure I can agree
 9  with.
10    Q.   Object as nonresponsive.
11         Please repeat the last question.
12         (Record read.)
13         MR. BENTON:  I thought it was
14  responsive.
15    A.   See what's going on.
16         I am trying my best to give answers
17  that are responsive now, and he keeps objecting
18  and repeating them.
19         MR. BENTON:  As a lawyer of 17 years
20  there has been a lot of unresponsive
21  answers.
22         THE WITNESS:  Fine.  We admit that.
23         MR. BENTON:  He has a right to dwell
24  on whatever portion he wants to dwell on.
25         THE WITNESS:  You're absolutely

Page 45

Pugh

 2  correct, but if he wants to drag the
 3  discovery deposition out all day I cannot
 4  come back tomorrow.  I have to leave here no
 5  later than 5 o'clock today.
 6         His choice.
 7         MR. GENDRY:  Read back the question.
 8         (Record read.)
 9    A.   No, it doesn't show proper transfer
10  necessarily.
11    Q.   You have examined Dr. Johnson's
12  report; is that correct?
13    A.   I just received it today just prior to
14  our beginning the deposition.
15         I have not read it in detail, but I
16  have read it enough to know what was done.
17    Q.   Do you disagree with the findings from
18  the testing that was done?
19    A.   Do you mean that it passed these ASTM
20  requirements?  I don't disagree with that, no.
21         Passing a standard doesn't make it --
22  passing a standard doesn't make it acceptable,
23  because standards are minimum.
24    Q.   Object as nonresponsive.
25         Any other weakness or -- strike that.

Page 46

Pugh

1        Pugh
2        You have talked about your opinion
3    concerning the corner of the ladder, correct?
4        A.   I think so.
5        Q.   Any other specific defect in the
6    ladder that you're referring to in your testimony
7    or in your report?
8        A.   Design defects including the failure
9    to use an encapsulating foot, and I will add or
10   some other mechanical device to stabilize the
11   rails at the bottom of each leg.
12          I have stated in my report the back
13   rails of the ladder should have cross-braces
14   similar to the steps configured on the front legs
15   such that the cross-braces attached to two sides
16   of the fiberglass leg cross-section, that is, to
17   each rail of each leg.
18          And lastly, the warnings and
19   instructions are deficient and defective in that
20   the recommendation to discard the ladder if
21   damaged is nonspecific and requires a level of
22   expertise beyond that of the lay user to identify
23   incipient unstable cracks in the fiberglass which
24   could become unstable.
25          It is not reasonable to expect a user

Page 47

1        Pugh
2    to notice, for example, hairline cracks in the
3    fiberglass legs, and even if noticed to realize
4    the potential for the crippling effects such a
5    crack can induce into a fiberglass structure when
6    such cracks propagate.
7          And consistent with this I will add
8    one last factor, and that is the basic principles
9    of hazard management.
10          The basic principles of hazard
11   management dictate that if a hazard exists it
12   must be eliminated.  It can be eliminated
13   economically and feasible.
14          The hazard in this particular product,
15   the lack of tying in the lower parts of the legs
16   is a hazard and a defect that can be economically
17   and feasibly rectified as was done by Werner and
18   other manufacturers, and was eventually done by
19   Bauer itself.
20          The second, only if the defect cannot
21   be eliminated is it permissible to guard against
22   that defect.
23          And lastly, only if the defect or
24   hazard cannot be eliminated and cannot be guarded
25   against is it permissible to warn and instruct

Page 48

1        Pugh
2    about the dangers of such a hazard.
3        Q.   You are pretty much reading from your
4    report; is that correct?
5        A.   Basically, yes.  I just wanted to make
6    sure I didn't leave anything out.
7        Q.   You've mentioned in your report that
8    you feel the initial cracking may have been the
9    result at least in part of improper curing of the
10   fiberglass; is that correct?
11       A.   Yes.
12       Q.   Do you have any evidence of that?
13       A.   No, that's why I used the word "may,"
14   and then I have given a list.
15       Q.   Do you have any basis in methodology,
16   scientific methodology, for giving the opinion
17   that there is improper curing of the fiberglass
18   in the manufacturing process?
19       A.   Some of the fracture surfaces appear
20   flaky, as if the resin had not properly set up or
21   properly bonded to the glass.
22       Q.   Just by the appearance of flakiness in
23   a ladder that is ten years or so old, is that
24   scientific evidence of improper curing of
25   fiberglass?

Page 49

1        Pugh
2        A.   I am looking at the fresh fracture
3    surfaces now.  This is exposed surface.  It
4    hasn't been exposed for ten years.
5        Q.   This ladder was approximately ten
6    years old when the accident happened; is that
7    correct, ten or eleven?
8        A.   I wouldn't disagree with that.
9        Q.   What is the methodology accepted in
10   the field of engineering or science for
11   determining if there is improper curing of
12   fiberglass?
13       A.   There are assays specified by ASTM.  I
14   believe they were done by Johnson, but they
15   weren't done in the area of the corner.
16       Q.   Have you done any assays to determine
17   whether or not there was improper curing of the
18   fiberglass at the corners?
19       A.   Only the microscopy.
20       Q.   Is microscopy an accepted methodology
21   for determining that there is improper curing of
22   fiberglass?
23       A.   As previously discussed.
24       Q.   Yes or no?
25       A.   Yes, as previously discussed.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 166 of 328

Page 50

Pugh

1
2    Q.   Object to the responsiveness.
3    A.   Okay. Just yes, sir.
4    Q.   Where would you find such literature
5    establishing that microscopy is acceptable for
6    determining improper curing in a fiberglass
7    ladder that is ten or eleven years old?
8    A.   Failure of Engineering Plastics, a
9    textbook.
10   Q.   And who is the author of that?
11   A.   I forget. I think it may have been
12   Herzberg.
13   Q.   How do you spell his last name?
14   A.   H-E-R-Z-B-E-R-G, same as before.
15   Q.   Have experts or engineers in the past
16   relied upon microscopy to determine that there is
17   improper curing of fiberglass?
18   A.   Absolutely.
19   Q.   Is it your opinion, Dr. Pugh, that the
20   failure at the corner was the result of improper
21   control of moisture during the curing process or
22   the improper use of woven glass materials?
23   A.   My opinion is that the initial
24   cracking of the rails of the ladder may have been
25   fostered by defective manufacturing condition

Page 51

Pugh

1
2    caused by one, and I will add or more of the
3    following or a combination of the following;
4    improper curing of the fiberglass, improper
5    proportion of components, improper control of
6    moisture during the curing, improper use of the
7    woven glass materials.
8    Q.   All of those are based upon your
9    inference as a result of inspecting
10   microscopically the corner; is that correct?
11   A.   My deduction, yes.
12   Q.   If you had improper proportion of
13   components, improper control of moisture during
14   the curing and improper use of the woven glass
15   materials, testing such as compression testing,
16   tensile strength testing, and tests such as
17   conducted by Dr. Johnson would demonstrate
18   whether or not that was true, would you agree
19   with that?
20   A.   Only comparative testing. These
21   defects can exist and still allow compliance with
22   the standard.
23   Q.   Object as nonresponsive.
24        What do you mean when you say in your
25   report "improper use of woven glass materials"?

Page 52

Pugh

1
2    A.   Failure to have a high enough
3    proportion of transverse fibers across the
4    longitudinal joint.
5    Q.   What is the proportion of transverse
6    fibers to longitudinal fibers in fiberglass such
7    as this to demonstrate that there were
8    insufficient transverse fibers?
9    A.   Nature of the failure.
10   Q.   Is there any physical evidence which
11   would demonstrate the layout of the mat to
12   support your theory that there was improper use
13   of woven glass materials, i.e., not enough
14   transverse fibers?
15   A.   No, it's the brittle failure of the
16   subject ladder that is proof of that.
17   Q.   What can cause brittle failure of
18   fiberglass?
19   A.   Improper curing of the fiberglass,
20   improper proportion of components, improper
21   control of moisture during the curing, improper
22   use of the woven glass materials.
23   Q.   Are you able to demonstrate -- strike
24   that.
25        What do you mean by "brittle failure"?

Page 53

Pugh

1
2    A.   Brittle failure is a very low energy
3    absorptive mode of failure that is commensurate
4    with, for example, glass fracturing in which you
5    could essentially glue a glass back together into
6    its original configuration except for the glue
7    joints and retain its original geometry.
8        Ductile failure, on the other hand, in
9    contrast is a highly energy absorptive failure in
10   which there is tremendous distortion of the
11   failed piece and which does not allow fitting the
12   piece back together into its original
13   configuration.
14        Typically metals fail in a ductile
15   manner and glass fails in a brittle manner.
16   Other materials fail in a range of
17   brittle to ductile depending whether they're
18   fabricated properly or not.
19   Q.   Are you saying that fiberglass for the
20   most part fails in a brittle manner when it
21   fails?
22   A.   No. Properly molded and fabricated
23   fiberglass should fail in a ductile manner.
24   Q.   And ductile failure you're saying is
25   because of tremendous force; is that correct?

Page 54

Pugh
1
2    A.   High energy absorption.
3    Q.   Practically speaking, if you drive
4  over a ladder it may crack and split; is that
5  correct?
6    A.   That could happen.
7    Q.   If you throw a ladder around and bang
8  it around over a consistent period of time it
9  could wear out; is that correct?
10   A.   Surely.
11   Q.   By wearing out it could split, could
12 it not?
13   A.   Well, when you say "split," you mean
14 split the corner now?
15   Q.   Split at any part if you hit it hard
16 enough.
17   A.   Well, it's typically going to split in
18 an area where there is a geometric discontinuity,
19 which is going to be the corner of the rails,
20 which is why they need to be reinforced.
21        Yes, it can split anywhere.
22   Q.   Object as not responsive.
23        When a ladder splits for whatever
24 reason at the corner or any other portion, you've
25 agreed that it should be taken out of service; is

Page 55

Pugh
1
2  that correct?
3    A.   Yes, it should be.
4    Q.   In this --
5    A.   But it's not quite as simple as that
6  and I would like to be able to complete that
7  answer if I could.
8    Q.   In this particular case, and I've read
9  your report here, you've said that obviously
10 there was preexisting cracking and splitting of
11 this ladder before Mr. Escudero got on it; is
12 that correct?
13   A.   Yes, there was.
14   Q.   You've pointed out the back rails to
15 me on this particular ladder and I see that a
16 portion of the rail where there is separation or
17 splitting has been worn so that there is actually
18 a gap between the split members; is that a
19 correct statement?
20   A.   Would you please point out to me what
21 you're talking about?
22   Q.   Sure.  You pointed this out where you
23 could see through, push this back together.
24        Do you see this big wide gap?
25   A.   Okay.

Page 56

Pugh
1
2        MR. BENTON:  What's the question?
3    A.   Yes, they appear to be about one inch
4  where this material is missing, if that's what
5  you're referring to.
6        We should say that's on leg No. 4.
7    Q.   Do you find the same phenomenon --
8    A.   Excuse me, that was on leg No. 3.
9  Sorry.
10   Q.   Do you find the same phenomenon of the
11 preexisting gap or a wearing portion on leg No.
12 4?
13   A.   Yes.
14   Q.   And when referring to leg No. 4 we
15 mean the, if we set this ladder up we mean the
16 right rear leg as we face the ladder; is that
17 correct, sir?
18   A.   It's upside down, so that's kind of an
19 ambiguous --
20   Q.   Flip it up.  Set this thing down, this
21 is going to be on your right as you face the ladder;
22 is that correct?
23   A.   Well, it's going to be on your left as
24 you face the back of the ladder.
25   Q.   No, face the front of the ladder.

Page 57

Pugh
1
2    A.   It's going to be on your right.
3        That's why I labeled it leg 1, 2, 3
4  and 4.  3 and 4 are the back legs.  Legs 1 and 2
5  are the front legs.
6    Q.   OSHA requires somebody like
7  Mr. Escudero in the construction business to
8  inspect ladders daily for any damage, would you
9  agree with that?
10   A.   I believe that's correct.
11   Q.   And failure to inspect this ladder to
12 note the cracking, the preexisting cracking in
13 the ladder was a failure to use ordinary care on
14 the part of Mr. Escudero; is that correct?
15   A.   I don't agree with that.  He said he
16 inspected it.
17   Q.   From your observation of the ladder,
18 Dr. Pugh, it was obvious that the ladder had
19 preexisting cracking on it if it had been
20 inspected, would you agree with that?
21        MR. BENTON:  Objection to form.
22   A.   Depends on what the nature of the
23 inspection is.
24   Q.   If you inspect it for any gaps or
25 cracks such as may have been present on this

**DR. JAMES PUGH - MORNING SESSION**                    **AUGUST 16, 2001**

16 (Pages 58 to 61)

Page 58

1           Pugh
2  ladder they would have been observable; would you
3  agree with that?
4      A.   To the trained eye, keeping in mind
5  that the ladder in this configuration now is not
6  the way it was when Mr. Escudero got on it at the
7  time of his accident.
8      Q.   Have you read Mr. Poremba's
9  deposition?
10     A.   Yes, I did.
11     Q.   Did you read in his deposition the
12 testimony that it was obvious that the ladder was
13 broken, had excessive wear and tear, had
14 preexisting cracks and splits before Mr. Escudero
15 got on it?
16     A.   Yes.  As an investigative engineer he
17 would be aware of that as much as I would be,
18 particularly with experience with these types of
19 ladders.
20          However, with a lay person it's a
21 different story.
22     Q.   Mr. Escudero wasn't exactly a lay
23 person, was he?
24          He was in the construction business
25 who had the duty to inspect the ladders to ensure

Page 59

1           Pugh
2  their safety, did he not?
3      A.   I didn't get from his testimony that
4  he was a specialist in failure analysis or
5  fracture instabilities, no.
6      Q.   What is your understanding of what
7  OSHA says about having split or cracked rails,
8  what you're supposed to do with the ladder?
9      A.   You're supposed to discard the ladder.
10     Q.   Let me go on to the next part of your
11 report.
12          You say there was a failure to use an
13 encapsulating foot; is that correct?
14     A.   That's correct.
15     Q.   What would this have done, increase
16 the longevity of the rail of the ladder?
17     A.   As testified to by Mr. Vasichko.
18     Q.   Do you agree it would have increased
19 the longevity of the rail?
20     A.   Among other things.
21     Q.   When were encapsulating foots, or feet
22 I should say, put on fiberglass ladders in the
23 industry?
24     A.   I believe the late '80s, time of
25 manufacture of this ladder.

Page 60

1           Pugh
2      Q.   Who was the first manufacturer to put
3  encapsulating feet on fiberglass ladders?
4      A.   I believe it was Werner.
5      Q.   Do you have any data indicating when
6  Werner put encapsulating feet on fiberglass
7  ladders?
8      A.   Data?
9      Q.   Yes, sir.
10     A.   Testimony of Vasichko.
11          I don't know what you mean by "data."
12 I didn't attempt to research that.
13          That's commensurate with my
14 understanding of when this came about.
15     Q.   Where did Mr. Vasichko say that Werner
16 put encapsulating feet on the ladder in 1988?
17     A.   On page 76 it says Werner around 1990,
18 that means the period late '80s, early '90s,
19 began putting a metal shoe and a fiberglass one
20 on their ladders.
21          And then we have reference to a patent
22 in the 1930s of a metal shoe on the foot of a
23 wooden ladder.
24     Q.   In any event, it's your opinion that
25 that encapsulating foot would have done what?

Page 61

1           Pugh
2      A.   It would have made the rails in this
3  Bauer ladder, given the composition and
4  properties as the fiberglass, without changing,
5  that it would stabilize the bottom of the legs,
6  all four legs, and particularly the critical legs
7  which are the back legs, such that No. 1, it
8  would be highly unlikely that a crack would
9  initiate.
10          And nextly, it just would not
11 propagate and it would and should reduce the
12 incidence of the failure of the legs much that
13 Mr. Vasichko testified that it did.
14     Q.   Let me ask you something about what
15 you think about Vasichko said.
16     A.   I read his deposition.  I don't think
17 anything.
18     Q.   He didn't say that you don't ever have
19 any cracks or splits in the rails because you
20 have an encapsulating foot on it, he didn't say
21 that, did he?
22     A.   Well, I can envision having cracks
23 still in the rails, but you don't have cracks
24 that are going to lead to catastrophic collapse.
25     Q.   Object as not responsive.

Page 62

Pugh
1
2      Mr. Vasichko did not at all say that
3   you never can have cracks or have had cracks in
4   rails simply because you have a foot on the
5   bottom of it or a slip-on shoe; is that correct?
6      A.   I believe he was silent about that.
7      I don't recall him being asked that
8   question. So that's correct, he didn't say that.
9      Q.   Have you done any testing to support
10  your theory that the encapsulating foot would
11  prevent the cracking or splitting of rails?
12     A.   That's a question like do I have any
13  proof that if I push on this bottle of soda here,
14  or seltzer, hard enough, that it will fall off
15  the end of the table.
16     It's an obvious engineering given.
17     Q.   Objection as nonresponsive.
18     Have you done any testing to support
19  your theory that the encapsulating foot would
20  prevent rails from splitting?
21     A.   Sir, I have not done any mechanical
22  testing on these ladders. Ergo, I have not done
23  any mechanical testing to show what the
24  statistics have shown that these feet prevent the
25  splitting of the rails and surely prevent the

Page 63

Pugh
1
2   accidents.
3      Q.   Have you done any sort of study or
4   analysis to determine the failure rate of ladders
5   that do in fact have encapsulating feet on them?
6      A.   I read the deposition of Mr. Vasichko.
7      Q.   And what did Mr. Vasichko say that you
8   think is responsive to that question?
9      A.   That the problem was much less of a
10  problem after introduction of the feet,
11  encapsulating feet, or it virtually eliminated
12  the problem.
13     Q.   Is it going to be your testimony in
14  this case that the encapsulating feet would have
15  prevented this particular accident from
16  happening?
17     A.   Yes, sir. The encapsulating feet or
18  any other suitable mechanical countermeasure to
19  catastrophic longitudinal rail splitting.
20     Q.   Are ladders manufactured and put on
21  the market today such as this, fiberglass
22  ladders, stepladders, without the encapsulating
23  feet?
24     A.   Today?
25     Q.   Yes, sir.

Page 64

Pugh
1
2      A.   I don't know that. I should say that
3   every ladder I've seen of recent manufacturers
4   had an encapsulating foot, often much more
5   aggressive encapsulation than Warner or Bauer in
6   what we've talked about in this case.
7      Q.   Warner has on the market today a
8   ladder with exactly -- well, I shouldn't say
9   exactly, but with feet and with bracing such as
10  on this letter; is that a true or correct
11  statement if you know?
12     A.   I don't know that.
13     Q.   You mentioned in your report that the
14  preexisting cracks which you've acknowledged you
15  state were not nearly as extensive as implied by
16  Naismith Engineering?
17     MR. BENTON: Is there a question?
18     MR. GENDRY: Yes, it's a question. In
19  the form of a question.
20     A.   Where are you reading in my report
21  now?
22     Q.   Page 3 at the bottom paragraph.
23     A.   Okay.
24     Q.   And in making that statement what are
25  you trying to say?

Page 65

Pugh
1
2      A.   Well, Naismith Engineering pointed out
3   that there was paint and spackle inside the
4   cracks, indicating that they -- as proof that
5   they preexisted the subject accident.
6      And when I examined the cracks in
7   detail I in fact could not find that, the paint
8   and the spackle was inside those cracks. It was
9   beside the crack, but it was not on the actual
10  fracture surface.
11     So the basis for their conclusion that
12  the crack had to preexist up to that point was
13  wrong, and I'm saying the preexisting cracks were
14  not nearly as extensive as implied by Naismith
15  Engineering because they misinterpreted the
16  marking on the legs.
17     Q.   Did you see any of the photographs
18  produced by Mr. Poremba at his deposition?
19     A.   Yes. But beyond that I have taken the
20  actual indications and measurements of Poremba
21  and have gone to the subject ladder and examined
22  in detail the marks that he is referring to, and
23  they do not extend under the fracture surface.
24     Q.   Did you see the photograph with the
25  spot of brown paint in the area of the crack?

PHONE #(210)377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX #(210)344-6016
1-800-969-3027

**DR. JAMES PUGH - MORNING SESSION**                    **AUGUST 16, 2001**

18 (Pages 66 to 69)

Page 66

Pugh
1
2      A.   Yes.  It surely is adjacent to the
3  crack.  There is no question of that.  It's not
4  on the fracture surface.
5      Q.   Can you point this out on this
6  particular ladder?
7      A.   Show me which photograph you are
8  referring to of his if you would please, and I
9  will do my best.  Or if you would show me the
10  photograph that would be a big help and I can
11  answer the question specifically.
12         It's on the abraded outside surface of
13  the fracture.  This is missing material in here
14  where the fracture surface was.
15      Q.   When you say "missing material," in
16  other words, that obviously was an old fracture?
17      A.   No, it's on the outside surface of the
18  fracture -- the brown paint depicted in -- what
19  do you want to call this photograph?
20      Q.   Poremba photograph.
21      A.   -- in the Poremba photograph, the
22  fracture surface is in here.
23         That's the outside abraded edge of the
24  ladder leg.  That's not the fracture surface.
25      Q.   It's right next to where there is a

Page 67

Pugh
1
2  split and there is a rather large gap between the
3  flange and the web; is that correct?
4      A.   Yes.  I wouldn't say "rather large."
5  There is missing material from the fracture
6  surface, yes.
7      Q.   And it's obvious from looking at that
8  particular portion of the ladder that that split
9  had been there for some time, would that be a
10  correct statement?
11      A.   The split there predated the failure
12  of the -- yes, but there are other indications
13  he's made where the crack had not propagated to
14  before the accident.
15         That's just one example of it.
16      Q.   You make the statement in your report,
17  and again I'm on page 3 of your report, you state
18  that --
19      A.   I just want to state I believe my
20  labels have been taken off of this ladder and put
21  on in the wrong positions.  They have obviously
22  been untied.
23         Well, in producing the sections that
24  were removed for testing by Dr. Johnson, they
25  were put back on in the wrong positions.

Page 68

Pugh
1
2         Do you want me to correct that?
3      Q.   If your attorney wants to do that he
4  can do that later on.
5      A.   It will save some time, because the
6  way they're on the ladder now is not the way when
7  it left my possession and it's in
8  contradistinction to the labeling that we all I
9  think adopted, which was the Naismith Engineering
10  labeling for the leg numbers.
11         MR. BENTON:  We will do it when I
12  start.
13      Q.   You state something here "Rails will"
14  -- this is on page 3, your fourth paragraph
15  down, "Cracks may develop in the event that" --
16      A.   Fourth paragraph on page 3?
17      Q.   Page 3, paragraph 4.
18      A.   On page 3?
19      Q.   Yes.
20      A.   Okay.
21      Q.   The way the ladder is folded and
22  stored you believe that --
23      A.   I don't see that in that paragraph.
24      Q.   Look down at the bottom of the
25  paragraph where it starts "It is foreseeable that

Page 69

Pugh
1
2  the back rails, particularly due to loading" --
3      A.   Okay.  I'm sorry.
4      Q.   What do you mean by stating that
5  "Cracks will develop if the ladder is folded and
6  stored"?
7      A.   As the ladder rides against the
8  bumpers, okay, when it's folded up and as it
9  displaces from that and is loaded in a sideways
10  and cross manner, it's going to load these rails
11  such that there is going to be a tendency to
12  split just from normal handling.
13      Q.   From what, abrasion?
14      A.   No, from impact or even from putting
15  something on top of the ladder.  Let's say a box
16  of nails or something, a heavy box of nails or a
17  sheet rock compound container or something.
18      Q.   That would be abuse of the ladder,
19  would it not?
20      A.   I don't regard that as abuse at all.
21      Q.   Laying heavy things on top of the
22  ladder?
23      A.   No.  Construction workers are going to
24  do that.
25         Is there any warning on here that says

---

Page 70

Pugh
1
2     "Do not stack anything on this ladder in the
3     folded condition"?
4         Q.   Object as nonresponsive.
5             Have you done any testing or failure
6     analysis to support your theory that if you load
7     this ladder it is going to cause cracking in the
8     ladder such as you see in this particular ladder?
9         A.   Well, not as extensively as you see in
10    this ladder, but surely the area where the
11    bumpers are are a critical point of loading for
12    the ladder because it will generate cracks at the
13    worst possible location, the area of the feet,
14    which is going to zip right up the entire rail as
15    is shown here, and cause the rail to collapse.
16        Q.   What methodology do you have to
17    determine that the rails will split as a result
18    of placing something on the ladder, as you say,
19    in loading the ladder as you see in this
20    particular ladder?
21        A.   I don't mean to be funny, but it's
22    called Fudd's First Law of Opposition.
23            If you push on something hard enough
24    it will fall over.  If you push on something hard
25    enough it will break.  That's a given.

---

Page 71

Pugh
1
2         Q.   Let's get out of your Fudd realm.
3             Let's get into any failure analysis
4     that you have done supporting the theory that if
5     you load the cross-members or the ladder, the
6     back of the ladder, that this is going to cause
7     cracking to split.
8         A.   You're talking about in the folded
9     condition?
10        Q.   Folded condition, yes, sir.
11        A.   Testing that I have done?
12        Q.   Yes, sir.
13        A.   I have told you before, the only
14    testing I did was microscopic analysis of the
15    fracture surfaces.
16        Q.   Have you done any failure analysis to
17    determine whether or not your theory is correct?
18        A.   By "theory," now, you mean that the
19    bumpers will initiate cracks under certain
20    circumstances in the back rails?
21        Q.   Correct.
22        A.   And the question is did I do any
23    testing?
24        Q.   Yes, sir.
25        A.   Nothing beyond the analysis of the

---

Page 72

Pugh
1
2     geometry of the ladder plus the microscopic
3     assay.
4         Q.   Is there any literature in your
5     profession, the engineering profession, to
6     support your theory that the loading of this
7     ladder would cause the splitting of the rails as
8     you just described?
9         A.   I'm not saying it happened.  I'm
10    saying it's prone to happen.  But no, the
11    engineering literature is much too sophisticated
12    to include a paper involving bumpers on a ladder
13    in a stored condition.
14            That would be something for Bauer to
15    responsibly test in their premarket testing for a
16    product to determine the likely failure modes,
17    which we have no indication they did.
18        Q.   Object as nonresponsive.
19            To cut it short, you have not done any
20    testing to support your theory that the loading
21    of the ladder by equipment or nails, as you put
22    it, box of heavy nails, as you put it, can cause
23    or will cause splitting in the rails at the
24    corners?
25        A.   I have not simulated that, no.

---

Page 73

Pugh
1
2         Q.   What sort of testing would be
3     available to simulate that sort of -- to try to
4     find out if that's true or not?
5         A.   It's called fatigue testing.  Actually
6     compression testing and fatigue testing.
7         Q.   You stated in your opinion and you
8     have mentioned it before --
9         A.   Maybe what we want to do -- I don't
10    mean to interrupt your question.  Maybe if we --
11            MR. BENTON:  Off the record.
12            (Discussion off the record.)
13        Q.   Dr. Pugh, you state in paragraph 4 on
14    page 3 in your opinion the back rails of the
15    ladder should have cross-braces similar to the
16    steps configured on legs 1 and 2; is that
17    correct, sir?
18        A.   That's correct.
19        Q.   What do you mean by that?  I'm not
20    sure I'm following you.
21        A.   You see the way the legs 1 and 2
22    attach to both of these rails here?
23        Q.   Yes, sir.
24        A.   The back one doesn't.  It only
25    attaches to the rail in one position.  The other

---

**DR. JAMES PUGH - MORNING SESSION**                    **AUGUST 16, 2001**

20 (Pages 74 to 77)

Page 74

Pugh
1
2  one is left free to swing.
3        It should be a U-shaped cross-brace
4  similar to this U-shaped step that will allow
5  attaching to both flanges of the rail in the
6  back.
7        Q.   And if that were the case, what's your
8  proposition or theory that that would have
9  prevented this accident?
10       A.   It will resist that crack propagating
11  up past that first cross-brace, the lowest back
12  cross-brace.
13       Q.   Have you done any testing or analysis
14  to support that theory?
15       A.   It's a mechanical engineering
16  problem. It doesn't require testing to prove the
17  enhancement of that design.
18       Q.   The cracking at the back brace as
19  we're looking at it now is where the -- what do
20  you call that, angle brace?
21       A.   Yes.
22       Q.   Angle brace is attached; is that
23  correct, sir?
24       A.   You're talking about here, this is the
25  angle brace?

Page 75

Pugh
1
2       Q.   Yes, sir
3       A   Is attached to one side of the U of
4  that leg, right
5       Q.   And that side of the U is split, is it
6  not?
7       A.   Oh, yes, it's broken  Right  It's
8  also distorted.
9        The other rail is incipiently cracked
10  and the whole thing is what we call
11  parallelogrammed, P-A-R-A-L-L-E-L-O-G-R-A-M-M-E-D,
12  which means a distorted rectangle
13        Should be rectangular cross-sections
14  It's a parallelogram now.
15        That's in the absence of the frank
16  splitting of the other side of the rail on leg
17  number -- that should be leg No. 3  And that's
18  on leg 3.
19       Q   Come here, Doctor, please
20       A   Yes, sir
21       Q   You say that the angle brace attached
22  to the step in the front rail --
23       A   Can we use the numbers?
24       Q   No, we don't need to.
25       A.   Let's make this as confusing as

Page 76

Pugh
1
2  possible.
3       Q.   It's just discovery.
4        You're saying that the angle rail
5  attached to one of the front legs serves a
6  purpose of preventing splitting longitudinally?
7       A.   You're misunderstanding my testimony.
8        On the front legs both angle -- both
9  braces, angle braces are attached to the front
10  and back rails of the U of the front leg, right.
11       Q.   Attached to the flange.
12       A.   Both flanges.
13       Q.   Right.
14       A.   The step is attached to both flanges.
15       Q.   Right.
16       A.   But the back leg there is only
17  attachment of the angle brace and the
18  cross-braces to the rear flange. That's the
19  problem.
20       Q.   And it's your theory that that
21  produces that?
22       A.   It promotes an instability of the leg
23  and opening up of the crack to propagate the
24  entire length of the leg or substantial fracture
25  of the leg where it otherwise would be arrested.

Page 77

Pugh
1
2        It would otherwise be arrested to a
3  degree here, but it surely would be arrested more
4  when the crack reaches the point of the
5  cross-brace when it's tied into both rails.
6       Q.   You have no testing or failure
7  analysis to support that theory; is that correct?
8       A.   Just basic mechanical engineering.
9       Q.   How do you explain, Doctor, where you
10  have splitting on the front rail which obviously
11  has been there for some time and it's even
12  beginning to crack down this way?
13       A.   You're focusing on the front rail --
14        MR. BENTON: Objection to form.
15       A.   Legs 1 and 2, the front rail is not
16  the basic problems with these ladders
17  collapsing. It's the back rail. And that makes
18  it so dangerous because people think it's the
19  rails that you have your weight mainly on, which
20  are the massive rails which are important to look
21  at and make sure they're stable. That's not the
22  case.
23        It's the back rails, the little rails,
24  the ones that are seemingly insignificant that
25  propagate a crack and cause this failure.

**PHONE #(210)377-3027**          **ESQUIRE DEPOSITION SERVICES**          **FAX #(210)344-6016**
**7800 IH-10 WEST, SUITE 100**      **SAN ANTONIO, TEXAS 78230**            **1-800-969-3027**

Page 78

Pugh

1
2        I just caution you against focusing on
3   the front rails.
4        Notice that crack you're pointing to
5   on leg No. 2 is arrested at the part of the angle
6   brace.
7        Q.   Object as nonresponsive.
8        A.   Well, your question proves what it is
9   I'm telling you about.
10       The angle brace has arrested that
11  crack.  It hasn't gone past it.
12       Q.   Object as nonresponsive.  I didn't ask
13  a question --
14       A.   Well, ask me a question now so I can
15  answer yes or no.
16       Q.   You wasted about five minutes of your
17  time.
18       A.   We're waiting for lunch actually.
19       Q.   Now, you have explained, Doctor, that
20  you have a crack in the front rail where you have
21  angle braces such as you have described.
22       A.   Defective and deficient fiberglass.
23       Q.   But you have no testing or failure
24  analysis to support that theory?
25       A.   Not beyond the microscopic analysis

Page 79

Pugh

1
2   and everything I have discussed with you up to
3   date.
4        But noticing that that crack hasn't
5   propagated down below the cross-brace.  It hasn't
6   propagated down beyond the angle brace either.
7        Q.   Given sufficient use, abuse, damage,
8   all ladders eventually can wear out.
9        Would you agree with that general
10  statement?
11       A.   Sure.
12       Q.   And it would not be unusual to see
13  cracks beginning in the corner of a U joint made
14  out of fiberglass given enough time, wear, tear
15  and abuse?
16       A.   If they're going to start somewhere,
17  that's where they're going to start.
18       To expect a user to be cognizant of
19  the principles of stress concentration, though,
20  is a lot to ask.
21       Q.   Object to the nonresponsiveness of the
22  last part of the answer.
23       A.   I'm doing my best.
24       Q.   You state, Doctor, on page 4 of your
25  report, it's your opinion that the ladder had not

Page 80

Pugh

1
2   been abused nor misused on prior occasions; is
3   that correct?
4        A.   That's correct.
5        Q.   Is that speculation on your part?
6        A.   Where are you reading now?
7        Q.   Last paragraph on page 4 of your
8   report.
9        A.   Okay.  It looks like just normal wear
10  and tear to me.
11       Q.   Do you know at all the history of this
12  ladder before Mr. Escudero ever got on it?
13       A.   I've read a variety of testimony and
14  tracing of the whereabouts of the ladder and the
15  hands it's gone through, yes.
16       Q.   We really don't have any information
17  at all as to how this ladder was treated or who
18  may have known what about it before Mr. Escudero
19  got on it, would that be a correct statement?
20       A.   But we do know various places it's
21  been.
22       Q.   But we don't know the condition of it
23  or what condition it may have been in before it
24  got into Mr. Escudero's hands?
25       A.   I would generally agree with that.

Page 81

Pugh

1
2        By that question I'm interpreting you
3   to mean we don't know all the damage was
4   sustained to this while it was in Mr. Escudero's
5   hands.
6        Q.   For all we know, this ladder may have
7   been disposed of by someone and Mr. Escudero
8   picked it up at a job site or somebody who worked
9   for him picked it up at a job site?
10       A.   I know that intimation or contention
11  has been made by defendant in this, yes.
12       Q.   It's possible, isn't it?
13       A.   Anything is possible.  But the
14  problem, if I let that answer stand and just add
15  this and let you object to it, the problem is the
16  failure mode necessitating retiring the ladder is
17  not something that one would notice and is a mode
18  that makes the ladder rather dangerous to
19  continue using.
20       The failure mode promotive of or
21  indicating of retiring should be something that's
22  not hazardous to the user in the successive use.
23       Q.   Objection to the nonresponsiveness to
24  the last part of the answer.
25       You stated that warnings and

Page 82

Pugh
1
2  instructions were deficient and defective.
3        In what way were they deficient and
4  defective?
5        A.   The recommendation to discard the
6  ladder if damaged is nonspecific and requires a
7  level of expertise beyond that of the lay user to
8  identify incipient unstable cracks in the
9  fiberglass which could become unstable.
10       It's also nonspecific with regard to
11  the indication or warning or instructing that the
12  back rails are the ones that really need
13  attention as far as inspection.
14       If you admit that the design defect
15  cannot be rectified by appropriately, which I
16  disagree with, and you admit that the defect and
17  the hazard can't be controlled by guarding and
18  you want to control it by a warning and
19  instruction, it should say something like "Pay
20  close attention to the back rails, the bottom of
21  the back rails of the ladder.  If any cracking of
22  any nature is exhibited in those areas the ladder
23  should be discarded."
24       And you know what?  Bauer would have
25  gotten so many complaints early on in this that

Page 83

Pugh
1
2  they would have had to rectify it much earlier
3  and this accident would never have happened.
4        Q.   Object as nonresponsive.
5        A.   There is a reason why manufacturers,
6  why they have a vague warning.  It's to avoid
7  complaints.
8        And unfortunately these accidents
9  happen because of it.
10       Q.   Object as nonresponsive.
11       The label advised the user if there
12  was damage to the ladder it should be taken out
13  of service, did it not?
14       A.   That's correct.
15       Q.   Mr. Escudero recognized in his
16  deposition that if there is cracking in the
17  ladder it should be taken out of service, did he
18  not?
19       A.   Yes, I believe he did.
20       Q.   OSHA states that ladders are to be
21  inspected daily and if cracking and splitting is
22  noted they are to be taken out of service; isn't
23  that correct?
24       A.   That's correct.
25       Q.   And you're saying what we should add

Page 84

Pugh
1
2  to that, that if the splitting is at the back of
3  the rails it may be -- it may lead to
4  catastrophic failure and that somehow should be
5  added to this label, is that what you're saying?
6        A.   No.  I'm saying that the hazard should
7  be designed out by having an encapsulating foot
8  or some other feature.
9        MR. BENTON:  Read back the question.
10       (Record read.)
11       A.   I'm not endorsing the use of a warning
12  to control this hazard.
13       You had asked me what was wrong with
14  the warning and I am telling you if you choose to
15  manage the hazard with the warning, it's not
16  specific enough to allow someone to control the
17  hazard with the warning.
18       And Mr. Escudero on page 56 clearly
19  said if he had noticed a break in the legs he
20  would not have used it.  He looked at the ladder
21  and he was not looking for what threshold cracks
22  or hairline cracks, that's not what he was
23  looking for.
24       And part of the problem -- if you let
25  me complete it before you object as nonresponsive

Page 85

Pugh
1
2  -- one of the basic problems, this rail in here,
3  you will see this rail is cracked, but it's not
4  really obvious from the outside.
5        If you look on the inside of the rail,
6  this is leg No. 3 now, if you look at the inside
7  it's clearly cracked on the flange that meets the
8  -- if the ladder is standing up and you're
9  facing it in the proper orientation as you're
10  going to board it, it's leg labeled No. 3 that's
11  the right rear leg, and it would be the closest
12  flange of that right rear leg where the thing is
13  parallelogrammed.  We talked about that before.
14       There is clear evidence of cracking
15  when you look inside, if you look closely inside
16  that joint, but the outside doesn't show it.
17       Q.   Object as nonresponsive.
18       A.   Thank you.
19       Q.   After all that, Doctor, I think I
20  heard you say you're not endorsing a change in
21  the label; is that correct?
22       A.   I'm not. no.  This hazard should not
23  be managed by warnings and instructions.
24       Q.   In your opinion, then, the label was
25  sufficient that if a person, user notices the

Page 86

Pugh
1
2    cracking, the ladder should be removed from
3    service?
4       A.   I can't agree with that.  That would
5    have been appropriate if the design defect had
6    been managed by the boot, encapsulating foot,
7    etcetera.
8           I wouldn't see anything wrong with the
9    warning as it exists with an inherently
10   nondefective ladder.
11      Q.   Let's just assume, Dr. Pugh, we had a
12   ladder that had a boot on it, okay, and you had a
13   crack midway up the rail above the boot.
14          Would the label be sufficient if the
15   user sees the crack, inspects the ladder and sees
16   the crack, to remove the ladder from service?
17      A.   Sure.  And it probably should be
18   removed if there is a noticeable crack on the
19   rail anywhere on it.
20          Noticeable, by "noticeable" I mean
21   without having to scrutinize the ladder up close
22   and turn it upside down.  That is too much to ask
23   for construction workers.
24          They have better things to do with
25   their time than spend an hour inspecting a ladder

Page 87

Pugh
1
2    before they get on it to drive a nail that is
3    going to take ten seconds to do.
4       Q.   That's not what OSHA says, though, is
5    it?
6       A.   That's correct.  And the OSHA standard
7    is not attached to the ladder.
8       Q.   Mr. Escudero was aware of the OSHA
9    standards, was he not?
10      A.   I believe he was, yes.
11      Q.   He had a safety program, or so he
12   said, to daily inspect the ladders, did he not?
13      A.   Yes.
14      Q.   If this ladder had been inspected the
15   cracking would have been noticed, would it not?
16      A.   It depends on the nature of the
17   inspection.
18      Q.   Well, if you pick the ladder up and
19   look at it, I mean obviously -- you even said
20   there were preexisting cracks, obviously the
21   cracking would have been noticed, would you
22   agree?
23      A.   If you look for the cracks, if you
24   were told there are cracks here, point them out
25   to me, anybody should be able to point the cracks

Page 88

Pugh
1
2    out.
3           If you're saying inspect the ladder to
4    see if it's safe, that's a different story.
5       Q.   Your testimony is going to be that if
6    you look for the cracks they would have been
7    noticed; is that correct?
8       A.   If you're going into this ladder
9    looking for the cracks, they should have been
10   noticed before the collapse because there were
11   preexisting cracks.
12      Q.   And OSHA says to look for cracks; is
13   that correct?
14      A.   I don't think it says to look for
15   cracks.
16          If you show me the document, let's
17   take a look at it.  I don't think it uses those
18   words.
19          MR. BENTON:  Is this it?
20          MR. GENDRY:  You got it.
21      Q.   Dr. Pugh, I have handed to you OSHA
22   Regulations Reportable Ladders No. 1917,
23   1917.119.
24      A.   Yes, sir.
25      Q.   I direct your attention to page marked

Page 89

Pugh
1
2    below as page 123, which is the court reporter's
3    stamp.
4       A.   Bates 123.
5       Q.   Yes.  Under subparagraph E in parens,
6    1 in parens, would you please read that.
7       A.   We should read what prefaces that,
8    what leads into that E-1, "The employer shall
9    maintain portable ladders in a safe condition.
10   Ladders with the following defects shall not be
11   used and either shall be tagged as unusable if
12   kept on the premises or shall be removed from the
13   work site."
14          E-1 double I, "Broken or split side
15   rails."
16          It doesn't say anything about looking
17   for breaks or splits.
18      Q.   We will get to that, sir.
19      A.   Okay.
20      Q.   Now, it states that they shall be
21   maintained in a safe condition and removed from
22   service if they have broken or split side rails;
23   is that correct?
24      A.   That's what I just read, yes.
25      Q.   And that was Mr. Escudero's duty; is

Page 90

1           Pugh
2    that correct?
3        A.   As the employer?
4        Q.   As the construction job site manager?
5        A.   Well, if he's construed as the
6    employer, then yes, that would be his job.
7        Q.   And directing your attention to
8    subparagraph E in parens, 2 in parens, read
9    that.
10       A.   It says "Ladders shall be inspected
11   for defects prior to each day's use and after any
12   occurrence, such as a fall, which could damage
13   the ladder."
14       Q.   Again clearly states that the employer
15   has the duty to inspect, actually inspect the
16   ladder to look for cracks such as were existing
17   in this ladder?
18       A.   But it doesn't use the phraseology of
19   your prior question.
20       Q.   Object as nonresponsive.
21       A.   It doesn't say "Thou shalt make a
22   scrupulous effort to find a crack and no matter
23   how small that crack the ladder should be
24   retired."
25           There is none of that verbiage in

Page 91

1           Pugh
2    here.
3        Q.   Object as nonresponsive.
4            In any event, Dr. Pugh, the employer
5    did have the duty to inspect the ladder to see if
6    it was safe for use; is that correct?
7        A.   That's the spirit of this document,
8    yes, and that's the key thing, to see that it was
9    safe for use.
10       Q.   And we can tell from looking at the
11   very ladder in this case that there obviously
12   were gaps at the areas where the rails have
13   separated?
14       A.   There were some gaps that were
15   preexisted, yes.
16       Q.   Are you going to express any opinions
17   that the ANSI standards for fiberglass ladders
18   were not met in this particular ladder?
19       A.   I didn't in my report.
20           Probably not, except now that you've
21   asked I don't think Mr. Benton was going to ask
22   me anything about it.
23           Except as I testified to in the Scott
24   case, ANSI A-14.5 1982, Section 7.2,
25   Manufacturing Process, the ladder may have been

Page 92

1           Pugh
2    in violation of that.
3            In particular, the second paragraph of
4    that section it says "The material shall be
5    smooth, clean, uniform in color and reasonably
6    free from conducting particles, foreign
7    materials, pits, cracks, voids, chips, sink
8    marks, delaminations, blisters and scratches in
9    accordance with good commercial practice.
10   Distribution of filler additives or glass fiber
11   shall be in accordance with good commercial
12   practice.  The material shall be free of
13   resin-rich and resin-starved areas, and there
14   shall be no evidence of significant reinforcement
15   shifting, wrinkles, bunching up or density
16   variation with any length all in accordance with
17   good commercial practice."
18           We have already talked about
19   resin-rich and resin-starved areas, so that would
20   be a violation of the ANSI standard, but I don't
21   know as I sit here that that was the case.
22       Q.   You do not know that was the case at
23   the time this ladder was manufactured, what you
24   just quoted; is that correct?
25       A.   That's correct.  That's the only

Page 93

1           Pugh
2    reference I would make to a possible violation of
3    ANSI.
4        Q.   To determine that you would have to do
5    some sort of testing; is that correct?
6        A.   Probably.
7        Q.   What has been your experience in,
8    other than involved with lawsuits concerning the
9    Bauer fiberglass ladder, what has been your
10   experience in connection with the manufacturer
11   process of fiberglass?
12       A.   My personal experience?  I have
13   professionally been involved with composites ever
14   since my days at MIT in the late '60s with regard
15   to failure analysis of composites, the layup and
16   production of composites, and the failure
17   analysis thereof.
18           I have over the years had the
19   opportunity to analyze a wide variety of
20   fiberglass products for failures and conditions
21   promoting failure, including fiberglass boats,
22   fiberglass helmets of all types, of course
23   ladders.  Those would be the main areas.
24           But I have done my own work with
25   fiberglass as far as boat building, boat repair.

25 (Pages 94 to 97)

Page 94

```
1              Pugh
2         That's probably a good summary of it.
3     Q.   Have you ever done any destructive
4   testing on fiberglass ladders similar to this
5   where you have the web and the flange
6   arrangement?
7     A.   I don't believe I have done mechanical
8   testing on these ladders, no. It would be done
9   on an exemplar anyway.
10    Q.   You haven't done it on any of the
11  ladders that you have been involved in or with in
12  litigation or exemplar ladders; is that a correct
13  statement?
14    A.   That's correct.
15    Q.   Have you reviewed any literature
16  regarding the testing of fiberglass ladders?
17    A.   The standards, reports much like
18  Dr. Johnson wrote.
19    Q.   Do you belong to any professional
20  organizations regarding the standards required
21  for fiberglass stepladders?
22    A.   I do belong to ASTM and have for a
23  number of years. I'm a member of the Society of
24  Plastics Engineers.
25         And I'm not a member of ANSI, but I do
```

Page 95

```
1              Pugh
2   keep cognizant of the standards and requirements
3   and different things for all those
4   organizations.
5         I am also a member of the American
6   Society for Mechanical Engineers, ASME.
7     Q.   Have you belonged to any ANSI
8   committees concerning portable ladders?
9     A.   No, sir.
10    Q.   Have you ever published any area of
11  fiberglass ladders?
12    A.   No, sir.
13    Q.   Most of your testimony has been in
14  connection with plastic or vinyl helmets, has it
15  not, crashworthy helmets?
16    A.   I do a lot of work in helmets and
17  helmet technology, yes.
18         MR. BENTON: Let's take a lunch
19  break.
20         (Lunch recess taken at 2:15 p.m.)
21
22
23
24
25
```

Page 96

```
1              Pugh
2         A F T E R N O O N   S E S S I O N
3         (Time noted: 2:45 p.m.)
4   J A M E S   P U G H,   resumed and testified as
5     follows:
6   EXAMINATION BY (Cont'd.)
7   MR. GENDRY:
8     Q.   I got one or two other questions,
9   Doctor.
10         Your fee, what do you charge for your
11  services to Mr. Benton?
12    A.   The workup of the case is billed at
13  $250 an hour.
14    Q.   How much time have you spent on the
15  case up to today's deposition, do you have any
16  records with you?
17    A.   No.
18    Q.   You don't have your file with you,
19  your billing file?
20    A.   No. All I have is what I relied on in
21  reaching opinions.
22         It's probably been about ten hours.
23    Q.   Where do you keep your billing
24  records?
25    A.   They're in the computer.
```

Page 97

```
1              Pugh
2     Q.   They're here in the office?
3     A.   We have a limited staff today. I
4   don't know that they're retrievable.
5     Q.   I thought we asked to have that
6   produced.
7     A.   I got no notice or anything.
8         It's been about 15 hours exclusive up
9   to date.
10         MR. BENTON: I have got some bills
11  with me, Tom.
12    Q.   We have asked you to produce at
13  today's deposition your time log and bill fees
14  for work done in this case.
15         Do you have that with you today?
16    A.   I don't have it with me. I can find
17  it.
18    Q.   Can you generate that before we
19  terminate today's deposition?
20    A.   Before we terminate the video court
21  appearance?
22    Q.   Yes, sir.
23    A.   Sure.
24    Q.   And your $250 per hour, for what kind
25  of work?
```

**DR. JAMES PUGH - MORNING SESSION**                    **AUGUST 16, 2001**

26 (Pages 98 to 101)

Page 98

Pugh
1
2     A.   That's for the workup of the case.
3     Q.   And for testifying what do you charge?
4     A.   Court appearance is $3,000.
5     Q.   Is this considered a court appearance
6   to you today?
7     A.   Well, I bill the day rate and I have
8   devoted the day to this and it includes the
9   deposition and the court appearance, yes.
10    Q.   What are your charges to Mr. Benton
11  for your appearance here today?
12    A.   $3,000.
13    Q.   Anything else that you have billed in
14  this case other than your workup time at $250 an
15  hour and today's deposition?
16    A.   My assistant was billed out for
17  packing and unpacking the evidence on numerous
18  occasions.
19    Q.   At the end of the day here will you
20  have your billing produced that we can attach it
21  to your deposition?
22    A.   Yes, sir.
23    Q.   Including the time that you spent on
24  the case.
25    A.   The bills that are generated to date I

Page 99

Pugh
1
2   will be happy to hand to Mr. Benton, who will
3   make a decision whether he's going to hand them
4   to you or not.
5     Q.   We have asked you to produce any
6   professional articles or scientific studies in
7   support of your opinions in this case.
8          Do you have any stuff, such
9   professional articles or scientific studies with
10  you today?
11    A.   I have in front of me everything that
12  I am relying on and testifying to in this case,
13  yes.
14    Q.   What professional articles do you have
15  that you are relying on?
16    A.   I didn't produce any articles.
17    Q.   Have you produced any scientific
18  studies?
19    A.   No, sir.
20    Q.   Have you utilized any professional
21  articles in the opinions that you're expressing
22  in this case?
23    A.   Not specifically.
24    Q.   And are you using any specific
25  scientific studies in support of your opinions in

Page 100

Pugh
1
2   this case?
3     A.   Well, if Dr. Johnson's report is
4   used -- construed as a scientific study, which I
5   presume it is, I am relying on that to
6   demonstrate a better failure of fiberglass than
7   occurred at the joint or the angle joint in the
8   particular ladder involved.
9     Q.   I object to the responsiveness.
10         As I understand it, to some extent
11  you're relying on Dr. Johnson's report; is that
12  correct?
13    A.   I believe his report proves my
14  contentions pretty well, yes.
15    Q.   I object to the nonresponsiveness part
16  of the answer.
17         Have you produced your complete file
18  relating to all work done and documents reviewed
19  and/or generated in this case?
20    A.   Yes, sir.
21    Q.   I have asked you to produce any
22  ladders used by you or reviewed by you relating
23  to your opinions in this case.
24         Do you have any such ladders available
25  today?

Page 101

Pugh
1
2     A.   The other ladders for the other cases
3   are not available.
4          MR. BENTON:  Except for that yellow
5   one out there.
6     A.   There is an exemplar out here, yes.
7     Q.   You have an exemplar ladder here?
8     A.   Yes.
9     Q.   What kind of ladder is that?
10    A.   It's a Bauer.
11         MR. BENTON:  The big one I showed you.
12    Q.   Where did you get the Bauer ladder?
13    A.   It was in storage here.  It appears to
14  be an exemplar from someone else's case.
15    Q.   Was that ladder purchased new?
16    A.   I don't know.
17    Q.   Where did it come from?
18    A.   It came from our evidence storage
19  area.
20    Q.   At your office?
21    A.   Yes, sir.
22    Q.   And was it used in connection with any
23  lawsuit?
24    A.   I don't know.
25    Q.   Do you know when it was purchased?

Page 102

Pugh

1
2    A.   No, I don't.
3    Q.   Do you know how old it is?
4    A.   Obviously newer than the ladder we're
5  discussing today in the Escudero case.
6    Q.   My question is do you know how old it
7  is?
8    A.   I have not looked at it except for the
9  foot treatment.
10    Q.   And are you relying on the foot
11  treatment of the exemplar ladder that you have
12  today in support of any of your opinions?
13    A.   Surely. It's a better foot treatment,
14  significantly better than the subject Escudero
15  ladder.
16         It has significantly reinforced feet
17  on it.
18    Q.   You have not generated any test
19  results or data compilation with the exception of
20  your report, would that be a correct statement?
21    A.   That's correct, sir.
22    Q.   Have you prepared any photographs?
23    A.   I took photographs, just evidentiary
24  documentary photographs, yes.
25    Q.   Did you provide those to Mr. Benton?

Page 103

Pugh

1
2    A.   I have not, no.
3    Q.   Where are those photographs now?
4    A.   One set just got back today because it
5  had been in the camera for awhile, and the other
6  set I might be hard-pressed to put my hands on
7  it, but it's around somewhere.
8    Q.   Are you relying upon any photographs
9  you have to support any of your opinions?
10    A.   No. I believe the evidence speaks for
11  itself with the exception of those parts that
12  were removed by Dr. Johnson.
13         MR. BENTON: Of course I am going to
14  use some photographs here that I showed
15  you.
16    Q.   Mr. Benton has handed me some bills,
17  which why don't you take a look at them.
18         Do they in part reflect the work done
19  on this case?
20         MR. BENTON: The tabbed ones. Just
21  look at the tabbed spot.
22    A.   I believe these are accurate.
23    Q.   Are there bills subsequent to that?
24    A.   I don't think so.
25    Q.   Did you spend time with Mr. Benton

Page 104

Pugh

1
2  reviewing this case yesterday?
3    A.   No, I did not.
4    Q.   Did you spend time with him before
5  today's deposition?
6    A.   Yes, sir.
7    Q.   How much time did you spend with him
8  before we started?
9    A.   From 9 o'clock until you arrived.
10         MR. GENDRY: Are you going to
11  introduce those bills?
12         MR. BENTON: No.
13         MR. GENDRY: I want to attach as
14  Deposition Exhibit 1 -- off the record.
15         (Discussion off the record.)
16    Q.   Dr. Pugh, do you have your
17  correspondence file with Mr. -- communications
18  with Mr. Benton with you today?
19    A.   No, sir.
20    Q.   Where would we find that?
21    A.   All I have in front of me is the
22  things I relied on. Letters of correspondence
23  and everything are often taken out, and
24  transmittal, and thrown out.
25    Q.   What's thrown out?

Page 105

Pugh

1
2    A.   Letters of transmittal, cover letters.
3         MR. GENDRY: You mind if we mark this
4  file?
5         MR. BENTON: No.
6         MR. GENDRY: Can we just attach as
7  Deposition Exhibit 1 communications between
8  Mr. Benton and Dr. Pugh, and then I will
9  pass the witness.
10         MR. BENTON: I reserve my questions.
11         (Deposition Exhibit 1, communications
12  between Mr. Benton and Dr. Pugh, marked for
13  identification, as of this date.)
14         (Time noted:  2:50 p.m.)
15
16
17         _____
18              JAMES PUGH
19
20  Subscribed and sworn to before me
21  this ___ day of _____, 2001.
22
23  _____
24
25

Page 106

```
 1
 2              C E R T I F I C A T E
 3    STATE OF NEW YORK      )
 4                    ) ss.:
 5    COUNTY OF NEW YORK     )
 6
 7          I, LINDA SALZMAN, a Notary Public
 8    within and for the State of New York, do
 9    hereby certify:
10          That JAMES PUGH, the witness whose
11    deposition is hereinbefore set forth, was
12    duly sworn by me and that such deposition is
13    a true record of the testimony given by such
14    witness.
15          I further certify that I am not
16    related to any of the parties to this action
17    by blood or marriage; and that I am in no
18    way interested in the outcome of this
19    matter.
20          IN WITNESS WHEREOF, I have hereunto
21    set my hand this 21st day of August, 2001.
22
23          ------------------------
24              LINDA SALZMAN
25
```

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 181 of 328

Page 1

1

2　　　　　　IN THE UNITED STATES DISTRICT COURT

3　　　　　　FOR THE SOUTHERN DISTRICT OF TEXAS

4　　　　　　　　　　BROWNSVILLE DIVISION

5

6　　JOSE ESCUDERO, JR.,

7

8　　　　　　　　　Plaintiff,

9

10　　　　　　vs.　　　　　　　　　No. B-00-193

11

12　　BAUER CORPORATION D/B/A

13　　BAUER LADDER CORPORATION,

14

15　　　　　　　　　Defendant.

16　　-------------------------------x

17

18　　　　VIDEOTAPED DEPOSITION OF DR. JAMES PUGH

19　　　　　　　　Mineola, New York　　*afternoon*

20　　　　　　Thursday August 16, 2001

21

22

23　　Reported by:

　　　LINDA SALZMAN

24　　Job No 124356b

25

Page 2

```
 1
 2
 3
 4
 5
 6                 August 16, 2001
 7                   2:50 p.m.
 8
 9          Videotaped Deposition of DR. JAMES
10    PUGH, held at the offices of Inter-City
11    Testing & Consulting Corp., 167 Willis
12    Avenue, Mineola, New York, pursuant to
13    Notice, before Linda Salzman, a Notary
14    Public of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2    A P P E A R A N C E S :
 3
 4       BARRY R. BENTON, ESQ.
 5       Attorney for Plaintiff
 6           284 Ebony Avenue
 7           Brownsville, Texas 78520-8014
 8       BY:  BARRY R. BENTON, ESQ.
 9
10       GENDRY & SPRAGUE, P.C.
11       Attorneys for Defendant
12           645 Lockhill Selma
13           San Antonio, Texas 78216-5057
14       BY:  THOMAS W. GENDRY, ESQ.
15
16    ALSO PRESENT:
17       SILVIO FACCHIN, Videographer
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2            THE VIDEOGRAPHER:  This is the tape
 3       labeled No. 1 of the videotape deposition of
 4       Dr. James Pugh.  We're now going on the
 5       record.  The time is 2:55 p.m.
 6            Counsel will state their appearances
 7       for the record.
 8            MR. BENTON:  Barry Benton for the
 9       plaintiff, Jose Escudero.
10            MR. GENDRY:  Tom Gendry representing
11       Bauer Ladder Corporation.
12            THE VIDEOGRAPHER:  Will the court
13       reporter please swear in the witness.
14    J A M E S   P U G H,  called as a witness,
15       having been duly sworn by a Notary Public,
16       was examined and testified as follows:
17    EXAMINATION BY
18    MR. BENTON:
19       Q.   Please state your name.
20       A.   My name is James Pugh.  That's spelled
21    P-U-G-H.
22       Q.   And do people refer to you as
23    Dr. Pugh?
24       A.   That's correct, sir.
25       Q.   Can you give the jury a history of
```

Page 5

```
 1            Pugh
 2    your education.
 3       A.   Yes, sir.
 4            I attended college at the
 5    Massachusetts Institute of Technology in
 6    Cambridge, Massachusetts, that's MIT, during the
 7    years 1964 through 1972.
 8            I received two degrees from MIT, a
 9    Bachelor of Science and Engineering specified in
10    materials science and engineering in 1968, and a
11    Doctor of Philosophy or a Ph.D. specified in
12    biomedical engineering in 1972.
13            That really was the end of my formal
14    college education.  However, I spent a
15    three-month post-doctoral Fellowship at MIT from
16    June of 1972 through September of 1972 in
17    bioengineering, during which time I wrote up
18    parts of my doctoral thesis for publication in
19    various journals.
20            I took a course in review of basic
21    principles of engineering in preparation for my
22    licensing examination as a professional engineer,
23    and I was licensed as a professional engineer in
24    the State of New York as a result of a two-day
25    examination, I believe it was in 1984.
```

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 183 of 328

Page 6

1          Pugh
2          I have attended, I should add I have
3   attended numerous continuing education courses,
4   both biomechanical and engineering in nature,
5   over the years since my graduation, but that's
6   the nature of my formal education.
7      Q.   What have you been doing as a
8   livelihood since you got your Ph.D.?
9      A.   Well, I spent a number of years
10  working in hospitals full time doing
11  bioengineering and biomechanics.
12         I was involved with injuries, injury
13  analysis and the prevention thereof, safety
14  aspects of various work situations, and I
15  designed implants, artificial joints. I worked
16  with plastics and composites and I have been
17  consulting during that time.
18         I started consulting and doing
19  engineering consulting projects as early as 1966
20  at MIT, so I have been consulting continuously
21  since 1966.
22         And part of my standard practice is to
23  do failure analysis of not only human body parts,
24  but also engineered parts, such as ladders.
25         I should add I have began an

Page 7

1          Pugh
2   affiliation as an independent contractor with the
3   company called Inter-City Testing and Consulting
4   Corporation which is a broad-based consulting
5   engineering firm where we are here today in
6   Mineola, New York.
7          I began that relationship in 1978, and
8   I have been continuously involved as an
9   independent contractor with Inter-City Testing
10  since 1978.
11         I am now a partner of Inter-City
12  Testing and a co-owner, and I still continue to
13  serve as an independent contractor to Inter-City
14  Testing.
15     Q.   Have you ever had professor
16  responsibilities?
17     A.   Yes, I have, sir.
18     Q.   Could you describe those?
19     A.   In 1973 I was appointed assistant
20  professor of orthopedics at the Mount Sinai
21  School of Medicine, and I taught courses at Mount
22  Sinai in biomechanics and injury analysis.
23         I was promoted to associate professor
24  of orthopedics in 1979 at the Mount Sinai School
25  of Medicine.

Page 8

1          Pugh
2          The Mount Sinai School of Medicine is
3   the medical school of the City University of New
4   York.
5          I was appointed associate professor at
6   NYU, that's New York University, in the
7   Department of Occupational Health and Safety in
8   1980, and I taught courses for about a four-year
9   period in ergonomics, which is the science of man
10  and machine interactions to produce useful work
11  without injury to bystanders or operators. I
12  also taught courses there in biomechanics.
13         I taught at the associate professor
14  level at the City College of the City University
15  of New York in the early '80s for a number of
16  years. I taught in the Department of Engineering
17  technology courses in applied mechanics, strength
18  of materials and materials science and
19  engineering. That was all pure engineering
20  courses.
21         I also taught at the associate
22  professor level at the Cooper Union School of
23  Engineering in New York City for about four years
24  in the early '80s. I taught courses there in
25  biomechanics, biomaterials and materials science

Page 9

1          Pugh
2   and engineering.
3          I was promoted to full professor at
4   the State University of New York at Stony Brook
5   in 1984, and I also assumed a full professorship
6   in the Department of Materials Science and
7   Engineering at Stony Brook at that time.
8          And I continued to serve as professor
9   in the medical school in 1986 when I began my
10  full-time practice of consulting engineering here
11  at Inter-City Testing and Consulting Corporation,
12  and I maintained my professorship at Stony Brook
13  in the Department of Materials Science and
14  Engineering up until about 1988 or thereabouts.
15         I currently offer a course at the full
16  professor level at the Cooper Union School of
17  Engineering in New York City which is taken by
18  upper level graduate students. It's a catalogue
19  course called EID 124, bioengineering in accident
20  reconstruction, injury prevention and safety.
21     Q.   Have you published anything
22  professionally?
23     A.   My curriculum vitae lists I believe 73
24  publications in engineering and bioengineering.
25         MR. BENTON:  I will have marked as

**DR. JAMES PUGH - AFTERNOON SESSION**                    **AUGUST 16, 2001**

4 (Pages 10 to 13)

Page 10

```
1              Pugh
2      Exhibit 1 to your deposition this document
3  here I am going to have shown to you.
4          (Plaintiff's Exhibit 1, curriculum
5      vitae, marked for identification, as of this
6      date.)
7      Q.   Can you identify Exhibit No. 1?
8      A.   That's my curriculum vitae with the
9  list of scholarly activities.
10     Q.   Is that basically a professional
11 resume?
12     A.   Yes, sir.
13     Q.   Now, you said that you have been doing
14 forensic engineering testing since the '60s, but
15 how long have you done it full time?
16     A.   Since 1986.
17     Q.   What exactly -- can you describe the
18 kind of work that involves?
19     A.   Well, it involves -- my practice
20 really has to do with bodily injury, human
21 injury, and the engineering circumstances
22 surrounding it.
23          And my practice consequently involves
24 a large number of different types of accidents,
25 among them accidents occurring on ladders,
```

Page 11

```
1              Pugh
2  ladders that have failed as we are going to be
3  talking about today.
4          And my assignments typically involve
5  analyzing the injuries and the engineering
6  circumstances surrounding those injuries, which
7  in the case that we are going to be talking today
8  about includes what we call the failure analysis
9  of the ladder.
10     Q.   Who would be your clients in these
11 kind of cases?
12     A.   I do work for a large variety of
13 interested parties.
14          I do work for attorneys who represent
15 injured parties in court actions.  I do work for
16 -- a lot of work for insurance companies who
17 represent insurers' interests in various
18 accidents.
19          I do work for companies who are
20 defendants in various lawsuits, and I do a
21 reasonable amount of criminal work.
22          I work for not only prosecutors but
23 also for district attorneys, and I should add I
24 do a reasonable amount of work for district
25 attorneys in the New York City metropolitan area,
```

Page 12

```
1              Pugh
2  including the major boroughs and Westchester
3  County.
4          I should add a large fraction of what
5  I do for them is done as a professional courtesy
6  and as a public service for which I do not bill
7  and do not get paid.
8      Q.   Do you belong to any affiliations as
9  far as your engineering profession?
10     A.   Yes, sir.
11     Q.   Can you tell us about those?
12     A.   Well, the engineering affiliations
13 include the American Society for Testing and
14 Materials, or the ASTM, which is a standard
15 setting organization, the ASME or American
16 Society for Mechanical Engineers, the SPE or
17 Society of Plastics Engineers.
18          The National Association for
19 Professional Accident Reconstruction
20 Specialists.
21          I belong to the Orthopedic Research
22 Society, Society for Biomaterials.  That's an
23 overview.
24          New York State Society for
25 Professional Engineers, National Society for
```

Page 13

```
1              Pugh
2  Professional Engineers.
3      Q.   You charge for your services including
4  testifying; is that correct?
5      A.   I charge for my time, yes, sir.
6      Q.   And Mr. Escudero is paying you for
7  your time today; is that right?
8      A.   Well, I don't know who is paying me,
9  but I am being paid for my time today, yes.
10     Q.   How do you charge for your time?
11     A.   My time is billed at a rate of $250 an
12 hour.
13     Q.   The first time we met was when?
14     A.   This morning.
15     Q.   Prior to that our association has been
16 how?
17     A.   Telephonically.
18     Q.   We're here today because of an
19 accident in which Mr. Jose Escudero was injured
20 when he fell off a Bauer ladder, you understand
21 that, right?
22     A.   Yes, sir.
23     Q.   Prior to being apprised of the facts
24 surrounding Mr. Escudero's accident, had you had
25 occasion to be involved in Bauer ladders on a
```

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 185 of 328

Page 14

```
 1          Pugh
 2  professional basis?
 3     A.  Yes, sir.
 4     Q.  Can you tell us about those?
 5     A.  Well, I had done analyses of two prior
 6  accidents.
 7        MR. GENDRY:  Let me make an objection
 8  to the form.
 9     A.  I had done and had been retained to
10  analyze two prior accidents that resulted in
11  injury to people using Bauer ladders, very
12  similar Bauer ladders under very similar
13  circumstances.
14        The captions were Smith versus Bauer
15  and Scott versus Bauer.
16     Q.  Which one was first?
17     A.  I believe the Scott case preceded the
18  Smith case.
19     Q.  And do you remember the date of injury
20  in that case?
21     A.  I don't have that committed to memory,
22  no.
23     Q.  Do you remember roughly what the case
24  was about?
25     A.  Well, I remember what both cases were
```

Page 15

```
 1          Pugh
 2  about.
 3     Q.  I thought we would start with one
 4  first and then the next.
 5        MR. GENDRY:  Objection to the form.
 6     A.  They were both very similar by my
 7  recollection.
 8        They both involved situations where
 9  the gentlemen were using a Bauer ladder,
10  fiberglass ladder much as we have here today,
11  climbing up on the ladder, performing ordinary
12  routine activity when the ladder precipitously
13  collapsed on them, throwing them to the
14  horizontal surface and resulting in significant
15  injury.
16        And both of those ladders exhibited
17  the same failure mechanism, I should add, as was
18  exhibited in the Escudero ladder.
19     Q.  Namely what?
20     A.  Maybe it would be best to have the
21  ladder in front of us, a photograph, but
22  basically it was -- can you focus in on this?
23        Basically what happened was there was
24  a splitting of the rear legs that caused the rear
25  legs, if you will, to turn to rubber, as it was
```

Page 16

```
 1          Pugh
 2  described, and caused the ladder to collapse.
 3        The rear legs split in an upward
 4  manner which caused them to lose their structural
 5  integrity and failed to support the weight of the
 6  person on the ladder.
 7     Q.  How were the ladders similar in the
 8  two previous cases to the Escudero case?
 9     A.  Well, all three of these ladders were
10  Bauer manufactured fiberglass ladders and they
11  all had very similar, if you will, foot
12  treatments.
13        That is, the bottom of the legs were
14  very similar in each of the three types of --
15  they were virtually identical ladders in all
16  three cases.
17     Q.  When I contacted you about your
18  services, what was your assignment?
19     A.  Well, you asked me to examine the
20  ladder that Mr. Escudero was using at the time of
21  his accident, to advise you about the way the
22  failure occurred that caused him to sustain
23  severe injury to his foot and ankle area, and to
24  let you know what could have been done to prevent
25  this occurrence.
```

Page 17

```
 1          Pugh
 2     Q.  And what did you do to form a
 3  considered opinion in this matter?
 4     A.  Well, initially you shipped to me the
 5  ladder that he was using at the time of the
 6  accident, and you were kind enough to send me
 7  some medical information relating to the
 8  injuries.
 9        You sent me his deposition transcript,
10  his testimony wherein he described the
11  background and the accident and the condition of
12  the ladder when he was using it.
13        You sent me x-rays showing the damage
14  to the left foot.
15        I had a taped statement of
16  Mr. Escudero answering questions relative to the
17  accident, and subsequently I was forwarded
18  materials consisting of a deposition of a
19  Mr. John Vasichko, V-A-S-I-C-H-K-O, who is an
20  employee of Bauer who is in on some of the design
21  work on the Bauer ladders, and a Mr. Richard
22  Poremba, P-O-R-E-M-B-A, who had written a prior
23  report authored by Naismith, N-A-I-S-M-I-T-H,
24  Engineering on the subject ladder that he had
25  examined.
```

Case 1:00-cv-00193  Document 24  Filed in TXSD on 10/19/2001  Page 186 of 328

Page 18

Pugh

1 I received from Dr. Johnson, or that
2 is from you, that Dr. Johnson wrote on behalf of
3 defendant Bauer, a report dated August the 3rd of
4 2001, and I just today received an additional
5 report authored by Dr. Johnson dated August the
6 10th of 2001 which contained the results of some
7 testing that he did on the samples that were
8 removed from the subject ladder.
9         In discovery I received certain
10 documents, including information on ladders,
11 technical specifications, not only on Bauer
12 ladders but other types of ladders, Louisville,
13 Green Bull, Werner.
14         There were some blueprints. I
15 received standards which I already had, ANSI
16 standards.
17         I received an OSHA document,
18 Occupational Safety and Health, and that was
19 really about it.
20         I proceeded to digest all this
21 material, the written materials, I proceeded to
22 take the ladder itself. I carefully documented,
23 and of course I had the report of Naismith
24 Engineering in hand which reported their

Page 19

Pugh

1 examination of the ladder, while I was examining
2 it.
3         I examined where the legs had failed.
4 There were -- as you look at the ladder there
5 were splits that were shown on the ladder in
6 certain positions on the ladder; this being the
7 back rails, this being the front rails, if you
8 can see that.
9     Q.   Can we stop right there.
10         Let's identify the parts of the ladder
11 so that we can talk about them freely with the
12 jury understanding what part we're talking
13 about.
14         The average laymen I think would call
15 them legs, but that's really not what they say in
16 the industry, is it?
17     A.   Well, we use the word legs or rails
18 interchangeably pretty much.
19     Q.   Can you just with the use of your
20 drawing show us where the steps are, where the
21 what they call the web is and some of the areas
22 we're going to be talking about today?
23     A.   Well, probably would be best from the
24 diagram from the ANSI standard here. These are

Page 20

Pugh

1 the rails, the support rails, these are the back
2 rails, these are the front rails, these are the
3 steps, these are the rear cross-braces, this is
4 the spreader, and the web mechanism is at the
5 top.
6         It's a pretty standard stepladder
7 we're talking about.
8     Q.   What was your understanding of how the
9 accident happened generally?
10     A.   My understanding was that Mr. Escudero
11 was -- had taken the ladder to where he was going
12 to be using it. He examined the ladder to see
13 that it was in usable condition.
14         He proceeded to climb up the ladder
15 to, I believe it was the fourth or fifth step,
16 and he was performing an overhead operation when
17 all of a sudden the ladder just collapsed on him
18 or collapsed with him on it, and his left foot
19 hit the horizontal surface sustaining a severe
20 fracture.
21     Q.   You have had a chance to study the,
22 what we're going to call the subject ladder, the
23 one that was involved in this accident?
24     A.   Yes, sir, in quite a bit of detail.

Page 21

Pugh

1     Q.   Based on what you understood from
2 Mr. Escudero, as well as haven't you read some
3 other depositions of witnesses that were at the
4 scene?
5     A.   I only had the depositions of Mr. --
6 well, yes, I did. I'm sorry. You're absolutely
7 correct.
8         I did read and summarize the
9 depositions of Carmen Escudero, Jose Escudero,
10 Sr., Jessie Ramirez, Ramundo Medina.
11         Thanks so much for reminding me of
12 that.
13     Q.   Based on what you learned from the
14 testimony of the other witnesses and from your
15 study of the subject ladder, did you come to any
16 conclusions about how this accident happened?
17     A.   Yes, I did, sir.
18     Q.   Can you tell us about that?
19         MR. GENDRY: Object to form.
20     A.   Well, what happened in this particular
21 accident was the, and this is my drawing of the
22 subject ladder, these are the -- this I have
23 labeled legs 1 and 2 which are the ones you would
24 climb up.

Page 22

1              Pugh
2         Legs 1 and 2 are these legs over here,
3    are rails that were the ones that you would climb
4    up, have the steps on them. The back legs are
5    labeled 3 and 4.
6         And basically what happened was there
7    were cracks, small cracks in these legs that when
8    Mr. Escudero was on the ladder zipped up the back
9    legs destroying the mechanical integrity of the
10   back leg and allowing the ladder to fall over and
11   throw him to the floor.
12       Q.   From studying the ladder did it appear
13   that some of the cracks preexisted Mr. Escudero's
14   fall?
15       A.   Yes. There were preexisting cracks in
16   the ladder at the time he mounted the ladder just
17   before the fall.
18       Q.   And did the fall itself in your
19   opinion or not expand or propagate the cracks?
20       A.   You mean the actual event of the
21   ladder hitting the horizontal surface?
22       There may have been some propagation.
23   I can't conclude the amount of that, but there
24   may have been some. Not significant though.
25       Q.   Was there any cracking in the

Page 23

1              Pugh
2    mechanics of the back rails contorting?
3        A.   Oh, yes, that's what in fact
4    happened.
5        The cracks in the back rails started
6    propagating up because there was a load placed on
7    those rails, and they shot up the back rail and
8    essentially reduced the cross-section of the rail
9    to pieces of spaghetti.
10       Q.   Was that while Mr. Escudero was on the
11   ladder?
12       A.   That's correct.
13       Q.   And did you have any information as to
14   how long he was on the ladder before that all
15   happened?
16       A.   My recollection was it was just a
17   short length of time, just a few minutes.
18       Well, there was testimony he was on
19   the ladder ten, fifteen minutes before the fall.
20   That's from Mr. Medina.
21       Mr. Escudero says he was on the ladder
22   three to ten minutes, so a number of minutes.
23       Q.   You've had a chance to look at the
24   ladder.
25       Did the subject ladder, did its

Page 24

1              Pugh
2    particular design promote or cause this accident
3    to happen?
4        A.   Yes, it did, sir.
5        Q.   How?
6        A.   Perhaps it might be useful to have the
7    ladder in front of us here somehow if we can
8    focus on it.
9        Q.   What I would like to do, I will come
10   over here and see if we can get this shot here.
11   I am going to turn this ladder upside down.
12       First of all, as we show the jury this
13   ladder, that is not the way this ladder looked --
14   I am leading you, and let me rephrase that
15   question -- is this the way the ladder looked
16   when you first received it from my office?
17       A.   No, sir. It did not. You may want to
18   open it up just so we -- thank you.
19       Q.   How is it different here now than when
20   you first saw it?
21       A.   Well, it's different in that -- can we
22   focus on the ladder now?
23       It's different in that the legs 3 and
24   4, the rear legs have been -- the top has been
25   cut out for testing by Dr. Johnson on behalf of

Page 25

1              Pugh
2    the defendant Bauer.
3        When I received the ladder these rails
4    were the same fiberglass rails as you see in the
5    front.
6        Q.   How did the design, if it did,
7    precipitate this accident?
8        A.   The design precipitated the accident.
9    If you let us look at the back rails here in
10   particular, and let's just hold these up to the
11   camera if we could, they have been taped
12   together, and if I could just remove the tape
13   here.
14       The cracks propagated quite a
15   distance, perhaps as much as from here up to
16   here, while Mr. Escudero was on the ladder. And
17   of course it rendered this rail incapable of
18   supporting the load on the ladder, basically
19   reduced it to spaghetti. You see how bendable it
20   is.
21       Of course the other one failed also.
22   The cracks shot up the leg, destroyed the
23   mechanical integrity of the back rails and
24   rendered the ladder unable to support the weight
25   that was on it.

Case 1:00-cv-00193  Document 24  Filed in TXSD on 10/19/2001  Page 188 of 328

**AUGUST 16, 2001**

8 (Pages 26 to 29)

Page 26

Pugh

1       Pugh
2       And I should add that Mr. Escudero was
3   not particularly heavy.  He gives his height as
4   6,1 to 6,2, and his weight 190 to 200 pounds.
5       Q.   How could this ladder have been
6   designed differently to prevent or make this kind
7   of problem less likely?
8       MR. GENDRY:  Object to the form.
9       A.   Well, it's a very simple matter to
10  take the foot and encapsulate the foot in what we
11  call a boot that keeps any splitting, even if it
12  does occur, it keeps the splitting from allowing
13  the leg or the rails to separate so that they
14  maintain their mechanical integrity.
15      Another way to do it, and we have a
16  ladder outside, is to put, simply put an
17  additional fiberglass sheath around the bottom of
18  the leg to make it stiffer.
19      Did you want to pull that in and put
20  that on the camera?
21      Q.   We will do that in a little bit if
22  it's okay.
23      A.   Other things that should be done and I
24  recommend is that the cross-braces as they are
25  shown to be riveted onto this part of the leg,

Page 27

1       Pugh
2   they should also be riveted to the front edge of
3   the rail so that it will not separate so it ties
4   the leg together, much as is done with the steps
5   on the front of the ladder which are riveted to
6   both sides of, of the large front rail.
7       Q.   And there's going to be some talk in
8   this trial regarding these different parts.
9       What do they call this part right
10  here?
11      A.   Well, I call that a flange.
12      Q.   Okay.  I think that's how it's going
13  to be identified.
14      And this part, do some call this part,
15  this wider part, the web?
16      A.   That could be called the web also.
17  With -- a lot of these words are used
18  interchangeably.
19      With regard to beam technology, this
20  would be called the web of the beam.
21      There is also a web that exists up in
22  the top part here that sustains the top step.
23      Q.   Is it significant with the --
24      A.   With regard to the beam, these would
25  be the flanges, this would be the web.

Page 28

1       Pugh
2       Q.   Is there any significance that the
3   cracking or splitting occurred between the flange
4   and the web on the rail?
5       A.   Yes, there is.
6       Q.   What would that be?
7       A.   The structure here, that edge is
8   called a geometric discontinuity.  It's a bend or
9   change in shape of the material at that point,
10  and that means that any loads that are placed on
11  this structure are going to be amplified at that
12  corner, so it's a high stress location.
13      And materials in general fail in
14  regions of the high stresses, so this is the
15  region that's most at risk for failure in this
16  particular structure.  It's the edge of the beam.
17      Q.   Is that something in reasonable
18  engineering probability that could be anticipated
19  by a designer or a manufacturer of a ladder?
20      MR. GENDRY:  Objection to the form.
21      A.   Absolutely.  An engineered structure,
22  a manufactured structure must always be designed
23  and built to accommodate stress concentrators
24  resulting from the geometry of the structure,
25  which is what we're talking about here.

Page 29

1       Pugh
2       Q.   The questions that I am asking you,
3   that I have asked you so far, have they been
4   based on reasonable engineering probability?
5       A.   Yes, sir.
6       Q.   The questions that I am going to ask
7   you in the future, would you also base those
8   answers on reasonable engineering probability?
9       A.   Yes, sir.
10      Q.   And it's your testimony that there are
11  four basic rails to a ladder such as this?
12      A.   Yes, sir.
13      Q.   Would it be a known hazard to a
14  manufacturer, designer of ladders such as this,
15  that they could have cracking or splitting of
16  rails?
17      MR. GENDRY:  Object to form.
18      A.   Yes, sir.
19      Q.   Is that something that they should
20  reasonably anticipate?
21      A.   Yes, sir.
22      Q.   What sort of duty is on a manufacturer
23  in regard to designing a safe product?
24      MR. GENDRY:  Object to form.
25      A.   It really lies in what we call the

9 (Pages 30 to 33)

---

Page 30

Pugh

1
2  principles of hazard management. And the basic
3  principles of hazard management in any situation,
4  but particularly for a designed and manufactured
5  product, is that if there is a hazard in the
6  product, if it can economically and feasibly be
7  designed out the manufacturer must design that
8  hazard out, must eliminate that hazard.
9      Further down the line if it's
10 determined that the hazard, it's not economical
11 or feasible to engineer that or design out that
12 hazard, then it's appropriate to guard against
13 that hazard.
14     And one of the examples of guarding
15 would be the use of a saw, let's say a table saw
16 where you have to have the blade, the hazard to
17 cut the wood. That's the purpose of it. But you
18 can minimize the hazard by putting a guard around
19 the blade that prevents the hand from going into
20 the blade.
21     Now, if it's determined that it's not
22 economical or feasible to either design out the
23 hazard or guard against it, then what's permitted
24 as a last resort is to warn and instruct the user
25 that's the nature of the hazard so they may

---

Page 31

Pugh

1
2  provide appropriate countermeasures to it.
3      Q.   Now, your understanding is that
4  Mr. Escudero was on what step when he fell?
5      A.   He was on the fourth or fifth step by
6  his testimony. I do believe that.
7      Q.   If would you assume that there is
8  going to be some testimony that the user of these
9  ladders are instructed not to go above the fourth
10 step --
11     A.   Yes, sir.
12     Q.   -- is there a method that the Bauer or
13 a similar ladder manufacturer could take to
14 eliminate that risk that someone is going to go
15 up higher than four steps?
16     A.   Yes, sir.
17     Q.   How can they do that?
18     A.   An insert can very simply be put in
19 those steps to prevent someone climbing on those
20 steps.
21     Q.   When you say "an insert," you mean
22 some sort of physical thing that doesn't allow
23 you use it as a step?
24     A.   That's correct, just a flat sheet of
25 plastic in fact, or fiberglass just screwed onto

---

Page 32

Pugh

1
2  the ladder or adhesed onto the ladder.
3      Q.   Under the basic principles of hazard
4  management would that be preferable to warning
5  someone don't get up on the fifth or top step?
6      A.   Yes, sir.
7          MR. GENDRY: Objection, leading.
8      Q.   Have you looked at other similar
9  stepladders to see if they have designed their
10 rails differently to anticipate and deal with
11 this problem of the rail splitting?
12         MR. GENDRY: Object to form.
13     A.   Yes, sir.
14     Q.   What other manufacturers have you --
15 models have you looked at?
16         MR. GENDRY: Object to form.
17     A.   In particular I have observed the
18 Werner, W-E-R-N-E-R, ladders, and the Werner
19 ladders -- and I believe there's a photograph or
20 a brochure showing that have a rather aggressive
21 design to hold the bottom of the legs together to
22 prevent the splitting that you see on the
23 Escudero ladder.
24     I believe you have photographs there,
25 or maybe the brochure might even be better to

---

Page 33

Pugh

1
2  show a photograph of.
3          MR. BENTON: Let me have you mark this
4  as Exhibit No. 2.
5          (Plaintiff's Exhibit 2, photograph of
6  Werner ladder, marked for identification, as
7  of this date.)
8      Q.   Can you identify Exhibit No. 2 for me,
9  please.
10     A.   Yes, sir, this is a Werner ladder.
11     Q.   Does that ladder in its design treat.
12     The problem of splitting or cracking
13 of the rails.
14         MR. GENDRY: Object to form.
15     A.   That shows an additional part at the
16 base of each leg that ties the leg in, or all
17 parts of the leg into the, or the rail into the
18 bottom cross-brace on the back and into the
19 bottom step on the front.
20     Q.   You can take off that little green tab
21 if you would.
22     I will have this marked as Exhibit 3 I
23 believe.
24         (Plaintiff's Exhibit 3, photograph,
25 marked for identification, as of this date.)

---

**DR. JAMES PUGH - AFTERNOON SESSION**  **AUGUST 16, 2001**

10 (Pages 34 to 37)

Page 34

1          Pugh
2          MR. BENTON: While we're at it, let's
3     mark this one as No. 4.
4          (Plaintiff's Exhibit 4, photograph,
5     marked for identification, as of this date.)
6     Q.   Dr. Pugh, I am handing you these
7     Exhibits 2, 3, and 4.
8          I don't know how good a shot we can
9     get from the camera, but I would love the
10    cameraman to try to zoom in as much as he can.
11         Can you talk about how or why you
12    believe that's a superior design for dealing with
13    the problem of cracking rails?
14         MR. GENDRY: Object to form.
15    A.   This is Exhibit 2 that I showed
16    before, but there are closer ups in Exhibit 3 and
17    Exhibit 4 and they show basically the use of an
18    insert at the bottom of the legs that ties and
19    holds the leg parts, the rails and the flanges
20    and the web together to keep them from flying
21    apart as happened with the Escudero ladder.
22    Q.   The technology involved in these shoes
23    or caps that they're putting on these rails, is
24    that technology something that was available when
25    this subject ladder was manufactured?

Page 35

1          Pugh
2     A.   Yes, sir.
3     Q.   I want you to assume that Bauer is
4     representing that this subject ladder was
5     manufactured sometime around 1990, maybe a little
6     before, 1988 to 1990.
7     A.   Yes, sir.
8     Q.   How far back does at least the concept
9     of reinforcing the bottom of the rails on any
10    kind of ladder go back, to your knowledge?
11    A.   There is a patent dating back to the
12    1930s involving the use of a metal cap or metal
13    in support for wooden ladder legs, to stabilize
14    those legs and prevent deterioration and collapse
15    of those legs.
16         So it goes back at least to the '30s,
17    1930s.
18    Q.   Is that the same general principles
19    we're talking about with the Werner shoes?
20    A.   It's the identical principle, yes.
21    Q.   Do you have any knowledge from reading
22    perhaps Mr. Vasichko's deposition, whether it's
23    affordable in the manufacturing process to put on
24    these type of shoes or caps or enclosures around
25    the ends of the rails?

Page 36

1          Pugh
2     A.   Yes. He testified that it was
3     affordable, and I believe he even intimated that
4     it was in fact less expensive to put these boots
5     that Bauer has begun to use on the bottom of the
6     ladder legs on rather than having the fixtures
7     that were on the ladders that were prone to
8     failure.
9          MR. GENDRY: Object as nonresponsive.
10    Q.   Were you able to review Mr. Vasichko's
11    testimony as a representative of Bauer
12    Corporation --
13    A.   Yes, sir.
14    Q.   -- regarding the effectiveness of
15    enclosing the shoe with some sort of vinyl boot
16    in preventing this fracture that occurred on
17    Mr. Escudero?
18    A.   Yes, I do.
19         MR. GENDRY: Object to form.
20    Q.   What did you learn from reading
21    Mr. Vasichko's deposition?
22         MR. GENDRY: Object to form.
23    A.   That this boot was quite effective in
24    preventing the failures that we see in the
25    Escudero and also the Smith and the Scott

Page 37

1          Pugh
2     ladders.
3          MR. GENDRY: Object as not
4     responsive.
5          MR. BENTON: I will have this marked
6     as Exhibit No. 5, please.
7          (Plaintiff's Exhibit 5, photograph,
8     marked for identification, as of this date.)
9     Q.   I am going to show you a photograph
10    that I am going to represent to you is a group of
11    Bauer ladders.
12         MR. GENDRY: I object to form.
13         Is that your question? Object to
14    form.
15         MR. BENTON: I am going to go ahead
16    and have this marked as Exhibit No. 6.
17         (Plaintiff's Exhibit 6, photograph,
18    marked for identification, as of this date.)
19    Q.   I am going to represent to you that 6
20    is a higher shot of these Bauer ladders and that
21    5 is the lower part of the ladders.
22    A.   Yes, I see that.
23         MR. GENDRY: Object to form.
24    Q.   Are those stepladders similar to the
25    one that is the subject ladder here today?

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 191 of 328

Page 38

Pugh

1
2  A.  Yes.
3        MR. GENDRY:  Object to form.
4  A.  Yes, sir.
5  Q.  Is there a meaningful difference in
6  regard to protecting against fracturing or
7  splitting or cracking of the rails at the bottom
8  on those ladders?
9        MR. GENDRY:  Object to form.
10  A.  Yes, sir.
11  Q.  How are those designed differently
12  than the subject ladder here?
13        MR. GENDRY:  Object to form.
14  A.  Should I hold the photograph up?
15  Q.  Sure, please.  Always.
16  A.  These photos show the in treatment or
17  the leg treatment of the newer Bauer ladders
18  consisting of a vinyl boot that is encompassing
19  of the bottom of the front and back legs, and as
20  I said, would tie together the rails, the flanges
21  with the web so that this splitting would not be
22  a problem.
23        MR. GENDRY:  Object to responsiveness.
24  Q.  If there was cracking in the rail,
25  would that type of a boot, both on the Bauer as

Page 39

Pugh

1
2  well as the shoe on the Werner, would they reduce
3  the likelihood that a catastrophic injury would
4  occur from that cracking?
5        MR. GENDRY:  Object to form.
6  A.  Very much so, sir.
7  Q.  I may be a bit redundant, but can you
8  explain again how that would prevent again a bad
9  accident happening?
10        MR. GENDRY:  Object to form.
11  A.  They would positively tie in the leg
12  and it would keep the flanges from separating
13  from the rail, and it would ensure that the
14  mechanical integrity of the leg would exist on
15  the ladder for almost an indefinite period of
16  time.
17  Q.  Does the Bauer treatment of the rail
18  shoe and the Werner treatment of the rail shoe
19  show different methods of dealing with the same
20  problem?
21        MR. GENDRY:  Object to form.
22  A.  Yes, sir.
23  Q.  But on the other hand, do they have
24  similarities?
25  A.  Yes, sir.

Page 40

Pugh

1
2  Q.  You prepared a report of your studies
3  on the subject ladder and comparable ladders; is
4  that true?
5  A.  Yes, sir.
6        MR. BENTON:  I am going to have this
7  marked as Exhibit 7.
8        (Plaintiff's Exhibit 7, a four-page
9  report, marked for identification, as of
10  this date.)
11  Q.  Looking at Exhibit 7, Doctor, can you
12  identify that for us, please.
13  A.  That's my report dated May 22nd of
14  this year, 2001.  It's a four-page report.
15  Q.  Does that report basically summarize
16  your findings and conclusions in this case?
17        MR. GENDRY:  Object to form.
18  A.  Yes, sir.
19  Q.  Let me rephrase that.
20        What does your report do, Doctor?
21  A.  It states in quite a bit of detail the
22  results of my inspection and analysis of the
23  submitted materials, including the ladder, and my
24  opinions and conclusions about how the accident
25  could have been prevented and should have been

Page 41

Pugh

1
2  prevented.
3        MR. GENDRY:  Object to responsiveness.
4  Q.  And what is your opinion as to the
5  cause of this fall?
6  A.  The failure of manufacturer Bauer to
7  eliminate the hazard of the splitting of the legs
8  between the flanges and the web, particularly the
9  rear legs, which is what causes the accident with
10  these ladders.
11        Their failure to eliminate that hazard
12  by encapsulating or tying together the bottom of
13  those legs with some appropriate means which we
14  know to be economical and feasible to do.
15  Q.  In your opinion if they had treated
16  the protection of rails with shoes or caps
17  similar to the present Bauer design, or Werner,
18  do you have an opinion whether this accident that
19  Mr. Escudero was involved in would have happened
20  or not?
21        MR. GENDRY:  Object to form.
22  A.  Yes, I do, sir.
23  Q.  And what is that opinion?
24        MR. GENDRY:  Object to form.
25  A.  My opinion is that had there been an

Page 42

Pugh

2  appropriate treatment of either the subsequent
3  Bauer type or the Werner type or other types that
4  we know of now, that this accident would have
5  never occurred.
6      Q.   Now, there is expected to be testimony
7  that alleges or contends that Mr. Escudero caused
8  his own accident because he failed to observe the
9  cracks that were in the rails at the time he went
10  to use this ladder.
11      Is there -- are these kind of cracks
12  that are present in the subject ladder, and I'm
13  not talking post-accident, I'm talking
14  preaccident, the extent of the cracks, are they
15  something that the average layman or even the
16  average construction worker would be looking for
17  when they took a ladder?
18      MR. GENDRY: Object to form.
19      A.   No, they are not.
20      And let me just demonstrate by using
21  the front rails here.  I will turn the ladder
22  around.
23      The front rails here in fact are also
24  cracked, but these really are stable cracks, at
25  least they didn't propagate in this accident.

Page 43

Pugh

2      And the cracks that existed in the
3  back rails in my opinion were not dissimilar from
4  what existed in the front rails.  In fact, they
5  were similar to this what we see here prior to
6  the subject accident.
7      And this would be interpreted by a
8  worker as being an acceptable structure.  In
9  fact, they wouldn't be inclined to even identify
10  this as a major problem because the ladder with
11  this crack when you put it down is relatively
12  stable.  You can move it and it's stable.
13      The problem is when you get on the
14  ladder, at least with the rear cracks, and put a
15  load or twist it a little bit, which is normal
16  action, the crack will shoot way up the leg
17  immediately and collapse the ladder.
18      It's called an incipiently unstable
19  crack.
20      MR. GENDRY: Object to responsiveness.
21      Q.   In your studies have you found that
22  when a worker goes to look at the ladder before
23  he uses it, that he understates the importance of
24  inspecting the back rails, the skinnier rails?
25      MR. GENDRY: Object to form.

Page 44

Pugh

2      A.   Yes, sir, very much so.
3      Q.   Why do you think that's so?
4      MR. GENDRY: Object to form.
5      A.   The workers don't regard the back
6  rails as a major load-carrying structure of that
7  importance with regard to keeping the ladder up.
8  Their weight is mainly on the front, more massive
9  rails.
10      In fact, the rear rail legs are
11  smaller in cross-section and they're inherently
12  weaker, and the inspection is generally done of
13  the area where you're going to put your weight,
14  and the attention is paid more closely to that
15  typically.
16      Of course there is nothing on the
17  ladder, there is no warning or instruction to
18  indicate that attention should be paid to the
19  rear legs, particularly because those are the
20  ones that are going to throw you.
21      Q.   I anticipate there is going to be some
22  testimony about the ANSI standards.
23      First, what does ANSI stand for?
24      A.   ANSI is an acronym for American
25  National Standard Institute, which is a standard

Page 45

Pugh

2  setting organization.
3      Q.   Does that institute set standards for
4  things such as stepladders?
5      A.   There is an ANSI standard, yes.
6      Q.   In your opinion can a product, such as
7  a stepladder in this case, comply with those
8  standards and still not be the optimum design?
9      MR. GENDRY: Object to form.
10      A.   Absolutely.
11      Q.   Do you believe this to be the case?
12      MR. GENDRY: Object to form.
13      A.   I believe that -- well, my analysis of
14  this and my analysis of the standards as well as
15  the OSHA requirements, is that they are, as
16  always, intended to provide a minimal or minimum
17  level of safety.
18      And that it is incumbent upon the
19  manufacturer to exceed the requirements of the
20  ANSI standards and the OSHA standards, and
21  requirements to produce a product that is
22  reliably safe and it has hazards that are
23  reasonably eliminated.
24      MR. GENDRY: Object to
25  responsiveness.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 193 of 328

Page 46

Pugh

1
2    Q.   In your study did you have certain
3    opinions about the integrity or the quality of
4    the fiberglass involved with the subject ladder?
5         MR. GENDRY:  Object to form.
6    A.   Yes, sir.
7    Q.   And what were your conclusions about
8    the -- let me ask you, how did you study the
9    quality of the fiberglass itself where it's
10   relevant on this ladder?
11        MR. GENDRY:  Object to form.
12   A.   I examined the failed -- if you can
13   pick that up for me -- thank you.
14        I examined the fracture surfaces, the
15   key fracture surfaces that resulted in the
16   collapse of the ladder under the microscope, and
17   I determined that in fact the failure of these,
18   the joint or the edge or surface between the
19   flanges and the web, was what we call a brittle
20   failure.  That is, you can fit the pieces back
21   pretty much together.  It's a very low energy
22   absorptive failure.
23        And in examination I noticed that the
24   fiberglass fibers, the actual cloth, the way it
25   failed along here was predominantly between

Page 47

Pugh

1
2    fibers running this way rather than across fibers
3    running this way.
4         And of course the nature of the
5    failure being brittle is unacceptable in an
6    engineering sense, and would demand there be an
7    enhancement of properties by the use of a boot or
8    some stabilizing device to accommodate this.
9         MR. GENDRY:  Object to responsiveness.
10   Q.   In a little more simpler terms for
11   someone like myself, did you believe that the
12   quality of the fiberglass was not sufficient?
13        MR. GENDRY:  Object to form.
14   A.   I felt that the fiberglass was not of
15   sufficient quality given the absence of an
16   encapsulating boot or encapsulating type of
17   assembling at the bottom of the leg.
18        That in conjunction with the lack of
19   the boot, the weakness at that edge there was
20   promotive of the failures that we see here.
21   Q.   If there were more cross-fibers of
22   fiberglass going across instead of just
23   long-wise, would that have strengthened this
24   vital area where the crack occurred?
25        MR. GENDRY:  Object to form.

Page 48

Pugh

1
2    A.   Yes, it would have.
3    Q.   Now, I anticipate that there is going
4    to be some testimony that Mr. Escudero or someone
5    was using this ladder at a time when the cracks
6    or fractures were quite extensive like they are
7    today.
8         And some of the evidence there in
9    their attempt to show that is with either paint
10   or spackling in the cracks.
11        Did you take a look at those cracks to
12   see if you saw things like spackling or paint in
13   them?
14   A.   Yes, I did.
15   Q.   What did you find?
16   A.   I did not find any evidence of spackle
17   or paint on the specific fracture surfaces
18   involved with the splitting of the rail or flange
19   to web joint in the back rails.
20   Q.   You testified earlier that you had an
21   opportunity to read the two reports of Dr.
22   Johnson, the Bauer Corporation's expert; is that
23   right?
24   A.   Yes, sir.
25   Q.   Starting with the first report, did

Page 49

Pugh

1
2    you notice one of his conclusions was that there
3    was no evidence of a bad design to the subject
4    ladder?
5    A.   Yes, sir.
6    Q.   Did you see any analysis of
7    alternative designs in his report?
8    A.   No, sir.
9    Q.   How would you characterize his
10   analysis in coming to that conclusion based on
11   his report?
12        MR. GENDRY:  Object to form.
13   A.   I disagree with his findings and we
14   have specific examples of ladders, the Werner
15   ladders with the encapsulating feet that were
16   produced around the same time that this ladder
17   was manufactured, mainly 1988 to 1990, which were
18   much more stable and much more resistant to this
19   type of failure.
20        MR. GENDRY:  Object to responsiveness.
21   Q.   Did you find he even addressed the
22   alternative designs in his first report?
23        MR. GENDRY:  Object to form.
24   A.   I don't recall that he did address
25   that.  I am not finding my copy of that report.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 194 of 328

Page 50

```
 1              Pugh
 2     Q.  Then I will just give you this one
 3  anyway.  There it is right there. if you would
 4  like to use mine.
 5     A.  Thank you so much.
 6     Q.  In looking at the second report, I
 7  believe it's August the 10th; is that right?
 8     A.  Yes, sir.
 9     Q.  What basically was that report
10  purporting to try to show?
11     A.  Well, this August 10th report was the
12  result of testing that was done on the sections
13  that were removed from the accident ladder.
14        And basically what was done was test
15  samples were cut out of these pieces and the test
16  samples looked -- is there a marker here we could
17  use?
18        I could get one.  Does that have a
19  felt tip?  I could find one if you would like to
20  take a break for a second to do that.
21        THE VIDEOGRAPHER:  Off the record.
22        The time is 3:51 p.m.
23        (Recess.)
24        THE VIDEOGRAPHER:  We're now going on
25  the record.
```

Page 51

```
 1              Pugh
 2        The time is 3:52 p.m.
 3  BY MR. BENTON:
 4     A.  Test samples were cut out of the
 5  fiberglass and they were subsequently tested by a
 6  tensile tester and other means.
 7        Let me make sure I have the
 8  configuration properly.
 9        Basically samples were cut out that
10  looked like this.  That's called -- what we call
11  that is a dog bone specimen, if you will, or a
12  tensile bar with a reduced cross-section.  And in
13  some cases a rectangular piece was cut out.
14        So the material that was tested was
15  the material in the middle of the flange or the
16  middle of the rail or the middle of the web.
17        And no testing was done at all of the
18  material along the angle, along the edge that
19  actually failed in the subject ladder.
20     Q.  Is that relevant?
21     A.  Well, it most certainly is.
22     Q.  Why?
23     A.  In order to evaluate the factors
24  relating to the failure of this ladder, if you
25  want to do testing you need to do testing of the
```

Page 52

```
 1              Pugh
 2  material representative of what failed in the
 3  accident.  That was never tested.
 4        These flanges, the flat flanges
 5  never failed.  They're still intact.  It's the
 6  corner that failed.  And those were not tested by
 7  Dr. Johnson.
 8     Q.  In your report you discussed the issue
 9  of proper warnings; is that correct?
10     A.  Yes, sir.
11     Q.  Do you have any criticisms of the
12  warning labeling on the subject ladder?
13     A.  Yes, I do.
14     Q.  What are those?
15     A.  Given the configuration of the ladder
16  and the tendency for the ladder to split,
17  particularly in the back legs, the warnings are
18  vague and ambiguous and they don't really
19  indicate exactly what conditions the ladder
20  should be taken out of service, what size crack
21  or where the cracks should be looked for, or
22  anything that would enable the user to adequately
23  identify, look for and identify a structure that
24  is, or failure or an incipient crack that is
25  going to lead to catastrophic failure.
```

Page 53

```
 1              Pugh
 2        And it's also not the way to manage
 3  the hazard.  The hazard should be eliminated, not
 4  warned against.
 5        MR. GENDRY:  Object to responsiveness.
 6        MR. BENTON:  I will pass the witness.
 7        MR. GENDRY:  Let's take a short
 8  break.
 9        THE VIDEOGRAPHER:  We're now going off
10  the record.
11        The time is 3:54 p.m.
12        (Recess.)
13        THE VIDEOGRAPHER:  We're now going on
14  the record.
15        The time is 4:08 p.m.
16  EXAMINATION BY
17  MR. GENDRY:
18     Q.  Dr. Pugh, my name is Tom Gendry.
19        We have met this day for the first
20  time; is that correct, sir?
21     A.  Yes, sir.
22     Q.  Previous to this what we call a trial
23  deposition, you gave a discovery deposition
24  wherein I asked you a series of questions and you
25  responded; is that right?
```

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 195 of 328

Page 54

Pugh
1
2     A.   Yes, sir.
3     Q.   I am going to follow up on some of the
4  questioning presented to you by Mr. Benton in
5  this case.
6          When is it that you first got involved
7  in this case?
8     A.   I recall it was sometime last summer.
9     Q.   And that was on a call from
10  Mr. Benton; is that correct?
11    A.   That's correct.
12    Q.   Mr. Benton in fact retained you and
13  has paid you money with regard to providing
14  review of this case and testifying in this case?
15    A.   That's correct, sir.
16    Q.   And in fact he has sent you some sums
17  of money as the process has gone on?
18    A.   He's paid me for my time that I spent
19  on the case, yes, sir.
20    Q.   And previously we asked that your time
21  log and your fees in this case be attached to the
22  previous deposition and you have agreed to do
23  that; is that correct?
24    A.   I believe that was done, yes, sir.
25    Q.   Partly that was done by what was

Page 55

Pugh
1
2  produced by Mr. Benton.
3          But as to your bills, if there are any
4  more, you're going to attach them; is that
5  correct, sir?
6     A.   I believe that was complete, but yes,
7  if there are any additional I will be happy to
8  attach those.
9     Q.   For the purpose of the jury you
10  charged Mr. Benton, I think you said it was $250
11  per hour as you have spent time working up the
12  case?
13    A.   That's correct.
14    Q.   And up to today you thought you maybe
15  had 15 hours in the case?
16    A.   As a guesstimate, yes, sir.
17    Q.   As a guesstimate.
18          For today's testimony as I understand
19  it, this takes up most of your day, this is a
20  cost to Mr. Benton of $3,000?
21    A.   I am committing a 12-hour day to this
22  particular depo today, yes, sir.
23    Q.   You previously met with Mr. Benton
24  this morning to discuss your expected testimony
25  in the case?

Page 56

Pugh
1
2     A.   We discussed the case, yes, sir.
3     Q.   If you come to Texas to trial, again I
4  assume that you charge $3,000 per day; is that
5  correct?
6     A.   Plus applicable travel expenses, yes,
7  sir.
8     Q.   If you come to trial down in Texas do
9  you charge for your travel time at $3,000 a day,
10  or how does that work?
11    A.   Well, depending on the scheduling, I
12  mean I can only give you an example.
13          If I can be given the time distance I
14  can often travel down in the morning, appear in
15  court and come back in the evening.
16          If it's doable in one day, even if it
17  takes 18 hours of my time, I only bill 12 hours
18  for that.  It's limited to a 12-hour day.
19          If I have to arrive the prior day I do
20  bill the amount of time that it takes to arrive
21  the prior day.
22    Q.   At what rate the prior day?
23    A.   That's billed at $250 an hour, but
24  what I do, I take documents and I read documents
25  on the plane while I'm in transit, so basically

Page 57

Pugh
1
2  I'm working on the case during the time I'm
3  traveling.
4     Q.   Let me ask you a bit about your
5  background.
6          As I understand it, the fiberglass
7  ladder cases that you have worked on have been
8  Bauer cases only?
9     A.   That's correct.
10    Q.   In other words, Bauer Ladder
11  Corporation fiberglass stepladders is what you
12  have been involved with?
13    A.   To the best of my recollection, yes,
14  sir.
15    Q.   And with respect to other brands and
16  models, in particular you mentioned the Werner
17  brand, you have not been involved in any kind of
18  analysis of the Werner product, would that be
19  correct?
20    A.   I do not believe I have been exposed
21  to any failures of Werner products, yes.
22    Q.   I object to the responsiveness.
23          You have not been involved in any kind
24  of analysis of the Werner product, would that be
25  correct?

**DR. JAMES PUGH - AFTERNOON SESSION**                **AUGUST 16, 2001**

16 (Pages 58 to 61)

Page 58

Pugh
1
2     A.   Well, I have analyzed the Werner
3   products in conjunction with the Bauer cases I've
4   worked on, but I have not -- again in my prior
5   answer if you would be so kind -- I have not been
6   involved in analyzing failure of any Werner
7   ladders.
8        Thank you so much.
9        THE VIDEOGRAPHER:  We're now going off
10   the record.
11        The time is 4:12 p.m.
12        (Recess.)
13        THE VIDEOGRAPHER:  We're now going on
14   the record.
15        The time is 4:14 p.m.
16   BY MR. GENDRY:
17     Q.   You have not done an industrywide
18   comparison of ladders that are similar or like
19   the footing on the particular Bauer ladder
20   involved in this litigation; is that correct?
21     A.   I'm not sure I understand the
22   question.
23     Q.   Have you done any study of any other
24   ladder besides the Werner ladder?
25     A.   I surely have examined brochures of

Page 59

Pugh
1
2   the other ladders, Louisville, and I believe it
3   was Green Bull.
4     Q.   This is publications issued by
5   Louisville and Green Bull?
6     A.   Yes, sir.
7     Q.   Have any of those ladders demonstrated
8   footings similar to the Bauer ladder that is
9   involved in this case?
10     A.   I believe so. It doesn't appear to be
11   depicted in the brochure for Green Bull, but
12   there was testimony from the corporate designee
13   for Bauer that Green Bull produces a similar foot
14   treatment.
15        Louisville, the brochure that I have
16   in front of me here, doesn't appear to show that
17   encapsulation either.
18     Q.   So far as you know, there is at least
19   one other model that you know of that you have
20   seen, or at least a publication of, showing a
21   similar footing to the Bauer ladder?
22     A.   Well, there is a full metal foot for
23   the Louisville depicted here in these brochures
24   similar to the vinyl boot of the Bauer, yes.
25     Q.   I am not talking about the boot. I am

Page 60

Pugh
1
2   talking about the shoe similar to the particular
3   ladder involved in this lawsuit.
4     A.   Could you repeat the question,
5   please?
6     Q.   Yes.  Have you examined any other
7   ladders besides the Bauer ladder showing a shoe
8   similar to the shoe on the ladder involved in
9   this lawsuit?
10     A.   I don't recall.
11     Q.   Other than the cases that you have
12   been involved with in the Bauer case, the
13   fiberglass ladders, have you been involved in any
14   other cases involving fiberglass ladders?
15     A.   I do not recall any.
16     Q.   What has been your background
17   concerning the analysis and testing of fiberglass
18   ladders before you ever became involved in this
19   particular case?
20     A.   Fiberglass ladders per se.
21        The only -- well, I'm not sure --
22   well, before this particular case I analyzed the
23   other two Bauer ladder cases, but before that I
24   don't recall any analysis of any fiberglass
25   ladders.

Page 61

Pugh
1
2     Q.   You have never up to today's date done
3   any sort of failure analysis or testing of any
4   fiberglass ladders, would that be a correct
5   statement?
6     A.   With the exception of microscopic
7   analysis.
8     Q.   Microscopic, you mean some sort of I
9   think you called it a stereo microscopic --
10     A.   Yes.
11     Q.   -- viewing of this particular ladder
12   that we have here today?
13     A.   And the other ladders I have analyzed,
14   yes.
15     Q.   And as I understand it, there is no
16   literature specific to ladders that microscopic
17   examination is sufficient to show that there is
18   an insufficient or imperfect weaving of the
19   fiberglass structure of the fiberglass composite?
20     A.   Specifically for ladders, I do not
21   know that.
22     Q.   And before today's deposition you have
23   done no testing on any fiberglass ladders to make
24   the determination that any of the fiberglass mat,
25   meaning the weaving, the longitudinal or

Page 62

Pugh
1
2  transverse weaving is insufficient?
3      A.   Aside from the microscopic analysis,
4  correct.
5      Q.   And previously in the discovery
6  deposition you mentioned that there are a number
7  of tests which could have been utilized to
8  determine the strength of the corner of a ladder
9  as you have put it; is that correct?
10     A.   Yes, sir.
11     Q.   And you mentioned specific tests such
12 as the peel test, the crush test, the torsion
13 test and the microhardness test and the
14 quantitative microscopy; is that correct, sir?
15     A.   Yes, sir.
16     Q.   And you have done none of those tests?
17     A.   That's correct, sir.
18     Q.   In essence you are not able to say
19 within a reasonable degree of engineering
20 probability that the fiberglass mat or the
21 weaving of this ladder was insufficient?
22     A.   I cannot say that to a reasonable
23 probability, that's correct.  I strongly suspect
24 it though.
25     Q.   I object to the responsiveness of the

Page 63

Pugh
1
2  last part of the answer.
3          As I understand it, you're telling the
4  ladies and gentlemen of this jury that you did
5  some sort of microscopic examination here in this
6  facility that we're in here today?
7      A.   Yes, sir.
8      Q.   Is that machine still available for us
9  to look at?
10     A.   If you care to, yes.
11     Q.   In previous testimony you indicated
12 that you can attach a camera to that stereo
13 microscope which you used to look at this
14 particular ladder.
15     A.   Yes, sir.
16     Q.   And with that camera you could take
17 photographs showing what you're saying is
18 insufficient weave of the fiberglass?
19     A.   Yes, sir.
20     Q.   Is that a costly thing for you to do?
21     A.   It's timely, it's not costly.
22     Q.   What sort of time does it take to do
23 that?
24     A.   Well, this ladder is quite bulky and
25 has to be positioned.  The time consumption is

Page 64

Pugh
1
2  the position, adequate positioning and the fixing
3  of the camera in the location to take an adequate
4  photograph.
5      Q.   And as I understand it, the micron --
6  strike that.
7          The stereo microscopy would what,
8  illustrate to the jury what you're trying to say,
9  that there is insufficient fibers going
10 transversely?
11     A.   Well, in part, but it also doesn't
12 show anything that -- I'm not demonstrating right
13 here -- that is, that the splitting is straight
14 up the edge of the ladder without any splitting
15 going into the flat pieces of the material.
16         That's basically what that's saying.
17     Q.   I object as nonresponsive.
18         My question to you, Doctor, is would
19 the microscope enlarge the area such that the
20 jury could see it to determine whether or not
21 there is in fact some sort of insufficient
22 weaving in this case?
23     A.   On their part I wouldn't be able to
24 demonstrate them.
25     Q.   You would not be able to demonstrate

Page 65

Pugh
1
2  that with a microscope?
3      A.   Not to the jury, no.
4      Q.   In other words, the only way to make a
5  clear determination within a reasonable degree of
6  engineering probability is to have done one of
7  these other tests which I've mentioned, the peel
8  test, the crush test and so forth, to make
9  certain that the corner, as you say, had
10 insufficient weaving?
11     A.   No, it's determinable from microscopy
12 but it takes a trained eye to make the
13 determination.
14         And the point of taking a photograph
15 and not being able to demonstrate it is -- taking
16 a photograph is not convincing.
17         It's the analysis and the observation
18 of the fracture surface and the way the
19 striations run that make it probable that there
20 was lack of adequate crossing over of fibers
21 around the corner.
22     Q.   Do you have any, other than this
23 ladder, any demonstrable evidence to prove that
24 the weaving of the fiber transversely as opposed
25 to longitudinally was insufficient?

18 (Pages 66 to 69)

Page 66

1          Pugh
2     A.   Yes, I do.
3     Q.   What?
4     A.   The test results of Dr. Johnson.
5     Q.   And how do the test results of
6  Dr. Johnson show that the fiber was weaved
7  inadequately transversely?
8     A.   Well, it shows the failure mode of
9  samples tested along the flat surface of the
10 flange, and it shows a very different fracture
11 than what is exhibited on the edge.
12         And properly molded -- to complete the
13 answer, and properly molded fiberglass at the
14 edge should show the same fracture
15 characteristics or more closely the fracture
16 characteristics demonstrated by Dr. Johnson in
17 his test samples.
18    Q.   In the discovery deposition you
19 admitted to me that the testing done by
20 Dr. Johnson met the ANSI standards; is that
21 correct?
22    A.   Correct.
23    Q.   In other words, there is an
24 industrywide standard that manufacturers of
25 ladders must meet in order to put the product on

Page 67

1          Pugh
2  the market.
3          Dr. Johnson has tested for that and
4  the ladder met and exceeded those standards?
5     A.   I don't know that there is a
6  requirement that the ladders meet the ASTM
7  standards or ANSI standards.
8          It's a good idea for the manufacturers
9  to comply with them, but I don't know of any
10 statutory requirement.
11    Q.   I stand corrected on that with respect
12 to there being a statute.
13         I said industrywide standard.  There
14 is an industrywide standard on the part of ladder
15 manufacturers to meet the ANSI or ASTM standards?
16    A.   I believe it's what we call a
17 consensus standard; that is, a manufacturer can
18 decide to comply with ANSI or not.
19         If it complies and it's tested to
20 comply they're entitled to put an ANSI sticker on
21 the ladder; otherwise they can't just put an ANSI
22 sticker on.
23    Q.   And you know that Bauer Company did
24 that?
25    A.   I believe they did, yes.

Page 68

1          Pugh
2     Q.   And Dr. Johnson to confirm that did
3  some testing of this portions of the ladder other
4  than the corner, as you say, and found it to meet
5  the ANSI-ATSM standards?
6     A.   That's correct.  He did testing to
7  show something that we already knew, that the
8  ladder is in compliance with the ANSI
9  requirements, with the strict nature of the ANSI
10 requirements.
11    Q.   Dr. Johnson in no fashion stated that
12 the weaving of the ladder transversely was
13 insufficient?
14    A.   He never --
15         MR. BENTON:  Objection to form.
16    A.   That's correct, he never tested for
17 that.
18    Q.   Well, you're saying you can tell from
19 his photographs, the results of his testing that
20 the weaving was inadequate transversely; is that
21 what you're saying?
22    A.   No.  I'm saying that the results of
23 his testing, the photographs of his test samples
24 here that he failed, that he pulled apart and
25 broke, showed a fracture pattern very, very

Page 69

1          Pugh
2  different than what this is here, the splitting
3  of the corner piece.
4          What I am saying is that the corner
5  piece should have shown at least the failure
6  characteristics of these pieces that he tested on
7  the flat surfaces, and they don't.
8          That points to a deficiency in the
9  corner of the ladder.
10    Q.   Object to responsiveness.
11         You previously stated that the weakest
12 point of a structure would be the corner; is that
13 correct?
14    A.   Correct.
15    Q.   That not only applies to fiberglass,
16 it applies to many structures?
17    A.   Correct.
18    Q.   We asked you, Doctor, to produce at
19 your depositions today any professional articles
20 you have reviewed to serve as a basis for your
21 opinions in this case.
22         And as I understand from your
23 discovery deposition, you have no professional
24 articles to support your theories; is that
25 correct?

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 199 of 328

Page 70

Pugh

1
2     A.   I have not relied on any, no.  It's
3  not that I don't have any, I have not relied on
4  any.
5     Q.   And you have not produced in response
6  to our request for production in the depositions
7  in this case, you have not produced any
8  scientific studies to support your opinions in
9  this case?
10     A.   I have not relied on any scientific
11  studies.
12         I relied on the sum total of
13  scientific knowledge in general on the failure
14  characteristics of composites, plastics and
15  materials.
16     Q.   Do you have, Dr. Pugh, any peer review
17  articles supporting your theories of failure in
18  this case?
19         MR. BENTON:  I object to the form.
20  What kind of failure?
21     A.   I'm not sure I understand the question
22  also.
23     Q.   Have your theories that you expressed,
24  your opinions in this case, have they been
25  subjected to peer review by your contemporary

Page 71

Pugh

1
2  engineers?
3         MR. BENTON:  Objection to form.
4     A.   No.  It would be akin to subject
5  Newton's laws to physics to peer review.
6         These principles have been time-tested
7  and proven, and they are part of the general core
8  curriculum taught to engineering students in
9  materials science.
10         They are common concepts and tenets,
11  T-E-N-E-T-S, of materials science, materials
12  science and engineering.
13     Q.   I object to the responsiveness.
14         Yes or no, have you seen any articles
15  by your contemporaries supporting the theories of
16  failure which you have outlined in this case?
17         MR. BENTON:  Objection to form.
18     A.   Everything I see is consistent and
19  supportive of that.
20     Q.   Any specific journal articles?
21     A.   I would only recall an article that
22  would tend to sway me from the commonly accepted
23  principles.  I have never seen such an article.
24         If you have any in mind I would be
25  happy to take a look at it and advise you to the

Page 72

Pugh

1
2  validity of it.
3     Q.   Apparently there are certain tests
4  which you mentioned which if your theory was true
5  about what happened here, which would support
6  your theories, that being the peel test, the
7  crush test and the torsion test and the
8  microhardness test and the quantitative
9  microscopy test.
10     A.   Is that a question?
11     Q.   Yes.
12         MR. BENTON:  Objection to the form.
13     A.   I didn't get the question.
14         It sounded like a statement to me, but
15  I will be happy to answer it if you care to
16  phrase it in a natural form.
17     Q.   You have already stated that there are
18  tests which may give support to your theory of
19  how the failure took place.
20     A.   I don't think I testified to that.
21         You had asked me were there tests that
22  could be done on the edge of this particular, you
23  know, that would, though, show the difference in
24  mechanical properties.
25         And I said yes, there are tests that

Page 73

Pugh

1
2  can be done.
3         I said I don't think it's necessary to
4  do them because the demonstration of the brittle
5  nature of this failure and the way it zips right
6  up this edge without any propagation indicates
7  the weakness in that particular corner.
8         The way you want these things to fail,
9  if a crack starts you want to promote the bulk of
10  failure to the remainder of the material here, to
11  the bulk of the leg.  You don't want to be
12  concentrated all the way up and collapse the
13  ladder.
14         That's a basic concept of design,
15  mechanical science and engineering.
16     Q.   I object to the responsiveness.
17         In your discovery deposition did you
18  not say that a person could test the strength of
19  the corner of the ladder by these various tests
20  you have outlined, the peel, the crush, the
21  torsion, the electron microscopy -- strike that
22  -- the microhardness and the quantitative
23  microscopy?
24     A.   Yes, sir.
25     Q.   You have done none of those?

Page 74

Pugh
1          Pugh
2     A.   That's correct, I have not done them.
3     Q.   Most of your work has been involved in
4  biomechanics and ergo economics did you say?
5     A.   Ergonomics.
6     Q.   Ergonomics.
7     A.   I have done considerable work in
8  biomechanics and ergonomics, yes.
9     Q.   Can you explain to the jury what
10  subspecialty that is or what that involves?
11     A.   Ergonomics is that science that has to
12  do with, for example, man-machine interactions
13  such that operators of machinery or equipment can
14  produce useful work without injuring themselves
15  and without injuring bystanders.
16         This particular ladder situation would
17  fall in the area of ergonomics.  Having a worker
18  on a ladder producing a task in a manner that
19  would not be injurious to himself or bystanders
20  and the ergonomics features of this ladder were
21  part of the analysis that I did on this
22  particular case.
23     Q.   And what is the field of biomechanics?
24     A.   Biomechanics is that branch of
25  bioengineering that applies the laws of physics,

Page 75

1          Pugh
2  mechanical engineering and material science to
3  the human body to, for example, to explain how
4  certain injuries are produced in certain
5  circumstances, and how they can be prevented.
6     Q.   And your curriculum vitae contains
7  articles that you have published concerning
8  bioergo -- how do you say that?
9     A.   Ergonomics.
10     Q.   Bioergonomics --
11     A.   It's just ergonomics and biomechanics.
12     Q.   And you have published in that area;
13  is that correct?
14     A.   Yes, sir.
15     Q.   You have not published in the area of
16  ladder failure; is that correct?
17     A.   I have not published a paper on ladder
18  failure, that's correct.
19     Q.   In the discovery deposition I think we
20  learned from you that you agree that this ladder
21  bore cracking and splitting before Mr. Escudero
22  ever got on the ladder.
23     A.   That's correct, sir.
24     Q.   And you understand the history of
25  Mr. Escudero and his family, that they were in

Page 76

1          Pugh
2  the construction business?
3     A.   Yes, sir.
4     Q.   They were required to abide by the
5  OSHA standards concerning inspection of ladders?
6     A.   In principle, yes.
7     Q.   And you understand that Mr. Escudero,
8  Jr., the person who was injured, that he was the
9  manager and at least a part owner of the
10  construction business?
11     A.   I believe that's correct, yes, sir.
12     Q.   You learned from his deposition that
13  he had been involved in many jobs concerning
14  construction?
15     A.   Yes, sir.
16     Q.   And it's your understanding, is it
17  not, that OSHA required him to inspect daily a
18  ladder to see whether or not it had any cracking
19  or splitting or damage to the parts such that it
20  should have been removed from service?
21     A.   That's correct, sir.
22     Q.   If this ladder had been looked at it
23  was obvious, was it not, that the cracks were
24  visible?
25     A.   If one looks for the cracks one could

Page 77

1          Pugh
2  find them, yes.
3     Q.   In other words, some of these cracks,
4  especially on the back rails that we're talking
5  about, were even widened and worn so extensively
6  that there were gapes or gaps, would that be
7  correct?
8     A.   There were small gaps a fraction of an
9  inch.  A small gap that if one looked for that
10  gap one could find it, but it wasn't something
11  that could jump out to the casual observer.
12     Q.   Objection as to the responsiveness to
13  the last part of the answer.
14         In other words, if one were to look at
15  those cracks they would be seen as through and
16  through, you could see daylight?
17     A.   No, I would answer in the affirmative
18  to the question if someone were looking for these
19  cracks they could find them.
20     Q.   So if a person or contractor who is
21  required to abide by OSHA to inspect for cracks,
22  if he had looked at the ladder to look for cracks
23  they would have been visible?
24     A.   Yes.
25     Q.   And it's a failure to exercise

Page 78

Pugh
1
2  ordinary care on the part of an individual or
3  employer required to inspect for cracks not to
4  have done so?
5      A.   The cracks were inspected for by
6  Mr. Escudero and he did not see them by his
7  testimony and by my understanding of his
8  testimony.
9      Q.   Object to the responsiveness.
10         Assuming the ordinary contractor,
11 employer in a construction business, they have
12 the duty to inspect for cracks daily on ladders;
13 is that correct?
14     A.   That's what OSHA says, yes.
15     Q.   And some of these cracks show daylight
16 through them, do they not?
17     A.   Well, they do if you happen to be in a
18 position for the leg to shine daylight through
19 it.
20         Remember these cracks were at the
21 bottom of the legs.  When the ladder is inspected
22 prior to use it's more than likely to be
23 inspected in a stood up, erect position on the
24 floor, and it would be highly unlikely that
25 someone would bend down and lie on the floor to

Page 79

Pugh
1
2  examine in detail the legs.
3         In fact, that's too much to ask for a
4  daily inspection.  The daily inspection would
5  more than likely be a cursory examination of the
6  ladder close enough to pick out any gross failure
7  of the legs.
8         I don't regard this cracking as gross
9  failure, the cracking that existed at the time
10 Mr. Escudero mounted the ladder.
11        In fact, it's too much to ask, I
12 believe, for a construction person or manager to
13 pick the ladder up and place it on a table and do
14 a detailed examination of each and every part of
15 the ladder for cracks.
16     Q.   Object to the responsiveness of the
17 last part of the answer.
18         You have read some of the testimony in
19 this case by Richard Poremba, engineer?
20     A.   Yes, sir.
21     Q.   Did you read his testimony that
22 preexisting cracks extended as much as 20 or 22
23 inches up one of the rails?
24     A.   I'm not sure I agree with that, but I
25 did read his testimony about that.

Page 80

Pugh
1
2      Q.   That's a fairly significant length of
3  crack, is it not, preexisting?
4      A.   Well, that's correct.
5         And we have a crack on this edge here
6  which is not separated, it's almost that long,
7  which is not obvious from the outside of the rail
8  because it doesn't penetrate all the way through
9  the rail.
10     Q.   So you agree then with Mr. Poremba
11 that there may have been a preexisting crack as
12 much as 20 or 22 inches in length?
13     A.   Not a through crack, I disagree with
14 that.
15     Q.   Even some of these cracks had paint or
16 debris which had -- which were inside the area
17 that had been abraded away over time, would you
18 agree with that?
19     A.   I could find no evidence of anything
20 inside any of the cracks in the fracture surfaces
21 themselves that it separated.
22         There was debris that was adjacent to
23 the fracture surfaces and close to, and there was
24 debris that was on abraded areas outside the
25 fracture surface but not right actually in the

Page 81

Pugh
1
2  pieces that come apart.
3      Q.   In other words, you're telling the
4  jury that there had been such an abraded area,
5  that sometime before where the area was abraded
6  away next to the crack there was a spot of paint?
7      A.   I would agree with that, yes.  And of
8  course that occurred on one of the legs down
9  rather low, down around the area of the rivet for
10 the angle reinforcement of the bottom
11 cross-brace.
12         THE VIDEOGRAPHER:  We're now going off
13 the record.
14         The time is 4:38 p.m.
15         (Recess.)
16         THE VIDEOGRAPHER:  We're now going on
17 the record.
18         The time is 4:40 p.m.
19     Q.   In reviewing the depositions in this
20 case, particularly of Mr. Escudero and some of
21 his employees, it became obvious that this ladder
22 originally came from the Santa Rosa Independent
23 School District near Brownsville, Texas?
24     A.   I wouldn't disagree with that.
25     Q.   In fact, there has been stenciling

PHONE #(210)377-3027
7800 IH-10 WEST, SUITE 100
ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230
FAX #(210)344-6016
1-800-969-3027

**DR. JAMES PUGH - AFTERNOON SESSION**                    **AUGUST 16, 2001**

22 (Pages 82 to 85)

Page 82

Pugh
1        Pugh
2    shown on the side of the front rail or the ladder
3    to that effect?
4        A.   I am aware of that, yes.
5        Q.   You don't know and nobody has
6    testified as to when this ladder left the hands
7    of the Santa Rosa Independent School District?
8        A.   I would agree with that.
9        Q.   In effect, nobody knows the history of
10   this ladder from the time that it left the Santa
11   Rosa Independent School District, whatever time
12   that may have been, up to the time that
13   Mr. Escudero used it?
14       A.   I would basically agree with that,
15   yes.
16       Q.   All ladders eventually can become
17   broken, worn out, damaged, abused and have to be
18   taken out of service; is that, generalized, a
19   correct statement?
20       A.   All of that falls within the realm of
21   possibility, yes.
22       Q.   You read the testimony of Mr. Escudero
23   that his business had the job of cleaning up job
24   sites at various construction sites?
25       A.   I believe that was one of his

Page 83

1        Pugh
2    activities, yes.
3        Q.   For all you know or we know, this
4    ladder may have been disposed of as that it
5    should have been taken out of service at some job
6    site, somebody left it there and somebody picked
7    it up and provided it to Mr. Escudero's company?
8        A.   That may have happened, but then that
9    would have been a disposal contrary to OSHA
10   requirements.
11       Q.   I understand if you are going to take
12   one of these out of service you tie it up and you
13   mark it that it should be taken out of service
14   and then you take some means to cut it up and
15   destroy it?
16       A.   You break it.
17       Q.   Right.  And that was not done in this
18   particular case, was it?
19       A.   That's correct.
20       Q.   It is within the realm of possibility
21   that someone had concluded before Mr. Escudero
22   got on this ladder that it was broken and it
23   should not be used?
24       MR. BENTON:  Objection to form.
25       A.   Is a conjecture, yes.

Page 84

1        Pugh
2        Q.   It's a possibility?
3        A.   It's a possibility.
4        Q.   You cannot say that this ladder was
5    not damaged because of abuse?
6        MR. BENTON:  Objection to form.
7        A.   I do not believe this ladder was
8    abused.
9        Q.   Ladders can suffer, such as these
10   fiberglass ladders can suffer cracks if enough
11   pressure is placed against the ladder that it
12   starts cracking?
13       A.   Absolutely.
14       Q.   Or as you mentioned, if the ladder
15   hits the floor, that could make a ladder crack
16   further than what it had already cracked?
17       A.   That's correct.
18       Q.   If a ladder is misused, by that I mean
19   banged around, thrown around, things placed on
20   top of it, eventually it can suffer cracking?
21       A.   Absolutely.
22       Q.   And OSHA speaks to that requiring that
23   the ladder be removed from service if that is
24   noticed in the ladder?
25       A.   That's correct.

Page 85

1        Pugh
2        Q.   At the time that this ladder left the
3    manufacturer sometime in 1988 to 1990, I think
4    that's when we believe that the testimony has
5    been when this ladder was manufactured; is that
6    correct?
7        A.   That's correct, sir.
8        Q.   You know of no scientific evidence
9    demonstrating that at that time the ladder was
10   defective in manufacture?
11       A.   Could you please read that question
12   back to me.
13       (Record read.)
14       Q.   Let me repeat the question, rephrase
15   the question.
16       At the time that this ladder left the
17   manufacturer's hands when it was manufactured in
18   1988 to 1990, you know of no scientific evidence
19   demonstrating that this ladder was defective in
20   the manufacturing process?
21       A.   I have not seen produced in discovery
22   anything by Bauer that they did any testing to
23   reveal the inherent flaws in this ladder,
24   correct.
25       Q.   And you have not been provided with

**DR. JAMES PUGH - AFTERNOON SESSION**                    **AUGUST 16, 2001**

23 (Pages 86 to 89)

Page 86

Pugh
1
2    any testing data demonstrating to the jury proof
3    that the materials were defective in any fashion
4    when they left -- when it left the hands of Bauer
5    manufacturing?
6        A.   You're talking about absolute proof
7    now?
8        Q.   Yes, sir.
9        A.   Rarely is anything like this rendered
10   to absolute proof.
11       Q.   Is the answer no, you have not?
12       A.   Not to absolute proof, no.
13       Q.   You have been provided with no
14   materials and you have none demonstrating by any
15   scientific means that the materials in this
16   ladder were defective when it left the hands of
17   the manufacturer?
18       A.   You're talking about the materials
19   now, not the design?
20       Q.   The materials, integrity of the
21   materials.
22       A.   Again, I didn't receive in discovery
23   the results of any testing, nor do I know of any
24   testing that Bauer did to verify the safety of
25   the ladder.

Page 87

Pugh
1
2        Q.   If a ladder has a boot on it, that
3    does not mean necessarily that the rail which is
4    inside the boot will not fracture at some time?
5        A.   That's correct.
6        Q.   In other words, if we took this
7    particular ladder here and we had a boot on it up
8    to here, that doesn't mean that, depending upon
9    how the ladder was used or what happens to the
10   ladder, some ten years later it might have a
11   crack somewhere up the rail?
12       A.   That could happen.
13       Q.   And if so, the ladder again should be
14   taken out of service whether or not it has a boot
15   on it?
16       A.   That's correct.
17       Q.   Are you aware of ladders produced
18   today that are almost identical with respect to
19   the shoe and the cross-bracing and the angle
20   bracing as on this particular ladder?
21       A.   Only through the brochures.
22       Q.   There are some, are there not?
23       A.   Apparently.
24       Q.   Do you know that there is a Werner
25   ladder which is almost identical to this sold on

Page 88

Pugh
1
2    the market today with the same type of shoe, with
3    the same single brace to the rear flange rail
4    attached to the cross bar?
5        A.   I believe that, but I do not see any
6    of those in service.
7        Q.   Let me just represent to you to assume
8    that one will be produced at trial bought from
9    Home Depot just a week ago, would you say that
10   that ladder is defective?
11       A.   Absolutely.
12       Q.   Why?
13       A.   Well, I would have to see it, but if
14   it doesn't encapsulate the bottom of the leg and
15   the fiberglass is not sheathed up or beefed up
16   it's going to split and cause a problem.
17           But I would have to see the specific
18   Werner ladder. It's not in front of me, so I
19   can't really pass judgment on it adequately.
20       Q.   I think what you are saying, is it
21   not, Doctor, that a ladder with a sheath or a
22   boot on it may last longer than one that doesn't
23   have a boot on it?
24       A.   It will surely last longer, yes.
25       Q.   Just because one product will outlast

Page 89

Pugh
1
2    another doesn't make the product with the least
3    life on it defective, does it, in design?
4        A.   Well, if that increase in longevity
5    also has a commensurate reduction in hazard, then
6    there is a benefit to be accrued from that
7    longevity, a safety benefit to be accrued from
8    that longevity.
9        Q.   If you have a BMW with a strong shock
10   in it versus a Ford with a weaker shock, that
11   doesn't make the Ford vehicle defective, does it?
12       A.   Depends if the shock fails at a
13   thousand miles in the weaker one and causes an
14   accident and kills somebody, then that's been
15   demonstrated to be a hazard that causes
16   significant problems.
17       Q.   Generally speaking, Doctor, in just
18   about every line of products you're going to find
19   differently designed models?
20       A.   I would agree with that.
21           MR. BENTON: Objection to form.
22       Q.   And to take my analogy, and it may not
23   be the greatest analogy, for example, in the
24   automotive industry, it's well-known that some
25   shocks are better than others, it will last

Page 90

Pugh
1
2    longer; is that right?
3        A.   I would generally agree with that.
4        Q.   Some engines are built better than
5    other engines, they will last longer?
6        A.   Absolutely.
7        Q.   So simply to say that this ladder when
8    manufactured in 1988 because it did not have a
9    boot on it, that in and of itself does not make
10   it a defective design, would you agree?
11       A.   Not, I don't agree with that.
12       Q.   You're telling the ladies and
13   gentlemen of the jury that just because this
14   ladder did not have a boot on it, given its other
15   characteristics, that it was defectively
16   designed?
17       A.   Yes.
18       Q.   And by "other characteristics," it's
19   your belief, or what you're telling the jury is
20   that the cross-bracing, you could have had more
21   cross-bracing, is that one of the features?
22       A.   Well, what I'm saying specifically is
23   this ladder as produced, if anyone, an ergonomist
24   for example, such as me, had come into the
25   company to evaluate this prior to production, I

Page 91

Pugh
1
2    surely would have been able to tell them just by
3    proofing this without failure testing it even,
4    that there was structural inadequacies that was
5    going to lead to failure, make this prone to
6    failure, and that would lead me to do some
7    additional testing to duplicate this and to
8    describe to them the countermeasures.
9            I would have them tie these
10   cross-braces to both flanges and also put a boot
11   or encapsulation on the bottom of the leg,
12   knowing what I know about the materials science
13   of fiberglass.
14           Now this was not designed by someone
15   that was a specialist in fiberglass by my
16   understanding.
17       Q.   I object to the responsiveness.
18       A.   That's all in the deposition
19   testimony.
20       Q.   I object to the responsiveness.
21       A.   A manufacturer has a responsibility to
22   produce a safe product, and part of producing a
23   safe product is examining the failure modes of
24   that product.
25       Q.   Object to the responsiveness.

Page 92

Pugh
1
2        A.   Examination of the failure modes of a
3    product would have revealed the weaknesses and
4    indicated the propriety of putting a boot and/or
5    reinforcing the flanges.
6        Q.   Doctor, I think it's -- we just went
7    through a long discussion, but I think what
8    you're saying is that a boot would have made this
9    ladder last longer and not be subject to
10   splitting; is that what you're saying?
11           MR. BENTON:  Objection to form.
12       A.   No.  What I'm saying, a boot would
13   have eliminated the hazard and made this ladder
14   last longer.
15       Q.   Have you done any sort of statistical
16   analysis or failure testing of any ladders with
17   boots indicating that that's the case?
18       A.   No.  That was done in the subsequent
19   studies, reports of statistical claims after the
20   modifications were made.
21       Q.   Have you yourself done any statistical
22   study or testing to determine what it takes, how
23   much use it takes to cause a ladder with a boot
24   to fail?
25       A.   Not quantitatively, no.  But I will

Page 93

Pugh
1
2    add that in my practice I see a cross-section of
3    failures of products occurring across the
4    country, and it's surprising to me I have not
5    seen a Werner ladder failure.
6        Q.   Objection.
7        A.   And I have seen at least five Bauer
8    ladders fail in this mode.
9        Q.   Objection to the responsiveness of the
10   last part of the answer.
11           You mentioned that Mr. Escudero was
12   possibly on the fifth step of this ladder; is
13   that correct?
14       A.   I think he said fourth or fifth in his
15   dep testimony.
16       Q.   And the fifth step says "Don't step on
17   it," or something to that effect?
18       A.   I believe that's correct.  Not a step.
19       Q.   If Mr. Escudero was on the fifth step
20   of this ladder having been warned not to step on
21   it, that was a breach of the standard of ordinary
22   care on his part?
23       A.   Well, it was a function permissible by
24   the ladder.  It was not in accordance with the
25   recommendations on the ladder.

Page 94

```
 1            Pugh
 2      Q.  Are you telling the ladies and
 3  gentlemen of the jury that Mr. Escudero, it was
 4  okay for him to stand on the fifth step if he
 5  did, even though it was marked "Do not step"?
 6      A.  I don't recommend stepping on the
 7  fifth step, but I don't believe that bore any
 8  role in the failure of this ladder.
 9      Q.  I object to the responsiveness.
10          If Mr. Escudero stepped on a step
11  which was marked "Do not step," or words to that
12  effect, did he fail to exercise ordinary care?
13      A.  That sounds like a legal term to me.
14      Q.  Was he negligent?
15      A.  It was in violation of the
16  recommendations of the ladder.
17          He was assuming a certain amount of
18  risk if he was aware of that.
19      Q.  Have you looked at the label on the
20  front of the step?
21      A.  Yes.
22      Q.  What does it say?
23      A.  I didn't memorize it.  Let me just --
24  it says "Danger, do not stand on or above this
25  step.  You can lose your balance."
```

Page 95

```
 1            Pugh
 2          It doesn't say that the ladder can
 3  fail and throw you to the floor.
 4      Q.  Object to the responsiveness to the
 5  last part of the answer.
 6      A.  The implication of that warning is if
 7  you can keep your balance it's not a problem.
 8      Q.  Object to the responsiveness.
 9          On direct examination you mentioned
10  that if a boot had been on the ladder it may have
11  lasted for an indefinite period of time.
12      A.  Yes.
13      Q.  Have you made any analysis of how long
14  the ladder would have lasted with the boot on it?
15      A.  No, I haven't.
16          THE VIDEOGRAPHER:  We're going off the
17  record.
18          The time is 4:58 p.m.
19          (Recess.)
20          THE VIDEOGRAPHER:  We're now going on
21  the record.
22          The time is 4:59 p.m.
23          MR. GENDRY:  I want to ask you to mark
24  the Notice of Deposition as a defense
25  exhibit, Defendant's 1.
```

Page 96

```
 1            Pugh
 2          (Defendant's Exhibit 1, Notice of
 3      Deposition, marked for identification, as of
 4      this date.)
 5      Q.  Dr. Pugh, let me hand you Defendant's
 6  Exhibit 1, and that is the Notice that I prepared
 7  and sent out for your deposition.
 8          Have you seen that before today's
 9  deposition?
10      A.  No, sir.
11      Q.  You're accustomed to seeing documents
12  requesting you to produce items at your
13  deposition, are you not?
14      A.  Yes, sir.  I believe I produced
15  everything responsive to this.
16      Q.  Okay.  As I understand your deposition
17  testimony, the test that Dr. Johnson conducted,
18  they did show that the parts that he tested met
19  the ANSI-ATSM standards; is that correct?
20      A.  Yes, sir.
21      Q.  And you have done no testing with
22  regard to the strength of the ladder at the
23  corners?
24      A.  Correct.
25      Q.  And there are tests which we have
```

Page 97

```
 1            Pugh
 2  already listed which could be done?
 3      A.  Yes, sir.
 4          MR. GENDRY:  I pass the witness.
 5      Thank you, sir.
 6  FURTHER EXAMINATION
 7  BY MR. BENTON:
 8      Q.  Just one, maybe two questions,
 9  Dr. Pugh.
10          While Mr. Escudero does not admit or
11  necessarily believe that he was on the fifth
12  step, if he was on the fifth step, would that
13  have prevented this accident from happening?
14      A.  You mean if he weren't --
15      Q.  Let me rephrase it.  I'm sorry.  It's
16  been a long day.
17          If he was on the fifth step, did that
18  cause the accident to happen?
19      A.  No, it didn't.
20      Q.  And why?
21      A.  Because a properly designed and built
22  ladder would have been resistant to failure even
23  if he were on the fifth step.
24      Q.  I want you in answering these
25  questions to follow these definitions that I am
```

Page 98

1        Pugh
2  going to give you as I believe they are, or are
3  very similar as to what the court is going to
4  instruct the jury.
5        A design defect is a condition of the
6  product that renders it unreasonably dangerous as
7  designed, taking into consideration the utility
8  of the product and the risk involved in its use.
9  For a design defect to exist there must have been
10  a safer alternative design.
11        And then the definition of safer
12  alternative design means a product designed other
13  than the one actually used that in reasonable
14  probability, one, would have prevented or
15  significantly reduced the risk of the occurrence
16  or injury in question without substantially
17  impairing the product's utility and was
18  economically and technologically feasible at the
19  time the product left the control of Bauer
20  Corporation by the application of existing or
21  reasonably achievable scientific knowledge.
22        If you will use those definitions of
23  design defect and safe alternative design, let me
24  ask you this question.
25     A.  Yes.

Page 99

1        Pugh
2     Q.  Was there a design defect in the
3  subject ladder at the time it left the possession
4  of Bauer Corporation that was the producing cause
5  of the occurrence or injury in question; yes or
6  no?
7        MR. GENDRY:  Object to the form.
8     A.  Yes, sir.
9     Q.  And do you come to that conclusion
10  based on the testimony you have given at your
11  deposition today?
12     A.  Yes, sir.
13        MR. BENTON:  I'll pass the witness.
14        MR. GENDRY:  Nothing further.
15        (Continued to include jurat on the
16  next page.)
17
18
19
20
21
22
23
24
25

Page 100

1        Pugh
2        THE VIDEOGRAPHER:  We're now going off
3  the record.
4        The time is 5:04 p.m.
5        This is the end of the tape labeled
6  No. 1, concluding the videotape deposition
7  of Dr. James Pugh.
8        We're off the record.
9        (Time noted:  5:04 p.m.)
10
11  _____
12        JAMES PUGH
13
14  Subscribed and sworn to before me
15  this ___ day of _____, 2001.
16
17  _____
18
19
20
21
22
23
24
25

Page 101

1
2        C E R T I F I C A T E
3  STATE OF NEW YORK      )
4                          ) ss.:
5  COUNTY OF NEW YORK      )
6
7        I, LINDA SALZMAN, a Notary Public
8  within and for the State of New York, do
9  hereby certify:
10        That JAMES PUGH, the witness whose
11  deposition is hereinbefore set forth, was
12  duly sworn by me and that such deposition is
13  a true record of the testimony given by such
14  witness.
15        I further certify that I am not
16  related to any of the parties to this action
17  by blood or marriage; and that I am in no
18  way interested in the outcome of this
19  matter.
20        IN WITNESS WHEREOF, I have hereunto
21  set my hand this 21st day of August, 2001.
22
23  ---------------------------
24        LINDA SALZMAN
25

Page 102

```
1

2       ------------------I N D E X-------------------

3    WITNESS                EXAMINATION BY        PAGE

4    JAMES PUGH          MR. BENTON           4, 97

5                        MR. GENDRY              53

6

7       -------------------EXHIBITS-------------------

8    PLAINTIFF'S                           FOR I.D.

9    1           Curriculum vitae            10

10   2           Photograph of Werner ladder 33

11   3           Photograph                  33

12   4           Photograph                  34

13   5           Photograph                  37

14   6           Photograph                  37

15   7           Report                      40

16   DEFENDANT'S

17   1           Notice of Deposition        96

18

19

20

21

22

23

24

25
```

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE ESCUDERO, JR. | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. B-00-193 |
| BAUER CORPORATION D/B/A | § | |
| BAUER LADDER CORPORATION | § | |

## NOTICE OF INTENTION TO TAKE
## ORAL DEPOSITION WITH A DUCES TECUM

TO:  JOSE ESCUDERO, by and through his attorney of record,
     Mr. Barry Benton
     284 Ebony Ave.
     Brownsville, Texas 78520

Notice is hereby given that Defendant, BAUER CORPORATION, intends to take the oral deposition of the following:

**Dr. James Pugh, on Thursday, August 16, 2001, commencing at 11:00 a.m.**

Said deposition will be taken in the office of Dr. James Pugh at Inter-City Testing, 167 Willis Ave., Mineloa, New York 11501, testimony of which will be used as evidence at the trial of the above styled and numbered cause.  Such deposition will continue from day to day until completed.

Testimony will be taken down in stenography before a certified shorthand court reporter, authorized under the Texas Rules of Civil Procedure to take depositions, Esquire Deposition Service, 7800 IH 10 West Suite 100, San Antonio, Texas 78230 (210) 377-3027.



DEFENDANT'S
EXHIBIT

This notice is to serve as a duces tecum that the witness is to produce at his deposition the following:

1. Any and all factual observations, tests, supporting data, calculations and opinions of the witness, recorded and reduced to tangible form, including, but not limited to, all notes, memoranda and test data prepared by the witness or under the supervision of the witness concerning any and all kind or manner of testing done by the witness in connection with the ladder which made the subject of this litigation;

2. Any and all tangible reports, physical models, compilations of data and other materials prepared by the witness or for the witness in anticipation of trial and/or deposition testimony;

3. Any and all videotapes, photographs, motion pictures, and other photographic reproductions prepared by the witness or for the witness in anticipation of trial and/or deposition testimony;

4. The "physical model", specifically including any demonstrative device or devices relating to the ladder which made the subject of this lawsuit prepared by the witness or for the witness for the purpose of demonstrating the operation of ladder about which the witness intends to give opinions and/or conclusions relevant to the allegations in this lawsuit;

5. Any and all reports, test results, data compilation, recommendations, or other studies relied upon by the witness in any way in formulating the opinions and/or conclusions of the witness, whether prepared by the witness or by a third party, and whether prepared in relation to this particular litigation or not;

6. Any and all ladders used by the witness or under the supervision of the witness at any time in the past and relating in any way to the ladder which made the subject of this lawsuit and used in testing to determine the reason for the alleged failure;

7. Any and all notes, graphs, computer printouts or readouts, strip chart recordings or other recordings or photographic reproductions of recordings which reflect the results of any testing done by the witness or under the supervision of the witness and relating in any way to testing or investigation done by the witness in

connection with any litigation involving ladders .

8.  Your complete file relating to all work done and documents reviewed and/or generated in this case.

9.  Your time log and billed fees for work done in this case.

10. All ladders and ladder designs you claim offer an alternative safe design.

11. All professional articles you have reviewed that serve as a basis for your opinions in this case.

12. All scientific studies reported in professional articles or which you are aware that support you opinions in this case.

Respectfully submitted,

GENDRY & SPRAGUE, P.C.
645 Lockhill Selma
San Antonio, Texas 78216-5707
Telephone: (210) 349-0511
Facsimile: (210) 349-2760

By: _____
Thomas Gendry
State Bar No. 07797000
Federal I.D. No. 27525

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading was mailed, certified mail, return receipt requested and by facsimile, to Mr. Barry Benton, 284 Ebony Avenue, Brownsville, Texas 78520, on this 24th day of July , 2001.

_____
Thomas Gendry

r:\ras\escudero\depo.not

# Inter-City Testing & Consulting Corporation



**Northeastern Office:**
167 Willis Avenue
Mineola, N.Y. 11501
(516) 747-8400
FAX: (516) 746-0111/21
Out of NYS:(800) 822-1515

**Southeastern Office:**
4400 N. Federal Highway
Suite 210
Boca Raton, FL 33431
(407) 361-0990
FAX: (407) 338-7771

### DR. JAMES W. PUGH

### CURRICULUM VITAE

DR. JAMES PUGH is Director of Biomedical Engineering, Metallurgy, and Materials Science of Inter-City Testing & Consulting Corporation, Mineola, N.Y. He has a Ph.D. in Biomedical Engineering (Massachusetts Institute of Technology, 1972) and a Bachelor of Science in Metallurgy and Materials (M.I.T., 1968). Dr. Pugh is an expert in the analysis and evaluation of personal injuries of all types with a view towards establishing the causal relationship between events of an accident and actual injuries sustained. He has experience in accident reconstruction of all types, analysis of sports injuries, effects of seat belts in vehicular accidents, as well as injuries sustained by failure of medical devices.

Dr. Pugh is currently professor at the Cooper Union School of Engineering in New York, and has held professorships at the University of Washington in Seattle, New York University, City College of the City University of New York, Mount Sinai School of Medicine, and the State University of New York at Stony Brook. He has taught courses in applied mechanics, materials science, biomechanics, biomaterials, ergonomics, occupational health and safety, strength of materials, and orthopaedic engineering. He has over 20 years of consulting experience with governmental agencies, private corporations, and private law firms. He conducted research and taught at The Hospital For Joint Diseases in New York City for 13 years. He has published 73 technical articles in engineering and scientific journals, has delivered over 50 lectures nationally and internationally, has edited four volumes, has supervised theses for numerous master's and doctoral candidates, and has received two patents.

Dr. Pugh's affiliations include The Orthopaedic Research Society, The American Society for Mechanical Engineers, The American Society for Metals, The American Society for Testing and Materials, The Society of Sigma Xi, The Society for Biomaterials, The National and New York State Societies of Professional Engineers, The American Association for the Advancement of Science, the Society for Automotive Engineering, The Society of Plastics Engineers, and The Order of the Engineer. He has been listed in Who's Who in Engineering, and is a Registered Professional Engineer in the State of New York. He is also licensed by the FAA and the USCG.

### ###




## JAMES W. PUGH

### CURRICULUM VITAE

**EDUCATION:**  Ph.D in Biomedical Engineering from the Department of Metallurgy and Materials Science, June 1972, Massachusetts Institute of Technology (MIT), Cambridge, Mass.

S.B. in Metallurgy from Department of Metallurgy & Materials Science, June 1968, Massachusetts Institute of Technology, (MIT), Cambridge, Mass.

### EXPERIENCE:

**1986 - Present**  Director, Biomedical Engineering/Metallurgy/Materials Science, Inter-City Testing & Consulting Corporation; Staff Specialist in Scientific Accident Reconstruction and Member of National Association of Professional Accident Reconstruction Specialists (NAPARS), the Society of Automotive Engineers (SAE), and regular attendee at Stapp Car Crash Conferences (SAE).

**1/1/85-10/1/86**  State University of New York at Stony Brook
Research Professor, Department of Orthopaedics, School of Medicine Professor of Materials Science and Engineering
Technical Director of Gait Laboratory
Director of Orthopaedic Engineering

**11/1/79-12/31/84**  Hospital for Joint Diseases Orthopaedic Institute
Director, Division of Bioengineering
Associate Director, Occupational & Industrial Orthopaedic Center

**9/1/72-10/31/79**  Hospital for Joint Diseases & Medical Center
Director, Biomechanics Laboratory

**6/1/72-8/31/72**  Massachusetts Institute of Technology
Post-Doctoral Fellow in Bioengineering, Department of Metallurgy and Materials Science

### PROFESSORSHIPS:

**7/95-present:**  Professor, Cooper Union School of Engineering, New York

**10/86-6/87:**  Visiting Professor of Bioengineering
The Cooper Union School of Engineering
New York City

**12/20/89-**  Affiliate Professor/Bioengineering
The University of Washington
Seattle, Washington

**1/85-10/86:**  Research Professor, Department of Orthopaedics,
School of Medicine, SUNY
State University of New York at Stony Brook
Stony Brook, NY

2

CIMPDF - www.fesite.com

1/81-12/84:   Associate Professor of Orthopaedics
Mount Sinai School of Medicine,
City University of New York, NYC

9/82-1/85:   Adjunct Professor of Bioengineering
The Cooper Union School of Engineering
New York City

9/81-1/85.   Adjunct Associate Professor
Department of Occupational Health & Safety
New York University, NYC

9/82-1/84:   Adjunct Associate Professor of Engineering Technology Department of Engineering Technology
City College of the City University of New York, NYC

9/72-12/80:   Assistant Professor of Orthopaedics
Mount Sinai School of Medicine
City University of New York, NYC

## INSTRUCTORSHIPS:

9/69-6/71:   Teaching Assistant, MIT
6/77-9/79:   Instructor, New York College of Podiatric Medicine

## PROFESSIONAL ORGANIZATIONS:

American Society for Mechanical Engineers (ASME)
American Society for Testing and Materials (ASTM)
    Subcommittees: F-4 Implant Devices and Materials
                F-8 Sports Equipment
American Association for the Advancement of Science (AAAS)
American Society for Metals (ASM)
Orthopaedic Research Society (ORS)
National Association of Professional Accident Reconstruction Specialists (NAPARS)
National Society for Professional Engineers (NSPE)
New York State Society for Professional Engineers (NYSSPE)
Society of Automotive Engineers (SAE)
Society for Biomaterials
Society of Sigma Xi, Honorary Chemical Fraternity
Joint Medical Study Group

## LICENSES:

Professional Engineer (P.E.) New York State, Registered 1984, #061391-1
U.S. Coast Guard Operator's License, issued 1984,
Coastal, Up to Six Passengers, Up to 60 Tons Auxiliary Sail, Inland
Private Pilot, Single-Engine, Land. Licensed 1981

3

## PUBLICATIONS:

1.  J. W. Pugh, R. M. Rose, E. L. Radin: Techniques for the Study of the Structure of Bone,  Microstructures 3: 22-27, 1972.

2.  E. L. Radin, H. G. Parker, J. W. Pugh, R. S. Steinberg, I. L. Paul, R. M. Rose: Response of Joints to Impact Loading ---- III Relationship between Trabecular Microfractures and Cartilage Degeneration, J. Biomechanics 6: 51-57, 1973.

3.  J. W. Pugh, R. M. Rose: Mechanical Behavior of Cancellous Bone: A Finite Element Model, Proceedings of the New England Bioengineering  Conference, Burlington, Vermont, April 1973, pp. 46-63.

4.  J. W. Pugh, R. M. Rose, E. L. Radin: A Possible Mechanism of Wolff's Law: Trabecular Microfractures, Arch. Int. de Phys. et de Biochemie BI: 27-40, 1973.

5.  J. W. Pugh, R. M. Rose, E. L. Radin, I. L. Paul: Mechanical Resonance Spectra in Human Cancellous Bone, Science 181: 271-272, 1973.

6.  J. W. Pugh: The Micro-Mechanics of Cancellous Bone, I. Microscopic Observations, Bull. Hosp. Joint Diseases 34: 92-106, 1973.

7.  J. W. Pugh, R. M. Rose, E. L. Radin: Elastic and Viscoelastic Properties of Trabecular Bone, J. Biomechanics 6: 475-485, 1973.

8.  J. W. Pugh, R. M. Rose, E. L. Radin: A Structural Model for the Mechanical Behavior of Trabecular Bone, J. Biomechanics 6: 657-670, 1973.

9.  J. W. Pugh, R. M. Rose, E. L. Radin: Quantitative Studies of Human Subchondral Cancellous Bone. Its Relationship to the State of Its Overlying Cartilage, J. Bone Jt. Surg. 56-A: 313-321, 1974.

10. J. W. Pugh, F. J. Kummer, W. L. Jaffe, J. C. Runkle: Corrosion Behavior of a Metallic Implant: A Scanning Electron Microscope Study, Proceedings of the Second Annual New England Bioengineering Conference, Worcester, Massachusetts, March 1974, pp. 15-30.

11. J. W. Pugh, W. L. Jaffe, F. F. Jaffe: Corrosion Failure in Stainless Steel Implants, Surg. Gyn. & Obstret. 141: 199-202, 1975.

12. J. W. Pugh, G. C. Steiner: Relationship between Structure and Mechanical Resonance Spectra in Human Cancellous Bone, Med. & Biol. Eng. 13: 714-716, 1975.

13. J. Pugh, P. Robbins: The Morphology of Metallic Wear Debris from Orthopaedic Implants--A Scanning Electron Microscope Study, Proceedings of the Third Annual New England Bioengineering Conference, Medford, Massachusetts, May 1975, pp. 217-228.

14. S. Lasser, J. Pugh: Spatial Orientation of Trabeculae in Human Medial Femoral Condyles, Proceedings of the Third Annual New England Bioengineering Conference, Medford, Massachusetts, May 1975, pp. 252-259.

15.   J. W. Pugh, A. I. Streitman: The Use of Piezoelectric Accelerometers in the Analysis of Human Gait Characteristics, Proceedings of the International Conference on Biomedical Transducers, Paris, France, September 1975, pp. 213-218, Vol. I.

16.   J. C. Runkle, J. W. Pugh: The Micro-Mechanics of Cancellous Bone, II. Determination of the Elastic Modulus of Individual Trabeculae by a Buckling Analysis, Bull. Hosp. Joint Diseases 36: 2-10, 1975.

17.   J. W. Pugh: Comment on "Observations on Eburnated Bone," Clin. Orthop. & Rel. Res. 118: 269-270, 1976.

18.   J. Pugh, W. L. Jaffe, F. J. Kummer: Studies of the Corrosion Susceptibility of Metallic Cement Restricters: Comparative Corrosion Behavior of Stainless Steel and Cobalt-Chromium Alloys, Bull. Hosp. Joint Diseases 37: 40-53, 1976.

19.   J. W. Pugh, W. L. Jaffe: Clinically-Observed Corrosion of Surface Defects of Wires, J. Biomed. Mater. Res. 11: 625-628, 1977.

20.   J. Pugh, C. Weiss, F. Weiss, D. Malkin: Design and Biomechanical Evaluation of a Cementable Endosteal Blade Implant, J. Biomed. Mater. Res. 10: 571-581, 1976.

21.   J. W. Pugh: An Introduction to the Biomechanics and Biomaterials of Bone, Joints, and Implants, Bull. Hosp. Joint Diseases 37: 124-148, 1976.

22.   J. Pugh, P. Robbins, A. Streitman: Wear of Orthopaedic Implants--A Scanning Electron Microscope Study, Wear 45, 75-83, 1977.

23.   S. Lasser, J. Pugh: Preferred Orientations in Cancellous Bone: Techniques for Determination and Possible Biomechanical Significance, Bull. Hosp. Joint Diseases 38: 8-9, 1977.

24.   C. Weiss, J. Pugh, J. Gruber, R. Swett: The Application of Structure Borne Sound to the Structural Analysis of Bone and Fracture Healing, Bull. Hosp. Joint Diseases 38: 26-28, 1977.

25.   A. I. Streitman, J. Pugh: The Design and Implementation of a Simple, Effective System for Gait Analysis, Bull. Hosp. Joint Diseases 38: 31-34, 1977.

26.   A. Streitman, J. Pugh: The Response of the Lower Extremity to Impact Forces. I. Design of an Economical Low Frequency Recording System for physiologic Waveforms, Bull. Hosp. Joint Diseases 39: 63-73, 1978.

27.   J. W. Pugh: The Biomechanics of Cancellous Bone, in Human Joints and Their Artificial Replacement, by Peter S. Walker, Charles C. Thomas, " Springfield, Illinois, 1977, pp. 226-235.

28.   M. S. Zeide, J. Pugh, W. L. Jaffe: Failure of Femoral Component in Total Hip Arthroplasty: A Case Study--Failure Analysis, Orthopaedics 1: 291-293, 1978.

29.   P. Robbins, J. Pugh: A Comparative Study of Replication Techniques for Use in Scanning Electron Microscopy of Orthopaedic Implants, Wear 50: 95-103, 1979.

CVAPDF - www.fasiso.com

30.   A. Greenspan, J. Pugh, A. Norman, R. Norman: Scoliotic Index: A Comparative Evaluation of Methods for the Measurement of Scoliosis, Bull. Hosp. Joint Diseases 39: 117-125, 1978.

31.   A. Streitman, A. Miller, J. Pugh: The Response of the Lower Extremity to Impact Forces II. Computerized Mechanical Impedance Measurements, Bull. Hosp. Joint Dis. 40: 120-131, 1979.

32.   P. S. Walker, M. Ben-Dov, M. J. Askew, J. Pugh: The Deformation and Wear of Plastic Components in Artificial Knee Joints--An Experimental Study, Eng. in Med. 10: 33-38, 1981.

33.   P. J. Obiedzinski, W. Pennamacoor, J. D'Amico, J. Pugh: An Anomalous Tendon of the Extensor Hallucis Longus Muscle, J. Am. Pod. Assoc. 71: 426-429, 1981.

34.   J. Pugh: Biomechanical Aspects of Osteoarthritic Joints: Mechanisms and Noninvasive Detection, in Osteoarthromechanics, by Dhanjoo N. Ghista, ed., Hemisphere Publishing Corporation, McGraw-Hill Book Company, New York, 1982, pp. 161-191.

35.   J. Pugh, R. Averill, N. Pachtman, D. Bartel, W. Jaffe: Prosthesis Surface Design to Resist Loosening: Stress Normalization, Osteonics Corporation Technical Information Bulletin, 6 Pearl Court, Allendale, New Jersey 07401, 1982, pp. 1-4.

36.   J. Pugh, H. S. Sherry, B. Futterman, V. H. Frankel: Biomechanics of Pathologic Fractures, Clinical Orthopaedics and Related Research 169: 109-114, 1982.

37.   J. Pugh: Biomechanics of the Hip--Part 1, Orthopaedic Surgery Update Series, Volume 2/Lesson 7, 1982, pp. 1-8.

38.   C. Gross, M. Neuwirth, J. Graham, J. Pugh: Three-Dimensional Lordosimeter. A Device for the Nonradiographic Assessment of Spinal Configuration, Bull. Hosp. Joint Diseases Orth. Inst. 42: 151-171, 1982.

39.   K. Sinibaldi, J. Pugh, H. Rosen, S. Liu: Osteomyelitis and Neoplasia Associated with Use of the Jonas Intramedullary Splint in Small Animals, J. Amer. Vet. Med. Assoc. 181: 885-890, 1982.

40.   F. Ewald, R. Poss, J. Pugh, A. Schiller, C. Sledge: Hip Cartilage Supported by Methacrylate in Canine Arthroplasty, Clin. Orthop. and Rel. Res. 171: 273-279, 1982.

41.   J. Pugh, C. Tauber, J. Au: Computerized Video Gait and Motion Analysis, Mediguide to Orthopaedics 3: 1-5, 1982.

42.   J. Pugh: Biomechanics of the Hip. Part II. Total Hip Replacement, Orthopaedic Surgery Update Series, Volume 3/Lesson 27, pp. 2-8 , 1984.

43.   C. Gross, J. Graham, M. Neuwirth, J. Pugh: Scoliosis and Growth--An Analysis of the Literature, Clin. Orthop. and Rel. Res. 175: 243-250, 1983.

44.   C. Gross, M. Neuwirth, J. Graham, J. Pugh: Three-Dimensional Anthropometric Measurement, Proceedings of SPIE--The International Society for Optical Engineering, Biostereometrics '82, Annual Meeting of the Society for Photo-Optical Engineers, San

CVAPDF - www.fenix.com

Diego, California, 1982, pp. 116-118.

45.  S. Adelsberg, C. Tauber, J. Au, J. Pugh: Variations in Gait Patterns of Runners: Relationship to Anthropometric Measurements, Proceedings of SPIE--The International Society for Optical Engineering, Biostereometrics '82, Annual Meeting of the Society for Photo-Optical Engineers, San Diego, California, 1982, pp. 302-306.

46.  C. Tauber, J. Au, S. Bernstein, A. Grant, J. Pugh: Orthopaedic Application of Spatio Temporal Analysis of Body Form and Function, Proceedings of SPIE--The International Society for Optical Engineering, Biostereometrics '82, Annual Meeting of the Society for Photo-Optical Engineers, San Diego, California, 1982, pp. 307-313.

47.  J. Au, J. Pugh: Algorithms for Two-Camera Video Motion Analysis, Proceedings of SPIE--The International Society for Optical Engineering, Biostereometrics '82, Annual Meeting of the Society for Photo-Optical Engineers, San Diego, California, 1982, pp. 314-320.

48.  K. A. Josephson, Y. Z. Efe, C. M. Gross, J. W. Pugh: The Assessment of Human Leg Volume Via Three Dimensional Anthropometry, Proceedings of the ISMM International Symposium Mini and Microcomputers and Their Applications, San Francisco, California, 1983. pp. 68-72.

49.  T. Petsche, Y. Z. Efe, J. W. Pugh: Automated Reconstruction and Analysis of Three Dimensional Models of Two Phase Structures from Serial Sections, Proceedings of the ISMM International Symposium: Mini and Microcomputers and Their Applications, San Francisco, California, 1983, pp. 73-77.

50.  J. Pugh: Osteoarthritis as a Mechanical Phenomenon, Orthopaedic Surgery Update Series, Volume Two, Lesson 33, pp. 2-7, 1983.

51.  F. J. Bejjani, C. M. Gross, J. W. Pugh: Model for Static Lifting: Relationship of Loads on the Spine and the Knee, J. Biomechanics 17: 281-286, 1984.

52.  W. B. Lehman, D. Menche, A. Grant, A. Norman, J. Pugh: The Problem of Evaluating In Situ Pinning of Slipped Capital Femoral Epiphysis:  An Experimental Model and a Review of 63 Consecutive Cases, J. Ped. Orthop. 4: 297-303, 1984.

53.  W. B. Lehman, A. Grant, D. Rose, J. Pugh, A. Norman: A Method of Evaluating Possible Pin Penetration in Slipped Capital Femoral Epiphysis Using a Cannulated Internal Fixation Device, Clin. Orthop. and Rel. Res. 186: 65-70, 1984.

54.  Wen Ling, Jan Choy Au, James Pugh: Clinical Application of Electromyography, Orthopaedic Surgery Update Series, Volume 3/Lesson 2, pp. 2-7, 1983.

55.  Daniel Grande, James Pugh: Structure and Function of Articular Cartilage, Orthopaedic Surgery Update Series, Volume 3, Lesson 18. pp. 2-7, 1984.

56.  James Pugh: Viscoelasticity, Orthopaedic Surgery Update Series, Volume 3/Lesson 25, 1984, pp. 2-8.

57.  Victor H. Frankel and James Pugh: Biomechanics of the Hip, in Surgery of the Hip Joint, Volume I, Second Edition, Raymond G. Tronzo, Editor, Springer-Verlag, New

York, 1984, pp. 115-131.

58. James Pugh and Carol Stanis: Z-τ: Solid Metal Direct Skeletally Attached Prosthesis, NATO Advanced Study Institute, Applications of Materials Sciences to the Practice of Implant Orthopedic Surgery, Marbella, Costa del Sol, Spain, July 14-22, 1984, Prepublication Proceedings, pp. 211-221.

59. James Pugh, Carolyn Tauber, and Jan Choy Au: Functional Analysis in Inflammatory Diseases: Computerized Analysis of Gait, Mediguide to Inflammatory Diseases 4: 1-6, 1985.

60. J. Pugh: Mechanical Aspects of Osteoarthritis, in Biomechanics IX-A, David Winter, Robert Norman, Richard Wells, Keith Hayes, and Aftab Patla, Editors, Human Kinetics Publishers, Champaign, Illinois, 1985, pp. 135-139.

61. Richard B. Raynor, James Pugh, and Ilan Shapiro: Cervical Facetectomy and its Effect on Spine Strength, J. Neurosurgery 63: 278-282, 1985.

62. James Pugh and Victor H. Frankel: Biomechanics of Hip Fractures, in Fractures of the Hip, Marvin H. Meyers, ed., Year Book Medical Publishers, Chicago, Illinois, 1985, pp. 23-37.

63. Mindy Kassover, Carolyn Tauber, Jan Au, and James Pugh: Auditory Biofeedback in Spastic Diplegia, J. Orth. Res. 4: 246-249, 1986.

64. James Pugh: Orthopaedic Biomechanics and Biomaterials, Chapter 72, Attorney's Guide to Engineering, Ira S. Kuperstein and Neil L. Salters, eds., Matthew Bender & Co., Inc., 1986, pp. 72-1 through 72-84.

65. Duncan Troup and James Pugh: Task Injury Workshop Report on Acute Trauma, Proceedings of the First International Conference on Injuries in the Workplace, Hospital for Joint Diseases Orthopaedic Institute (Publishers), New York, New York, 1986, pp. 147-149.

66. Daniel A. Grande, Inder J. Singh, and James Pugh: Healing of Experimentally Produced Lesions in Articular Cartilage Following Chondrocyte Trans-plantation, The Anatomical Record 218: 142,148, 1987.

67. Richard B. Raynor, Ronald Moskovich, Paul Zidel, and James Pugh: Alterations in Primary and Coupled Neck Motions after Facetectomy, Neurosurgery 21: 681-687, 1987.

68. James Pugh and Roger Dee: Properties of Musculoskeletal Tissues and Biomaterials, Chapter 16, Principles of Orthopaedic Practice, edited by Roger Dee, Enrico Mango, and Lawrence Hurst, McGraw-Hill, New York, 1989, pp.134-146.

69. Michael D. Ries and James Pugh: Biomechanics of the Hip, Chapter 82, Section A, Principles of Orthopaedic Practice, edited by Roger Dee, Enrico Mango, and Lawrence Hurst, McGraw-Hill, New York, 1989, pp. 1064-1066.

70. M. Ries, J. Pugh, J. Choy Au, J. Gurtowski, and R. Dee: Normal Pelvic Strain Pattern In Vitro, J. Biomed. Eng. 11: 398-402, 1989.

71.   C. J. Abraham, Malcolm Newman, Stanley Shulman, and James Pugh: Assumption of Risk--Hockey Injuries, ASTM STP 1050, 1989, pp. 44-51.

72.   James Pugh and Malcolm Newman: The State-of-the-Art in Experts and Demonstrative Evidence, Proceedings of the November 3, November 10, and December 1. 1989, meetings of the New York State Bar Association, 1989, PP- 173-194-

73.   Michael Ries, James Pugh, Jan Choy Au, James Gurtowski, and Roger Dee: Cortical Pelvic Strains with Varying Size Hemiarthroplasty In Vitro, J. Biomechanics 22: 775-780, 1989

<u>PRESENTATIONS</u>:

1.  J. W. Pugh, J. C. Runkle, R. M. Rose, E. L. Radin, I. L. Paul: Determination of the Elastic Modulus of Individual Trabeculae by Their Buckling Behavior, presented at the 19th Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, January 30, 1973.

2.  J. W. Pugh, R. M. Rose: Mechanical Behavior of Cancellous Bone: A Finite Element Model, presented at the 1973 New England Bioengineering Conference, University of Vermont, Burlington, Vermont, April 19, 1973.

3.  J. W. Pugh, R. M. Rose: Mechanical Resonances in Human Bone, presented at the 26th Annual Conference on Engineering in Medicine and Biology, Minneapolis, Minnesota, October 1, 1973.

4.  J. W. Pugh, F. J. Kummer, W. L. Jaffe, J. C. Runkle: Corrosion Behavior of a Metallic Implant: A Scanning Electron Microscope Study, presented at the Second Annual New England Bioengineering Conference, Worcester polytechnic Institute, Worcester, Massachusetts, March 29, 1974.

5.  J. W. Pugh, G. C. Steiner: Relationship between Structure and Mechanical Resonance Spectra in Human Cancellous Bone, presented at the 27th Annual Conference on Engineering in Medicine and Biology, Philadelphia, pennsylvania, October 9, 1974.

6.  J. W. Pugh: The Role of Cancellous Bone in Joint Function, presented at the 21st Annual Meeting of the Orthopaedic Research Society, San Francisco, California, February 28, 1975.

7.  J. Pugh, C. Weiss, F. Weiss, D. Malkin: Design and Biomechanical Evaluation of a Cementable Endosteal Blade Implant, presented at the Seventh Annual International Biomaterials Symposium, Clemson University, Clemson, South Carolina, April 28, 1975.

8.  J. Pugh, P. Robbins: The Morphology of Metallic Wear Debris from Orthopaedic Implants--A Scanning Electron Microscope Study, presented at the Third Annual New England Bioengineering Conference, Tufts University, Medford, Massachusetts, May 9, 1975.

9.  S. Lasser, J. Pugh: Spatial Orientation of Trabeculae in Human Medial Femoral Co Condyles, presented at the Third Annual New England Bioengineering Conference, Tufts University, Medford, Massachusetts, May 9, 1975.

10. J. Pugh, W. Jaffe, F. Kummer, K. Sinibaldi: Corrosion of Orthopaedic Implants--A Clinical and Experimental Study, presented As the Spring Meeting of The Electrochemical Society, Toronto, Canada, May 13, 1975.

11. J. W. Pugh, A. I. Streitman, J. F. Stanoch. Studies of the Impact Response of Human Limbs, presented at the 28th Annual Conference on Engineering in Medicine and Biology, New Orleans, Louisiana, September 23, 1975. "

12. J. W. Pugh, A. I. Streitman: The Use of Piezoelectric Accelerometers in the Analysis of Human Gait Characteristics, presented at the International Conference on Biomedical Transducers, Paris, France, November 4, 1975.

13. J. Pugh, C. Weiss, F. Weiss, D. Malkin: Design and Biomechanical Evaluation of a Cementable Endosteal Blade Implant, presented at the Seventh Annual International Biomaterials Symposium, Clemson University, Clemson, South Carolina, April 28, 1975.

14. J. W. Pugh, S. P. Lasser, E. D. Seidman: Preferred Orientations in Cancellous Bone of the Knee and Ankle Joints: Technique for Determination and Possible Biomechanical Significance, presented at the 29th Annual Conference on Engineering in Medicine and Biology, Boston, Massachusetts, November 7, 1976.

15. J. W. Pugh, A. I. Streitman: The Design and Implementation of a Simple, Effective System for Gait Analysis, presented at the 29th Annual Conference on Engineering in Medicine and Biology, Boston, Massachusetts, November 8, 1976.

16. A. Streitman, J. Pugh: Design of an Economical Low-Frequency Recording System for Physiologic Waveforms, presented at the Eighth Annual Conference of the Society for Advanced Medical Systems, Boston, Massachusetts, November 12, 1976.

17. R. Israel, J. Pugh, A. Streitman: Impact Response of Normal and Osteoarthritic Knee Joints, presented at the 1977 World Congress of the International Society for Prosthetics and Orthotics, New York, New York, May 31, 1977.

18. H. S. Sherry, J. A. Suarez, B. Futterman, R. S. Siffert, J. W. Pugh: A Biomechanical Evaluation of Various Cement-Metal Assemblies for the Reconstitution of Pathologic Fractures, presented at the 30th Annual Conference on Engineering in Medicine and Biology, Los Angeles, California, November 6, 1977.

19. R. M. Israel, A. I. Streitman, J. W. Pugh: Impact Response of Normal and Osteoarthritic Knee Joints, presented at the 30th Annual Conference on Engineering in Medicine and Biology, Los Angeles, California, November 6, 1977.

20. R. Norman, R. Dueland, J. Pugh: The Bony Response to Cemented Endoprostheses-- A Study of the Femoral Component of Total Hips in Dogs, presented at the 24th Annual Meeting of the Orthopaedic Research Society, Dallas, Texas, February 22, 1978.

21. A. Streitman and J. Pugh: Shock-Absorption Due to Musculature in the Constrained Leg, presented at the 32nd Annual Conference on Engineering in Medicine and Biology, Denver, Colorado, October 8, 1979.

22. H. Wilpon, J. Pugh: Cancellous Bone: Mechanical Effects of Specimen Thickness, presented at the 33rd Annual Conference on Engineering in Medicine and Biology, Washington, D.C., October 1, 1980.

23. S. Adelsberg, C. Tauber, J. Au, J. Pugh: Variations in Gait Patterns of Runners: Relationship to Anthropometric Measurements, Biostereometrics 1982, 20th Annual Meeting of the Society of Photo-Optical Instrumentation Engineers, San Diego, California, August 26, 1982.

CVAPDF - www.tesia.com

24.   J. Au, J. Pugh: Algorithms for Two-Camera Video Motion Analysis, Biostereometrics 1982, 26th Annual Meeting of the Society of Photoptical Instrumentation Engineers, San Diego, California, August 26, 1982.

25.   J. Pugh: Biomechanical Assessment of Cemented Total Hip Systems, Current Concepts in Implant Fixation, Sheraton Bal Harbour, Bal Harbour, Florida, December 17, 1982.

26.   S. Adelsberg and J. Pugh: Kinematics of Running, presented at the 29th Annual Meeting of the Orthopaedic Research Society, Anaheim, California, March 10, 1983.

27.   J. Pugh: Mechanical Aspects of Osteoarthritis, IX International Congress of Biomechanics, University of Waterloo, Ontario, Canada, August 9, 1983.

28.   J. Pugh: Task/Injury Workshop on Acute Trauma. Technical Aspects, International Conference on Injuries in the Workplace, New York, New York, May 2, 1984.

29.   J. Pugh: A Computerized Video Motion Analyzer for Clinical Management of Orthopaedic Patients: Methods and Applications, Congress on Medical Instrumentation "Essential Qualities," International Congrescentrum RAI, Amsterdam, The Netherlands, May 28, 1984.

30.   J. Pugh: Z- : Nonporous and Noncemented Stepped-Surface Total Hip Prosthesis, Applications of Materials Sciences to the Practice of Implant Orthopedic Surgery, North Atlantic Treaty Organization Advanced Study Institute Meeting, Marbella, Costa del Sol, Spain, July 19, 1984.

31.   J. Pugh: Mechanical Aspects of Osteoarthritis: Pathogenesis and Joint Replacement with Z- g Prosthesis, The Pathology of Joint Failure, Edmonton, Alberta, Canada, September 19, 1984.

32.   J. Pugh: Uncemented Total Joint Replacement, presented at the three day meeting entitled "Uncemented Total Joint Replacement," November 19, 1984, Phoenix, Arizona, sponsored by the Harrington Arthritis Research Center, Phoenix, Arizona.

33.   P. Zidel, J. Ngai, R. Raynor, G. Hobbs, J. Pugh: Three-Dimensional Analysis of Cervical Spine Motion Segments by Computer Videophotogrammetry, 31st Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, January 23, 1985.

34.   J. Pugh: Biomechanical Aspects of Cementless Fixation, Current Concepts in the Design of Hip Implants, April 19, 1985, Garden City, New York, Sponsored by the State University of New York at Stony Brook, New York.

35.   J. Pugh: Biomechanics, May 23, 1985, Mount Sinai School of Medicine, New York, New York.

36.   J. Pugh: Mechanical and Material Considerations in Cementless Fixation, Current Concepts in Implant Fixation, December 12, 1985, Sheraton Bal Harbour, Bal Harbour, Florida, Sponsored by The Mount Sinai Medical Center, Cleveland, Ohio.

37.   J. Pugh: appropriate Prosthetic Designs for Cementless Fixation, January 20, 1986, Current Cementless Concepts for Total Hip Arthroplasty, The Snowmass Club, Snowmass Village, Colorado, Sponsored by Joint Medical Study Group, Stamford,

Connecticut.

38.  J. Pugh: Metallurgy of Femoral Implants, January 20, 1986, Current Cementless Concepts for Total Hip Arthroplasty, The Snowmass Club, Snowmass Village, Colorado, Sponsored by Joint Medical Study Group, Stamford, Connecticut.

39.  J. Pugh: The Design and Evaluation/Testing of Total Hip Prostheses--A Materials Science Viewpoint, March 13, 1986, Guest Lecture, Department of Materials Science and Engineering, State University of New York at Stony Brook, Stony Brook, New York.

40.  J. Pugh: Mechanical Aspects of Total Joint Replacements, Long Island Chapter Meeting, The American Society of Mechanical Engineers, Holiday Inn, Hauppauge, New York, June 26, 1986.

41.  J. Pugh: Biomechanics of the Skeletal System; The Structure, Composition, and Biology of the Skeletal System I, II; New York University Dental Center, Department of Dental Anatomy, School of Dentistry, New York, New York, November 4, 1986.

42.  J. Pugh: Pelvic Strains with Acetabular Implants, Current Cementless Concepts and Controversy in Total Hip Arthroplasty, Montego Bay, Jamaica, March 24, 1987.

43.  J. Pugh: Mechanical Testing of Femoral Implants, Current Cementless Concepts and Controversy in Total Hip Arthroplasty, Montego Bay, Jamaica, March 26, 1987.

44.  J. Pugh: Medico-Legal--Product Liability, Current Cementless Concepts and Controversy in Total Hip Arthroplasty, Montego Bay, Jamaica, March 27, 1987.

## ABSTRACTS:

1.  J. W. Pugh, J. C. Runkle, R. M. Rose, E. L. Radin, I. L. Paul: Determination of the Elastic Modulus of Individual Trabeculae by their Buckling Behavior, Proceedings of the 19th Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, 1973, p. 12.

2.  J. W. Pugh, J. C. Runkle, R. M. Rose, E. L. Radin, I. L. Paul: Determination of the Elastic Modulus of Individual Trabeculae by their Buckling Behavior, J. Bone Jt. Surg. 55-A: 651, 1973.

3.  J. W. Pugh, R. M. Rose: Mechanical Resonances in Human Bone, Proceedings of the 26th Annual Conference on Engineering in Medicine and Biology, Minneapolis, Minnesota, 1973, p. 44.

4.  J. W. Pugh, G. C. Steiner: Relationship between Structure and Mechanical Resonance Spectra in Human Cancellous Bone, Proceedings of the 27th Annual Conference on Engineering in Medicine and Biology, Philadelphia, Pennsylvania, 1974, p. 292.

5.  J. W. Pugh: The Role of Cancellous Bone in Joint Function, Proceedings of the 21st Annual Meeting of the Orthopaedic Research Society, San Francisco, California, 1975, p. 60.

6.  J. W. Pugh: The Role of Cancellous Bone in Joint Function, J. Bone Jt. Surg. 57-A: 575-576, 1975.

7.  J. Pugh, C. Weiss, F. Weiss, D. Malkin: Design and Biomechanical Evaluation of a Cementable Endosteal Blade Implant, Proceedings of the Seventh Annual International Biomaterials Symposium, Clemson, South Carolina, 1975, Section III, Dental Materials.

8.  J. W. Pugh: Mechanical Behavior of Cancellous Bone: A Finite-Element Model, Abstracts of the New England Bioengineering Conference, Burlington, Vermont, 1973, Section II A.

9.  J. Pugh, J. Runkle: Corrosion Behavior of a Metallic Implant: A Scanning Electron Microscope Study, Abstracts of the Second Annual Bioengineering Conference, Worcester, Massachusetts, 1974 , p. 2 .4.

10. J. Pugh, W. Jaffe, F. Rummer, K. Sinibaldi: Corrosion of Orthopaedic Implants--A Clinical and Experimental Study, Proceedings of the Spring Meeting of The Electrochemical Society, Toronto, Canada, 1975, p. 839-840.

11. J. W. Pugh, A. I. Streitman, J. F. Stanoch: Studies of the Impact Response of Human Limbs, Proceedings of the 28th Annual Conference on Engineering in Medicine and Biology, New Orleans, Louisiana, 1975, p. 171.

12. J. W. Pugh, S. P. Lasser, E. D. Seldman: Preferred Orientations in Cancellous Bone of the Knee and Ankle Joints: Technique for Determination and Possible Biomechanical Significance, Proceedings of the 29th Annual Conference on Engineering in Medicine and Biology, Boston, Massachusetts, 1976, p. 110.

13.   J.W Pugh, A. I. Streitman: The Design and Implementation of a Simple, Effective System for Gait Analysis, Proceedings of the 29th Annual Conference on Engineering in Medicine and Biology, Boston, Massachusetts, 1976, p. 185.

14.   A. Streitman, J. Pugh: Design of an Economical Low-Frequency Recording System for Physiologic Waveforms, program and Abstracts of the Eighth Annual Conference of the Society for Advanced Medical Systems, Boston, Massachusetts, 1976, p. 16.

15.   J. T. Demopoulos, J. Pugh: Biomechanical Evaluation of Plastic Orthoses, Arch. phys. Med. Rehabil. 57: 526, 1976.

16.   R. Israel, J. Pugh, A. Streitman: Impact Response of Normal and Osteoarthritic Knee Joints, Proceedings of the 1977 World Congress of the International Society for Prosthetics and Orthotics, New York, New York, 1977, p. 67.

17.   H. S. Sherry, J. A. Suarez, B. Futterman, R. S. Siffert, J. W. Pugh: A Biomechanical Evaluation of Various Cement-Metal Assemblies for the Reconstitution of Pathologic Fractures, Proceedings of the 30th Annual Conference on Engineering in Medicine and Biology, Los Angeles, California, 1977, p. 89.

18.   H. M. Israel, A. I. Streitman, J. W. Pugh: Impact Response of Normal and Osteoarthritic Knee Joints, Proceedings of the 30th Annual Conference on Engineering in Medicine and Biology, Los Angeles, California, 1977, p. 85.

19.   R. Norman, R. Dueland, J. Pugh: The Bony Response to Cemented Endoprostheses--A Study of the Pemoral Component of Total Hips in Dogs, Proceedings of the 24th Annual Meeting of the Orthopaedic Research Society, Dallas, Texas, 1978, p. 147.

20.   R. M. Israel, A. I. Streitman, J. W. Pugh: Impact Response of Normal and Osteoarthritic Knee Joints & Proceedings of the 23rd Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, 1977, p. 223.

21.   H. S. Sherry, J. A. Suarez, B. Futterman, R. S. Siffert, J. W. Pugh: A Biomechanical Evaluation of Various Cement-Metal Assemblies for the Reconstitution of Pathologic Fractures, Proceedings of the 23rd Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, 1977, p. 276.

22.   J. Pugh, R. Levy: Biomechanical Evaluation of an IN SITU Geomedic Prosthesis after One Year IN VIVO, Proceedings of the 24th Annual Meeting of the Orthopaedic Research Society, Dallas, Texas, 1978, p. 215.

23.   R. C. Hendler, J. W. Pugh: Patho-Biomechanics of Wrist Changes Following Radial Head Excision, Proceedings of the 24th Annual Meeting of the - Orthopaedic Research Society, Dallas, Texas, 1978, p. 216.

24.   M. Pruzansky, J. Pugh, R. Siffert: Trigger Thumb Associated with Trapeziometacarpal Arthritis: A Biomechanical Evaluation, Proceedings of the 24th Annual Meeting of the Orthopaedic Research Society, Dallas, Texas, 1979, P. 221.

CMxPDF - www.fenho.com

25. N. Pachtman, G. Steiner, J. Pugh: Determination of Collagen Fiber Orientations in Human Cancellous Bone by Birefringence Extinction, Proceedings of the 25th Annual Meeting of the Orthopaedic Research Society, San Francisco, California, 1979, p. 205.

26. Z. Weinberg, A. Pearlman, G. Steiner, J. Pugh: Nuclear Imaging and Mechanical Properties of Osteoarthritic Femoral Heads, proceedings of the 25th Annual Meeting of the Orthopaedic Research Society, San Francisco, California, 1979, p. 288.

27. A. Streitman, J. Pugh: Shock-Absorption Due to Musculature in the Constrained Leg, Proceedings of the 32nd Annual Conference on Engineering in Medicine and Biology, Denver, Colorado, 1979, p. 68.

28. H. Wilpon, J. Pugh: Cancellous Bone: Mechanical Effects of Specimen Thickness, Proceedings of the 33rd Annual Conference on Engineering in Medicine and Biology, Washington, D.C., 1980, p. 29.

29. J. Pugh, R. Averill, N. Pachtman, D. Bartel, W. Jaffe: Prosthesis Surface Design to Resist Loosening: Stress Normalization, Transactions of the 27th Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, 1981, p. 189.

30. I. Horowitz, J. Pugh: Calcium Heterogeneities and Stress Concentration in Cancellous Bone, Transactions of the 27th Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, 1981, p. 232.

31. P. Heyman, A. Streitman, R. Israel, J. Pugh: Measurement of Knee Flexion-Extension with a Computerized Isokinetic Dynamometer, Transactions of the 27th Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, 1981, F. 314.

32. C. Gross, J. Au, M. Neuwirth, J. Graham, J. Pugh: Scoliosis and Growth: A Review, Program of the 16th Annual Meeting of the Scoliosis Research Society, Montreal, Quebec, Canada, 1981, p. 145.

33. C. Gross, J. Pugh: Mechanical Testing of Scoliotic Spines--An In Vivo Clinical Study, Transactions of the 28th Annual Meeting of the Orthopaedic Research Society, New Orleans, Louisiana, 1982, p. 334.

34. W. Lehman, D. Mensche, A. Grant, A. Norman, J. Pugh: The Problem of Slipped Capital Femoral Epiphysis, Orthopaedic Transactions 6: 380-381, 1982.

35. C. Tauber, M. Neuwirth, J. Au, A. Miller, M. Rothschild, J. Schiffman, J. Pugh: Computerized Motion Analysis of Patients with Back Disorders: Spine and Lower Extremity Correlations, Transactions of the 29th Annual Meeting of the Orthopaedic Research Society, Anaheim, California, 1983, P- 209.

36. S. Adelsberg, J. Pugh: Kinematics of Running, Transactions of the 29th Annual Meeting of the Orthopaedic Research Society, Anaheim, California, 1983, p. 286.

37. D. Grande, J. Pugh: Scanning Electron Microscope Correlation of Dimples on Articular Cartilage, Transactions of the 29th Annual Meeting of the Orthopaedic Research Society, Anaheim, California, 1983, p. 364.

38.   K. Josephson, Y. Efe, C. Gross, J. Pugh: The Assessment of Human Leg Volume Via Three Dimensional Anthropometry, Program of the Twenty First International Symposium, Mini and Microcomputers and Their applications, San Francisco, California, 1983, p. 7.

39.   T. Petsche, Y. Efe, J. Pugh: Automated Reconstruction and Analysis of Three Dimensional Models of two Phase Structures from Serial Sections, Program of the Twenty-First International Symposium, Mini and Microcomputers and Their Applications, San Francisco, California, 1983, p. 8.

40.   J. Pugh: Mechanical Aspects of Osteoarthritis, IX International Congress of Biomechanics, Scientific Program, Waterloo, Ontario, Canada, 1983, p. 63.

41.   J. R. Lundy, T. Kazlausky, M. Kleinberger, G. Diskin, M. Lee, J. Pugh, C. Tauber: Early Detection of Joint Dysfunction via Pattern Recognition, Proceedings of the 36th Annual Conference on Engineering in Medicine and Biology, Columbus, Ohio, 1983, p. 201.

42.   C. Tauber, M. Neuwirth, J. Au, A. Miller, J. Pugh: Computerized Motion Analysis of Patients with Back Disorders: Spine and Lower Extremity Correlations, Orthopaedic Transactions ?: 327-328, 1983.

43.   J. Lundy, T. Kazlausky, J. Pugh, C. Tauber: Non-Invasive Assessment of Joint Dysfunction by Selective Visual Enhancement of Gait Measurement, Transactions of the 30th Annual Meeting of the Orthopaedic Research Society, Atlanta, Georgia, 1984, p. 91.

44.   M. Kassover, C. Tauber, J. Au, S. Johnson, J. Pugh: Auditory Biofeedback in Spastic Diplegia: Gait Analysis, Transactions of the 30th Annual Meeting of the Orthopaedic Research Society, Atlanta, Georgia, 1984, p. 160.

45.   R. Paterson, D. Mensche, D. Grande, M. Klein, C. Burmeister, J. Pugh, M. Pitman: Chondrocyte Transplantation--An Experimental Model in the Rabbit, Transactions of the 30th Annual Meeting of the Orthopaedic Research Society, Atlanta, Georgia, 1984, p. 218.

46.   D. Grande, G. Hobbs, L. Peterson, J. Pugh: The Cellular Distribution of Negative Charges in Cultured Articular Chondrocytes, Transactions of the 30th Annual Meeting of the Orthopaedic Research Society, Atlanta, Georgia, 1984, p. 284.

47.   J. Pugh: Task/Injury Workshop on Acute Trauma. Technical Aspects, Abstracts Booklet, International Conference on Injuries in the Workplace, New York, New York, 1984, p. 26.

48.   Duncan Troup, James Pugh: Task/Injury Workshop Report on Acute Trauma, Preliminary Report of the Workshops, International Conference on Injuries in the Workplace, New York, New York, 1984, pp. 20-21.

49.   J. Pugh, C. Tauber, J. Au, M. Kassover, D. Krebs, J. Lundy, T. Kazlausky: A Computerized Video Motion Analyzer for Clinical Management of Orthopaedic Patients: Methods and Applications, Abstracts, Congress on Medical Instrumentation "Essential Qualities," Amsterdam, The Netherlands, 1984, p. A36.

Inter-Ci   asting & Consulting Corporation

50.    R. B. Raynor, J. Pugh, I. Shapiro: The Role of Facet Joints in Anterior Posterior Shear and the Implications of Facetectomy, Orthopaedic Transactions 8: 2, 1984.

51.    W. B. Lehman, D. Menche, A. Grant, A. Norman, J. Pugh: Ole Problem of In Situ Pinning of Slipped Capital Femoral Epiphysis, Orthopaedic Transactions 6: 380, 1982.

52.    Wen Ling, James Pugh, Arthur Nelson: Quantitative Evaluation of Spasticity in Cerebral Palsy Children, Proceedings of the Second International Conference on Rehabilitation Engineering, Ottawa, Canada, 1984, pp. 503-504.

53.    J. Pugh: Nonporous and Noncemented Stepped-Surface Total Hip Prosthesis, Programme, Applications of Material Sciences to the Practice of Implant Orthopedic Surgery, North Atlantic Treaty Organization Advanced Study Institute, Marbella, Costa del Sol, Spain, 1984, p. 56.

54.    L. Peterson, D. Menche, D. Grande, M. Klein, G. Burmeister, P. Zidel, J. Pugh, M. Pitman: Chondrocyte Transplantation--An Experimental Model in the Rabbit, Orthopaedic Transactions 8: 292, 1984.

55.    D. Grande, G. Hobbs, L. Peterson, P. Zidel, J. Pugh: Surface Distribution of Negative Charges in Chondrocytes, Orthopaedic Transactions 8: 322, 1984.

56.    James Pugh: Mechanical Aspects of Osteoarthritis: Pathogenesis and Joint Replacement with Z- Prosthesis, Program, The Pathology of Joint Failure, Edmonton, Alberta, Canada, 1984, p. 11.

57.    D. Grande, M. Pitman, L. Peterson, D. Menche, G. Hobbs, J. Pugh: Ultrastructural Morphology of Osteoarthritic Chondrocytes, Transactions of the 3lst Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, 1985, p. 60.

58.    P. Zidel, J. Ngai, R. Raynor, G. Hobbs, J. Pugh: Three-Dimensional Analysis of Cervical Spine Motion Segments by Computer Video-Photogrammetry, Transactions of the 3lst Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, 1985, p. 330.

59.    A. Herzberg and J. Pugh: Fractal Modelling of Human Cancellous Bone, Transactions of the 32nd Annual Meeting of the Orthopaedic Research Society, New Orleans, Louisiana, 1986, p. 334.

60.    M. Ries, J. Pugh, J. Gurtowski, R. Dee, J. Au, N. Dong, X. Li, F. Chiang: pelvic Strains in Normal and Prosthetic Loading, Abstract Booklet, Nineteenth Annual American Orthopedic Association Residents' Conference, Los Angeles, California, 1986, Paper Number 140.

61.    A. M. Werzberg, J. W. Pugh, W. Lanzer: A Fractal Model for Trabecular Bone Microstructure and Functional Adaptation, Transactions of The . l2th Annual Meeting of the Society for Biomaterials, Minneapolis-St. Paul, Minnesota, 1986, p. 105.

62.    D. A. Grande, I. J. Singh, and J. Pugh: Healing of Articular Cartilage following Chondrocyte Transplantation, Seventh Annual New York-New Jersey Metropolitan American Academy of Dental Research Meeting Proceedings, College of Dentistry, New York University Dental Center, New York, New York, 1986, p. 15, paper 64.

63.  Richard B. Raynor, R. Moskovich, P. Zidel, J. Pugh: Primary and Coupled Neck Motions in the Normal and Facetectomized Cervical spine, Program of the Federation of Spine Associations, Second Annual Meeting, San Francisco, California, pp. 34-35, 1987.

64.  S. A. Silverberg, s. B. Cherney, J. Au, J. Pugh: Force Plate and Electromyographic Analyses of Running and Cutting in Patients with Anterior Cruciate Ligament Tears, Transactions of the 33rd Annual Meeting of the Orthopaedic Research Society, San Francisco, California, 1987, p. 200.

65.  M. Ries, J. Pugh, J. Au, J. Gurtowski, R, Dee: Pelvic Strains in Normal and Protrusio with Hemiarthroplasty and Screw In Acetabular Components, Transactions of the 33rd Annual Meeting of the Orthopaedic Research Society, San Francisco, California, 1987, p. 508.

66.  A. M. Herzberg, J. W. Pugh, J. A. Sigles, and F. A. Matsen: A Microstructural Model for Trabecular Bone Remodeling, Transactions of the 35th Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, 1989, P.31

CitiPDF - www.fastio.com

PEER-REVIEWED PAPERS IN REFERRED JOURNALS:

1.    E. L. Radin, H. G. Parker, J. W. Pugh, R. S. Steinberg, I. L. Paul, R. M. Rose: Response
      of Joints to Impact Loading ---- III Relationship between Trabecular Microfractures and
      Cartilage Degeneration, J. Biomechanics 6: 51-57, 1973.

2.    J. W. Pugh, R. M. Rose, E. L. Radin: A Possible Mechanism of Wolff's Law: Trabecular
      Microfractures, Arch. Int. de Phys. et de Biochemie 81: 27-40, 1973.

3.    J. W. Pugh, R. M. Rose, E. L. Badin, I. L. Paul: Mechanical Resonance Spectra in
      Human Cancellous Bone, Science 181: 271-272, 1973.

4.    J. W. Pugh, R. M. Rose, E. L. Radin: Elastic and Viscoelastic Properties of Trabecular
      Bone, J. Biomechanics 6: 475-485, 1973.

5.    J. W. Pugh, R. M. Rose, E. L. Radin: A Structural Model for the Mechanical Behavior
      of Trabecular Bone, J. Biomechanics 6: 657-670, 1973.

6.    J. W. Pugh, R. M. Rose, E. L. Fadin: Quantitative Studies of Human Subchondral
      Cancellous Bone. Its Relationship to the State of Its Overlying Cartilage, J. Bone Jt.
      Surg. 56-A: 313-321, 1974.

7.    J. W. Pugh, W. L. Jaffe, F. F. Jaffe: Corrosion Failure in Stainless Steel Implants, Surg.
      Gyn. & Obstet. 141: 199-202, 1975.

8.    J. W. Pugh, G. C. Steiner: Relationship between Structure and Mechanical Resonance
      Spectra in Human Cancellous Bone, Med. G Biol. Eng. 13: 714-716, 1975.

9.    J. W. Pugh: Comment on "Observations on Eburnated Bone," Clin. Orthop. & Rel. Res.
      118: 269-270, 1976.

10.   J. W. Pugh, W. L. Jaffe: Clinically-Observed Corrosion of Surface Defects of Wires, J.
      Biomed. Mater. Res. 11: 625-628, 1977.

11.   J. Pugh, C. Weiss, F. Weiss, D. Malkin: Design and Biomechanical Evaluation of a
      Cementable Endosteal Blade Implant, J. Biomed. Mater. Res. 10: 571-581, 1976.

12.   J. Pugh, P. Robbins, A. Streitman: Wear of Orthopaedic Implants--A Scanning Electron
      Microscope Study, Wear 45: 75-83, 1977.

13.   P. Robbins, J. Pugh: A Comparative Study of Replication Techniques for Use in
      Scanning Electron Microscopy of Orthopaedic Implants, Wear 50: 95-103, 1978.

14.   P. S. Walker, M. Ben-Dov, M. J. Askew, J. Pugh: The Deformation and Wear of Plastic
      Components in Artificial Knee Joints--An Experimental Study, Engineering in Medicine
      10: 33-38, 1981.

15.   P. J. Obiedzinski, W. Pennamacoor, J. D'Amico, J. Pugh:
      An Anomalous Tendon of the Extensor Hallucis Longus Muscle, J. Am. Pod. Assoc. 71:
      426-429, 1981.

16.   J. Pugh, H. Sherry, B. Futterman, V. Frankel: Biomechanics of Pathologic Fractures, Clinical Orthopaedics and Related Research 169: 109-114, 1982.

17.   K. Sinibaldi, J. Pugh, H. Rosen, S. Liu: Osteomyelitis and Neoplasia Associated with Use of the Jonas Intramedullary Splint in Small Animals, J. Amer. Vet. Med. Assoc. 181: 885-890, 1982.

18.   F. Ewald, R. Poss, J. Pugh, A. Schiller, C. Sledge: Hip Cartilage Supported by Methacrylate in Canine Arthroplasty, Clin. Orthop. and Rel. Res. 171: 273-279, 1982.

19.   C. Gross, J. Graham, M. Neuwirth, J. Pugh: Scoliosis and Growth-- An Analysis of the Literature, Clin. Orthop. and Rel. Res. 175: 243- 250, 1983.

20.   F. J. Bejjani, C. M. Gross, J. W. Pugh: Model for Static Lifting: Relationship of Loads on the Spine and the Knee, J. Biomechanics 17: 281-287, 1984.

21.   W. B. Lehman, D. Menche, A. Grant, A. Norman, J. Pugh: The Problem of Evaluating In Situ Pinning of Slipped Capital Femoral Epiphysis: An Experimental Model and A Review of 63 Consecutive Cases, J. Ped. Orthop. 4: 297-303, 1984.

22.   W. B. Lehman, A. Grant, D. Rose, J. Pugh, A. Norman: A Method of Evaluating Possible Pin Penetration in Slipped Capital Femoral Epiphysis Using a Cannulated Internal Fixation Device, Clin. Orthop. and Rel. Res. 186: 65-70, 1984.

23.   Richard B. Raynor, James Pugh, and Ilan Shapiro: Cervical Facetectomy and its Effect on Spine Strength, J. Neurosurgery 63: 278-282, 1985

24.   Mindy Kassover, Carolyn Tauber, Jan Au , and James Pugh: Auditory Biofeedback in Spastic Diplegia, J. Orth. Res. 4: 246-249, 1986.

25.   Daniel A. Grande, Inder J. Singh, and James Pugh: Healing of Experimentally Produced Lesions in Articular Cartilage Following Chondrocyte Transplantation, The Anatomical Record 218: 142-148, 1987.

26.   Richard B. Raynor, Ronald Moskovich, Paul Zidel, and James Pugh: Alterations in Primary and Coupled Neck Motions after Facetectomy, Neurosurgery 21: 681-687, 1987.

27.   M. Ries, J. Pugh, J. Choy Au, J. Gurtowski, and R. Dee: Normal Pelvic Strain Pattern In Vitro, J. Biomed. Eng. 11: 398-402, 1989.

28.   Michael Ries, James Pugh, Jan Choy Au, James Gurtowski, and Roger Dee, Cortical Pelvic Strains with Varying Size Hemiarthroplasty In Vitro, J. Biomechanics 22: 775-780, 1989.

## MASTER'S AND DOCTORAL THESES SUPERVISED TO COMPLETION:

1.  Neal Pachtman: The Nature of the Arrangements of Collagen Fibers in Human Femoral Cancellous Bone, Department of Bioengineering, Fairleigh Dickinson University, Teaneck, New Jersey, December 1978, Master of Science.

2.  Alan Streitman: A Microcomputer-Based Impact Data Acquisition/Analysis System for Characterization of the Mechanical Properties of the Lower Extremity, Department of Bioengineering, Fairleigh Dickinson University, Teaneck, New Jersey, May 1979, Master of Science.

3.  Clifford Gross: The Effect of Light Static Lifting on the Configuration of Healthy and Scoliotic Female Spines Using Three-Dimensional Lordosimetry, School of Education, New York University, New York, New York, June 1981, Doctor of Philosophy.

4.  Penny Kroll: Velocity-Length-Tension Values in Normal Athletes, School of Education, Health, Nursing, and Arts Professions, New York University, New York, New York, October 1982, Master of Arts.

5.  Mindy Joan Kassover: The Effect of Augmented Auditory Feedback on the Hip, Knee, and Ankle on the Equinus Gait in Children with Spastic Diplegia, Department of Physical Therapy, Columbia University, New York, New York, May 1983, Master of Science.

6.  Fadi J. Bejjani: Cine-Radiographic Analysis of the First MetatarsoPhalangeal and the Sesamoido-Metatarsal Joints in Normal Feet, Hallux Valgus and Hallux Rigidus, School of Education, New York University, New York, New York, May 1983, Master of Arts.

7.  Thomas Petsche: Automated Reconstruction and Analysis of Three Dimensional Models of Two Phase Structures from Serial Sections, The Cooper Union School of Engineering, New York, New York, October 1983, Master of Engineering.

8.  Wen Ling: The Influence of Tactile Versus Vestibular Stimulation of the Elbow Flexors of Spastic Premature and Full-Term Cerebral Palsy Children, School of Education, New York University, New York, New York, March 1984, Doctor of Philosophy.

9.  John Mirabello: Finite Element Analysis of the Calcar Femorale: Applications to Total Hip Replacement, The Cooper Union School of Engineering, New York, New York, May 1984, Master of Engineering.

10.  Daniel Grande: The Healing of Experimentally Produced Lesions in Articular Cartilage Following Chondrocyte Transplantation, Department of Basic Medical Sciences, Graduate School of Arts and Sciences, New York University, New Sork, New York, February 1986, Doctor of Philosophy.

11.  Alex Herzberg: Fractal Modelling of Human Cancellous Bone, -The Cooper Union School of Engineering, New York, New York, September 1988, Master of Engineering.

CVbPDF - www.fasisa.com

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 233 of 328

## ORTHOPAEDIC SENIOR RESIDENT THESES SUPERVISED TO COMPLETION:

1. Jeffrey Sabloff, M.D.: Biomechanics of Blade Plate Fixation, June 1974.

2. Stephen Lasser, M.D.: Spatial Orientation of Trabeculae in Human Medial Femoral Condyles, June 1974*

3. Ernesto Seldman, M.D.: Transverse Subchondral Trabecular Patterns of the Tibio-Talar Joint, June 1975.

4. Robert Israel, M.D.: Impact Response in Normal and Osteoarthritic Knees, June 1976.

5. Joseph Suarez, M.D.: Problems in the Fixation of Metastatic Long Bone Fractures, June 1976*

6. Jeffrey Penner, M.D.: Impact Studies on Cadaver Knees, June 1977.

7. Zwi Weinberg, M.D.: Correlation between Bone Scans and Mechanics and Histology of Pathologic Femoral Heads, June 1978.

8. Michael Gordon, M.D.: Torque Analysis of Screw Fixation, June 1978.

9. Elliot Weinger, M.D.: A Clinical Review and Gait Analysis Study of the Guepar Hinge Total Knee Arthroplasty, June 1978.

*Recipient of the Annual Samuel Kleinberg Award for Best Senior Thesis.

## VOLUMES EDITED:

1. J. Pugh: Proceedings of the 1976 Biomechanics and Biomaterials Symposium, Bull, Hosp. Joint Diseases 38: Number 1, 1977.

2. J. Pugh: Proceedings of the 1977 Biomechanics and Biomaterials Symposium, Bull. Hosp. Joint Diseases 38: Number 2, 1977.

3. J. Pugh: Proceedings of the 1978 Biomechanics and Biomaterials Symposium, Bull. Hosp. Joint Diseases 40: Number 1, 1979.

4. J. Pugh: Proceedings of the 1982 Bioengineering Symposium, Bull. Hosp. Joint Diseases Orthopaedic Institute 43: November 2, 1983.

5. J. Pugh: Proceedings of the 1983 Bioengineering Symposium, "Biomechanics of the Anterior Cruciate Ligament," Bull. Hosp. Joint Diseases Orthopaedic Institute 46: Number 2, 1986.

CSXPDF - www.tesla.com

## POSTER DISPLAY SESSIONS:

N. Pachtman, G. Steiner, J. Pugh: Determination of Collagen Fiber Orientations in Human Cancellous Bone by Birefringence Extinction, 25th Annual Meeting of the Orthopaedic Research Society, San Francisco, California, 1979.

J. Pugh, R. Averill, N. Pachtman, D. Bartel, W. Jaffe: Prosthesis Surface Design to Resist Loosening: Stress Normalization, 27th Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, 1981.

J. Lundy, T.Kazlausky, J. Pugh, C. Tauber: Non-Invasive Assessment of Joint Dysfunction by Selective Visual Enhancement of Gait Measurement, 30th Annual Meeting of the Orthopaedic Research Society, Atlanta, Georgia, 1984.

Wen Ling, James Pugh, Arthur Nelson: Quantitative Evaluation of Spasticity in Cerebral Palsy Children, Second International Conference on Rehabilitation Engineering, Ottawa, Canada, 1984.

D. Grande, M. Pitman, L. Peterson, D. Menche, G. Hobbs, J. Pugh: Ultra-structural Morphology of Osteoarthritic Chondrocytes, 31st Annual Meeting of the Orthopaedic Research Society, Las Vegas, Nevada, 1985.

Alex Herzberg, J. Pugh: Fractal Modeling of Human Cancellous Bone, 32nd Annual Meeting of the Orthopaedic Research Society, New Orleans,Louisiana, 1986.

Wallace B. Lehman, Alfred D. Grant, Allan M. Strongwater, James Pugh, Alexander Norman, Donald J. Rose, Raymond Koval: Evaluating Possible Pin Penetration in Slipped Capital Femoral Epiphysis by Using a Specially Designed Cannulated Fixation Device, A Scientific Exhibit presented at the 53rd Annual Meeting of the American Academy of Orthopaedic Surgeons, New Orleans, Louisiana, 1986.

## PATENTS:

1.  F.M. Weiss, D. P. Malkin, J. Pugh, C. Weiss: Bone Implants and Method for Inserting the Same, United States Patent 4,024,639, Filed February 25, 1975, 11 claims, 5 drawing figures.

2.  James Pugh: Method and Apparatus for Affixing A Prosthesis to Bone, United States Patent Filed February 9, 1984,

3.  James Pugh: Running Shoe Program, United States Patent Filed April, 1984.

4.  James Pugh: Computerized Video Gait and Motion Analysis System and Method, United States Patent 4,631,676, Filed May 19, 1983, Issued December 23, 1986.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 234 of 328

## CATALOG COURSES TAUGHT:

1. E18.2401--Biomechanics I, Fifteen lectures, New York University, Fall 1981, Thirty hours, Fall 1982. Fall 1983, Fall 1984.

2. E18.2407--Practicum in Biomechanics and Ergonomics, Fifteen sessions, New York University, Fall 1981, Thirty hours.

3. E18.2408--Practicum in Biomechanics and Ergonomics, Fifteen sessions, New York University, Fall 1981, Thirty hours.

4. T361--Mechanics of Materials, Thirty lectures, City College of The City University of New York, Spring 1982, Forty-five hours, Fall 1982.

5. T331--Materials Science, Thirty sessions, City College of The City University of New York, Fall 1982, Sixty hours.

6. EIDI25--Biomechanics, Thirty sessions, The Cooper Union School of Engineering, Fall 1982, Forty-five hours, Fall 1983. Fall 1984.

7. ESCIIO--Materials Science, Thirty Sessions, The Cooper Union School of Engineering, Spring 1983, Forty-five hours, Fall 1983.

8. EIDI22--Biomaterials, Thirty Sessions, The Cooper Union School of Engineering, Spring 1983, Forty-five hours, Spring 1984.

9. T360--Applied Mechanics, Thirty lectures, City College of The City University of New York, Spring 1983, Sixty hours.

10. E18.2402--Biomechanics II, Fifteen sessions, New York University, Spring 1983, Thirty hours. Spring 1984.

11. ESCIIOE--Materials Science, for Electrical Engineering Majors, Thirty Sessions, The Cooper Union School of Engineering, Spring 1984, Forty-five hours.

12. ESC110K--Materials Science, for Chemical Engineering Majors, Thirty Sessions, The Cooper Union School of Engineering, Spring 1984, Forty-five hours.

13. ESCIIOM--Materials Science, for Mechanical Engineering Majors, Thirty Sessions, The Cooper Union School of Engineering, Fall 1984, Forty-five hours.

14. ESCIIOC--Materials Science, for Civil Engineering Majors, Thirty Sessions, The Cooper Union School of Engineering, Fall 1984, Forty-five hours.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 236 of 328

## BIOGRAPHICAL SKETCH

James Pugh, Ph.D., P.E.

Dr. Pugh was born in Chicago, Illinois, on January 4, 1946, and was raised in Richmond, Virginia, attending public schools in that city. He was valedictorian in his graduation class of 196 at John Marshall High School in Richmond, Virginia. At that point in time, he matriculated at the Massachusetts Institute of Technology in Cambridge, Massachusetts, receiving his Bachelor of Science Degree in Metallurgy in 1968. His senior thesis "Computer Simulation of the Spray Steelmaking Process" was awarded a Dow Chemical Company Prize as best thesis from the Department of Metallurgy and Materials Science. He entered graduate school at MIT and worked as a teaching and research assistant while pursuing his Ph.D. in Biomedical Engineering in the Department of Materials Science and Engineering. He received his Doctor of Philosophy Degree in Biomedical Engineering from MIT in 1972 with a thesis entitled "Structure and Dynamic Mechanical Properties of Trabecular Bone."

In September 1972, Dr. Pugh joined the Hospital for Joint Diseases and Medical Center, then located at 123rd Street and Madison Avenue, and set up the Biomechanics Laboratory with full facilities for kinematic studies, mechanical testing, microscopy, and computational analyses. He was appointed Assistant Professor of Orthopaedics at the Mount Sinai School of Medicine of The City University of New York in 1973, and was promoted to Associate Professor of Orthopaedics in 1979.

In 1979, the hospital was relocated to 17th Street and Second Avenue in New York City and renamed the Hospital for Joint Diseases Orthopaedic Institute. The original Biomechanics Laboratory became the new Division of Bioengineering, reflecting significant increases in staff, space, and equipment. Dr. Pugh was appointed Adjunct Associate Professor of Occupational Health and Safety at New York University in 1981, Adjunct Professor of Engineering Technology at the City University of New York in 1982, and Adjunct Professor of Bioengineering at The Cooper Union School of Engineering in 1982.

He sequentially held the positions of Director, Biomechanics Laboratory, and Director, Division of Bioengineering, at the Hospital for Joint Diseases and Medical Center and the Hospital for Joint Diseases Orthopaedic Institute respectively. At the latter, he also served as Associate Director, Occupational and Industrial Orthopaedic Center.

In 1984-1985, Dr. Pugh was appointed Research Professor at SUNY/Stony Brook, as well as Director, Musculoskeletal Analysis Laboratory, and Director, Division of Orthopaedic Engineering, all in the Department of Orthopaedics, School of Medicine, Health Sciences Center. He also received in 1985 an appointment as Professor, Department of Materials Science and Engineering, SUNY/Stony Brook. His current research interests include design of total joint replacement prostheses, materials science of natural and synthetic biomaterials, computer stress analysis, industrial engineering, and kinematic and kinetic analysis of human motion. He supervises undergraduate and graduate students at SUNY/Stony Brook in their theses and projects.

Dr. Pugh married Dona Bergin on October 11, 1980. Their son, York Bergin-Pugh, was born to them on May 6, 1984.









PLAINTIFF'S
EXHIBIT

```
HEB 489   <No.11A>023
132 0112 -2-1 N N 16 (027)
```



CVISPDF – www.fesisc.com



PLAINTIFF'S
EXHIBIT



# Inter-City Testing & Consulting Corporation



**Northeastern Office:**
167 Willis Avenue
Mineola, N.Y. 11501
(516) 747-8400
FAX: (516) 746-0111/21
Out of NYS:(800) 622-1515

**Southeastern Office:**
P.O. Box 2619
Jupiter, FL 33468-2619
(561) 745-7940
FAX. (561) 745-7939

May 22, 2001

Barry R. Benton, Esq.
284 Ebony Avenue
Brownsville, TX 78520-7120

IN REF:  Escudero v. Bauer

Dear Mr. Benton:

     This is to inform you that I have completed my initial study,
evaluation, and analysis of the materials submitted to me with regard
to the above matter, which included but were not limited to the fol-
lowing:  the ladder that collapsed under Mr. Escudero, depositions,
medical records, medical images (X-ray films), standards, discovery
documents, blueprints, and other materials.  The opinions expressed in
this preliminary report are to a reasonable degree of engineering,
biomedical engineering, and scientific certainty.  This present report
necessarily rebuts certain findings of Naismith Investigative Engineering
Services as expressed in reports dated August 30, 1999, and September
29, 1999, which were prepared on behalf of Roger Becerra of State Farm
Insurance Companies on behalf of defendant Bauer.

     The accident, according to the records, occurred on May 10, 1999,
at between 5:00 and 6:30 pm.  According to Mr. Escudero, he was given
the ladder by a co-worker, Reymundo Medina, looked at it to ascertain
that it was standing and acceptably strong, and climbed up on the ladder
up to steps 4 or 5 to work on an overhead light fixture.  He estimated
that he was up on the ladder for about 3 to 10 minutes before the ladder
unexpectedly and without warning fell, throwing him to the floor, and
causing a severe injury to his left foot and leg.  The medical records
indicate a severe comminuted fracture of the left os calcis, with swelling.
Complications ensued, and the foot was still painful as of the deposition
of Mr. Escudero taken on May 3, 2001.  He apparently developed osteopenia
in his left foot and leg.  He gave his height as 6'1" to 6'2" and his
weight as 190 to 200 pounds at the time of the accident.  He, according
to the most recent medical records in my possession, required eventually
on May 3, 2000, a partial synovectomy of the left ankle, peroneal
tenosynovectomy and decompression for fibulotalar and fibulocalcaneal
impingement, with additional surgery to rectify complications of the
original injury.

     Inspection of the subject ladder revealed a six-foot step ladder,
fiberglass in construction, manufactured by the Bauer Corporation, Wooster,
Ohio, with OSHA/ANSI sticker and warning/instruction labels.  The nomenclature
for each leg, as shown by Naismith Engineering reports, is herein adopted:
hang tags labelling each leg sequentially as Leg #1, Leg #2, Leg #3, and

# Inter-City Testing & Consulting Corporation





**Northeastern Office:**
167 Willis Avenue
Mineola, N.Y. 11501
(516) 747-8400
FAX: (516) 746-0111/21
Out of NYS:(800) 922-1515

**Southeastern Office:**
P.O. Box 2819
Jupiter, FL 33468-2819
(561) 745-7940
FAX. (561) 745-7939

May 22, 2001

Barry R. Benton, Esq.
284 Ebony Avenue
Brownsville, TX 78520-7120

IN REF:  Escudero v. Bauer

Dear Mr. Benton:

    This is to inform you that I have completed my initial study, evaluation, and analysis of the materials submitted to me with regard to the above matter, which included but were not limited to the following: the ladder that collapsed under Mr. Escudero, depositions, medical records, medical images (X-ray films), standards, discovery documents, blueprints, and other materials. The opinions expressed in this preliminary report are to a reasonable degree of engineering, biomedical engineering, and scientific certainty. This present report necessarily rebuts certain findings of Naismith Investigative Engineering Services as expressed in reports dated August 30, 1999, and September 29, 1999, which were prepared on behalf of Roger Becerra of State Farm Insurance Companies on behalf of defendant Bauer.

    The accident, according to the records, occurred on May 10, 1999, at between 5:00 and 6:30 pm. According to Mr. Escudero, he was given the ladder by a co-worker, Reymundo Medina, looked at it to ascertain that it was standing and acceptably strong, and climbed up on the ladder up to steps 4 or 5 to work on an overhead light fixture. He estimated that he was up on the ladder for about 3 to 10 minutes before the ladder unexpectedly and without warning fell, throwing him to the floor, and causing a severe injury to his left foot and leg. The medical records indicate a severe comminuted fracture of the left os calcis, with swelling. Complications ensued, and the foot was still painful as of the deposition of Mr. Escudero taken on May 3, 2001. He apparently developed osteopenia in his left foot and leg. He gave his height as 6'1" to 6'2" and his weight as 190 to 200 pounds at the time of the accident. He, according to the most recent medical records in my possession, required eventually on May 3, 2000, a partial synovectomy of the left ankle, peroneal tenosynovectomy and decompression for fibulotalar and fibulocalcaneal impingement, with additional surgery to rectify complications of the original injury.

    Inspection of the subject ladder revealed a six-foot step ladder, fiberglass in construction, manufactured by the Bauer Corporation, Wooster, Ohio, with OSHA/ANSI sticker and warning/instruction labels. The nomenclature for each leg, as shown by Naismith Engineering reports, is herein adopted: hang tags labelling each leg sequentially as Leg #1, Leg #2, Leg #3, and

CUsPDF • www.tesia.com

Case 1:00-cv-00193 Document 24 Filed in TXSD on 10/19/2001 Page 246 of 328

Barry R. Benton, Esq. -2- May 22, 2001

Leg #4 were applied to the ladder to clearly indicate each leg as numbered and depicted in the August 30, 1999, report of Naismith Engineering, Photograph 1. References in the present report to the legs by number shall thus be similar to references in the Naismith Engineering reports, in regard to identification of the legs.

Regarding the August 30, 1999, report of Naismith Engineering, while I generally agree with the description of the ladder, I disagree with the entry under Discussion that "The cracking and other damage observed on the ladder is the result of excessive useage and/or misuse." The extent of the longitudinal cracking of the legs, particularly the back legs, was due to the propagation of pre-existing cracks at the time of the accident on May 10, 1999. Exclusive of this, the other damage and wear is from normal use, not misuse. The bent spreader is incidental and minor.

Additionally, regarding the August 30, 1999, report of Naismith Engineering, there is mention of an inability to obtain from Bauer Corporation any history of problems with this type of ladder or any known defects. I personally, to correct this miscommunication from Bauer to Naismith, gave a detailed deposition in the case of Scott v. Bauer, taken by attorneys representing Bauer, on August 15, 1994, almost five years before the Escudero accident. In that deposition, I gave detailed analysis of the failure mechanisms of a ladder similar to the Escudero ladder, outlined the hazards and defects, and testified as to proper means of control of same.

Regarding the September 29, 1999, report of Naismith Engineering, the "spot of brown paint" referenced in the section captioned Leg #3, represented by Naismith to be inside the crack, is clearly outside the crack on the exterior surface of the fiberglass. The "white paint or sheetrock joint compound" referenced in that section was found to be clearly on the exterior surface of the fiberglass and not inside the crack at the top of Leg #3. Further, regarding section captioned Leg #4, the "brown paint . . . visible inside the crack at approximately nine (9) and sixteen (16) inches from the bottom of the leg" clearly is on the surface of the fiberglass away from the crack and not inside that crack. In the section entitled Injured Location on Ladder, I wish to point out that Mr. Escudero clearly indicated in deposition when questioned that he was on step 4 or step 5, positions clearly permitted by the construction of the ladder, with step 4 clearly being permitted by the labelling on the ladder.

I have personally examined three ladders manufactured by Bauer, including the Escudero ladder, of substantially similar construction, which failed due to leg splitting, causing injuries to the users (Scott, Smith, Escudero). Further, I have in my possession a Bauer ladder, apparently discarded by the Long Island Rail Road, for reasons unrelated to leg splitting, which also demonstrates leg splitting. Finally, I have examined an un-used Bauer ladder demonstrating leg splitting due to the nature of storage and handling, as I testified to in detail in my deposition in Scott v. Bauer. Thus, I personally have examined in detail five Bauer fiberglass ladders, all showing similar defects and split legs, three of which resulted in accidents that caused injuries.

CUsPDF - www.texis.com

Case 1:00-cv-00193  Document 24  Filed in TXSD on 10/19/2001  Page 247 of 328

Leg #4 were applied to the ladder to clearly indicate each leg as numbered and depicted in the August 30, 1999, report of Naismith Engineering, Photograph 1. References in the present report to the legs by number shall thus be similar to references in the Naismith Engineering reports, in regard to identification of the legs.

Regarding the August 30, 1999, report of Naismith Engineering, while I generally agree with the description of the ladder, I disagree with the entry under <u>Discussion</u> that "The cracking and other damage observed on the ladder is the result of excessive useage and/or misuse." The extent of the longitudinal cracking of the legs, particularly the back legs, was due to the propagation of pre-existing cracks at the time of the accident on May 10, 1999. Exclusive of this, the other damage and wear is from normal use, <u>not misuse</u>. The bent spreader is incidental and minor.

Additionally, regarding the August 30, 1999, report of Naismith Engineering, there is mention of an inability to obtain from Bauer Corporation any history of problems with this type of ladder or any known defects. I personally, to correct this miscommunication from Bauer to Naismith, gave a detailed deposition in the case of <u>Scott v. Bauer</u>, taken by attorneys representing Bauer, on August 15, 1994, almost <u>five years before the Escudero accident</u>. In that deposition, I gave detailed analysis of the failure mechanisms of a ladder similar to the Escudero ladder, outlined the hazards and defects, and testified as to proper means of control of same.

Regarding the September 29, 1999, report of Naismith Engineering, the "spot of brown paint" referenced in the section captioned <u>Leg #3</u>, represented by Naismith to be inside the crack, is clearly outside the crack on the exterior surface of the fiberglass. The "white paint or sheetrock joint compound" referenced in that section was found to be clearly on the exterior surface of the fiberglass and not inside the crack at the top of Leg #3. Further, regarding section captioned <u>Leg #4</u>, the "brown paint . . . visible inside the crack at approximately nine (9) and sixteen (16) inches from the bottom of the leg" clearly is on the surface of the fiberglass away from the crack and not inside that crack. In the section entitled <u>Injured Location on Ladder</u>, I wish to point out that Mr. Escudero clearly indicated in deposition when questioned that he was on step 4 or step 5, positions clearly permitted by the construction of the ladder, with step 4 clearly being permitted by the labelling on the ladder.

I have personally examined three ladders manufactured by Bauer, including the Escudero ladder, of substantially similar construction, which failed due to leg splitting, causing injuries to the users (Scott, Smith, Escudero). Further, I have in my possession a Bauer ladder, apparently discarded by the Long Island Rail Road, for reasons unrelated to leg splitting, which also demonstrates leg splitting. Finally, I have examined an un-used Bauer ladder demonstrating leg splitting due to the nature of storage and handling, as I testified to in detail in my deposition in <u>Scott v. Bauer</u>. Thus, I personally have examined in detail five Bauer fiberglass ladders, all showing similar defects and split legs, three of which resulted in accidents that caused injuries.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 248 of 328

My analysis of the materials and ladder associated with the Escudero accident revealed that there were pre-existing cracks in the legs of the subject ladder, which spread and opened up at the time of the accident, resulting in a destabilization of the ladder, and the fall causative of Mr. Escudero's injuries. The presence of the initial cracks in the legs of the ladder were due to a combination of design and manufacturing defects, and may have been exacerbated by routine handling and storage of the ladder.

The initial cracking of the rails of the ladder may have been fostered by a defective manufacturing condition caused by one of the following, or a combination of the following: improper curing of the fiberglass, improper proportion of components, improper control of moisture during the curing, improper use of the woven glass materials. Regarding the latter, it was apparent that the longitudinal splitting of the rails (legs) was between fibers of the glass rather than across those fibers, predominantly.

The design defects included the failure to use an encapsulating foot of the type utilized on Werner ladders. Said encapsulating foot assembly is economical and feasible, as evidenced by its use on Werner ladders, and serves to tie together the longitudinal geometry of each leg, preventing not only the initiation of cracks which serve as a prelude to the catastrophic failure, but also guarding against rail geometry separation.

Nextly, the back rails of the ladder (Legs #3 and #4) should have cross-braces similar to the steps configured on Legs #1 and #2, such that the cross-braces attach to two sides of the fiberglass leg cross-section. It is foreseeable that the back rails particularly, due to the loading experienced when the ladder is folded and stored, will develop cracks during normal useage.

Lastly, the warnings and instructions are deficient and defective in that the recommendation to discard the ladder if damaged is non-specific, and requires a level of expertise beyond that of the lay user to identify incipient, unstable cracks in the fiberglass which could become unstable. It is not reasonable to expect a user to notice, for example, hairline cracks in the fiberglass legs and, even if noticed, to realize the potential for the crippling effects such a crack can induce into a fiberglass structure when such cracks propagate.

I am of the considered opinion that the pre-existing cracks were not nearly as extensive as implied by Naismith Engineering, for reasons outlined above. On the contrary, such cracks, particularly those on the back side of the back legs, would naturally not be recognized during a cursory inspection as being dangerous and indicative of the need to retire/discard the ladder. It must be emphasized that proper control of hazards in general, and the hazards in the Bauer fiberglass in particular, dictate that the hazard be eliminated if economical and feasible. Clearly, this is the manner to control the hazard by elimination of the aforementioned defects. In the absence of elimination of the defects, warning and instruction is permitted. However, the warnings and instructions were deficient and defective.

CSXPDF - www.fesisi.com

Case 1:00-cv-00193  Document 24  Filed in TXSD on 10/19/2001  Page 249 of 328

My analysis of the materials and ladder associated with the Escudero accident revealed that there were pre-existing cracks in the legs of the subject ladder, which spread and opened up at the time of the accident, resulting in a destabilization of the ladder, and the fall causative of Mr. Escudero's injuries. The presence of the initial cracks in the legs of the ladder were due to a combination of design and manufacturing defects, and may have been exacerbated by routine handling and storage of the ladder.

The initial cracking of the rails of the ladder may have been fostered by a defective manufacturing condition caused by one of the following, or a combination of the following: improper curing of the fiberglass, improper proportion of components, improper control of moisture during the curing, improper use of the woven glass materials. Regarding the latter, it was apparent that the longitudinal splitting of the rails (legs) was between fibers of the glass rather than across those fibers, predominantly.

The design defects included the failure to use an encapsulating foot of the type utilized in Werner ladders. Said encapsulating foot assembly is economical and feasible, as evidenced by its use on Werner ladders, and serves to tie together the longitudinal geometry of each leg, preventing not only the initiation of cracks which serve as a prelude to the catastrophic failure, but also guarding against rail geometry separation.

Nextly, the back rails of the ladder (Legs #3 and #4) should have cross-braces similar to the steps configured on Legs #1 and #2, such that the cross-braces attach to two sides of the fiberglass leg cross-section. It is foreseeable that the back rails particularly, due to the loading experienced when the ladder is folded and stored, will develop cracks during normal useage.

Lastly, the warnings and instructions are deficient and defective in that the recommendation to discard the ladder if damaged is non-specific, and requires a level of expertise beyond that of the lay user to identify incipient, unstable cracks in the fiberglass which could become unstable. It is not reasonable to expect a user to notice, for example, hairline cracks in the fiberglass legs and, even if noticed, to realize the potential for the crippling effects such a crack can induce into a fiberglass structure when such cracks propagate.

I am of the considered opinion that the pre-existing cracks were not nearly as extensive as implied by Naismith Engineering, for reasons outlined above. On the contrary, such cracks, particularly those on the back side of the back legs, would naturally not be recognized during a cursory inspection as being dangerous and indicative of the need to retire/discard the ladder. It must be emphasized that proper control of hazards in general, and the hazards in the Bauer fiberglass in particular, dictate that the hazard be eliminated if economical and feasible. Clearly, this is the manner to control the hazard by elimination of the aforementioned defects. In the absence of elimination of the defects, warning and instruction is permitted. However, the warnings and instructions were deficient and defective.

Barry R. Benton, Esq.                    -4-                    May 22, 2001

    Regarding the possibility that Mr. Escudero may have been using step number 5, I am of the considered opinion that, had the ladder not possessed the aforementioned defects, his standing on step 5 would not have been causative of ladder failure. Further, the sticker on that step is deemed insufficient to prevent use of that step, as the step itself is inviting for use. Filling that space between the top of step 5 and the top of the ladder would positively prevent standing on step 5, if that is indeed the intent of Bauer.

    Thus, I am of the considered opinion that the ladder appeared, for all intents and purposes, to be safe to Mr. Escudero at the time of the accident, and, due to the nature of the ladder, Mr. Escudero was properly using the ladder at the time of the occurrence. I am of the considered opinion that the ladder had not been abused nor misused on prior occasions, in that the condition of the ladder prior to the Escudero accident was consistent with normal use. Finally, if the defects outlined in this report had not existed, the failure/collapse would not have occurred, and the injuries would not have been sustained.

                        Respectfully submitted,

                        James Pugh, Ph.D., P.E.
                        Director, Biomedical Engineering,
                         Materials Science & Engineering
                         Accident Reconstruction/Injury Analysis
                         Safety/Ergonomics/Warnings/Instructions/
                          Human Factors/Failure Analysis/Structural
                         Analysis

JP/bh

Enclosure:  C.V.

Regarding the possibility that Mr. Escudero may have been using step number 5, I am of the considered opinion that, had the ladder not possessed the aforementioned defects, his standing on step 5 would not have been causative of ladder failure. Further, the sticker on that step is deemed insufficient to prevent use of that step, as the step itself is inviting for use. Filling that space between the top of step 5 and the top of the ladder would positively prevent standing on step 5, if that is indeed the intent of Bauer.

Thus, I am of the considered opinion that the ladder appeared, for all intents and purposes, to be safe to Mr. Escudero at the time of the accident, and, due to the nature of the ladder, Mr. Escudero was properly using the ladder at the time of the occurrence. I am of the considered opinion that the ladder had not been abused nor misused on prior occasions, in that the condition of the ladder prior to the Escudero accident was consistent with normal use. Finally, if the defects outlined in this report had not existed, the failure/collapse would not have occurred, and the injuries would not have been sustained.

Respectfully submitted,

James Pugh, Ph.D., P.E.
Director, Biomedical Engineering,
  Materials Science & Engineering
Accident Reconstruction/Injury Analysis
Safety/Ergonomics/Warnings/Instructions/
  Human Factors/Failure Analysis/Structural
  Analysis

JP/bh

Enclosure:  C.V.







CVISPDF – www.faxiss.com







CVISPDF – www.fastio.com





CVisPDF – www.fenlos.com





Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   JOSE ESCUDERO, JR.          )
          Plaintiff             )

 4                               )

     VS.                         )  CIVIL ACTION NO. B-00-193

 5                               )

     BAUER CORPORATION D/B/A     )

 6   BAUER LADDER CORPORATION    )
          Defendant             )

 7   ********************************************************

 8        VIDEO ORAL DEPOSITION OF RICHARD POREMBA

 9                     JULY 27, 2001

10                     VOLUME 1 OF 1

11   ********************************************************

12              ORAL AND VIDEOTAPED DEPOSITION OF

13   RICHARD POREMBA, produced as a witness at the

14   instance of the Defendant, and duly sworn, was taken

15   in the above-styled and numbered cause on the 27th of

16   July, 2001, from 1:02 p.m. to 3:39 p.m., before DANDY

17   ELLIS, CSR in and for the State of Texas, reported by

18   machine shorthand, at the offices of Gendry &

19   Sprague, 645 Lockhill Selma, San Antonio, Texas

20   78216, pursuant to the Rules of Civil Procedure and

21   the provisions stated on the record or attached

22   hereto.

23

24

25        *    *    *    *    *    *    *    *    *    *
```

Page 2

```
 1              A P P E A R A N C E S
 2
    FOR THE PLAINTIFF,
 3
       ATTORNEY AT LAW
 4     MR. BARRY BENTON
       284 Ebony Ave
 5     Brownsville, Texas 78520,
 6
    FOR THE DEFENDANT,
 7
       GENDRY & SPRAGUE
 8     MR. THOMAS GENDRY
       645 Lockhill Selma
 9     San Antonio, Texas 78216,
10
11
    VIDEOGRAPHER,
12     RODNEY CUELLAR,
13
14
15
16
17
18            * * * * * * * * * * *
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
                          PAGE
 2
    Appearances                    2
 3
    RICHARD POREMBA
 4
      Examination by Mr Gendry      4
 5    Examination by Mr Benton     48
      Further Examination by Mr Gendry   93
 6    Further Examination by Mr Benton   98
    Changes and Signature         104
 8  Reporter's Certificate        105
 9        EXHIBIT INDEX
10  NO      DESCRIPTION      PAGE
11
      1  Resume               7
12    2  Photograph          18
      3  Photograph          18
13    4  Photograph          20
      5  Photograph          21
14    6  Copy of Photograph  25
      7  OSHA Regulations    31
15    8  Photograph          35
      9  Photograph          36
16   10  Photograph          41
     11  Photograph          43
17   12  Initial Report      46
     13  Second Report       47
18   14  Phone Log           51
     15  Photograph          75
19   16  Photograph          76
     17  Photograph          79
20   18  Photograph          80
     19  Diagram             98
21   20  Diagram             98
     21  Correspondence     101
22
23
24            * * * * * * * * * * *
25
```

Page 4

```
 1        VIDEOGRAPHER:  We're on the record.
 2  The time on screen is 1:02.  Today's date is July
 3  27th, 2001.  My name is Rodney Cuellar with Esquire
 4  Deposition Services in San Antonio.  The court
 5  reporter today is Dandy Ellis, also with Esquire
 6  Deposition Services.  We're at the law office of
 7  Gendry & Sprague in San Antonio to take the
 8  deposition of Richard Poremba in the cause styled
 9  Jose Escudero, Jr. versus Bauer Corporation, et al in
10  the United States District Court for the Southern
11  District of Texas, Brownsville Division, Civil Action
12  No. B-00-193.  And now all counsel present will state
13  their appearance, please.
14        MR. GENDRY:  Tom Gendry for Defendant,
15  Bauer Corporation.
16        MR. BENTON:  Barry Benton for the
17  Plaintiff, Jose Escudero
18        RICHARD POREMBA,
19  having been first duly sworn, testified as follows:
20             E X A M I N A T I O N
21  BY MR. GENDRY:
22     Q.  Please state your name.
23     A.  Richard A. Poremba.
24     Q.  And what is your current business or home
25  address, Mr. Poremba?
```

Page 5

```
 1     A.  You want my business or home?
 2     Q.  Business will be fine.
 3     A.  5262 South Staples, Suite 350, Corpus
 4  Christi, Texas.
 5     Q.  All right.  And how long have you lived in
 6  Corpus Christi, Texas?
 7     A.  I've been in Corpus Christi for
 8  approximately 15 years.
 9     Q.  All right.  You and I have not previously
10  met before today; is that correct?
11     A.  That's correct, sir.
12     Q.  All right.  And I visited with you for about
13  an hour and a half before today's deposition.  And we
14  went ahead and had lunch; is that correct?
15     A.  That's correct, sir.
16     Q.  All right.  Let me ask you a little bit
17  about your background.  First of all, about your
18  born -- being born and raised, where did that take
19  place?
20     A.  Was born in Massachusetts and raised in
21  Massachusetts.  And been in Texas, I guess
22  approximately 18 years.
23     Q.  Okay.  And as I understand it, you have a
24  profession; is that right?
25     A.  Yes, sir.
```

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 263 of 328

Page 6

1    Q.  All right.  What is your profession?
2    A.  I'm a licensed engineer and also a certified
3  indoor air quality professional.
4    Q.  Okay.  What was the last, certified what?
5    A.  Indoor air quality professional.
6    Q.  Indoor air quality, okay.  Let me ask you
7  about your education  Did you attend schools in
8  Boston, Mass?
9    A.  I attended school in Massachusetts.  I went
10  to the University of Massachusetts undergraduate
11  where I have my civil engineering degree.  I went to
12  graduate school at Western New England College.  And
13  I have an MBA with a concentration in accounting.
14    Q.  When did you get your civil engineering
15  degree?
16    A.  1969.
17    Q.  All right.  And do you have any professional
18  licenses?  Are you a licensed or certified engineer?
19    A.  Just as a civil.  And I'm a licensed Texas
20  engineer as a civil engineer.
21    Q.  Okay.  And is that license currently on
22  file?
23    A.  Yes, sir.
24    Q.  Okay.  Any other advanced education that you
25  had or courses that you've undertaken in connection

Page 7

1  with the work that you do currently?
2    A.  I've been to a variety of higher education
3  schools, I guess seminars, whatever you want to --
4  from -- that would deal with my field, you know,
5  either with -- and also investigative engineering
6  related courses also.
7    Q.  All right.  I'm going to have the court
8  reporter mark your professional resume as Deposition
9  Exhibit 1.
10    (Exhibit 1 marked.)
11    Q.  (BY MR. GENDRY) Let me hand you what has
12  been marked as Deposition Exhibit 1 and ask you if
13  you recognize that as your professional resume?
14    A.  Yes, sir, that's what I provided to you.
15    Q.  Is that resume current concerning your
16  qualifications and experience in practice as an
17  engineer?
18    A.  Yes, sir.
19    Q.  All right.  If you could, for the jury,
20  please describe what your professional experience has
21  been over the past, let's say ten years.
22    A.  Well, my past experience over ten years has
23  basically been in consulting engineering, involved in
24  both civil engineering and environmental
25  investigative engineering work.

Page 8

1    Q.  All right.  In this particular case that
2  we're here for today, did you become involved as an
3  investigative engineer?
4    A.  Yes, sir.
5    Q.  Okay.  Can you explain to the jury what
6  investigative engineering constitutes?  What is it?
7    A.  Well, I guess the best way to explain it is
8  different clients retain us to investigate, using our
9  expertise, certain -- certain things that happen in
10  which you would be able to determine cause and
11  origin.  That's probably a good --
12    Q.  All right.
13    A.  -- explanation.
14    Q.  How about currently, for whom do you work
15  currently?
16    A.  Well, we work for our firm -- You mean our
17  firm or myself?
18    Q.  Your -- Whoever you work for, be it yourself
19  or a firm.
20    A.  Okay.  We work for -- we do two types of
21  work from a standpoint, we not only do investigative
22  work as I mentioned, you know, we do civil and
23  environmental work.  So over the last ten years I've
24  worked for a lot of municipalities.  I've worked for
25  county governments.  I've worked for refineries,

Page 9

1  petrochemical industry.  I've worked for insurance
2  clients, for attorneys, for builders, almost anyone
3  that would require those type of services.
4    Q.  All right.  And the name of your business
5  today that you work for is what?
6    A.  HNP.
7    Q.  HNP Consulting Engineers?
8    A.  Environmental and consulting engineers.
9    Q.  All right.  And how long have you been with
10  HNP?
11    A.  Actually, since May this year.
12    Q.  All right.  Have you previously
13  investigated, from an engineering standpoint, ladder
14  failure cases or ladder accident cases?
15    A.  Probably since, my previous employer being
16  Naismith Engineering, probably since 1994 I think we
17  got into investigative area.  And I probably have
18  been involved in maybe seven, seven ladder cases.
19    Q.  All right.  Any involving any fiberglass
20  ladders?
21    A.  Yes, I think there were about 50/50
22  probably, --
23    Q.  All right.
24    A.  -- as I recall.
25    Q.  And what other types of ladders have you

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 264 of 328

Page 10

1  been involved in from the standpoint of investigative
2  engineering?
3      A.  Wooden, wooden ladders.
4      Q.  Wooden ladders?
5      A.  Yes, sir.
6      Q.  Any metal or aluminum ladders?
7      A.  I don't recall.  I recall the
8  fiberglass, and again going back to 1994 or '93,
9  whatever it was, there might have been a metal one in
10  there.  I think --
11      Q.  Okay.
12      A.  Most -- Wooden rings the bell most.  But
13  fiberglass -- it was probably 50/50, as I stated.
14      Q.  In the field of investigative engineering,
15  have you in the past been asked to give deposition
16  testimony?
17      A.  Yes, sir.
18      Q.  And have you done so?
19      A.  Yes, sir.
20      Q.  Have you been asked to testify in court and
21  have you --
22      A.  Yes, sir.
23      Q.  And have you done so?
24      A.  Yes, sir.
25      Q.  All right.  Which courts have you testified

Page 11

1  in the south or south central Texas region?
2      A.  Well, I've testified in federal court, both
3  in Laredo and in Corpus.  And I've tested --
4  testified in other district courts in that area and
5  also some of the surrounding areas.
6      Q.  In order to investigate a ladder accident,
7  what sort of background does a person have to have?
8      A.  Well, I think if you just, again, look at
9  our background, I mean I think it's investigative
10  engineering type work.  You'd have engineers that
11  would be involved in some background in understanding
12  basic structural deficiencies and/or common sense
13  issues that you might want to be involved in.
14      Q.  All right.  Have you at all been involved in
15  any teaching or giving presentations concerning
16  investigative engineering?
17      A.  Yes, sir.
18      Q.  All right.  Can you briefly explain that
19  experience.
20      A.  Well, as I've got on my -- on my resume
21  here, I've done quite a few presentations on confined
22  space, foundation investigations and a lot of air
23  quality stuff, stuff to do with microbial issues.
24      Q.  Okay.  Can you give us a ballpark figure of
25  how many investigative engineering jobs or

Page 12

1  assignments that you've had over, say over the past
2  five to ten years?
3      A.  I've had -- either been involved or been the
4  principal in charge of probably 1500.
5      Q.  Okay.  Let me direct your attention to the
6  ladder that is involved in this particular case.  Did
7  you, on or about June 9, 1999 receive a ladder with
8  an assignment to investigate an accident concerning
9  the ladder?
10      A.  Yes, sir.
11      Q.  All right.
12      A.  Is it okay to --
13      Q.  Yes.
14      A.  Thank you.
15      Q.  And as I understand it, you have your
16  investigative file here with you today; is that
17  correct?
18      A.  Yes, sir.
19      Q.  And at the time that this investigation
20  occurred, you worked for Naismith Investigative
21  Engineering Services; is that correct?
22      A.  Naismith Engineering, and the investigative
23  engineering services is a branch of the company, yes,
24  sir.
25      Q.  And at that time you were working in what

Page 13

1  capacity?
2      A.  At -- On this investigation or --
3      Q.  Yes, sir.
4      A.  Well, I was the principal in charge of all
5  investigative work at Naismith, therefore being the
6  engineer -- I was the engineer and the principal in
7  charge in this investigation.
8      Q.  Okay.  And was this investigation concerning
9  this ladder that you received on June 9, 1999, was
10  that investigation ever completed?
11      A.  Yes, sir.
12      Q.  Okay.  And did you render any reports in
13  connection with the investigation that was done?
14      A.  Yes, sir.
15      Q.  And you have those reports in front of you;
16  is that correct?
17      A.  Yes, sir.
18      Q.  Okay.  Did you determine that this
19  particular ladder had been involved in an accident
20  concerning Mr. Jose Escudero?
21      A.  We were told that the -- the ladder was
22  involved in an accident.  I wasn't there at the time
23  of the accident.
24      Q.  All right.  Do you know -- Did you see the
25  ladder upon its receipt?

Page 14

1    A.  Yes, sir.
2    Q.  All right.  Where was it received?
3    A.  I believe we received -- Well, it was
4  received at our office ultimately.
5    Q.  Okay.  And I did not ask you to do this
6  particular investigation; is that correct?
7    A.  No, sir.
8    Q.  And Mr. Benton, the opposing attorney for
9  plaintiff did not ask you to do the investigation; is
10  that correct?
11    A.  No, sir.
12    Q.  All right.  And you are a professional.  I
13  am reimbursing you, I think at the rate of $125 an
14  hour for your work.
15    A.  Yes, sir.
16    Q.  What did you do when the ladder arrived at
17  Naismith Engineering?
18    A.  Well, when I -- as I recall, when the ladder
19  arrived at our place, it was set up in the hallway
20  outside of Clark Hudson's office.  And from that
21  point on we inspected it.
22    Q.  All right.
23    A.  The ladder may have been inspected in
24  Brown- -- in McAllen, or wherever it was in this
25  case, Harlingen.  Prior to it coming up here, I saw

Page 15

1  some notes in there.  But I was not involved in that.
2    Q.  All right.  When it was set up at Naismith
3  Engineering, when you mean set up, it was spread out,
4  set up as if someone could get on it; is that
5  correct?
6    A.  Well, we received the ladder.  And
7  obviously, we -- the first time I saw it it was
8  collapsed and folded up, for lack of a better word.
9  And we opened it to perform our inspection on it,
10  which we were requested to do.
11    Q.  All right.  Did you, at that time, do a
12  general inspection of the ladder?
13    A.  Yes, sir.
14    Q.  All right.  And can you recall for us your
15  impression of the appearance of the ladder when
16  you -- when you first saw it?
17    A.  Well, the ladder was -- it was badly worn.
18  I mean, it had seen its better days.
19    Q.  All right.  And when you say that the ladder
20  appeared to be badly worn, specifically can you
21  describe how it appeared to be worn as you initially
22  saw the ladder?
23    A.  Well, I -- I mean, we had some splits in the
24  rail, cracking in the rails on the ladder, which are
25  the legs.  It has four legs on it.  And we also --

Page 16

1  the spreader, you could see that the spreader was --
2  had been damaged on one side.  And you have two
3  spreaders on the ladder which hold the ladder in
4  place, fix it in place when it's open.
5    Q.  Okay.  When you say that the spreader was
6  damaged, can you tell us to what extent it was
7  damaged? ·
8    A.  It was -- it was bent, you know, and would
9  not -- it was bent inward where it should be
10  straight.  And the effect of that would be that the
11  ladder probably would not sit correctly on the
12  ground.
13    Q.  When you -- Did you observe whether or not
14  the ladder would sit correctly on the ground?
15    A.  Yes, sir.  We set the ladder up, I believe
16  it was on a table, if I recall.  And in looking at
17  some of the pictures that I have now received from
18  Naismith was -- it was off by about approximately an
19  inch on one of the legs.
20    Q.  All right.  Do you have an opinion as to why
21  the leg was off approximately an inch from the table
22  on which it rested?
23    A.  Yeah.  I mean the spreader had something to
24  do with it.  And as I recall, I mean I believe the
25  legs were all the same length.  So something was

Page 17

1  causing that to come up.  And the logical thing would
2  be the spreader on that.
3    Q.  Do you have that particular photograph with
4  the ladder on the table indicating the leg was
5  approximately one inch off the table?
6    A.  I think I have that here.  I don't think I
7  have it marked or anything, but I probably can
8  retrieve it.
9       Here's the picture where we measured
10  the space off the bottom of the ladder.
11    Q.  Let me hand this to the court reporter, what
12  you've just handed me, this photograph, to mark as
13  Deposition Exhibit 2.
14    A.  That you can see, that was a close-up of
15  what you can see there sitting on top of the table.
16    Q.  All right.  And you've handed me a second
17  photograph, which is actually the ladder in full view
18  sitting on top of the ladder; is that correct -- I
19  mean on top of the table; is that correct?
20    A.  Yes, sir.
21    Q.  All right.  Let's break for a minute and
22  mark this as Deposition Exhibit 2, which is -- has a
23  ruler in the picture; is that correct?
24    A.  Yes, sir.
25    Q.  And we'll mark as Deposition Exhibit 3 the

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 266 of 328

Page 18

1  full ladder sitting on the table; is that correct?
2     A.  Yes, sir.
3        (Exhibits 2 and 3 marked.)
4     Q.  (BY MR. GENDRY) And let me hand you
5  Deposition Exhibit 2.  Does this, in fact, show what
6  you just talked about, the ladder sitting on the
7  table with one leg being approximately one inch off
8  the table?
9     A.  Yeah.  It looks like about, actually, maybe
10 an inch and a quarter.  But about an inch would be
11 fine, yes, sir.
12    Q.  In other words, the ladder would not stand
13 evenly on a flat surface, is that what you're saying?
14    A.  That's correct, sir.
15    Q.  And let me hand you Deposition Exhibit 3.
16 And what does that show, again?
17    A.  That all shows -- In reference to that, that
18 shows the ruler here.  It shows the leg being raised
19 up in the air.
20    Q.  Would you face it to the camera.
21    A.  Okay.  It shows right here where it's
22 sitting on a table, you can see where the same ruler
23 close-up that we had there shows it being one inch
24 off the table, surface of the table, not being level.
25    Q.  Okay.  Did you notice any distinguishing

Page 19

1  identification marks on the ladder, not that
2  ordinarily would be on a ladder, but anything that
3  would distinguish it as being a particular ladder
4  belonging to someone?
5     A.  There was two identifications, as I recall
6  on here.  And I think we saw one of them had the
7  initials, I'm looking for that here, of, J.R.E.  And
8  that was on leg #2 and was etched into the side of
9  the leg near the top of the leg.  And as I recall
10 here, there was initials also from a school district
11 as I recall here.  I'm looking for it here.
12    Q.  Do you recall that as being something like
13 S.R. ISD Maintenance Department?
14       MR. BENTON:  I'm going to object to
15 form.
16    A.  Let's see if I can find it here.  I thought
17 I --
18    Q.  (BY MR. GENDRY) If you could look at your
19 photographs.
20       MR. BENTON:  Does he need the
21 photographs?  I'm sorry.
22       MR. GENDRY:  Oh, yeah, I wanted him to
23 look.
24    A.  I don't know if I -- I'm sure we referenced
25 that in here, and I just -- the exact --

Page 20

1        MR. BENTON:  He's looking for the
2  markings, is that what we're talking about?
3        THE WITNESS:  Yes.  There was two
4  identifications.  I found the J.R.E., but there was
5  also markings of a -- it appeared to be a school
6  district.  Yeah.
7     Q.  (BY MR. GENDRY) But you did find markings
8  of --
9     A.  Maintenance Department, S.R.  Here's the
10 picture right here.
11    Q.  Okay.  Let's mark that one.
12    A.  It's hard to see.  And I think we --
13    Q.  We'll mark this photograph with stenciling
14 on the side; is that correct?
15    A.  Yes, sir.
16    Q.  All right.
17       MR. GENDRY:  Mark that as Deposition
18 Exhibit 4.
19       (Exhibit 4 marked.)
20    Q.  (BY MR. BENTON) Did you find the photograph
21 with the J.R.E. on it?
22    A.  Here's the photograph with the J.R.E. right
23 here.
24    Q.  And let me just ask you, all of these
25 photographs, by whom were they taken?

Page 21

1     A.  All these photographs were taken by Clark
2  Hudson.
3     Q.  With Naismith?
4     A.  Yes, sir.
5     Q.  In connection with the investigation of this
6  ladder?
7     A.  Yes, sir.
8     Q.  All right.
9     A.  And the -- I found that where the lettering
10 was on leg #2, which was S.R. ISD Maintenance
11 Department.  And it was on a photo here, but as you
12 can see, I don't have the original report on this.
13    Q.  All right.
14       MR. GENDRY:  And we'll mark this
15 photograph as Deposition Exhibit 5, please.
16       (Exhibit 5 marked.)
17    Q.  (BY MR. GENDRY) Okay.  Let me hand you
18 Deposition Exhibits 4 and 5.  Do they show the
19 markings on the ladder, J.R.E., and the stenciling on
20 the side of the ladder?
21    A.  Yes, they do.
22    Q.  Okay.  What task or goals were you seeking
23 initially in doing the investigation of this ladder?
24    A.  Well, initially in -- which we cited in our
25 first report on August 30th, 1999, we were asked to

CMPDF - www.texiss.com

7 (Pages 22 to 25)

Page 22

1  do an analysis to include the composition and
2  description of the ladder. We were also asked to
3  identify any defects and/or damages noted on the
4  ladder, any manufacture seal and any other readily
5  available information relating to the ladder's
6  present condition.
7      Q.  All right. And generally your observations
8  with regard to that -- those tasks, what was the
9  result?
10     A.  Well, the conclusions of our report was that
11  damage to the ladder is a result of excessive usage,
12  wear and tear and/or misuse.
13     Q.  And what is the basis for that conclusion?
14     A.  As far as saying the damage, what we did was
15  we went through and we documented, leg by leg, the
16  ladder having four legs called rails, any damage that
17  we saw on it. And there was numerous cracks, the
18  ladder being -- as we discussed earlier, the ladder
19  being unlevel due to the spreader. The -- Also,
20  seeing wear and tear on the feet of the ladder that
21  would not allow the ladder to sit completely flat.
22  And you could see where it had -- but normal, you
23  know, wear and tear. The ladder was in -- was not in
24  very good shape. I mean, our consensus was it was
25  normal wear and tear or misuse.

Page 23

1      Q.  Let me ask you, in your experience with
2  ladders, do ladders such as these wear and tear to
3  the point where they should not be used, just
4  generally speaking?
5      A.  Yes. In fact OSHA states certain things
6  that would define when you should retire a ladder.
7  But most of it is good common sense.
8      Q.  All right. And you mentioned OSHA. What is
9  OSHA?
10     A.  Occupation -- Occupational Safety Health
11  Administration.
12     Q.  All right. And is that a U.S. government
13  organization?
14     A.  Yes, sir.
15     Q.  All right. Let me ask you to go through in
16  your initial report, and I think you said that was
17  given on August the 30th, 1999, you -- did you
18  inspect each of the legs of the fiberglass ladder?
19     A.  Yes. sir.
20     Q.  All right. With respect to the numbering of
21  the legs, how did you number them? You've got four
22  legs; is that right?
23     A.  Yes. sir. We took a picture. We
24  referenced, which was our photo number 1, and I don't
25  think I've been able to find that in those pictures

Page 24

1  there, it references the two legs with the steps on
2  it, which we would call the front legs would be legs
3  1 and 2. And the two back -- back legs without the
4  steps would be legs 3 and 4.
5      Q.  And as you're looking at the ladder from the
6  front where the steps are that you stand on, the
7  leg #1, would that be the right front rail or the
8  left?
9      A.  That would be the left front rail.
10     Q.  All right.
11     A.  #2 would be the right front rail. #3 would
12  be the left back rail. And #4 would be the right
13  back rail in looking at the ladder from the front.
14     Q.  Do you have a page number on the copy of the
15  photograph you're looking at?
16     A.  It's photograph number 1. And it's been
17  stenciled down here 00162.
18     Q.  162?
19     A.  Yes, sir. It's in the first report. It's
20  the first photograph, if that helps any.
21     THE WITNESS: I don't think that
22  picture's in there. Did you see it?
23     MR. BENTON: No.
24     MR. GENDRY: Why don't we go off the
25  camera for a second.

Page 25

1      VIDEOGRAPHER: Off the record at 1 29.
2      (Exhibit 6 marked.)
3      VIDEOGRAPHER  Back on the record at
4  1:30
5      Q.  (BY MR GENDRY) Mr Poremba, let me show you
6  what has been marked as Deposition Exhibit 6 and ask
7  you if you recognize that copy of photograph?
8      A.  Yes, sir
9      Q   All right  And what is it?
10     A.  It's a photograph of the ladder in which we
11  have designated certain -- certain components of the
12  ladder for identification purposes.
13     Q   All right  And does it depict the numbering
14  of the legs as you have previously described them?
15     A   Yes, sir
16     Q   All right  Did we mark your curriculum --
17  your resume?
18     MR BENTON  Yes
19     Q.  (BY MR  GENDRY) Okay  Let's go to leg 1
20  then, Mr. Poremba  What did you find upon your
21  inspection of leg 1?
22     A   Being specific. I'll refer to my report. We
23  found a crack at the bottom of the leg on the
24  front/side corner, approximately one inch  We found
25  a rating and usage label which was only partially

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 268 of 328

Page 26

1  legible due to paint, concrete and masking tape over
2  it. We found a usage label, which was only partially
3  legible due to paint, concrete and masking tape also.
4      Q.  And this would have been the left front leg;
5  is that correct?
6      A.  Yes, sir.
7      Q.  And in other testimony in this case we call
8  them rails. Is that another name for ladder leg?
9      A.  Yes, sir. Yes, sir.
10     Q.  All right. What did you find with respect
11  to rail or leg #2?
12     A.  We found a crack at the bottom of the leg on
13  the front/side corner, approximately six inches
14  long. And we also found a crack at the bottom of the
15  leg on the back/side corner, approximately four
16  inches long.
17     Q.  All right. And again, that would have been
18  the right front rail of the ladder as you're facing
19  the ladder; is that correct?
20     A.  Yes, sir.
21     Q.  And directing your attention to the rear leg
22  or rail #3, what did you find there?
23     A.  I found a crack at the bottom of the leg on
24  the back/side corner, approximately 15 inches long.
25  We found intermittent cracking near the bottom of the

Page 27

1  leg on the front/side corner approximately 16 inches
2  long. The initials J.R.E. were etched on the side of
3  the leg near the top of it. We found a crack at the
4  top of the leg on the back/side corner, approximately
5  five inches long. We also found a crack at the top
6  of the leg on the front/side corner approximately
7  four and a half inches long. And we found a worn
8  area on the leg adjacent to the aluminum spreader on
9  the inside front edge of the leg.
10     Q.  Are you able to describe with any more
11  particularly what you meant by worn area on the leg
12  adjacent to the aluminum spreader on the inside front
13  edge of the leg?
14     A.  I don't recall that, sir.
15     Q.  All right. So in fiberglass leg #3 that
16  you've just described multiple cracks, both at the
17  bottom of the leg and at the top of the leg, is that
18  a fair statement based upon what you've written?
19     A.  Yes, sir.
20     Q.  All right. Directing your attention to
21  rail #4, or as you put it, fiberglass leg #4, what
22  did you find?
23     A.  I found a crack at the bottom of the leg on
24  the front/side corner, approximately 26 inches long.
25  I found a crack at the bottom of the leg on the

Page 28

1  back/side corner, approximately 34 inches long. I
2  found a crack near the fourth step of the ladder on
3  the back/side corner of the leg. Found notches near
4  the third step of the ladder on the front/side corner
5  of the leg. And found a worn area on the leg
6  adjacent to the aluminum spreader on the inside front
7  edge of the leg.
8      Q.  All right. Did you inspect the plastic top
9  to the ladder?
10     A.  Yes, sir. We found two holes approximately
11  1/8 inch in diameter in the top piece of the ladder.
12     Q.  All right. And you've already -- excuse
13  me. You've already commented on the aluminum
14  spreader. What did you find with respect to the
15  aluminum spreader?
16     A.  We found that the spreader adjoining
17  fiberglass legs 1 and 3, which would be a front leg
18  and a back leg on the left side of the ladder is bent
19  from its original shape when compared to the
20  spreader -- the other spreader of the ladder. The
21  bent spreader does not allow all four fiberglass legs
22  of the ladder to rest on the supporting surface or
23  ground when the ladder is fully opened. We also
24  noted that leg #2 is approximately one inch off the
25  supporting surface when the ladder is fully opened.

Page 29

1      Q.  Did you conclude in your initial inspection,
2  investigation of the ladder whether or not it posed
3  any sort of safety problem to anyone who may have --
4  may want to use the ladder?
5      A.  We said that the cracking and the bent
6  spreader that were observed in our visual inspection
7  of the ladder is excessive and presents a safety
8  problem and the ladder should not be used.
9      Q.  All right. You've made reference, and you
10  have in the past in this deposition, but also in your
11  report, requirements of OSHA or Occupational Safety
12  and Health Administration regulations. And
13  specifically can you refer us to the regulations that
14  you are referencing and what they say?
15     A.  Well, when the people pulled it up, it looks
16  like off the internet in my office, although we might
17  have copies of it, it's usually easier to find it
18  there. And basically it refers -- it's from
19  standards 29 CFR. And it's applicable to ladders.
20  And the two things that we pointed out here,
21  additionally OSHA regulations require that portable
22  ladders are to be inspected on a daily basis and
23  subsequent to any incident that might damage to the
24  ladder -- might do damage to the ladder. It also
25  says in the regulation that maintenance and

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 269 of 328

Page 30

1  inspections, it says that the employer shall maintain
2  portable ladders in safe condition. Ladders with the
3  following defects shall not be used and either shall
4  be tagged as unusable if kept on the premises or
5  shall be removed from the worksite. And one of the
6  things in here would be either broken or split side
7  rails or legs, as they've been referred to back and
8  forth here, and any other structural defect on the
9  ladder which would also include the spreader in this
10  case.
11      Q.  All right. When this OSHA regulation refers
12  to a employer, would that include an employer of
13  someone who ran a construction business?
14      A.  Well, OSHA would have authority. Their
15  regulations would apply to all employers.
16      Q.  All right. As you looked at the ladder, and
17  based upon your inspection, did the OSHA regulations
18  require that this particular ladder, due to the
19  cracking and splitting and the spreader being bent,
20  did that require the ac- -- the ladder to be removed
21  from service?
22      A.  Yeah. I think we quoted that the regulation
23  said that any portable ladder with such defects, and
24  we put in quotes, shall not be used and shall be
25  tagged as unusable if kept on the premises or removed

Page 31

1  from the worksite, unquote.
2      Q.  All right. Does OSHA require any sort of
3  inspection on the part of an employer in -- before
4  using the ladder?
5      A.  I think there's a clause in here where --
6      Q.  Down on (e)(2) of --
7      A.  Right. Ladders shall be -- (e)(2) states it
8  out. Ladders shall be inspected for defects prior to
9  each day's use, and after any occurrence, such as a
10  fall, which could damage the ladder.
11      Q.  Let me --
12          MR. GENDRY: Let's mark this.
13          (Exhibit 7 marked.)
14      Q.  (BY MR. GENDRY) Let me hand you what has
15  been marked as Deposition Exhibit 7 and ask you if
16  that is in fact the OSHA regulation that you have
17  just quoted from, or a copy of it?
18      A.  That is correct, sir.
19      Q.  Did you gather any of the details of how
20  Mr. Escudero fell from the ladder in your
21  investigation?
22      A.  I -- The only knowledge that I have of that
23  was a -- was a sketch that was provided at one point
24  in time that sort of indicated that the ladder fell
25  to the backside. That's the only knowledge I have or

Page 32

1  we were provided.
2      Q.  While he was on the ladder?
3      A.  While he was on the ladder.
4      Q.  All right. Based upon your experience and
5  your training, in your opinion could the, as you put
6  it, considerable wear and tear on this ladder have
7  resulted from that fall?
8      A.  The condition of the ladder was probably
9  paramount in his fall, if that's what you're asking.
10      Q.  And by that, paramount at the time of his
11  fall, what do you mean by that?
12      A.  Well, I mean we examined the condition of
13  the ladder. And the state of the ladder was such
14  that would be, as we stated in our report, would be
15  unsafe to go on.
16      Q.  All right. And was the considerable wear
17  and tear observable to the naked eye?
18      A.  Yes, sir.
19      Q.  Were the splits and cracks observable to the
20  naked eye?
21      A.  Yes, sir.
22      Q.  And did OSHA regulations require that a
23  ladder with splits and cracks not be used and taken
24  out of service?
25          MR. BENTON: Objection to form.

Page 33

1      Q.  (BY MR. GENDRY) You can go ahead and
2  answer.
3      A.  Yes, sir.
4      Q.  You mentioned earlier, Mr. Poremba, that you
5  were asked to do some work or supplemental work in
6  connection with the ladder; is that correct?
7      A.  Yes, sir.
8      Q.  And that resulted in a second report dated
9  September 29, 1999?
10      A.  Yes, sir.
11      Q.  What additional tasks were you told to
12  investigate in connection with this ladder?
13      A.  We were asked to, basically do three
14  things. We were asked to determine if damage to the
15  ladder was present prior to the accident. We were
16  asked to try to determine which step Mr. Escudero was
17  standing on when the accident occurred. And three,
18  we were asked how high could 150- to 200-pound person
19  on the ladder -- climb on -- safely on that ladder in
20  its present condition.
21      Q.  In connection with the first task, to
22  determine if the damage to the ladder was present
23  prior to the accident, what did you do to make that
24  determination?
25      A.  We reexamined the ladder and looked for any

Case 1:00-cv-00193  Document 24  Filed in TXSD on 10/19/2001  Page 270 of 328

Page 34

1 kind of signs that might lead -- lead us to determine
2 whether the cracks or other damage on the ladder was
3 there prior to the fall as we were asked to do.
4     Q. All right. Was your attention in doing so
5 then directed to leg #2 of the ladder?
6     A. Well, we examined all the legs on the entire
7 ladder.
8     Q. All right. Did you find anything
9 significant with respect to any of the legs in this
10 supplemental investigation?
11    A. Yes, sir.
12    Q. And in the report I see that you've
13 mentioned at least two legs; is that correct?
14    A. Yes, sir.
15    Q. Well, you mentioned three, three legs.
16    A. Yes, sir. We mentioned leg #2, 3 and 4.
17    Q. All right. Let me then direct your
18 attention to leg 2. What did you find?
19    A. What we found on leg 2 is that at the very
20 bottom of the front edge it shows signs of wear that
21 are not likely to have occurred at the time of the
22 ladder failure. And we referenced this to photograph
23 number 1.
24    Q. Do you have that photograph?
25    A. I believe I do. Again, I tried to match

Page 35

1 these up. What we noted there was, because of some
2 displacement of the front and side pieces would be
3 required in order to allow the wear that was observed
4 to take place.
5     Q. Let me mark this before you go on.
6     A. Okay.
7        (Exhibit 8 marked.)
8     Q. (BY MR. GENDRY) And I've had the court
9 reporter mark Deposition Exhibit 8. Does that show
10 leg #2 which you've just now spoken about?
11    A. Yes, sir.
12    Q. With a -- With your pen, could you point, as
13 the camera focuses in on it, I don't know how good
14 it's going to come out at trial, where you see the
15 displacement of the front and side pieces and wear.
16    A. Well, you can see it's not worn evenly.
17 It's not worn evenly across the bottom of the ladder,
18 it's worn to the side.
19       VIDEOGRAPHER: Can you tip it forward
20 so it doesn't glare.
21       THE WITNESS: That way? How's that?
22       MR. GENDRY: Tip it a little bit
23 forward.
24       THE WITNESS: Better? Of course it's
25 going to be difficult for me to point now, but I'll

Page 36

1 see what I can do here.
2     A. You can see just the bottom part where it
3 shows in black there, which looks like a rubbery
4 surface, that it's worn. It's not worn flat, as if
5 sitting flat on a surface, but is worn to the sides.
6 And we concluded that that was there prior.
7     Q. (BY MR. GENDRY) Simply because of the wear?
8     A. Yes, sir.
9     Q. All right. Let me direct your attention to
10 leg 3 in your supplemental inquiry  What did you
11 find with regard to leg 3.
12    A. Well, on leg 3 we found a spot of brown
13 paint was observed inside the crack on the back/side
14 corner of the leg approximately three inches from the
15 bottom of the leg. And we referred to this in our
16 photograph number 2, which I think I've picked out
17 one or the other.
18    Q. All right.
19       MR. GENDRY: And we'll mark this as
20 Deposition Exhibit 9.
21       (Exhibit 9 marked.)
22    Q. (BY MR. GENDRY) Let me hand you Deposition
23 Exhibit 9 and ask you if that photograph depicts the
24 spot of brown paint that you were just referencing?
25    A. It does, sir.

Page 37

1     Q. And does the location of that spot of brown
2 paint have any significance to you with regard to
3 your search of previous wear and tear or damage to
4 this ladder?
5     A. Well, what we concluded was this brown paint
6 right here appears to be the same paint that we found
7 adjacent on undamaged parts on this ladder. It was
8 sort of like they had a paint job previously, or
9 whatever, and it sprinkled on the ladder. So we
10 concluded that that paint was there for a while.
11       You want me to try to hold this up
12 too?
13    Q. I want to ask you to draw an arrow pointing
14 to that piece of brown paint, and then we'll hold it
15 up to the camera.
16    A. (Witness complies.)
17    Q. And if you'd hold that up to the camera,
18 Mr. Poremba.
19    A. (Witness complies.)
20    Q. It appears to be pointing to a spot along
21 the side of the rail where the rail has separated; is
22 that correct?
23    A. Yes, sir. It's right -- it's right within
24 the crack separation to be one of the sides of that
25 crack.

**RICHARD POREMBA VOL. 1 OF 1**                               **JULY 27, 2001**

11 (Pages 38 to 41)

Page 38

1    Q.  All right.  And you stated that you found
2  evidence of the same sort of paint on other undamaged
3  portions of the ladder; is that correct?
4    A.  That's correct.
5        MR. BENTON:  Objection, form.
6    A.  That's correct, sir.
7    Q.  (BY MR. GENDRY) Did you find paint like that
8  on any other portion of the ladder?
9    A.  Yes, we did.
10    Q.  All right.  On any other undamaged portion
11  of the ladder?
12    A.  Yes, sir.
13    Q.  All right.  What did that tell you?
14    A.  Well, that concluded that the paint probably
15  came in in the same time span, and basically the
16  paint was there prior to the accident occurring.
17    Q.  All right.  As to leg #3, did you find
18  anything with regard to matching up of the separated
19  portions which gave you any enlightenment as to
20  whether or not the separation of the rails had been
21  there before this particular accident?
22    A.  Yes.
23    Q.  What did you find?
24    A.  We found that pieces up on the leg, when
25  they were put back together, previous cracking did

Page 40

1  Sheetrock joint compound visible inside the crack at
2  the top of the leg on the back/side corner.  Because
3  separation of the two pieces, again, just like the
4  other paint, the brown paint we noted earlier, would
5  be necessary to allow the paint or the joint compound
6  to be present inside the crack, we concluded that the
7  cracking was present prior to the accident.
8    Q.  All right.  Let's move from leg 3 or rail 3
9  to leg or rail 4.  Did you make further investigation
10  of leg 4 to answer your question whether or not there
11  was preexisting wear and tear to this ac- -- to this
12  ladder?
13    A.  Well, we also found some brown paint again
14  visible inside the crack, a crack approximately 9
15  inches and 16 inches from the bottom of the leg.
16    Q.  Can you -- Do you have a picture of that?
17    A.  I don't think, without -- I don't think I
18  was able to locate it in here.
19    Q.  Okay.
20    A.  And we would not provide -- Basically what
21  we did in our reports was we retained pictures in the
22  file, but we didn't provide a picture of every
23  circumstance.  The picture of the original brown
24  paint, in our opinion at the time, was just to
25  provide one of them, I would assume at this time.

Page 39

1  not adjoin smoothly together.
2    Q.  Do you have a photograph depicting that
3  where maybe you pinched together leg #3 to show this
4  mismatch?
5    A.  I think we have a photograph showing that
6  basically on leg #4.  But we didn't provide a
7  photograph here.  But I think the same idea.
8    Q.  All right.
9    A.  But the premise was if you take the crack --
10  if you take the two sides of the cracked portions and
11  you put the crack -- put it back together again, if
12  it was a recent crack, they should bind pretty
13  close.  When we put the crack together we had gaps in
14  the crack, which would indicate that it's worn by
15  wobble or movement or whatever over time.  And
16  therefore, it indicated to us, and we cited it
17  several places here, that that was there for some
18  period of time.
19    Q.  And by some period of time, meaning before
20  this particular accident?
21    A.  Yes, sir.
22    Q.  All right.  Any other paint or material that
23  you found inside any of the cracks which were
24  significant to you?
25    A.  We also found, on leg #3, white paint or

Page 41

1    Q.  All right.  What else did you find -- In
2  addition to the brown paint 9 and 16 inches what else
3  did you find --
4    A.  We found --
5    Q.  -- on leg 4?
6    A.  We also found that the back piece at the
7  bottom of the leg showed signs of wear and tear that
8  could only occur if the back and side pieces were
9  displaced for some time.  And we cited photograph
10  number 3 for that.
11    Q.  Do you have that available?
12    A.  It's a difficult process here.  But I do,
13  sir.
14    Q.  All right.
15        MR. GENDRY:  Let's mark this, please.
16        (Exhibit 10 marked.)
17    Q.  (BY MR. GENDRY) Let me hand you what has
18  been marked as Deposition Exhibit 10.  And is that
19  the photograph that you were just referring to?
20    A.  Yes, sir.
21    Q.  And what does that photograph show?  And if
22  you could, point it out to the camera as best you
23  can.
24    A.  Do you want me to use your black --
25    Q.  Yeah, you can draw an arrow to it.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 272 of 328

Page 42

1    If you could point out -- You've drawn
2  arrows to an area on the bottom of the rail #4,
3  leg #4; is that correct?
4    A.  Yes, sir.
5    Q.  And what, again, does it show?
6    A.  Well, you can see right here where you have
7  this gapped area that has been worn away here.  And
8  that's been there, too, for some time.  I mean, it's
9  worn down from -- from use or misuse.
10   Q.  Could you determine how the wearing down
11 could occur as you looked at the ladder?
12   A.  I don't believe we determined that.  But it
13 would be obvious that that was either -- would have
14 to be broken off at some earlier point on that rail.
15 And by the wear and tear you can see being rounded
16 and everything, it would be prior to the accident.
17 That was our main --
18   Q.  Okay.  And where -- On Exhibit 10, what you
19 just referred to where you showed the wear and tear
20 also that you just referred to, was that particular
21 rail separated at that point?
22   A.  There's a separation that would be
23 considered a crack in the rail right there at that
24 point.
25   Q.  All right.  And how about -- and how about

Page 43

1  up the rail?
2    A.  There was some other -- I think we
3  documented on this rail that there was some other
4  cracking on that rail as we went through earlier.
5    Q.  Okay.  Anything else that you found with
6  reference to rail #4?
7    A.  Oh, in the -- in addition, approximately 20
8  inches at the back/side of the -- the back and side
9  piece edges do not match up when they're adjoined.
10 And we also referenced that to a photo which was
11 photograph number 4 in our report.
12   Q.  All right.  Do you have that photograph?
13   A.  Let's see.  Yes, sir.
14      MR. GENDRY:  Let's mark it.
15      (Exhibit 11 marked.)
16   Q.  (BY MR. GENDRY) Let me hand you what has
17 been marked as Deposition Exhibit 11.  And is that
18 the photograph you were just referring to regarding
19 matching up?
20   A.  Yes, sir.
21   Q.  And could you explain what you found that is
22 shown in that particular photograph?
23   A.  Well, in this photograph -- You want me to
24 use your marker again?
25      Thank you, sir.

Page 44

1    Q.  If that will help you.
2    A.  Thank you.
3       As you can see in the photograph here,
4  what I've shown is a -- by putting the two arrows
5  there, is we have a gap in the rail.  And you can see
6  that the -- when you press them together when they
7  come together they didn't match up, indicating to us
8  that they had been there for a while and wear and
9  tear had created an additional gap in the rail.  In
10 fact, we looked right above this in our report and
11 noted the fact that where the rail had split recently
12 where you had recent fiberglass splitting, they will
13 match up perfect.
14   Q.  And that was -- The gap goes up to, I think
15 you said to 20 inches above the bottom of the rail;
16 is that correct?
17   A.  I believe that's what we -- yes, sir, that's
18 what we said in our report.
19   Q.  All right.  And when you initially looked at
20 the ladder, was that gap observable to you?
21   A.  Yes, sir.
22   Q.  All right.  Do you have an opinion whether
23 or not it would have been observable to a contractor
24 such as Mr. Escudero?
25   A.  I would think it would be, sir, yes, sir.

Page 45

1    Q.  Anything else on rail or leg 4 that you
2  found regarding your supplemental investigation?
3    A.  No.
4    Q.  All right.
5    A.  No, sir.
6    Q.  There's been testimony in this case, I'll
7  ask you to assume that Mr. Escudero was standing on
8  either the fourth or fifth step of the ladder at the
9  time that the accident occurred.  Did you do any
10 investigation in that regard?
11   A.  Yes, sir.
12   Q.  All right.  And was the outcome of your
13 investigation the same, that the gentleman must have
14 been on the fourth or fifth step?
15   A.  That is correct, sir.
16   Q.  Okay.  Following your supplemental
17 investigation, did you have any conclusion or
18 additional opinion with regard to your supplemental
19 investigation?
20   A.  We concluded two things.  We concluded that
21 what you just mentioned, Mr. Escudero was standing on
22 either the fourth or fifth step of the ladder at the
23 time of the accident.  We also concluded that the
24 cracking at the bottom of leg #2 on the front/side
25 corner of the leg, at the bottom at leg 3 on the

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 273 of 328

Page 46

1   back/side corner of the leg, at the top of leg 3 on
2   the back/side corner of the leg, and at the bottom of
3   leg #4 on the back/side corner of the leg was present
4   prior to the accident.  We said that because the
5   cracking was present prior to the accident, it should
6   not have been used by Mr. Escudero or any other user.
7      Q.  Did you note with respect to the fifth --
8   fifth step of the ladder any warning device on the
9   ladder?
10     A.  I did not see that, no, sir.
11     Q.  Okay.  Did you observe, when you looked at
12  the ladder, as to whether or not the fifth step was
13  intended for use?
14     A.  I didn't look at the ladder from that
15  perspective, sir.
16     Q.  Okay.
17        Do you have -- Strike that.
18        (Exhibit 12 marked.)
19     Q.  (BY MR. GENDRY) I'm going to hand you,
20  Mr. Poremba, what has been marked as Deposition
21  Exhibit 12.  And do you recognize that as your
22  initial report?
23     A.  Yes, sir.
24     Q.  And the date of that report?
25     A.  August 30th, 1999.

Page 47

1      Q.  And does it express your opinions and
2   findings with regard to the initial investigation?
3      A.  Yes, sir.
4         (Exhibit 13 marked.)
5      Q.  (BY MR. GENDRY) I'll hand you Deposition
6   Exhibit 13.  If you could explain to the jury what
7   that is.
8      A.  That is our second report that we discussed
9   of September 29th, 1999.
10     Q.  And does it express your investigation, your
11  findings and conclusions?
12     A.  Yes, sir.
13     Q.  Have the opinions that you've given today
14  and that are present in the documents that have been
15  attached as exhibits, particularly Deposition
16  Exhibits 12 and 13, are they based upon a reasonable
17  degree of engineering -- engineering work?
18     A.  Yes, sir.
19        MR. GENDRY:  Okay.  Pass the witness.
20        MR. BENTON:  Let's go off the record
21  before I start, please.
22        VIDEOGRAPHER:  Off the record at 2:03.
23        (Off the record.)
24        VIDEOGRAPHER:  Back on the record at
25  2:23.

Page 48

1            EXAMINATION
2   BY MR. BENTON:
3      Q.  Mr. Poremba, I'm Barry Benton.  I represent
4   Jose Escudero in this lawsuit.  I'm going to ask you
5   some questions now.  If you don't understand my
6   question, would you let me know?
7      A.  Yes, sir.
8      Q.  Okay.  You're a civil engineer; is that
9   right?
10     A.  Yes, sir.
11     Q.  With an emphasis on environmental issues?
12     A.  No, I'm just a licensed civil engineer.
13     Q.  But your practice focuses, it looks like a
14  lot on air quality and environmental issues?
15     A.  Not -- I mean recently, yes.  But my
16  practice is in all areas of civil, environmental and
17  investigative, as I said earlier.
18     Q.  Who would -- what kind of subpart of
19  engineering would focus on the design of ladders?
20     A.  I don't think there's a specific designation
21  for ladder emphasis in engineering.  In fact, I know
22  there isn't.
23     Q.  So who -- What kind of engineers design
24  ladders?
25     A.  I wouldn't know.  I would think that

Page 49

1   probably some in the civil area would be -- civil is
2   the most general engineering, so that's usually the
3   one it falls upon.
4      Q.  Would it deal with the substances involved,
5   like the -- whether it's fiberglass, metal, aluminum,
6   so on?  Would it deal with supporting structures?
7   What sort of analysis goes into designing a ladder?
8      A.  I don't really have knowledge of that.
9      Q.  How long were you with Naismith?
10     A.  Nine years, sir.
11     Q.  And why did you leave that company's employ?
12     A.  Better opportunity.
13     Q.  You described some of the clients of
14  Naismith.  You said insurance companies.
15     A.  Yes, sir.
16     Q.  What insurance companies were their clients?
17     A.  Well, probably somewhere in the vicinity of
18  a hundred of them.  I mean, that was a percentage of
19  our business at Naismith.
20     Q.  And you said attorneys also hired you.
21     A.  We also did legal work, yes, sir.
22     Q.  Was it in connection with the insurance
23  companies?
24     A.  Not always, sir.
25     Q.  Were there some plaintiff's lawyers that

Page 50

1  hired you?
2     A.  Not me specifically, no, sir.  I don't
3  recall.
4     Q.  So -- But generally so, almost
5  overwhelmingly so, you almost always were on the
6  defense side; is that right?
7     A.  Generally, yes, sir.
8     Q.  Did you -- You were hired in this case by
9  State Farm Insurance Company?
10    A.  Yes, sir.
11    Q.  Okay.  And you were paid, it looks like
12 almost, what, $3500 -- or Naismith was for the work.
13    A.  I think the invoices were in that ballpark.
14 yes, sir.
15    Q.  And you were given a factual background as
16 to this claim; is that correct?
17    A.  Not me personally.  It came into the office
18 with some background.  Normally State Farm, or
19 whoever the insurance company who might want to hire
20 us to investigate something, would provide some
21 background.
22    Q.  And being hired by State Farm and given a
23 factual background, isn't it true that you approached
24 this from a position of basically serving your
25 client, that is to show ways in which Mr. Escudero

Page 51

1  might be at fault for the accident that occurred?
2     MR. GENDRY·  Objection.
3     A.  No, sir.
4     (Exhibit 14 marked.)
5     Q.  (BY MR. BENTON) I'm going to show you what's
6  been marked as Deposition Exhibit 14.  And I'm going
7  to represent to you that that came out of Naismith
8  Engineering's file.  Does that exhibit look familiar?
9     A.  It looks like one of our phone logs, but I
10 haven't read it yet.
11    Q.  You can --
12    A.  I'll read it if you would like.
13    Q.  Sure.
14    A.  Yes, sir, I've read it.
15    Q.  So you're not -- you are denying that --
16 that the descriptions in here of the assignment from
17 determining how the cracks played a role in the fall,
18 the location of the user on the ladder and -- are not
19 focusing on areas that would tend to show that Jose
20 Escudero shouldn't have been using the ladder, as
21 opposed to objectively figuring out why the accident
22 happened?
23    A.  Well, I think initial -- that letter right
24 there, those notes are probably taken by Clark Hudson
25 in our office.  Number two, it refers to our second

Page 52

1  report, not to our first report by the date on it.
2  And I think I defined earlier exactly what we did.  I
3  mean. if you're asking me -- I mean, I think I stated
4  earlier we've done 1500 investigations.  And we
5  wouldn't be in the business of doing investigations
6  if we didn't call it the way we see it.
7     Q.  I understand.  But there's an objective
8  method of focusing on what happened in the accident,
9  faults and causations.  And there's another when you
10 get a call or a letter from an insurance adjuster
11 that says, I want you to focus on A, B and C issues.
12    MR. GENDRY: Object to form.
13    Q.  (BY MR. BENTON) Wouldn't you agree that
14 would affect the objectivity of the report?
15    MR. GENDRY: Object to the form.
16    A.  I think we've defined clearly what we --
17 what our objectives were.  That correspondence right
18 there appears to be from Clark to indicate the fact
19 that he was reading into the insurance person's --
20 adjuster's head and saying I think this is where he's
21 going with this, as background information.  But that
22 was not our -- that is not what we did.
23    Q.  (BY MR. BENTON) So that you could then in
24 turn serve the party that's paying you, right?
25    MR. GENDRY: Object to the form.

Page 53

1     A.  No, we didn't -- Basically, we do an
2  independent investigation.  We were given a ladder.
3  They asked us to determine four things up front in
4  the initial report, three things in the second
5  report, that were the only things that we responded
6  to.
7     Q.  Yeah, that was the -- the things they asked
8  you to do were the focus of your work; isn't that
9  right?
10    A.  Yes.  Somebody asks you to do something, you
11 do an independent investigation of it.  And I think
12 we've defined that in the reports.
13    Q.  Well, I think that's where I'm going with
14 this.  How independent is it if they're setting the
15 points you're to look at instead of you, when it
16 comes to how did an accident happen and what were the
17 causative elements, and maybe even who's at fault?
18    MR. GENDRY: Object to form.
19    A.  I don't think they asked us that either.  I
20 think the questions you're asking me were not what
21 were asked in those three seven areas that I brought up.
22    Q.  (BY MR. BENTON) Okay.  You've -- you've
23 testified on behalf, I take it, of insurance
24 company's lawyers in the past. right?
25    A.  Yes, sir.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 275 of 328

Page 54

1    Q.  Okay.  And can you think of some
2  involving -- some involving fiberglass ladders?
3    A.  Yes, sir.
4    Q.  Okay.  Can you help us to tell us the names
5  of those cases?
6    A.  Not off the top of my head, sir.
7    Q.  Can you remember the names of the lawyers
8  involved?
9    A.  No, sir.  In fact, I don't think we've
10  ever -- I go back on my statement just now, is that
11  we didn't testify.  We did investigations.  I believe
12  this is, to my knowledge, is the first ladder case
13  we've ever had go to a deposition or any kind of a
14  legal matter.
15    Q.  At least as far as you testifying
16  personally?
17    A.  As far as I know from the ladder cases we
18  did.
19    Q.  So when you've testified before it wasn't
20  ladder cases?
21    A.  I've testified in different cases, not -- I
22  mean I've only testified in one ladder case.  We've
23  done, approximately, I guess that -- seven ladder
24  investigations, none of which ended up to where we
25  are today.

Page 55

1    Q.  Okay.  And so your recollection is that
2  you've only testified once in a ladder case?
3    A.  Yes, sir.
4    Q.  Am I understanding you?
5    A.  Yes, sir.
6    Q.  And was that a wood ladder case?
7    A.  That's this ladder case, sir.
8    Q.  Okay.  So this is your first time testifying
9  in a ladder case?
10    A.  In a ladder case, yes, sir.
11    Q.  Thank you.
12    A.  Okay.
13    Q.  Now, when you've looked at the various
14  condition of the ladder, the ladder that you're
15  looking at is -- is in post-accident condition,
16  right?
17    A.  We received it after the accident, yes,
18  sir.
19    Q.  Did you try to determine what damage was
20  caused by the accident so that you could get your
21  before and after picture that you've been testifying
22  about?
23    A.  I think we -- we basically did that, and
24  determined was -- we were asked to determine was any
25  damage there prior to the accident.  So if we

Page 56

1  determined damage that was there prior, there was
2  some damage after.
3    Q.  Okay.  That's the first time I think I've
4  heard that testimony, is that right, that the
5  accident did cause some damage to the ladder?
6    A.  I think we found places on the ladder, when
7  we were talking about how you match the cracks up,
8  all right, when you match cracks up that had been
9  worn that have happened over a period of time, you
10  know, time frame being undefined but not to -- to
11  cause normal wear and tear, those cracks didn't match
12  up.  However, some of the newer cracks, okay, which
13  showed fiberglass splitting, etcetera, would indicate
14  they matched up perfect.  All right.  We did note
15  that in the report.
16    Q.  And is it your testimony that what you're
17  calling the matching up cracks, that those splits
18  were caused by this accident probably?
19    A.  Those would be more recent cracks.  I mean,
20  we did not make a determination that that was caused
21  on that date.
22    Q.  Could you have?
23    A.  No.  You could -- All you could do is
24  reasonably say it was recent because they matched up
25  perfect.

Page 57

1    Q.  And let's be reasonable, in this case --
2  control of the ladder was taken directly by a State
3  Farm representative, right?
4    A.  I don't have direct knowledge of that, but I
5  believe you're correct.
6    Q.  And then they transported it over to your
7  place which kept it in a safe condition, right?
8    A.  I think it either was transported or we
9  picked it up, and I don't recall.  I think we might
10  have picked it up, sir.
11    Q.  And if there's testimony that the ladder
12  wasn't used after this accident happened, is it fair
13  to say that in reasonable probability that what
14  you're describing is the new cracking or splitting
15  was caused when Mr. Escudero fell off the ladder?
16    A.  That's reasonable to say that that -- the
17  cracking that I call newer cracking was done more
18  recently.  I couldn't tell you what time period that
19  was exactly.
20    Q.  So that -- if you're making opinions based
21  on reasonable probability, you don't think that you
22  can come to an opinion whether it was prob- -- the
23  new cracking, as you're saying, was probably caused
24  in the Escudero fall?
25    A.  I don't think you could totally conclude

CMPDF - www.texio.com

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 276 of 328

Page 58

1   with that. I mean. if the ladder had not been used
2   and then he used it and he was the only one that used
3   that ladder, then you could probably conclude that.
4   But I do not know that for a fact.
5       Q. But I mean you are willing to testify today
6   for both sides about probability as opposed to
7   certainty, right?
8       A. It depends what the question is, sir. I
9   mean, if I feel I can render an opinion on it, I'll
10  be more than happy to do that.
11      Q. Okay. How -- Do you have measurements as to
12  what was the length of the new cracking?
13      A. I believe that they're -- they may be in
14  notes. I don't think we've defined -- I think one
15  point here, as I recall in the report, we said there
16  was some damage new cracking above that that matched
17  perfectly.
18      Q. Is that answer -- answer. no, that you
19  didn't measure it or you did?
20      A. Well, I didn't measure it anyhow. The
21  measurements were done by Clark Hudson. But he -- it
22  is cited in the report.
23      Q. So all these measurements that you're
24  testifying to and in your report, those -- you don't
25  have personal knowledge of those?

Page 59

1       A. I didn't go out and measure them exactly,
2   but I viewed what was measured.
3       Q. Okay. Well, certainly the area of new
4   cracking is not specifically enumerated in the
5   report, is it?
6       A. No, sir.
7       Q. Is there -- Y'all call yourself -- Do you
8   call yourself forensic engineers?
9       A. We've never used that title. Some people
10  do. We call it investigative engineers.
11      Q. Have y'all been hired to try to reconstruct
12  accidents like a fall off a ladder?
13      A. No, sir, not -- you could be hired to do
14  that, but we don't do -- we have not, to my
15  knowledge, done any of that work.
16      Q. Do you have -- Do you believe that you had
17  the skill to do that and the training to do that?
18  Had you been asked by State Farm?
19      A. To -- To reconstruct?
20      Q. Yes.
21      A. I think we were partially asked in asking
22  what stair he fell off. So I think in a way we were
23  kind of doing that.
24      Q. But not really, right?
25      A. We -- We tried to determine whether he was

Page 60

1   on the fourth or fifth step. We concluded that he
2   was, one or the other.
3       Q. Well, we have man who fell off a ladder,
4   right?
5       A. Yes, sir.
6       Q. Okay. Isn't there a lot of important
7   details about how that exactly transpired?
8       A. Well. there may be some important details.
9   I'm sure there are. But we weren't asked to do
10  anything that had to do with reconstructing an
11  accident, other than the fact of determining which
12  step, if we could, by the measurements that were
13  given to us, Mr. Escudero might have been on.
14      Q. You were just taking orders as to what to
15  look at, right?
16      A. We were -- right. What we were asked to do
17  within the bounds of our investigation.
18      Q. Okay. Do we know how he fell, that is the
19  mechanism? Did we know if leg #3 or #4 gave out,
20  whether it twisted, whether he fell to the right, the
21  left? Do we know how this all happened exactly
22  from -- at least from your investigation?
23      A. We, being us at Naismith Engineering, --
24      Q. Sure.
25      A. -- did not know anything about that, to my

Page 61

1   knowledge. Now. there may be something in notes here
2   that we may briefly refer to that. But we were not
3   given all the facts of how exactly he fell or did a
4   leg collapse or whatever it was.
5       Q. Your job was to find out what step of the
6   ladder he was on, whether the cracking contributed to
7   the fall and whether the cracks preexisted the fall,
8   is that about the three-prong investigation that
9   you-all were doing?
10      A. Well. actually there were seven things that
11  we were asked to do. But those are some of the seven
12  things.
13      Q. Okay. What else do you remember?
14      A. Well, we were asked initially -- As you
15  recall there were two reports. In the first report
16  we were asked to determine the composition and
17  description of the ladder, to note any defects or
18  damages noted in the ladder, to see if there was any
19  kind of manufacturer specification or labels on
20  them -- on the ladder so we could identify. We were
21  also to -- any other readily available information
22  relating to the ladder's present condition we were to
23  document. That were the four things that we did in
24  the initial.
25          In the second report we were asked to

**RICHARD POREMBA VOL. 1 OF 1**                    **JULY 27, 2001**

17 (Pages 62 to 65)

Page 62

1    do -- to determine if the damage to the ladder was
2    present prior to the accident. We were asked to
3    determine which step Mr. Escudero was standing on
4    when the accident occurred. And we were asked to, if
5    we could determine how high a 150- to 200-pound user
6    could climb on the ladder in its present condition
7    that was given to us. Those were the seven.
8        Q. Which is really, therefore, tied into the
9    one before that, what step was he on?
10       A. Indirectly, yes.
11       Q. So you really weren't given the assignment
12   to say how did this accident happen and what caused
13   it and, therefore, by causation, figuring out fault?
14   You weren't really asked that general question, were
15   you?
16       A. No, sir.
17       Q. Is it fair to say -- And I'm really using
18   your words I think earlier in your testimony about
19   when an engineer analyzes some of the issues that
20   you're addressing here today, that you use common
21   sense, that is you've been trained and you have
22   certain knowledge of properties and rules and you
23   just take it and you can apply them to different
24   things. Is that fair to say?
25       A. I think engineers, as far as schooling and

Page 63

1    training, look at things different than a doctor
2    would, or whatever, different professions.
3        Q. Let's -- Let's talk a little bit about the
4    ladder. The holes on the top, were they by design or
5    were they holes, as in someone just punctured holes
6    somehow in them?
7        A. We just documented there was holes in the
8    top. I don't have any knowledge whether those are
9    standard or whatever.
10       Q. Because some of them have holes to hold
11   things in them, right?
12       A. Well, I think we were talking, in this case,
13   were screw holes in the top of it.
14       Q. Okay.
15       A. That's what I think we were referring to
16   there.
17       Q. Did you see those screw holes yourself?
18       A. I don't recall. I don't think it was
19   something that -- I probably looked at the top of it,
20   but at that point in time didn't -- I mean, it
21   wasn't -- something that was probably not pertinent
22   to the investigation. It was something we documented
23   on it.
24       Q. Looking at your first report, every one of
25   the rails, all four, had cracks in them, right, to

Page 64

1    some extent or another?
2        A. I think we noted, yeah, in our first
3    inspection that all the rails had cracks in them.
4    That's correct, sir.
5        Q. Do you have an opinion whether a ladder that
6    might be ten years old should have cracks in the
7    fundamental-four legs or rails to it?
8        A. It depends how it was --
9            MR. GENDRY: Object to form.
10       A   It would depend how it was taken care of.
11   In other words, you know, you -- it's no different
12   than a car. You can have a car one year old, and it
13   should be in good shape. But if you don't take care
14   of it, it can end up looking like this ladder does.
15       Q. (BY MR. BENTON) And some of these cracks
16   didn't contribute at all to the fall because they --
17   they were just cracks and they didn't involve any
18   splitting of the supporting structure; isn't that
19   right?
20       A. I don't think you know that. I think you
21   know what OSHA says, that -- What OSHA's determined,
22   and the government did all the research on this, is
23   the fact that any crack in the rail, that ladder
24   should not be used. Because any crack in a support
25   member may be -- may be relinquishing some of the

Page 65

1    structural integrity of that member.
2        Q. So you're saying, for example, you found
3    some cracks at the top of the rails, right?
4        A. I don't recall. I'd have to read back
5    through it.
6        Q. Go ahead and take a look. I can help you a
7    little bit.
8        A. Sure.
9        Q. For example, I see on leg #3, if you look at
10   the fourth bullet down, it says crack at the top edge
11   of the back/side corner, about five inches long.
12       A. That's correct.
13       Q. And then you look at the next bullet after
14   that, crack in the top leg on the front/side corner,
15   approximately four and a half inches long.
16       A. That's correct, sir.
17       Q. If you look at leg 4, you'll see on third
18   bullet, crack near the fourth step of the ladder.
19   That's two-thirds up the ladder, right?
20       A. Yes, sir.
21       Q. Do you have an opinion whether those cracks
22   contributed to the fall of Mr. Escudero?
23       A. I think that I -- I don't know which crack
24   ultimately, or what -- whether the spreader did or
25   whatever. I wasn't asked to determine that. But

Case 1:00-cv-00193    Document 24    Filed in TXSD on 10/19/2001    Page 278 of 328

Page 66

1    obviously, I mean, I feel the same way, that any
2    crack, you know, depending on the size of the crack,
3    where it is, or whatever, can have -- can relinquish
4    some of the structural integrity. And I think that's
5    why OSHA publishes the guidelines or publishes the
6    regulations.
7         Q. I don't want to put words in your mouth, but
8    in a yes or no, and you don't even have to have an
9    opinion, but if you have an opinion, you're saying,
10   yes, you believe those cracks at the top caused
11   Mr. Escudero to fall?
12        A. I didn't conduct any kind of structural
13   investigation on that or testing or analysis, so I
14   don't have knowledge of that. All I know is that
15   being an engineer and using common sense, that you've
16   got cracks in the ladder. I don't know which one
17   would, or whether it's a combination or whatever.
18   But structural integrity could have been suffered and
19   I wouldn't use the ladder. And that's from a common
20   sense standpoint.
21        Q. And from a common sense standpoint, when you
22   look at the bottom legs, especially the 3 and 4 legs,
23   isn't it clear that that's where the severe cracking
24   is, and that that is clearly the most obvious risk
25   area as far as making it a dangerous or not dangerous

Page 67

1    ladder?
2         MR. GENDRY: Object to form.
3         A. I think we noted probably, it appears to --
4    here, by the number of bullets that we had, that 3
5    and 4 had the most cracking in it.
6         Q. (BY MR. BENTON) But I mean to look at the
7    pictures and to see this long strips of fiberglass
8    separation, doesn't that look like that and -- that
9    that's what most likely compromised the integrity of
10   the ladder?
11        A. Again, I didn't do a structural analysis on
12   the ladder.
13        Q. But doesn't common sense tell you that?
14        A. That they caused it?
15        Q. That that's more likely the source of the
16   instability then, say, cracks up at the top that
17   don't go all the way down through the --
18        A. Probably when you take away from your bottom
19   area. the cracks near the bottom would have more
20   structural integrity as far as -- or could have -- be
21   more important, and they seem to be bigger. But the
22   spreader might have had a lot to do with it.
23        Q. And we don't know if the spreader was
24   damaged in the fall. do we?
25        A. No, I don't. I do not know that. I know

Page 68

1    that we received the ladder, the spreader was
2    damaged. I don't know whether it was one way or the
3    other. I know we noted some wear at the spreaders
4    from closing. But you couldn't say for sure, to my
5    memory. I'd have to be looking at the ladder right
6    now.
7         Q. If anything's going to bend as opposed to
8    break, it would be those aluminum spreader rails, or
9    whatever you call those ones that have a little pivot
10   spot in it so that it can collapse and open. They're
11   made, generally. I believe, of aluminum, right?
12        A. That's correct.
13        Q. And if anything, when a ladder falls, that
14   would be a very easy area to sustain damage, wouldn't
15   it?
16        MR. GENDRY: Object to form.
17        A. It would depend how the ladder fell. But I
18   do agree with you that that would have more
19   flexibility than something fiberglass. That I agree
20   with.
21        Q. (BY MR. BENTON) So we can't say for fact
22   whether that ladder fit flat on the ground or not
23   before Mr. Escudero used it, can we?
24        MR. GENDRY: Object to form.
25        A. I wasn't there, so I can't really -- I don't

Page 69

1    know if it sat flat on the ground. I do know that we
2    felt and we concluded that numerous cracks were there
3    prior to the accident or had been there for a
4    considerable amount of time.
5         Q. (BY MR. BENTON) And you say considerable
6    amount of time. Why -- What did you base that on?
7    Did you try to age the paint in the cracks?
8         A. No. I think if you want -- Specifically to
9    the paint, is the fact that there was a lot of paint
10   spots on undamaged portions of the ladder. And we
11   found paint in the cracks in at least two areas. And
12   that would indicate that that happened at the same
13   time.
14        Q. But we don't know when the painting
15   occurred, do we?
16        A. Well, the paint wasn't something new on
17   there, let's put it that way. And the -- if the
18   paint was in the crack, you could see from the point
19   it wasn't -- it wasn't -- if you paint something
20   freshly, it -- you could see on some of the pictures
21   that you can see there's dirt on it, there's wear and
22   tear over that paint. That paint had been there for
23   a while.
24        Q. That's based on sort of a common sense
25   observation?

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 279 of 328

Page 70

1    A.  Common sense, yeah.
2    Q.  Some of the cracks had paint in them that
3  weren't cracks that went all the way down the rails,
4  right?
5    A.  I don't recall exactly.  I know -- I believe
6  we reference paint in cracks and also -- also some
7  caulking compound in one of the cracks in the second
8  report.  I can look at that.
9        We found white paint or Sheetrock joint
10  compound inside the crack at the top of the leg on
11  the back/side corner.  That was leg #3.  And what we
12  said was, because the separation of the pieces would
13  be necessary to allow the paint to get in there, it
14  would have had to have -- it was our opinion that it
15  would had to have happened prior to the accident.
16    Q.  And is that cracks that didn't go all the
17  way down through the bottom?
18    A.  In reference to that one white piece of
19  paint, the white paint or Sheetrock joint, it was
20  inside the crack at the top of the leg.  On 2 --
21    Q.  And to stop you, if I can?
22    A.  Yes, sir.  I'm sorry.
23    Q.  So that's not one that went all the way
24  through, that crack?
25    A.  I don't -- I don't recall exactly.  Again, I

Page 71

1  don't have that ladder here in front of me, and we
2  don't have a good picture here to show that.
3    Q.  But if it was a top crack and there was
4  paint in it, or plaster, whatever it might be, the
5  white, would that indicate to you that someone used
6  that ladder with the crack in it?
7    A.  If there -- Yeah, the paint indicated -- In
8  both cases, the brown paint and the white caulking
9  indicated that the ladder -- the paint was there and
10  someone had probably used the ladder prior to that.
11    Q.  And so if Mr. Escudero wasn't involved in
12  painting or sheetrocking, someone used that ladder
13  successfully, even though it had cracks in it.
14        MR. GENDRY:  Object to form.
15    A.  We know someone could have used the ladder.
16  We don't know that.  That ladder could have been
17  thrown away in a Dempsey dumpster.  I don't know.  We
18  don't know if anybody used it, we just know that
19  the -- that would indicate that the cracks were there
20  and the paint was after the cracks.  So someone could
21  have been on that ladder.  It could have got splashed
22  on that ladder.
23    Q.  (BY MR. BENTON) But if we're -- I believe
24  there's going to be testimony that the bottom legs
25  gave out where the long -- long longitude cracking

Page 72

1  occurred.
2    A.  Yes, sir.
3    Q.  And you've got evidence of the cracking at
4  the top in which the cracks don't go all the way down
5  to the feet, if you will.
6    A.  Okay.
7    Q.  And there is some sort of a white plaster
8  inside there, that makes you think that someone was
9  able to use that ladder without falling, --
10        MR. GENDRY:  Object to form.
11    Q.  (BY MR. BENTON) -- with the cracks; --
12        MR. GENDRY:  Object to form.
13    Q.  (BY MR. BENTON) -- is that fair to assume?
14        MR. GENDRY:  Object to form.
15    A.  It's possible that someone was on the
16  ladder.
17    Q.  (BY MR. BENTON) Now, you understood that
18  Mr. Escudero was -- was working as a contractor when
19  he was hurt, is that what you think?
20    A.  I wasn't real clear on that.  But I did read
21  some of our notes, and it appears that he was a -- he
22  is a contractor.
23    Q.  I want you to assume that in this case he
24  was in a role of fixing a light fixture at his
25  maternal grandparents' old house that his mother

Page 73

1  rents, and it was not a business thing at all.
2        MR. GENDRY:  Object to form.
3    Q.  (BY MR. BENTON) Now, some consumers who go
4  to use ladders as opposed to people who do it for a
5  living, they wouldn't have the same point of
6  reference as far as evaluating whether a ladder was
7  dangerous or not, would you agree?
8        MR. GENDRY:  Object to form.
9        THE WITNESS:  Can I go off the record
10  for just a second?
11        MR. BENTON:  Sure.
12        THE WITNESS:  I just want to --
13        VIDEOGRAPHER:  Off the record at 2:56.
14        (Off the record.)
15        VIDEOGRAPHER:  Back on the record at
16  2:57.
17    A.  Well, that -- My answer to that would be
18  that basically they might not have a reference, they
19  might not have OSHA regulations, but they have common
20  sense.
21    Q.  (BY MR. BENTON) And wouldn't you tend to,
22  when you look at a ladder, tend to, I guess, look at
23  the spreader, see if it works, spread the legs out,
24  see if it feels secure on the floor, and wouldn't you
25  think that would be a typical analysis from a typical

Case 1:00-cv-00193  Document 24  Filed in TXSD on 10/19/2001  Page 280 of 328

Page 74

1  person?
2      A.  Well, if you didn't, when you hit that first
3  step you'd know it.
4      Q.  Can I take that as a "yes"?
5      A.  Yes, sir.
6      Q.  And so it might take a little bit more
7  experience or knowledge in the area to actually be
8  looking at rails to see if there's cracks in rails,
9  wouldn't you think?
10     A.  It would if they weren't visible.
11     Q.  Can you tell me today how much cracking, in
12  your opinion, was the result of the Escudero fall --
13  Strike that.  Well, let me back up here.
14         Are you willing to give an opinion of
15  reasonable probability how much of the cracking of
16  the legs was caused by the Escudero fall?
17     A.  No.  I think you could take -- Let me
18  respond to that.  I say no.  because you ask me
19  today.  I think if you had the ladder and was back
20  here again, you might be able to ascertain, because
21  you're asking me how much of the cracking occurred
22  from the Escudero fall.  And there -- As we cited in
23  our report. there was two types of cracks, okay, and
24  I'm generalizing here, cracks which showed wear which
25  indicated that they were there for a period of time,

Page 75

1  a longer period of time, and cracks that appeared to
2  be very recent because they showed splitters -- or
3  splinters from the fiberglass and could be matched
4  perfectly together.  But I don't know the exact
5  measurements of that.  But probably it could be
6  determined.
7      Q.  Do you remember offhand if one leg or the
8  other had greater new splitting or not?
9      A.  No, sir.
10     Q.  If one side had a greater splitting than
11  another, would it be reasonable to deduce that that's
12  probably a leg that may have given out?
13     A.  That was probably a structural breakdown.  I
14  mean something was happening there.  It was a weak
15  point.
16     Q.  Now, when we look at these pictures, and
17  we'll go ahead and mark this one as the next one.
18         (Exhibit 15 marked.)
19     Q.  (BY MR. BENTON) As No. 15.  Is that the
20  front or the back legs?
21     A.  That would indicate to me that's the back
22  legs.
23     Q.  Okay.  How would those fractionalized or
24  split pieces rub against each other so as to wear the
25  surface out or change the surface where the two --

Page 76

1  where the two pieces originally connected?
2      A.  Well, I don't know exactly how that would
3  happen.  I mean, that -- they could flop back and
4  forth.  Ladders are pulled, dragged or whatever.
5  Normal wear and tear through the -- through the air
6  will -- that stuff will fall off in time.  You know
7  what I'm talking about, the splitters and stuff like
8  that.
9         It may have been somebody tried to
10  repair it at some time.  A variety of things could
11  have happened.  I -- Not having it here right now, I
12  can -- by the picture, you can see it could flap back
13  and forth.  You know, like when you take the ladder
14  down and you leaned it up on the ground -- you put it
15  on the ground.  I mean, ladders -- normal occurrence
16  is not to leave the ladder up all the time, so you're
17  going to get rubbing of parts, dragging of parts.
18         I guess that's my picture -- No, it's
19  yours.
20     Q.  No, we need to keep these right over here.
21     A.  Yes, sir.
22     Q.  I'm having another picture marked, and we're
23  calling it No. 16.
24         (Exhibit 16 marked.)
25         MR. GENDRY:  Okay.

Page 77

1      Q.  (BY MR. BENTON) Looking at 16 you see how
2  that -- that aluminum support that goes across the
3  ladder that sort of looks like another series of
4  steps in the back, right.  But they're not steps, of
5  course, but they're just for support, you see that
6  there, the cross support?
7      A.  Yes, sir.
8      Q.  Okay.  And then you see the angle support
9  that -- and if you could kind of -- if you'll hold
10  this up a little bit, so while we're talking -- and
11  if you kind of put it to the side of you so --
12         THE WITNESS:  You want it bent down, is
13  that --
14     Q.  (BY MR. BENTON) Okay.  And as you look at
15  that picture, you see that angled support, right?
16     A.  Yes. the metal support, right.
17     Q.  Yes.  And do you see by looking at that, how
18  that is tied into what has been called the flange
19  part of the rail?
20     A.  Are you referring to this right here?
21     Q.  Yes.
22     A.  Yes. sir.
23     Q.  And just so that we have the same
24  terminology. as I understand it, the widest portion
25  of the rail they're calling the web.  That's what

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 281 of 328

Page 78

1    Bauer -- the Bauer guy called it.
2        A.  Okay.
3        Q.  And so if we have --
4        A.  You mean the widest spread on the --
5        Q.  Right, the widest part of the rail.  And
6    then you have this part sticking off at a 90 degree
7    angle, which is a flange?
8        A.  You're calling that the web.
9        Q.  As we look at it, the widest part --
10       A.  Okay.
11       Q.  -- is the web.
12       A.  Okay.
13       Q.  And the narrower part, which goes off --
14       A.  Is the flange?
15       Q.  -- is the flange.
16       A.  Okay.
17       Q.  That's how -- at least how the Bauer
18   representative described it.
19           You notice that the splitting, the
20   worst splitting seems to be occurring right there at
21   that junction of the flange and the web, isn't it, on
22   both 3 and 4.  And if you'd like another picture to
23   sort of confirm that visually for you, I'll get one
24   for you.  In fact I will anyway.
25           MR. GENDRY:  Is that a statement or a

Page 79

1    question?
2            MR. BENTON:  That's -- That's a bad
3    question.
4        Q.  (BY MR. BENTON) Okay.  Let me rephrase.
5            (Exhibit 17 marked.)
6        Q.  (BY MR. BENTON) You can also look at this
7    picture that I've identify now as No. 17 to your
8    deposition.  Does that depict the back rails or the
9    legs of the ladder in question?
10       A.  Yes, sir.
11       Q.  Okay.  Is it fair to say, from the pictures
12   and your recollection, that the worst cracking
13   occurred on those back legs, not the legs where you
14   walk up?
15       A.  I think it's documented in our report that
16   we documented the most damage on 3 and 4, yes, sir.
17       Q.  And isn't the severe cracking that's present
18   right at that junction where the flange meets the
19   web?
20       A.  Well, it goes through that area, but it
21   would appear, you know, just being an engineer, that
22   that cracking would start down here and move its way
23   up.  So the cracking would start from the base of the
24   ladder and move itself up.
25       Q.  Right.  But I mean it's not running through

Page 80

1    the middle of the web and it's not running through
2    the middle of the flange, it's running from that line
3    that basically connects the flange and the web,
4    right?
5        A.  Yeah.  It's right at the juncture of the web
6    and the flange, right.
7        Q.  And then when you look at the -- the
8    supporting braces that go horizontally across the
9    bottom, as well as the angle brace, they're all
10   attached to the flange, aren't they?
11       A.  That's correct.
12       Q.  And so if -- well, it seems apparent from
13   the pictures at least, that the cracking tends to run
14   along that junction.  Once you have the flange
15   separated from the web and the flange is no -- you've
16   now lost most of your strength and stability at the
17   bottom, haven't you?
18       A.  You shouldn't be using the ladder that way.
19       Q.  Right.
20       A.  It would be -- This would be an unstable
21   ladder.
22       Q.  Let me show you a different ladder.
23           (Exhibit 18 marked.)
24       Q.  (BY MR. BENTON) All right.  Exhibit No. 18
25   I'm going to represent to you is one manufactured by

Page 81

1    the Werner Corporation.  And do you see how they
2    support the bottom of their ladders, the yellow
3    plastic or fiberglass parts there?  They look
4    plastic.
5        A.  Yeah, I can -- Yes, sir.
6        Q.  Do you see how that plastic part actually
7    attaches to the web portion of the rails?
8        A.  Well, it appear -- let's see here.
9        Q.  The rivets go through the web portion.
10       A.  You're talking about on the bottom, you
11   mean?
12       Q.  Yes.  That's the plastic parts we're talking
13   about on the bottom.
14       A.  Right, I understand.
15       Q.  See how the rivets go into what we're
16   calling the web?
17       A   I can see that, yes.
18       Q.  There may well be rivets into the flange,
19   but they're put into the web.  And then this is all a
20   portion that supports the angle brace?
21       A.  I don't really know the functions of these
22   two members.  They're obviously capped on the bottom
23   too, and that may be for wear and tear on the bottom
24   of the ladder.  But I do not know the functions.  I
25   wouldn't understand why they had it in plastic.  So

Page 82

1  there's got to be a reason for why they put it there.
2        MR. GENDRY: Object to the part that
3  was nonresponsive.
4        Q. (BY MR. BENTON) Okay. But what I'm trying
5  to say, from a common sense standpoint here, and more
6  than just a little common sense, because you are an
7  engineer. Whether you're a specialist in designing
8  ladders or not, you're an engineer. When you look at
9  that as an engineer can you see how if you had
10  fracturing or splitting that occurred between the
11  flange and the web, how this is a superior design
12  because it's attached right into the web?
13        MR. GENDRY: Object to the form.
14    A. I have no opinion on that, because I'm not
15  involved in a structural capacity on that ladder, the
16  design of it.
17    Q. (BY MR. BENTON) That doesn't make --
18    A. I do not know what the function of that is.
19    Q. That does not make common sense to you?
20        MR. GENDRY: Object to the form.
21    A. I don't know -- I would have -- In other
22  words, to respond to that you're asking me to give
23  you an engineering opinion. I'd have to know more
24  about what the function of this was intended to do.
25    Q. (BY MR. BENTON) Well, isn't it obvious that

Page 83

1  it's intended to support the rails?
2        MR. GENDRY: Object to the form.
3    A. No, it's not obvious to me.
4    Q. (BY MR. BENTON) Well, is it obvious to you
5  that once you get a separation or crack between the
6  flange and the web, that because of the way the Bauer
7  ladder is tied into the flange area only, that you
8  lose substantial amount of strength and
9  flexibility --
10        MR. GENDRY: Object to the form.
11    Q. (BY MR. BENTON) -- once that happens?
12    A. I think -- Again, I was not involved in the
13  structural determination of this ladder, so I don't
14  know whether this is your main support or that's your
15  main support.
16    Q. Well, wouldn't you think the wider side part
17  of the rail would be your greater support and not the
18  narrower flange?
19        MR. GENDRY: Object.
20    A. I don't know that for a fact because I
21  wasn't the design engineer on it.
22    Q. (BY MR. BENTON) Doesn't is seem to be common
23  sense?
24        MR. GENDRY: Object to form.
25    A. I mean, because this is wider than this,

Page 84

1  would it be -- would it be the --
2    Q. (BY MR. BENTON) Yeah. And isn't it
3  generally true that your -- that the part where you
4  walk up on a ladder, that's going to get the most
5  weight, those two rails, the front two rails?
6    A. It would seem to me that if you're walking
7  up on the ladder, until you're wherever -- again, I
8  wasn't involved in the design. Your center of
9  gravity changes at some point in time and puts more
10  weight on the back part of the ladder. That's just
11  coming from a straight --
12    Q. And generally -- And including these
13  ladders, aren't the front rails heavier and bigger
14  generally -- well, and I just mixed my apples and
15  oranges there.
16        Where are the other pictures?
17        Looking at Exhibit No. 5, I mean, even
18  on a Bauer ladder isn't it obvious that the rails are
19  bigger and thicker on the front than they are on the
20  back, the one --
21    A. By the picture, yeah, they are.
22    Q. And do you -- And do you think that's just
23  accidental as an engineer, or do you think that may
24  be because there's more weight levied down in the
25  front of the ladder?

Page 85

1        MR. GENDRY: Object.
2    A. You could be right. I mean, again, you
3  know, I -- I'm just giving you a generalization of
4  what I said earlier. I think your weight would be
5  more towards the front as you went to the ladder, and
6  it would become balanced as your center of gravity
7  changed going up it.
8    Q. (BY MR. BENTON) And therefore, that's why
9  they make the front rails heavier, wouldn't you think
10  that?
11    A. Could be one reason, yes, sir.
12    Q. Do you know how long Jose Escudero was on
13  the ladder before it -- he fell?
14    A. No, sir.
15    Q. And you don't know the actual mechanism of
16  how he fell, right?
17    A. No, sir.
18    Q. So you're really just here to testify that
19  because it didn't look good, he shouldn't have gotten
20  on it. That's what you're basically saying, right?
21        MR. GENDRY: Object to the form.
22    A. I'm testifying to the reports that we
23  submitted.
24        MR. BENTON: Well, I'm going to object
25  to that as unresponsive.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 283 of 328

Page 86

1    Q.  (BY MR. BENTON) I think you're here
2  testifying today about your opinion about the ladder
3  was unsafe; are you not?
4    A.  That was one of the things we were asked in
5  here.  We declared that the ladder was -- you know,
6  should not have been used.
7    Q.  But you don't have an opinion as to whether
8  the cracks caused the accident or not, do you?
9    A.  We weren't asked to determine that.
10      MR. BENTON:  Object to responsiveness.
11    Q.  (BY MR. BENTON) It's a yes or no or I don't
12  have an opinion.
13    A.  I don't really have a good opinion on that.
14    Q.  So to sort of clean up the record, so to
15  speak, you don't have an opinion whether the fact
16  that the ladder was -- there was some cracking in the
17  ladder before Jose Escudero got on it, whether that
18  caused him to fall that day, you do not have an
19  opinion about that, do you?
20    A.  Only an opinion to the fact that I'm
21  cognizant of OSHA, and OSHA says any cracking in the
22  rails, you don't use the ladder.  I didn't do the
23  research to determine OSHA's regulation.  But I do
24  know that it must be if you have cracking in the
25  ladder, it can fall.

Page 87

1    Q.  But you don't know what caused this
2  accident, so you're not mak- -- giving an opinion
3  today, are you not, on what caused the accident?
4    A.  That's correct.  The ladder could have been
5  tipped on a 30-degree slope.  So, you know, what
6  you're asking me is I don't know all the
7  circumstances.
8    Q.  And so you're not here to render an opinion
9  about him getting -- because that ladder was cracked
10  before he used it, that caused him to fall, you're
11  not giving that opinion, are you?
12    A.  No, I didn't give that -- just the opinion,
13  again, that the ladder was unsafe.
14    Q.  One of your jobs was to determine what step
15  Mr. Escudero was on when he fell, right?
16    A.  Yes, sir.
17    Q.  Okay.  And you came to the opinion that --
18  that he was on the fourth or the fifth; is that
19  right?
20    A.  That's correct, sir.
21    Q.  Now, when I run this math, we had a -- How
22  tall was the ceiling?
23    A.  I think they said 11'2", if I recall
24  correctly.  Yeah, 11'2" the ceiling height above the
25  floor.

Page 88

1    Q.  And that was the number you were using in
2  figuring out what would naturally be the height he
3  could reach at one step versus another, 11'2"; is
4  that right?
5    A.  That was the number we were given.
6    Q.  Okay.  Did you take any consideration into
7  the fact that the fixture may be coming off of the
8  wall, and so therefore you're dealing with some
9  inches down from there because of the nature of the
10  fixture?
11    A.  Yes, sir.
12    Q.  How many inches did you consider for that?
13    A.  We didn't know the size of the fixture, so
14  all you -- I think what we said was he'd be on the
15  fourth or fifth step.  We realize that a man could
16  reach 20 inches with -- a 6'1" man, average 20 inches
17  if he is completely extended.  We realized more
18  comfortable would be about 15.  And that's how we
19  drew our conclusions in going to the fourth or fifth
20  step.
21      What we felt was he either had to be in
22  an uncomfortable position or a potentially
23  uncomfortable position, depending on where exactly
24  the bulb was that he replaced, or he would be in a
25  comfortable position and be a step higher on the

Page 89

1  fifth step.
2    Q.  Well, I want you to assume that Mr. Escudero
3  testified that the fixture was six or seven inches
4  off of the ceiling.  And so if we take the number
5  seven for example, if you have 11'2", --
6    A.  Yes, sir.
7    Q.  -- according to my calculations that would
8  that bring us down to about 10'7".
9    A.  So it was seven inches down.
10    Q.  (Moving head up and down.)
11    A.  Yes.
12    Q.  And then we have a 6' man who's 73 inches;
13  is that correct?
14    A.  That's correct.
15    Q.  He can reach 20 inches over his head; is
16  that correct?
17    A.  That would be max.
18    Q.  So that combined, I think is 93 inches; is
19  that right?
20    A.  Yes, sir.
21    Q.  And if my calculations are right, eight feet
22  is 84 inches; is that right?
23    A.  That sounds presumable, yes, sir.
24    Q.  And so that would be -- subtracting 84 from
25  93, that would be 8'7" would be his reach?

Page 90

1    A.  Sounds about right, yes, sir.
2    Q.  And you-all measured the ladder height at
3  the fourth step taking him up 3'7"; is that right?
4    A.  Yes, sir.
5    Q.  So when you add his 8'7" reach to his ladder
6  heighth at the fourth step, does that come out to
7  12'2"?
8    A.  Yes, sir.
9    Q.  So now -- And if we're dealing here with
10  something that's 10'7", then actually if he got up
11  one more step on the ladder he'd be too close to his
12  action, wouldn't he?
13    A.  Yeah, I would say.
14    Q.  So it's more than likely he was on the
15  fourth step, isn't it?
16    A.  Again, we did not know the height of the
17  fixture.  So we reasoned he would be on the fourth or
18  the fifth.  From what you're saying there, and if
19  that's correct, then more than likely he was probably
20  on the fourth step.  He could have been on the fifth
21  step.
22    Q.  But that --
23    A.  If it was me changing it, I'd probably be on
24  the fourth step.
25    Q.  But I mean you can get so close to your

Page 91

1  work, --
2    A.  That's correct.
3    Q.  -- that now it's actually cumbersome trying
4  to deal with, it being that close to your face,
5  right?
6    A.  Yes, sir.
7    Q.  Have you done enough ladder cases to --
8  fiberglass ladder cases to know that this cracking or
9  sometimes it's termed fracturing of the rails is --
10  is a known hazard?
11          MR. GENDRY:  Object to form.
12    A.  I don't have any knowledge of it being a
13  known hazard.
14    Q.  (BY MR. BENTON)  Well, the idea that OSHA
15  says that you need to check for cracks, don't you
16  think that gives you some indication that that's a
17  known hazard?
18    A.  I don't -- I don't know -- OSHA says to
19  check for the cracks, but I don't know whether it's a
20  problem with ladders all the time.  Now I've seen
21  ladders and I've seen them with cracks in them and
22  been disposed of.  I worked in a manufacturing
23  background part of my career.  But I don't know --
24  The ladder would be unsafe.  I don't know whether
25  it's been a problem on ladders.  I mean, after you

Page 92

1  use a ladder -- ladders get pretty well abused,
2  banged around.
3    Q.  So you're not willing to testify that in
4  this case the splitting of the rails caused a
5  dangerous condition?
6    A.  Splitting of the rails is a dangerous
7  condition.  Not caused a dangerous, it is a dangerous
8  condition as defined by OSHA.
9    Q.  Okay.  So don't you think that because those
10  conditions occur in ladders, like they did here, that
11  a manufacturer ought to design a ladder knowing that
12  that's a risk and try to create a design that deals
13  with that risk the best they can?
14          MR. GENDRY:  Object to form.
15    A.  I don't know what a manufacturer does with
16  that, but I mean nothing's going to last forever.
17          MR. BENTON:  Okay.  I'll pass the
18  witness.
19          MR. GENDRY:  Just a couple of
20  questions, Mr. Poremba.
21          Do you need time to change?
22          VIDEOGRAPHER:  Yeah.  I've got less
23  than a minute of tape left.
24          MR. GENDRY:  Okay.
25          VIDEOGRAPHER:  Tape number 1 concludes

Page 93

1  at 3:23.
2          (Off the record.)
3          VIDEOGRAPHER:  We're on the record and
4  tape number 2 begins at 3:26.
5          FURTHER EXAMINATION
6  BY MR. GENDRY:
7    Q.  Mr. Poremba, just a few more questions.  You
8  were asked some questions about the fact that State
9  Farm had given you this -- Naismith this assignment.
10  Do you recall that testimony?
11    A.  Yes, sir.
12    Q.  All right.  Were you ever told the legal
13  ramifications of the outcome of your investigation?
14    A.  No, sir.
15    Q.  Did it make any difference to you at all as
16  to what the ramifications of your investigation may
17  be from a standpoint of your investigation done
18  honestly and independently?
19    A.  No, sir.
20    Q.  All right.  Were you even aware as to whose
21  policy of insurance was involved when you were
22  assigned the case by State Farm Insurance?
23    A.  The only thing we knew, that State Farm was
24  an insurance company involved in it.
25          VIDEOGRAPHER:  Would you move your

Case 1:00-cv-00193    Document 24    Filed in TXSD on 10/19/2001    Page 285 of 328

Page 94

1  microphone higher up on your tie, please.
2         THE WITNESS: Is that better?
3         VIDEOGRAPHER: (Moving head up and
4  down.)
5         THE WITNESS: Sorry.
6    Q. (BY MR. GENDRY) With regard to measurements
7  done, which I think some are recorded in your
8  reports. some may have been done by an associate of
9  yours; is that correct?
10   A. That's correct, sir.
11   Q. Is that customary, in your business, to --
12 somebody else in the firm to do some measurements and
13 you participate in rendering the final opinion?
14   A. Yes, sir.
15   Q. Do you -- is it customary to rely on the
16 measurements or work done by associates working on
17 the same case?
18   A. Yes, sir.
19   Q. And I notice on the 9/29 report you do in
20 fact state, do you not, that the edges above 20
21 inches from the bottom -- It's under leg 4. You did
22 make a measurement that the edges above 20 inches
23 from the bottom appeared to show a -- matching up
24 signs, I think is the way you put it, isn't it?
25        MR. BENTON: Objection to form.

Page 95

1    A. We said that approximately, yeah, 20 inches
2  of the back and side piece edges did not match up
3  when they are joined. We also said, further down,
4  that the edges above the 20 inch area match up when
5  adjoined. The jagged fibers fit good together.
6    Q. (BY MR. GENDRY) So in fact, measurements
7  were taken as to the determination of the unmatched
8  fibers along with the matched fibers, would that be a
9  correct statement?
10   A. Some measurements were taken, yes, sir.
11   Q. Whether cracking in a ladder is lengthwise
12 or crosswise or laterally, if a ladder is cracked,
13 broken or split. it should be taken out of service;
14 would that be a correct statement?
15        MR. BENTON: Objection, form.
16   A. That's correct, according to OSHA.
17   Q. (BY MR. GENDRY) There was some testimony in
18 response to Mr. Benton's questions about the back
19 broken legs and the flapping back and forth of the
20 separated portions. Do you recall that?
21   A. Yes, sir.
22   Q. All right. And that simply means that the
23 damage is occurring over a period of time; does it
24 not?
25   A. Yes, sir.

Page 96

1    Q. In other words, each time you got the
2  flapping back and forth, you've got wearing on the
3  ladder and you've got -- you're adding additional
4  damage, would that be correct?
5         MR. BENTON: Objection, form.
6    A. I think what my response was to his question
7  was that was one way you could get additional wear.
8  If it flaps back and forth it's going to hit against
9  the edges or whatever, and that's going to wear those
10 edges, smooth them out and continue to do so until
11 they're free of that area.
12   Q. And in this particular ladder was there
13 evidence of wear and tear over a period of time?
14   A. Yes, sir.
15   Q. Mr. Benton has shown you Deposition
16 Exhibit 18, which I think he represented was a
17 different type ladder or a different manufacturer's
18 ladder. Do you recall that?
19   A. Yes, sir.
20   Q. And if any other sort of ladder was --
21 Strike that.
22        That particular photograph apparently
23 shows a new, undamaged ladder; does it not?
24   A. I don't know if it's brand-new, but it's in
25 good condition.

Page 97

1    Q. All right. If a ladder, any ladder, such as
2  the ladder in Deposition Exhibit 18, should show
3  signs of wear and tear over time resulting in
4  cracking or splitting, should it also be removed from
5  service?
6    A. That's correct, according to OSHA.
7    Q. And you have never examined, in connection
8  with this case, another ladder for the purposes of
9  rendering the opinions that you have in your reports
10 and in your direct testimony; would that be correct?
11   A. The only ladder we examined, I think you're
12 asking, was the ladder in question today.
13   Q. All right. If you're working on a fixture
14 that hangs down from -- six to even inches or --
15        Let me restate the question. If you
16 are working on a fixture from a ceiling that hangs
17 down, whether it be six or seven inches or a foot or
18 four inches, or what have you, if you're working at
19 the base of that fixture, you may have to move about
20 on the ladder; is that a fair statement?
21   A. That's correct.
22   Q. In other words, if you're working at the
23 termination of the fixture or if you're working up
24 towards the ceiling, you may have to go from one step
25 to the other?

Page 98

1   A.  That's correct.  If you had an eight-inch
2   fixture or whatever, you might be going from the
3   bottom to the top of that fixture, that's correct.
4        MR. GENDRY:  Pass the witness.
5        (Exhibit 19 marked.)
6        FURTHER EXAMINATION
7   BY MR. BENTON:
8   Q.  I'm going to show you what's been marked as
9   No. 19 to your deposition.  Is that part of your
10  file -- or Naismith's file?
11  A.  I did find a copy of that in our file, yes,
12  sir.
13  Q.  Did that tell you at least -- Well, who did
14  that, do you know?
15  A.  I'm not aware of who did that.  I'm not even
16  sure that's exactly what we have.  Let's see.  It
17  looks -- it's got some of the same demarcations.  Now
18  we may have put -- I know we put these marks.  We may
19  have put these on here.  But it's not exactly what
20  you gave me.  So that's not it.
21  Q.  Okay.  And I appreciate that.  Let's have
22  this marked, please.  Anything you want back, she'll
23  make a copy of it for you.
24  A.  That will be fine.
25       (Exhibit 20 marked.)

Page 99

1   Q.  (BY MR. BENTON) So now I'm showing you
2   Exhibit 20.  And that is, you can testify, is right
3   out of y'all's file, right?
4   A.  That is correct, sir.
5   Q.  Okay.  And you're not sure who -- who drew
6   up the -- the initial part, which is Exhibit 19?
7   A.  No, sir.
8   Q.  I'm going to -- you can assume that that was
9   the client's, either father or himself, because
10  they're the ones that own Paisano Construction
11  Company.
12  A.  Okay, sir.
13  Q.  Was that provided to you by State Farm?
14  A.  I believe it was provided by State Farm, but
15  I do not know that for a fact.
16  Q.  Did you have the Escuderos available to
17  cooperate with you in your investigation if you
18  needed it?
19  A.  If I needed what?
20  Q.  The cooperation of the Escuderos, maybe
21  needed some information from them or anything --
22  A.  I don't recall.
23  Q.  -- regarding how it happened?
24  A.  I did not have any -- I did not talk to any
25  of the Escuderos.

Page 100

1   Q.  So as far as you know, they would have been
2   cooperative with you?
3        MR. GENDRY:  Object to form.
4   A.  I -- As far as I know.  I don't have any
5   knowledge that says one way or the other  Most
6   people are cooperative. but --
7   Q.  (BY MR. BENTON) Do you think that the fact
8   that they provided State Farm with that drawing shows
9   some form of cooperation?
10       MR. GENDRY:  Object to form.
11  A.  I don't know what the intent of the form was
12  provided to them.
13  Q.  (BY MR. BENTON) You do know from your own
14  report and records that Bauer Corporation didn't want
15  to give any information: isn't that right?
16  A.  That's -- They gave us very limited
17  information, that's correct.
18  Q.  And -- And then you have information in your
19  file, if you've read this file, that State Farm
20  ordered you-all not to turn over information to me,
21  Mr. Escudero's attorney; isn't that right?
22       MR. GENDRY:  Object to form.
23  A.  I believe that State Farm told us not to
24  initially return the ladder to you.  I mean, there's
25  quite a bit of information here, and I did read

Page 101

1   through it.  And I -- I can remember something about
2   that.
3   Q.  (BY MR. BENTON) Do you remember the part
4   that says, basically, don't give him any information?
5   A.  I don't recall that specifically.
6        MR. BENTON:  Do you have number 40?
7   Would you like to look at it?
8        MR. GENDRY:  I'm sorry?
9        MR. BENTON:  Would you like to look at
10  it a moment?
11       THE WITNESS:  Is this it?  I've got
12  one, too.
13  Q.  (BY MR. BENTON) Okay, let's use -- Now that
14  we've identified it, let's just go ahead and use
15  yours, if we can.
16  A.  That will be fine.
17       MR. BENTON:  We're going to use this
18  one.  You can go ahead and keep that one.  Thank you,
19  though.
20       (Exhibit 21 marked.)
21  Q.  (BY MR. BENTON) If you will read -- Whose
22  handwriting is this in Exhibit 21?  Do you recognize
23  that?
24  A.  I think it's Clark Hudson's.
25  Q.  And he's with Naismith, right?

Page 102

1   A.  No longer, but he was at the time.
2   Q.  Okay.
3   A.  Yes, sir.
4   Q.  And if you will read this one sentence here
5   that I've started with my finger, just to the end of
6   that paragraph.
7   A.  Where it says State Farm?
8   Q.  Where it says Roger.
9   A.  Excuse me.  Right here?
10  Q.  Yes.
11  A.  Roger said we do not have to give Barry any
12  information.  Tell him to talk to State Farm.
13  Q.  Does that refresh your memory about whether
14  they wanted you to give -- your office or Naismith to
15  give me any information?
16  A.  Yeah.  I mean, I can read it and it does.
17  But that's not -- I wouldn't consider it unusual.
18  Q.  Now, in your testimony earlier you said that
19  a sketch showed that the ladder fell backward.  And
20  I've looked through the file as far as I can tell.
21  Can you identify any sketch that showed that the
22  ladder fell backward?
23  A.  Well, the only thing is from this sketch.
24  Q.  Okay.  And identify that exhibit, would you?
25  A.  Excuse me.  Exhibit No. 20.  The only thing

Page 103

1   I mentioned on that was -- this is the only sketch
2   I've ever seen.  And basically it said the leg
3   broke.  The leg broke.  I just -- I was guessing, to
4   be quite honest with you.
5       MR. BENTON:  I'll pass the witness.
6       MR. GENDRY:  I don't think I have
7   anything else.
8       Thank you, sir.
9       VIDEOGRAPHER:  Are we off the record
10  then?
11      MR. GENDRY:  (Moving head up and down.)
12      VIDEOGRAPHER:  We're off the record at
13  3:40.  This concludes the deposition of Richard
14  Poremba.
15      (Deposition concluded)
16
17
18
19
20
21
22
23
24
25

Page 104

1               CHANGES & SIGNATURE PAGE
2
3   RE Escudero  vs  Bauer Corporation
4   PAGE   LINE   CHANGE   REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11      I, RICHARD POREMBA, have read the foregoing
12  deposition and hereby affix my signature that same is
    true and correct, except as noted above
13
14      RICHARD POREMBA
15  THE STATE OF TEXAS )
16  COUNTY OF BEXAR )
17      Before me, _____, on this day
    personally appeared RICHARD POREMBA, known to me (or
18  proved to me under oath or through _____)
    (description or identity card or other document) to
19  be the person whose name is subscribed to the
    foregoing instrument and acknowledged to me that they
20  executed the same for the purposes and consideration
    therein expressed
21      Given under my hand and seal of office this
    _____ day of _____, 2001
22
23      Notary Public in and for the
24      State of Texas
        * * * * * * * * * *
25

Page 105

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2               BROWNSVILLE DIVISION
3   JOSE ESCUDERO, JR     )
        Plaintiff       )
4                       )
        VS              )  CIVIL ACTION NO  B-00-193
5                       )
    BAUER CORPORATION D/B/A  )
6   BAUER LADDER CORPORATION )
        Defendant       )
7
        REPORTER'S CERTIFICATION
8       DEPOSITION OF RICHARD POREMBA
            JULY 27, 2001
9
        I, DANDY ELLIS, a Certified
10
11  Shorthand Reporter in and for the State of Texas, do
12  hereby certify that the foregoing deposition is a
13  full, true and correct transcript.
14      That the foregoing deposition of
15  RICHARD POREMBA, the Witness, hereinbefore named was
16  at the time named, taken by me in stenograph on JULY
17  27, 2001, the said Witness having been by me first
18  duly cautioned and sworn to tell the truth, the whole
19  truth, and nothing but the truth, and the same were
20  thereafter reduced to typewriting by me or under my
21  direction  The charge for the completed deposition
22  is $_____ due from Defendant;
23      ( x ) That, by agreement of counsel, the
24  deposition officer is instructed to release the
25  original deposition transcript, and the deposition

## N THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

JOSE ESCUDERO, JR.         *
                                   *

vs                            *   CIVIL ACTION NO. B-00-193
                                     *

BAUER CORPORATION D/B/A   *
BAUER LADDER CORPORATION   *

## <u>AFFIDAVIT OF PLAINTIFF, JOSE ESCUDERO, JR.</u>

       BEFORE ME, the undersigned authority, personally appeared the JOSE ESCUDERO, JR., know to me to person whose name is subscribed below, and upon being duly sworn, deposed and said:

       "My name is Jose Escudero, Jr.  I am the Plaintiff in the above-entitled and numbered cause.  I am over the age of 18, of sound mind and competent in all respects to make this affidavit. The facts stated herein are based on my personal knowledge.

       "I have worked in the construction business to some extent or another virtually my entire adult life. I am 33-years-old. I have worked in the construction business in the Rio Grande Valley since 1997. During that time I have personally done carpentry, sheetrock and other forms of construction work.  I have also worked as a contractor hiring various skilled tradespersons to do the various tasks necessary to construct houses and buildings.  By hiring these skilled tradespersons on many occasions I have a working knowledge of how much they earn. A carpenter, whether he or she frames or does finish work, earns about $13 dollars an hour and works at least 48 hours per week, especially with the large amount of construction which has been and is currently going on in the Rio Grande Valley.  Such a skilled tradesperson could easily earn close to $30 thousand dollars a year.   Because of the injury to my heel, should I need to, I can no longer do the work of a carpenter or other construction work, which I did and could have done again had



I not suffered that injury.  Because of my heel injury suffered on May 10, 1999, and the subsequent surgeries necessary to treat that injury, I could not work full-time as president of my company, E&E Builders, Inc. d.b.a. Paisano Construction Company for about five  months after the initial injury and approximately another five months after the subsequent surgery in May of 2000.  To this day I cannot supervise construction jobs like I used too.  Because of my heel injury, I have difficulty walking around construction sites with their rough terrain, walking flights of stairs, which are common at the hotels I build, or inspecting slanted roofs.  Somedays I have difficulty getting out of bed and walking at all and must use a cane.  I anticipate or intend to work until I am at least sixty years old.  As a result, since my injury I have been forced to hire substitute supervisors.  One was named Hector Trevino, another Eric Gutierrez, another Luis Alejandro Hernandez, and another Ernesto Robles. I was paying these men about $2,200 to $2,500 dollars per month. Attached is an Employee QuickReport prepared by my accountant reflecting some of their compensation. The cost of a supervisor on an annual basis is approximately $26,400 to $30 thousand dollars.  I anticipate that to some extent or another I will continue to have to hire substitute supervisors at this cost indefinitely.  One of the problems of hiring substitute supervisors is that frankly they do not do as good a job as I can as the owner and the result is frequently increased job costs."

_____
JOSE ESCUDERO, JR.

SWORN  TO  AND  SUBSCRIBED  before  me  on  the  *19th* day  of
*October* , 2001.

_____
Notary Public, State of Texas
*Leslie C. Delgado*
Notary's printed name:
SEAL:
My commission expires: *Dec. 10, 2002*

LESLIE C. DELGADO
MY COMMISSION EXPIRES
December 10, 2002

# Paisano Construction, Co.
## Employee QuickReport
### January 1999 through December 2000

10/19/01

| Type | Date | Num | Memo | Account | Amount |
|------|------|-----|------|---------|--------|
| **Alejandro Hernandez** | | | | | |
| Check | 09/24/1999 | 1536 | Days Inn Harlingen | IBC-Business Checking | 325.90 |
| Check | 10/01/1999 | 1570 | Days Inn Supervision | IBC-Business Checking | 325.95 |
| Check | 10/08/1999 | 1646 | Days Inn Supervision | IBC-Business Checking | 325.95 |
| Check | 10/15/1999 | 1715 | DAYS INN SUPERVISION | IBC-Business Checking | 325.95 |
| Check | 10/22/1999 | 1772 | Days Inn supervision | IBC-Business Checking | 325.90 |
| Check | 10/29/1999 | 1793 | Days Inn Harlingen Supervision | IBC-Business Checking | 325.95 |
| Check | 11/05/1999 | 1852 | Days Inn Supervision | IBC-Business Checking | 325.95 |
| Check | 11/12/1999 | 1821 | supervision Days Inn | First Nat'l Bk(#601519) | 325.95 |
| Check | 11/22/1999 | 1828 | sup.Days Inn Harlingen | First Nat'l Bk(#601519) | 325.96 |
| Check | 11/26/1999 | 1867 | Days Inn Supervision | IBC-Business Checking | 325.95 |
| Check | 12/03/1999 | 1963 | Days Inn supervision | IBC-Business Checking | 651.90 |
| Check | 12/17/1999 | 1984 | Days Inn Supervision | IBC-Business Checking | 30.00 |
| Check | 12/17/1999 | 1993 | Days Inn supervision | First Nat'l Bk(#601519) | 325.95 |
| Check | 12/23/1999 | 1895 | Days Inn Supervision | First Nat'l Bk(#601519) | 651.90 |
| Check | 01/07/2000 | 1997 | Days Inn supervision | First Nat'l Bk(#601519) | 651.90 |
| Check | 01/21/2000 | 2069 | Days Inn Supervision 2 weeks | First Nat'l Bk(#601519) | 651.90 |
| Check | 02/04/2000 | 2173 | Days Inn | First Nat'l Bk(#601519) | 726.00 |
| Check | 02/17/2000 | 2208 | Days Inn Harlingen Supervision | First Nat'l Bk(#601519) | 651.90 |
| Check | 03/03/2000 | 2288 | Days Inn supervision | First Nat'l Bk(#601519) | 651.90 |
| Check | 03/17/2000 | 2390 | DAYS INN / SUPERVISION | First Nat'l Bk(#601519) | 651.90 |
| Check | 03/31/2000 | 2474 | DAYS INN/LABOR | First Nat'l Bk(#601519) | 651.90 |
| Check | 04/14/2000 | 2541 | Days Inn | First Nat'l Bk(#601519) | 605.00 |
| Check | 04/27/2000 | 2617 | Days Inn | First Nat'l Bk(#601519) | 700.00 |
| Check | 05/15/2000 | 2700 | Days Inn | First Nat'l Bk(#601519) | 650.00 |
| Check | 05/25/2000 | 2745 | Days Inn | First Nat'l Bk(#601519) | 650.00 |
| Check | 06/09/2000 | 2805 | Days Inn Supervision | First Nat'l Bk(#601519) | 650.00 |
| Check | 06/23/2000 | 2878 | Days Inn supervision for 2 wks | First Nat'l Bk(#601519) | 650.00 |
| Check | 07/07/2000 | 2960 | Days Inn Supervision 2 wks | First Nat'l Bk(#601519) | 650.00 |
| Check | 07/21/2000 | 3056 | Days Inn Supervisor | First Nat'l Bk(#601519) | 650.00 |
| Check | 08/04/2000 | 3146 | Days Inn - Supervisor | First Nat'l Bk(#601519) | 650.00 |
| Check | 08/18/2000 | 3252 | Days Inn Supervisor | First Nat'l Bk(#601519) | 650.00 |
| Check | 09/01/2000 | 3332 | Holiday Inn Supervisor | First Nat'l Bk(#601519) | 650.00 |
| Check | 09/15/2000 | 3414 | Holiday Inn Supervisor | First Nat'l Bk(#601519) | 650.00 |
| Check | 09/29/2000 | 3473 | Holiday Inn Supervisor-plus exp | First Nat'l Bk(#601519) | 664.00 |
| Check | 09/29/2000 | 3478 | Holiday Inn clean-up 3 workers | First Nat'l Bk(#601519) | 123.60 |
| Check | 10/13/2000 | 3595 | Holiday Inn Supervisor | First Nat'l Bk(#601519) | 650.00 |
| Check | 12/15/2000 | 3714 | Holiday Inn Supervisor | First Nat'l Bk(#601519) | 800.00 |
| Check | 12/30/2000 | 3841 | Holiday Inn Supervisor | First Nat'l Bk(#601519) | 400.00 |
| | | | | | 19,675.10 |
| Total Alejandro Hernandez | | | | | |
| **TOTAL** | | | | | **19,675.10** |

Page 1

Case 1:00-cv-00193  Document 24  Filed in TXSD on 10/19/2001  Page 291 of 328

## Paisano Construction, Co.
## Vendor QuickReport
### All Transactions

10/19/01

| Type | Date | Num | Memo | Account | Amount |
|------|------|-----|------|---------|--------|
| **Ernesto Robles** | | | | | |
| Check | 11/18/1999 | 1869 | Sport Complex Mission | IBC-Business Checking | -360 00 |
| Check | 11/18/1999 | 1870 | Supervision Sport Complex Mission | IBC-Business Checking | -40.00 |
| Check | 11/23/1999 | 1852 | Sport Complex Mission | First Nat'l Bk(#601519) | -268.15 |
| Check | 11/29/1999 | 1937 | Supervision Sport Complex | IBC-Business Checking | -500.00 |
| Check | 12/02/1999 | 1886 | supervision Sport Complex | IBC-Business Checking | -500.00 |

$1,668.^{15}$

Page 1

CutePDF - www.fastio.com

## Paisano Construction, Co.
## Vendor QuickReport
### All Transactions

10/19/01

| Type | Date | Num | Memo | Clr | Split | Amount |
|------|------|-----|------|-----|-------|--------|
| **Eric Gutierrez** | | | | | | |
| Check | 03/03/2000 | 2273 | Levin Dupiex supervision | X | Payroll Expenses | -2,000.00 |
| Check | 03/17/2000 | 2378 | Field Supervisor | X | Payroll Expenses | -533.33 |
| Check | 03/31/2000 | 2445 | Brownsville supervision | X | Payroll Expenses | -1,347.59 |
| Check | 04/07/2000 | 2509 | reimbursed Expenses | X | Reimbursed Expenses | -232.99 |
| Check | 04/17/2000 | 2574 | Las Arenas Supervisor | X | Payroll Expenses | -1,000.00 |
| Check | 04/26/2000 | 2638 | Reim. Exp./ for gas | X | Reimbursed Expenses | -453.46 |
| Check | 05/05/2000 | 2648 | Payroll April 21 to May 01 | X | Payroll Expenses | -750.00 |
| Check | 05/13/2000 | 2666 | Salary 5/01/00 | X | Payroll Expenses | -750.00 |
| Check | 05/19/2000 | 2722 | Salary 5-16-00 | X | Payroll Expenses | -1,000.00 |
| Check | 05/25/2000 | 2733 | reimbursement expense | X | Payroll Expenses | -437.17 |
| Check | 06/02/2000 | 2768 | Las Arenas Supervisor | X | Payroll Expenses | -1,500.00 |
| Check | 06/09/2000 | 2808 | Las Arenas reimb.exp | X | Reimbursed Expenses | -479.82 |
| Check | 06/16/2000 | 2829 | Las Arenas Supervision | X | Payroll Expenses | -1,000.00 |
| Check | 06/30/2000 | 2915 | Las Arenas Supervision Salary | X | Payroll Expenses | -1,500.00 |
| Check | 07/07/2000 | 2975 | Reim. Exp. | X | Reimbursed Expenses | -245.37 |
| Check | 07/07/2000 | 2976 | Reim. Exp | X | Reimbursed Expenses | -400.00 |
| Check | 07/14/2000 | 3009 | Supervision Las Arenas | X | -SPLIT- | -1,016.49 |
| Check | 07/14/2000 | 3019 | Las Arenas Supervision | X | Payroll Expenses | -500.00 |
| Check | 07/26/2000 | 3114 | Las Arenas Supervisor | X | Payroll Expenses | -1,500.00 |
| Check | 08/04/2000 | 3151 | reim. exp. Las Arenas | X | Reimbursed Expenses | -222.00 |
| Check | 08/10/2000 | 3196 | Las Arenas Supervisor | X | Payroll Expenses | -1,000.00 |
| Check | 08/25/2000 | 3303 | Reim. exp. Las Arenas | X | Reimbursed Expenses | -194.41 |
| Check | 08/31/2000 | 3322 | Las Arenas Supervisor | X | Payroll Expenses | -1,500.00 |
| Check | 09/08/2000 | 3403 | Reim. Expense | X | Reimbursed Expenses | -121.40 |
| Check | 09/15/2000 | 3383 | VOID: Las Arenas Supervisor | X | Payroll Expenses | 0.00 |
| Check | 09/15/2000 | 3420 | Las Arenas Supervisor | X | Payroll Expenses | -200.00 |
| Check | 09/22/2000 | 3440 | VOID: Reim. Expense | X | Reimbursed Expenses | 0.00 |
| Check | 09/29/2000 | 3471 | Las Arenas Supervisor | X | Payroll Expenses | -1,679.31 |
| Check | 10/13/2000 | 3593 | Las Arenas Supervisor | X | Payroll Expenses | -1,000.00 |
| Check | 10/20/2000 | 3622 | VOID: Las Arenas Supervisor | X | Payroll Expenses | 0.00 |
| Check | 11/03/2000 | 16 | Las Arenas Supervisor | X | Payroll Expenses | -1,256.00 |
| Check | 11/09/2000 | 36 | Las Arenas Supervisor | | Payroll Expenses | -533.00 |



## Paisano Construction, Co.
## Employee QuickReport
### All Transactions

10/19/01

| Type | Date | Num | Memo | Account | Clr | Amount |
|------|------|-----|------|---------|-----|--------|
| **Hector Trevino** | | | | | | |
| Check | 07/14/2000 | 3018 | Bahnman-Vargas Supervision | First Nat'l Bk(#601519) | X | 569.97 |
| Check | 07/26/2000 | 3115 | Bahnman/Vargas Supervisor | First Nat'l Bk(#601519) | X | 950.00 |
| Check | 08/10/2000 | 3197 | Bahnman & Vargas Supervisor | First Nat'l Bk(#601519) | X | 950.00 |
| Check | 08/25/2000 | 3299 | Reim. expense for Bahnman | First Nat'l Bk(#601519) | X | 27.06 |
| Check | 08/25/2000 | 3304 | Bahnman/Vargas Supervisor | First Nat'l Bk(#601519) | X | 950.00 |
| Check | 09/15/2000 | 3385 | Bahnman/Vargas Supervisor | First Nat'l Bk(#601519) | X | 950.00 |
| Check | 09/22/2000 | 3439 | Bahnman/Vargas Supervisor | First Nat'l Bk(#601519) | X | 950.00 |
| Check | 10/06/2000 | 3546 | Vargas/Bahnman Supervisor | First Nat'l Bk(#601519) | X | 950.00 |
| Check | 10/20/2000 | 3627 | Bahnman/Vargas Supervisor | First Nat'l Bk(#601519) | X | 950.00 |
| Check | 10/27/2000 | 3666 | Reimb. Exp. for Job Materials Vargas | First Nat'l Bk(#601519) | X | 152.90 |
| Check | 11/03/2000 | 20 | Vargas Supervisor | First Nat'l Bk(#80005071) | X | 950.00 |
| Check | 11/22/2000 | 537 | Vargas/Bahnman Supervisor | First Nat'l Bk(#80005071) | X | 950.00 |
| Check | 11/22/2000 | 538 | Reimbursement Expense | First Nat'l Bk(#80005071) | X | 297.59 |
| Check | 12/16/2000 | 3748 | Las Arenas Supervisor | First Nat'l Bk(#601519) | X | 1,050.00 |
| Check | 12/29/2000 | 3828 | Las Arenas Supervisor Salary | First Nat'l Bk(#601519) | X | 950.00 |
| Check | 12/29/2000 | 3829 | Reimb. Expense | First Nat'l Bk(#601519) | X | 514.57 |
| Check | 01/13/2001 | 545 | Bahnman Supervision | First Nat'l Bk(#80005071) | X | 950.00 |
| Check | 04/05/2001 | 1015 | Arenas | IBC-Ck #55548903-01 | X | 1,900.00 |
| Check | 04/10/2001 | 1026 | | IBC-Ck #55548903-01 | X | 950.00 |
| Check | 07/27/2001 | 1155 | Days Inn Supervision | IBC-Ck #55548903-01 | X | 200.00 |
| Check | 08/31/2001 | 1225 | Pmt On Previous Balance | IBC-Ck #55548903-01 | | 300.00 |
| **Total Hector Trevino** | | | | | | **16,412.09** |
| **TOTAL** | | | | | | **16,412.09** |

Page 1

Page 1

1                IN THE UNITED STATES DISTRICT COURT

             FOR THE SOUTHERN DISTRICT OF TEXAS

2                      BROWNSVILLE DIVISION

3    JOSE ESCUDERO, JR.              )

          Plaintiff                  )

4                                    )

     VS.                             )   CIVIL ACTION NO. B-00-193

5                                    )

     BAUER CORPORATION D/B/A  )

6    BAUER LADDER CORPORATION )

          Defendant                  )

7    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

8        VIDEO ORAL DEPOSITION OF DR. MAYO GALINDO, JR.

9                      JULY 26, 2001

10                    VOLUME 1 OF 1

11   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

12                ORAL AND VIDEOTAPED DEPOSITION OF DR.

13   MAYO GALINDO, JR., produced as a witness at the

14   instance of the Defendant, and duly sworn, was taken

15   in the above-styled and numbered cause on the 26th of

16   July, 2001, from 2:20 p.m. to 2:56 p.m., before DANDY

17   ELLIS, CSR in and for the State of Texas, reported by

18   machine shorthand, at the offices of Mayo Galindo,

19   Jr., M.D., 9150 Huebner, Suite 280, San Antonio,

20   Texas, pursuant to the Rules of Civil Procedure and

21   the provisions stated on the record or attached

22   hereto.

23

24

25           *   *   *   *   *   *   *   *   *   *   *

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 295 of 328

---

Page 2

```
 1              A P P E A R A N C E S
 2
     FOR THE PLAINTIFF,
 3
       ATTORNEY AT LAW
 4     MR  BARRY BENTON
       284 Ebony Ave
 5     Brownsville, Texas  78520,
 6
     FOR THE DEFENDANT,
 7
       GENDRY & SPRAGUE
 8     MR  THOMAS GENDRY
       645 Lockhill Selma
 9     San Antonio, Texas  78216,
10
11
     VIDEOGRAPHER,
12     TERRY LINDEMANN,
13
14
15
16
17
18           * * * * * * * * * * *
19
20
21
22
23
24
25
```

---

Page 3

```
 1              INDEX
                         PAGE
 2
     Appearances              .        2
 3
     DR  MAYO GALINDO, JR
 4
       Examination by Mr  Gendry       4
 5     Examination by Mr  Benton   .   18
       Further Examination by Mr  Gendry.  26
 6     Further Examination by Mr  Benton   27
 7   Changes and Signature            29
 8   Reporter's Certificate           30
 9          EXHIBIT INDEX
10   NO     DESCRIPTION          PAGE
11
       1    Curriculum Vitae        28
12   2     Report                  28
13
14           * * * * * * * * * * *
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1         VIDEOGRAPHER:  The date is July 26th.
 2   2001.  The time is 2:21 p.m.  This is Tape 1 of the
 3   deposition of Dr. Mayo Galindo. Jr.. M.D.  It's taken
 4   in the case of Jose Escudero, Jr. versus Bauer
 5   Corporation.  The cause number is B-00-193.  This is
 6   being taken in the United States -- United States
 7   District Court for the Southern Division of Texas
 8   Brownsville Texas Division.
 9         We're located at Dr. Galindo's office
10   at 9150 Huebner, Suite 200 in San Antonio, Texas.
11   The reporter's name is Dandy Ellis.  The
12   videographer's name is Terry Lindemann.
13         Would counsel introduce themselves.
14         MR. BENTON:  I'm Barry Benton,
15   representing Jose Escudero, the plaintiff.
16         MR. GENDRY:  Tom Gendry representing
17   Bauer Ladder Corporation, the defendant.
18         VIDEOGRAPHER:  Would you please swear
19   the witness.
20            DR. MAYO GALINDO, JR.,
21   having been first affirmed, testified as follows:
22         E X A M I N A T I O N
23   BY MR. GENDRY:
24      Q.  Would you please state your name.
25      A.  Mayo J. Galindo, Jr.
```

---

Page 5

```
 1      Q.  And do you have a business address?
 2      A.  Yes, sir.
 3      Q.  And what is it, sir?
 4      A.  9150 Huebner, Suite 200, San Antonio, Texas
 5   78240.
 6      Q.  Let me identify myself as Tom Gendry
 7   representing the defendant in this case.  You and I
 8   previously have met and have worked on one or two
 9   cases together; is that right, Doctor?
10      A.  Yes, sir. that's correct.
11      Q.  Okay.  Would you please explain to the jury
12   your profession.
13      A.  I'm an orthopaedic surgeon with a specialty
14   in foot and ankle surgery.
15      Q.  All right.  Let me get a little bit of
16   background information from you. Dr. Galindo.  Born
17   and raised where?  Here in San Antonio?
18      A.  San Antonio. yes, sir.
19      Q.  Okay.  Graduated from high school here?
20      A.  Yes, sir.
21      Q.  Briefly where did you go to college?
22      A.  I went to the University of Dallas and
23   graduated in 1976.  From there I attended medical
24   school at Baylor College of Medicine and graduated in
25   January 1980.  Did a six-month infectious disease
```

---

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 296 of 328

**DR. MAYO GALINDO VOL. 1 OF 1**                    **JULY 26, 2001**

3 (Pages 6 to 9)

**Page 6**

1  fellowship following that, a research fellowship.
2  And then from 1980 through '85 did an orthopaedic
3  residency at Baylor College of Medicine. Following
4  that a year fellowship in Los Angeles in foot and
5  ankle surgery from 1985 to 1986. I've been in
6  private practice in San Antonio since 1986.
7      Q. All right. Can you briefly explain to the
8  jury what orthopaedic surgery is?
9      A. It's musculoskeletal surgery or surgery and
10  care of the bones and joints and muscles.
11      Q. And you stated that you attended the
12  orthopaedic surgeon residency; is that correct, sir?
13      A. Yes, sir.
14      Q. And are you board certified in orthopaedic
15  surgery?
16      A. Yes, sir.
17      Q. And you mentioned also you had a fellowship
18  in foot and ankle surgery.
19      A. That's correct.
20      Q. Do you obtain some sort of certification for
21  that?
22      A. There's no extra certification, but I have a
23  certificate documenting that I did that extra year of
24  training.
25      Q. All right. And briefly, professional

**Page 7**

1  organizations, do you belong to the standard
2  organizations for orthopaedic surgeons?
3      A. Yes, sir. The American Academy of
4  Orthopaedic Surgeons, Bexar County Medical Society,
5  Texas Medical Association, Western Orthopaedic
6  Association, just to name a few.
7      Q. All right. And you practice private
8  practice here in San Antonio; is that correct?
9      A. Yes, sir.
10      Q. Hospital privileges are where?
11      A. The Methodist, main Methodist Hospital,
12  Methodist Specialty and Transplant, St. Luke's
13  Baptist and all the St. Luke's -- or all the Baptist
14  system in San Antonio, Santa Rosa Northwest Hospital,
15  the University Hospital or county hospital, whatever
16  it's called now. I think I go to RIOSA, a rehab
17  hospital. Those are the main ones. Methodist
18  Ambulatory Surgery Hospital is where I do most of my
19  work.
20      Q. Do you at all get involved with any of the
21  clinics or hospitals down in the lower Rio Grande
22  Valley? This case is pending in Brownsville.
23      A. No, sir, I have no involvement.
24      Q. And you are licensed to practice medicine;
25  is that correct?

**Page 8**

1      A. In Texas, yes, sir.
2      Q. All right. Do you have a curriculum vitae
3  that we could get either now or later and attach it
4  as an exhibit to your deposition?
5      A. Yes, sir, I do. We'll provide that later.
6      Q. All right. Could you briefly describe your
7  medical practice here in San Antonio.
8      A. My practice here is limited to orthopaedic
9  problems below the knee. Occasionally that comes
10  above the knee when amputations are required.
11      Q. Okay. You have testified in depositions, as
12  you're doing today, before?
13      A. Yes, sir.
14      Q. And how about at trial, have you testified
15  at trial?
16      A. Yes, sir.
17      Q. And you have given opinions concerning
18  surgical treatment and peer review and independent
19  medical examinations of various patients or
20  individuals suffering from orthopaedic problems?
21      A. Yes, I have.
22      Q. All right. Let me ask you Doctor, did you
23  have occasion to do a medical examination on Mr. Jose
24  Escudero?
25      A. Yes, I did.

**Page 9**

1      Q. All right. And you prepared a report; is
2  that correct, sir?
3      A. Yes.
4      Q. Feel free to refer to the report. I'm going
5  to go into that with you. What personal history did
6  you find out about Mr. Escudero?
7      A. In talking with Mr. Escudero he relayed, as
8  I recorded in his note -- or in the note for the
9  office visit of June 6th, 2001, that he was a
10  self-employed construction company owner, and that on
11  the date of his injury, about May 10th, 1999, he was
12  fixing a light fixture in an apartment. He was on a
13  stepladder about six feet tall and he said that the
14  legs or the base of it were made out of plastic. He
15  felt that these split and he -- as he fell, the
16  ladder collapsed a distance of about five feet.
17          He apparently sustained a left heel
18  fracture at the time. He relayed that he had what is
19  called a closed reduction and pinning, which means
20  that his fracture was treated without opening the
21  skin, but a pin was used to bring the fragments back
22  together and to hold them together.
23          About two months after his initial
24  injury he had the pins removed. His fracture
25  ultimately healed. But because of continued pain he

**PHONE #(210)377-3027**          **ESQUIRE DEPOSITION SERVICES**          **FAX #(210)344-6016**
**7800 IH-10 WEST, SUITE 100**        **SAN ANTONIO, TEXAS 78230**          **1-800-969-3027**

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 297 of 328

Page 10

1  had a CT scan in December 1999. And he was followed
2  in May 2000 by Dr. John Bishop in Houston, apparently
3  having surgery at that time. Based on the notes
4  provided, he had what's called a lateral
5  decompression where the side of the heel bone. which
6  is usually wider when it's broken, was narrowed and
7  the tendons around it and the small nerve called the
8  sural nerve were decompressed. That was done by
9  Dr. Bishop.
10     Q. That was the second surgery?
11     A. Yes, sir.
12     Q. Is it your understanding that the purpose of
13  the second surgery, I think what you're saying was to
14  decompress the pressure on the sural nerve, did you
15  say?
16     A. Sural nerve and peroneal tendons. yes, sir.
17     Q. Okay.
18     A. Yes, sir.
19     Q. Did you review any studies concerning the
20  outcome of the second surgery?
21     A. Yes, sir, I did. He had some notes that
22  came with him, but I also had some x-rays to review
23  as well. And I obtained x-rays on that office visit.
24     Q  What did you find concerning the x-rays
25  following the second surgery. not the x-rays you

Page 11

1  obtained but the ones with the file?
2     A. Well, the ones in the file were from 2000,
3  but they did not have a date or a label on them, so I
4  did not consider them as being actually legal
5  documents.
6     Q. All right. So then you obtained your own
7  x-rays; is that correct?
8     A. Yes, sir, I did.
9     Q. Did you do that here in the office?
10     A. Yes, sir.
11     Q. And what was your reading of the x-rays that
12  you conducted?
13     A. That his fracture had healed, that he had
14  moderate subtalar arthritis. The subtalar joint is
15  the joint below the ankle joint. It's the one that
16  is injured with the heel fracture. And depending on
17  the severity of the injury and the length of time,
18  arthritis is possible. And he demonstrated that on
19  his x-ray.
20     Q. All right. Did you examine him clinically?
21     A. Yes, sir, I did.
22     Q. Could you explain how you did that and what
23  your findings were.
24     A. I checked his pulses, or his circulation,
25  and it was fine. His motor examination or muscle

Page 12

1  examination did not show any gross deficits, but he
2  did have atrophy of his calf muscle. His ankle range
3  of motion was not completely normal. It measured
4  8 degrees of upward motion and 30 degrees of downward
5  motion.
6     Q. How do you compare that to normal, the
7  motion?
8     A. It was less than his normal side. Accepted
9  range of normal is around 20 degrees upward motion to
10  40 degrees or more of downward motion. And he had
11  no -- he had very little motion in a side to side
12  plane. I recorded that as essentially no motion.
13  But his subtalar joint was in neutral to five degrees
14  of valgus, or outward turning of the foot, which is
15  considered a position of function.
16     Q. When you say considered as a position of
17  function, what do you mean by that?
18     A. That means if he ultimately had to have a
19  fusion of that joint to address his pain, that's the
20  position you would like for it to be in.
21     Q. I see. Okay. Because that was the position
22  of comfort; is that correct?
23     A. Of comfort and the best position for proper
24  functioning of that joint.
25     Q. Did he experience any sort of discomfort or

Page 13

1  pain upon your examination?
2     A. Yes, sir, he did. When I attempted to turn
3  his foot inward, there was a lot of resistance and he
4  did have pain with that maneuver. He was also tender
5  in an area called the sinus tarsi, which is his
6  subtalar joint, the one that we're concerned with.
7     Q. All right. What do you attribute the
8  tenderness to?
9     A. I thought that was from his arthritis and
10  his injury.
11     Q. All right. And the decreased range of
12  motion that you found, what is that attributed to?
13     A. That's all consistent with his injury.
14     Q. Okay. Your assessment of the patient
15  consisted of what?
16     A. It was my opinion and impression that he had
17  had a heel fracture, that it had in fact healed, but
18  that he had arthritis in his subtalar joint as a
19  result of his injury. The other things associated,
20  like loss of motion and pain, were all part of his
21  injury and part of the residual from his injury.
22     Q. And do you attribute your findings and your
23  diagnosis and your assessment to the fall from the
24  ladder?
25     A. Yes, sir, by history that's what he tells

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 298 of 328

5 (Pages 14 to 17)

Page 14

1  me.
2    Q.  Okay.  What prognosis concerning
3  Mr. Escudero did you find?
4    A.  I thought that, based on his pain and what I
5  saw in the x-rays, that at some point in time in the
6  future he will probably require future intervention.
7  That could be in the form of nonoperative treatment
8  consisting of antiinflammatory medications or
9  bracing, such as an AFO, which is abbreviation for
10 ankle foot orthosis.  That's a brace that goes from
11 the toes to above the ankle, in essence like wearing
12 a cast except the ability to move it from shoe to
13 shoe.
14           He might ultimately require a fusion of
15 his subtalar joint.  That would address the arthritic
16 pain that he was experiencing from the joint.
17   Q.  Did you learn from him one way or the other
18 if he was on any kind of medication at the time that
19 he visited you?
20   A.  He has a questionnaire here and he lists no
21 medications that he is currently taking.
22   Q.  All right.  Did you inquire of him about
23 that?
24   A.  I don't recall if I specifically did or
25 not.

Page 15

1    Q.  All right.  You did not see him for the
2  purpose of administering any treatment or prescribing
3  any medication; is that correct?
4    A.  That's correct.
5    Q.  All right.  At this point in time, or the
6  point in time that you saw Mr. Escudero, do you have
7  an opinion as to the approach that was appropriate
8  for him considering his condition when you examined
9  him?
10   A.  Can you be a little more specific with the
11 question, sir.
12   Q.  You mentioned prognosis or the future --
13   A.  Yes, sir.
14   Q.  -- concerning Mr. Escudero may be
15 nonoperative or it may be operative.
16   A.  Yes, sir.
17   Q.  At this point in time, or the time that you
18 saw him, do you have an opinion as to the approach
19 that would be appropriate for him?
20   A.  Initially a nonoperative approach would be
21 appropriate.  And if that failed, then an operative
22 approach.
23   Q.  All right.  Is there any way for you to
24 predict with any certainty, medical certainty, as to
25 the possibility of surgery in the future?

Page 16

1    A.  That's really a hard question to answer.  I
2  think the best analogy that I can offer is if you
3  have a worn out or wearing tire, the harder you drive
4  it, the faster it's likely to wear out.  So a lot may
5  depend on how hard he pushes himself.
6    Q.  All right.  Did Mr. Escudero explain to you
7  what his job duties were?
8    A.  He indicated to me that he was self-employed
9  as a -- in construction, that he owned his own
10 construction company.
11   Q.  In your field and in your practice, has it
12 been part of your practice to render opinions
13 concerning the function or employability of a person?
14   A.  Yes, sir.
15   Q.  All right.  Persons with injuries like
16 Mr. Escudero suffered?
17   A.  Yes, sir.
18   Q.  Considering what Mr. Escudero told you about
19 his employment, do you have an opinion one way or the
20 other whether or not he would or should be able to
21 perform his job duties?
22   A.  He indicated to me that he was working.
23   Q.  Okay.  Would that be consistent with your
24 findings on examination of Mr. Escudero and the
25 records that you reviewed and the film -- the x-rays

Page 17

1  that you studied?
2    A.  Yes, sir, it would be consistent.
3    Q.  All right.  In your report you addressed the
4  cost of antiinflammatory medications in the event
5  that Mr. Escudero uses them.  And what is the cost
6  for antiinflammatory medications?
7    A.  Depending on the medication, somewhere
8  between one and three dollars per day.
9    Q.  Okay.  You also mentioned the possibility of
10 the brace, and I think you mentioned in your report
11 if a brace is needed, it would cost between 600 to
12 $800 with a life expectancy of approximately two
13 years, correct?
14   A.  That's a direct quotation, yes, sir.
15   Q.  All right.  And when you saw Mr. Escudero,
16 in your opinion was he in need of an ankle brace?
17   A.  At the time he did not indicate that he was
18 requiring more aggressive intervention.
19           MR. GENDRY:  I think that's all I have,
20 Doctor.  Thank you very much.
21           THE WITNESS:  Thank you.
22           MR. BENTON:  Can we go off the record
23 for a moment. please.
24           VIDEOGRAPHER:  Off the record at 2:38.
25           (Off the record.)

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 299 of 328

Page 18

1      MR. BENTON:  What we're going to
2  stipulate to is that we're going to first agree that
3  Dr. Galindo's deposition -- report. rather, can be
4  attached to his deposition.  And we stipulate that
5  it's a business record.
6      MR. GENDRY.  So stipulated.
7      VIDEOGRAPHER:  Back on the record at
8  2:42.
9          EXAMINATION
10  BY MR. BENTON:
11    Q.  Dr. Galindo, my name is Barry Benton.  This
12  is the first time we've had a chance to meet; is that
13  right?
14    A.  Yes, sir.
15    Q.  The fact that this injury occurred in a
16  weight-bearing joint has significance, doesn't it?
17    A.  Yes, sir.
18    Q.  Can you explain what that means practically
19  to a person such as Jose Escudero who walks around on
20  construction sites?
21    A.  It means that for this particular joint,
22  uneven ground stresses that joint.  Uneven ground may
23  force his foot into an inverted or inward turned
24  position, which in the office caused him some pain.
25  So in -- on uneven ground. he would probably have

Page 19

1  pain.
2    Q.  Would walking steps be painful?
3    A.  Possibly so.
4    Q.  Walking on roofs that might be slanted?
5    A.  Yes, sir, that would be.
6    Q.  And then once he experiences pain, is it
7  probable that he'll develop inflammation?
8    A.  That's difficult to say.
9    Q.  Well, what's his likelihood?  Is it probable
10  or not really that if he walks on it and works on it,
11  you know, and tries to do his best, that it's going
12  to swell up and hurt him?
13    A.  I think it will hurt him.  Whether it will
14  swell up or not, which is what I think we described
15  as inflammation, I can't say with certainty.
16    Q.  Okay.  And just as a housekeeping thing,
17  everything you've opined so far has been based on
18  reasonable medical probability, right?
19    A.  Yes, sir.
20    Q.  And you'll do so through the rest of this
21  deposition for us, right?
22    A.  Yes, sir.
23    Q.  Okay.  The significance that you found
24  arthritis in his ankle when you took the x-rays or --
25  Let me rephrase that.

Page 20

1      What is the significance that you found
2  arthritis already at the site of that fracture?
3    A.  Okay.  Well, I think you mentioned ankle.
4  It's actually in his subtalar joint.  The
5  significance of his arthritis is that, number one, it
6  is a known complication of his injury.  Number two,
7  that arthritis is usually what drives people to
8  treatment.  And number three, the end point of the
9  treatment is when he ultimately has a subtalar
10  fusion.
11    Q.  Is -- In reasonable probability will his
12  arthritis get progressively worse that?
13    A.  Is likely too, yes.
14    Q.  And as it gets worse, is he likely to
15  experience more pain?
16    A.  Yes, sir.
17    Q.  When I first started learning about this
18  case I didn't really realize there was a joint in the
19  heel.  I guess I think of the joint as being in the
20  ankle.  How -- I know you don't really have anything
21  to use to describe vis- -- or show visually, but how
22  does the joint move in the heel?
23    A.  In the ankle, the joint moves up and down,
24  okay.  If you will, in the heel, the joint tends to
25  move more on a side to side plane, like this.

Page 21

1    Q.  And if it's fused, that's what he's going to
2  lose?
3    A.  Yes, sir, he will lose a lot of that.
4  There's still some side to side motion through
5  adjacent joints that aren't fused and some through
6  the ankle.  But most of the side to side he would
7  lose.  He's already lost it.
8    Q.  And how about when he's walking, will you
9  notice a change in his gait if it's fused?
10    A.  Not necessarily so.  Maybe barefooted to an
11  un- -- to a trained eye, you might notice it.  But in
12  shoe wear, in pants, even in shorts, a person might
13  not notice it with a successful fusion.
14    Q.  Assume that he -- he likes to play sports;
15  soccer, baseball, so on.  How much is this going to
16  limit his ability to do those kind of things?
17    A.  Soccer and baseball both involve cutting,
18  running and jumping.  He is not likely to be able to
19  play those sports in the condition that he is in now.
20    Q.  And how about if he has it fused?
21    A.  If he has a painless fusion, he might be
22  able to do some aspects of those sports, but he
23  probably will not perform at a level that he had
24  previously.
25    Q.  What are the chances that even if he has it

Page 22

1  fused, he's still going to have some pain?
2      A.  Probably less than 15 percent.
3      Q.  So there's a pretty good chance that if he
4  has it fused, the pain will go away?
5      A.  Yes, sir, very good chance.
6      Q.  And I think you said in your report that
7  your estimate of the cost of such a surgery, which is
8  technically called, what, an arthrodesis, --
9      A.  Yes, sir, subtalar arthrodesis.
10      Q.  -- is about $15,000.
11      A.  Yes, sir.
12      Q.  And that's fully impacted with radiologist
13  bills, the anesthesiologist bills, the hospital
14  bills, the surgeon's bills, maybe a side surgeon's
15  bills, everything?
16      A.  That's a rough estimate.  And yes, sir,
17  that's -- and assumes no complications.
18      Q.  Now, I want you to assume a fact here,
19  because I expect testimony to this effect, that Jose
20  Escudero, at times, especially at the very beginning
21  of his ownership of a construction company, used to
22  do some of the work himself; the framing, the finish
23  work, the carpentry finish work and so on.  Will --
24  Will this injury affect his ability to do those sort
25  of skilled labor jobs?

Page 23

1      A.  As -- As his condition exists now, that
2  would affect him, yes, sir.
3      Q.  I want you to assume that Mr. Escudero tells
4  me that he has good days and bad days about his pain
5  in his heel.  Is that to be expected?
6      A.  Yes, sir.
7      Q.  And he says on his real bad days he has
8  really difficulty walking.  Is that to be expected?
9      A.  That's consistent.
10      Q.  So there might be some days where even if
11  his job is merely to go around the construction site
12  and make sure the subcontractors are doing their job
13  right, that he really can't even do that?
14      A.  That's possible.
15      Q.  Would you -- Would you think that that is on
16  some days -- Would it be probable that some days he
17  couldn't do it?
18      A.  I -- I think I would use the word possible,
19  sir.
20      Q.  So you can't really envision then that there
21  would be days when he really couldn't walk?
22      A.  I can envision that he might have days like
23  that.  But if you ask me probable or possible, I've
24  got to go with what I think is most likely, and
25  that's possible.  But yes, sir, that would be

Page 24

1  consistent with his injury.
2      Q.  And we -- and the decision whether to go to
3  work or not based on the level of pain, is that
4  something you would tell your patients that they just
5  need to make a personal call on?
6      A.  I think so.  I think as a self-employed
7  person myself, that the decision not to go to work
8  better be a pretty good decision if I'm not going to
9  show up, because the bills keep coming in even when
10  you don't work.
11      Q.  You've had a chance to review the history of
12  the treatment of Mr. Escudero in this case, right?
13      A.  Yes, sir.
14      Q.  Did you feel like any of the services that
15  were rendered to him were just like unnecessary?
16      A.  Not at all.
17      Q.  I've heard that heel fractures are
18  problematic, meaning that they tend even with proper
19  treatment to be a problem as far as pain and function
20  is concerned.  Is that your experience?
21          THE WITNESS:  Can you read that
22  question back to me, please.
23          (Read back.)
24      A.  They can be, yes, sir.
25      Q.  (BY MR. BENTON) I guess to put it as plainly

Page 25

1  as I can, when people come to you with heel
2  fractures, do they tend to have pain after they've
3  been put back in place?
4      A.  Many people, with the best of care, with
5  anatomic reduction and fixation of their fractures do
6  have some residual pain.
7      Q.  This -- This fracture was displaced; is that
8  right?
9      A.  Yes, sir.
10      Q.  Can you explain to the jury what that means,
11  first generally, and then specifically as to
12  Mr. Escudero.
13      A.  It means moved out of place.  And
14  specifically to this fracture it means some parts of
15  his heel bone got smashed into a position that they
16  shouldn't be in.
17      Q.  Do you have a recollection of what his heel
18  looked like on the, say the first x-rays that you
19  saw?  How many pieces were involved in this fracture?
20      A.  I don't recall exactly how many pieces there
21  were, but it was significant.  His heel was shorter,
22  wider.  The posterior facet or one of the joints on
23  the back of the heel was depressed.  All of that is a
24  consistent finding with the heel fracture.
25      Q.  Is it fair to say that Mr. Escudero's

8 (Pages 26 to 29)

Page 26

1   problem with his heel is permanent?
2       A.  Yes, sir.
3       Q.  Is it fair to say that it's chronic?
4       A.  Yes. sir.
5       Q.  I'll pass the witness.
6               MR. GENDRY:  Okay.
7               FURTHER EXAMINATION
8   BY MR. GENDRY:
9       Q.  When you interviewed -- took the history
10  from Mr. Escudero, Dr. Galindo, did he describe to
11  you that on some days he could not walk?
12      A.  No, he did not say that.
13      Q.  Did he describe to you instances when he
14  could not do his job as a construction company owner?
15      A.  No, sir, he did not describe that.
16      Q.  Okay.  As I understand it, he did describe
17  to you some intermittent pain; is that correct?
18      A.  Yes, sir.
19      Q.  And that's what you would expect with
20  somebody with an arthritic joint?
21      A.  Yes, sir.
22              MR. GENDRY:  Pass the witness.
23              Thank you, sir.
24
25

Page 27

1               FURTHER EXAMINATION
2   BY MR. BENTON:
3       Q.  In your practice, Doctor, do you find
4   that -- yourself evaluating the candidness of your
5   different patients?
6       A.  Can you rephrase the question.
7       Q.  Sure.  Do you find in your practice that
8   some patients seem to exaggerate their problems
9   where -- and overstate them where others do not?
10      A.  Yes, sir.
11      Q.  Okay.  How did Jose Escudero come across to
12  you?  Did he come across sincere and candid with you?
13      A.  That was my impression.
14      Q.  And I see on your report that there's one
15  little handwritten interlineation here that says he
16  finds -- this is the first paragraph.
17      A.  Yes, sir.
18      Q.  Is that your handwriting?
19      A.  That's my handwriting
20      Q.  And is that word cane?
21      A.  That's correct.
22      Q.  So he came in with a cane when he came in to
23  visit you?
24      A.  I don't recall that he came in with a cane.
25  I made the statement that he finds that on some

Page 28

1   mornings he has to use a cane to go to the shower.
2   What I'm describing there is morning pain that people
3   with an arthritic joint often describe.
4               MR. BENTON:  I'll pass the witness.
5               MR. GENDRY:  Nothing further.
6               VIDEOGRAPHER:  Off the record at 2:56.
7   End of Tape !.
8               (Exhibits 1 and 2 marked.)
9               (Deposition concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 29

1               CHANGES & SIGNATURE PAGE
2
3   RE Escudero  vs  Bauer Corporation
4   PAGE     LINE   CHANGE   REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
    I, DR MAYO GALINDO, JR , have read the foregoing
12  deposition and hereby affix my signature that same is
    true and correct, except as noted above
13
14  _____
    DR MAYO GALINDO, JR
15  THE STATE OF TEXAS )
16  COUNTY OF BEXAR )
17  Before me, _____, on this day
    personally appeared DR MAYO GALINDO, JR , known to
18  me (or proved to me under oath or through
    _____) (description or identity card or
19  other document) to be the person whose name is
    subscribed to the foregoing instrument and
20  acknowledged to me that they executed the same for
    the purposes and consideration therein expressed
21  Given under my hand and seal of office this
    _____ day of _____, 2001
22
23  _____
    Notary Public in and for the
24  State of Texas
    * * * * * * * * * *
25

Page 30

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
2                    BROWNSVILLE DIVISION
3   JOSE ESCUDERO, JR       )
        Plaintiff           )
4                           )
        VS                  ) CIVIL ACTION NO  B-00-193
5                           )
    BAUER CORPORATION D/B/A  )
6   BAUER LADDER CORPORATION )
        Defendant           )
7
                 REPORTER'S CERTIFICATION
8            DEPOSITION OF DR  MAYO GALINDO, JR
                      JULY 26, 2001
9
                 I, DANDY ELLIS, a Certified
10
11  Shorthand Reporter in and for the State of Texas, do
12  hereby certify that the foregoing deposition is a
13  full, true and correct transcript,
14          That the foregoing deposition of
15  DR  MAYO GALINDO, JR , the Witness, hereinbefore
16  named was at the time named, taken by me in
17  stenograph on JULY 26, 2001, the said Witness having
18  been by me first duly cautioned and sworn to tell the
19  truth, the whole truth, and nothing but the truth,
20  and the same were thereafter reduced to typewriting
21  by me or under my direction   The charge for the
22  completed deposition is $_____ due from
23  Defendant,
24      ( x ) That, by agreement of counsel, the
25  deposition officer is instructed to release the
```

# *CURRICULUM VITAE*

| | |
|---|---|
| *Name:* | Mayo J. Galindo, Jr., M.D. |
| *Office Address:* | 9150 Huebner Road, Suite 200, San Antonio, TX  78240 |
| *Business Telephone:* | (210) 561-7060 |
| *Home Address:* | 3419 Hunters Walk, San Antonio, Texas 78230 |
| *Home Telephone:* | (210) 493-6727 |
| *Date of Birth:* | December 8, 1954 <br> San Antonio, Texas |
| *Social Security Number:* | 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 |
| *Citizenship:* | U.S.A. |
| *Practical Experience:* | South Texas Orthopaedic Foot & Ankle Associates, P.A. <br> 06/1986 - Present |
| *Medical Education:* | Orthopaedic Surgery of the Foot and Ankle Fellowship <br> F.W. Wagner, M.D., Phillip K. Kwing, M.D. and J.A. Realyvasquez, M.D. <br> The Wagner Institute, Los Angeles, California <br> From 07/1985 to 07/1986 |
| | Orthopaedic Surgery <br> Baylor College of Medicine <br> Houston, Texas <br> From 07/1981 to 06/1985 |
| | Orthopaedic Surgery <br> Baylor College of Medicine <br> Houston, Texas <br> From 06/1980 to 06/1981 |
| *Board Certification:* | American Board of Orthopaedic Surgery |
| *Hospital Affiliation:* | Methodist Ambulatory Surgery Hospital <br> 9150 Huebner Road, Suite 100 <br> San Antonio, TX  78240 <br> Active Status     02/10/93- Present |



DEPOSITION
EXHIBIT 7/
Galindo

CVisPDF - www.fastio.com

| | |
|---|---|
| *Hospital Affiliation:* | Southwest Texas Methodist Hospital |
| *(Continued)* | 7700 Floyd Curl Drive |
| | San Antonio, TX 78229 |
| | Active Status       05/28/86 - Present |
| | |
| | St. Lukes Baptist Hospital |
| | 7930 Floyd Curl Drive |
| | San Antonio, TX  78229 |
| | Active Status       05/27/86 - Present |
| | |
| | Methodist Specialty and Transplant Hospital |
| | 8026 Floyd Curl Drive |
| | San Antonio, TX  78229 |
| | Active Status       07/04/86 - Present |
| | |
| | Christus Santa Rosa Northwest Hospital |
| | 2827 Babcock Road |
| | San Antonio, TX  78229 |
| | Active Status       01/01/86 - Present |
| | |
| *Memberships:* | Bexar County Medical Society |
| | Medical Legal Liaison Committee |
| | Texas Medical Association |
| | Texas Orthopaedic Association |
| | Western Orthopaedic Association |
| | Fellow, American Academy of Orthopaedic Surgeons |
| | American Orthopaedic Foot and Ankle Society |
| | International College of Surgeons |
| | Texas Orthopaedic Association |
| | Association of American Physicians and Surgeons |

**South Texas Orthopaedic Foot & Ankle Associates**
**9150 Huebner Road, Suite 200  San Antonio, TX  78240**

JOSE ESCUDERO                                                          JUNE 6, 2001
ACCT#: 275061

Mr. Escudero is a 33-year-old self-employed construction company owner here for an IME regarding an injury that he sustained on or about May 10, 1999. He was fixing a light fixture in an apartment. He was on a stepladder, approximately six feet in length. He says that the legs, or the base of it was made out of plastic and these apparently split and he fell as the ladder collapsed a distance of approximately five feet. Based on his x-rays that accompany him from May 10, he had a displaced left os calcis fracture for which he underwent a closed reduction and percutaneous pinning. Two months later he had the pins removed. His fracture ultimately healed but because of continued pain he had a CT scan in December, 1999, subsequently followed in May, 2000 via surgery by Dr. John Bishop in Houston. Based on his description this probably was a lateral decompression. He had limited motion before his most recent surgery and though he has more motion he still has limited motion. He has continued pain. It is intermittent in nature. He finds that on some mornings he has to use a cane to go to the shower. He cannot run, but as a self-employed gentleman, still has the ability to work.

There is no previous history of any other foot injury.

Past surgical history is significant for closed reduction and percutaneous pinning, May 11, 1999, subsequent pin removal July 8, 1999, followed by a lateral decompression May 3, 2000. Review of systems is unremarkable. He enjoys good health. He is allergic to no medications and lists no current medications.

**EXAMINATION:**

On examination, he has a good dorsalis pedis and posterior tibial pulse bilaterally. Motor examination shows no gross deficits below the knee but he did have some mild calf atrophy, left compared with the right. Ankle range of motion measured eight degrees of dorsiflexion to thirty degrees plantar flexion on the left side, less than his normal unaffected right ankle motion. His subtalar joint was virtually ankylosed in a neutral position to five degrees of valgus and any attempts at inversion met with resistance and with discomfort. He had tenderness in the sinus tarsi. The lateral incision about his upper heel and lateral heel was nontender and he had intact sensation in the lateral foot and heel.

**X-RAYS:**

X-rays are reviewed from his injury which show a displaced joint depression type fracture of his os calcis. Subsequent films have shown his fracture healed with pins removed. He did have some post injury films that showed reduction of his fracture with pin fixation. A CT scan in December 1999 is reviewed. It shows some density change in a central fragment of his posterior facet but the alignment of the facet is satisfactory and the fracture at that time is healed although there is osteopenia. His last films were in 2000 but did not have a label or date on them and therefore were not legal documents.

DEPOSITION
EXHIBIT 726
2
Galindo

RE:  Jose Escudero
June 6, 2000
Page 2

Current x-rays obtained today confirm that his fracture is healed.  He has some moderate subtalar arthritis and there is some mild depression of his posterior facet.

## ASSESSMENT:

1.  History of left os calcis fracture.
2.  Post traumatic arthritis, left subtalar joint.

## DISCUSSION:

Mr. Escudero is experiencing the natural history of his os calcis fracture.  He has had appropriate treatment for his injury to date including closed reduction and pinning, lateral decompression, but most likely will require future additional intervention at some point in his life.  Nonoperative approach could consist of anti-inflammatory medications and bracing.  An operative approach as Dr. Bishop has discussed with him could include a subtalar arthrodesis or fusion of the affected joint.  Even were he to undergo the procedure with a successful outcome and relief of his pain this would not preclude gainful employment, especially since he is self-employed.  He may have some limitation of certain activities such as working on uneven ground, unprotected heights, on a sloped roof or climbing ladders and standing on them for an extended period of time

Should he ultimately require future intervention it may be in the form of anti-inflammatory medications.  It could be in the form of bracing or may ultimately be a subtalar arthrodesis.  Estimated cost for all of the modalities is dependent on the extent of his medical utilization.  Anti-inflammatory medications roughly run between $1.00 and $3.00 per day of therapy.  A brace such as an AFO is approximately $600.00 to $800.00 and has a life expectancy of approximately two years.  A subtalar arthrodesis, assuming no complications, costs for surgeons fees, hospital fees, postoperative casts and x-ray, approximately $15,000.

Mr. Escudero is likely to have ongoing concerns with his hindfoot and ankle for the remainder of his life, although fortunately as a self-employed gentleman he continues to pursue his occupation.  He will experience limitations as he has discussed and enumerated above.  These are quite likely to be permanent limitations.

Since this represents an independent medical evaluation he was not offered any form of treatment.  This is merely for informational purposes to provide an independent review and opinion regarding his current problem.

6-11-2001

Mayo J. Galindo, M.D.

MJG/bps

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

```
JOSE ESCUDERO, JR.,        ) (
        Plaintiff          ) (
                           ) (
VS.                        ) (   CIVIL ACTION NO. B-00-193
                           ) (
BAUER CORPORATION D/B/A    ) (
BAUER LADDER CORPORATION,  ) (
        Defendant          ) (
```

ORAL DEPOSITION OF

BOB PEASTER

AUGUST 30, 2001

ORAL DEPOSITION OF BOB PEASTER, produced as a

witness at the instance of the DEFENDANT, taken in the

above styled and numbered cause on AUGUST 30, 2001,

reported by CORINNA N. GARCIA, Certified Court Reporter

No. 5210, in and for the State of Texas, at the offices

of Barry Benton, Attorney at Law, 284 Ebony,

Brownsville, Texas, pursuant to the Texas Rules of

Civil Procedure.

Page 2

APPEARANCES

COUNSEL FOR PLAINTIFF


BARRY R BENTON

Attorney at Law

284 Ebony Avenue

Brownsville, Texas  78520

(956) 546-9900


COUNSEL FOR DEFENDANT


BLANCA GALO

GENDRY & SPRAGUE, P C

645 Lockhill Selma

San Antonio, Texas  78216

(210) 349-0511


ALSO PRESENT


Jose Escudero, Jr

Page 3

INDEX

|  | PAGE |
|---|---|
| Appearances | 2 |
| BOB PEASTER | |
| Examination by Ms  Galo | 4 |
| Errata Sheet/Signature Page | 83 |
| Reporter's Certificate | 84 |

Attached to the end of the transcript  Stipulations

EXHIBITS

| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | Notice of Deposition | 6 |
| 2 | 1999 Tax Return . . | 24 |
| 3 | Paisano Construction Company Vendor QuickReport | 34 |
| 4 | 1998 Schedule K-1 | 38 |
| 5 | Las Arenas Profit & Loss by Job | 44 |
| 6 | 1998 Tax Return | 52 |

Page

1　　　　BOB PEASTER,
2　having been duly sworn, testified as follows:
3　　　　EXAMINATION
4　BY MS. GALO:
5　　Q　Can you state your name?
6　　A　Bob Peaster.
7　　Q.　Mr. Peaster, how are you employed?
8　　A.　I work for myself as an accountant.
9　　Q　And how long have you been an accountant?
10　　A.　Since 1981.
11　　Q　Where are your offices located?
12　　A　In McAllen.
13　　Q　Are you a CPA?
14　　A　No.
15　　Q　Does your business have a name, or is it just
16　under Bob Peaster?
17　　A　It's Peaster's Financial Services.
18　　Q　And I'm assuming you have a degree in
19　accounting?
20　　A.　Correct.
21　　Q　Where did you get that?
22　　A　The University of Arkansas.
23　　Q.　What year was that?
24　　A.　Also in '81.
25　　Q.　Okay.  How long have you been doing work for

Page

1　Mr. Escudero?
2　　A.　I just met him in October of 2000 and began
3　then.
4　　Q　Do you know who had been doing his work prior
5　to?
6　　A　I just learned yesterday.
7　　Q　Who would that be?
8　　A　Joe Cabera.
9　　Q　Cabrera?
10　　　　MR. ESCUDERO:  Cabrera, yes.  Can I speak
11　too?  If I'm asked something --
12　　　　MS. GALO:  That's okay.
13　　　　MR. BENTON:  Generally, no, because you're
14　not under oath.
15　　　　MS. GALO:  If you want to clarify if he
16　says a name wrong or something like that, that doesn't
17　bother me if your attorney doesn't care.
18　　Q　And do you know where Mr. Cabrera is located?
19　　A.　In Pharr.
20　　Q.　For today's deposition a notice of deposition
21　was sent to Mr. Barry Benton for your deposition today
22　and it asked for numerous items to be produced at the
23　deposition today.  And I'm going to show you that
24　document.
25　　　　MS. GALO:  Barry, mine's got a phone

Case 1:00-cv-00193　Document 24　Filed in TXSD on 10/19/2001　Page 309 of 328

Page 6

1 number on the top. If you don't care, I'll mark it as
2 Exhibit 1, or we can get a clean copy of it.
3　　　MR. BENTON: That's fine with me if it's
4 fine with you.
5　　　MS. GALO: No, I don't care.
6　　　Mark it as Exhibit 1 when you get a
7 chance.
8　Q Have you ever seen that document before?
9　A Yes.
10　Q. And I'm going to go through this one by one,
11 and you can tell me if you brought items responsive to
12 that. Do you have a general ledger for E&E Builders,
13 Inc. and/or Paisano Construction for '98, '99, 2000,
14 and 2001?
15　A. I do for 2000 and 2001, but not for the prior
16 years. And I did provide that information through the
17 Esquire document retrieval.
18　Q Okay. Do you have any kind of cash flow
19 statements for E&E Builders?
20　A. No.
21　Q. Profit and loss statements for E&E Builders?
22　A Just 2000/2001, and, of course, they're
23 unaudited.
24　Q Is it safe to say that any documents that you
25 have, generally speaking, unless you tell me otherwise,

Page

1 or would that just be documents that you have in your
2 own file?
3　A Uh-huh
4　Q And we talked about the tax returns a minute
5 ago, and you've brought the tax returns that you have
6 for Mr Escudero --
7　A Correct
8　Q. -- and E&E Builders. And did you have any for
9 Paisano Construction?
10　A. No.
11　Q Do you do the tax returns for Mr Escudero,
12 Sr.?
13　A No
14　Q. Did you bring any records that reflect any
15 salaries paid to the owners or partners or shareholders
16 of the business?
17　A. That would just be the information that's on
18 the tax returns.
19　Q. Okay. All documents of Paisano Construction
20 Company and E&E Builders reflecting shareholder losses
21 and distributions for the years '98, '99, and 2000?
22　A Again, that's on the tax returns　Just 2000
23　Q Corporate tax returns?
24　A I've got '99
25　Q You've got '99　And that would be for E&E

Page 7

1 will include 2000 and 2001?
2　A. Correct.
3　Q. Okay. Did you bring your entire file for E&E
4 Builders with you today?
5　A Yes
6　Q. Did you bring any tax returns?
7　A. Yes　Those two copies were sent to your
8 office
9　Q. For Esquire?
10　A. What I have, yes.
11　Q. Let me ask you this, have the 2001 returns been
12 prepared for the corporation and/or the individual?
13　A. 2000, you mean?
14　Q 2000, I'm sorry
15　A. The personal, but, no, not the corporate.
16　Q Okay　When is the extension for the
17 corporate --
18　A. October 15th.
19　Q Okay　Did you bring all the financial
20 statements reflecting the expenses, losses, and
21 compensation of any employees of E&E Builders? Would
22 that be in your general ledger?
23　A. They tentatively didn't have any employees
24　Q Okay　Any and all documents that you have
25 received or reviewed in support of your opinions today,

Page

1 Builders? It was a corporation at that time?
2　A Correct, that was our first year
3　Q Do you have any written communications or
4 documents reflecting losses incurred on the -- and I
5 may not be saying this right, so please correct me --
6 Bahnman Realty job, the Vargas Clinic job, Levin Duplex
7 job, or Las Arenas Condo job?
8　A. I have some information on Las Arenas. That
9 would be the only one.
10　Q. And any documents reflecting loss of income to
11 Jose Escudero, Jr. for the years '99, 2000, and 2001.
12 Would that also be contained in the tax returns?
13　A Correct.
14　Q I'm going to try to make this, I guess, as
15 short as I can　Because, if not, I think we could all
16 be here for hours, which I don't think anybody wants to
17 be
18　　　I don't know if you need to look at your
19 documents　I'm going to be asking you some questions
20 specifically from them
21　A Okay
22　Q Whenever you need to pull them out, please tell
23 me　In 1999 you said you had the corporate tax return
24 for E&E, is that correct?
25　A Correct

Page 10

1 Q Can you tell me what the gross income was for
2 that year for --
3 A. It was roughly 1.1 million.
4 Q. Do you know offhand whether that was an
5 increase or a decrease from 1998?
6 A. I don't. Did you get everything from Esquire?
7 Q. I got whatever you provided to them. So,
8 hopefully, it will make it go a little bit easier.
9 A. Gross receipts were 1.1 million.
10 Q What was the net income to the corporation that
11 year?
12 A 595, $595.
13 Q In 1998 was it your understanding that E&E
14 Builders was a partnership at that time and not a
15 corporation?
16 A Actually, from the tax return of '98, his
17 personal, it became a partnership sometime in the
18 middle of that year.
19 Q Does the -- do you have his 1998 personal
20 return?
21 A. Yes.
22 Q. Do you know how much money that partnership
23 made?
24 A. It lost money.
25 Q Do you know what the loss was in 1998?

Page 11

1 A. I don't, but I believe his portion of the loss
2 was 17,000.
3 Q. Do you know if that would have been the entire
4 loss or just a portion of the loss?
5 A. It would have been his share.
6 Q Would that have been 50 percent?
7 A I believe there are three partners, his father
8 and his brother.
9 Q Do you know what his brother's name is?
10 A. No.
11 Q So in 1998 that was under Paisano Construction
12 Company; is that correct?
13 A. Yes.
14 Q. And your understanding is that there was three
15 partners, so the loss would have been divided three
16 ways?
17 A Correct.
18 Q So would it be fair to say that if we
19 multiplied the 17 times 3, it would give you the total
20 loss for the partnership that year?
21 A. If it was an equal partnership, yes. But I
22 don't know that.
23 Q Okay. I guess we just have to determine what
24 ownership everybody had?
25 A Correct

Page

1 Q In 1999 they made -- it became a corporation.
2 And at that point it made $595 that year?
3 A. Correct.
4 Q Do you know what income was paid to
5 Mr. Escudero, Jr. that year?
6 A. No, but it was somewhere in the 30,000s, I
7 believe. But, no, I don't know for sure.
8 Q. Do you have the tax return from 1999 for him?
9 A. No, it was actually -- actually, it was never
10 filed.
11 Q Is there any reason that was never filed?
12 A. My understanding is that he was under the
13 assumption that the CPA filed it, but he just learned a
14 few weeks ago, actually, that it never was filed.
15 Q Are you all taking steps to correct that?
16 A. Yes.
17 Q And are you all going to be preparing a return?
18 A. Yes.
19 Q But the corporation's profit that year was only
20 $595?
21 A Correct.
22 Q Are you looking at the tax return?
23 A. Yes.
24 Q Okay. I'm going to get on the same page with
25 you. I think it will be a little bit easier.

Page 1

1 They'll have fun at my office putting this
2 back together again. The nice thing is I don't have to
3 do it.
4 A. It says "'98 partnership" on it.
5 Q Is that where you got that figure of about
6 17,000?
7 A Yes.
8 Q And here --
9 A Actually, it does show this percentage probably
10 was --
11 Q 33 percent?
12 A Yeah, which would be a third.
13 Q Okay. So we would multiply that 17 by 3 to get
14 the total loss the partnership experienced?
15 A. Correct.
16 Q Then in 1999 were you involved in the
17 incorporation of the company?
18 A. No.
19 Q And in 1998 --
20 A. That's his personal.
21 Q. That's his personal return?
22 A Yeah, that's part of it.
23 Q It was incorporated, of course, in here?
24 A. Uh-huh.
25 Q We'll put that together. This is the

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 311 of 328

Page 14

1 corporate?

2   A   Right

3   Q   Okay. So the corporation in 1999 had gross

4 receipts or sales of 1.1 million?

5   A   Correct.

6   Q.   Okay. The total income to the company was

7 94,860; is that correct?

8   A   That's the gross profit.

9   Q   Gross profit right here. Okay. Then the

10 company as a whole, you're saying, made 595?

11   A.   Yes.

12   Q   Okay. And does this indicate in any of your

13 documents that you have any type of salary, bonus, or

14 anything that may have been paid to Mr. Escudero, Jr.

15 at that time?

16   A.   No.

17   Q   And you estimate it was about 30,000?

18   A   Correct.

19   Q   But you all are working on that?

20   A   Correct.

21   Q   Let's talk about 2000 real quick. We'll go

22 into more detail in a little bit. In 2000 do you know

23 what the total income was to the company?

24   A   Gross receipts were 2.7, close to 2.8 million.

25   Q   Was that an increase or a decrease from 1999?

Page 15

1   A.   That was an increase.

2       MR. BENTON: What did he say the gross

3 receipts were?

4       MS. GALO: About 2.8 million. We're just

5 doing approximates. I think that will be easier.

6   Q   Was that an increase or a decrease, as far as

7 your understanding, from 1998, based on the individual

8 return in the K-1?

9   A   From the K-1 I know what net loss is, but I

10 don't know what the gross receipts were for that year.

11   Q.   Let's go through 2000. He had 2.8 million on

12 income; is that correct?

13   A.   Correct.

14   Q   What was his gross profit that year?

15   A.   Well, it's a work in progress. It's going

16 to -- when we finish, it's probably going to be

17 somewhere around break even.

18   Q   Okay. So the figures that you provided through

19 Esquire Service are just working figures? They're

20 not -- it's not a complete breakdown? The profit and

21 loss statement is not complete?

22   A.   Correct.

23   Q   The 2000 individual return has been prepared;

24 is that correct?

25   A.   Correct.

Page 1

1   Q   What does the income show for Mr. Escudero in

2 2000?

3   A   32,400.

4   Q   Would that be more or less than he had earned

5 in 1998, based on the return that you have?

6   A   Based on the return, it looks like it's a lot

7 more. It's more.

8   Q   And --

9   A   I might add something to that, though, if you

10 wish.

11   Q.   Sure.

12   A   I do know he had to borrow money in the year

13 2000 in order to make the company survive for him to

14 make those draws.

15   Q.   But the money that is borrowed from a bank

16 would not go into a company as income to the compan

17 is that correct?

18   A   That's right.

19   Q   It would be calculated as a loan?

20   A   Correct.

21   Q.   So it wouldn't reflect any inflated values that

22 the company may have?

23   A   No.

24   Q   Looking at 1999, the information that we have

25 from the corporate tax return -- and I understand that

Page 1

1 that was not prepared by you; is that correct?

2   A.   Correct.

3   Q.   In going through this -- see where it was. Is

4 there any place on this tax return in 1999 that would

5 show what payroll expenses were?

6   A.   If there were, it would be on line 13.

7   Q.   So does that indicate to you that he had no

8 employees in 1999?

9   A   Correct.

10   Q.   Does the K-1 give you any indication on whether

11 there was any types of expenditures as far as payroll

12 or anything like that?

13   A.   It could. I haven't looked at that to see if

14 there were any, but I would say there probably aren't.

15 No.

16   Q   What about in 1999, did he have any employees

17 in 1999?

18   A   That's -- no

19   Q   We talked about '98.

20   A   Yeah, that's -- line 13 on the corporate return

21 shows none.

22   Q   Year 2000, does he have employees?

23   A.   No.

24   Q   Is he always dealing with subcontractors or

25 independent contractors?

Page 18

1   A   Correct.
2   Q   So he's not issuing any type of W-2s?
3   A.   No.
4   Q   Do you all issue out any 1099s or anything?
5   A   Well, that was the problem with last year, they
6 didn't. But, yes, we're working on correcting that.
7   Q   In going through the profit and loss statement
8 for 2000, it has a list for -- I'm looking under the
9 expense section of it, and it has some expenditures for
10 commissions. Do you know what those are?
11   A   No, I'd have to look at the ledger. The
12 expenses, many of the items on there are not
13 categorized correctly because of a part-time person
14 that came in and did the checks. For example, you'll
15 see payroll on there 324,000. That was all subcontract
16 work that she called employees. So it was incorrectly
17 coded.
18   Q   Where would Mr. Escudero's salary be
19 categorized in here?
20   A.   It would usually be shown as a draw.
21   Q   I think in 2001 this portion of the ledger that
22 you have there is something for a draw. But there was
23 nothing in 2000, and that's why I was asking.
24       How would you go back and determine how
25 much money was paid to Mr. Escudero in 2000?

Page 19

1   A.   On QuickBooks I can just run a check count of
2 everything that was paid to him for that year.
3   Q.   Okay. And that's not been done on any of these
4 documents; is that correct?
5   A   No
6   Q   So as we sit here today, you can't tell me --
7   A.   I don't have that with me, no
8   Q   Okay  I was going through some of these
9 expenditures, and a lot of them I know is listed as
10 subcontractors  And taking what you told me into
11 consideration, I think at some point there was also an
12 office secretary  Are you aware of that?
13   A.   Right. She was handled as contract labor
14   Q.   Also as contract labor?
15   A.   Correct.
16   Q   Okay  How many jobs are you aware of that
17 Mr. Escudero was working in 1999 when -- you came on
18 board in 2000?
19   A.   Right
20   Q.   So were you aware of anything that had been
21 going on in 1999 as far as his finances were concerned?
22   A.   I'm just really beginning to learn what he did
23 in '98 and '99
24   Q.   Okay
25   A   So, no  I know that the Las Arenas job was

Page 2

1 started in '99, and he has told me that he had other
2 jobs, but I couldn't tell you what they all were.
3   Q   Let's talk about Las Arenas. That one you say
4 began in 1999?
5   A.   Yes, that's my understanding.
6   Q   Do you know what that job was to pay?
7   A.   No.
8   Q   Do you know if Mr. Escudero has completed that
9 particular job?
10   A.   I think it's near the end, but, no, it's not
11 finished.
12       THE WITNESS:  It is finished?
13   A   It's finished, but, I guess, not all the bills
14 are paid or -- so I guess constructionwise, it's
15 finished.
16   Q   Have you seen any of the documentation that
17 would indicate how much Mr. Escudero was paid for
18 that -- to perform that job and as to how much he
19 realized in profit?
20   A   Correct, yes.
21   Q   How much was he -- was that entire project
22 contracted for?
23   A.   I never saw the estimates, but on the books
24 it's roughly 1.4 -- 1.74 million is what has been
25 collected in income, but that's not the total. I

Page 2

1 believe it's closer to 1 4 million
2       MR BENTON:  I didn't understand that
3       THE WITNESS·  Because there is still
4 retainage and all that
5       MR BENTON:  So he's collected 1 4, but
6 he's owed 1 74?
7       THE WITNESS·  He's been paid 1.17, but the
8 total construction is right about 1 4
9       MR BENTON·  Now I understand  Thank you
10   Q   Do you know if Mr Escudero suffered any type
11 of monetary loss on that particular job for any reason
12 that you're aware of?  Was he penalized any types of
13 money?
14   A.   I'm not aware of the penalties, but I couldn't
15 say for sure  I do know that there were delays, but I
16 don't know if there were penalties or not.
17   Q   Do you know what those delays were from?
18   A.   If you're asking me from a construction point
19 of view, which is kind of not my field, I would say a
20 lot of it was due to his not being there for one reason
21 or another, and also having to hire supervisors that
22 may or may not have done or known all they were doing.
23   Q   Is this something that you know from your
24 personal knowledge, or is this something that
25 Mr Escudero or somebody may have told you?

## Page 22

1    A   Well, a little bit of both. I've seen that the
2  supervision cost has gone way up.
3    Q   Okay. Let's talk about the supervision cost.
4  You're saying it went up. When did it go up? From
5  what point did it go up?
6    A   The supervision he's paid just on this one
7  particular job, which is really the only one I can
8  really speak from, is significantly higher than what, I
9  guess, he was paid in some of the other jobs, on a
10  percentage basis.
11    Q   Do you have any documents that would show that
12  there is a comparison that you can make to show that
13  the supervision on this job was higher than another job
14  that may have been a --
15    A   No, but we're beginning to put some of that
16  together.
17    Q   Okay. So as we speak here today, you don't
18  have anything that can show that?
19    A   No, I can't give you precise percentages.
20    Q   Okay. Do you know if Mr. Escudero in 1999 or
21  2000 was working on a similar project to Las Arenas
22  that we could do a comparison on or that you have done
23  a comparison on?
24    A   Again, I'm just beginning to get into those,
25  and, no, I can't give you any specifics.

## Page 23

1    Q   So right now, as you're saying that these costs
2  have gone up, it's based on preliminary work that is
3  not anything that we can look at today or that you can
4  show me today?
5    A   Correct, I'll have to put that all together.
6    Q   Okay  And when do you anticipate having that
7  information?
8    A   Well, the attorney here asked me yesterday to
9  begin putting that together  So I'm not sure what
10  date, but it's going to take some time going through
11  all the past records
12    Q   What other changes have you seen in
13  Mr Escudero's income from, say, 1999 to 2000 or 2001?
14  Because in looking at the records, it seems like the
15  year 2000 he had a substantial amount of projects going
16  on; is that correct?
17    A   Substantial?
18    Q   Well, if you start looking at his profit and
19  loss statement, which you've now told me is a work in
20  progress, he had construction income of 2,800,000
21    A   Yes, there were of four or five projects that he
22  had, but they're all large projects
23    Q   Okay  And that was in 2000?
24    A   Correct
25    Q   Do you know how that compared with 1999?

## Page 24

1    A   No, I'm not sure
2    Q   Do you know if it was an increase or a decrease,
3  based on documents --
4    A   I think it was an increase
5    Q   Increase? What could we look at that would
6  give us a comparison between this work in progress of
7  January through December, 2000 and 1999? Would it be
8  the corporate tax return?
9    A   Yes
10    Q   So if we're looking at the corporate tax
11  return -- and I'm going to mark the corporate return as
12  Exhibit No. 2.
13    A   Unfortunately, we only have this one corporate
14  return
15    Q   Right.
16    A   But, yeah, we can --
17        MR BENTON:  Need a copy of that?
18    A   -- compare this to this.
19        MS. GALO·  We can do it afterwards.  Do
20  you care?
21        MR BENTON·  No, that's fine
22    Q   Okay  In -- on the corporate income tax
23  return, what would be comparable to total income that
24  you've listed on your profit and loss statement?  Would
25  that be the gross receipts?

## Page 25

1    A   Correct.
2    Q   So it was more than twice the gross receipts
3  from '99 to 2000. So there is a definite increase --
4    A   Right.
5    Q   -- as far as projects and stuff going on.  If
6  I'm not mistaken, the tax return also has the cost of
7  goods. Does it not?
8    A   Yes.
9    Q   I don't know exactly where it is, but I know
10  it's in there.
11    A   Collectively the costs of goods is line 2,
12  which is a little over 1 million, and that's broken
13  down over here. You have your cost of labor.
14    Q   And the cost of labor was 1,017,000?
15    A   Correct. Some licenses and permits. I'm
16  looking at it backwards. Purchases were 1 million. I
17  would assume from looking at this return that they're
18  including both materials and labor.
19    Q   Broken into -- all together?
20    A   Collectively into that one number.
21    Q   Is that the way you've broken down your profit
22  and loss statement?
23    A   Yeah, and, now, understand, this is the general
24  ledger from what was done prior. This is not mine.
25  And I'm having to work from this. It would be -- all

Page 26

1 the subcontract labor would be part of the costs of
2 goods sold as well as all the materials.
3    Q   Okay.  So here like the subcontractors they've
4 got listed as 1,300,000?
5    A   And you have to add the 324,000.  I know at
6 least that much.  And I have to look in the commissions
7 and I have to look in some of these other numbers too.
8    Q   Do you know if there were more projects going
9 on in 1999 or 2000, or were some of those being carried
10 over from what you've reviewed?
11    A   There is always some carried over, correct.  In
12 fact, the Las Arenas job, which started in '99, has
13 been carried over to this year.
14    Q   So it's still going on?
15    A   Right.
16    Q   And that's a large project?
17    A   Yes.
18    Q   And, I guess, based on that, they've paid in
19 1.1 million on that one?
20    A   Right.  If you compare so far what's been
21 expensed on that, it's got a substantial loss.  In the
22 year 2000 you would have a huge loss for the year, but
23 it's all going to fall on this year.
24    Q   Okay.  But at the time the projects or the
25 income was going up, there may have been expenses and

Page 27

1 things associated, but the amount of the projects or
2 the value of the projects that he was doing definitely
3 increased from the year 1999 to the year 2000?
4    A   Correct.
5    Q   Now, you understand that Mr. Escudero was
6 injured in 1999?
7    A   Yes.
8    Q   Okay.  And that -- do you know what month that
9 was in?
10    A   I believe he told me May.
11    Q   Okay.  Now, in 2001 we have a limited amount of
12 information.  Did you prepare this information, or did
13 somebody else prepare it?
14    A   I prepared that one.
15    Q   Okay.  And I'm sorry I'm jumping around.
16 That's just the way my mind works sometimes.
17        MR. BENTON:  You're doing great.
18    Q   It just goes everywhere.  What was the income
19 that was shown from January through June?
20    A   You mean the sources?
21    Q   Uh-huh.
22    A   I would say primarily from Las Arenas.  But
23 there is a couple other projects also.
24    Q   Are those included in here?
25    A   Correct.

Page 2

1    Q   Okay.  Have there been any other projects that
2 have been obtained since January and June 2000, because
3 we're now almost in September?
4    A   You mean new projects that have started this
5 year?
6    Q   Yes, sir
7    A   Yes
8    Q   And do you know what the value of those are?
9    A   They're all in their early stages  You mean
10 the value of the total --
11    Q   Yes
12    A   -- jobs?  I know it's -- one project is roughly
13 1 6 million
14    Q   And that's not reflected in this profit and
15 loss statement?
16    A   No, because that's more or less on a cash --
17 well, that's cash accruable  We don't have the total
18 income reflected for those jobs.
19    Q   Okay.  So if we look at this total income right
20 now of 476,000, that's really not an accurate reading
21 of what --
22    A   That's what's collected
23    Q   That's what's collected, but there is other
24 things going on that are going to bring in additional
25 income?

Page 2

1    A   Correct.
2    Q   What do you anticipate -- being that this is --
3 I guess we're, what, reaching close to the fourth
4 quarter?
5    A   Uh-huh
6    Q   Almost there -- the profitability and/or loss
7 of the company to be this year?
8    A   It's going to be a loss because Las Arenas is
9 going to hit the books this year.
10    Q   Okay.  And that's a carry-over from 1999?
11    A   Correct.
12    Q   How big was that project?
13    A   Dollarwise?
14    Q   Uh-huh.
15    A   It was 1.4 or 1.5 million.
16    Q   And do you know what exactly that job entailed?
17    A   It's a big condominium, 13, 14-condominium
18 project.  I've not seen it myself.
19    Q   Is Mr. Escudero building that on his own, or
20 are there other builders involved in that?
21    A   There are other builders.  There's somebody
22 else that is the general.
23    Q   Have any factors -- I know that Mr. Escudero
24 has said that there is some losses or delays that he's
25 had to incur as a result of some of, he says, his

## Page 30

1 injuries on some of these projects to which he's been
2 penalized. Are there any other factors which can cause
3 delays, to your knowledge, here, weather, or anything
4 like that?
5     A Yeah, I'm sure there could be.
6     Q. Do you know of anything in 1999 or 2000
7 weatherwise, that could have caused a delay in the
8 building of any of these projects?
9     A No, I'm not aware of them.
10     Q Okay. Are you aware of anything on the Bahnman
11 Realty project?
12     A. No, I don't know anything about that job.
13     Q Okay. So you don't know if there was a penalty
14 incurred or what that penalty -- how it arose, and you
15 have no documentation on that?
16     A. No, I don't.
17     Q Do you have any documentation with regard to
18 that particular job that show losses which are
19 attributable to any types of delays or result in
20 changes in subcontractors?
21     A. No.
22     Q Do you have any knowledge on the project called
23 the Vargas Clinic project?
24     A. No.
25     Q And you would have no documentation to support

## Page 31

1 any loss or income or gain on that?
2     A. No.
3     Q How about the Levin Duplex? Do you have any
4 information on that project?
5     A No.
6     Q. Do you have any documents that would support
7 Mr. Escudero's assertion that he was penalized $24,000?
8     A. Just what he's told me, that that's happened.
9     Q. How would you handle a penalty like that on an
10 income tax return or on a profit and loss statement?
11     A It gets classified as a penalty.
12     Q Okay. And is there any particular place on a
13 tax return or on the profit and loss statement that it
14 would be included?
15     A. You create a line item cost, fines and
16 penalties, which usually comes at the end of a return.
17 And I don't know that there is any such thing on here
18 Again, it could have been reclassified if there was
19 anything actually paid out.
20     Q. So in 2001 on the profit and loss statement,
21 which we've not completed the year, in all fairness --
22     A No, there is a lot of adjustments to be made.
23     Q But right now you do not have anything listed
24 on here that shows any type of penalties incurred for
25 any reason?

## Page

1     A Not that I've seen I'm not sure that there
2 isn't
3     Q Okay
4     A In 2001 there is not, no Many times what
5 happens is when you have a in-house bookkeeper and if
6 there is a -- if there is a draw, for example, that's
7 due somebody as "X" dollars -- "X" amount of dollars,
8 that customer may just subtract that from his draw
9 And if they do that, then the in-house bookkeeper
10 doesn't know to post that as an expense
11     Q But let's assume that Mr Escudero this year
12 was penalized, let's say, on project A $15,000 in
13 February because of delays. Would you have been aware
14 of that, or would you have to have knowledge of that?
15     A I'd have to have knowledge of that.
16     Q Because, if not, you cannot prepare his returns
17 accurately or prepare the bookkeeping accurately?
18     A. In net it comes out the same because it's just
19 not reflected in the revenue
20     Q Right It's kind of -- you work it into it,
21 but you have to have knowledge of where that came from?
22     A Right
23     Q And in 2001 you don't have that as of yet?
24     A. No
25     Q What about -- looking at the documents in

## Page

1 2000 -- and I understand that they're being revised --
2 was there anything in here in your review of these
3 documents that show that he had been penalized for a
4 reason?
5     A. I haven't seen it yet, but that's not to say
6 there couldn't be.
7     Q Okay. If there was -- do you know when any of
8 these projects, the Bahnman Realty, Vargas Clinic,
9 Levin Duplex, were completed?
10     A. I don't, but I'm going to have to find out,
11 because if they are reflected in 2000, I'm going to
12 have to know that.
13     Q Okay. And, again, you don't have any
14 documentation with regards to any of these projects?
15     A No.
16     Q On Las Arenas, on which you do have a little
17 bit of knowledge, Mr. Vargas is listed -- I'm sorry.
18 I'm looking at Vargas Clinic. That's what happens.
19       Mr. Escudero has listed an extra
20 superintendent at $24,352 Do you have any
21 documentation which would support that figure to sho
22 that he has had to pay that much money to somebody t
23 supervise that project?
24       THE WITNESS: Is that Miguel? No.
25       MR. ESCUDERO: Hector.

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 316 of 328

Page 34

1    Q  Is it Hector Trevino?  I know that there was a
2  gentleman by the name of Eric Gutierrez, and I'm
3  assuming it was either him or Hector Trevino
4         MS GALO:  Okay  We're going to mark this
5  as Exhibit No 3  We can make a copy so he can keep
6  his originals  I don't want to get that.
7    Q  And these items -- you've handed me what's
8  called Paisano Construction Company Vendor QuickReport
9  Paisano is now E&E Builders  Can we agree on that?
10   A  Yes
11   Q  It's one and the game  It's not the
12 partnership anymore  It's a corporation
13   A  Right
14   Q  And these show the amount of checks that were
15 paid to Eric Gutierrez
16   A. Correct.
17   Q. And these items that you've highlighted, are
18 those all payments to him as a superintendent?
19   A. Yes.  I was asked -- they're highlighted
20 because I questioned what they were actually for
21 because they were marked "payroll" and they were marked
22 "reimbursements."  So I was questioning, are they
23 really reimbursements, or are they part of his
24 supervision  And he told me they're all part of his
25 supervision.

Page 35

1    Q  So all of these figures, the 479 82 --
2    A.  Were his
3    Q  Okay  Do you know what his compensation was?
4  Was it done on a daily, hourly, weekly, biweekly --
5    A  Based on this, I think it was every other week,
6  more or less
7    Q  Okay  Then if it was done every other week,
8  I'm just curious, then why would you have some entries
9  for 1,000, some for 1,500?  I can see those figures
10 because they're kind of comparable, but then you end up
11 with 1,016 49 or you end up with 200 here, 1,679.31
12 Do you know how those figures were calculated?
13   A. Procedurally, I don't know how they did that.
14   Q. Okay  And are you basing the fact that this
15 was compensation to him based on what Mr. Escudero has
16 told you?
17   A. Correct.
18   Q  Have you seen any of the checkstubs?
19   A  Yes, I actually reconcile the bank statements
20 myself
21   Q  Okay  And they all show income to him?
22   A  Correct
23   Q  And you're going to be issuing -- did you all
24 issue a 1099 to Eric?
25   A  No, he didn't

Page

1    Q  Is he going to?
2    A.  I've encouraged him to get his Social Security
3  number  So we're still waiting for that, yes
4    Q.  And what are these other figures that are
5  contained in your Vendor QuickReport general ledger?
6    A.  These were just numbers I was running by
7  category.  This is out of -- in other words, this is
8  the complete list  I was breaking it down by what was
9  classified as reimbursement, what was classified as
10 payroll, and why it was done that way
11   Q  Do you know why it was done that way?
12   A  Again, because the gal that they had in there
13 didn't know how to categorize things  When I first
14 came in, it was in October, and things were not going
15 well, I guess  And so I was trying to help the gal
16 categorizing them at that time over the process of
17 October, November, December, up through January.  And
18 that's basically what my first four months there was,
19 and reconciling bank statements.
20   Q.  Do you have any type of Vendor QuickReport,
21 like you have for Eric Gutierrez, for Hector Trevino?
22   A.  I don't with me, no.
23   Q.  Do you know when Hector Trevino first began
24 with E&E Builders?
25   A.  No, I don't

Page

1    Q  Do you know if he was prior to or after Eric
2  Gutierrez?
3    A  I don't know.
4    Q  I'll just put this underneath.  I know it's
5  yours.  We'll return them.  That way we just can get
6  copies of what we need.
7         So Eric was paid a total of 24,000, a
8  little over 24?
9    A  Correct.  Right.
10   Q.  Do you know if in 1998 or 1999 Mr. Escudero
11 any other jobs, say, superintendents or supervisors
12 other than himself?
13   A  I don't know.  He has told me that he did most
14 of them himself.
15   Q.  But you haven't seen any documentation?
16   A.  No.
17   Q  I was noticing in the individual tax return for
18 1998 --
19   A.  Right here.
20   Q  -- it shows the total income as being a loss of
21 5,205.
22   A  That's because before it was a partnership they
23 had a sole proprietorship, and I don't know why the
24 accountant did this, but he showed that he earned
25 12,400 that year and didn't have any expenses.  So a

Page 38

1 reported 12,000 was on his income. So that's a net of
2 the two.
3    Q  So let me just make this kind of simple so
4 we'll understand. 1998 Paisano Construction Company
5 has a loss --
6    A  Correct.
7    Q  -- split three ways is what we've determined by
8 the K-1. And we're going to make that Exhibit No. 4.
9        MS. GALO: I'm marking mine, Barry, so
10 that we can do it later.
11       MR. BENTON: Okay.
12       MS. GALO: Is that all right?
13       MR. BENTON: Sure.
14    Q  The income is 1999, and the company has a $595
15 profit, so to speak?
16    A  Correct.
17    Q  2000 we don't have anything for at this time?
18    A  Correct.
19    Q  Right? But we do know that the total income,
20 based on the document, is 2.8 million?
21    A  (Moving head up and down)
22    Q  Since 1998, based on the documents that we have
23 in front of us, based on the figures that we have in
24 front of us, did the business increase in income or
25 decrease?

Page

1    A  I'm sorry  Yes
2    Q  Thank you  Does the fact that labor costs or
3 other expenses may cause the company to, say, break
4 even -- you're anticipating a break even for 2000?
5    A  Correct
6    Q  Or right in there?  Does that reflect
7 somebody's inability to work, or it could also mean
8 that the cost of labor has gone up, the cost of
9 materials have gone up, or anything to that effect?
10 There's a variety of factors that could affect that; is
11 that correct?
12    A  Yes.
13    Q  And in 2001 -- where right now we know was not
14 a complete picture, and I don't think it's fair to try
15 to characterize it as we have 1999 -- it's not an
16 accurate showing of this 452,000 because there is other
17 projects that have been obtained since that time?
18    A  Correct
19    Q  Okay  Is there anything that you can show me
20 or any documents that you have that can show me that as
21 a result of Mr Escudero's injury in 1999, the
22 profitability -- the profitability of his company has
23 decreased or the volume of his business has decreased?
24    A  Not directly, because I've not been asked to
25 try to do something like that

Page 39

1    A  It did increase.
2    Q  Did it increase by just a tiny little bit, or
3 was there a substantial increase in the volume of the
4 business at that time or the value of the projects that
5 were being worked on?
6    A  Yes.
7    Q  Okay. Isn't it true that as you start to
8 work -- and I know you're an accountant, but bear with
9 me. If you're working on the remodeling of a home and
10 it's going to give you a lesser profit, generally
11 speaking, if the job is not as big, you don't need as
12 many subcontractors or workers; is that correct?
13    A  That's correct.
14    Q  So as the volume of your work increases, the
15 need for the subcontractors actually would increase as
16 well?
17    A  Right.
18    Q  So if your company has doubled in the amount of
19 work it's doing or the volume, as it did from 1999 to
20 what the profit and loss statement that -- that's the
21 only thing we have in front of us today, is at least
22 two times, doesn't it make sense that the expenses
23 would also increase in trying to complete those jobs?
24    A  Uh-huh.
25       MR. BENTON: You need to say words, Bob.

Page

1    Q  Can you show me any document that would
2 evidence any type of losses in the year 2000, as
3 opposed to 1999, that -- I mean, is there any documents
4 that show any type of losses for the year 2000 at this
5 point as per '99?
6    A  It's too early for me to say  Once I look into
7 the records, then go through the general ledger myself
8 and try to put together a tax return, then I might find
9 something  But it's too early for me to say.
10    Q  But you will agree that from 1998 to 1999 there
11 was an increase in the profitability of the company?
12    A  Yes, because it was a brand-new start-up
13 company
14    Q  But if you compare the partnership to the
15 corporation, Mr Escudero is making more money in 1999,
16 or at least the --
17    A  It was a growing --
18    Q  It was growing
19    A  -- business, correct.
20    Q  And if we look at the 2000 profit and loss
21 statement, the company was still growing in 2000; is
22 that correct?
23    A  Yes
24    Q  And in 2001, it's an unknown?
25    A  And I might add, I think primarily because of

Page 42

1 one job, though.
2 Q That would be Las Arenas?
3 A Correct.
4 Q Which is still going on?
5 A Correct.
6 Q And do you know when he obtained that in 1999?
7 A When it started?
8 Q Yes.
9 A It was roughly April. I believe April was the
10 first transaction I saw, April of '99.
11 Q In looking at this -- you've reviewed this
12 general ledger of profit and loss from 2000. I know
13 you don't agree with the categorization, and I'm not
14 trying to hold you to that at all. I was noticing in
15 here where it said -- the way they've got it is a memo
16 and a split. Do you know what that means, and can you
17 explain that?
18 A Well, what the memo does sometimes -- it
19 depends on what account it is, but the reason both are
20 shown is sometimes the memo will show what job it is,
21 and sometimes it will show what bank it's from.
22 Q Okay. Does Mr. Escudero bank at numerous
23 banks?
24 A Yes, he has.
25 Q What banks does he bank with?

Page 43

1 A First National, IBC.
2 Q Who would you say is his primary banker?
3 A Right now I believe it's IBC.
4 Q Now, when he is paid money for, say, Las
5 Arenas -- he's been paid 1.1 million, more or less?
6 A Correct.
7 Q When that money is deposited, do you know how
8 that money has come in? Has it been in chunks, like in
9 draws, as in construction people get a draw?
10 A Yes.
11 Q And how is that reflected in a general ledger?
12 A It will show under the deposits in the bank,
13 which is at the very beginning.
14 Q Is it on that page?
15 A You'll see the bank here and the deposits.
16 Q And those would be deposits from various jobs,
17 but they're not specified here. Like here is a
18 deposit. Here we have a deposit on 1/14/00 pertaining
19 to, it states, construction. That's for $15,000.
20 A Again, because the gal didn't know what to do
21 with it.
22 Q And you're going back and trying to determine
23 which one was coming from what?
24 A Correct. In fact, the Las Arenas I've had to
25 go back through all the invoices. This has been pretty

Page

1 much unreliable for me.
2 Q Do you have any partial list of what you've
3 done with Las Arenas with you at this point?
4 A A little bit.
5 Q Can we take a look at that?
6 A This would be a P&L up to a couple of weeks
7 ago.
8 Q This would be No. 5, Exhibit No. 5. Okay. And
9 here you're showing that there was -- what's come in
10 far --
11 A Correct.
12 Q -- since the inception of this job, I might
13 add, right?
14 A Right.
15 Q So it's between 1999 and 2001?
16 A 2001, correct.
17 Q Do you know when the majority of this money
18 came in, whether it came in in 1999, 2000 or --
19 A In 2000.
20 Q In 2000. Now, here you've got cost of goods
21 sold, and you have electrical, $463,000, which is a
22 substantial increase from other projects, I would
23 assume.
24 A Correct.
25 Q Is that because of the type of project it was

Page

1 and the size of the project?
2 A Yes.
3 Q Okay. You also have --
4 A I might add that was probably over what they
5 had budgeted also for that job.
6 Q Okay. Do you know if Mr. Escudero in the past
7 has had to hire people to do the electrical, or does he
8 do that himself?
9 A Normally a contractor will hire a
10 subcontractor.
11 Q And that's what Mr. Escudero is; is that
12 correct, he's a contractor? He oversees how things
13 are done, and he goes out and he hires the people
14 necessary for the job?
15 A Correct.
16 Q Do you know if he physically himself performs
17 any aspect of the job other than supervision?
18 A Yes, he's told me he does, he will.
19 Q Do you know what type of work he does?
20 A Trim work, carpentry work, plaster.
21 Q What is his operational expenses related to
22 cost of goods sold of 20,000?
23 A That would include things such as his phone,
24 utilities, rent, things that aren't directly related to
25 the cost.

Case 1:00-cv-00193  Document 24  Filed in TXSD on 10/19/2001  Page 318 of 328

Page 46

1  Q  Okay. And right here, the total cost of goods
2  sold is $1,463,377.25. And, of course, that's more
3  than what's been brought in.
4  A. Correct.
5  Q  Is that because Las Arenas is still owing some
6  money?
7  A. Correct.
8  Q  Do you anticipate a break even on Las Arenas,
9  or do you expect a profit?
10  A. At this point it looks like it's going to be a
11  break even or less due to working out some of the
12  retainage fees and not being able to collect
13  everything.
14  Q  Okay. Do you know why you can't collect
15  everything?
16  A  No, I don't know all the reasons.
17  Q  Does Mr. Escudero bid for these jobs?
18  A  Correct.
19  Q  Do you know how that's done?
20  A  If he's the general contractor for a job, yes,
21  he bids for them.
22  Q  Do you assist him in any way in coming up with
23  the bids?
24  A  No.
25  Q  You don't help him do any projection costs or

Page 47

1  anything?
2  A. No.
3  Q. Do you know whether -- strike that.
4      Do you know if most of these
5  subcontractors, say, an electrical, masonry, carpentry,
6  painting, stucco, do you know if they're paid per job
7  or on an hourly basis or how that's worked out?
8  A. It's normally done on a job basis.
9  Q  Okay. You contract with a certain company?
10  A  Right. And they're paid based on the
11  percentage of work that's been completed.
12  Q  As so he's paying out money -- as he gets
13  money, he's having to pay money out; is that correct?
14  A. Correct.
15  Q  Do you know if the cost of labor has gone up
16  since 1999?
17  A. Yes.
18  Q. Do you know how much it's gone up by?
19  A  No.
20  Q  Do you know if the companies that -- we've been
21  talking -- strike that.
22      We've been talking about Las Arenas
23  condos. That's, I guess, one of the biggest projects
24  he has going on at this time as far as your knowledge,
25  or are there other ones?

Page

1  A  He's got one going on that, from a dollar point
2  of view, is actually bigger.
3  Q  Where is that one?
4  A  That's on South Padre Island.
5  Q  And when did that one start?
6  A  First of this year, I believe.
7  Q  Do you know what the dollar value on that one
8  is?
9  A. 1.6 million. Can I ask if I say something
10  that's not correct, that he can correct me?
11  Q. Generally what happens -- let's go off the
12  record for a minute.
13      (Discussion off the record)
14  Q  Let me ask you about this SPI project, South
15  Padre Island. That began -- it was a $1.6 million
16  project?
17  A  Correct.
18  Q. Does Mr. Escudero just have one project going
19  on at one time, or are there numerous projects going
20  on?
21  A  No, there will be maybe three or four projects
22  going on.
23  Q  And depending on the size of the projects,
24  depending on the amount of subcontractors he has. S
25  again, based on his volume of business is the need fo

Page

1  subcontractors; is that correct?
2  A. Right.
3  Q. Okay. This SPI project, or South Padre Island
4  project that began, do you know how much money he
5  realized so far off of that project?
6  A  Approximately 300,000.
7  Q  Is that reflected in any of these profit and
8  loss statements?
9  A  In the 2001 it will be there.
10  Q  Would that be part of this $452,000 figure?
11  A  Correct.
12  Q  Do you know when that 300,000 was paid in?
13  A  It's been in portions, you know, little by
14  little. You can see on the general ledger.
15  Q  The draw -- where it shows deposits?
16  A  Correct.
17  Q  And have you done -- okay. Like here you have
18  a deposit, and it's construction. Do you know what
19  that's to?
20  A. Yes, I do. It's not reflected on this
21  particular report, but I have reports that reflect what
22  his jobs are.
23  Q. Do you have any document that shows how ma
24  jobs and how much each project has earned this year?
25  A. Currently he has Las Arenas, Quality Inn, and

Case 1:00-cv-00193  Document 24  Filed in TXSD on 10/19/2001  Page 320 of 328

Page 50

1 he's beginning -- he's got Days Inn   He's beginning
2 another one.
3    Q.  Do you know -- which is the $1 6 million
4 project?
5    A.  The Quality Inn
6    Q  Do you know what the Days Inn project is worth?
7    A  No, I don't
8    Q  And Las Arenas, do you know how much he's going
9 to realize this year, or approximately how much he'll
10 realize from the completion of that project this year?
11    A  He's hoping to collect the remaining that's due
12 to him, which is --
13    Q  About 300?
14    A.  -- 250 to 300,000
15    Q  Is the Quality Inn project slated to be
16 completed this year?
17    A.  Yes.
18    Q.  What about the Days Inn?
19    A.  I don't know
20    Q  If he completes -- these are the only three
21 projects you're aware of?
22    A  Yes
23    Q  Is it possible that he's done some other small
24 projects that you're not aware of?
25    A.  I don't think so.  Otherwise, it would be -- it

Page 5

1    A.  32,400.  It's on the tax return.
2    Q  Did we pull that one out?  I don't think we
3 have the 2000 return, do we?
4    A  I think you have a copy of that somewhere.
5    Q  So he drew 32,400 in 2000?
6    A  Correct.
7    Q  Okay.  We're going to mark that tax return
8 as --
9    A  I did send this.
10    Q  It's probably in there.  That's going to be
11 No. 6.
12       MR. BENTON:  What's that check attached,
13 IRS?
14       THE WITNESS:  That's a copy of a payment.
15       MR. BENTON:  That's a copy?
16       THE WITNESS:  Yeah.  Looks real, doesn't
17 it?
18    Q.  Okay.  So in 2001 you anticipate him to draw
19 approximately 36,000 --
20    A.  Yes.
21    Q.  -- as a draw.  In 2000 he drew 32,400.  Do you
22 know what he drew in 1999, or is there any way we ca
23 determine what he drew in 1999?
24    A.  I don't know.  His return shows he lost money,
25 but I don't know --

Page 51

1 would be showing up in the books.
2    Q  This Quality Inn project for 1.6 million,
3 Quality Inn is a hotel?
4    A.  Yes.
5    Q  And he's building a hotel?
6    A.  Uh-huh.
7    Q  Is he one of the many contractors, or is he the
8 single contractor?
9    A  I believe he's the general contractor for that
10 job.
11    Q  Do you know what his expected salary is going
12 to be this year from -- or, I guess, draw for himself
13 will be based on the Quality Inn project?
14    A.  He takes a draw monthly no matter what job
15 they're doing, but generally it's about 3 to 4,000.
16 36,000 usually a year.
17    Q  36 a year?
18    A.  Correct.
19    Q.  Generally speaking, and then he bonuses out any
20 money that's left year end?
21    A  He may.  I don't know if he will or not.
22    Q  Based on -- this is for 2001 that we're talking
23 about.  In 2000 do you know what his draw was?
24    A.  In 2000?
25    Q  Uh-huh.

Page 5

1    Q  What he drew as a salary?
2    A  Yeah.
3    Q  Because even though you've lost money as a
4 corporation, you can still draw money, needless to say?
5    A  Yes.
6    Q  Do you know what he drew in 1998?
7    A.  No.
8    Q  So the draw from 2000 to what's anticipated in
9 2001 would actually be an increase of about 3,600?
10    A.  (Moving head up and down)
11       MR. BENTON:  Is that a "yes"?
12    A  Yes.
13       MR. BENTON:  Thank you.  Sorry.  It's for
14 the record.
15    Q.  So his income is increased, his personal income
16 is increased or is anticipated to increase from last
17 year to this year, 2001?
18    A  Correct.
19    Q  Which, of course, won't be reflected until the
20 tax returns are filed next year?
21    A  Correct
22    Q  Is there anything that we have in front of us
23 that shows that Mr. Escudero's business has decreased
24 or lost money from 1998, based on what's in front of
25 us?

Case 1:00-cv-00193   Document 24   Filed in TXSD on 10/19/2001   Page 321 of 328

Page 54

1   A. To present?
2   Q At the present.
3   A I think 2001 is going to be significantly lower
4 than last year.
5   Q But we don't have anything as far as 2001; is
6 that correct?
7   A. Once we put Las Arenas in there, that -- the
8 total when it's completed, by year end it's anticipated
9 this year will be worse than last year.
10   Q. But last year actually, valuewise, the
11 buildings and the types of projects he was doing, was a
12 substantial increase from 1999; is that correct?
13   A Yes, but it was in its early stages to just
14 beginning.
15   Q Now, is the fact that a project causes a
16 loss --
17   A Let me back up, though. I might add that the
18 Las Arenas job did begin in '99, which was a large
19 project.
20   Q It was a large project, and in 1999 he had 1.1
21 million of gross receipts or sales. We're just talking
22 about gross. We're not talking about taking all the
23 deductions out. And in 2000 we were looking at 2 point
24 something million.
25   A. Which may come down significantly. I don't

Page 54

1 reasons. It could be if you project to build a
2 building, let's just say, for example, will you agree
3 that if maybe the soil or something is not 100 percent
4 right and you have to go back and do certain things to
5 reinforce the structure, that could also increase the
6 cost that you're going to end up having to expend?
7   A. Unforeseen things, sure.
8   Q. Exactly. That doesn't necessarily -- I guess
9 what I'm trying to say is there is various factors that
10 can go into a project either making money or losing
11 money.
12   A. Sure.
13   Q. You can't control all of them all the time; is
14 that correct?
15   A That's correct.
16   Q And you basically, in a certain, way have to
17 hope for the best?
18   A You're asking an accountant's point of view of
19 contracting. So I'm answering the best way I can.
20   Q Yeah, exactly. But you'll agree with me that
21 when you're looking at somebody's tax return or you'r
22 preparing somebody's tax return and you've got the
23 profit and loss statement, you're having to look at
24 significant figures or single figures for every single
25 thing?

Page 55

1 know.
2   Q Does the fact that a particular project ends up
3 being a lost -- or a loss -- there are significant
4 factors that can go into that happening; is that
5 correct?
6   A. Sure.
7   Q. It doesn't necessarily have to be just one sole
8 cause the fact that maybe Mr. Escudero wasn't present
9 for, say, three months or something, that doesn't
10 necessarily become the sole and significant cause of
11 that loss. I mean, you can take other factors into
12 consideration; is that not true?
13   A I'm sure.
14   Q You could take, say, cost of labor. If cost of
15 labor increases, your profitability is going to drop.
16 Is that true?
17   A Yes.
18   Q So the amount that's being paid to a particular
19 laborer or a particular company, that can cause a loss
20 in your business if it's not projected correctly, or if
21 it's not calculated into a bid; is that true?
22   A. That's true. But there could also be other
23 reasons why that cost may have gone up during the
24 project that were anticipating prior.
25   Q. Okay. And that could also be for various

Page 5

1   A. Correct. But I don't ever have to ask why.
2   Q But if all of a sudden you see in this
3 electrical -- let's just say start-up costs 1,700, and
4 another year you have start-up costs of 500, do you
5 know what the sole cause of that would be, or can you
6 sit here and tell me, "Oh, that's" --
7   A Sometimes I can.
8   Q -- "because so-and-so wasn't here"?
9   A Yes.
10   Q So if we have an increase in the electrical
11 cost from 2000 to 2001, can you tell me why?
12   A Sometimes. And the reason I say sometimes is
13 because sometimes I will know what the original bid
14 was. I'll even have copies of what the specs were.
15 And if I see a significant overrun, sometimes in
16 communication with the contractor I'll know why.
17   Q. But you have to look at the project that's
18 being built?
19   A Well, I don't have to physically look at it.
20   Q Right. But if you know that one project is
21 only worth, say, $200,000, and you're building
22 something worth $1.6 million, you're going to have
23 distinctions in the costs that are associated with each
24 one.
25   A Right.

Page 58

1  Q  And that's not necessarily going to cause you
2  to go, "Oh, my God, there is a huge loss" or "There is
3  a huge gain in these figures"; is that correct?
4  A  That's right.
5  Q  It's based on project?
6  A  (Moving head up and down)
7  Q  Is that right?
8  A  That's right.
9  Q  It's all right.  Now, Mr. Escudero was, I
10  guess -- as a general contractor he would go out and
11  supervise these projects.  Is that what your
12  understanding is?
13  A  Yes.
14  Q  And do you have any documentation that you can
15  show me that as a result of his inability to do that,
16  that the costs have gone up or that his losses?
17  A  Not with me today.
18  Q  Do you anticipate having anything?
19  A  I'm going to review that particular point and
20  see if there is anything to substantiate that.
21  Q  What would you be reviewing in trying to
22  substantiate that?
23  A  Well, No. 1 would be overruns due to delays.
24  And if those overruns were because of delays because of
25  mistakes by a supervisor or some other mishandling of

Page 59

1  the project.
2       Secondly, I'll look at other costs
3  compared to the projects that he supervised and try to
4  document what costs might have gone up as a direct
5  result of his either supervising it or not supervising
6  it.  That's going to require me having to dig into
7  whatever we can get from '98, '99, 2000.
8  Q  When you say "overruns due to delay," "mistakes
9  by supervisors," are you saying that there is some sort
10  of document that you can look at where it would show
11  that there was a mistake made by either a supervisor --
12  A  For example, if an electrician did something
13  incorrectly and he has to go back and he has to redo
14  it, and that profession argued, "Well, that's the way
15  the supervisor told me to do it.  That's the way I
16  understood to do it," and he comes back and says, "No,
17  it's wrong.  It's not meeting code," he has to go back
18  and redo it, then it's an extra cost that may or may
19  not have been on the error of the supervisor.
20  Q  Would you have a document that says that,
21  though, or would that be just based on what
22  Mr. Escudero tells you?
23  A  Well, the document -- it depends on the error.
24  It could be the word of the electrician.  It could be
25  an invoice that explains it.  It could be anything.  I

Page 6

1  don't know.
2  Q  But you don't have any of that today?
3  A  No, I don't.
4  Q  When you also -- when we talk about overruns
5  due to delays, again, the delays could be because of
6  inclement weather?
7  A  Could be.  It could be because of, again,
8  supervisor not calling subcontractors to be here, be
9  there, do this.
10  Q  Could it also be because materials aren't
11  delivered in a timely fashion or the unavailability of
12  certain materials?
13  A  Sure.  There is probably 101 reasons.
14  Q  So when you go back in and you look at these
15  overruns that are due to delays, are you going to look
16  solely for mistakes made because of the fact that
17  Mr. Escudero was not present at the scene?
18  A  No, I don't try to be biased.
19  Q  Is Mr. Escudero present at all the projects 100
20  percent of the time?
21  A  No.
22  Q  He goes from -- whatever jobs he's having to
23  do, he goes and looks at them?
24  A  Correct.
25  Q  Do you know, to your knowledge, has he always

Page 6

1  done that?  Or would you assume that he does that?
2       MR. BENTON:  If you know.
3  Q  Yeah.
4  A  I don't know.
5  Q  Okay.  If Mr. Escudero has four projects going
6  on in one given year at the same time, physically it's
7  impossible for him to be at every single one all the
8  time; is that correct?
9  A  That's correct.
10  Q  Do you know if he's ever had to hire
11  supervisors in the past to assist him in supervising
12  some of the projects that he's done?
13  A  In prior years, no, I don't know that.
14  Q  Do you know what year Mr. Hector Trevino was
15  hired?
16  A  No, I don't know.
17  Q  Do you know what year Mr. Gutierrez, Eric
18  Gutierrez, was hired?
19  A  No, I don't.
20  Q  We don't have anything from 1999 or 1998,
21  right?
22  A  Correct.
23  Q  What else have you been asked to look at in
24  preparation for this trial or prepare?
25  A  Primarily, 1998, 1999, try to do a comparison

Page 62

1 of the cost to the cost of 2000.
2    Q How do you do that? How do you go back in and
3 do a comparison?
4    A I usually use spreadsheets and use percentages
5 and try to compare this project to 15 percent cost,
6 electrical, this project 20 percent. There is a 5
7 percent difference or variance and try to decide why.
8 And sometimes you don't always know why.
9    Q. Does the cost of a project or maybe the cost of
10 subcontractors also depend on the location of a
11 building that's going up?
12    A Yes.
13    Q Would you expect that -- and you may not know
14 this. If you're building out on South Padre Island, do
15 you know if there are certain requirements for the
16 structures that may be in addition to something that
17 you have generally here in Brownsville because of the
18 location?
19    A. (Moving head up and down)
20    Q Is that "yes"?
21    A Yes.
22    Q. So you could expect maybe some additional costs
23 on a project on South Padre Island that you would not
24 have somewhere else?
25    A. That's possible, yes.

Page 63

1    Q. Where is Las Arenas located? Do you know?
2    A. At South Padre Island.
3    Q Also?
4    A. Uh-huh.
5    Q So would South Padre Island, the Las Arenas
6 project, be a good comparison for the Quality Inn?
7    A It might be, yes.
8    Q What else will you look at as far as comparing
9 1998, '99, and 2000?
10    A Specifically, it depends on what I find. I
11 can't say specifically what yet, but I'm going to look
12 at supervision. I'll look at cost in the
13 subcontractors. I'm primarily looking at the cost of
14 goods sold.
15    Q On the profit and loss statement that you
16 prepared for January through June of 2001, I notice
17 that you have partner 1 equity and partner 2 equity
18 Can you explain what that means to the jury?
19    A He is the only owner, sole owner. That's just
20 the way it was set up originally was in the case that
21 there would be a partnership. There is no other
22 partner.
23    Q Mr. Escudero's father is no longer part --
24 physically, I guess, part of the company?
25    A Correct.

Page 6

1    Q What is A-D-R-F-T stand for?
2    A. Auto draft.
3    Q Is it typical in the business of, say,
4 construction, like E&E and Paisano, to have significan
5 overdrafts and then when the money comes in from a
6 project or a draw comes in from a project, it gets
7 covered? Is that generally the way they operate?
8        Because I was noticing in going through
9 the 2000 and 2001 that at some points in times it seem:
10 like -- and maybe I'm wrong. And I don't know if this
11 is the way it reads, but here if you look on 4/10/2001,
12 if you look at the balance, we're at negative 121,167.
13    A. It depends on what account you're looking at.
14    Q Okay. Is this a combination of accounts?
15    A For example, if -- yeah, a general ledger
16 includes all accounts. So if it's a negative balance,
17 it may be a liability, which is really a positive
18 number.
19    Q Okay. And do you have this -- do you have 2001
20 broken down by account right now?
21    A. Correct.
22    Q. What is Mercedes Builders? Is that a
23 subcontractor?
24    A. A supplier, I believe.
25    Q. Okay. You talked a little bit about a loan

Page 6

1 that Mr. Escudero had gotten. Was that in the year
2 2000 or 2001?
3    A. 2000. It wasn't 2001. Sometime in 2000.
4    Q Do you know the amount of that loan that he
5 obtained?
6    A. He told me it was roughly 100,000, and it was a
7 personal loan.
8    Q A loan personally to him, not to the company?
9    A It was used in the company. It was for use in
10 the company.
11    Q. Okay. Do you know if the loan was taken out in
12 the name of E&E or under Jose Escudero?
13    A It was a relative that gave him the money.
14    Q It was not done through the bank?
15    A No.
16    Q Do you know if that money is being paid back,
17 or is that being reflected in this document?
18    A. No.
19    Q Do you know if the person that gave him the
20 100,000 is participating in the corporation in any way
21 or receiving any types of money?
22    A. I have no knowledge that he is, no.
23    Q Do you know if that money is going to be
24 required to be paid back?
25    A I don't know.

**Page 66**

1  Q  Do you have any documents that show that loan?

2  A  No.

3  Q.  Do you know if Mr. Escudero took out any other

4  type of loans in either '99, 2000, or 2001?

5  A  No, I don't know.

6  Q  And I know I've asked you this.  What do you

7  anticipate 2001 being, a break even?

8  A  Yes.

9  Q  Because of Las Arenas?

10  A  Correct.

11  Q  Which began in 1999?

12  A.  Correct.

13  Q  And you said that one began in April of 1999?

14  A  Correct.

15  Q  Prior to Mr. Escudero being injured?

16  A.  Yes.

17  Q.  And that was a major project?

18  A  Correct.

19  Q  On the Quality Inn, do you know what the time

20  line is for completion on that project?

21  A  He told me the end of this year.

22  Q  So roughly about how long does it take to

23  complete that project?

24  A.  10 or 11 months.

25       MR. BENTON:  If you know.

**Page 67**

1  A.  That's just --

2  Q.  If you want to correct that, that's all right.

3       MR. BENTON:  Just be careful.

4  A  I'm just going by what he told me.

5       MR. BENTON:  Okay.  If you remember well.

6  You might want to say, "He told me."

7  Q  And that's fine if you want to say --

8  A.  Well, I think I did earlier when you asked me

9  that question.

10       MR. BENTON:  You're doing fine.  I'm not

11  trying to pick at you.

12  Q  What else have you been asked to do in regards

13  to Mr. Escudero?

14  A  His tax returns, which it's going to take me a

15  long time to go through 2000.

16  Q  Did they --

17  A  Primarily the reason we haven't done much on it

18  yet is because he's asked me to put together the Las

19  Arenas job.  And I've had to literally go through every

20  single invoice and bills still due, and that's taken me

21  the last four or five months to do.

22  Q  Now, you have to have the 2000 return by

23  October, though; is that correct?

24  A  October 15th, correct.

25  Q  I mean, no ifs, ands, or buts.  There is no

**Page 6**

1  more extensions after that, or is there?

2  A  Well, it can be late.

3  Q  Yeah.

4  A  And if there is a loss, there is no penalty.

5  But, yes, our deadline is October.

6  Q  For determining, I guess, whether there is a

7  payment so you don't incur a penalty or anything; is

8  that correct?

9  A  Correct.

10  Q  Do you anticipate having it done by October

11  15th?

12  A.  Yes, knock on wood.

13  Q  But the 2000 personal return has been done?

14  A  Correct.

15  Q  How --

16  A.  Now, the reason I say the 2000 can be done by

17  October 15th is because my purpose is not to audit.

18  You know, I can do what I can do.  But I'm certainly

19  not going to go through every single transaction and

20  try to correct every transaction and pull every

21  transaction.  That's why with the year 2001 we're

22  trying to do everything correct.

23  Q  So you can start --

24  A  So I can support what the numbers are.

25  Q  Okay.  Are you going to be issuing -- you are

**Page 6**

1  going to be issuing 1099s this year?

2  A  Yes, we're right now attempting to get the

3  information.

4  Q  So you can do so?

5  A  Correct.

6  Q  And based on Mr. Escudero's salary, you just

7  did that by going through the checks that were paid out

8  to him?

9  A.  Yes.

10  Q  Just looking through the year 2000?

11  A  Actually, this year we've got him and Eric on

12  payroll.  So we're actually doing deductions and

13  doing --

14  Q  Is Eric --

15  A.  That's payroll -- I'm sorry, not Eric.

16  Q  Hector Trevino, because Eric was a previous --

17       MR. BENTON:  Reymundo.

18  A  Reymundo, I'm sorry.

19       MS. GALO:  And I don't mind you all doing

20  that.

21       MR. BENTON:  Obviously, it's not critical.

22  You need to know the names.  We're just trying to

23  supply it.  By the way, Las Arenas started in 2000.

24       THE WITNESS:  2000?

25       MR. BENTON:  February of 2000.  You might

**Page 70**

1 want to know that.

2     MS. GALO: Yeah, it makes a difference.

3   Q He probably got everything -- he started

4 working on it, I'm assuming, in 1999 to get the project

5 rolling for 2000. If you're going to start a project,

6 I guess it takes some prep work and bidding.

7   A It was 2000, yes.

8   Q. Okay. So Reymundo Medina, is that his name,

9 that's currently on the payroll?

10   A. Yes, we just started that a month ago.

11   Q Okay. And Jose Escudero, they're the only two

12 people on the payroll?

13   A That's correct.

14   Q Everybody else is an independent contractor.

15   A Yes And that's probably because I'm

16 encouraging them to set themselves up as employees.

17   Q How much is Reymundo earning?

18   A I'm going by memory. I don't remember.

19   Q Is it more or less what Eric was earning or

20 less?

21   A More or less.

22   Q What is Reymundo's position there, do you know?

23 Is it a management position, or more of a --

24   A. I'm not sure.

25   Q. And what do you have Jose Escudero receiving,

**Page 71**

1 about? What we talked about where it breaks down to

2 about 36 a year?

3   A. Yes

4   Q And it's just once a month a draw?

5   A No, it's every other week

6   Q Every other week How did you all choose the

7 figure 36,000?

8   A That was his choice

9   Q And, of course, since he's the owner of the

10 company, he can choose what he want to choose?

11   A Correct

12   Q Let's go off the record real quick Let me

13 look at some stuff

14     (Brief recess)

15   Q If you had to right now, based on what you have

16 in front of you, state what year was the best one

17 either for Paisano and/or E&E, just because it became a

18 corporation? What year would you say, based on what we

19 have in front of us, was the most profitable at this

20 point? And if you need to look at something, please

21 feel free to.

22   A. Looked like 1999 was

23   Q And what do you base that on?

24   A That the tax return shows there was a profit

25   Q Of 595?

**Page 72**

1   A Correct.

2   Q And 2000 we don't have the benefit of really

3 looking at right now because we don't have it in front

4 of us. But it could also show a $500 profit or a zero

5 profit?

6   A. Correct.

7   Q. You can't tell me that 2000 was worse at this

8 point?

9   A. No.

10   Q We can only -- really, I guess, in all

11 fairness, you can only compare 1998 to 1999?

12   A Right.

13   Q Other than what you produced in -- to Esquire

14 Court Reporting Service, do you have any other

15 documents that were requested in this notice with you?

16   A. No.

17   Q Do you have any other type of --

18   A I produced only what I could.

19   Q Okay. Have you created any other type of

20 financial statements or anything for Mr. Escudero for

21 presentation to the bank for loans or for --

22   A No.

23   Q -- business purposes? Have you ever been asked

24 to?

25   A. No.

**Page 73**

1   Q Do you anticipate preparing any type of

2 financial statements?

3   A. If asked.

4   Q Have you seen -- when Mr. Escudero hires a

5 subcontractor, do they just bill him, do you know, on a

6 regular monthly, weekly -- or how do they do that?

7   A With most contractors it's usually they want a

8 draw by the end of the week. Usually weekly.

9   Q Like every Friday or something?

10   A Correct.

11   Q. And does he have set up a line of credit or

12 something to be able to use that, as far as you know?

13   A Not to my knowledge.

14   Q Just bases it on his bank account, just draws

15 it out?

16   A Correct.

17   Q The only current employees are himself and

18 Reymundo; is that correct?

19   A Correct.

20   Q How many subcontractors is he currently using

21 at this point in time? Do you have any idea?

22   A. No. You want me to guess?

23   Q. No, I don't want you to guess. If you can

24 estimate, that's fine. If you can say, more than ten,

25 less than 20, that's okay, but I'm not going to hold

**Page 74**

1  you to an exact figure because you probably have to
2  look at some documents to do that; is that correct?
3    A  Yes
4    Q  Do you have any sort of document that shows how
5  many subcontractors are used on a particular project at
6  any given time?
7    A  No.
8    Q  Do you have any type of document that shows how
9  many subcontractors were used in any given year and how
10  they were divided between the projects?
11    A  No  Something like that could be produced.
12    Q.  Okay
13    A.  But I don't --
14    Q.  Have you been asked to do anything like that?
15    A.  No.
16    Q  Does part of a company's profitability -- is it
17  also based on the management of the actual company
18  itself and how it's set up and how it's run?
19    A.  Sure.
20    Q  Is Mr Escudero an S corporation or is he just
21  a plain --
22    A  He's a C corporation
23    Q  C corporation  Which he should be, I guess
24  Did you assist in preparation of the documents for the
25  corporation?

**Page 75**

1    A.  No
2    Q  Do you know who did?
3    A  No
4    Q  Do you know at whose suggestion he became a
5  corporation?
6    A  No.
7    Q.  That was done through -- I guess during the
8  time that Mr. Cabrera was with him?
9    A.  According to this document here, the date
10  incorporated was January 1st of '99
11    Q  And you were not with him at that time?
12    A  No
13    Q  Do you know how Mr Escudero came to retain you
14  as his accountant?
15    A  Yes, I do some work for a truss plant in Los
16  Fresnos, and an individual there knew Jose, and that's
17  how we met
18    Q  Do you know who the officers of the corporation
19  are?
20    A  Just himself, as far as I know.  He's the sole
21  shareholder
22    Q  Is the field supervisor, would that be -- on
23  this Vendor QuickReport you have listed as a memo field
24  supervisor, would that be a superintend -- that would
25  be Eric Gutierrez?  That's what he was called

**Page 76**

1  sometimes?
2    A  Yes
3    Q  Do you know when Eric left employment with E&E?
4    A  No
5    Q  You did a profit and loss by job for Las
6  Arenas  Have you done that for any other job that he's
7  working on?
8    A.  I'm beginning to complete one for Quality Inn
9    Q  But you don't have any others?
10    A.  No
11    Q  When do you expect the one to Quality Inn to be
12  done?
13    A  It's up to date.  So it will be done when the
14  project is done
15    Q.  When the project is completed?  And I think I
16  may have asked you this before  Do you anticipate
17  Mr Escudero making a profit on that particular
18  project?
19    A.  I believe so
20    Q  Do you know -- can you estimate -- and we're
21  not going to hold you to anything -- what that profit
22  would be?  Because it can change
23    A  No, I can't
24    Q  Do you have any other documents or information
25  that Mr Escudero has provided you with regards to the

**Page 77**

1  corporation or any of its losses?  Have you seen any of
2  the contracts where -- that he's entered into recently?
3    A.  Just the one at Quality Inn.
4    Q.  That's the only one that you've reviewed?
5    A  Correct.
6    Q  You haven't seen any of the ones from the
7  Bahnman Realty or the Vargas Clinic?
8    A  No, I haven't.
9    Q  Other than the items that we've talked about
10  that they've asked you to prepare, have you been asked
11  to do any other types of financial documents, records,
12  or any other type of comparison other than what you and
13  I have discussed?
14    A.  The only thing I'm doing is collecting his
15  invoices each week, and we're trying to create a
16  payables list and what's due and when, age it.
17    Q  So it's an accounts payable.  Are you also
18  doing accounts receivables for him, maintain a list for
19  his accounts receivables?
20    A.  No.
21    Q  Just accounts payable?
22    A.  Correct.
23    Q.  Do you know what those are as of this date?
24    A.  Yeah, I have a list here.
25    Q  What did you use to create that, just invoices

Page 78

1 that he presented to you?

2     A. Yes.

3     Q And is that for the year 2000 or 2001?

4     A. 2001. Some of them are old.

5     Q Items that maybe he hasn't paid that have been

6 due on various projects?

7     A. Correct.

8     Q. When did you prepare that?

9     A. We began this a couple of months ago, and I've

10 been doing them on a weekly basis.

11     Q How much are the unpaid bills as of today?

12     A Approximately 250,000.

13     Q And those are divided amongst what types of

14 projects? Are they broken down by projects or just by

15 vendor?

16     A They are. They're broken by vendor and by

17 project.

18     Q Okay. How much of that is attributable to Las

19 Arenas?

20     A If you asked my opinion, I'd almost say all of

21 it because of not being able to collect on that job

22 which has caused him to get behind on his bills.

23     Q. So the fact that he hasn't been able to collect

24 on a job that he's owed money on, he's had to, in turn,

25 be late on other projects?

Page 79

1     A Correct

2     Q Has that hurt him in any way? Not being able

3 to pay some of these people, has it prevented these

4 people from working for him as subcontractors? Do you

5 know?

6     A I don't know if it's prevented them from

7 working for him I don't know that

8     Q Is it common in the construction industry, if

9 you've done work for them in the past -- I don't know

10 if you have or not -- for unpaid bills -- or people not

11 to pay right on time that they're supposed to, like,

12 say, Las Arenas not give him the money that he's

13 rightfully owed?

14     A You're talking about a general contractor

15 paying another contractor?

16     Q. No, I'm talking about like the project owner of

17 Las Arenas not paying their general contractor, which

18 would be Mr Escudero. I mean, does that happen?

19        MR. BENTON: He wasn't the general

20 Peacock Construction was the general

21     Q So do you know who would be responsible for

22 paying Mr Escudero's remaining portion of that Las

23 Arenas?

24     A Mr Peacock

25     Q Do you know why he has not paid?

Page 80

1     A Because there are disputes over various things

2 on the project

3     Q. Are those disputes being -- trying to be worked

4 out at this time?

5     A Yes

6     Q. Do you know what those disputes center around,

7 or what types of disputes they are?

8     A I don't know the details. I know that there is

9 a lot of retainage that's due from that was held back.

10 But why it's not being paid, I don't know

11     Q You don't know You're not involved in that

12 aspect of it?

13     A No

14     Q And you would say that the majority of this --

15 what is that entitled?

16     A. This is actually an unpaid bills list by

17 vendor

18     Q By vendor?

19     A Yes, I don't have the one with me by project.

20     Q Okay How would you know -- like, say,

21 Peacock, who is a general contractor, how would you

22 know how much money is owed to Mr Escudero by Peacock?

23     A. More or less based on the detail to this --

24     Q. On the profit and loss by job?

25     A. Correct. By everything that was paid on that

Page 81

1 job.

2     Q So, basically, would it be around the range

3 that's owed to him, approximately about 288, really

4 what's --

5     A Yes. By his -- by his books.

6     Q Right. Okay. But you don't know the reason

7 for the withholding?

8     A No.

9     Q On that job, Las Arenas, which you're

10 anticipating it being a loss -- am I right or wrong?

11     A I'm making that assumption based on the dispute

12 going on, things I've heard that --

13     Q It's going to go on for a little while?

14     A. Yeah, and there is going to be some

15 negotiation.

16     Q. Okay. Can you say that that's directly -- as

17 we sit here today, based on what you've seen, can you

18 say that's directly related to the fact that

19 Mr. Escudero was not present at that particular

20 project?

21     A I can't say one way or the other.

22        MS. GALO: Okay. I think until we get

23 more information that he has an opportunity to review

24 or we talk to Mr. Cabrera, because I feel it's unfair

25 for me to be asking this witness about things that he

## Page 82

1 really --

2     MR. BENTON: He just shouldn't answer.

3     MS. GALO: Yeah, because he doesn't have

4 knowledge, and I don't think it's fair, and I don't

5 want to try to mislead anybody, that I think maybe we

6 need to discuss the fact that --

7     MR. BENTON: Just have Tom call me. We

8 know what the issues are.

9     MS. GALO: Okay. I'm going to just --

10 we'll just go ahead and let you go today just because

11 it's not fair to you and I feel bad.

12     MR. BENTON: Okay. I'll reserve any

13 questions I have until trial.

14     (Deposition concluded)

15

16

17

18

19

20

21

22

23

24

25

## Page 83

1     ERRATA SHEET/SIGNATURE PAGE

2 PAGE LINE CHANGE       REASON

3 _____

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

   I, BOB PEASTER, have read the foregoing transcript

14 and hereby affix my signature that same is true and

15 correct, except as noted above

16     BOB PEASTER

17

18 THE STATE OF TEXAS

19 COUNTY OF _____

20     SUBSCRIBED AND SWORN TO BEFORE ME, the

21 undersigned authority on this the _____ day of

22 _____. 2001

23

24     Notary Public in and for

25     The State of Texas

## Page 84

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE SOUTHERN DISTRICT OF TEXAS
    BROWNSVILLE DIVISION

3 JOSE ESCUDERO, JR ,    )(
    Plaintiff    )(

4     )(

    VS    )( CIVIL ACTION NO B-00-193

5     )(

    BAUER CORPORATION D/B/A  )(

6 BAUER LADDER CORPORATION, )(
    Defendant    )(

7

    REPORTER'S CERTIFICATE

8

9     I, CORINNA N GARCIA, Certified Court

10 Reporter, certify that the witness, BOB PEASTER, was

11 duly sworn by me, and that the deposition is a true and

12 correct record of the testimony given by the witness on

13 AUGUST 30, 2001, that the deposition was reported by me

14 in stenograph and was subsequently transcribed under my

15 supervision.

16     I FURTHER CERTIFY that I am not a

17 relative, employee, attorney or counsel of any of the

18 parties, nor a relative or employee of such attorney or

19 counsel, nor am I financially interested in the action.

20     WITNESS MY HAND on this the _____ day of

21 _____. 2001

22

23     CORINNA N GARCIA, CSR NO 5210
    Expiration Date 12/31/01

24     Bryant & Stingley, Inc
    2010 East Harrison

25     Harlingen, Texas 78550